IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNA K. NUPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| SCHNADER HARRISON SEGAL | ) | |
| & LEWIS, LLP, and BRUCE A. | ) | |
| ROSENFIELD, ESQ., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR INTENTIONAL LEGAL MALPRACTICE AND EXEMPLARY DAMAGES

COMES NOW the Plaintiff Anna K. Nupson, through her counsel, Joel Young Attorney at Law, LLC, and states the following in support of an *in personam* judgment against the Defendants for compensatory and exemplary damages:

## NATURE OF THE CASE

1.      Plaintiff Anna K. Nupson was a longtime client of Defendants Bruce A. Rosenfield and his law firm, Schnader Harrison Segal & Lewis, LLP.  This civil action seeks compensatory and exemplary damages for harm that sophisticated Philadelphia attorneys inflicted on one client whom they found less useful to advancing their interests than another.

2.      This is not the typical case involving a single act of incompetence or oversight, and for that reason may present a matter of first impression in Pennsylvania.  The Defendants violated numerous United States and Pennsylvania statutes including 42 Pa. C.S.A. § 2522 (an attorney's Oath of Office), standards for ethical practice imposed by the Pennsylvania Rules of Professional Conduct and the common law, and their own procedures for addressing conflicts of interest so consistently and for so long as to describe serial and intentional misconduct.

3.      For a period of several years, the Defendants were secretly paid by a wealthy corporate client to represent Ms. Nupson in various capacities.  The Defendants failed to disclose that and other serious conflicts of interest, lied in response to Ms. Nupson's inquiries about such conflicts, exploited their understanding of her vulnerabilities, and applied their sophistication with trust and estate law, corporate mergers and acquisitions, and related tax shelters in order to bait, pressure, and mislead her into making decisions that irreparably harmed her while benefitting their corporate patron, its chief executive, and his children.

4.      As detailed later on, Defendants' deliberate acts and omissions included:

(i) drafting documents that progressively undermined a 1994 trust they had drafted for her benefit and funneled additional real and personal property into that trust, and failing to alert her that the trust's portfolio was increasingly slanted toward long-term principal growth and away from income-earning vehicles.  Defendants thus helped to increase her dependence on their corporate patron—also her co-trustee—while creating a vast remainder for his children;

(ii) advising Ms. Nupson in 2003 to let their corporate patron, also her co-trustee, redeem her stock from the 1994 trust established for her benefit, and another trust they had also drafted for her benefit, for what they knew to be woefully inadequate consideration, while withholding and then lying about numerous facts that they knew were vital to her interests in that transaction—such as the fact that their fees for purporting to represent her were paid by that same corporate patron.  These acts and omissions not only benefitted Defendants' corporate patron to Ms. Nupson's detriment; they helped to conceal Defendants' role in harming a vulnerable and disfavored client, violating 42 Pa.C.S.A. § 2522 and several Rules of Professional Conduct enumerated later on;

(iii) failing to counsel Ms. Nupson about the significance for her interests that Rosenfield had in 2003 back-dated and fraudulently witnessed the execution of a grantor-retained annuity trust in order to both enable the above redemption and to enhance and unlawfully preserve a tax shelter to benefit their corporate patron, contrary to 18 U.S.C. § 371 and 26 U.S.C. §§ 2308(a)(1), 7606(1)-(2) (false reporting, tax evasion felonies with enhanced penalties for corporations), 42 Pa.C.S.A. § 2522, and the Rules of Professional Conduct;

(iv) advising Ms. Nupson to enter a related tax indemnification agreement to benefit the chief executive of the corporation secretly paying their fees, and which they did not counsel her was contrary to Pennsylvania public policy and could expose her to civil and potential criminal liability, thus violating 42 Pa.C.S.A. § 2522, and several Rules of Professional Conduct;

(v) withholding or lying to Ms. Nupson via U.S. Mail, email, and telephone about serious conflicts of interest preventing them from simultaneously representing her and their corporate patron in connection with proposed adjudications of her 1994 trust, and lying in response to her direct question about who had paid their fees when they advised her to permit the 2003 redemption encompassed in those adjudications, contrary to 18 U.S.C. §§ 371, 1341, 1343, 42 Pa.C.S.A. § 2522, and the Rules of Professional Conduct;

(vi)     during a protracted effort to induce her to sign-off on the above adjudications, referring her to lawyers whom they knew had serious conflicts of interest or whose analysis they influenced by omission or misinformation, via email, text messages, mail, or telephone contrary to 18 U.S.C. §§ 371, 1341, 1343, 42 Pa.C.S.A. § 2522, and the Rules of Professional Conduct;

(vii) concealing the above facts and their unwaived conflicts from the Orphan's Court while electronically filing an entry of appearance and other documents, exchanging emails, and mailing notices of the proceedings in order to obtain adjudications that they knew would

3

irreparably harm Ms. Nupson *inter alia* by triggering 20 Pa.C.S.A. § 7798(b), thus barring any challenges she might wish to bring against the redemption they had advised her to permit while secretly being paid by the redeeming corporation, contrary to 18 U.S.C. §§ 371, 1341, 1343, 42 Pa.C.S.A. § 2522, and the Rules of Professional Conduct; and

(viii) acting via email and telephone between May and December of 2010 to use Ms. Nupson's trust accounts to fraudulently conceal who had paid Defendants to purport to represent her in connection with the 2003 redemption, by laundering and returning to that corporate patron approximately $154,000 (one-hundred-fifty-four thousand dollars) in legal fees, contrary to 18 U.S.C. §§ 371, 1343, 1956, and 42 Pa.C.S.A. § 2522, and the Rules of Professional Conduct.

5.      In light of these and other facts pled herein, this case is about more than just the cause and extent of Ms. Nupson's injuries.  The Defendants prostituted the trust reposed in them by Ms. Nupson and by the court in order to relax their vigilance, thereby concealing and enabling their nefarious actions. The Defendants did those things skillfully, stealthily, and deliberately over many years and for the basest of motives: to curry favor with and benefit a wealthy corporate client, secure millions of dollars in fees and commissions, and increase the goodwill value of the Schnader Firm.

6.      Notwithstanding the requirements of Rule 8.3(a) (lawyers shall report misconduct involving honesty and trustworthiness), Rosenfield's partners and ex-colleagues did nothing to inhibit his misconduct. Accordingly, this case has large consequences for the public's confidence in a self-policing profession whose members are supposed to be "guided by personal conscience and the approbation of professional peers." *Preamble: A Lawyer's Responsibilities*, ¶ 7, Pa. R. Prof. Conduct.  Ms. Nupson therefore seeks exemplary damages sufficient to deter

Rosenfield, the Schnader Firm, and any similarly situated Pennsylvania attorneys from reducing the practice of law to a cynical game of privilege and patronage, driven by ambition and avarice.

## PARTIES

7.     Plaintiff Anna K. Nupson (formerly Anna K. Middleton) is a citizen of New Mexico and was, for many years, a client of the Defendants.

8.     Defendant law firm Schnader Harrison Segal & Lewis, LLP is a limited liability partnership that was organized and has its principal place of business in Pennsylvania.

9.     Defendant Bruce A. Rosenfield is a citizen of Pennsylvania, an attorney licensed to practice in Pennsylvania (1976), New York (2010), and Georgia (2013), a senior partner at the Schnader Firm and for some time the chairperson of the firm's trust and estate department.

## JURISDICTION

10.     This civil action is between Ms. Nupson, a citizen of New Mexico, and Rosenfield and the Schnader Firm, who are citizens of Pennsylvania.  There is complete diversity between Ms. Nupson and all of the Defendants.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1).

11.     The precise amount of compensatory damages will be determined by the jury. However, for purposes of 28 U.S.C. § 1332(a), during the time Ms. Nupson was represented in various capacities by the Defendants, she had an interest in real and personal property including approximately 157,010 shares of stock in a family holding company, Bradford Holdings, Inc. ("Bradford").  The Defendants advised Ms. Nupson to let Bradford redeem her remaining stock for less than $50,000,000 (fifty million dollars) without revealing and later lying about the fact that Bradford had paid their fees as it advised her to permit the redemption, and without revealing or counseling her on the significance of the fact that one of Bradford's assets, the

tobacco company John Middleton, Inc. ("JMI") had for several years been repeatedly courted by other tobacco companies. Shortly after the statute of limitations for tax penalties related to the redemption under 26 U.S.C. § 6501 had lapsed, Bradford sold JMI to the most persistent of its suitors, Altria, Inc. (a.k.a. Philip Morris U.S.A.) for $2,900,000,000 (2.9 billion dollars).

12.     The amount in controversy exceeds $75,000 (seventy-five thousand dollars).

13.     The precise amount of exemplary damages will also be determined by the jury. However, for purposes of 28 U.S.C. § 1332(a) and upon information and belief, the Defendants jointly and severally possess tangible assets, including investments, fees and commissions likely to be generated from work underway, and ascertainable goodwill value collectively worth well in excess of $10,000,000 (ten million dollars).  Because nominal punitive damages will not deter the Defendants and any similarly situated attorneys from committing the rather heinous acts alleged herein, the amount in controversy exceeds $75,000 (seventy-five thousand dollars).

## VENUE

14.     All of the Defendants are citizens of Pennsylvania.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2), (c) because a substantial portion of the events giving rise to Plaintiff's claims occurred in this district.

## THE TERMINATED STATE LITIGATION

16.     In October of 2014, Ms. Nupson brought the first of several declaratory judgment actions in the Orphan's Court of Montgomery County, Pennsylvania and later responded to declaratory judgment and indemnification actions brought by her brother, John S. Middleton ("John"), who is President and Secretary of Bradford.  Ms. Nupson obtained summary judgment

on the validity of a spendthrift provision against a certain 1998 Assignment at issue in three of those cases, and prevailed in John's related appeal to the Superior Court of Pennsylvania.[1]

17.     John and Bradford subsequently reached a comprehensive, non-confidential settlement agreement with Ms. Nupson that was approved by the Orphan's Court on April 18, 2018 ("The 2018 Agreement").   The Defendants in this lawsuit were not parties to that settlement, which excluded third-party beneficiaries in general and the Defendants in particular.

18.     The Orphan's Court retains jurisdiction over pending adjudications of certain trusts discussed herein.  However, consistent with the Supreme Court's decision in *Marshall v. Marshall*, 547 U.S. 293 (2006), the *in personam* judgment that Ms. Nupson seeks in this lawsuit does not undertake to interfere with the Orphan's Court's possession of any trust res, and does not necessitate a declaration concerning the validity of any trust before that court.

19.     A substantial portion of the discovery in the terminated state actions would appear to be material to the instant lawsuit.  Much of what John, Bradford, and their lawyers including the Schnader Firm withheld as attorney-client privileged must be produced in this case, due to Defendants' practice of comingling their corporate, trust, and other client files—effectively eviscerating the attorney-client privilege—and in the alternative under the crime-fraud exception because of the mail and wire fraud, and money-laundering alleged herein.  Accordingly, the claims asserted in this Complaint have or are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.  Fed. R. Civ. P. 11(b)(3).

---

[1] The terminated state actions are cause numbers 1998-X1871, 2012-X3503, 2013-X3936, 2014-X3827, 2015-X1266, 2016-X4305, 2017-X1239, 2017-X1364.  Ms. Nupson prevailed on summary judgment motions in 2014-X3827 (upheld in Superior Court cause number 3389-EDA-2015), and thereafter in 2017-X1239 and 2017-X1364.

## FACTUAL BACKGROUND AND DEFENDANTS' COMMON PURPOSES

20.     Ms. Nupson, John, and their sister Lucia M. Hughes ("Lucia") are the adult offspring of Herbert H. Middleton, Jr. and Frances S. Middleton.

21.     Herbert returned from World War II to run JMI, the family tobacco company, which had begun with a small Philadelphia tobacco shop established in 1856 by the company's namesake and Herbert's great-grandfather, John Middleton. Among Herbert's innovations was using machines of proprietary design to roll pipe tobacco into small cigars, the Cherry Blend, and later the Black & Mild and the Gold & Mild.

22.     In 1987, JMI became a wholly-owned subsidiary of G.W. Hunter, Inc. (hereinafter "Hunter"), the predecessor to Bradford. There were then three classes of Hunter stock: Class A Voting Common; Class B Non-Voting Common; and First Preferred Stock.

23.     Five years earlier in 1982, Herbert owned 632 of the 1,161 outstanding shares of JMI Class A Voting Common. Through a series of gifts beginning in late 1989, by January 1992 Herbert had bequeathed all of his Class A Voting Common shares in Hunter.

24.     As a result, by January 1992, John owned 716 shares of Hunter Class A Voting Common, or roughly 71 percent of all outstanding voting shares, giving him majority voting control of the company. John also served as the company's president and secretary. Therefore, although Herbert was still alive and retained a larger percentage of Class B Non-Voting Common stock than his son, John exerted exclusive control over the company.

25.     By this time, burgeoning sales of JMI's pipe tobacco cigars had begun to generate significant profits and attracted the attention of competitor tobacco companies.

26.     Also by this time, the Defendants had provided estate planning and tax advice to numerous members of the extended Middleton family, but the law firm was also counsel to

8

Hunter.  In a January 1997 restructuring, Hunter was succeeded by Bradford, which thus ranked among the Schnader Firm's most important corporate clients.

27.     At least one of the Schnader Firm's partners, Rosenfield, would also serve on the Board of Directors for Hunter Services Inc., a wholly owned subsidiary of Bradford.  Rosenfield served as the Schnader Firm's client manager for Bradford. The Defendants thus had both direct and indirect stakes in advancing the company's interests, and they arranged their client files accordingly.  The Defendants kept dozens of individual and trust account files under the client number for Bradford, treating them as matters of interest to the company, and Defendants routinely refrained from following their own policies and procedures that, upon information and belief, required them to disclose their conflicts and obtain written, informed waivers from each of the affected individuals, entities, and trusts.

28.     As detailed later on, rather than counselling Ms. Nupson on the vital significance of that and other information for her interests, Defendants withheld their conflicts of interest, lied in response to her inquiries about the existence of any conflicts, and engaged in a series of actions that would irreparably harm her, much of the time while being paid by Bradford.

29.     Accordingly, Rosenfield and the Schnader Firm became partners in an enterprise whose common purposes were to: (i) curry favor with and benefit a wealthy corporate patron, the expected profits and increased goodwill from which they would share over the ensuing years; (ii) conceal their unethical and unlawful conduct and their role in harming a disfavored, vulnerable client to help their corporate patron; (iii) erect barriers to their disfavored client's ability to ascertain, timely investigate, and remedy the harm they had inflicted or willfully allowed others to inflict upon her; and (iv) exploit account adjudications for a trust they had drafted for her benefit to fraudulently conceal who had paid Defendants to purport to represent her in

9

connection with the 2003 redemption, by laundering and returning to that corporate patron approximately $154,000 (one-hundred-fifty-four thousand dollars) in legal fees used to harm her.

## COUNT I – LEGAL MALPRACTICE

**A.    The Pennsylvania Rules of Professional Conduct and common law establish a lawyer's duty to a client, and inform and define the related standard of care.**

30.    All preceding allegations are incorporated as if set forth in their entirety herein.

31.    The Pennsylvania Supreme Court has concluded that the Rules of Professional Conduct impose duties on lawyers practicing in the Commonwealth. *Rizzo v. Haines,* 520 Pa. 484, 502, 555 A.2d 58, 67 (Pa. 1989), and that the "common law imposes on attorneys the status of fiduciaries *vis a vis* their clients; that is, attorneys are bound, at law, to perform their fiduciary duties properly.  Failure to so perform gives rise to a cause of action.  It is actionable." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 253, 602 A.2d 1277, 1283 (Pa. 1992).

32.    This Court has observed that the Rules of Professional Conduct inform and define a standard of care establishing a lawyer's duty to a client. *Hecht v. Ryan*, 2012 WL 12904141, slip op. at 1, ¶ 2 (E.D. Pa. Nov. 8, 2012) (citing *Rizzo*, 520 Pa. at 502, 555 A.2d at 67-68).

33.    Important to this case is that the consent requirement demands more than merely making a client aware of a possible conflict.  Instead, actual consultation is required to satisfy a lawyer's duty to obtain informed consent. *International Longshoremen's Ass'n, Local Union 1332, et al., v International Longshoremen's Ass'n, et al.*, 909 F. Supp. 287, 291-94 (E.D. Pa. 1995); Pa. R. Prof. Conduct 1.2; 1.4; 1.7(a)(1)-(b)(1).

**B.      Request for an extension or modification of existing or developing law, or the establishment of new law.**

34.      Ms. Nupson's claim is based on Defendants' serial and intentional misconduct, reckless disregard for the rights of their client and for the civil and potential criminal liability to which they willfully exposed her, and in the alternative on their negligent acts and omissions.

35.      This Court's sister tribunal has concluded that "[t]o argue that negligent conduct has a remedy but that intentional conduct does not is illogical and incorrect." *Bangert v. Harris*, 553 F. Supp. 235, 237 and n. 4 (M.D. Pa. 1982) (citing *Duke & Company v. Anderson,* 275 Pa. Super. 65, 418 A.2d 613 (Pa. Super. 1980) for survey of related law back to 1834).

36.      However, should this Court conclude that the Pennsylvania Supreme Court has yet to recognize intentional malpractice and in particular exemplary damages for that tort, Ms. Nupson seeks an extension or modification of existing or developing law, or the establishment of new law, pursuant to  Federal Rule of Civil Procedure 11(b)(2).

**C.      Defendants drafted, progressively undermined, and otherwise manipulated the 1994 Trust to benefit their corporate patron and harm Ms. Nupson.**

37.      The overarching theme of this lawsuit is that while Defendants were paid by Bradford—and without disclosing that arrangement, counseling Ms. Nupson on its significance, or obtaining her informed consent to let them represent her notwithstanding their conflicts of interest—they remained silent about or advised her to make a series of decisions that benefitted Bradford and John while irreparably harming her.   However, even after that compensation arrangement had lapsed, Defendants continued to take actions to benefit their corporate patron to Ms. Nupson's material detriment.   Certain trusts, assignments, powers of attorney, and family agreements drafted by Defendants were important to achieving Defendants' common purposes.

11

38.     In 1994, Ms. Nupson was suffering from alcoholism and depression, and as a result she was highly vulnerable. She had considerable assets, primarily in the form of gifts and expected inheritance from her parents and grandparents. In September of 1994, Rosenfield drafted a trust bearing Ms. Nupson's name (then Anna M. Bauer, due to marriage) and which she settled with diverse assets from a Mellon Bank custodial account that included 99,074 shares of stock in Hunter (the predecessor holding company to Bradford) valued at $0.00.

39.     The stated purpose of the 1994 Trust was to allow Ms. Nupson, the primary and sole lifetime beneficiary, to support herself, and toward that end the vast majority of her assets were used to settle the trust.  For the same reason, and provided that her co-trustees John and Frances agreed, Ms. Nupson could access up to the entirety of the principal.

40.     However, when the 1994 Trust was presented to Ms. Nupson, the Defendants:

(i) did not inquire into her objectives or counsel her on alternatives to contributing the vast majority of her valuable property to an irrevocable trust;

(ii) made no attempt to determine whether she had retained independent counsel to do those things, and did not refer her to such counsel, notwithstanding their awareness of and professional relationships with experienced and competent trust and estate lawyers;

(iii) did not tell her that they were being paid by a company whose president, John—who would also be her co-trustee—could exercise his discretion to bar her access to principal and thus enrich his children (who had a remainder interest) while depriving Ms. Nupson of her own property, contrary to the trust's purpose and Pennsylvania public policy prohibiting the mere temptation of self-dealing. *In re Noonan's Estate*, 361 Pa. 26, 63 A.2d 80 (Pa. 1949); and

(iv) did not explain the significance of those facts for their ability to zealously represent her interests, and did not obtain written, informed waivers of their related conflicts.

12

41.     Through the above acts and omissions, Defendants proximately harmed Ms. Nupson by violating their duties in Pennsylvania common law and Rules 1.1 (requiring competent representation), 1.2 and 1.4 (requiring consultation on scope of representation, means to achieve client objectives), 1.7(a)(1)-(b)(1) (prohibiting representation among clients with adverse interests absent full disclosure, informed consent), 1.8(f) (prohibiting undisclosed payment from one client to represent an adverse client), 1.8(k) (prohibitions in 1.8(a)-(i) apply to all lawyers associated with firm), 1.10 (imputing conflicts to all lawyers in firm), 1.16(a)(1) (prohibiting representation that might result in violation of Rules), 2.1 (requiring independent professional judgment in representation), 8.4(a) (professional misconduct to violate or attempt to violate the Rules), their Oath of Office, 42 Pa. C.S.A. § 2522, and upon information and belief, their own internal policies and procedures for identifying and addressing conflicts of interest.

42.     In July of 1995, Rosenfield drafted a renunciation of the 1994 Trust's principal, and when it was presented for Ms. Nupson's signature Defendants:

(i) did not counsel her on the significance for her interests of the fact that they were being paid by John's company;

(ii) did not counsel her on the significance for her interests of the Hunter (Bradford) stock which she was renunciating not being ascribed a value;

(iii) did not counsel her that the purported renunciation of her interest in property she had contributed to the trust settled primarily for her own benefit was legally invalid and unenforceable;

(iv) did not counsel her that by renunciating her access to principal, she was enabling John to enrich his children while proportionately and permanently depriving Ms. Nupson of her

own property, contrary to the trust's purpose and Pennsylvania public policy prohibiting the mere temptation of self-dealing;

(v) did not counsel her that their corporate patron thus had a disqualifying conflict under *Noonan's Estate* prohibiting his action and mandating his removal as her co-trustee;

(vi) did not counsel her that she had an obligation to take action against a breaching co-trustee and, failing that, could be liable for those breaches under Sections 184 and 224 of the Restatement (Second) of Trusts (1959) and long-settled common law with which Rosenfield, who was chair of the Schnader Firm's trust and estate department, was intimately familiar;

(vii) did not explain the significance of the above facts for their ability to zealously represent her interests and did not obtain a written, informed waiver of their related conflicts; and

(viii) did not refer her to independent counsel who lacked their conflicts, notwithstanding their awareness of and professional relationships with many experienced trust and estate lawyers.

43.     Through the above acts and omissions, Defendants proximately harmed Ms. Nupson by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.9(a)-(b)(1)-(2), 1.10, 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522.

44.     On or about June 15, 1998—or scarcely four weeks after Ms. Nupson's father, Herbert, died suddenly of a heart attack during a Rotary Club meeting—the Defendants did three things that benefitted their corporate patron to Ms. Nupson's detriment.  First, Defendants prepared and Rosenfield witnessed the execution of an instrument purporting to assign her interests in three spendthrift trusts that Defendants had drafted for Herbert ("the 1998 Assignment").  Second, Defendants prepared and Rosenfield witnessed the execution of a power of attorney authorizing Ms. Nupson's sister Lucia, whose children were among the remaindermen of the 1994 Trust together with John's children, to act in her behalf ("the 1998

14

POA"). Third, Defendants prepared and recorded a deed contributing Ms. Nupson's Bryn Mawr house to the 1994 Trust, valuing it (on October 29, 1998, according to the related 2012 account) at $147,500 (one hundred forty-seven, five hundred dollars), a fraction of its market value.

45.    Thereafter, Lucia, used the 1998 POA to contribute to the 1994 Trust additional shares of Hunter (Bradford) stock.

46.    However, the Defendants withheld or did not counsel Ms. Nupson about the significance for her interests of numerous things they knew to be true, including:

(i) that they were being paid by John's company to draft the 1998 Assignment and POA;

(ii) that permitting Lucia to contribute additional stock to the trust would further enrich the children of their corporate patron while proportionately depriving Ms. Nupson of her own property, contrary to the trust's purpose and Pennsylvania public policy prohibiting the mere temptation of self-dealing;

(iii) that by contributing her house to the trust, Ms. Nupson had further enriched the children of Defendants' corporate patron while proportionately depriving herself of her own property, contrary to the trust's purpose and Pennsylvania public policy prohibiting the mere temptation of self-dealing;

(iv) that the 1998 Assignment would permit John to further enrich his children while proportionately depriving Ms. Nupson of her own property, contrary to the trust's purpose and Pennsylvania public policy prohibiting the mere temptation of self-dealing;

(v) that the 1998 Assignment directly contradicted the spendthrift provisions that her father and their late client, Herbert, had directed them to include in the three affected trusts, thus violating the intent of her recently departed father by shunting millions of dollars to the children of the president of the company secretly paying their fees;

15

(vi) that the 1998 Assignment thus facilitated their corporate patron's self-dealing contrary to Pennsylvania public policy under *Noonan's Estate*, prohibiting his service as trustee, mandating his removal as her co-trustee, and, absent corrective action by Ms. Nupson, subjected her to potential liability for his self-dealing; and

(vii) that under settled Pennsylvania trust law, the 1998 Assignment was a legal nullity that was unenforceable against the spendthrift provisions they had drafted, could be withdrawn any time, and was neither irrevocable as it purported to be, nor capable of being made irrevocable through a separate contract that Herbert had also expressly prohibited in the trusts that they had drafted;[2] and

(viii) that they were required to explain the significance of each of those facts for their ability to zealously represent her interests and obtain a written, informed waiver of their related conflicts, or refer her to independent counsel who lacked any such conflicts.

47.     Through the above acts and omissions, Defendants proximately harmed Ms. Nupson by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.9(a)-(b)(1)-(2), 1.10, 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522.

48.     The Defendants not only used the 1994 Trust they had drafted for Ms. Nupson's benefit as a means to enrich their corporate patron's children while depriving Ms. Nupson of her own property, contrary to the trust's purpose and Pennsylvania public policy prohibiting the mere temptation of self-dealing. They also withheld and did not counsel Ms. Nupson about the significance for her interests of numerous related facts including that:

(i) Rosenfield communicated via email or telephone in March of 2001 with his then-partner,   Laubach, Defendants' corporate patron, John, and Bradford's Certified Public

---

[2] *See* Paragraphs 16, 18, and footnote 1. The invalidity of the 1998 Assignment and the validity of those spendthrift provisions has already been conclusively established and is not at issue in the instant lawsuit.

Accountant John B. Stine of Ernst & Young, LLP, that he (Rosenfield) was very comfortable helping to manipulate Ms. Nupson's 1994 Trust to limit her monthly income;

(ii) Stine suggested to Rosenfield, Laubach, and John, also via email in March of 2001, that toward this end dividends from the Bradford stock could be characterized, not as income, but instead diverted into the principal in Ms. Nupson's 1994 Trust—which Rosenfield had earlier helped to prevent her from accessing as alleged *supra*;

(iii) Rosenfield thereafter discussed with John enlisting Ms. Nupson's mother, a third co-trustee who rarely if ever acted to administer the trust, to sign-off on these efforts, thereby effectively allowing his corporate patron to override any objection by Ms. Nupson; and that

(iv) Rosenfield had thereby violated Ms. Nupson's privilege, to the extent Defendants represented her as an individual, and enabled John's self-dealing to her detriment, and contrary to Pennsylvania public policy and the express purpose of the trust, by revealing and discussing the substance and strategic ramifications of Defendants' knowledge of Ms. Nupson's objectives and vulnerabilities.

49.     Through the above acts and omissions, Defendants used the wires to further their common purposes contrary to 18 U.S.C. § 1343, and harmed her by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.6, 1.7(a)(1)-(b)(1), 1.10, 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522.

**D.     The Defendants benefitted their corporate patron and harmed Ms. Nupson in connection with the 2003 redemption.**

50.     The Defendants informed Ms. Nupson via telephone, email, or both means that John's company wished to redeem her stock held in the 1994 Trust and in another, grantor-retained annuity trust discussed below.  On or about October 11, 2002 Defendants presented her with a conflict waiver purporting to allow them to represent her in the related negotiations.

However, the Defendants did not disclose or counsel Ms. Nupson about the significance for her interests of several things they knew to be true, including that:

(i) they had for years been paid by John's company purportedly to represent her interests, and would continue to be paid by his company during the supposed, arm's-length negotiations with him and his company to redeem her stock;

(ii) Rosenfield's ex-partners—mergers and acquisitions specialist Larry P. Laubach and Rosenfield's co-chair of the trust and estate department Margaret G. Thompson—had left the Schnader Firm for Cozen O'Connor, LLP, in part, if not primarily for the purpose of manufacturing the appearance of Schnader's independent representation of Ms. Nupson in the supposed, arm's-length negotiations with Schnader's longtime clients, John and his company;

(iii) notwithstanding the appearance of their separation and independence, the two firms would continue to share and exchange attorney-client privileged materials that would be stored and improperly comingled in the firms' respective vaults, filing cabinets, computers and other devices, electronic servers, and elsewhere;

(iv) inasmuch as Defendants treated every Middleton family trust and estate to be matters of interest to Bradford, and because Laubach and Thompson had both worked on numerous matters that impacted Ms. Nupson's interests in those trusts and estates, Laubach and Thompson had ethical duties to Ms. Nupson as their former client while at the Schnader Firm and they were required to disclose their conflicts and seek her permission to represent John and his company in seeking the redemption adverse to her interests;

(v) by letting Bradford redeem her stock she would further enrich the children of Defendants' corporate patron while compounding the existing deprivation of Ms. Nupson's own

property, contrary to the trust's purpose and Pennsylvania public policy prohibiting the mere temptation of self-dealing;

(vi) the proposed redemption would thereby facilitate their corporate patron's self-dealing contrary to Pennsylvania public policy prohibiting John's service as her co-trustee, mandating his removal, and, absent corrective action by Ms. Nupson, could subject her to potential liability for his self-dealing; and that

(vii) they were ethically required to obtain a written, informed waiver of each of their related conflicts or refer her to independent counsel who lacked any such conflicts.

51.    Through the above acts and omissions, and by using the wires to harm her contrary to 18 U.S.C. § 1343, Defendants proximately harmed Ms. Nupson by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.9(a)-(b)(1)-(2), 1.10, 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522.

52.    In February of 2003, the Defendants advised Ms. Nupson in person, via telephone or email to accept the benefit of the bargain offered to her by John and his company, Bradford, which wished to redeem the stock held in the 1994 Trust.  However, the Defendants withheld and did not counsel Ms. Nupson about the significance for her interests of numerous things they knew to be true, including:

(i) that they were being paid by John's company;

(ii) that JMI represented the vast majority of Bradford's value, even if assessed solely from the standpoint of revenue and profits, and exclusive of its potential market value;

(iii) that JMI's significance for the 1994 Trust in light of Bradford's April 2001 S-corporation declaration, and even accepting the 1995 Renunciation, was that it comprised the

trust's single largest and most reliable income-earning asset, and thus if she did not agree to let Bradford redeem its stock, JMI would continue to play that role in perpetuity;

(iv) that the income from the Bradford stock over the next few years would, if it were retained rather than sold, equal or exceed the entire consideration that the company secretly paying Defendants' bills was offering to redeem that stock;

(v) that JMI had been repeatedly courted by several tobacco companies over the years, the most persistent of which included the colossus Philip Morris U.S.A.;

(vi) that JMI believed that the Black & Mild was not a cigarette as a matter of law, and was thus immune from regulatory factors and civil suits aimed at cigarette manufacturers which supposedly justifying the consideration offered by the company that was secretly paying Defendants to represent her;

(vii) that by letting Bradford redeem her stock, she would vastly enrich the children of Defendants' corporate patron while depriving herself of the most valuable asset she possessed, thus decimating the standard of living that the trust Defendants had drafted for her benefit was expressly designed to maintain;

(viii) that the redemption would exponentially compound their corporate patron's self-dealing vis-à-vis the 1994 Trust contrary to Pennsylvania public policy mandating John's removal as her co-trustee and which, absent corrective action by Ms. Nupson, subjected her to potential liability for his self-dealing; and

(ix) that they were ethically required to obtain a written, informed waiver of each of their conflicts or refer her to independent counsel who lacked any such conflicts.

53.     Through the above acts and omissions, and to the extent they using the wires to further their common purposes contrary to 18 U.S.C. § 1343, Defendants proximately harmed

Ms. Nupson by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.10, 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522.

54.     Also in connection with the February 2003 redemption, Defendants did not disclose to Ms. Nupson or counsel her about the significance of certain unethical and unlawful actions Rosenfield took to benefit his corporate patron while it secretly paid him to purport to represent her.

55.     During the negotiations leading to the February 2003 redemption, Rosenfield drafted, back-dated, and purported to witness John execute a grantor-retained annuity trust ("GRAT") on February 1, 2001, or two years earlier than when it was actually executed.

56.     At least two other licensed attorneys representing the parties to the redemption, including Rosenfield's ex-partner Laubach, either remained mute about or facilitated Rosenfield's duplicity while he purported to represent Ms. Nupson.  For instance, on or about November 25, 2002, Elizabeth K. Arias of Womble Carlyle Sandridge & Rice, LLP alerted Rosenfield, through a letter or memorandum sent via the wires to him and to Laubach, that his proposed provision in the back-dated GRAT had to be omitted because it could otherwise alert the Internal Revenue Service as to when the trust was really signed.

57.     Thereafter, Rosenfield finished drafting, back-dated, and fraudulently witnessed the GRAT's execution to *inter alia* avoid taxes that he believed or feared would otherwise be assessed on the 258,029 shares of Bradford stock used to settle the back-dated GRAT, and which had up to then been held in a previous GRAT that purported to have been settled with the same stock on the same day in February of 2001, but which had exclusively benefitted John.

58.     Rosenfield did the above things notwithstanding that on or about April 12, 2001, and while being paid by Bradford, he had directed or acquiesced in an action by Certified Public

Accountant John B. Stine of Ernst & Young, LLP.  Stine, who upon information and belief was also being paid by Bradford, informed the Internal Revenue Service via certified U.S. Mail that as of April 1, 2001, the same 258,029 shares of Bradford stock were not held in the GRAT supposedly settled two months earlier, but were instead held outright by the GRAT's supposed settlor and Ms. Nupson's co-trustee of the 1994 Trust, her mother Frances.

59.     In short, while purporting to represent Ms. Nupson's interests—but while secretly being paid by Bradford—Rosenfield conspired to violate 18 U.S.C. § 1343, 26 U.S.C. §§ 1374, 2308(a)(1) and 7606(1)-(2) (tax evasion, false reporting, felonies with enhanced penalties for corporations), Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 2.1, 8.4(a)-(c), 42 Pa. C.S.A. § 2522, and Pennsylvania common law prohibiting his actions. *See Office of Disciplinary Counsel v. Chung*, 548 Pa. 108, 110-111, 695 A.2d 405, 405-06 (Pa. 1997) (attorney suspended five years in lieu of disbarment for false tax reporting and related crimes).

60.     Thereafter, Defendants did not disclose to Ms. Nupson or counsel her on at least four ramifications for her interests of their advice that she enter into a related agreement to indemnify their corporate patron for any taxes and penalties that might be triggered by the false reporting and tax evasion that Rosenfield had committed, conspired to commit, or helped to conceal while secretly being paid by that corporation.

61.     First, as experienced attorneys, Defendants knew or were charged with knowing that pursuant to Pennsylvania and United States common law, a contract like the indemnification agreement whose subject-matter interferes with the enforcement of state or federal law was against public policy, void *ab initio*, and unenforceable.

62.     Second, as experienced attorneys, Defendants knew or were charged with knowing that the practical effect of such an indemnification agreement was contrary to the

Commonwealth's public policy prohibiting a fiduciary from using trust assets to indemnify himself for his wrongdoing, which the Pennsylvania Supreme Court has decried as "the most damaging blow at the integrity of trusts which has ever been delivered in Pennsylvania." *Fire Ins. Patrol*, 120 Pa. at 649, 15 A. at 558 (Pa. 1888).

63.     The Defendants were thus ethically prohibited from advising Ms. Nupson as a fiduciary of her 1994 Trust—from which Bradford proposed to redeem tens of thousands of shares, and into which proceeds from the redemption would be contributed, thereby further enriching John's children—to enter into an agreement: (i) contrary to her interests; (ii) in violation of Pennsylvania public policy prohibiting her co-trustee's self-dealing; and (iii) which, absent corrective action by Ms. Nupson, could subject her to potential liability for her co-trustee's self-dealing under Pennsylvania common law well-known to Rosenfield and his partners in the Schnader Firm's trust and estate department.

64.     Third, as experienced attorneys, Defendants knew or were charged with knowing that by allowing the redemption facilitated by Rosenfield's duplicity, false reporting, and tax evasion, unlawful use of the wires to further their common purposes, or conspiracy to commit those crimes—and for which the indemnification agreement was part consideration to the company secretly paying Defendants' fees—Ms. Nupson could be investigated and potentially prosecuted for furthering or as an accessory after-the-fact to a so-called *Klein* conspiracy. *See United States v. Klein,* 247 F.2d 908 (2d Cir. 1957), *cert. denied,* 355 U.S. 924 (1958); *see also* 18 U.S.C.A.A. § 371; 26 U.S.C.A.A. § 1374; 26 U.S.C.A.A. § 2308(a)(1) and 7606(1)-(2); *United States v. Lester*, 282 F.2d 750, 753 (3d Cir. 1960) (those who co-operate in common effort to obtain unlawful results become responsible for all done before).

65.     Fourth, and notwithstanding all of the above, Defendants did not: (i) reveal to, or counsel Ms. Nupson about the fact that they were secretly being paid by John's company to advise her to permit the 2003 redemption and enter into the unlawful tax indemnification agreement benefitting John and exposing her to potential liability; (ii) obtain a written, informed waiver of those and other conflicts (presuming they were waivable at all, which seems inconceivable); or (iii) refer her to independent counsel who lacked their grave conflicts.

66.     Through the above acts and omissions, and by using the wires to further their common purposes contrary to 18 U.S.C. § 1343, Defendants proximately harmed Ms. Nupson by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.10, 1.16(a)(1), 2.1, 8.4(a)-(c), and 42 Pa. C.S.A. § 2522.

67.     Three months after the redemption, on or about May 29, 2003, Defendants performed a hasty, post-hoc conflict check which purported to find no conflicts of interest affecting their ability to represent Ms. Nupson and her 1994 Trust, notwithstanding that the client number appearing on that putative conflict check was the client number for Bradford—the company secretly paying their bills—and the client manager listed on the form was Rosenfield.

68.     Defendants never disclosed or counseled Ms. Nupson on the reason for or significance of this post-hoc, sham conflict check, whose evident purpose was to assemble plausible deniability in the event their files were later scrutinized.  The tardy conflict form would create the false impression that they had addressed their conflicts of interest.  That impression, in turn, would conceal the means by which Defendants exposed Ms. Nupson to liability, violated their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522, and proximately harmed her.

**E.      Rosenfield planned to use account adjudications for Ms. Nupson's 1994 Trust to benefit their corporate patron, harm Ms. Nupson, and to launder money to fraudulently conceal who paid their fees in the 2003 redemption.**

69.      Defendants engaged in a protracted effort to convince Ms. Nupson to sign-off on 2012 petitions for account adjudications they prepared together with their corporate patron's executive and Ms. Nupson's co-trustee, John.  Broadly speaking, those adjudications would yield at least three important benefits to their corporate patron, none of which were disclosed or made the subject of an informed, written waiver provided to Ms. Nupson.

70.      First, as detailed below, the adjudications would release John and cement his affirmative defenses to any objections Ms. Nupson might later wish to raise to *inter alia*: (i) John's self-dealing contrary to Pennsylvania public policy and the express purpose of the 1994 Trust; (ii) the redemption and unlawful tax indemnification agreement that Defendants advised her to enter into in 2003 while secretly being paid by John's company; and (iii) numerous acts and omissions by Defendants alleged herein and intended to enrich the children of their corporate patron's executive and keep Ms. Nupson subject to his control, both directly and indirectly.

71.      Second, the adjudications would allow Defendants to exploit their reputation to relax the vigilance of the Orphan's Court, thereby distracting from his undisclosed and unwaived conflicts of interest arising from his October 3, 2012 entry of appearance for both Ms. Nupson and for John.

72.      In emails exchanged during April of 2013, Rosenfield and his ex-partners Thompson and Laubach, thus fretted about which Orphan's Court judge would handle the adjudications.  They discussed their hope that Hon. Lois E. Murphy, a younger judge appointed November 3, 2009, would be much more accommodating of their attempt to terminate Ms. Nupson's 1994 spendthrift trust—which was putatively accomplished through a separate 2003

Family Settlement Agreement that Ms. Nupson had executed on Defendants' advice while they were secretly paid by John's company—than would Senior Judge Stanley R. Ott.

73.      Third, the adjudications of the 1994 Trust that Defendants had drafted ostensibly for Ms. Nupson's benefit would be used in Rosenfield's plan to fraudulently conceal who had paid his firm to purport to represent Ms. Nupson in connection with the 2003 redemption, by laundering and returning to that corporate patron launder and reimburse that corporate patron for $154,000 (one-hundred-fifty-four thousand dollars) in legal fees, contrary to 18 U.S.C. §§ 371, 1343, and 1956.

74.      Defendants' scheme at this critical juncture had several moving parts.  One tactic reoccurred so consistently during Defendants' representation of Ms. Nupson over the years that it is emblematic of their serial and intentional misconduct.  Each time they offered Ms. Nupson advice and counsel, Defendants withheld and did not explain to her the significance of the facts that: (i) they treated every trust and estate benefitting her, and their representation of her in every capacity including as an individual, as matters of interest to Bradford (or its predecessor Hunter) and thus to the company's President and Secretary, John; (ii) their files related to representation of her in every capacity were organized and kept under the client number for Bradford (or Hunter); and (iii) that Bradford had secretly paid them to purport to represent her in numerous matters where her interests diverged from or were directly adverse to those of Bradford and John.

75.      Among the harmful consequences of Defendants' decision to deliberately comingle their corporate, trust, and individual clients' files was the effective evisceration of the attorney-client privilege that Ms. Nupson would have enjoyed with independent counsel pursuant to Pennsylvania state and federal common law which Defendants well knew or were charged with knowing.

76.     At numerous junctures critical to Ms. Nupson's interests, Rosenfield and other partners at the Schnader Firm—including Laubach and Thompson, before and after the pair departed for Cozen O'Connor, LLP to facilitate the 2003 redemption—shared privileged information via the wires about the Schnader Firm's representation of Ms. Nupson in various capacities.

77.     One example detailed below involved a March 24, 2011 email in which Rosenfield violated Ms. Nupson's privilege by revealing and discussing with his ex-partner, Laubach, strategic ramifications of Rosenfield's advice to Ms. Nupson regarding whether she should contest or sign-off on the adjudications that Rosenfield would seek after entering an appearance for *both* her and John, and without disclosing his unwaived conflict of interest to her or to the Court.

78.     Over the years they purported to represent Ms. Nupson, Defendants consistently withheld and did not counsel Ms. Nupson on the significance for her interests of their repeated violations of her privilege; they did not obtain an informed waiver each time they undertook to violate her privilege; and they did not refer her to a firm without their conflicts and powerful motivation to breach their fiduciary duties to her.  The Defendants thus proximately harmed Ms. Nupson by violating their duties in Pennsylvania common law and by Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522.

79.     Defendants' strategy vis-à-vis the adjudications would have at least three benefits. First, it would advance their common purposes of currying favor with and benefitting John and Bradford to Ms. Nupson's detriment, securing hundreds of thousands of dollars in fees and commissions and increasing the goodwill value of the firm.

80.     Second, Defendants' strategy would relax Ms. Nupson's vigilance and thereby further their efforts to harm her and conceal their role in harming her.

81.     Third, Defendants' strategy would help to manufacture the appearance of voluminous and convoluted but otherwise unremarkable accounts prepared by harmonious co-fiduciaries represented by the same, reputable law firm whose partners were familiar to the Orphan's Court.  This would, in turn, relax the vigilance of the tribunal, helping to conceal Defendants' undisclosed and unwaived conflicts of interest and their decades-long role in harming Ms. Nupson, and thereby further their plan detailed below to use the adjudications to fraudulently conceal who had paid Defendants to purport to represent her in connection with the 2003 redemption, by laundering and returning to that corporate patron $154,000 (one-hundred-fifty-four thousand dollars) in legal fees.

82.     In short, Defendants' common purposes depended, not just on withholding from Ms. Nupson the benefit of their sophistication with trust and estate law, but on exploiting that expertise and their reputation with the Orphan's Court to harm a vulnerable client and line their pockets.

83.     For instance, in 2005 the Pennsylvania Legislature promulgated the Uniform Trust Code, which "codifie[d] those portions of the law of express trusts that are most amenable to codification" but was "supplemented by the common law of trusts, including principles of equity, particularly as articulated in the Restatement of Trusts[.]" 20 Pa.C.S.A. § 7706, and Uniform Law Comment thereto.

84.     Notwithstanding their intimate familiarity with this important development, Defendants did not advise Ms. Nupson of numerous implications for her interests.  For example, they did not alert her that, in addition to irreparably harming herself by releasing John from

28

liability and cementing his affirmative defenses under 20 Pa.C.S.A. § 7798(b) to any claims she might wish to bring as a beneficiary, by signing-off on the petitions for adjudication she was subjecting herself to liability as John's co-fiduciary under 20 Pa.C.S.A. § 7763(f) by permitting his self-dealing in violation of Pennsylvania public policy and contrary to her affirmative duties to "exercise reasonable care to prevent a cotrustee from committing a breach of trust involving fraud or self-dealing" and to "compel a cotrustee to redress a breach of trust involving fraud or self-dealing." 20 Pa.C.S.A. § 7763(g)(1)-(2). The Defendants thus proximately harmed Ms. Nupson by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.16(a)(1), 2.1, 8.4(a), and in 42 Pa. C.S.A. § 2522.

85.    Yet another tactic deployed by Defendants in their concerted effort to convince Ms. Nupson to sign-off on the adjudications was lying in response to her direct inquiries about the existence of conflicts of interest. On or about January 11, 2011—or on the same day that Rosenfield directed her to the first of the attorney-straw men discussed below—Ms. Nupson emailed him and pointedly asked him to "please advise me as soon as possible of any and all conflicts or concerns that you may have. Again, I don't like surprises."

86.    Rosenfield responded via email that "[t]he only conflict that I feel is that I would not be willing to bring the direct challenge attacking the validity of the trust since I prepared it." However, he did not disclose or counsel her on the significance for her interests in the forthcoming adjudications of numerous facts he knew to be true, including without limitation:

(i) that John's self-dealing was contrary to Pennsylvania public policy, and Defendants' role in facilitating that self-dealing to her detriment was prohibited by the Rules of Professional Conduct, Pennsylvania common law, and 42 Pa. C.S.A. § 2522, an attorney's Oath of Office;

(ii) that the redemption and tax indemnification agreement which Defendants had advised her to enter into in 2003 while secretly being paid by John's company, Bradford, was illegal, unenforceable, contrary to Pennsylvania trust law and against state and federal public policy;

(iii) that the absence of any attorney bills in the 'piggy-backed' account corresponding to the first several years of the 1994 Trust's administration belied a series of undisclosed and unwaived conflicts of interest spanning nearly a decade;

(iv) that his related plan to use the forthcoming adjudications to fraudulently conceal who had paid his firm to purport to represent her in connection with the 2003 redemption, by laundering and returning to Bradford $154,000 (one-hundred-fifty-four thousand dollars) in fees was prohibited by state and federal law, the Rules of Professional Conduct, and his Oath of Office; and

(v) that Hunter Services, which Rosenfield directed, and at least one shell company for Bradford, would play important roles in furthering his money laundering, as detailed below.

87.    The Defendants thus proximately harmed Ms. Nupson through their deception via the wires contrary to 18 U.S.C. § 1343, by exploiting the trust they had drafted for her benefit and planned to exploit yet again during the forthcoming adjudications, and by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.16(a)(1), 2.1, 8.4(a), and in 42 Pa. C.S.A. § 2522.

88.    Approximately six months later, as his effort to convince Ms. Nupson to sign-off on the adjudications intensified, Rosenfield lied via the wires in response to her direct inquiry about who had paid Defendants' fees to represent her during the negotiations leading to the 2003 redemption.  Instead of telling her the truth—that the adverse party in the sham negotiations, Bradford, had paid Defendants' fees—Rosenfield pretended in a July 14, 2011 email to be

unsure whether it was her 1994 Trust or her mother who had paid Defendants' fees. The Defendants thus proximately harmed Ms. Nupson by using the wires to deceive her contrary to 18 U.S.C. § 1343, and by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.16(a)(1), 2.1, 8.4(a), and in 42 Pa. C.S.A. § 2522.

89.     Indeed, Defendants did not disclose the truth about who had paid them to represent Ms. Nupson in the 2003 redemption—either to her or to the Montgomery County Orphan's Court to which they presented the 2012 accounts for adjudication—until Rosenfield's partner did so in a meeting with Ms. Nupson's general counsel, Thomas J. Budd Mucci, on or about June 23, 2016 at the Philadelphia offices of Schnader Harrison Segal & Lewis, LLP.

90.     Rosenfield's feigned ignorance about who had paid his law firm's fees is all the more outrageous because he was not only the firm's client manager for Bradford and thus familiar with the status of its accounts payable.  Rosenfield was also a director of Hunter Services, Inc., a wholly owned subsidiary of Bradford which *inter alia* handled debts payable by and owed to Bradford, and which as detailed below, was part of Rosenfield's plan to use Ms. Nupson's 1994 Trust to fraudulently conceal who had paid his firm to purport to represent her in connection with the 2003 redemption, by laundering and returning to that corporate patron hundreds of thousands of dollars in fees used to harm her over the years.

91.     The Defendants thus proximately harmed Ms. Nupson by deceiving Ms. Nupson via the wires contrary to 18 U.S.C. § 1343, through their ongoing concealment of facts vital to her interests, and by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522.

92.     Another tactic used to convince Ms. Nupson to sign-off on the accounts that Defendants would present to the court was exploiting ostensibly independent lawyers to act as

straw men, who either had conflicts of interest that they and Defendants concealed from Ms. Nupson, or who would raise and then confute weak arguments for contesting the adjudications. To facilitate that process, Rosenfield used the wires to either spoon-feed the weak arguments to the straw-men, suggest that they limit their analysis to those weak arguments, or misconstrue or withhold from those attorneys information vital to Ms. Nupson's interests, including Defendants' unwaived conflicts of interest and unethical or unlawful actions alleged in this Complaint.

93.     The first of these attorney-straw men was James F. Mannion, namesake of Mannion Prior, LLP, a boutique Orphan's Court law firm.  Rosenfield sold Mannion in a January 11, 2011 email as the litigator best equipped to challenge the 1994 Trust, which, as alleged *supra*, Rosenfield had drafted and thereafter undermined to benefit John's children to Ms. Nupson's detriment while secretly being paid by John's company, Bradford.  In that email, Rosenfield foreshadowed Mannion's conclusion that she could not successfully challenge the trust that Rosenfield had drafted and helped to undermine to benefit his corporate patron:

> My thought in recommending him for you to talk with was not necessarily to have him handle the action (though he would be my choice if you did decide to pursue it), but rather to discuss with you the merits of the case and whether you have any realistic possibility of successfully challenging the trust or you would be better off going forward with filing the account.

94.     Important to Defendants' common purposes of currying favor with and benefitting John and Bradford to Ms. Nupson's detriment, was that Mannion would—and during a February 1, 2011 telephone interview with Rosenfield on the line, did in fact—refrain from discussing or inquiring into numerous things that to any experienced trust litigator would have been self-evidently critical to her interests, including at a minimum:

(i) the fact that Rosenfield planned to represent both Ms. Nupson and John in the forthcoming adjudications and would prepare the related petitions;

(ii) the applicability of substantive trust law well known to Mannion or which he was charged with knowing upon holding himself out as an Orphan's Court specialist, and which provided viable alternatives to the sole remedy he analyzed, apparently at Rosenfield's direction—a change of circumstances claim;

(iii) the respective relationships of Ms. Nupson and of her multi-billionaire co-trustee and his company, Bradford, with the Schnader Firm during the period at issue, but at a bare minimum at the time when each of the documents provided by Rosenfield for Mannion's purported analysis—together with each document referenced therein—was drafted and executed;

(iv) the 1998 Assignment, which Mannion knew or was charged with knowing was as a matter of seminal Pennsylvania trust law, revocable, invalid, and unenforceable against the spendthrift provisions in the trusts to which it referred;

(v) Mannion knew or was charged with knowing that the 1998 Assignment would funnel still more money into the trust he was supposed to help Ms. Nupson challenge, contrary to her deceased father's express intent, and which sat on his desk as he interviewed her;

(vi) Mannion knew or was charged with knowing that a certain 2003 Family Settlement Agreement which characterized the 1998 Assignment as irrevocable was, as a matter of seminal Pennsylvania trust law, equally unenforceable against the spendthrift provisions in the trusts to which it referred, and which were the sources of additional assets to be siphoned into the 1994 Trust, contrary to the express intent of Ms. Nupson's deceased father; and

(vii) Mannion knew or was charged with knowing the irreparable harm that Ms. Nupson would suffer under 20 Pa.C.S.A. § 7798(b), and the corresponding benefit to John, if she did not challenge the trust and agreed instead to approve the petitions to adjudicate its accounts.

95.     In playing his straw man role for Defendants, the enticement to Mannion to refrain from using his mastery of Pennsylvania trust law and his aggressiveness and creativity as a veteran Orphan's Court litigator was currying favor with a local celebrity and Ms. Nupson's multi-billionaire adversary in potentially challenging the adjudications, John.[3]

96.     Indeed, not long after Mannion gave Ms. Nupson his baleful, perfunctory assessment of the sole remedy he analyzed, he was hired by John, who has since paid his firm, Mannion Prior, LLP, in excess of $1,000,000 (one million dollars) in legal fees.   Upon information and belief, a significant portion of those fees were billed for prosecuting John's retaliatory declaratory judgment and indemnification actions against Ms. Nupson, and for exploiting the very affirmative defenses that Rosenfield convinced Ms. Nupson to concede in 2003 while secretly being paid by Bradford, and which Mannion refrained from discussing with Ms. Nupson while pretending to analyze her chances of challenging the 1994 Trust.

97.     By using the wires to further their common purposes contrary to 18 U.S.C. § 1343 to point Ms. Nupson to their first straw man or to withhold from her or that lawyer facts that they knew prohibited them from representing her and John in the forthcoming adjudications, or whose absence contributed to Mannion's negative assessment of her chances of challenging the 1994 Trust, and by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.16(a)(1), 2.1, 8.4(a), and in 42 Pa. C.S.A. § 2522, the Defendants proximately harmed Ms. Nupson.

98.     Yet another tactic was violating Ms. Nupson's attorney-client privilege. For instance, on or about March 24, 2011, shortly after deploying Mannion as their first straw man, Rosenfield emailed John and Laubach, Rosenfield's ex-partner and John's lawyer in the 2003

---

[3] In addition to being one of the wealthiest men in Pennsylvania and the United States, John is perhaps best known as an outspoken owner of the Philadelphia Phillies Major League Baseball Club.

transactions.  In that email, Rosenfield: (i) violated Ms. Nupson's privilege by revealing and discussing the substance and strategic ramifications of his advice whether she should challenge the 1994 Trust or sign-off on the adjudications he had prepared together with John, and which he planned to present to the court as attorney for both her and for John; and (ii) revealed his continued loyalty to John—owner of the company for whose subsidiary, Hunter Services, Rosenfield was a director—by assuring him the adjudications could get him "totally off the hook" as Ms. Nupson's co-trustee of the 1994 Trust.

99.     The Defendants thus proximately harmed Ms. Nupson by violating Ms. Nupson's privilege, by using the wires to further their common purposes contrary to 18 U.S.C. § 1343, and by violating their duties in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.16(a)(1), 2.1, 8.4(a), and in 42 Pa. C.S.A. § 2522.

100.    In that same March 24, 2011 email, Rosenfield remarked that he had not yet heard from Ms. Nupson's Los Angeles lawyer (Jonathan Freund, namesake of Freund & Brackey, LLP) concerning the adjudications, with the clear intimation being that he intended to relate whatever he learned to John and Laubach.

101.    John responded approximately thirty days later on or about April 28, 2011, also via email, informing Rosenfield and Laubach that they had not heard back from Ms. Nupson's Los Angeles lawyer because she was waiting to learn who would represent her in the Montgomery County Orphan's Court in connection with the account adjudications at issue.

102.    John then proceeded to:

(i) inform Rosenfield and Laubach that Ms. Nupson had been referred to John Stoviak of Saul Ewing Arnstein & Lehr, LLP;

(ii) list several reasons why Stoviak would be obliged to protect his interests while purporting to represent Ms. Nupson—including that both men had attended the Haverford School; that Stoviak was on Haverford's board; that John was a former trustee for Haverford; and that John was then Haverford's largest donor;

(iii) reveal that he had already talked to Stoviak about protecting his interests while purporting to represent Ms. Nupson;

(iv) inform Rosenfield and Laubach that he expected Stoviak to reveal the substance of any legal advice rendered to Ms. Nupson; and

(v) alert them that if that did not happen, he would solicit the substance of that advice from Stoviak.

103.    Notwithstanding that Rosenfield therefore had detailed, verifiable, and credible information that Stoviak was at least as interested in protecting John's interests as in promoting Ms. Nupson's interests in the forthcoming adjudications, that Stoviak had already acted consistent with that compromised position, and that he was expected to do so again or would be prompted to do so by his ex-schoolmate and Defendants' corporate patron, and that Rosenfield had informed Ms. Nupson that he was sufficiently conflicted to recuse himself from participating in any challenge to the 1994 Trust which he had drafted, Rosenfield did not alert Ms. Nupson to any of those facts indicating Stoviak's serious and already manifested conflicts of interest.

104.    To the contrary—and notwithstanding Rosenfield's ostensible awareness of his own inability to participate in any challenge to the 1994 Trust he had drafted while being paid by John's company—Rosenfield proceeded to: (i) interact with Stoviak via telephone, emails, facsimile, and U.S. Mail or common carrier; and (ii) affirmatively give Ms. Nupson the impression, or do nothing to dissuade her from believing that Stoviak was disinterested and

36

independent of any influence exerted by Defendants' corporate patron, contrary to what Rosenfield knew to be true.

105.    Ultimately, consistent with John's conclusion that Stoviak would protect his interests while purporting to advise Ms. Nupson, Stoviak concluded that her chances of challenging the 1994 Trust were effectively nil because *inter alia* there was no one upon whom she had relied, who exerted influence over her, and who stood to receive a substantial benefit from the 1994 Trust, notwithstanding that:

(i) Stoviak knew that John was her co-trustee, without whose approval she could not take any action in administering the trust;

(ii) Stoviak had himself demonstrated an inability to resist John's influence by telephoning to seek his approval to represent Ms. Nupson—an approval which John had no legal authority to withhold, and the several bases for which influence Stoviak did not discuss with Ms. Nupson;

(iii) Stoviak knew that the 1994 Trust had been drafted by Defendants without consultation with Ms. Nupson;

(iv) Stoviak knew the 1994 Trust had been altered to prevent Ms. Nupson from accessing the principal she had contributed;

(v) Stoviak knew that John, as trustee of the tributary trusts listed in the 1998 Assignment, had the ability to funnel more of Ms. Nupson's inheritance into the 1994 Trust; and

(vi) Stoviak knew that John's children were among the remaindermen of the 1994 Trust and stood to receive forty percent of the principal.

106.    Through his above acts and omissions, Rosenfield deliberately helped to create or maintain the false impression in Ms. Nupson's mind that yet another experienced lawyer had

independently concluded there was no viable basis to challenge the petitions to adjudicate accounts for the 1994 Trust that he had drafted and then helped to progressively undermine to curry favor with and benefit his corporate patron's chief executive—while secretly being paid by that corporation—to Ms. Nupson's detriment.  The Defendants thus proximately harmed Ms. Nupson by using the wires to further their common purposes contrary to 18 U.S.C. § 1343, and by violating their duties in Pennsylvania common law and at minimum Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522.

107.   Another part of Defendants' protracted effort to convince Ms. Nupson to sign the adjudications was prompting Bradford's Certified Public Accountant John B. Stine, via email or telephone, to admonish Ms. Nupson that she would need to set aside at least $200,000 (two hundred thousand dollars) just for preliminary consultations with the straw-man lawyers.

108.   This and other similar acts alleged herein were designed to foment a sense of futility and desperation in Defendants' vulnerable client, and thereby dissuade her from hiring truly independent, competent counsel to investigate the historical background for, scrutinize, and object to the accounts that Defendants intended to file as lawyer for both her and John, thereby duping the Orphan's Court into facilitating their deception of, and injury to their own client. The Defendants thus proximately harmed Ms. Nupson by using the wires to deceive her contrary to 18 U.S.C. § 1343, and by violating their duties in Pennsylvania common law and at minimum Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522.

109.   Another series of deliberate acts and omissions were committed by Rosenfield on behalf of the Bradford subsidiary that he directed, Hunter Services, Inc. in order to conceal that Defendants had been paid by Bradford to purport to represent Ms. Nupson in connection with the 2003 redemption.   Rosenfield planned to use the 1994 Trust's federally regulated custodial

accounts to fraudulently conceal who had paid his firm to purport to represent her in connection with the 2003 redemption, by laundering and secretly returning to Bradford $154,000 (one-hundred-fifty-four thousand dollars) in legal fees contrary to 18 U.S.C. §§ 371, 1343, 1956 and potentially Rule 1.15 (safekeeping client property).

110.    Defendants had informed Ms. Nupson in an October 11, 2002 conflict waiver discussed *supra* that Rosenfield was a director of Hunter Service Company, Inc., a wholly owned subsidiary of Bradford.  However, the Defendants deliberately withheld from Ms. Nupson and did not counsel her then or during their protracted effort to convince her to sign-off on the 2012 petitions to adjudicate her 1994 Trust accounts on the significance for her interests of numerous things that they knew to be true, including:

(i) that Rosenfield had long been the client manager for Bradford at the Schnader Firm and continued to use that title in May of 2003, following the redemption and while still purporting to represent Ms. Nupson's interests in the recent transactions;

(ii) that the scheme to use Ms. Nupson's 1994 Trust accounts to fraudulently conceal who had paid Defendants to purport to represent her in connection with the 2003 redemption, by laundering and returning to Bradford $154,000 (one-hundred-fifty-four thousand dollars) in legal fees used to harm her would violate 18 U.S.C. §§ 371, 1343, 1956;

(iii) that the money-laundering scheme would involve: (a) Rosenfield in four capacities as partner of the Schnader Firm, client manager for Bradford, director of Hunter Service Company, Inc., and as lawyer for her and for John as co-trustees of the 1994 Trust; (b) Rosenfield's partners or associates and non-lawyer employees at the Schnader Firm; (c) Bradford's Certified Public Accountant John B. Stine, then of SMART Business Advisory and Consulting, LLC; and

(d) Michael Kelly and Annette Madison, who were employees or officers of an apparent shell company for Bradford, Dock Street Capital, LLC;

(v) that Dock Street Capital was originally a King of Prussia accounting and bookkeeping service founded in 1996 but which on September 10, 2009 was registered as a Delaware limited liability company.  On the same day, a second apparent Delaware shell corporation for Bradford was created, Pine Street Group, LP;

(v) that both companies list 510 Feheley Dr., King of Prussia, PA 19406 as their business address—the same address used by a major Bradford asset, the McIntosh Inns hotel chain;

(vi) that in emails sent on or about December 18 and 26, 2009, or not long after the simultaneous creation of Dock Street Capital and Pine Street, Rosenfield informed his ex-partners Laubach and Thompson that: (a) Hunter Service Company wanted *its* books cleaned up; (b) the Schnader Firm wanted to be compensated for *its* unpaid legal fees; and (c) that Rosenfield wanted to alert Madison, an employee or officer of Dock Street Capital in both of its historical iterations, that they would not be able to clean up *Hunter's* books that year;

(vii) that in an email sent five months later on May 17, 2010 by Kelly of Dock Street Capital, LLC to Rosenfield, Stine, and to Kelly's colleague Madison, Kelly had referred to the stalled effort to adjudicate Ms. Nupson's 1994 Trust and reminded Rosenfield that the newly formed Dock Street Capital, LLC had sitting on *its* books $154,000 (one-hundred-fifty-four thousand dollars) in reimbursement due *to Bradford*; and that evidently, therefore,

(viii) one or more of the disbursements in a series of forthcoming 1994 Trust accounts would contain monies to be disbursed from the trust's federally regulated custodial accounts, thence to be passed through one or more interim recipients—evidently including Dock Street Capital, LLC and Hunter Services—and thence ultimately to Defendants' corporate patron, as

reimbursement for having paid $154,000 (one-hundred-fifty-four thousand dollars) in Defendants' legal fees.

111.    The Defendants thus proximately harmed Ms. Nupson by using the wires to conceal the nature or cause of the harm they inflicted upon her contrary to 18 U.S.C. § 1343, and by violating their duties to her as established in Pennsylvania common law and Rules 1.1, 1.2, 1.4, 1.7(a)(1)-(b)(1), 1.8(f), (k), 1.10, 1.16(a)(1), 2.1, 8.4(a), and 42 Pa. C.S.A. § 2522, and by violating their duties to the Court established in Pennsylvania common law, 42 Pa. C.S.A. § 2522, and Rule 3.3 (requiring candor to the tribunal) while purporting to represent Ms. Nupson.

**F.    Ms. Nupson is entitled to separate awards of compensatory and exemplary damages in amounts to be determined by the jury.**

112.    Rosenfield and each of his partners at the Schnader Firm is jointly and severally liable for every act and omission alleged in this Complaint. *Radel v. Seib*, 105 Pa. Super. 75, 79, 159 A. 182, 183 (Pa. Super. 1932) (concluding that members of partnership are jointly and severally liable). Ms. Nupson is therefore entitled to an award of compensatory damages to be determined at trial.

113.    In addition to compensatory damages, exemplary damages are proper where, as alleged throughout this Complaint, the actions of Rosenfield and his partners, associates, and non-lawyer employees that create actual damages also import insult or outrage, and are committed with a view to oppress or are done in contempt of a plaintiffs' rights. *Golomb v. Korus,* 261 Pa. Super. 344, 396 A.2d 430 (Pa. Super. 1977).

114.    The wealth of the Defendants, and each of them, must be considered by the jury in assessing exemplary damages, for "if a wealthy person commits a rather heinous act, nominal punitive damages will not deter either that person or any other similarly situated person from committing a similar act." *Vance v. 46 and 2, Inc.*, 920 A.2d 202, 206 (Pa. 2007).

115.    As for the standards by which Defendants' acts and omissions should be measured, Rosenfield did more than violate the enumerated Rules of Professional Conduct, Pennsylvania common law, and his Oath of Office.  Many of his actions alleged throughout this Complaint—and in particular the course of action he undertook to facilitate the 2003 redemption and planning to use adjudications of a trust he drafted for Ms. Nupson's benefit to injure her, and to conceal who had secretly paid his firm's fees to purport to represent her in connection with the redemption—involved dishonesty and were contrary to Pennsylvania and United States statutes. *See* 26 U.S.C.A.A. § 2308(a)(1), which the Treasury Department has determined to be "applicable to any power affecting the time or manner of enjoyment of property or its income," T.D. 6292 (June 23, 1958); *and see* 26 U.S.C.A.A. § 2308(a)(1) and 7606(1)-(2) (tax evasion and false reporting felonies with enhanced penalties for corporations); *Estate of Lauder v. C.I.R.*, T.C. Memo. 1994-527, *p 20 (U.S. Tax Ct. 1994) (agreed-upon formula used by shareholders of closely-held corporation could not be used to depress fair market value of stock to avoid estate tax); *Com. v. Phoebe W. Haas Charitable Trust "A''*, 29 Pa. Cmwlth. 214, 220, 370 A.2d 406, 409 (Pa. Cmwlth. Ct. 1977) (discussing treatment of trust assets subject to 72 P.S. §§ 7301-7303, 7305); and 18 U.S.C. §§ 371, 1956.

116.    Significantly for this case, such behavior is sufficiently egregious to warrant disbarment or at least suspension from the practice of law.  R. Prof. C. 1.2(d) (lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent); *Office of Disciplinary Counsel v. Holston,* 533 Pa. 78, 619 A.2d 1054 (Pa. 1993) (forging court order, lying about origins of document, demonstrated callous disregard for integrity of judicial process and warranted most severe sanction); *Chung*, 548 Pa. 108, 695 A.2d 405 (false statements to federally insured financial institutions warranted five-year suspension).

42

117.     Yet, even if assessed in a statutory-regulatory vacuum—and thus measured solely against the standard established by the Rules of Professional Conduct—the acts and omissions alleged herein are sufficiently outrageous in character and extreme in degree to warrant substantial exemplary damages.

118.     Because "[a] lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen *having a special responsibility for the quality of justice*[,]" it is utterly intolerable that officers of the Supreme Court of Pennsylvania should prostitute the trust confided to them by a vulnerable individual client while secretly being paid by and acting to benefit another, much wealthier corporate client. "Preamble: A Lawyer's Responsibilities," *Pennsylvania Rules of Professional Conduct*, ¶ 1 (emphasis supplied).

119.     Perhaps even more atrocious, if that is possible, is that Defendants were keenly aware of the harm that their actions would predictably inflict on a client who had for years expressed exasperation bordering on despair at her inability to access her own property in a trust that Defendants had drafted ostensibly to benefit her and which bore her name.  Notwithstanding his client's increasingly desperate refrain that she did not understand how she had become separated from her own bounty and wished, above all, to learn how her predicament might be ameliorated, Rosenfield used his knowledge of her particular vulnerabilities, concealed the nature of his firm's ongoing relationship with its corporate patron, and exploited his reputation before the Orphan's Court and in the legal community at large to block her from achieving that end while lining his own pockets and those of his partners.

120.     In perhaps the epitome of conduct prohibited by the Oath of Office requiring Rosenfield to "discharge the duties of [his] office with fidelity, *as well to the court as to the client*," 42 Pa.C.S.A. § 2522 (emphasis added), he then proceeded to represent Ms. Nupson and

his corporate patron's chief executive in court proceedings that would not only seal her fate, but which would also be used to conceal from her and the tribunal the fact that his corporate patron had paid his firm's fees while he inflicted harm on her—a final insult on top of two decades of deplorable and injurious misconduct.

121.    Ms. Nupson is therefore entitled to an award of exemplary damages in an amount sufficient to deter the Defendants, together with every similarly situated attorney and law firm in the Commonwealth, from committing similar acts and omissions.

### DEMAND FOR A TRIAL BY JURY

Pursuant to the Seventh Amendment to the U.S. Constitution and Federal Rule of Civil Procedure 38(b), Anna K. Nupson demands a trial by a jury in this action of all issues so triable.

### PRAYER

WHEREFORE, a judgment should be entered against Bruce A. Rosenfield and Schnader Harrison Segal & Lewis, LLP, holding them jointly and severally liable for compensatory and punitive damages, in separate amounts to be determined at trial, for the costs of suit, and for any other relief as the Court deems just and proper.

Respectfully Submitted:

JOEL YOUNG ATTORNEY AT LAW, LLC

Joel M. Young, Esq. (no. 320380)
P.O. Box 1189
Bernalillo, NM 87004
jmyoung@swcp.com
(505) 243-5696

Dated June 15, 2018

44

<u>DECLARATION PURSUANT TO 28 U.S.C.A.A. § 1746</u>

I declare under penalty of perjury that the foregoing Complaint is true and correct to the best of my knowledge.

Anna K. Nupson

Dated: June 15, 2018