IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNA K. NUPSON | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | No. 2:18-cv-02505-NIQA |
| v. | : | |
| | : | |
| SCHNADER HARRISON SEGAL & | : | |
| LEWIS LLP, et al. | : | |
| *Defendants.* | : | |

## THIRD AMENDED COMPLAINT FOR LEGAL MALPRACTICE, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, AND OTHER TORTIOUS MISCONDUCT

COMES NOW the Plaintiff Anna K. Nupson, through counsel, and states the following in support of her Third Amended Complaint for Legal Malpractice, Breach of Contract, and Breach of Fiduciary Duty, and other tortious misconduct:

1. Plaintiff Anna K. Nupson, aka Anna M. Bauer, and Anna Middleton, is a citizen of New Mexico.

2. Defendant Bruce Rosenfield ("Rosenfield") is a citizen of Pennsylvania. Defendant Schnader Harrison Segal & Lewis LLP ("Schnader") is a limited liability partnership with its principal place of business in Philadelphia, Pennsylvania. Defendant Schnader is a law firm and Defendant Rosenfield is a partner in Schnader. Defendant Schnader is liable for all of Defendant Rosenfield's actions alleged in this Third Amended Complaint.

3. Defendants Schnader and Rosenfield represented Plaintiff beginning in approximately 1994. This is an action for legal malpractice, breach of contract, breach of fiduciary, negligent misrepresentation, and constructive fraud against Defendants Schnader and Rosenfield arising out of Defendants' representation of Plaintiff and Plaintiff's trusts.

4. Additionally, this is an action against Defendant Rosenfield while acting as trustee of the

Trust Under Agreement of Frances S. Middleton FBO Anna K. Nupson dated February 1, 2001 ("Anna Nupson 2001 Trust"). In his capacity as trustee, Rosenfield is personally liable for torts committed in the course of administering the Anna Nupson 2001 Trust. *See* 20 Pa. C.S.A. §7790.

5. The amount in controversy exceeds $75,000. Plaintiff does not seek recovery of her damages from any trust being administered by the Pennsylvania Orphans' Court, and Plaintiff does not request this Court assume *in rem* jurisdiction over trust property that is in the custody of the Orphans' Court. *See Three Keys Ltd. v. SR Utility Holding Co., 540 F.3d 220, 227 (3d Cir. 2008)*; *see also Marshall v. Marshall, 547 U.S. 293, 311-12 (2006).* This Court has jurisdiction over the matter pursuant to 28 U.S.C. 1332.

6. Venue in this District is proper pursuant to 28 U.S.C. 1391(b)(1) and (2), because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

7. Defendants represented Plaintiff in connection with the sale of stock in a family-owned corporation. The net effect of this stock sale transaction was that Plaintiff's brother, John Middleton ("John"), another client of Defendants, became the sole owner of Bradford Holdings, Inc. ("Bradford"), the family-owned corporation. From 1994 forward, Defendants also represented the family-owned corporation and Plaintiff's parents, Herbert Middleton, Jr., and Frances Middleton.

8. At the time of the negotiations for the sale of the stock, Plaintiff was led to believe she had no right to her 38 voting class A Bradford shares and 70,963 non-voting class B Bradford shares held in her 1994 Trust, and only a discretionary right to the dividends from those shares, which were valued for the purposes of the stock sale at $275 per share. In fact, Bradford's shares were worth nearly $5000 per share.

9.  As alleged below, Defendants' legal malpractice and breach of contract resulted in Defendants leading Plaintiff to believe that selling her interest in the Bradford shares was in her best interests and they counseled her to proceed with the transaction. Driven by their own conflicts of interest and their recent, undisclosed representation of John in a secret transfer of 258,029 Bradford shares to a trust for John's benefit, Defendants counseled Plaintiff to give up all rights to Bradford shares. In addition, Defendants' conduct breached their fiduciary duties owed to Plaintiff as a result of Defendant Rosenfield's role Trustee of the Trust under Agreement of Frances S. Middleton fbo Anna K. Nupson dated February 1, 2001 (the "Anna Nupson 2001 Trust"), a trust created for the benefit of Plaintiff.

### The Middleton Family and Bradford

10. Plaintiff is the daughter of Herbert Middleton, Jr. ("Herbert") and Frances Middleton ("Frances"). Herbert and Frances had two other offspring, Plaintiff's siblings, John and Lucia Middleton Hughes ("Lucia"). The Middleton's are sometimes referred to as the "Middleton Family" in this Third Amended Complaint.

11. The Middleton Family owned a very successful business, started by Herbert's father. That business, first known as John Middleton, Inc., then became a subsidiary of G.W. Hunter, and later Bradford, manufactured several tobacco products, the most famous of which were the Black and Mild, Middleton's Cherry Blend, Gold and Mild, and Prince Albert's.

12. The Middleton Family's business was enormously successful and generated vast wealth for the Middleton Family. By way of illustration, the Company had revenues of $194,981,434 (for the year ended January 31, 2001) and total assets of $233,456,477.

### Defendants' Representation of the Middleton Family and the Company

13. Prior to 1994, Defendant Schnader began representing the Middleton Family and the

Company. Over the course of the following decades, Defendant Schnader represented the Company, Herbert, Frances, John, and Plaintiff, as well as a host of other

Middleton Family and Bradford-related entities. At times, Defendant Schnader and Defendant Rosenfield represented the Company or individual members of the Middleton Family; at other times Defendant Schnader and Defendant Rosenfield represented the interests of the Middleton Family as a whole. However, as alleged below, Defendants failed to recognize the need to address each matter as a separate representation, failed to identify the client for each separate representation, and failed to identify and address potential and actual conflicts of interest posed by Defendants' concurrent representation of the Company, the Middleton Family or individual members of the Middleton Family.

Instead, Defendants often acted as "lawyers for the Company" or as "lawyers for the family" even when they were representing an individual member of the Middleton Family. Defendants treated their representation of Plaintiff as if Bradford were the client.

14. Billings for Defendant Schnader's representation of the Middleton Family in trust matters alone have exceeded approximately $1,000,000. Billings for Defendant Schnader's representation of the Middleton Family and the Company on all matters is a large multiple of that amount.

### The Middleton Family Agreements

15. The Middleton Family entered into a series of agreements that governed their ownership of Bradford and their financial assets. Defendants represented the Middleton Family in connection with each of these agreements and Defendants were well aware of the terms of each of these agreements.

16. In 1982, Defendants represented the Middleton Family in creating a Shareholders'

Agreement that controlled the ownership of stock in the Company. The Shareholders' Agreement was amended several times, in 1987, 1993, and 1997. In each case, Defendants provided legal advice to the Middleton Family and drafted the agreements.

17. The 1982 Shareholders' Agreement imposed restrictions on the shares of the Middleton Family business and its successors. These restrictions were designed to keep the shares of the Company in the Middleton Family, and to ensure that the three Middleton children (Lucia, Anna, and John) were treated equally with respect to their ownership interest in the Company.

18. On December 15, 1993, Herbert and Frances executed an agreement under which Herbert agreed to transfer to himself and Frances, as tenants by the entireties, 439,374 shares of Class B non-voting stock of G.W. Hunter, Inc. (Bradford's predecessor), as well as other assets (the "Restriction Agreement"). These shares represented approximately 45% of the total outstanding shares of the Company.

19. The Restriction Agreement imposed restrictions on Frances' disposition of the Bradford shares transferred by Herbert. Specifically, the Restriction Agreement provided that if Frances survived Herbert, she:

> will not transfer ownership (either by gift, sale or otherwise) of the Shares, or shares of any successor to G.W. Hunter, Inc., or in property received in conversion or exchange for the Shares, to any party other than G.W. Hunter, Inc. or the descendants of HERBERT and FRANCES, during her lifetime or upon her death, without the consent of John S. Middleton (or if he is not then sui juris, then without the consent of LUCIA M. HUGHES and ANNA M. BAUER who are then sui juris.)

20. On the same date that Herbert and Frances executed the Restriction Agreement, Frances also executed an Agreement To Be Bound by the terms of the 1982 Shareholders'

Agreement.

21. In the Agreement To Be Bound, Frances agreed that:

> As a proposed transferee of Shares covered by the Shareholders'
> Agreement, the undersigned hereby agrees that such Shares are subject to
> all of the terms and conditions of the Shareholders' Agreement and all
> rights and obligations thereunder arising, including but not limited to the
> imprinting of a legend on the certificate representing such Shares, that the
> undersigned accepted all of the terms and conditions of the Shareholders'
> Agreement and that the undersigned shall hereafter be deemed to be a
> signatory party to the Shareholders' Agreement in the position of one of
> the Shareholders.

22. As noted above, the 1982 Shareholders' Agreement imposed restrictions on the transfer of
the future and outstanding shares of the Company. The restrictions imposed by the 1982
Shareholders' Agreement included a provision which required, among other things, that
any shareholder who wished to transfer his or her shares, other than "outright to an Eligible
Family Member" or "In Trust," must first offer the shares to the Company or to the other
shareholders in proportion to their interest. If the transfer were made in Trust, several
conditions had to be met to avoid the requirement that the shares first be offered to the
Company or to the other shareholders. In addition, the 1982 Shareholders' Agreement
required that the value of the shares being transferred be established by a recent fair
valuation.

23. The net effect of the Shareholders' Agreement, the Restriction Agreement, the Agreement
to Be Bound, and other agreements entered into by the Middleton's, was that any transfer
of the Bradford shares mandated for the direct descendants of Frances and Herbert, John,
Lucia and Plaintiff, to retain proportional ownership in Bradford and or fair value for
relinquishing that proportional ownership.

24. This was consistent with Herbert's and Frances' estate planning, which was designed to ensure that Plaintiff, Lucia and John would be treated equally in the distribution of the Middleton Family assets. As trusts and estates counsel to the Middleton Family, Defendants were aware of, and indeed had drafted, the operative agreements.

25. Thus, Defendants were at all times well aware of the Middletons' estate planning goals, and specifically the requirement that any transfer of Frances' Bradford shares must result in the three Middleton children each owning an equal number of Frances' Bradford shares.

### Defendants' Representation of John in the 2001 GRAT Transactions

26. In 2000, Defendants represented John in a transaction that resulted in Frances transferring her Bradford shares to a trust whose sole beneficiaries were John and his family, and thereby excluding Lucia and Plaintiff.

27. Despite the fact that Defendant Rosenfield and Defendant Schnader represented all members of the Middleton Family, both collectively and individually, and despite the fact that Defendant Rosenfield represented Plaintiff in trust and estates matters, Defendants had a duty and an ethical responsibility to disclose their representation of John to Plaintiff and breached that duty by failing to disclose to Plaintiff. Defendants had a duty to inform the Plaintiff that shares had been transferred between Frances and John against the terms of the Shareholders' Agreement. This is the kind of complex estate planning and family business transaction that requires attorneys to exercise a high degree of diligence in ensuring that the interests of all parties are adequately protected and that no conflicts arise.

28. As part of this transaction, beginning in 1999 and continuing to late 2000, John, Frances and Defendant Rosenfield discussed an inter vivos transfer of Frances' Bradford shares to

John, using a grantor retained annuity trust ("GRAT") as a vehicle to avoid the substantial gift taxes that would otherwise apply to an inter vivos gift of the Bradford shares.

29. The Bradford shares that were the subject of this inter vivos transfer were worth at least $52,895,945 and may have been worth more than $1,000,000,000. The gift tax applicable on an inter vivos gift of Frances' Bradford shares was substantial and would have totaled at least $20,000,000 and could have totaled more than $400,000,000.

30. By December 2000, John, with Defendant Rosenfield's legal advice and assistance, had secured Frances' agreement to fund a two-year GRAT, using 258,029 of Frances' Bradford shares, with the shares being transferred to a trust for the sole benefit of John and his family.

31. On or before February 1, 2001, John, with Defendant Rosenfield's legal advice and assistance, had secured an irrevocable gift from Frances of her Bradford shares and it has been represented that Frances signed stock powers and directed the transfer of her Bradford shares.

32. Defendants were fully aware of these events and fully participated in the transfer of Frances' Bradford shares to a trust for John and his family's sole benefit, excluding Lucia and Plaintiff.

33. Over the next several months, Defendant Rosenfield prepared trust documents to be used to document the already effected transfer of Frances' Bradford shares to John. These documents provided that, upon termination of a two-year annuity trust, the trust assets would be delivered to another trust solely for the benefit of John and his family, excluding completely Lucia and Plaintiff.

34. Defendant Rosenfield has stated under oath that on November 19, 2001, Frances signed the

GRAT I trust document prepared by Defendant Rosenfield for the transfer of Frances'

Bradford shares. The trust document bore a February 1, 2001 date, but this was false.

Frances' agreement to transfer the Bradford shares had occurred months before and,

according to Defendant Rosenfield's later sworn statement, the Bradford shares had already

been transferred to John by means of an oral trust. Despite this, Defendant Rosenfield

witnessed Frances' signature on the trust document, which was drafted, signed, and

witnessed many months after the fact.

35. Defendants did not inform Plaintiff about the oral trust or the 2001 GRAT ("GRAT I")

transaction, and Plaintiff did not learn about either until October 2016.

36. Instead, Defendants actively and fraudulently concealed the oral trust and the 2001 GRAT

I transaction from Plaintiff.

37. In addition, Defendants did not disclose to Plaintiff that they had represented John in the

oral trust or in the 2001 GRAT I transaction. During the course of the Orphan's Court

litigation, discussed below, Bradford shares were produced that demonstrated that Frances

had funded GRAT I on February 1, 2001.

38. The oral trust and the 2001 GRAT I transaction violated the terms of the Middleton Family

agreements and Herbert's and Frances' estate plan, which required that any transfer of

Frances' Bradford shares must be a transfer to John, Lucia, and Anna in equal shares. In

addition, the 1982 Shareholders' Agreement required that the transfer of Bradford stock be

preceded by sufficient notice to all shareholders and triggered a right for any other

shareholder to purchase the shares, and required a formal valuation to insure that the

proposed transfer was at fair value.

39.  Lucia learned of the 2001 GRAT I transaction in approximately 2002. Plaintiff did not

learn of the 2001 GRAT I transaction until October 2016.

40. When Lucia learned of the 2001 GRAT I transaction, she accused John of procuring it

through undue influence over Frances.

41. Defendants failed to advise Plaintiff of Lucia's allegation against John of exerting undue

influence over Frances which demonstrated a potential conflict in the transfer of shares.

Instead, Plaintiff did not learn of Lucia's belief that John had exerted undue influence over

Frances in the transfer of the shares to the GRAT I until October 2016. Defendants failed

in their duty to notify Plaintiff of the potential conflict and the legal ramifications she

suffered as a result, and instead concealed these facts from Plaintiff.

42. As a result of Lucia's claims of undue influence, GRAT I was later modified and a new

GRAT ("GRAT II") was adopted and backdated to February 1, 2001.

43. Under the terms of GRAT II, in 2005, Defendant Rosenfield assumed his role as Trustee

of the Anna Nupson 2001 Trust. Rosenfield currently serves as trustee of the Anna Nupson

2001 Trust. As trustee, Defendant Rosenfield owes a fiduciary duty to Plaintiff.

**Defendants Joint Representation of Plaintiff and Frances**

44. In late 2002 and early 2003, Defendants represented Plaintiff and Frances in connection

with negotiations leading to a transaction engineered by John in which, among other things,

Plaintiff, her sister Lucia, and their mother Frances transferred all of their interests in

Bradford stock to the Company (the "Bradford Stock Sale Transaction"). As alleged above,

the net effect of this transaction was that John became the sole owner of Bradford.

45. At the time of the Bradford Stock Sale Transaction, Bradford was conservatively estimated

to be in the range of approximately $1-3 billion.

46.  At the time of the Bradford Stock Sale Transaction, Plaintiff was entitled to one third shares of the Bradford shares transferred to Frances by Herbert or their fair value.

47.  In the Bradford Stock Sale Transaction, Plaintiff received an annuity trust of approximately $24,917,767 for her 1/3 portion of Frances's Estate, something that she would have received through Frances existing estate plan. When they commenced their representation of Plaintiff in the Bradford Stock Sale Transaction, Defendants did not disclose to Plaintiff: 1) that Defendants had represented John in the 2001 oral trust and the GRAT I transaction, that transferred Frances' Bradford shares to John alone, excluding Lucia and Plaintiff; 2) the existence of the 2001 oral trust and the 2001 GRAT I transaction, and that these transactions were structured to transfer Frances' Bradford shares to John and his family, excluding Plaintiff and Lucia from the ownership of Frances' Bradford shares; 3) that Defendants had also represented Frances in the 2001 oral trust and the 2001 GRAT I transaction; and 4) that John had been accused of exerting undue influence over Frances in connection with the 2001 oral trust and the 2001 GRAT I transaction.

48.  At the time Defendants undertook to represent Plaintiff in the negotiations leading to the Bradford Stock Sale Transaction, Defendant Rosenfield drafted a letter to Frances, John and Plaintiff, which purported to satisfy his obligations under Pennsylvania law to disclose all actual or potential conflicts of interest before undertaking the representation of Plaintiff and Frances in the Bradford Stock Sale Transaction. Defendant Rosenfield's letter stated: "We believe that Rule 1.7 [of the Rules of Professional Conduct] does not preclude us from

representing either and both of you [Frances and Plaintiff] in this matter and that the criteria of Rule 1.7(a) are satisfied, provided that we obtain the consent of each of you."

49. Rule 1.7 requires that a lawyer make full disclosure to a client in connection with conflict waivers and requires that any consent given be an informed consent to be valid.

50. Defendant Rosenfield's letter was false. The Rules of Professional Conduct did not permit Defendant Rosenfield to represent Plaintiff, given his recent representation of John in the oral trust and GRAT I transaction and his failure to obtain Plaintiff's informed consent. In addition, Defendant Rosenfield did not identify each and every conflict being waived as required by the Rules of Professional Conduct. Most seriously, Defendant Rosenfield failed to reveal he and Defendant Schnader viewed Bradford as their client, with any matters for Frances or Plaintiff as a subsidiary or sub-category of Bradford's interest.

51. In addition, Defendant Rosenfield's letter did not disclose, but instead concealed, that Defendant Rosenfield had assumed a duty to John and Bradford that was in direct opposition to the interests of Plaintiff and Frances. Having just represented John in the 2001 oral trust and the 2001 GRAT I transaction, which were designed to allow John to obtain for himself Frances' Bradford shares, in breach of the Middleton Family agreements and in violation of Herbert's and Frances' estate plan, Defendant Rosenfield was well aware that he had an actual and serious conflict of interest that could not be waived. Defendant Rosenfield and Defendant Schnader failed to disclose these serious conflicts to Plaintiff.

52. Defendant Rosenfield was aware of his obligations and duties under Pennsylvania law to

disclose to Plaintiff any actual or potential conflicts of interest he or Defendant Schnader had before undertaking to represent Plaintiff. Defendant breached those duties by failing to disclose his representation of John and Frances in the 2001 oral trust and the 2001 GRAT I transaction.

53. Defendant Rosenfield undertook to represent both Plaintiff and Frances in the Bradford Stock Sale Transaction. This was yet another conflict of interest.

### The Orphans' Court Litigation

54. In 2015, John initiated multiple proceedings in the Orphans' Court of Montgomery County ("Orphans' Court Litigation") seeking declaratory judgments regarding the Bradford Stock Sale Transaction, among other relief.

55. In general, John initially took the position that the Bradford Stock Sale Transaction was valid.

56. In the course of the Orphans' Court Litigation, in October 2016 John's counsel disclosed for the first time the existence of the 2001 GRAT I transaction gifting Frances' Bradford shares to John.

57. In October 2016, following an Order from the Court, Defendant Rosenfield, as trustee, filed a Petition for Adjudication and administrative Accounting for the Anna Nupson 2001 Trust.

58. By Order dated March 16, 2017, the Orphans' Court dismissed Rosenfield's Petition and John's Declaratory Judgment actions and ordered Defendant Rosenfield to file an Amended Petition for the GRAT that stated the complete and factual correct history of the Trust.

59. On May 1, 2017, John filed a new Declaratory Judgment action, asserting for the first time

that the 2001 GRAT, which was solely for his benefit, had been amended to benefit all siblings equally, as consideration for Plaintiff in the Bradford Stock Sale Transaction, and in a Master Settlement Agreement ("MSA") and Family Settlement Agreement entered into at or around the same time.

60. In addition, on May 1, 2017, Defendant Schnader, as lawyers, and Defendant Rosenfield, as the Trustee of the Anna Nupson 2001 Trust, filed an Amended Petition in the Orphans' Court, which disclosed the facts underlying the 2001 oral trust and the 2001 GRAT I transaction for the first time. In his Amended Petition, Defendant Rosenfield stated, under oath, that the trust had been oral until November 2001 and was backdated to February 1, 2001.

61. Plaintiff did not know these facts and could not in the exercise of reasonable diligence have learned these facts before they were disclosed by Defendants Schnader and Rosenfield. Indeed, these facts had been actively and fraudulently concealed from Plaintiff by Defendants.

62. Prior to filing the Amended Petition, in sworn filings with the Orphans' Court, Defendant Rosenfield had asserted that GRAT II leaving the Bradford shares equally to all three siblings was signed on February 1, 2001, and was the only GRAT that ever existed, omitting any mention of the oral trust or GRAT I, which solely benefited John.

63. Moreover, during the Orphans' Court Litigation, Defendants Rosenfield and Schnader disclosed, for the first time, that the 2001 GRAT I was not executed on February 1, 2001. Instead, Defendant Rosenfield admitted that the 2001 GRAT I was not drafted until

November 2001, and that Defendant Rosenfield had backdated the instrument to February 1, 2001 and "witnessed" Frances' and John's signatures on the backdated document.

64. Defendant Rosenfield drafted and facilitated the execution of the 2001 GRAT I, which benefited John and was contrary to the rights and interests of Plaintiff and also the interests of Lucia.

65. Defendant Rosenfield represented that Frances' Bradford shares were transferred to the 2001 GRAT I in February 2001, even though the 2001 GRAT I had not been drafted and had not been executed.

66. As alleged above, Defendant Rosenfield has stated under oath that prior to the execution of the 2001 GRAT I in November 2001, there was an "oral trust" under which John was the beneficial owner of Frances' Bradford shares.

67. The IRS does not recognize oral GRATs. Any transaction in which Frances' Bradford shares were transferred to John by oral trust for John's benefit, would have been a taxable event.

68. The IRS also does not recognize any modification of a GRAT during its term. As a result of the facts disclosed by Defendant Rosenfield in 2017, the validity of all versions of the GRAT were called into question. If the 2001 GRAT I had been set aside, Frances and John would have incurred a substantial tax liability, because Frances' inter vivos gift to John in February 2001 via the oral trust was a taxable event. As alleged above, had Frances' gift to John been taxable, the tax liability would have ranged from $20,000,000 to $400,000,000.

69. As alleged above, Defendant Rosenfield did not disclose to Plaintiff that he had drafted the

2001 GRAT I in November 2001, backdated it to February 1, 2001 and "witnessed" Frances' and John's signatures.

70. Defendant Rosenfield further did not disclose to Plaintiff that he had negotiated the modification of the oral GRAT I (that solely benefitted John) and further backdated the later GRAT II (that purported to benefit all siblings), as supposed consideration for the Bradford Stock Sale Transaction and the 2003 MSA.

71. Plaintiff did not learn these facts, and could not have learned these facts in the exercise of reasonable diligence, until John filed the 2001 GRAT I in the Orphans' Court Litigation on February 23, 2017, and an Amended Petition for Declaratory Relief on May 1, 2017, producing a verified copy of the original 2001 GRAT I for the first time.

72. Plaintiff did not learn of these facts and could not have learned of these facts in the exercise of reasonable diligence, until Defendant filed an Amended Petition on May 1, 2017, contradicting John's Amended Declaratory Action and revealing for the first time that the 2001 GRAT I solely benefitting John had been oral and that the written version was backdated.

73. Defendants concealed these facts from Plaintiff to cover up their own conduct and to protect John from the possible effects of their conduct.

**Defendants' Estate Planning for Plaintiff**

74. Defendant Rosenfield represented Plaintiff individually in trust and estate planning matters commencing in 1994.

75. At the direction of Plaintiff's father, Herbert, Defendant Rosenfield drafted Plaintiff's self-

settled irrevocable trust in 1994, (the "1994 Anna Trust"). At all times, the trust reflected the intent of Herbert and not the Plaintiff.

76. In 1995, Defendant Rosenfield drafted and secured Plaintiff's renunciation to the principal in the 1994 Anna Trust, leaving her with only a discretionary right to income. However, in fact Plaintiff had nothing to renounce because no principal was devolving to her. This modification of the trust was done unilaterally without the consent of all beneficiaries.

77. At the time of the Bradford Stock Sale Transaction, Plaintiff's trust owned interests in 71,001 shares of Bradford, comprising approximately 11% of the outstanding shares.

78. As part of the 2003 MSA, the Middleton Family executed the 2003 Family Settlement Agreement ("2003 FSA") which terminated the 1994 Anna Trust and divided the corpus into two trusts for the benefit of Plaintiff's nieces and nephews, FBO Hughes and Middleton.

79. In the Bradford Stock Sale Transaction, Plaintiff's trust received approximately $19,500,000 as consideration for the purchase of her 71,001 shares.

80. At the time of the Bradford Stock Sale Transaction, the shares in the 1994 Anna Trust were worth at least $334,800,000 (or at least $315,000,000 more than she received).

81. Defendants concealed from Plaintiff at all times the true facts regarding her trust and its subsequent modifications.

82. Defendant Rosenfield knew at all times that Plaintiff's goal was to receive any and all proceeds of the shares held in the 1994 Anna Trust outright. Defendant Rosenfield failed to disclose to Plaintiff that he had negotiated the termination of the 1994 Anna Trust into FBO Hughes and Middleton as consideration for Frances and Lucia agreeing to the 2003 MSA.

83. Defendant Rosenfield failed to counsel Plaintiff on how to achieve her objective of obtaining a cash payout for the shares held in her 1994 Trust.

84. The sole purpose of this concealment was to allow Defendant Rosenfield the ability to use the termination of the 1994 Anna Trust and its division into in FBO Hughes and Middleton as Frances' and Lucia's consideration for the 2003 MSA.

### DEFENDANTS' LEGAL MALPRACTICE

85. All preceding allegations are incorporated as if set forth in their entirety herein.

86. Under Pennsylvania "[a]n action for legal malpractice may be brought in either contract or tort." *Garcia v. Community Legal Servs. Corp.*, 362 Pa.Super. 484, 524 A.2d 980, 982 (1987).

87. The elements of a legal malpractice action, sounding in negligence, include: (1) employment of the attorney or other basis for a duty; (2) failure of the attorney to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of the harm to the plaintiff. *Bailey v. Tucker*, 533 Pa. 237, 621 A.2d 108, 112 (1993).

88. With regard to a breach of contract claim, "an attorney who agrees for a fee to represent a client is by implication agreeing to provide that client with professional services consistent with those expected of the profession at large." *Id.* at 115. *See also Gorski v. Smith*, 812 A.2d 683, 694 (Pa.Super.2002) (citing *Bailey* and noting that "when an attorney enters into a contract to provide legal services, there automatically arises a contractual duty on the part of the attorney to render those legal services in a manner that comports with the profession at large").

89. As alleged above, Defendants were employed to represent Plaintiff, they failed to exercise ordinary skill and knowledge, and as a result, Plaintiff suffered damage.

90. In addition, Defendants breached their contractual duty to render legal services to Plaintiff in a manner that comports with the legal services rendered by the profession at large.

91. As alleged above, Defendants breached their duties to Plaintiff by, among other things: 1) representing John, or both John and Frances, in the 2001 oral trust transaction, which was intended to transfer Frances' Bradford shares to John, in violation of the Middleton Family agreements and in violation of Herbert's and Frances' estate planning intentions, which required that Frances' Bradford shares be transferred to all three of their children in equal shares; 2) drafting and witnessing the documents used to effectuate the 2001 GRAT I Transaction, which was an after-the-fact and backdated effort to legitimize the 2001 oral trust and to legitimize the modification of that trust; 3) representing both Frances and Plaintiff in the Bradford Stock Sale Transaction, despite the multiple conflicts involved; 4) failing to advise Plaintiff that John, with good cause, had been accused of exercising undue influence over Frances; 5) proceeding in their representation of Plaintiff in the Bradford Stock Sale Transaction and in conducting their representation in a way to insure that the transaction would go forward and be completed to assist John in his efforts to gain control of the Company, and also to cover up Defendants' own conflicts of interest and 2001 oral trust and 2001 GRAT Transaction; 6) failing to act to represent Plaintiff's best interests; 7) guiding Plaintiff to settle with John and complete the Bradford Stock Sale Transaction, despite Defendants' knowledge that John's underlying position was fatally flawed, that the

consideration being discussed and offered for the Bradford shares was based on an outdated

and inapplicable valuation; 8) counseling Plaintiff to enter into the MSA, which required

Plaintiff to indemnify John for any tax liability resulting from the GRAT redemption

transaction. As noted above, the potential tax liability was immense and could have totaled

more than $400,000,000; and 9) failing to advise Plaintiff concerning the possible effects

of the 2001 oral trust and GRAT I Transaction.

92. Defendant Rosenfield continued to serve as counsel and as Trustee for the Anna Nupson

2001 Trust despite all of this and also filed accountings with the Orphans' Court in an effort

to continue to conceal the true facts.

93.  Defendants' actions breached their fiduciary duty to Plaintiff.

## DEFENDANTS' BREACHES OF DUTIES AS TRUSTEE AND COUNSEL OF THE ANNA NUPSON 2001 TRUST

94.  All preceding allegations are incorporated as if set forth in their entirety herein.

95.  Upon termination of GRAT II in February 2003, the Trust directed that Plaintiff's one-

third portion of GRAT II's corpus formed a separate subtrust for the benefit of Plaintiff—

the Anna Nupson 2001 Trust.

96.  Pursuant to the terms of GRAT I and GRAT II, John acted as trustee of the GRAT from

2001-2003. Following termination of GRAT II, Frances served as trustee for the Anna

Nupson 2001 Trust from 2003-2005, after which, the Trust instrument named Defendant

Rosenfield as the default successor trustee of the Anna Nupson 2001 Trust.

97.  In 2005, Defendant Rosenfield accepted his role as sole trustee of the Anna Nupson 2001

Trust and secured the services of his law firm, Defendant Schnader, as counsel for the

Trust. To date, Defendant Schnader continues to serve as counsel for the Trust and Defendant Rosenfield continues to serve as Trustee.

98. Defendants' interests were conflicted with the interests of the Anna Nupson 2001 Trust and Plaintiff, the sole lifetime beneficiary of the Trust. Defendants' conflicts precluded Rosenfield from assuming his role as trustee of the Anna Nupson 2001 Trust, and Schnader from serving as counsel to the Anna Nupson 2001 Trust. Defendants' Rosenfield and Schnader failed to inform Plaintiff that they were precluded from acting as trustee and counsel for the Anna Nupson 2001 Trust because of their conflicts of interest following their misconduct surrounding the GRAT transactions.

99. Plaintiff did not and could not have known of Defendant conflicts until May of 1, 2017, when Defendants' revealed the above material facts.

100. Defendants' breached their duties owed to the Plaintiff and her Trust by misusing their respective roles as trustee and counsel for the Anna Nupson 2001 Trust by misrepresenting material and critical facts concerning the GRAT instruments and stock sale transactions to conceal their prior misconduct.

101. Defendants' Schnader and Rosenfield failed to inform and or advise Plaintiff of the following:

   a. Defendants' interests were adverse to the interests of Plaintiff and the Anna Nupson 2001 Trust;

   b. Defendants' were disqualified from serving as trustee and counsel for the Anna Nupson 2001 Trust;

   c. The legal flaws or the GRAT instruments with regarding to their formation, funding, execution, and modification and that the instrument(s) were susceptible to challenge and court review;

21

d. Defendants' acts of backdating the GRAT I, and GRAT II instruments for purposes of using an outdated valuation in avoidance of tax consequences and, thereby, resulting in a lower value of Plaintiff's Bradford interests at the time of their sale in 2003;

e. Defendants' drafted and suggested the provision in GRAT II naming Rosenfield as the default successor trustee of the Anna Nupson 2001 Trust;

f. Defendants' knew, or should have known, that Court review of the GRAT instruments, the 2003 MSA transactions, and the actions of all prior trustees was in the best interests of the Trust and the Plaintiff, and was necessary for Rosenfield to fulfill his duties as trustee;

g. Defendants' breached their duties owed to the Plaintiff and her Trust by misusing their respective roles as trustee and counsel for the Anna Nupson 2001 Trust by failing to collect, maintain, and produce trust documents to the Plaintiff, including but not limited to all documents concerning the oral GRAT, GRAT I, GRAT II, and the Anna Nupson 2001 Trust.

102. Additionally, Defendants' breached their duties owed to the Plaintiff and her Trust by misusing their respective roles as trustee and counsel for the Anna Nupson 2001 Trust by participating in a litigation strategy beginning in 2015 that they knew, or should have known, was detrimental to Plaintiff and the Anna Nupson 2001 Trust.

103. Defendants Rosenfield's continued misrepresentations in 2016 and 2017 about material facts concerning the formation and funding of the alleged 2001 GRATs were meant to conceal Defendants' malfeasance and deceive the Plaintiff and the Court into believing that Anna had received proper consideration for the 2003 MSA.

22

104. At all times relevant to the facts pled herein, Defendants actions were contrary to the interests of Plaintiff and her trusts. Defendants' ongoing acts and omissions of concealing and misrepresenting material facts regarding the GRAT instruments and 2003 MSA Transactions are separate acts in breach if their duties owed to Plaintiff and her Trusts.

## Negligent Misrepresentation and Constructive Fraud

105. Under Pennsylvania law, a Defendant is liable for negligent misrepresentation if the Plaintiff makes a showing of: (a) a misrepresentation of material fact; (b) made under circumstances in which the defendant ought to have known its falsity; (c) with an intent to induce another to act on it; and (d) that results in injury to a party acting in justifiable reliance on the misrepresentation. *See Bortz v. Noon*, 556 Pa. 489, 500, 729 A.2d 555, 561 (1999).

106. Elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern material fact and speaker need not know his or her words are untrue, but must have failed to make reasonable investigation of truth of the words; moreover, like any action in negligence, there must be existence of duty owed by one party to another. *Id.*

107. Constructive fraud arises upon a showing that there has been a breach of duty which tends to deceive others and operates to their injury, even though there is no vicious intent. *See Lichtenstein v. Kidder, Peabody & Co. Inc.*, 840 F. Supp. 374, 385 (W.D. Pa. 1993) (interpreting Pennsylvania law).

108. On October 5, 2016, Defendants' prepared and filed Rosenfield's First Petition for Adjudication of his Accounting and Administration of the Anna Nupson 2001 Trust. ("Defendants' First Petition"). Defendants' First Petition recounted the formation history

of the GRAT instruments stating Frances committed her Bradford shares on February 1, 2002, forming the corpus of a GRAT, and that Frances' GRAT had never been amended. Defendants' knew these statements were false.

109. Defendants' Schnader and Rosenfield negligently misrepresented and concealed from Plaintiff and the Court the material and critical facts surrounding the formation, funding, and signing of Frances' oral GRAT and GRAT I.

110. Following submission of Defendant's First Petition, a partner at the Schnader law firm, Roy Ross executed an affidavit dated December 23, 2016, ("Ross Affidavit"). The Ross Affidavit, which was filed in the Orphans' Court proceedings, admitted that Defendant Schnader lawyers had drafted Frances' GRAT I instrument, but Defendants provided no additional details regarding the formation of the oral GRAT. The Ross Affidavit attached an incomplete and unsigned copy of the GRAT I instrument.

111. Through the Ross Affidavit, Defendant Schnader again negligently misrepresented and concealed from Plaintiff and the Court the material and critical facts surrounding the formation, funding, and signing of Frances' oral GRAT and GRAT I, and Defendants' roles regarding Frances' oral GRAT and GRAT I.

112. On February 23, 2017, a separate party filed a signed copy of the GRAT I instrument with the Orphans' Court. For the first time, Plaintiff and her counsel were provided a complete copy of the instrument.

113. In an Opinion and Order dated March 16, 2017, the Orphans' Court stated the Court had been misled by Defendants Schnader and Rosenfield when each failed to disclose the original GRAT to the Court. The Court also noted it had been misled as to the date that Frances actually signed the original GRAT, and that the original GRAT did not contain

language that the sale of stock in connection with the 2003 MSA was authorized "without the need for court approval." The Court further stated:

> [O]f significant concern, the petition for adjudication filed October 5, 2016, by Mr. Ross's law partner, Bruce A Rosenfield, Esquire, as trustee, states that there have been no amendments to the trust. Mr. Rosenfield executed a verification in which he verified the truth and correctness of the facts in the petition. Mr. Rosenfield is presumed to be familiar with the disputed 2003 transactions including the purported amendment of the Irrevocable 2001 GRAT as he represented both Frances and Anna in transactions that resulted in the execution of the 2003 Master Settlement Agreement and the sale of the BHI stock from the 2001 GRAT trusts. Indeed, Mr. Rosenfield personally witnessed the signature of Frances and John to the Amended Trust Version signed in February 2003 but dated February 1, 2001.

114. On March 16, 2017, the Orphans' Court ordered Rosenfield to file an amended pleading stating an accurate history of the GRAT instruments.

115. On May 1, 2017, Defendants Schnader and Rosenfield in their capacity as attorneys for the Anna Nupson 2001 Trust, and Rosenfield as trustee, filed an Amended Petition in the Orphans' Court. Defendants' Amended Petition disclosed a different factual account regarding the history and formation of Frances' GRAT instruments. Defendants' Amended Petition now attached a complete and executed copy of the purported GRAT I and disclosed that Defendants Rosenfield and Schnader had drafted the GRAT I instrument.

116. In their Amended Petition, Defendants admit that their prior statements before the Orphans' Court were untrue. The Amended Petition states:

> Bruce never intended to mislead anyone -- and especially not the Court. However, upon consideration of the Court's March 16, 2017 Opinion and Order, Bruce recognizes that it would have been more informative if Bruce had reported and described the modification or reformation of the Original Trust Agreement in the Original Petition for Adjudication of his account of the 2001 Trust for Anna and apologizes for not having done so. (emphasis added)

117. In their 2016 and 2017 verified pleading and accounts filed before the Orphans' Court

Litigation, and at all times prior to filing their accounts, Defendants' Rosenfield and Schnader made material misrepresentations to Plaintiff and the Court.

118. Defendants' knew, or should have known, that Plaintiff and the Court would rely upon Defendants' statements because of their roles as counsel and as the sole trustee for the Anna Nupson 2001 Trust.

119. Defendants' misstatements served to conceal from Plaintiff and the Court the material facts concerning the formation and funding of the GRAT trusts. At all times, Defendants acted in ways that benefitted their own interests to the detriment of Plaintiff and her Trust.

120. Defendants' are liable for negligent misrepresentation and constructive fraud in both their capacity as Plaintiff's counsel, as the counsel of the Anna Nupson 2001 Trust, and as trustee of the Anna Nupson 2001 Trust.

## PLAINTIFF WAS DAMAGED BY
## DEFENDANTS' MISCONDUCT AND BREACHES OF DUTIES

121. Plaintiff was damaged by Defendants' legal malpractice and breach of fiduciary duty.

122. The oral trust and the 2001 GRAT 1 (and the 2003 "modified" GRAT II) involved transfers of shares governed by the 1982 Shareholders' Agreement, which required sufficient notice to all shareholders, a fair valuation, a price based on that valuation, and an option to the other shareholders (and the Company) to step in and purchase the shares.

123. Defendant Rosenfield thus had yet another conflict of interest- he was representing Frances and John in a transaction that was adverse to the interests of the other shareholders and the Company.

124. These transactions were the proximate cause of damage to Plaintiff. Had the 1982 Shareholders' Agreement been followed, there would have been a valuation and there

would have been an option process that would have given other shareholders, including Plaintiff, the opportunity to bid in and purchase Frances' shares. This provision by itself was a separate price protection mechanism to ensure that the best value would be paid for the shares.

125. In addition, had Defendant Rosenfield revealed his conflict of interest, Plaintiff would have retained independent counsel, who would have examined the underlying agreements, the consideration being offered, the tax indemnification being required and would have independently advised Plaintiff concerning the Bradford Stock Sale Transaction and the 2003 MSA.

126. Had Defendants disclosed the facts which they concealed from Plaintiff until October 2016 and May 2017, Plaintiff would not have agreed to the Bradford Stock Sale Transaction and would not have agreed to the terms of the 2003 MSA. Defendants' acts and omissions deprived Plaintiff of a favorable bargaining posture in negotiating and agreeing to 2003 MSA and the Bradford Stock Sale Transaction.

127. Defendants' ongoing acts and omissions regarding the GRAT instruments and transfers, the Bradford Stock Sale Transaction, and the 2003 MSA served to mislead and conceal Plaintiff's injuries and causes of action. Plaintiff did not, and could not, in the exercise of reasonable diligence, have learned of Defendants' breaches of duties and misrepresentations before May 1, 2017.

128. As a result of Defendants' breaches of duty, Plaintiff has been damaged in an amount in excess of $315,000,000.

129. Additionally, the GRAT II redemption of 258,029 shares at $275 per share would not have taken place.

130. Defendants actions were outrageous, because Defendants' acts were intentional, they acted with reckless indifference to the rights of Plaintiff, and they had palpable conflicts of interest, which caused them to advance the rights of one client over the rights of another client. Defendants' decision to conceal what they had done to cover up their own wrongful conduct was also intentional and outrageous and fraudulent. Defendants used their confidential position, as Plaintiff's lawyers, to persuade Plaintiff to enter into a transaction that benefited their other client and covered over their own prior actions in connection with the oral trust, the 2001 GRAT I and GRAT II. Defendants withheld from Plaintiff critical information, failed to disclose their own conflicts of interest, and counseled her to enter into transactions which grossly undervalued her interests and exposed her to enormous potential liability. As a result, an award of punitive damages is warranted.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38(b), Federal Rules of Civil Procedure, Plaintiff Anna K. Nupson demands a trial by jury in this action of all issues so triable.

## **PRAYER**

WHEREFORE, a judgment should be entered against Bruce A. Rosenfield and Schnader Harrison Segal & Lewis LLP for compensatory and punitive damages in an amount to be

determined at trial, for the costs of this suit, for attorney's fees incurred in this action, for attorney's fees and costs incurred in connection with the terminated Orphans' Court litigation and for any other relief the Court deems just and proper.

Respectfully submitted,

**DURHAM, PITTARD & SPALDING, L.L.P.**

*/s/ Justin R. Kaufman*

Justin R. Kaufman
505 Cerrillos Road, Suite A209
Santa Fe, NM 87501
Telephone: (505) 986-0600
Facsimile: (505) 986-0632
jkaufman@dpslawgroup.com

Brian A. Gordon
**GORDON & ASHWORTH, P.C.**
One Belmont Ave., Suite 519
Bala Cynwyd, PA 19004
Telephone: (610) 667-4500
Briangordon249@gmail.com

Kimberly Brusuelas
**5TH STREET LAW**
312 San Pasquale, NW
Albuquerque, New Mexico 87104
Telephone: (505) 247-9333
kim@fifthstreetlaw.com

Ben Davis
**THE DAVIS KELIN LAW FIRM**
127 Bryn Mawr Dr. SE
Albuquerque, New Mexico 87106
Telephone: (505) 886-0387
bdavis@daviskelin.com

***Attorneys for Plaintiff***

## **DECLARATION PURSUANT TO 28 U.S.C. Section 1746**

I declare under penalty of perjury that the foregoing Third Amended Complaint is true and correct to the best of my knowledge.

*/s/ Justin R. Kaufman*
Justin R. Kaufman

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of August, 2020, I caused the foregoing to be filed with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania using the ECF system, it is available for viewing and downloading from the ECF system, and a true and correct copy was served via ECF to all counsel of record registered with the ECF system.

<u>/s/*Justin R. Kaufman*</u>
Justin R. Kaufman