**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANNA K. NUPSON,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.: 18-cv-2505** |
| | : | |
| **SCHNADER HARRISON SEGAL &** | : | |
| **LEWIS LLP,** *et al.* | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**SITARSKI, M.J.**                                                                 **April 7, 2021**

   Presently pending before the Court is Plaintiff's Motion to Compel Discovery Responses

from Defendants (Pl.'s Mot. to Compel, ECF No. 102), Intervenors' and Defendants' responses

thereto (Intervenors' Resp., ECF No 121-4; Defs.' Resp., ECF No. 123), Plaintiff's reply in

support of her motion (Pl.'s Reply, ECF No. 132), Intervenors' and Defendants' sur-replies

thereto (Intervenors' Sur-reply, ECF No. 139; Defs.' Sur-reply, ECF No. 140), and Plaintiff's

supplemental reply in support of her motion.  (Pl.'s Supp. Reply, ECF No. 153).[1]  For the

reasons that follow, Plaintiff's motion shall be **GRANTED IN PART** and **DENIED IN PART**.

**I.**   **BACKGROUND**

   Plaintiff Anna Nupson ("Plaintiff"), Intervenor John Middleton ("John") and Lucia

Middleton Hughes ("Lucia") are the adult children of Herbert Middleton, Jr. ("Herbert") and

Frances Middleton ("Frances" or, collectively with the other family members, "the

---

[1]  The Honorable Nitza I. Quiñones Alejandro referred the matter to me for disposition
pursuant to 28 U.S.C. § 636(b)(1)(A).  (Order, ECF No. 137).

Middletons").[2]  (Pl.'s Third Am. Compl., ECF No. 119, at ¶ 10).  The Middletons owned a successful tobacco products company, Intervenor Bradford Holdings, Inc. ("Bradford").  (*Id.* at ¶ 11).  Defendant Bruce Rosenfield ("Rosenfield") is a partner at the law firm of Defendant Schnader Harrison Segal & Lewis LLP ("Schnader" or, together with Rosenfield, "Defendants").  (Pl.'s Third Am. Compl., ECF No. 119, at ¶ 2).  Defendants have represented Middleton family members, Bradford and related entities on a variety of matters over the last four decades.  (*Id.* at ¶¶ 13, 16).

In the 1980s and 1990s, Defendants[3] represented the Middletons in Shareholders' and Restriction Agreements designed to ensure that the Middleton children retained equal ownership in Bradford or received fair compensation for relinquishing that ownership.  (*Id.* at ¶¶ 15-25).  In 1999, Defendants began representing Frances, as settlor, and John, as trustee, in the establishment of a grantor retained annuity trust, with Frances's Bradford shares as the trust corpus and John and his family members as the sole beneficiaries ("GRAT I").  (*Id.* at ¶¶ 26, 28, 30; Defs.' Answer, ECF No. 131, at ¶ 26).  On February 1, 2001, Frances signed stock powers and directed the transfer of her shares to fund the GRAT I.  (Pl.'s Third Am. Compl., ECF No. 119, at ¶ 33; Defs.' Answer, ECF No. 131, at ¶ 33).  Over the next several months, Defendants drafted trust documents for the oral trust.  (Pl.'s Third Am. Compl., ECF NO. 119, at ¶ 33).  On November 19, 2001, Frances executed the GRAT I trust documents bearing a date of February 1, 2001.  (*Id.* at ¶ 34).

---

[2]  Because some of these individuals share the Middleton last name, and following the practice Plaintiff uses in her briefing, the Court refers to Plaintiff's family members by their first names.

[3]  Rosenfield did not begin representing any Middleton family member or business until 1992. (Defs.' Answer and Aff. Defenses, ECF No. 131, at ¶ 16).

Lucia learned of the GRAT I in 2002 and accused John of procuring it through undue influence.  (Pl.'s Third Am. Compl, ECF No. 119, at ¶¶ 39-40).  Plaintiff contends that Defendants failed to divulge the existence of the oral GRAT I, the related stock transfer and Lucia's allegation of undue influence from her until October of 2016.  (*Id.* at ¶¶ 35, 41).  Defendants point to Plaintiff's handwritten notes allegedly showing her knowledge of the trust in 2002.  (Defs.' Answer, ECF No. 131, at ¶ 35).  Plaintiff claims that the GRAT I violated the Middleton family's written agreements, although Defendants deny this claim as well.  (Pl.'s Third Am. Compl, ECF No. 119, at ¶ 38; Defs.' Answer, ECF No. 131, at ¶ 38).

In late 2002 and early 2003, Defendants represented Plaintiff and Frances in negotiations involving Middleton family members, their shares in Bradford and various trusts related to the family members.  (Pl.'s Third Am. Compl, ECF No. 119, at ¶¶ 44, 59, 91).  Defendants obtained a conflict waiver for the joint representation, but Plaintiff asserts various deficiencies with it.[4] (*Id.* at ¶¶ 48-53).  Multiple transactions and agreements resulted from these negotiations. Plaintiff, Frances and Lucia transferred all Bradford shares not held by John to him ("Bradford Stock Transfer").  (Pl.'s Third Am. Compl, ECF No. 119, at ¶ 44).  The shares transferred at Plaintiff's direction were held in trust by the 1994 Anna Trust, a self-settled irrevocable trust established in 1994.  (*Id.* at ¶¶ 75, 77).  She claims that at the time of the Bradford Stock Transfer, the shares in the 1994 Anna Trust had a value of nearly 335 million dollars, but it only received 19.5 million dollars.  (*Id.* at ¶¶ 79-80).  The Middletons also entered the 2003 Master Settlement Agreement ("MSA"), including the 2003 Family Settlement Agreement, which

---

[4] Plaintiff asserts that Rosenfield failed (1) to obtain informed consent for the waiver in light of his recent representation of John (as trustee) in the GRAT I and related stock transfer; (2) to identify all conflicts subject to the waiver; and (3) to disclose that he viewed Plaintiff's and Frances's interests as secondary to Bradford's.  (Pl.'s Third Am. Compl., ECF No. 119, at ¶ 50). Defendants deny these allegations.  (Defs.' Answer, ECF No. 131, at ¶ 50).

terminated the 1994 Anna Trust and split its corpus into two trusts for the benefit of Lucia's and John's children, FBO Hughes and FBO Middleton, even though Plaintiff contends that she had intended to receive the proceeds from the shares outright.[5]  (*Id.* at ¶¶ 78, 82).

As consideration for the Bradford Stock Transfer and the MSA, the GRAT I was modified to the GRAT II.  (*Id.* at ¶ 70).  Unlike the GRAT I, the GRAT II benefited Plaintiff, John and Lucia equally.  (*Id.* at ¶¶ 59, 62).  John served as trustee of the GRAT II, as he had with the GRAT I.  (*Id.* at ¶ 96).  Upon the termination of the GRAT II in February of 2003, Plaintiff's one-third share of the trust remainder was used to form a separate sub-trust for her benefit, the Trust Under Agreement of Frances S. Middleton FBO Anna K. Nupson dated February 1, 2001 (Anna Nupson 2001 Trust).[6]  (*Id.* at ¶¶ 60, 95; Defs.' Answer, ECF No. 131, at ¶ 95).  Frances served as trustee of the Anna Nupson 2001 Trust until 2005.  (Pl.'s Third Am. Compl., ECF No. 119, at ¶ 96).  Rosenfield has served as trustee since then.  (*Id.* at ¶¶ 96-97).

In 2015, John initiated multiple proceedings in the Montgomery County Orphans' Court seeking declaratory judgments regarding the validity of his family members' transfers of Bradford shares to him.  (*Id.* at ¶¶ 54-55).  In the course of the litigation, in October 2016, John disclosed, allegedly for the first time, the existence of the GRAT I.  (*Id.* at ¶ 56).  On October 5, 2016, Rosenfield, as trustee of the Anna Nupson 2001 Trust, filed a Petition for Adjudication recounting the origination of the GRAT I but not referencing its modification.  (*Id.* at ¶ 108).  Schnader attorney Roy Ross subsequently filed an affidavit dated December 23, 2016, in support of the Petition and attaching an unsigned and undated copy of the GRAT I.  (*Id.* at ¶ 110).  On

---

[5]  In 1995, Plaintiff renounced the principal to the 1994 Anna Trust, leaving her with only a discretionary right to income.  (Pl.'s Third Am. Compl., ECF No. 119, at ¶ 76).

[6]  The parties do not explain why the Anna Nupson 2001 Trust was formed in 2003 but was dated February 1, 2001.

February 23, 2017, "a separate party"[7] submitted a signed copy of the GRAT I to the Orphans' Court.  (*Id.* at ¶ 112).  Plaintiff alleges that she had not seen a complete copy of the GRAT I until this submission.  (*Id.*)

On March 16, 2017, the Orphans' Court admonished Rosenfield for not noting the amendment of the GRAT I in the Petition for Adjudication and ordered him to file an amended pleading.  (*Id.* at ¶¶ 113-14).  On May 1, 2017, he filed an Amended Petition for Adjudication disclosing, also allegedly for the first time, that Frances had originally formed the GRAT I as an oral trust on February 1, 2001, before executing trust documents bearing that date on November 19, 2001.  (*Id.* at ¶¶ 60, 115).  The Amended Petition attached an executed copy of the GRAT I. (*Id.* at ¶ 115).  The parties dispute whether the GRAT I was validly formed as an oral trust.  (*Id.* at ¶ 67; Defs.' Answer, ECF No. 131, at ¶ 67).

Schnader, a non-party in the Orphans' Court matter, nonetheless provided Plaintiff with substantial documents in that matter.[8]  On February 19, 2016, the Orphans' Court parties and Schnader, via its General Counsel, Wilbur Kipnes, Esquire, held a conference to discuss production of Plaintiff's and John's client files.  (Pl.'s Mot. to Compel, ECF No. 102, at 6-7; Kipnes Decl., ECF No. 123-1, at ¶ 1).  At the conference, it was agreed that Schnader would search for hard copies and electronically stored information ("ESI") and distribute them to the client or clients who appeared to hold any applicable privilege.  (Pl.'s Mot. to Compel, ECF No. 102, at 7; Kipnes Decl., ECF No. 123-1, at ¶ 8).  Schnader provided documents regarding the Anna Nupson 2001 Trust for the period since Rosenfield had taken over as trustee to Anna.

---

[7]  The pleadings do not indicate who filed the signed GRAT I trust document.

[8]  In March 2014, prior to the Orphans' Court litigation, Defendants, at Plaintiff's request, provided her hard copy documents regarding the 1994 Anna Trust and the Anna Nupson 2001 Trust.  (Kipnes Decl., ECF No. 123-1, at ¶ 4).

(Kipnes Decl., ECF No. 123-1, at ¶ 11).  It provided documents regarding that trust for the period

that Frances served as trustee, and documents regarding the GRAT I, to John, as executor of the

estate of Frances.  (*See* Pl.'s Mot. to Compel, ECF No. 102, at 7).  It provided documents

regarding the GRAT II to both Plaintiff and John, in his capacity as executor of Frances's estate.

(Kipnes Decl., ECF No. 123-1, at ¶ 30).

> Plaintiff initiated this action on June 15, 2018.  (Pl.'s Compl., ECF No. 1).  On August

26, 2020, she filed her Third Amended Complaint, the operative complaint in this matter.  (Pl.'s

Third Am. Compl., ECF No. 119).  Her complaint includes claims against Defendants for legal

malpractice and breach of fiduciary duty.[9]  (*Id.* at ¶¶ 85-120).  Defendants assert counterclaims

for breach of contract, promissory estoppel and unjust enrichment due to Plaintiff's alleged

nonpayment of her half of Schnader's costs in making the Orphans' Court ESI production.

(Defs.' Answer, Aff. Defenses and Counterclaim, ECF No. 67, at 15-21, ¶¶ 1-39; *see also* Defs.'

Answer Aff. Defenses, ECF No. 131, at 1 n.1).

> Plaintiff filed the instant motion to compel discovery responses on August 5, 2020.  (Pl.'s

Mot. to Compel, ECF No. 102).  On September 2, 2020, Defendants filed a response in

opposition.  (Defs.' Resp., ECF No. 123).  On September 9, 2020, the Honorable Nitza I.

Quiñones Alejandro entered the parties' stipulated order permitting Intervenors to intervene for

the limited purpose of opposing Plaintiff's motion and deeming their response thereto filed.

(Stip. Order, ECF No. 129; *see also* Intervenors' Resp., ECF No. 121-4).  Plaintiff filed her joint

reply in support of her motion on October 2, 2020.  (Pl.'s Reply, ECF No. 132).  Defendants and

Intervenors filed sur-replies on October 16, 2020.  (Defs.' Sur-reply, ECF No. 139; Intervenors'

---

[9]  On March 24, 2021, Judge Quiñones Alejandro dismissed Plaintiff's claims for negligent misrepresentation and fraudulent concealment.  (Order, ECF No. 191).

Sur-reply, ECF No. 140).  On November 3, 2020, Plaintiff filed her supplemental reply in

support of her motion.  (Pl.'s Supp. Reply, ECF No. 153).

## II.   LEGAL STANDARD

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery in federal

litigation.  Rule 26(b)(1) provides:

> Parties may obtain discovery regarding any nonprivileged matter
> that is relevant to any party's claim or defense and proportional to
> the needs of the case, considering the importance of the issues at
> stake in the action, the amount in controversy, the parties' relative
> access to relevant information, the parties' resources, the importance
> of the discovery in resolving the issues, and whether the burden or
> expense of the proposed discovery outweighs its likely benefit.
> Information within this scope of discovery need not be admissible
> in evidence to be discoverable.

FED. R. CIV. P. 26(b)(1).

Although the scope of discovery is broad, it is not unlimited.  *Inventio AG v.*

*Thyssenkrupp Elevator Ams. Corp.*, 662 F. Supp. 2d 375, 380 (D. Del. 2009); *see also Eisai Inc.*

*v. Sanofi-Aventis U.S., LLC*, No. 08-4168 MLC, 2012 WL 628320, at *3 (D.N.J. Feb. 27, 2012)

("Discovery is not without bounds . . . and courts will not permit parties to engage in fishing

expeditions . . . .") (quoting *MacDermid Printing Sols., L.L.C., v. E.I. du Pont de Nemours &*

*Co.*, No. 07-4325, 2008 WL 323764, at *1 (D.N.J. Feb. 5, 2008)).  Upon a party's motion or of

its own accord, the court must limit the frequency or extent of discovery if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative,
> or can be obtained from some other source that is more convenient,
> less burdensome, or less expensive;

> (ii) the party seeking discovery has had ample opportunity to
> obtain the information by discovery in the action; or

> (iii) the proposed discovery is outside the scope permitted by Rule
> 26(b)(1).

FED. R. CIV. P. 26(b)(2)(C).

A party who has received evasive or incomplete discovery responses may seek a court order compelling disclosure or discovery of the materials sought.  *See* FED. R. CIV. P. 37(a).  The moving party must initially demonstrate the relevance of the information sought to a particular claim or defense.  *Bostwick v. Shoop*, No. 1:09-CV-2212, 2010 WL 4536977, at *2 (M.D. Pa. Nov. 3, 2010) (citing *Paluch v. Dawson*, Civil No. 1:CV–06–01751, 2008 WL 2785638 at *2 (M.D. Pa. July 17, 2008)).  Relevance in this context has been "construed broadly to encompass any matter that could bear on, or that could reasonably lead to other matter that could bear on any issue that is or may be in the case."  *Oppenheimer Funds v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 349 U.S. 495, 501 (1947)).  "The burden then shifts to the opposing party, who must demonstrate in specific terms why a discovery request does not fall within the broad scope of discovery or is otherwise privileged or improper."  *Peay v. Fisher*, No. 3:15-CV-00345, 2016 WL 3876634, at *1 (M.D. Pa. July 15, 2016) (citing *Goodman v. Wagner*, 553 F. Supp. 255, 258 (E.D. Pa. 1982)).

## III.    DISCUSSION

Plaintiff argues that Defendants' discovery responses and document production are deficient for four overarching reasons.  First, she protests that Defendant has produced only minimal documents in this matter on the purported basis that they no longer possess responsive documents following the February 2017 document production in the Orphans' Court matter.  (Pl.'s Mot. to Compel, ECF No. 102, at 14-20; Pl.'s Reply, ECF No. 132, at 18-21; *see also* Pl.'s Supp. Reply, ECF No. 153).  Second, she complains that Defendants are withholding responsive documents and information as confidential or privileged because they concern the representation of other clients.  (Pl.'s Mot. to Compel, ECF No. 102, at 20-26; Pl.'s Reply, ECF No. 132, at 5-

18).  Third, she opposes Defendants' withholding of documents and information due to alleged

attorney-client and work-product privileges shared between Schnader and Rosenfield.  (Pl.'s

Mot. to Compel, ECF No. 102, at 26-29; Pl.'s Reply, ECF No. 132, at 21-29).  Fourth, she claims

that Defendants have provided boilerplate objections and nonresponsive and incomplete answers

to many discovery requests.  (Pl.'s Mot. to Compel, ECF No. 102, at 30-35).

   A.   **Alleged Issues With Defendants' Reliance On Its Orphans' Court Production**

      Plaintiff raises several issues with Defendants' repeated references in their discovery

responses to their document production in the Orphans' Court matter.  She complains that

Defendants fail to direct her to specific documents in that production in response to individual

requests in this one.  She claims that Defendants selected search terms and document custodians

based on her claims in the Orphans' Court case, not this one.  Further, she challenges

Defendants' position that it is no longer in custody or control of documents relating to the

formation of the GRAT I and administration of the Anna Nupson 2001 Trust after turning them

over to John in the Orphans' Court litigation.

      Defendants respond that the text of the documents is fully searchable and that Plaintiff

may correlate them to specific requests or any other categories she desires.  They point out that

the search terms, to which Plaintiff had the opportunity to but did not object in Orphans' Court,

included terms covering the GRAT I.  Defendants observe that, due to Schnader's ten-year

document retention policy, it no longer has such documents, and, even if it did, it would have

turned them over to John as executor of Frances's estate and thus the holder of her privilege as to

the documents.  For this reason, Schnader also turned over to John documents for the Anna

Nupson 2001 Trust for the period of Frances's trusteeship, although it provided Plaintiff with

documents for the period that Rosenfield served as trustee.  Defendants also provide a

declaration from Kipnes attesting that the additional custodians from whom Plaintiff seeks

documents did not work on any matters relevant to this dispute.  Intervenors add that Plaintiff

may not require Defendants to demand Intervenors' files back from them, let alone materials that

Intervenors never provided to Defendants.

### 1.    Failure To Categorize Documents By Discovery Request

Plaintiff contends that "[i]n violation of the Federal Rules, Defendants fail to identify or

direct Plaintiff to any specific documents, or categories of documents, from their OC [Orphans'

Court] Production that are responsive to Plaintiff's discovery requests in this action."  (Pl.'s Mot.

to Compel, ECF No. 102, at 14).  She further protests that Defendants also failed to categorize

documents in their more recent hard copy production.  (Pl.'s Mot. to Compel, ECF No. 102, at

13-14).  She maintains that Defendants produced two of these documents, legal bills, "in a

format not consistent with how they are kept in the ordinary course of business . . . ."  (*Id.* at 13).

She further contends that if Defendants had categorized the documents in its hard copy

production it would have discovered a misplaced conflict waiver letter earlier than it did.  (*Id.* at

30-31).  She demands that Defendants update their discovery responses to identify this letter as

responsive to specific requests.  (*Id.* at 31).[10]

---

[10]   In her reply, Plaintiff argues that "Defendants provide no authority that an ESI
production in an unrelated action is sufficient to meet that party's discovery obligations in this
separate action."  (Pl.'s Reply, ECF No. 132, at 19).  However, Plaintiff provides no authority
that it cannot be.  Under Federal Rule of Civil Procedure 26(b)(2)(C)(i), this Court has a duty to
limit "unreasonably cumulative or duplicative" discovery or that which "can be obtained from
some other source that is more convenient, less burdensome, or less expensive . . . ."  FED. R.
CIV. P. 26(b)(2)(C)(i).  If the production of documents in this action would merely recreate
Defendants' Orphans' Court production to Plaintiff, this Court has the inherent authority under
Rule 26 to deny that discovery as "unreasonably cumulative or duplicative."  *Id.*  If Plaintiff
already has the documents that she seeks, they "can be obtained from some other source [i.e.,
Plaintiff herself] that is more convenient, less burdensome, [and] less expensive" than
compelling Defendants to reproduce them to her.  *Id.*  I also note that Plaintiff has apparently
reproduced her Orphans' Court production in response to Defendants' discovery requests in this
matter.  (Defs.' Sur-reply, ECF No. 140, at 6-7 n.4).

Rule 34(b)(2)(E)[11] provides:

> (E) Producing the Documents or Electronically Stored Information. Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:
>
>> (i) A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request;
>>
>> (ii) If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms; and
>>
>> (iii) A party need not produce the same electronically stored information in more than one form.

FED. R. CIV. P. 34(b)(2)(E).

"The touchstone remains, under Rule 34(b)(2)(E), that a requesting party is entitled to production of ESI as it is ordinarily maintained or in a form that is reasonably usable for purposes of efficiently prosecuting or defending the claims and defenses involved in the matter." *Jordan v. Mirra*, No. 1:14-CV-01485-GAM, (D. Del. Feb. 27, 2019) (quotation omitted); *see also Coleman v. Blockbuster, Inc.*, No. 05-4506, 2007 WL 4084281, at *2 (E.D. Pa. Nov. 15, 2007) ("a party producing electronically stored information. . . must produce the information in a form or forms in which it is ordinarily maintained or in a form or forms that are reasonably

---

[11]   Plaintiff also cites Rule 33(d) governing the option of a party responding to interrogatories to produce business records as its answer "if the burden of deriving or ascertaining the answer will be substantially the same for either party . . . ." FED. R. CIV. P. 33(d).  However, Defendants do not direct Plaintiff to business records in lieu of providing an answer for any of their responses to Plaintiff's interrogatories.  (Defs.' Resps. to Pl.'s First Set of Interrogatories, ECF No. 102-1; Defs.' Resps. to Pl.'s Second Set of Interrogatories, ECF No. 102-10; Defs.' Resps. to Pl.'s Third Set of Interrogatories, ECF No. 102-16).  In any event, had they done so, such a response would not have been improper because the searchability of the documents makes the burden of ascertaining answers substantially the same for Plaintiff as for Defendants.

usable") (citation and quotation omitted).  "If the producing party produces documents in the order in which they are kept in the usual course of business, the Rule imposes no duty to organize and label the documents, provide an index of the documents produced, or correlate the documents to the particular request to which they are responsive."  *MGP Ingredients, Inc. v. Mars, Inc.*, No. 06–2318–JWL–DJW, 2007 WL 3010343, at *3 (D. Kan. Oct. 15, 2007) (citations omitted).

Here, Defendants appear to have made the Orphans' Court production consistent with how Schnader maintained the hard copy and ESI documents in that production in the usual course of business.  (*See* Kipnes Decl., ECF No. 123-1, at ¶¶ 3-30 (detailing how relevant hard copy documents were produced or made available for inspection and copying and how relevant ESI was identified and produced, and denying that ESI was "manipulated")).  As such, Defendants had no duty to correlate materials to specific document requests.  Further, Defendants provided text- and date-searchable ESI to Plaintiff.  (Defs.' Resp., ECF No. 123, at 4, 15).  Thus, it is in a "reasonably usable" format for Plaintiff to identify relevant documents to substantiate its claims and defenses in this matter.  *See Jordan*, 2019 WL 2127788, at *12.

In addition, Plaintiff complains that Defendant produced two of the 927 documents in its hard copy document production in this matter in a form other than that kept in the usual course of business.  (Pl.'s Mot. to Compel, ECF No. 102, at 13-14).  Thus, Rule 34 did not require Defendants to categorize the other 925 documents.  *See MGP Ingredients, Inc.*, 2007 WL 3010343, at *3.  Further, Plaintiff succeeded in correlating each document in the production, including the two legal bills and the misplaced conflict waiver letter, to the request to which it was responsive, if any.  (Pl.'s Mot. to Compel, ECF No. 102, at 13-14).  Lastly, I disagree that the delayed production of one misplaced document in a production of 927 warrants deviating from the normal rule that a party producing documents in the ordinary course of business need

not categorize them by request.  Defendants located the letter, any prejudice to Plaintiff is minimal,[12] and amendment of Defendants' discovery responses to cite the letter as responsive would serve no purpose.

### 2.      Search Terms

Plaintiff argues that in compiling the Orphans' Court ESI production Defendants used search terms "relevant to the Orphan's Court litigation, not this case."  (Pl.'s Mot. to Compel, ECF No. 102, at 16-17).  In particular, she contends that Defendants searched only relevant family member and company names "and did not include any search terms specifically relating to Frances' GRAT instruments, or the 2003 master settlement agreement."  (*Id.* at 17).  Defendants respond that they have no documents relating to these matters.  They maintain that they turned over hard copy documents relating to the GRAT I to John, and hard copy documents relating to the master settlement agreement and the GRAT II to Plaintiff and John, as executor for Frances, Plaintiff's fellow co-client in the representation.  (Defs.' Resp., ECF No. 123, at 3; Kipnes Decl., ECF No. 123-1, at ¶ 30).  They point out that due to Schnader's ten-year document retention policy they no longer possess emails created before March 24, 2005, ten years prior to when Schnader placed a litigation hold in effect, nor does Schnader have any documents regarding the formation of the GRAT I on its document management system.  (Defs.' Resp., ECF No. 123, at 4).  In addition, Defendants observe that "Plaintiff completely misstates the tremendous breadth of the search terms actually used, which were significantly broader than the search terms she is proposing. Thus, any hits for the search terms Plaintiff is proposing would have already been culled from the ESI by the broader search term[s] that [were] in fact used by Schnader."  (*Id.* at 18).

---

[12]  On October 29, 2020, the Court extended the dispositive motion deadline until June 21, 2021.  (Order, ECF No. 150).

"The Federal Rules of Civil Procedure do not impose a duty upon litigants to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations.  Instead, the [producing] party must conduct a diligent search, which involves developing a reasonably comprehensive search strategy."  *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2020 WL 3498161, at *2 (E.D. Pa. June 29, 2020) (quotation omitted).  As the moving party, Plaintiff bears the burden of showing that Defendants "either withheld relevant documents or failed to conduct a reasonable search."  *Id.* (citing *Enslin v. Coca-Cola Co.*, Civ. A. No. 14-06476, 2016 WL 7013508, at *1 n.2 (E.D. Pa. May 13, 2016)). This burden is "not trivial . . . ."  *Id.*  Because producing parties have "the best knowledge as to how documents have been preserved and maintained," they are "in the best position to determine the method by which they will collect documents."  *Ford Motor Co. v. Edgewood Props., Inc.*, 257 F.R.D. 418, 427 (D.N.J. 2009).

Plaintiff has failed to carry her burden.  In the Orphans' Court litigation, Defendants distributed documents for each matter to the respective client(s), and thus the holder(s) of any privilege.  (Kipnes Decl., ECF No. 123-1, at ¶ 8).  This practice meant that Defendants turned over hard copy documents concerning the GRAT I to John, as Frances's executor and co-client in the representation.  (Defs.' Resp., ECF No. 123, at 3; Kipnes Decl., ECF No. 123-1, at ¶ 30). Although Defendants would have turned over any such ESI to John rather than Plaintiff anyway, Plaintiff incorrectly states that Defendants failed to search for it.  Defendants specifically searched the ESI for terms that would have uncovered any materials concerning the GRAT I (and the GRAT II), including the terms "GRAT" and "grantor retained annuity trust," but located none.  (Kipnes Decl., ECF No. 123-1, at ¶ 30; Kipnes Decl. Ex. B, ECF No. 123-3, at 4-5).

Defendants did not specifically search for the "master settlement agreement."  (*See* Kipnes Decl. Ex. B, ECF No. 123-3, at 4-5).  However, they searched for all the family members

14

– including Plaintiff, John, Frances, Lucia and Herbert – and the family trusts – including the GRAT I, the modification of which resulted in the MSA.  (*Id.*)  It defies logic that a document concerning the MSA would not have mentioned any of the family members involved or any of the family trusts, especially the GRATs at the core of the agreement.  Accordingly, Defendants fulfilled their obligation to conduct a "reasonably comprehensive" search as to documents concerning the MSA as well.  *Winn-Dixie Stores, Inc.*, 2020 WL 3498161, at *2.  This Court has a duty to limit "unreasonably cumulative or duplicative" discovery, and as such I decline to order Defendants to run a redundant search likely only to uncover the same documents already provided to Plaintiff.  *See* FED. R. CIV. P. 26(b)(2)(C)(i).

### 3.    Records Custodians

Plaintiff asserts that "the records custodians that Defendants searched for resulting in the OC Production were not inclusive of all persons that have relevant and probative materials." (Pl.'s Mot. to Compel, ECF No. 102, at 17).  She provides a list of 14 additional custodians and argues that "Defendants' invoices demonstrate the omitted custodians logged and billed Plaintiff for substantial legal work directly related to the 2001 GRAT matters at issue in this case . . . ." (*Id.* at 18; *see also* Pl.'s Reply Ex. 42, ECF No. 132-10).  However, in his declaration Kipnes attests that none of these custodians "represented her in connection with the 2003 settlement agreement and redemption that is at the heart of this case, and half of them were not even in the trust and estate department."  (Kipnes Decl., ECF No. 123-1, at ¶ 31).  He further attests that Plaintiff previously represented that she did not seek documents unrelated to her trust and estate matters.  (*Id.* at ¶ 5).  Defendants note that they represented Plaintiff for approximately 30 years on a variety of legal matters.  (Defs.' Resp., ECF No. 123, at 17).

"If the requesting party seeks to have the responding party search the information of additional custodians, the requesting party should be able to articulate a basis for the court to find

that ESI in the possession of the additional custodians would be different from, and not simply duplicative of, information that the responding party has already produced." *Enslin*, 2016 WL 7013508, at *1 n.2 (citing *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. CIV.A. 12-05275, 2015 WL 5055241, at *3 (D.N.J. Aug. 21, 2015)).  The party seeking discovery from the custodians must do more than "explain why he believes that these additional individuals may have some connection to the events at issue in this action . . . ." *Id.*  Thus, Plaintiff "must also articulate a[ ] basis to believe that Defendants' search and production of responsive documents was inadequate; in other words, why they would be in possession of additional non-cumulative responsive information." *Id.*

Here, Plaintiff fails to articulate any such basis.  Instead, she merely attaches legal invoices from Schnader that Plaintiff has highlighted as to select entries that she apparently believes show some type of work on the GRAT I by the additional custodians.  (Pl.'s Reply Ex. 42, ECF No. 132-10).  She does not further comment on what the entries purportedly show, whether on an individual or aggregate basis.  She does not discuss the entries of any single custodian.  Thus, she leaves the task of deciphering and analyzing these unknown individuals' billing entries to the Court.  However, many of the entries, on their face, do not appear to relate to the GRAT I.  Some apparently bill for administrative tasks completed by support staff.  (*See, e.g.,* Pl.'s Reply Ex. 42, ECF No. 132-10, at 4 (Carol Whitelock billing twenty dollars for spending one-half hour to "rvw bill; prep ck; ltr to Dr. Cox to pay bill")).  Other custodians billed at most a *de minimis* amount of time on the GRAT, often two hours or less total.  (*See id.* at 17 (Andrea Callan, Jennifer Stoudt, Melica Blige, Carol McCarthy, Frances Orr, Wilbur Kipnes)).  Because Plaintiff has not carried her burden of showing that Defendants' selection of custodians

16

was inadequate, I will not order production of documents from additional custodians.[13]  *See*

*Winn-Dixie Stores, Inc.*, 2020 WL 3498161, at *2 (party responding to discovery requests has "to

examine every scrap of paper in its potentially voluminous files").

    **B.**    **Documents Withheld By Defendants Because Of John's Privilege And Confidentiality**

      Plaintiff complains that Defendants produced documents concerning the GRAT I and the

Anna Nupson 2001 Trust to John so he could assert attorney-client privilege over them and now

"rely on a brash assertion that they do not have to produce any responsive discovery because the

documents are no longer in Defendants' possession."[14]  (Pl.'s Mot. to Compel, ECF No. 102, at

15-16, 18).  She contends that as trustee of the Anna Nupson 2001 Trust Rosenfield has the

"legal right and duty to collect, obtain, and preserve documents for production on demand."  (*Id.*

at 19).  Plaintiff claims that she has "no alternative means of obtaining the documents" because

John's current attorneys, Blank Rome, LLP, have objected to the subpoena she issued to them for

the documents.[15]  (*Id.* at 19).  She makes various arguments that John has waived the attorney-

---

[13]  Even if Plaintiff had carried her burden, she could not compel Defendants to produce the documents because they represented Frances, as the settlor of the GRAT I, and John, as its trustee.  Any documents would now belong to John, Frances's executor and former co-client.  Therefore, even if Plaintiff had articulated a basis to believe that these custodians had documents concerning the GRAT I, she could not compel Defendants to produce them.  *See* PA. R. PRO. CONDUCT 1.6 ("A lawyer shall not reveal information relating to representation of a client . . . .");  *see also infra* § III.B.

[14]  Plaintiff also claims that Rosenfield admitted to withholding trust documents in an April 28, 2014 email.  (Pl.'s Reply, ECF No. 132, at 20).  The referenced email shows that the documents apparently concerned a trust for Frances and Herbert's grandchildren, in which Plaintiff had only a "very remote" interest.  (*Id.* at Ex. 41).  I fail to see how this trust relates to Plaintiff's claims in this matter, and Plaintiff provides no explanation.

[15]  On January 7, 2021, Plaintiff filed a motion to compel compliance with the subpoena, to which Blank Rome filed a response on January 28, 2021.  (Pl.'s Mot. to Compel Compliance with Subpoena, ECF No. 166; Blank Rome's Resp., No. 174).  On January 29, 2021, the Honorable Nitza I. Quiñones Alejandro denied the motion without prejudice to renewal following disposition of the instant motion, if appropriate.  (Order, ECF No. 178).

client privilege as to the documents that she seeks or that they are otherwise not confidential. (*Id.* at 20-26; Pl.'s Reply, ECF No. 132, at 5-17, 20).

Defendants respond that they represented not Plaintiff but Frances, as settlor, and John, as trustee, regarding the GRAT I.  (Defs.' Resp., ECF No. 123, at 6).  Accordingly, pursuant to an agreement with Plaintiff and John in Orphans' Court, they distributed all documents regarding the GRAT I to John as trustee and as executor of the estate of Frances.  (*Id.* at 2, 6).  Defendants assert that even if they still retained any GRAT I documents after the Orphans' Court production, Pennsylvania Rule of Professional Conduct 1.6 would prohibit Defendants from disclosing them. (*Id.* at 11 (citing PA. R. PRO. CONDUCT 1.6); Defs.' Sur-reply, ECF No. 140, at 1 (same)).  They maintain that John also continues to assert the attorney-client privilege over protected communications and deny that they have the authority to waive it for him.  (Defs.' Resp., ECF No. 132, at 3, 6; Defs.' Sur-reply, ECF No. 140, at 4).  They further contend that they have "produced all trust administration documents concerning Mr. Rosenfield's service as trustee of Ms. Nupson's subtrust from February 1, 2005 to Plaintiff . . . except those documents as to which Schnader asserts a privilege of its own."[16]  (Defs.' Resp., ECF No. 132, at 8-9; *see also* Defs.' Sur-reply, ECF No. 140, at 2-3, 5).  Defendants allege that Plaintiff's motion constitutes an attempted "end-around" of John's attorney-client privilege and confidentiality and that if she wants John's documents, she must pursue her subpoena to his counsel.  (*Id.* at 7, 11). Defendants note that Plaintiff "does not dispute that the underlying documents and information

---

[16]  Plaintiff contends that despite Defendants' assurances in July 2020 that they would produce trust administration documents for the Anna Nupson 2001 Trust from 2017 through the present, they have not done so.  (Pl.'s Reply, ECF No. 132, at 20 n.8 (citing Pl.'s Mot. to Compel, ECF No. 102, at Ex. 15)).  Defendants do not refute this contention.  (*See generally* Defs.' Resp., ECF No. 140).  To the extent that Defendants have not yet produced trust administration documents from 2017 onward, they shall do so within 21 days of the issuance of this opinion.

that she is seeking are confidential or protected by the attorney-client privilege," but that she instead asserts waiver arguments.  (*Id.* at 11).  Defendants oppose these arguments.  (*Id.* at 12-15).

Like Defendants, Intervenors also oppose Plaintiff's waiver arguments and allege that her motion constitutes an attempt to circumvent John's attorney-client privilege and confidentiality, whether held individually or as the representative of Frances's estate or Bradford.  (Intervenors' Resp., ECF No. 121-4, at 19-24; Intervenors' Sur-reply, ECF No. 139, at 5-10).  In addition, they contend that their Orphans' Court settlement agreement with Plaintiff estops her from seeking documents regarding the GRAT I because Plaintiff "expressly agreed to relinquish *any* efforts to obtain Intervenors' privileged communications."  (Intervenors' Sur-reply, ECF No. 139, at 4) (emphasis in original).

Plaintiff does not dispute that the attorney-client privilege and Pennsylvania Rule of Professional Conduct 1.6 normally protect confidential client communications and files from disclosure.  (*See generally* Pl.'s Mot. to Compel, ECF No. 102; Pl.'s Resp., ECF No. 132).  However, she argues that in this case the privilege has been waived or that the documents at issue are otherwise not confidential as to her.  First, she contends that Defendants' joint representation of Frances, John and her regarding the master settlement agreement waived the protections of the attorney-client privilege and Rule 1.6 among these co-clients as to the GRAT.  (Pl.'s Mot. to Compel, ECF No. 102, at 22-24; Pl.'s Reply, ECF No. 132, at 6).  Second, Plaintiff claims that Defendants' and Intervenors' Orphans' Court disclosures and filings containing information about the GRAT I have waived the privilege and confidentiality as to documents concerning it.[17]  (Pl.'s Mot. to Compel, ECF No. 102, at 24-26; Pl.'s Reply, ECF No. 132, at 7-

---

[17]  Plaintiff also advances the related argument that in Orphans' Court Defendants and Intervenors took "contradictory positions on the same privilege designations," including both producing and withholding documents that they claim contain business rather than legal advice,

10, 14-16).  I shall consider these arguments in turn, but first I address Intervenors' threshold

contention that the Orphans' Court settlement agreement estops Plaintiff from seeking

documents regarding the GRAT I.

### 1.    Orphans' Court Settlement Agreement

Intervenors claim that Plaintiff acknowledged in the settlement agreement that the

Intervenors had concealed nothing from her and "expressly agreed to relinquish *any* efforts to

obtain Intervenors' privileged communications."  (Intervenors' Supp. Resp., ECF No. 153, at 4

(citing OC Settlement Agmt., ECF No. 121-5, at §§ III.C.5 [sic],[18] D.10 and I.5)) (emphasis in

original).  They maintain that "[h]er agreement to those provisions was a necessary precondition

to the judicially approved 2018 Settlement Agreement, without which she never would have

received" the settlement payment under the agreement.[19]  (*Id.*)

Under section II.C.5[20] of the settlement agreement, Plaintiff agreed to sign a waiver of

her right to "challenge this Agreement on the non-disclosure of documents or information related

to the 2001 GRAT" within five days of execution of the agreement, payment of the settlement

payment, and the issuance of adjudications by the Orphans' Court, whichever occurred last.  (OC

---

such that Defendants must produce all documents containing similar advice.  (Pl.'s Reply, ECF
No. 132, at 11-14, 17-18).

[18]  Intervenors presumably intend to cite section II of the settlement agreement.  No
section III exists.  (*See generally* OC Settlement Agmt., ECF No. 121-5).

[19]  Intervenors also make an argument on the merits, that Plaintiff suffered no harm from
the alleged failure to inform her of the creation of the oral GRAT I, under which she would have
received nothing, because she became a beneficiary after the GRAT's modification with
Frances's and John's consent.  (Intervenors' Sur-reply, ECF No. 139, at 3-4).  This argument
concerning the validity of Plaintiff's underlying claims exceeds the scope of the motion to
compel.  As such, I do not consider it.

[20]  Sections II.D.10 and I.5, the other provisions Intervenors cite, mirror section II.C.5 but
apply to other trusts.  (*See* OC Settlement Agreement, ECF No. 121-5, at §§ II.D.10, I.5).

Settlement Agreement, ECF No. 121-5, at § II.C.5).  However, Plaintiff has not signed the

waiver because the Orphans' Court has yet to issue any adjudications.  (Pl.'s Supp. Resp., ECF

No. 153, at 3-4).  Accordingly, even assuming that her actions in this litigation constitute a

"challenge"[21] to the settlement agreement, section II.C.5 has no applicability at present.

## 2.      The Joint Representation

Plaintiff observes that "in 2002, Frances and John knowingly agreed to Defendants' joint

representation of Plaintiff regarding the master settlement agreement regarding Frances' estate,

which included Frances' 2001 GRAT instruments."  (Pl.'s Mot. to Compel, ECF No. 102, at 23).

From this fact she extrapolates that "Frances and John voluntarily and knowingly waived their

claims to privilege and confidentiality on all matters relating to Defendants' joint representation

over Frances' estate in 2002 and the original 2001 GRAT instrument and, as a result, Rule 1.6

does not apply to documents Defendants are withholding under a claim of privilege."  (*Id.*)  She

contends that the following averments in Intervenors' Amended Petition for Declaratory and

Other Relief filed in the Orphans' Court litigation demonstrate that Frances and John waived

privilege and confidentiality as to the earlier created GRAT I when they shared information

about it with Plaintiff during the course of the joint representation:

> 75.      From the first conversation that John had with his mother
> about changing the terms of the trust instrument from the Original
> GRAT, John told her, in substance, that he would only agree to do
> so if (i) the contemplated changes resulted in a comprehensive and
> final family resolution of all issues related to Frances' assets and
> estate once and for all time, which final resolution could not be
> achieved unless Ms. Nupson were included in the family
> negotiations, (ii) he received appropriate protection from any
> possible adverse gift tax consequences that could arise from

---

[21]  Plaintiff argues that her "discovery efforts . . . have not demonstrated any intent of
rescinding or challenging the 2018 Settlement Agreement on the bases of non-disclosure of
documents or information."  (Pl.'s Supp. Resp., ECF No. 153, at 3).  Because Plaintiff has yet to
execute the waiver, I find it unnecessary to consider whether Plaintiff's actions challenge the
settlement agreement.

changing the terms of the trust instrument for the Original GRAT
and (iii) Ms. Nupson were included in Frances' inheritance.

76.     At the direction of his mother, John had not previously
discussed the Original GRAT with Ms. Nupson.  In or around
September, 2002, however, and with the permission of his mother,
John called Ms. Nupson and informed her of Frances' estate plan,
which included the creation of a trust in 2001 for the benefit of
John and his family and that Frances had transferred her remaining
Bradford shares into that trust.

. . . .

109.    A material part of the global family resolution and the
purchase of the Bradford shares was that certain terms of the trust
instrument for the Original GRAT would be changed in a new trust
document modifying the Original GRAT, and which would be
executed by Frances in connection with the global family
resolution.

(Pl.'s Mot. to Compel, ECF No. 102, at 22-24 (quoting Intervenors' Am. Pet. for Declaratory and

Other Relief, ECF No. 102-28, at ¶¶ 75-76, 109)).[22]

Defendants respond that they only represented Plaintiff jointly with Frances[23] regarding

the "negotiations in late 2002 and early 2003 which led to the modified GRAT II" and that they

have produced all documents related to that trust.  (Defs.' Resp., ECF No. 123, at 14).  They

refute that the statements Plaintiff excerpts from Intervenors' Orphans' Court amended petition

show that the joint representation extended any further than the MSA and GRAT II negotiations.

(*Id.* at 12-13).  They contend that Intervenors' averments regarding the existence and nature of

---

[22]  In addition, Plaintiff notes that a rider to Defendants' Petition for Adjudication filed in
Orphans' Court states that the family intended the master settlement agreement to resolve the
disposition of Frances's estate, including the GRAT.  (Pl.'s Mot. to Compel, ECF No. 102, at 23
(citing Defs.' Pet. for Adjudication, ECF No. 102-19, at 5-6)).

[23]  Defendants state that the joint representation resulting in the GRAT II and MSA
included only Plaintiff and Frances, not John.  (Defs.' Resp., ECF No. 123, at 14).  Because John
has a right to assert the attorney-client privilege by virtue of his status as the executor of
Frances's estate, whether Defendants also represented John in the matter does not affect my
analysis.

the GRAT I constitute mere statements of facts necessary for the joint representation, not disclosure of privileged legal communications.  (*See id.* at 12).  Defendants deny that this representation waived the attorney-client privilege as to earlier matters, such as the formation and funding of the original GRAT.  (*See id.* at 14.)  Defendants assert that Rule of Professional Conduct 1.6 prohibits them from disclosing privileged and confidential communications about the GRAT I.  (*Id.* at 2, 11).

Intervenors add that John "agreed only to a joint representation *going forward* – not to a backward-looking waiver of privilege that would permit Ms. Nupson to simply demand anything she wanted from his, his mother's or the company's client files."  (Intervenors' Resp., ECF No. 121-4, at 6) (emphasis in original).  They note that Plaintiff fails to cite any evidence that Frances or John agreed to waive privilege as to communications occurring prior to the joint representation.  (*Id.* at 19).  They point out that the October 11, 2002 conflict waiver letter for the joint representation sets forth no such waiver.  (*Id.*)

"The attorney-client privilege protects communications between attorneys and clients from compelled disclosure.  It applies to any communication that satisfies the following elements: it must be '(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.'"  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (quoting Restatement (Third) of the Law Governing Lawyers § 68 (2000)).

The Third Circuit[24] has explained the scope of the attorney-client privilege where an attorney represents multiple clients on the same matter:

---

[24]  "Although the opinion [in *In re Teleglobe Communications Corp.*] applied Delaware law on some issues, in addressing exceptions to attorney-client privilege the court looked to case law from numerous jurisdictions, the Restatement (Third) of the Law Governing Lawyers, and general principles animating the doctrines at issue." *CAMICO Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP*, No. 11-4753, 2013 WL 315716, at *1 (E.D. Pa. Jan. 28, 2013).  Accordingly,

> When co-clients and their common attorneys communicate with one another, those communications are "in confidence" for privilege purposes.  Hence the privilege protects those communications from compelled disclosure to persons outside the joint representation. Moreover, waiving the joint-client privilege requires the consent of all joint clients.  Restatement (Third) of the Law Governing Lawyers § 75(2).  A wrinkle here is that a client may unilaterally waive the privilege as to its own communications with a joint attorney, so long as those communications concern only the waiving client; it may not, however, unilaterally waive the privilege as to any of the other joint clients' communications or as to any of its communications that relate to other joint clients.  *Id.* at cmt. e.

*Id.* at 363.

In a joint representation, the attorney-client privilege "only protects communications from compelled disclosure to parties outside the joint representation."  *Id.* at 366.  When former co-clients become adversaries in litigation, previously privileged communications that occurred "in the course of the joint representation" become discoverable.  *Id.* (citations omitted). However, discoverability remains limited to communications on the matter of joint representation.  *Id.* at 363.  "As the Restatement notes, a co-client relationship is limited by 'the extent of the legal matter of common interest.'"  *Id.* (citing Restatement (Third) of the Law Governing Lawyers § 75 cmt. c).  The Restatement further acknowledges that "a lawyer might also represent one co-client on other matters separate from the common one."  Restatement (Third) of the Law Governing Lawyers § 75 cmt. c.

A client may also waive the attorney-client privilege.  "[V]oluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege."  *Westinghouse Elec. Corp. v. Rep. of Phil.*, 951 F.2d 1414, 1424 (3d

---

judges within this district have found it persuasive as to the parameters of the joint-client privilege when applying Pennsylvania law.  *See id.*; *see also* FED. R. EVID. 501 ("in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision").

Cir. 1991) (citing *United States v. AT & T*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)). "Consequently, it is well-settled that when a client voluntarily discloses privileged communications to a third party, the privilege is waived." *Id.* (citing *United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990); 16 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE §§ 2016, 2024 (West 1977)); *see also BouSamra v. Excela Health*, 210 A.3d 967, 982 (Pa. 2019) (citing *Joe v. Prison Health Servs., Inc.*, 782 A.2d 24, 31 (Pa. Cmwlth. Ct. 2001)) (additional citations omitted). Further, "the privilege only protects communications from discovery. Facts are discoverable, even if discussed in privileged communications." *SodexoMAGIC, LLC v. Drexel Univ.*, 291 F. Supp. 3d 681, 685 (E.D. Pa. 2018). Accordingly, disclosure of facts does not waive the privilege.

In addition, Pennsylvania Rule of Professional Conduct 1.6(a) provides that "[a] lawyer shall not reveal information relating to representation of a client unless the client gives informed consent" or an enumerated exception applies. PA. R. PRO. CONDUCT 1.6(a). The exceptions to Rule 1.6 include compliance with a court order. PA. R. PRO. CONDUCT 1.6(c)(8).

Here, Defendants did not represent Plaintiff as to the formation and administration of the GRAT I. Rather, they represented Frances, as settlor, and John, as trustee, on that matter. Nonetheless, Plaintiff demands discovery of documents relating to the GRAT I because Defendants subsequently represented her along with Frances and, allegedly, John in the negotiations that resulted in the MSA regarding the disposition of Frances's estate. She bases her demand on a claim that "Frances' estate . . . included Frances' 2001 GRAT instruments" and a few statements by Intervenors in their amended petition in Orphans' Court referencing the existence and nature of the GRAT. (Pl.'s Mot. to Compel, ECF No. 102, at 22-24 (quoting Intervenors' Am. Pet. for Declaratory and Other Relief, ECF No. 102-28, at ¶¶ 75-76, 109)).

Plaintiff overreaches.  The origination and administration of the GRAT I constituted a separate matter from the negotiations to modify it.  The subsequent negotiations represented "the extent of the legal matter of common interest" among Plaintiff, Frances and John.  *See In re Teleglobe Commc'ns Corp.*, 493 F.3d at 363 (citation omitted).  Nothing indicates that at the time Frances created the GRAT I that she or anyone else even contemplated the later negotiations for a master settlement agreement in which Defendants represented Plaintiff jointly with Frances and John.  As Plaintiff observes, John provided Plaintiff with facts regarding the existence and nature of the GRAT I necessary to carry out the negotiations to amend it, but nowhere does she point to any indication that he or Frances intended to waive the attorney-client privilege as to prior communications between them and counsel about the GRAT I or that they divulged such communications to her.  She does not deny that the conflict waiver executed for the joint representation did not purport to waive to such communications.  Certainly, John did not view his agreement to the joint representation as waiving privilege and confidentiality as to earlier communications about the GRAT.  (Intervenors' Resp., ECF No. 121-4, at 6).  Because the GRAT constituted a separate matter from the later negotiations that led to its modification, the subsequent joint representation of Plaintiff, Frances and John in those negotiations does not waive the attorney-client privilege as to the earlier matter.  Accordingly, I decline to compel Defendants to produce documents related to the GRAT I.  *See* PA. R. PRO. CONDUCT 1.6(c)(8).

### 3.       Intervenors' Orphans' Court Production

Plaintiff claims that Intervenors also waived privilege by producing two documents to Plaintiff in the Orphans' Court litigation, an email from Rosenfield to John and estate planning materials for Frances.  (Pl.'s Mot. to Compel, ECF No. 102, at 24).  She contends that these documents "constitute a voluntary waiver by John by disclosing information regarding Frances'

formation and planning for her 2001 GRAT transaction" and by allegedly showing that

Defendants and John misrepresented the GRAT I's origination date.  (*Id.* at 26).

The first document consists, in relevant part, of the following March 10, 2001 email from

Rosenfield to John:

> With respect to your mom, during our last meeting, my thought she
> was leaning to make no further benefit to anna under her will. **It
> wouldn't be that much of a stretch to say she would give you
> stock and them the rest (or something like that). We will be
> addressing that sooner than later if we ever get together on
> gifting.**
>
> **In this regard, if there are enough assets, we are talking about
> cashing out lots of her stock throough [sic] the gifting program.
> she will be getting cash instead, which would help in the over all
> programof [sic] getting non company assets to your sisters.**
>
> We have to be careful to make sure that any transactions qualify for
> cap gains treatment for your sisters.

(Pl.'s Reply, ECF No. 132, at 13 (quoting *id.*, ECF No. 102-29, at Ex. 29) (emphasis added by

Plaintiff)).  The second document "depict[s] several trusts and gifting options for completing an

inter-vivos transfer of Frances' company shares."  (Pl.'s Mot. to Compel, ECF No. 102, at 25-26;

*see also* Pl.'s Reply, ECF No. 132-5, at Ex. 37).

Intervenors[25] respond that they only produced these documents in Orphans' Court after

Plaintiff convinced them that the attorney-client privilege did not protect them from disclosure.

(Intervenors' Resp., ECF No. 121-4, at 22).  They argue that production of nonprivileged

documents does not waive the privilege and "voluntary disclosures of documents, for which a

claim of privilege has been made, to resolve disputes between the parties,  . . . do not operate as a

waiver of other confidential communications, even as to communications involving the same

---

[25]  Defendants state that they lack knowledge of the circumstances surrounding the
production of the documents and defer to Intervenors' position on the issue.  (Defs.' Resp., ECF
No. 140, at 13-14).

subject matter." (*Id.* at 22-23 & n.23 (citing *Nationwide Mut. Ins. Co. v. Fleming,* 924 A.2d 1259, 1262-63 (Pa. Super. Ct. 2007), *alloc. granted* 935 A.2d 1270, 594 Pa. 311 (2007), *aff'd by an equally divided court*, 992 A.2d 65, 605 Pa. 468 (2010); *Scranton Cultural Ctr. at the Masonic Temple v. Phila. Indemnity Ins. Co.*, 2015 WL 13778567, at *4-5, 46 Pa. D. & C.5th 393 (Phila. Com. Pl. Ct. 2015); *Minatronics Corp. v. Buchanan Ingersoll, P.C.*, 23 Pa. D. & C.4th 1, 20-21 (Allegheny Com. Pl. Ct. 1995) (Wettick, Jr., J.))). Intervenors contend that the attorney-client privilege, and thus subject matter waiver for producing privileged documents, does not apply because neither document includes a request for or provision of legal advice. (*Id.* at 22). They further contend that subject matter waiver does not apply because Defendants were not parties to the Orphans' Court action and Intervenors are not parties do this action. (*Id.* at 21).

In reply, Plaintiff argues that Intervenors listed these documents on prior privilege logs. (Pl.'s Reply, ECF No. 132, at 11-12, 15). She posits that if these documents consist of business or estate planning, rather than legal, advice, Intervenors must produce "all other documents pertaining to Frances' accounting and tax estate planning regarding the disposition of her Bradford shares." (Pl.'s Reply, ECF No. 132, at 11-14, 17-18). Intervenors counter that they initially placed the documents on privilege logs before Plaintiff convinced them that the attorney-client privilege did not protect the documents, as well as others that Intervenors subsequently produced. (Intervenors' Sur-reply, ECF No. 139, at 7). They ask the Court not to reward such gamesmanship. (*Id.*) They also note that they never attempted to use the documents offensively as a "sword," as evidenced by Plaintiff's reliance on the documents to show that Frances did not form the GRAT I in February 2001 as Intervenors claim. (*Id.* at 8).

"First and foremost, Pennsylvania courts have not adopted subject-matter waiver." *Bagwell v. Pa. Dep't of Educ.*, 103 A.3d 409, 419 (Pa. Cmwlth. Ct. 2014). "Second, subject-matter waiver, to the extent it is recognized, applies where the parties seeking disclosure are

adversaries in litigation." *Id.* Third, "[i]n discovery disputes, implied waivers are construed narrowly, and a party is only forced to produce documents under a prospective waiver theory if it agrees to disclose only favorable privileged documents while keeping for itself the unfavorable ones to gain an advantage in litigation." *In re Teleglobe Commc'ns Corp.*, 493 F.3d at 378 (citing *Westinghouse Elec. Corp.*, 951 F.2d at 1426 n. 12; *In re Lott*, 424 F.3d 446, 453 (6th Cir. 2005)) (additional citation omitted). Fourth, "limited disclosures can serve a worthwhile purpose and, consequently, the law should not discourage parties from voluntarily disclosing confidential communications (unless made for the purpose of achieving a tactical advantage) by adopting a rule of law that causes voluntary disclosures to operate as a waiver of other confidential communications involving the same subject matter." *Minatronics Corp.*, 23 Pa. D. & C.4th at 11.

　　　None of these considerations weigh in favor of finding subject matter waiver based on the earlier production of the March 10, 2001 Rosenfield email or the April 25, 2001 estate planning documents. Even recognizing the possibility of a narrow subject matter waiver, the Court observes that Intervenors, who produced the documents in the Orphans' Court litigation, are not parties to this litigation, where Plaintiff seeks subject matter waiver. Plaintiff attempts to use these documents against Defendants, non-parties in the Orphans' Court litigation, not Intervenors. Further, the fact that Plaintiff attempts to use them at all highlights another reason that subject matter waiver does not apply: the documents do not constitute a selective disclosure of materials unfavorable to the recipient party. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d at 378. Rather, they tend to support, not undermine, Plaintiff's claim that Frances did not form the GRAT I in February 2001. If in March and April 2001 Frances was still considering her trust and gift options to make an *inter vivos* transfer of her Bradford shares, as Plaintiff contends the documents show, that fact might call into question whether she formed the GRAT I in February

of that year, as Defendants and Intervenors have maintained.  In addition, Plaintiff does not deny

that Intervenors produced the documents in the Orphans' Court litigation, after initially

withholding them on privilege logs, to resolve disputed privilege designations that had arisen in

the prior meet-and-confer.  Finding subject matter waiver based on this disclosure would punish

Intervenors for their willingness to consider and act upon Plaintiff's prior contention that the

attorney-client privilege does not apply to the documents.[26]  *See Minatronics Corp.*, 23 Pa. D. &

C.4th at 11.  For these reasons, I decline to find subject matter waiver or order the production of

any additional documents based upon Intervenors' production of the March 10, 2001 Rosenfield

email or Frances's April 25, 2001 estate planning materials.

### 4.    **Defendants' Orphans' Court Filings**

In addition, Plaintiff claims that Intervenors' waived privilege as to the subject matter of

the GRAT when they did not object to two of Defendants' Orphans' Court filings, the Petition

for Adjudication filed by Rosenfield, as trustee, and Schnader attorney Roy Ross's supporting

affidavit.  (Pl.'s Reply, ECF No. 132, at 10-11, 15).  Rosenfield's October 5, 2016 petition

discussed the formation of the GRAT I.  (Pl.'s Mot. to Compel, ECF No. 102, at 4; *see also id.* at

Ex. 17).  Ross's December 22, 2016 affidavit attached an unsigned and undated draft of the trust

instrument.  (*Id.* at 4; *see also id.* at Ex. 18).  Plaintiff contends that Intervenors' "acquiescence

to Defendants' intentional and voluntary production of a draft of Frances' original GRAT [and

---

[26]    Requesting all other documents concerning Frances's planned disposition of her
Bradford shares, Plaintiff complains that Intervenors have taken inconsistent privilege positions
as to the March 25, 2001 email and April 25, 2001 estate planning documents.  (Pl.'s Reply, ECF
No. 132, at 11-14, 17-18).  But Intervenors could make the same claim about Plaintiff.  After
arguing in Orphans' Court that the documents were not privileged, they now contend that they
are, such that their prior disclosure has resulted in subject matter waiver.  (Pl.'s Mot. to Compel,
ECF No. 102, at 24, 26).

filing of a petition discussing the same] constitutes a voluntary, intentional, and selective disclosure and waiver of privilege." (Pl.'s Reply, ECF No. 132, at 10).

Intervenors counter with arguments similar to those they raised in opposition to Plaintiff's request for a finding of subject matter waiver based on the production of the Rosenfield email and estate planning materials, discussed above. Citing *Bagwell*, they note that Pennsylvania does not recognize subject matter waiver. (Intervenors' Sur-reply, ECF No. 140, at 7). They observe that these disclosures occurred in another litigation by another party, one who is not a party here. (*See id.* at 7). They also contend that these documents merely disclosed facts about the GRAT I (e.g., its existence, formation and execution) that were neither privileged nor intended to remain confidential. (*See id.*).

The filing of these documents does not meet the requirements for subject matter waiver. Defendants filed them in their capacities as trustee of the Anna Nupson 2001 Trust (Rosenfield) and his counsel (Schnader). (Pl.'s Mot. to Compel, ECF No. 102, at 4). They did not file the documents as counsel for Intervenors. Plaintiff asserts that Intervenors "failed to object," but they articulate no basis (and cite to no authority) for attributing any waiver to Intervenors. (*Id.*) In short, Intervenors did not use the documents as a "sword" in the Orphans' Court litigation. *See Murray v. Gemplus Int'l, S.A.*, 217 F.R.D. 362, 367 (E.D. Pa. Sept. 16, 2003) ("Where one party attempts to utilize the privilege as an offensive weapon, selectively disclosing communications in order to help its case, that party should be deemed to have waived the protection otherwise afforded it by the privilege it misused."). Moreover, the filings purported to disclose only facts about the GRAT I, such as its terms, when it was formed, and when it was signed, not privileged communications about it. (Pl.'s Mot. to Compel, ECF No. 102, at 4). The attorney-client privilege does not protect facts from disclosure, and thus the dissemination of facts about the GRAT I could not waive the privilege. *See SodexoMAGIC, LLC*, 291 F. Supp. 3d

at 685.  For these reasons, I decline to find subject matter waiver or order the production of any

additional documents based upon Defendants' filing of the Petition for Adjudication or the

supporting affidavit.

     C.     **Documents Withheld By Defendants Because Of Their Attorney-Client And Work-Product Privileges**

     Plaintiff complains that Defendants have withheld 654 "internal communications

regarding their administration and preparation of trust accountings and Petitions for Adjudication

regarding their administration of Plaintiff's 2001 GRAT sub trust, and Schnader's representation

of that trust," on the purported basis "of attorney client and attorney work product privileges

shared between Defendants Schnader and Rosenfield."  (Pl.'s Mot. to Compel, ECF No. 102, at

28; *see also id.* at Ex. 23).  However, she claims that the documents withheld "were not prepared

in anticipation of litigation," and thus not attorney work product, "because Plaintiff had not

asserted any claims or substantive objections against Rosenfield in his capacity as trustee prior to

filing this case in June 2018."  (Pl.'s Mot. to Compel, ECF No. 102, at 29).  She further alleges

that even if the attorney-client privilege or work-product doctrine would otherwise protect the

withheld documents from disclosure, under *Follansbee v. Gerlach*, 56 Pa. D. & C.4th 483, 487

(Allegheny Com. Pl. Ct. 2002) (Wettick, Jr., J.) a "fiduciary exception" to these privileges exists

to allow trust beneficiaries "to discover communications between the fiduciary and trust counsel

generated in the course of administering the trust."  (Pl.'s Reply, ECF No. 132, at 21).  She

further claims that these privileges do not apply because Schnader and Rosenfield communicated

"to conceal their prior and current malpractice and breaches of fiduciary duties," not to transmit

legal advice.  (Pl.'s Reply, ECF No. 132, at 29).

     Defendants counter that the fiduciary exception set forth in *Follansbee* "has not been

universally adopted by all state and federal courts and it has not been adopted by the

Pennsylvania Supreme Court."  (Defs.' Sur-reply, ECF No. 140, at 8).  They state that in any

event the exception does not apply to the withheld documents because they "are internal communications amongst Schnader attorneys with and about Rosenfield, as Rosenfield's counsel," not communications involving trust administration.  (Defs.' Resp., ECF No. 123, at 21).  They defend their selection of December 31, 2013, as the date by which they reasonably anticipated litigation and by which communications between Rosenfield and Schnader switched from the topic of trust administration to the former's legal defense – such that the *Follansbee* exception would not apply even if recognized – on the basis that Plaintiff hired new counsel to review Schnader's files in the fall of 2013, "a position that Schnader reasonably concluded was adversarial."  (*Id.* at 18-20).  Defendants also assert that Plaintiff improperly raises her fraudulent concealment argument in her reply brief and that, even if the Court considers it, "what Plaintiff alleges was concealed – the chronology relating to the formation of the Original GRAT and the execution of the trust instrument [–] have been on the record in the Orphans' Court since May 1, 2017."  (Defs.' Sur-reply, ECF No. 140, at 8 n.5).

The work-product doctrine[27] protects from disclosure documents "prepared (1) at a time when litigation was reasonably foreseeable; and (2) primarily for the purpose of litigation." *Fouad v. Milton Hershey Sch. & Tr.*, No.1:19-CV-253, 2020 WL 3265245, at *13 (M.D. Pa. June 17, 2020) (citing *Rockwell Int'l*, 897 F.2d at 1266) (additional citation omitted).  For the work-product doctrine to apply, "the materials must be prepared in anticipation of litigation, and not in the ordinary course of business.  Otherwise, the privilege does not apply." *Id.* (citing *Rockwell Int'l*, 897 F.2d at 1266) (internal citation omitted).

I set forth the parameters of the attorney-client privilege in section III.B.2.  In *Follansbee*, Judge Wettick considered whether a trustee may invoke the privilege "to withhold from a

---

[27]  This Court has already set forth the parameters of the attorney-client privilege in section III.B.2.

beneficiary communications between the trustee and counsel to the trustee regarding the management of the trust." 56 Pa. D.&C.4th at 485.  After noting that no Pennsylvania appellate court had addressed the issue, he reviewed case law from other jurisdictions and concluded that most "distinguish between communications about potential liability and communications about trust administration and apply the attorney-client privilege only to the former." *Id.* at 486.  He also observed that Pennsylvania courts follow the Restatement (Second) of Trusts provision regarding a trustee's "[d]uty to furnish information." *Id.* at 487 (citing Restatement (Second) of Trusts § 173).  This section obligates a trustee, if requested by the beneficiary, to provide information about the nature and amount of trust property and to inspect the subject matter and documents relating to the trust.  Restatement (Second) of Trusts § 173.  However, a comment to the section states that the trustee "is privileged to refrain from communicating to the beneficiary opinions of counsel obtained by him at his own expense and for his own protection." *Id.* § 173, cmt. b.  In light of this and other persuasive authority, Judge Wettick held that "the trustee cannot withhold from any beneficiary documents regarding the management of the trust, including opinions of counsel procured by the trustee to guide the trustee in the administration of the trust, because trust law imposes a duty to make these documents available to the beneficiaries."[28] *Follansbee*, 56 Pa. D.&C.4th at 491.

---

[28]  Although some of the authority Judge Wettick cited stated that the attorney-client privilege does not attach to legal advice the trustee obtains for his own benefit and at his "own expense," *see* 2A Austin W. Scott & William F. Fratcher, Scott on Trusts § 173, 462, 464-65 (4th ed. 1987); Restatement (Second) of Trusts § 173, cmt. b, who paid for the advice was not an issue in the case. *See generally Follansbee*, 56 Pa. D.&C.4th 483.  Accordingly, Judge Wettick did not determine whether application of the attorney-client privilege requires that the trustee paid for the legal advice himself.  *See generally id.*  Because it is not known at this time whether production of any document hinges on who paid for the legal advice sought or contained therein, the Court similarly declines to determine whether that is a relevant consideration in determining the applicability of the attorney-client privilege or the fiduciary exception thereto.

The validity of *Follansbee*'s fiduciary exception is currently pending before the Pennsylvania Supreme Court.  *In re Estate of McAleer*, 201 A.3d 724 (Pa. 2019).  In the Superior Court iteration of *McAleer*, the court applied the exception.  *See In re Estate of McAleer*, 194 A.3d 587, 596-97 (Pa. Super. Ct. 2018) (finding fiduciary exception applicable where trustee "neither argued nor presented evidence to establish that the redacted information pertained to communications from counsel retained for [trustee's] personal protection in the course of litigation").  The Superior Court also considered the applicability of the exception in another case.  *See In re: Trust Under Deed of Trust of Sarah Mellon Scaife, Dec. 30, 1935*, No. 1415 WDA 2018, 2019 WL 7372742, at (Pa. Super. Ct. 2019) (finding *Follansbee* exception "germane with regard to the Trust management documents [but] not controlling with regard to estate planning documents") (non-precedential decision).  Indeed, the Pennsylvania Supreme Court itself, while not adopting the exception, has considered the possibility of the exception's application in a case before concluding that the exception did not fit the facts of the case.  *See Pittsburgh Hist. & Landmarks Found. v. Ziegler*, 200 A.3d 58, 411 n.2, 444-45 (Pa. 2019) (discussing the fiduciary exception set forth in *Follansbee* but finding it "ill-fitting" in derivative litigation).  In light of Pennsylvania appellate courts' demonstrated openness to applying *Follansbee*'s fiduciary exception, as well as Judge Wettick's well-reasoned and well-researched opinion itself, I do not exclude the possibility that the exception applies in this case.

Defendants claim that they have "produced all trust administration documents concerning Mr. Rosenfield's service as trustee of the Anna Nupson 2001 Trust from February 1, 2005 to Plaintiff . . . , except those documents as to which Schnader asserts a privilege of its own." (Defs.' Resp., ECF No. 132, at 8-9; see also Defs.' Sur-reply, ECF No. 140, at 2-3, 5).  They maintain that the withheld documents comprise privileged attorney-client communications and attorney work product generated in the course of Rosenfield seeking, and Schnader providing,

legal advice regarding the adversarial relationship that had arisen with Plaintiff.  (*See* Defs.'
Resp., ECF No. 123, at 21).  This fact, if true, would render the materials not subject to
disclosure, even under *Follansbee*.  *See* 56 Pa. D.&C.4th at 491 (trustee only required to provide
beneficiary "documents regarding the management of the trust, including opinions of counsel
procured by the trustee to guide the trustee in the administration of the trust").  However, it is
simply not possible to determine if Defendants have properly invoked these privileges based
upon their log in its current form.  Although the log includes entries for each document's[29]
sender, recipient, date and "Subject," it lacks sufficient description to allow Plaintiff (or if
necessary the Court) to determine whether Defendants have properly withheld the document
based on a claim of a privilege.  (*See* Pl.'s Mot. to Compel, ECF No. 102, at Ex. 23).

Further, Plaintiff contends that Defendants could not have prepared the documents on the
privilege log, which date to December 14, 2015, or earlier, in anticipation of litigation because
Plaintiff did not assert claims against Rosenfield until she filed the instant litigation in June of
2018.  (Pl.'s Mot. to Compel, ECF No. 102, at 29).  Under Plaintiff's view, the documents could
therefore not constitute work product, nor could Defendants have created them to provide legal
advice for the benefit of Rosenfield because Plaintiff had not yet sued him.  However, the
relevant consideration is whether litigation was "reasonably foreseeable," not actually filed.
*Fouad*, 2020 WL 3265245, at *13.  Thus, the Court declines to accept the filing date of this
litigation as the point at which Defendants first reasonably foresaw litigation.

Nonetheless, the Court also does not accept Defendants' December 31, 2013 cutoff date.
Defendants offer no explanation as why they selected this date, which they purportedly based
upon Plaintiff's engagement of new counsel to review Schnader's trust files at some earlier point

---

[29]  Based on the entries in the log, the documents appear to be overwhelmingly if not
exclusively emails.

that fall.  (Defs.' Resp., ECF No. 123, at 18).  Defendants fail to rebut Plaintiff's assertion that she merely requested, through counsel, "a routine administrative accounting and administration documents from Defendants."  (Pl.'s Mot. to Compel, ECF No. 102, at 29).  I note that Plaintiff had the right to make such a request pursuant to Restatement (Second) of Trusts § 173.  *See Follansbee*, 56 Pa. D.&C.4th at 487 (noting that Pennsylvania courts have adopted this provision).  Nor did Defendants institute a litigation hold at this time.  (Defs.' Resp., ECF No. 123, at 3; *see also Rhoades v. YWCA of Greater Pittsburgh*, No. 09-261, 2009 WL 3319820, at *7 (W.D. Pa. Oct. 14, 2009) ("[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold'" (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y.2003)))).  Under these circumstances, I find that Defendants have not established that they reasonably anticipated litigation with Plaintiff until her counsel sent them a letter on June 5, 2014, advising of her intention to pursue claims against them.  (*See* Defs.' Mot. to Dismiss, ECF No. 33, at Ex. B).

Accordingly, within 21 days of the date of this opinion, Defendants shall revise their privilege log with an additional field describing each document in sufficient detail to establish that the claimed privileges apply.  Each description shall also include sufficient information to determine the applicability of the fiduciary and fraud exceptions alleged by Plaintiff.  Defendants shall further revise their privilege log to withdraw all assertions of the work-product doctrine for documents created prior to June 5, 2014.  Defendants shall produce any documents created prior to that date previously withheld solely on the basis of the work-product doctrine.

### D.    Attorney Liability Assurance Society Documents

Plaintiff's request for production of documents ("RFP") number 8 seeks documents exchanged between Schnader and its malpractice insurer, the Attorney Liability Assurance Society ("ALAS"), regarding conflicts of interest, new matter intake or any other issue raised in

this case.  (Pl.'s Mot. to Compel, ECF No. 102, at 32; Defs.' Resps. to Pl.'s First Set of

Interrogatories, ECF No. 102-1, at RFP No. 8).  Plaintiff claims that these "documents are

directly relevant to Plaintiff's claims of malpractice, [and] they go to what Defendants knew or

should have known of their duties during the relevant time periods at issue . . . ."  (*Id.* at 33).

Defendants respond that these documents "have no bearing on any issue in this matter."  (Defs.'

Resp., ECF No. 123, at 9).  They further contend that Schnader has received "voluminous

communications" since joining ALAS in 1979 and that it has no means of isolating documents

from the period at issue here.  (*Id.* at 21).

      I concur with Defendants that documents exchanged between Schnader and its

malpractice insurer have no bearing on the issues in this litigation.  Plaintiff argues that she

needs these documents to establish the standard of care applicable to her malpractice claims.

(Pl.'s Mot. to Compel, ECF No. 102, at 33).  However, "in order to avoid an involuntary

dismissal or a directed verdict" at trial in a legal malpractice case, the plaintiff must "establish

the standard of care with expert testimony," not insurance documents.  *Gans v. Mundy*, 762 F.2d

338, 343 (3d Cir. 1985) (citing *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474 (3d Cir.

1979)).  Accordingly, I decline to compel Defendants to produce these documents.

      **E.**    **Joint Defense And File Sharing Agreements**

      Plaintiff's RFP numbers 64 and 65 seek joint defense and file sharing agreements

between Defendants and Intervenors concerning Plaintiff.  (Pl.'s Mot. to Compel, ECF No. 102,

at 32; Defs.' Resps. to Pl.'s First Set of Interrogatories, ECF No. 102-10, at RFP Nos. 64-65).

Plaintiff believes such documents exist because she interprets Defendants' 2015 and 2016 billing

entries as showing that they "communicated with John concerning an indemnification agreement

and litigation strategy and produced Plaintiff's client and/or trust files to John regarding

Plaintiff's 2001 GRAT sub trust."  (*Id.* at 32).  However, Defendants respond that they have no

joint defense or file sharing agreements.  (Defs.' Resps. to Pl.'s First Set of Interrogatories, ECF No. 102-10, at RFP Nos. 64-65).  In support, Kipnes avers in his declaration that the "indemnification agreement" Plaintiff references was in fact a letter from Intervenors' counsel to Plaintiff's counsel, sent to Rosenfield as an address of record for Plaintiff, asserting Intervenors' rights against Plaintiff for indemnification pursuant to the MSA.  (Kipnes Decl., ECF No. 123-1, at ¶ 33(c)).  He also avers that the only documents from John of which he knows are not litigation agreements with Defendants but rather documents his counsel produced in response to a subpoena from Schnader.  (*Id.* at ¶ 33(d)).  Further, although Defendants produced files for the Anna Nupson 2001 Trust to John, as executor of the estate of Frances, for the period that she served as trustee, they did so pursuant to the Orphans' Court document production agreement among Schnader and the litigants in that matter, not any joint defense or file sharing agreement. (Defs.' Resp., ECF No. 123, at 3; Kipnes Decl., ECF No. 123-1, at ¶ 8).

In short, Plaintiff has failed to carry her burden to show that Defendants have withheld responsive documents.  *See Winn-Dixie Stores, Inc.*, 2020 WL 3498161, at *2.  The Court declines to order Defendants to produce documents that do not to exist.

### F.   Policies and Procedures for Defendants' Orphans' Court Production

Plaintiff has also issued at least four interrogatories, 15 requests for admissions ("RFAs") and 40 RFPs seeking "[d]ocuments and information regarding the policies, processes, procedures, directives, and communications of Defendants' OC Production and ESI search." (Pl.'s Mot. to Compel, ECF No. 102, at 33; Defs.' Resps. to Pl.'s Third Set of Interrogatories, Fourth Set of RFAs and Fifth Set of RFPs, ECF No. 102-16, at Interrogatory Nos. 11, 16-18, RFA Nos. 110-24, RFP Nos. 66-105).  Defendants object that the discovery requests are irrelevant, unduly burdensome, vague, ambiguous and confusing.  (*See generally* Defs.' Resps. to Pl.'s Third Set of Interrogatories, Fourth Set of RFAs and Fifth Set of RFPs, ECF No. 102-16,

at Interrogatory Nos. 11, 16-18, RFA Nos. 110-24, RFP Nos. 66-105.)  They also object on the basis of attorney-client privilege as to the RFPs seeking documents or correspondence regarding individual time entries on the invoice Schnader issued on December 11, 2017, for conducting the ESI search. (Pl.'s Mot. to Compel, ECF No. 102, at 33; Defs.' Resps. to Pl.'s Third Set of Interrogatories, Fourth Set of RFAs and Fifth Set of RFPs, ECF No. 102-16, at Interrogatory Nos. 11, 16-18, RFA Nos. 110-24, RFP Nos. 75, 81-100).  Nonetheless, they provided substantive answers to all the RFAs and all but one of the interrogatories and produced or agreed to produce documents in response to many of the RFPs.  (*See* Defs.' Resps. to Pl.'s Third Set of Interrogatories, Fourth Set of RFAs and Fifth Set of RFPs, ECF No. 102-16, at Interrogatory Nos. 11, 16-18, RFA Nos. 110-24, RFP Nos. 66-74, 80, 100-04).

Plaintiff asserts that her requests regarding entries on Schnader's ESI invoice are relevant because Defendants have asserted a counterclaim for fees listed on it.  (Pl.'s Mot. to Compel, ECF No. 102, at 33; Defs.' Resps. to Pl.'s Third Set of Interrogatories, Fourth Set of RFAs and Fifth Set of RFPs, ECF No. 102-16, at RFP Nos. 76-103; Defs.' Answer, Aff. Defenses and Counterclaim, ECF No. 67, at 15-21, ¶¶ 1-39).  She claims that these and the other requests are also relevant "to determine whether Defendants' OC Production sufficiently captured all of Plaintiff's client material" because Defendants have not otherwise correlated the production to Plaintiff's individual document requests and allegedly do not provide information regarding their preparation of the production.  (Pl.'s Mot. to Compel, ECF No. 102, at 34; *see supra* § III.A.1). She denies that the attorney-client privilege applies to Defendants' internal communications regarding the Orphans' Court production and claims that in any event they have not provided a privilege log.  (Pl.'s Mot. to Compel, ECF No. 102, at 34).  Lastly, she posits that her requests are not unduly burdensome because of "the relationship shared between the parties and the duties that Defendants owe Plaintiff in maintaining client and trust administration records."  (*Id.*)

As an initial matter, the Court finds Defendants' answers to RFA number 120[30] and
Plaintiff's interrogatories acceptable.  Although Defendants did not select "Admit" or "Deny" as
to the RFA, they provided a detailed response furnishing the information requested.  (Defs.'
Resps. to Pl.'s Third Set of Interrogatories, Fourth Set of RFAs and Fifth Set of RFPs, ECF No.
102-16, at RFA No. 120).  In addition, notwithstanding their objections, Defendants provided
substantive answers to three of the four interrogatories.  In their answer to Interrogatory number
11, in particular, they described in detail the steps they took to carry out the Orphans' Court ESI
production.  (*Id.* at Interrogatory No. 11).  The only Interrogatory to which they did not provide a
substantive answer was Interrogatory number 17, which asked them to "[i]dentify and describe
all information" concerning a $759.92 third-party copying bill from 2017.  (*Id.* at Interrogatory
No. 17).  The Court agrees with Defendants that requiring them to spend hours compiling
information about this bill would prove unduly burdensome.

Defendants also produced documents responsive to many of the requests for production
of documents, notwithstanding their objections to them.  Their responses indicate that they
produced, or agreed to produce,[31] documents responsive to RFP numbers 66 through 74, 80 and
100-04.  (*Id.* at RFP Nos. 66-74, 80, 100-04).

---

[30]   RFA number 120 is the only RFA Defendants did not specifically admit or deny, and
their response is the only RFA response that Plaintiff specifically cites as problematic.  (*See* Pl.'s
Mot. to Compel, ECF No. 102, at 34 (citing Defs.' Resps. to Pl.'s Third Set of Interrogatories,
Fourth Set of RFAs and Fifth Set of RFPs, ECF No. 102-16, at RFA No. 120)).  To the extent
that she complains about the responses to her other RFAs in her Fourth Set of RFAs, the Court
has reviewed them and finds any such complaints unwarranted.  Defendants admitted or denied
all other RFAs and provided additional clarifying information for all but three of these responses.
(Defs.' Resps. to Pl.'s Third Set of Interrogatories, Fourth Set of RFAs and Fifth Set of RFPs,
ECF No. 102-16, at RFA Nos. 110-24).

[31]   In some instances, Defendants stated that they had produced responsive documents,
whereas in others they stated that they would produce responsive documents.  However, the
Court does not understand Plaintiff to complain that Defendants have not followed through in
producing promised documents.  (*See* Pl.'s Mot. to Compel, ECF No. 102, at 33-34).

All but one[32] of the remaining RFPs at issue seek information about Defendants' process for making the Orphans' Court ESI production.  (*Id.* at RFP Nos. 75-79, 81-99).  Some of these RFPs would require Defendants to recreate substantial portions of its production process.  (*See id.* at RFPs Nos. 75 (requesting all documents referenced in the ESI invoice), 76 (requesting "data reports" showing all search results), 77 (requesting all data results collected in the eDiscovery software, "Early Data Analyzer," which would include over one million "hits"), 79 (requesting all documents reflecting how Defendants further refined these million-plus results)).  The others are more limited in scope individually, although in the aggregate they would also require Defendants to recreate substantial portions of their ESI production.  (*See id.* at RFP Nos. 78, 81-99 (requesting all correspondence and other documents associated with individual time entries related to the production process)).

Plaintiff maintains that she needs the requested documents "to determine whether Defendants' OC Production sufficiently captured all of Plaintiff's client material."  (Pl.'s Mot. to Compel, ECF No. 102, at 34).  She claims that without them she "is incapable of determining

---

[32]  RFP number 105 requests that Defendants "[p]roduce a copy of all time records for Roberta A. Barsotti, Wilbur Kipnes, S. Yeung, D. Brandt, and any other person that billed time for hard copy and ESI client file production not included on the invoices billed to the 2001 GRAT FBO Anna Nupson, including but not limited to invoices 2427923, 2413125, and 2403839."  (Defs.' Resps. to Pl.'s Third Set of Interrogatories, Fourth Set of RFAs and Fifth Set of RFPs, ECF No. 102-16, at RFP No. 105).  Defendants object that the RFP is ambiguous, confusing and unintelligible, and I agree.  (*Id.*)  As best as the Court can determine, Plaintiff requests all time records for these and other individuals who billed time on the Orphans' Court production that was not billed to the Anna Nupson 2001 Trust.  Defendants' response, also ambiguous but perhaps because Plaintiff's request was so, appears to indicate that Schnader did not bill file production to the trust.  (*See id.* ("The billing number for the ESI production was entirely distinct from the billing number for the 2001 Trust f/b/o Anna Nupson."))  If so, then "any other person" would include literally every individual who billed time on the production because all time was billed separately.  However, even if Plaintiff limited her request for "all time records" to the named individuals only it would still prove overbroad and unduly burdensome.  This Court will not force Defendants to produce individuals' entire timekeeping records, unlimited in time and scope, simply because the individual billed time on the Orphans' Court production.

whether Defendants have produced all responsive materials." (*Id.*)  But the only bases she offers for believing that Defendants have improperly withheld documents are her assertion, already addressed in section III.A.1 above, that Defendants have not categorized documents by request, and her circular contention that she needs documents about the production because Defendants refuse to "produce information regarding their communications, procedures and guidelines used in preparing the OC Production . . . ." (*Id.*)

I find the court's treatment of a similar scenario in *Ford Motor Co. v. Edgewood Properties, Inc.* instructive here:

> The Court finds that reinventing the wheel here would be unduly burdensome to Ford.  *See* Fed R. Civ. P. 26(b)(2)(C)(i).  The gravamen of Edgewood's complaint is that it suspects it has not received all of the documents to which it is entitled.  But such a conclusory allegation premised on nefarious speculation has not moved several courts, nor will it move this one, to grant burdensome discovery requests late in the game.  *See, e.g., Margel v. E.G.L. Gem Lab Ltd.,* No. 04–1514, 2008 WL 2224288, at *3 (S.D.N.Y. May 29, 2008) ("[u]nder ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in his possession, custody or control, should resolve the issue of failure of production ...") (quoting *Zervos v. S.S. Sam Houston,* 79 F.R.D. 593, 595 (S.D.N.Y. 1978)); *Golden Trade S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 514, 525 n.7 (S.D.N.Y. 1992) ("[i]n the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion"); *see also U.S. v. O'Keefe,* 537 F.Supp.2d 14, 22 (D.D.C. 2008) (noting that in the face of a protest of "inexplicable deficiencies" in a party's production, vague and speculative notions that there, in essence, *should be more,* are insufficient to compel judicial action).
>
> Here, Edgewood has not made a colorable showing that Ford is purposefully (or even negligently) withholding documents.  The notion that a document production is insufficient based on a belief that documents must exist simply is not enough to grant a motion to compel that would require Ford to go back to square one and begin its document collection efforts anew.  It would be improvident at this juncture to grant Edgewood the relief it seeks when it has not shown any indicia of bad faith on the part of Ford.  To countenance such a holding would unreasonably put the shoe on the other foot and require a producing party to go to herculean

> and costly lengths (especially in a document-heavy case such as
> this) in the face of mere accusation to rebut a claim of withholding.
> This scenario is not contemplated by the Federal Rules.

257 F.R.D. at 427-28 (emphasis in original).

Like Edgewood, Plaintiff has had "other avenues of recourse if it truly believes that it is not getting what it is entitled to." *Id.* at 428. It had the opportunity to depose a custodian of records or other individuals with knowledge of the document production process. *See id.* ("If Edgewood wishes to press its argument that correspondence or other documentation in the realms in which it is concerned about must exist, it can take that up in depositions with fact witnesses who have knowledge in these areas."). It received information about the process for Defendants' Orphans' Court production in many of their other responses to Plaintiff's discovery requests. (*See, e.g.,* Defs.' Resps. to Pl.'s Third Set of Interrogatories, Fourth Set of RFAs and Fifth Set of RFPs, ECF No. 102-16, at RFP No. 11 (outlining steps taken in ESI production)). The Kipnes Declaration, in particular, details Defendants' actions in carrying out both the Orphans' Court hard copy and ESI productions. (*See generally* Kipnes Decl., ECF No. 123-1). Kipnes avers that perhaps the most fundamental component of the productions – the provision of documents to the Schnader client believed to hold any privilege for the document – resulted from an agreement among Schnader and the Orphans' Court litigants, including Plaintiff. (*Id.* at ¶¶ 6-9). He further avers that Plaintiff received but failed to object to Schnader's proposed search terms, even though she now effectively seeks to cause Defendants to rerun those searches. (*Id.* at ¶¶ 20-25; *see also* Pl.'s Mot. to Compel, ECF No. 102, at Ex. 16, RFP Nos. 76-77, 79).

The discovery requests to which Defendants did not respond or produce documents are unduly burdensome. I decline to order Defendants to provide further documents or information in response to the requests at issue in Plaintiff's motion.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff's motion is granted in part and denied in part.

Defendants shall produce Anna Nupson 2001 Trust administration documents from 2017

onward, to the extent they have not already done so.  Defendants shall revise their privilege log

(ECF No. 102-23) with an additional field describing each document in sufficient detail to

determine whether the claimed privileges, or an exception thereto, apply.  Defendants shall also

revise their privilege log to withdraw all assertions of the work-product doctrine for documents

created prior to June 5, 2014.  Defendants shall produce any documents created prior to that date

that it withheld solely on the basis of the work-product doctrine.  Defendants shall take these

actions within 21 days of the date of this memorandum.

In all other respects, the motion is denied.


BY THE COURT:


 /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge