# TAB 2

# DECEMBER 2016 AFFIDAVIT OF JOHN S. MIDDLETON

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

ORPHANS' COURT DIVISION

No. 2015-X1266

TRUST OF FRANCES S. MIDDLETON, SETTLOR,
UNDER AGREEMENT OF TRUST DATED FEBRUARY 1, 2001

### AFFIDAVIT OF JOHN S. MIDDLETON

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : |
|  | : ss |
| COUNTY OF MONTGOMERY | : |

I, John S. Middleton, being of full age, upon my oath depose and say, to the best of my knowledge, information and belief, as follows in connection with the pending Motion for Summary Judgment:

a) **HISTORICAL INFORMATION ABOUT JOHN MIDDLETON, INC.**

1. In 1857, my great-great-grandfather, John Middleton, founded a business that became known as "John Middleton, Inc." (hereinafter "JMI"). JMI originally operated as a single retail tobacco store in Philadelphia.

2. Over the last century, JMI expanded gradually as it purchased tobacco and created its own blends. Sometime in the 1950's, JMI began manufacturing its own tobacco products.

3. In the late 1950's, JMI fundamentally changed its business model by ending its retail business. Instead, the company decided to focus on manufacturing and selling its own tobacco products to other retailers. Thereafter, in the late 1960's, JMI launched its own cigar made of pipe tobacco. JMI's pipe tobacco brands and pipe tobacco cigars ultimately enjoyed tremendous success and were well-known across the United States.

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

4. For a substantial period of time during its existence, JMI operated without a Shareholders' Agreement. In 1976, the JMI shareholders executed what I believe was the first Shareholders' Agreement (hereinafter "the JMI Shareholders' Agreement"). Thereafter, that agreement was superseded by a JMI Shareholders' Agreement dated November 17, 1982. *See* Exhibit 1.

5. Through corporate restructuring in 1987, JMI and several other business interests became wholly-owned subsidiaries of G.W. Hunter, Inc., a holding company ("G.W. Hunter").

6. At the time of this restructuring, the shareholders of G.W. Hunter agreed that the JMI Shareholders' Agreement became the Shareholders' Agreement of G.W. Hunter by execution of an Amendment to the JMI Shareholders' Agreement dated January 31, 1987 (hereinafter "the Hunter Shareholders' Agreement"). *See* Exhibit 2.

7. On June 30, 1993, the Hunter Shareholders' Agreement was amended pursuant to the terms and conditions set forth as "Amendment No. 2 to Shareholders' Agreement." The purpose of Amendment No. 2 was to permit Hunter shareholders who were 62 years of age or older to transfer Class B Non-voting shares into the joint names of each such shareholder and his or her spouse. *See* Exhibit 3.

8. Thereafter, pursuant to a separate written agreement dated December 15, 1993, my father, Herbert H. Middleton Jr. ("Herbert"), and my mother, Frances S. Middleton ("Frances"), agreed that all of my father's Class B Non-voting shares of Hunter would be transferred into their joint names as tenants by the entireties (hereinafter "the Restriction Agreement"). My mother also agreed that she would not transfer ownership (either by gift, sale or otherwise) of the Hunter shares that my father transferred to their joint names to any party other than G.W. Hunter or my parents' descendants during her lifetime or upon her death,

2

without my consent (with alternate provisions in the event I was not then *sui juris*), which provision gave me the authority to prevent any gift or sale of her stock not in strict conformity with the Restriction Agreement. *See* Exhibit 4.

9. Additionally, on December 15, 1993, my mother signed another written agreement to be bound by all of the terms and conditions of the Hunter Shareholders' Agreement, as amended (hereinafter "the Agreement to be Bound"). *See* Exhibit 5.

10. On January 31, 1997, G.W. Hunter was dissolved in connection with another corporate restructuring. As a part of this restructuring, Bradford Holdings, Inc. ("Bradford") was formed and became the holding company for numerous wholly-owned subsidiaries including JMI. In connection with this transaction, the Hunter shareholders agreed that effective on or after the close of business on January 31, 1987, the Hunter Shareholders' Agreement would become the Shareholders' Agreement for Bradford, pursuant to the terms and conditions set forth in Amendment No. 3 (hereinafter referred to as "Bradford Shareholders' Agreement"). *See* Exhibit 6.

### b) MOTHER ANNOUNCES HER INTENTIONS REGARDING HER ESTATE.

11. Herbert passed away from a sudden, unexpected heart attack on May 11, 1998. As a result of his death, ownership of the jointly-held Bradford Class B Non-voting shares passed by operation of law to my mother.

12. In or about June 1999, my mother convened a meeting at her home with her attorney, Bruce A. Rosenfield ("Attorney Rosenfield"), a member of the Schnader Harrison law firm ("the Schnader firm"), and me (hereinafter "the June 1999 meeting"). My mother stated that the purpose of the meeting was to discuss her estate planning. Attorney Rosenfield said the two most important goals for my mother's estate plan were for her to have more liquid assets,

3

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

which she could use to continue an appropriate lifestyle given the loss of income from my father's compensation following his death, and to create a plan to get the company's shares out of her estate over time so that the company would not be presented with a huge cash demand at her death to pay estate taxes that might force the sale of the company. My mother also stated, as Lucia and Anna already knew, that my grandparents gave my father, during his tenure at the company, the majority of the outstanding company stock, which was significantly more shares than his sister,[1] as an incentive for him to work hard and succeed for the entire family. She stated further that both my father and she had always discussed doing the same for me on many occasions. She reminded me that the November 18, 1982 Trust (hereinafter "the 1982 Trust")[2] was created and funded for my benefit so that my father and mother could give shares of company stock to me over time. From November 1982 through February 1987, my father made seven gifts to the 1982 Trust for my benefit which, in total, transferred 105,900 non-voting shares. From December 1989 to January 1992, my father gave his voting shares of stock to me in four separate gifts. During the period of time that I received these gifts of voting and non-voting shares, as described above, no gifts of any shares of voting stock were made to my sisters Anna K. Nupson ("Anna") or Lucia M. Hughes ("Lucia"). In fact, my parents never gave Anna or Lucia any voting stock.

---

[1] The shareholder records should show that my grandparents gave my father 15.8% of the common stock by 1964 and subsequently redeemed their shares, amounting to 71.0% of the outstanding shares, in March 1966 and January 1967, leaving my father owning 54.4% of the company personally and his three children owning 17.7% collectively, a total of 72.1% for my father's family. At that time, my aunt owned 13.4% personally and her two daughters owned 14.5% collectively, a total of only 27.9% for her family. Thus, my grandparents gave my father more than four times the amount of stock they gave to their daughter and my father's family collectively more than 2.5 times the amount of stock they gave to their daughter's family collectively. Until 1970, there was only one class of common stock so my father's 54.4% interest gave him both voting control and the majority of the economic value of the company. On January 30, 1970, all of the outstanding shares of common stock were recapitalized to create two classes of common stock, one with voting rights and one without voting rights. Each shareholder received one share of Class A Voting common stock for each share of the former common stock and 1,000 shares of Class B Non-voting common stock for each share of the former common stock. After this recapitalization, each shareholder owned the exact percentage interest in the company as he or she did prior to the recapitalization.

[2] This is a different trust than the May 19, 1982 trust created by JMI to hold life insurance.

4

13. During the June 1999 meeting, my mother reiterated my parents' rationale, adopted from and consistent with her prior discussions with my father and also consistent with my grandparents' treatment of my father, for giving me both voting control of the company and a disproportionate economic interest in it. As had been explained to me previously over the years, she stated that my father and she wanted to vest control of the company in me and simultaneously give me a disproportionate economic benefit of the company, exactly as my grandparents had done for my father, to insure that my professional focus would be directed exclusively to running the family business.[3] My mother also stated, consistent with my past discussions with my parents over the years, that my parents had discussed creating an additional trust or trusts for my benefit which would be funded with their remaining shares of company stock. She further stated that all of the above matters had been discussed previously, in conversations among Attorney Rosenfield, my father and my mother.

14. Although I was grateful for what my mother was contemplating, and expressed my appreciation to her, at that time I had no knowledge of her specific intentions regarding my sisters, except as described above. I also reminded my mother that the value of the company exceeded my mother's remaining assets. Attorney Rosenfield also questioned my mother about the apparent differences between her intended treatment of me and my sisters.

---

[3] While I was in high school, my father asked me if I was prepared to commit to devoting my career to the family business, in which case he expected me to begin working there every summer to learn the business from the ground up just as he, my grandfather and my great-grandfather had done. I made that commitment and began working at the company in the summer of 1971 when I was sixteen and continued to work there every summer until I graduated from business school with a Masters Degree in 1979, at which time I started working for the company full time. Throughout the time that I was given stock, I was personally responsible for creating and executing the conglomerate's strategic plan, the key elements of which were to acquire pipe tobacco brands from our competitors, focus on developing new cigar brands, shift the marketing and sales emphasis from minimizing the decline in pipe tobacco to growing the sales of cigars and build new McIntosh Inns to build market share in the mid-Atlantic region. Lucia never worked for any of the family owned companies. Anna worked for JMI for approximately nine years starting in December 1985. During this time, she maintained various positions in the Marketing Department.

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

15. In response, my mother stated that she was contemplating disinheriting Anna. She explained her view that Anna had already been provided for through a trust established previously from generous gifts from her grandparents and parents, had not taken appropriate measures to address her alcoholism and other issues, was financially irresponsible and otherwise undeserving of any more family money. My mother was upset that Anna had refused to have Mark Mastrangelo, her then boyfriend, sign a pre-nuptial agreement despite the fact that Anna had already gone through one divorce, and my mother was worried about what would happen to the family money in Anna's trust if she married Mastrangelo.[4] Both Attorney Rosenfield and I cautioned my mother that disinheriting Anna was a draconian action, and that a trust for Anna could be set up with appropriate restrictions to protect her family money. In response, my mother said that she would think about it, but reiterated her inclination to disinherit Anna and further stated that she was inclined to leave all the non-Bradford assets that she possessed to Lucia, which would make Lucia's inheritance more substantial.

16. During this discussion, Attorney Rosenfield described different ways in which my mother could gain liquidity in her estate and simultaneously transfer the value of the company, including setting up trusts and transferring her Bradford shares to them, redeeming her Bradford shares as my grandparents had done and combinations of these ideas. One type of trust he described was a grantor retained annuity trust ("GRAT"). He discussed the value of the shares of the company based upon their appraisal in my father's estate, and the value of my mother's remaining assets. Attorney Rosenfield also stated there were timing differences with lifetime gifts compared to gifts made at death and that the latter would bear death taxes that a GRAT would avoid. The meeting ended with Attorney Rosenfield agreeing to research options to allow

---

[4] Anna and Mastrangelo subsequently married. To my mother's disappointment, Anna and Mastrangelo never signed a pre-nuptial agreement, and they divorced several years after the marriage.

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

my mother to gain more liquidity in her asset mix and also effecting a transfer of my mother's Bradford shares, and my mother agreeing to further reflect upon disinheriting Anna.

17. In the period of time following the June 1999 meeting and prior to my mother signing the Original GRAT, my mother consistently stated that my father and she had always wanted to give me a significantly disproportionate amount of her Bradford shares. My mother also consistently stated that she wanted to give Lucia all her other assets and disinherit Anna. During these infrequent discussions, I consistently urged my mother to speak to Lucia so Lucia would know her intentions and the reasons therefor. My mother balked at the idea of discussing her estate plan with Lucia. Attorney Rosenfield and I also urged her to speak to Anna, but my mother categorically refused. I was hopeful that my mother would ultimately either change her mind about her intentions regarding Anna or advise Anna of her intention to disinherit her.

18. My mother finally agreed to advise Lucia of her estate plan and called a meeting among Lucia, herself and me at the Schnader firm's office in Norristown, Pennsylvania. Attorney Rosenfield opened the meeting by stating that my mother had made decisions about her estate planning and wanted to inform Lucia. He advised that my mother had decided to give her estate to the two of us, with me receiving her shares of Bradford stock through a GRAT and Lucia receiving everything else. He further advised that my mother intended to disinherit Anna. He explained that there were timing differences between the bequests to me and to Lucia. Attorney Rosenfield also stated that the value of my mother's non-company assets was substantial, but less than the value of her Bradford shares. Attorney Rosenfield explained the reason why our mother thought I should get a significantly disproportionate share of the company: it was consistent with my father's wishes which, in turn, were based on what my grandparents had done for him. Attorney Rosenfield noted that Lucia was getting more from our

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

parents' estates than our aunt (my father's sister) received from her parents (my grandparents) because Lucia was getting all of my mother's remaining assets rather than splitting the remainder of her estate equally with me, as was the case with my father and aunt after my grandparents died. Attorney Rosenfield then advised that these were important family matters that needed to be discussed, and he left the room.

19. Following Attorney Rosenfield's departure, my mother, Lucia and I remained in the conference room to further discuss my mother's estate plan and the reasons she made certain decisions. Our discussions covered the value of the company now and in the future, and the trade-off between its risk (with specific reference to class action lawsuits against tobacco companies, governmental regulation and the increasingly hostile legislative environment) versus the certainty of my mother's other assets. At no time during this discussion did Lucia voice any objections to my mother's decisions.

20. Subsequent to that meeting, Lucia and I had at least two telephone conversations during which the subject of our mother's estate plan arose. During both conversations, Lucia continued to voice support for the plan.

c) **THE CREATION OF THE ORIGINAL GRAT AND THEN THE 2001 GRAT.**

21. My mother executed an Agreement of Trust dated February 1, 2001 (the "Original GRAT"). The Original GRAT was a grantor retained annuity trust with a two-year annuity term. After the end of the annuity period, the then-remaining principal of the Original GRAT continued in trust for the sole benefit of myself and my descendants.

22. The Original GRAT was funded with my mother's 258,029 Class B Non-voting shares of Bradford stock, consistent with my mother's December 15, 1993 Agreement to be

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

8

Bound by the terms of the Shareholders' Agreement and with my consent pursuant to the December 15, 1993 Agreement.

23. I learned that, beginning in the spring of 2002, Lucia began complaining to my mother and insisting that certain terms and conditions of the Original GRAT must be changed.

24. I also discovered during this time that Lucia's anger with my mother was caused by her learning about the profitability of Bradford based upon her review of certain financial information about Bradford. By way of background, Bradford converted from a "C Corp." to an "S Corp." for income tax purposes as of February 1, 2001. As a result of this conversion, all Bradford shareholders received a K-1 in early 2002 that contained information from which one could determine the company's profits. Lucia and her representatives, I later learned, studied this financial information and concluded that the value of the Bradford shares given to me through the original GRAT substantially exceeded the value of the balance of my mother's estate. As such, I learned that Lucia's representatives concluded that Lucia should receive more of my mother's estate than was contemplated in my mother's estate plan.

25. In response to learning about Lucia's anger, I spoke with my mother and asked what, if anything, she wanted to do to address Lucia's issues. My mother stated that she wanted to change the terms of the trust instrument for the Original GRAT.

26. Thereafter, Lucia, through her attorneys at Womble, Carlyle, Sandridge & Rice, LLP ("the Womble firm"), demanded changes to the Original GRAT.

27. From the first conversation that I had with my mother about changing the terms of the trust instrument for the Original GRAT, I told her, in substance, that I would only agree to do so if (i) the contemplated changes resulted in a comprehensive and final family resolution of all issues related to my mother's assets and estate once and for all time, which final resolution could

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

not be achieved unless Anna were included in the family negotiations, (ii) I received appropriate protection from any possible adverse tax consequences that could arise from changing the terms of the trust instrument for the Original GRAT and (iii) Anna were included in my mother's inheritance. In short, I wanted whatever agreements were necessary to insure that there would be no future litigation between and among family members. Eventually, my mother agreed with my requests, as did Lucia and Attorney Rosenfield.

28. On or about mid-October 2002, my mother requested Attorney Rosenfield to change certain terms and conditions of the Original GRAT so that following the expiration of my mother's annuity the then remaining principal of the Original GRAT would no longer continue in trust for the sole benefit of myself and my descendants, but instead would be distributed one-third to each of her children. *See* Exhibit 7. Thereafter, attorneys from the Womble firm, Attorney Rosenfield and other attorneys from the Schnader firm, and my attorneys began drafting changes to the terms of the trust instrument for the Original GRAT. By this time, I was represented by Larry P. Laubach who was then a member of the law firm of Cozen O'Connor ("the Cozen firm").[5]

### (d) THE CIRCUMSTANCES LEADING UP TO THE BUY-OUT OF LUCIA'S AND ANNA'S BRADFORD STOCK.

29. Throughout the fall of 2002, Lucia raised Bradford-related concerns regarding her governance rights. Through her counsel, Lucia's demands for information about Bradford were very broad. During the same period of time, the attorneys for our mother and Anna (the Schnader firm), Lucia (the Womble firm) and me (the Cozen firm) prepared a draft family

---

[5] Anna and my mother requested that Attorney Rosenfield represent both of them. A waiver was executed in October 2002 by Anna, my mother and me. *See* Exhibit 9.

settlement agreement. That family settlement agreement was never finalized because of the events described below.

30. In the Fall of 2002, attorneys from the Womble, Cozen and Schnader law firms were preparing changes to the terms of the trust instrument for the Original GRAT. On November 25, 2002, Womble distributed to all of the parties a draft containing Lucia's proposed changes. *See* Exhibit 8.

31. On December 19, 2002, a family meeting occurred, the participants at which were Lucia, Anna, my mother and me, along with our respective counsel. The purpose of the meeting was to discuss outstanding governance issues, open trust and estate matters, and other issues that Lucia had concerning the operations at Bradford. To the surprise of everyone at the meeting, Lucia's counsel made a written proposal for a buy-out, which proposal was distributed to each attendee, including Anna. The proposal requested (a) that Lucia's and her family's Bradford shares, in trust and owned outright, be redeemed at the price of $215 per voting share and $205 per non-voting share on specified dates or events expected to occur over approximately the next four years,[6] and (b) that she receive a $10 million priority inheritance from my mother's estate upon her death. Lucia's proposal also demanded changes to the Original GRAT that provided for a family "pot" trust until January 15, 2007, and then division into shares for each family line. Lucia's proposal specifically required (i) all parties to confirm the contemplated changes to the Original GRAT, (ii) all parties to acknowledge that it reflected my mother's intent and the intent of the beneficiaries, and (iii) all parties to cooperate in effecting and implementing the changes to the Original GRAT and defending its tax treatment. *See* Exhibit 10.

---

[6] Significantly, Lucia's proposal for payment over the four years was based upon a fixed share price. It was not tied to the company's performance in each of those years.

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

32. During a period when Lucia and I were alone at this meeting, I told her that there was no reason to sell her shares if she did not want to. Lucia replied that she had to sell them because I owned the majority of the voting stock of Bradford and therefore controlled the company.

33. In response to Lucia's proposal, I requested to know Anna's position. Through her counsel, Attorney Rosenfield, we learned subsequent to the meeting that Anna was inclined to <u>not</u> participate in the buy-out and thus have a trust hold the Bradford shares she would inherit based upon the contemplated changes to the Original GRAT, in addition to the shares held by her September 12, 1994 trust. On or about December 24, 2002, however, I learned, through her counsel, that Anna changed her mind and now desired to explore a buy-out pursuant to the same terms and conditions sought by Lucia. Thereafter, by letter dated January 23, 2003, Attorney Rosenfield set forth Anna's demands for a buy-out. *See* Exhibit 11.

34. During the period of time leading up to the execution of the buy-out agreements, I was indifferent regarding my two sisters' decisions about the buy-out of their respective shares of Bradford. To avoid the possibility of any litigation then and in the future, I insisted that Anna and Lucia be treated equally with respect to both their Bradford shares and our mother's estate. Among other things, I knew that my mother did not have sufficient assets to provide both Lucia and Anna with a $10 million priority inheritance, and that the present value of such a priority was uncertain.

35. In mid-January 2003, I, on behalf of Bradford, and with input from John B. Stine, II, a partner then at Ernst & Young, and Attorney Laubach, made a written proposal to Anna's and Lucia's counsel that included (a) Bradford redeeming all shares owned by or for their (and

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

their families') benefit at a price of $288.41 per voting share,[7] and $275 per non-voting share, payable within one year, and (b) Anna's sharing equally in our mother's estate. *See* Exhibit 12. This difference in value between Lucia's original proposal and this proposal was communicated to the Womble attorneys and Attorney Rosenfield and is described in Exhibit 13.

36. On January 31, 2003, Attorney Rosenfield circulated a revised draft, which contained additional proposed changes to the terms of the trust instrument for the Original GRAT. *See* Exhibit 14.

37. On or about February 4, 2003, Lucia accepted the company's counter offer. Anna had previously accepted the counter offer.

38. Thereafter, a comprehensive, master family settlement agreement dated February 20, 2003 (the "2003 Master Settlement Agreement") was signed by all parties in interest in all applicable capacities following consultation with their respective counsel. *See* Exhibit 15.

39. During the negotiations culminating in the 2003 Master Settlement Agreement, Lucia was represented by the Womble firm, one of the largest in North Carolina. At the December 19, 2002 family meeting, Mike Gunter, a partner at Womble and one of Lucia's attorneys, stated that Womble had represented RJ Reynolds in product liability tobacco litigation and had attorneys very familiar with, among other things, the risks of class action lawsuits against tobacco companies. In addition to Lucia's financial advisors, Mike Gunther had graduated with distinction from University of Pennsylvania, Wharton School with a MBA in finance. Lucia's proposal included what she and the Womble attorneys considered an appropriate discount for illiquidity and lack of control given the significant legal, regulatory and

---

[7] Lucia and Anna received voting shares as a result of the January 30, 1970 recapitalization. *See* Fn. 1.

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

13

legislative risks facing JMI.[8] Given the expertise and sophistication of Lucia's and Anna's advisors, the fact that we had negotiated the redemption price, and Bradford's offer was significantly more than the value of Lucia's initial buy-out proposal, Lucia, Anna, my mother and I, as well as our respective counsel, agreed that an appraisal of Bradford shares was unnecessary.

40. A material part of the global family resolution and the purchase of the Bradford shares was that certain terms of the trust instrument for the Original GRAT would be changed in a new trust document that would be executed in connection with the global family resolution. The new trust document (hereinafter referred to as "the 2001 GRAT") was dated February 1, 2001. The 2001 GRAT changed the beneficiaries, and provided that the assets would be divided into three equal and separate family trusts for each of Lucia, Anna and me after the end of the annuity period. *See* Exhibit 16.

41. The 2001 GRAT was executed simultaneously with the 2003 Master Settlement Agreement dated February 20, 2003. The 2001 GRAT was an important part of the consideration for the 2003 Master Settlement Agreement, as were the releases and the indemnity obligations contained therein. These provisions were essential inducements for each of us to enter into the 2003 Master Settlement Agreement.

42. A review of one of the blacklined drafts of the 2001 GRAT clearly reveals that the parties considered and rejected requiring an appraisal in connection with the 2001 GRAT.

---

[8] A significant and potentially catastrophic regulatory risk surfaced approximately three years following the execution of the 2003 Master Settlement Agreement. In October 2006, the Alcohol and Tobacco Tax and Trade Bureau ("TTB") issued a notice of proposed rulemaking – Rulemaking 65 – that would have reclassified the cigars manufactured by JMI as cigarettes. That rule was scheduled to be effective shortly after the sixty day public comment period ended, which period was subsequently extended to March 26, 2007. Rulemaking 65, if adopted, would have subjected JMI's products to the same federal and state taxation and other regulations as cigarettes. JMI senior management unanimously concluded, and advised me, that if proposed Rulemaking 65 were enacted, JMI would have to immediately cease production of its cigars and withdraw them from the market. The consequence of that action would have forced the business to cease operations immediately.

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

14

The draft of the 2001 GRAT submitted by the Womble firm on November 25, 2002, stated as follows:

> ~~FIFTEENTH~~ FOURTEENTH – <u>Company Stock</u>: A major asset held hereunder is stock in Company. Grantor gives to Trustee or Trustees full discretion as to the retention or sale of any or all of the Company stock held hereunder without regard to any state law requirement of diversification and despite the fact, that such stock may not pay dividends<u>; provided however, that should any portion other than all of the stock be sold and should such portion of stock so sold be allocable to Lucia's share, such stock shall not be sold for less than fair market value as determined by an outside independent appraiser decided on jointly by JOHN S. MIDDLETON and LUCIA M. HUGHES</u>. Moreover, no transfers of such stock shall be permitted that are in violation of Company's Shareholders' Agreement, nor may a power of appointment be exercised other than in favor of an eligible S corporation shareholder. [Blackline in original]. *See* Exhibit 8.

43.  The parties ultimately agreed to eliminate the appraisal requirement, opting instead for the following provision at the time the final version of the 2001 GRAT was executed, which is consistent with and complies with the Bradford Shareholders' Agreement, as amended, and the December 15, 1993 Agreement to be Bound:

> FOURTEENTH – <u>Bradford Holdings, Inc. Stock:</u> A major asset held hereunder is stock in Bradford Holdings, Inc. ("BHI"). Grantor gives to Trustee or Trustees full discretion as to the retention or sale of any or all of the BHI stock held hereunder without the need for court approval and without regard to any state law requirement of diversification and despite the fact that such stock may not pay dividends. Notwithstanding anything in this Agreement to the contrary, during any period in which BHI stock is held by any trust hereunder, no distribution of either income or principal of such trust or transfer of any stock by BHI owned by such trust shall be permitted to the extent such distribution or transfer is prohibited by the Shareholders' Agreement dated

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

November 17, 1982, as amended, among BHI and each of its stockholders.[9] See Exhibit 16.

44. Given the changes to the language of Article FOURTEENTH during the family negotiations, I was concerned that the 2001 GRAT complied with both the Shareholders' Agreement, as amended, and the two December 15, 1993 agreements governing my mother's right to transfer stock she received from my father. My mother and I firmly believed that the 2001 GRAT complied without exception to the Shareholders' Agreement, as amended, and the two December 15, 1993 Agreements. I would not have consented to the 2001 GRAT[10] if the terms of the 2001 GRAT restricted the operation of the Bradford Shareholders' Agreement in any way, including precluding the Bradford Shareholders' Agreement from being amended pursuant to its terms or requiring the 2001 GRAT to operate only under the terms of the then applicable Bradford Shareholders' Agreement rather than a future, amended Bradford Shareholders' Agreement.

45. Paragraph 1 of the 2003 Master Settlement Agreement states:

> 1. <u>Confirmation of the GRAT</u>. Each of the Parties agrees and confirms that the GRAT, a copy of which is attached hereto as <u>Exhibit A</u>, reflects the intent of Frances and all beneficiaries of the GRAT. Each Party shall use his, her or its best efforts and cooperate in good faith in effectuating the terms of the GRAT and in defending the tax treatment of the GRAT. See Exhibit 15.

46. Paragraph 7 of the 2003 Master Settlement Agreement also provides that Anna would be included equally in my mother's estate upon her death. See Exhibit 15.

47. In addition, Anna and Lucia executed a separate Indemnification Agreement dated February 20, 2003, indemnifying me for any gift tax, interest and penalties "arising out of

---

[9] An agreement by the shareholders to modify Article 8 of the Shareholders' Agreement was not unprecedented. When our aunt, Anne Flood, redeemed her stock in 1984, she and the company agreed that an Article 8 appraisal was not necessary.
[10] Without my and my family's consent, the Original GRAT would have remained effective, and my family and I would have received all of my mother's shares of Bradford stock.

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

or relating to any gift or purported gift made" by me to Anna or Lucia "resulting from or relating to the creation of the [2001] GRAT attached as <u>Exhibit A</u>" to the 2003 Master Settlement Agreement. *See* Exhibit 17.

48. As a result of the 2003 Master Settlement Agreement, Anna received approximately $23.6 million from the 2001 GRAT in trust from our mother plus in excess of $5 million from my mother and her estate. She would not have received the stock from the 2001 GRAT or other inheritance from my mother had I not persuaded my mother to <u>not</u> disinherit her and also agree to the changes to the terms of the trust instrument for the Original GRAT.

49. I would not have agreed to change the terms of the Original GRAT if a) the 2001 GRAT and accompanying 2003 Master Settlement Agreement did not completely, finally and forever resolve the family dispute, the threatened litigation and all future litigation, or b) the 2001 GRAT did not comply with or be subject to the Shareholders' Agreement, as it may be amended, or c) the terms of the 2001 GRAT precluded the Shareholders' Agreement from being modified in the future, or d) the 2001 GRAT incorporated any of the terms of the Shareholders' Agreement, as amended, into the terms of the 2001 GRAT, or e) the 2001 GRAT expressly or impliedly precluded the very redemption of Bradford shares provided in the 2003 Master Settlement Agreement.

50. I no longer have the original executed version of the Original GRAT because I gave my fully executed Original GRAT to Attorney Laubach following the execution of the 2003 Master Settlement Agreement. I am in the process of attempting to locate a signed copy of the Original GRAT.

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

Case# 2015-X1266-40.4 Received at Montgomery County Register of Wills Office on 12/23/2016 3:57 PM, Fee = $0.00

The foregoing statements are true and correct to the best of my knowledge, information and belief, and I understand that false statements herein are subject to the penalties of 18 Pa. C.S.A. § 4904, relating to unsworn falsification to authorities.

_____
John S. Middleton

Sworn and subscribed
before me this 23rd day of
December, 2016

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
JUDITH A. TRINLEY, Notary Public
Royersford Boro., Montgomery County
My Commission Expires November 12, 2019

18