# TAB 3

# 2017 PETITION FOR DECLARATORY AND OTHER RELIEF

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

**COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**

**ORPHANS' COURT DIVISION**

**No. 2015-X1266**

**TRUST OF FRANCES S. MIDDLETON, SETTLOR,
UNDER AGREEMENT OF TRUST DATED FEBRUARY 1, 2001**

<u>**PETITION FOR DECLARATORY AND OTHER RELIEF**</u>

**TO THE HONORABLE, THE JUDGES OF SAID DIVISION:**

John S. Middleton, individually and as former Trustee of the Trust of Frances S.

Middleton, Settlor, under Agreement of Trust dated February 1, 2001,[1] and Bradford Holdings,

Inc., by and through respective undersigned counsel, and pursuant to the Court's March 16, 2017

Order, file this Petition for Declaratory and Other Relief and in support thereof say as follows:

<u>**John Middleton, Inc.**</u>

1.      In 1857, John Middleton, the great-great-grandfather of Petitioner John S.

Middleton, founded a business that became known as "John Middleton, Inc." (hereinafter

"JMI").  JMI originally operated a single retail tobacco store in Philadelphia.

2.      Over the last century, JMI expanded gradually as it purchased tobacco and created

its own blends.  Sometime in the 1950's, JMI began manufacturing its own tobacco products.

3.      In the late 1950's, JMI fundamentally changed its business model by ending its

retail business.  Instead, the company decided to focus on manufacturing and selling its own

tobacco products to other retailers.

---

[1]  Contemporaneously with this filing, John, individually and as Trustee of the Anna 1994 Trust, and Bradford are filing a similar Petition for Declaratory and Other Relief at docket no. 2012-X3503.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

4.      In the late 1960's, JMI launched its own cigar made of pipe tobacco.  JMI's pipe tobacco brands and pipe tobacco cigars ultimately enjoyed tremendous success and were well-known across the United States.

### The Middleton Family

5.      John Middleton, founder of JMI, had two sons, John Middleton, Jr. and Frank Herbert Middleton.

6.      Frank Herbert Middleton had one child, Herbert H. Middleton, Sr.

7.      Herbert H. Middleton, Sr. ("Herbert, Sr.") and his wife, Anna E. Middleton, had two children, Herbert H. Middleton, Jr. ("Herbert, Jr.") and Anne Middleton Flood.

8.      Herbert, Jr. married Frances S. Middleton, née Staubus ("Frances"), and had three children, Lucia Middleton Hughes ("Ms. Hughes"), your Petitioner John S. Middleton ("John"), and Anna K. Middleton, later Anna M. Bauer and now Anna K. Nupson ("Ms. Nupson").

9.      Ms. Hughes is married to Thomas P. Hughes and has three adult children, J. Alexander Hughes, Thomas M. Hughes, and John C. Hughes, and two minor grandchildren; John is married and has two adult children, John P. Middleton and Frances B. Middleton; Ms. Nupson is not presently married and has no issue.  *See* Family Tree attached as Exhibit 1.

### Transfers of Shares of John Middleton, Inc./G.W. Hunter/Bradford Holdings, Inc.

10.      For a substantial period of time during its existence, JMI operated without a Shareholders' Agreement.  In 1976, the JMI shareholders executed what is believed to be the first Shareholders' Agreement.  Thereafter, that agreement was superseded by a JMI Shareholders' Agreement dated November 17, 1982.  *See* Exhibit 2.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

11.     The following day, on November 18, 1982, Herbert, Jr. created a trust with John as Trustee (the "1982 Trust").[2]  Herbert, Jr. transferred Class B Non-voting shares of JMI to the 1982 Trust, which by its terms provided that such shares, or the shares of any affiliate or successor company, vested in John under conditions not necessary to recite here.  Herbert, Jr. personally held Class A voting shares free of any trusts.

12.     From November 1982 through February 1987, Herbert, Jr. made seven gifts to the 1982 Trust for John's benefit that, in total, transferred 105,900 Class B Non-voting shares.

13.     Through corporate restructuring in 1987, JMI and several other business interests became wholly-owned subsidiaries of G.W. Hunter, Inc., a holding company ("G.W. Hunter"). The Class A voting and Class B Non-voting shares of JMI were converted, respectively, into Class A voting and Class B Non-voting shares of G.W. Hunter.

14.     At the time of this restructuring, the shareholders of G.W. Hunter agreed that the JMI Shareholders' Agreement became the Shareholders' Agreement of G.W. Hunter by execution of an Amendment to the JMI Shareholders' Agreement dated January 31, 1987 (hereinafter "the Hunter Shareholders' Agreement").  *See* Exhibit 3.

15.     From December 1989 to January 1992, Herbert, Jr. gave all his 632 Class A voting shares of G.W. Hunter stock to John in four separate gifts.  By January 1992, John owned 716 Class A voting shares of G.W. Hunter or 71.2% of all the outstanding Class A voting shares, thereby giving John majority voting control of G.W. Hunter.  The Class A voting shares given to John were given outright and were not subject to any trust duties.

---

[2]  This is a different trust than the May 19, 1982 Trust created by John Middleton, Inc. (the "1982 JMI Trust"), docketed at 2014-X3827, which primarily held a life insurance policy on the life of Herbert, Jr.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

16.     During the period of time that John received the gifts of voting and non-voting shares outright or in trust as described in the preceding paragraphs, no gifts of any shares of voting stock were made to Ms. Nupson or Ms. Hughes.

17.     Ms. Nupson and Ms. Hughes received Class A voting stock only as part of a January 30, 1970 recapitalization, when all of the outstanding shares of the heretofore single class of common stock were recapitalized to create two classes of common stock, Class A voting and Class B Non-voting.

18.     Herbert, Sr. died April 21, 1992.  By that time, Herbert, Jr. and his family line, and the 1982 Trust for John's benefit, owned 83.3% of the family business interests, and the children of Anne Middleton Flood owned 16.7%.

19.     Ms. Hughes and Ms. Nupson were aware that Herbert, Sr. and Anna E. Middleton gave Herbert, Jr. the majority of the outstanding company stock, which was significantly more shares than were given to Anne Middleton Flood, as an incentive for Herbert, Jr. to work hard and succeed for the entire family.

20.     On June 30, 1993, the Hunter Shareholders' Agreement was amended pursuant to the terms and conditions set forth as "Amendment No. 2 to Shareholders' Agreement."  The purpose of Amendment No. 2 was to permit G.W. Hunter shareholders who were 62 years of age or older to transfer Class B Non-voting shares into the joint names of each such shareholder and his or her spouse.  *See* Exhibit 4.

21.     Thereafter, pursuant to a separate written agreement dated December 15, 1993, Herbert, Jr. and Frances agreed that all of Herbert, Jr.'s Class B Non-voting shares of G.W. Hunter would be transferred into their joint names as tenants by the entireties (hereinafter "the Restriction Agreement").  Frances also agreed that, during her lifetime or upon her death, she

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

would not transfer ownership (either by gift, sale, bequest or otherwise) of the G.W. Hunter shares that Herbert, Jr. transferred to their joint names to any party other than G.W. Hunter or descendants of Herbert, Jr. and Frances, without John's consent (with alternate provisions in the event John was not then *sui juris*).   The Restriction Agreement was even more restrictive than the Shareholders' Agreement in that the former precluded Frances from transferring her G.W. Hunter shares into a trust without John's prior approval.  *See* Exhibit 5.

22.      Additionally, on December 15, 1993, Frances signed another written agreement to be bound by all of the terms and conditions of the Hunter Shareholders' Agreement, as amended (hereinafter "the Agreement to be Bound").  *See* Exhibit 6.

23.      On January 18, 1994, Herbert, Jr. and Frances created a generation-skipping trust for the benefit of their grandchildren (*i.e.,* the children of John, Ms. Hughes and Ms. Nupson) and more remote descendants (the "1994 GST Trust"), and transferred Class B Non-voting shares of the business to that trust.  John was named Trustee of the 1994 GST Trust.

24.      On September 12, 1994, Ms. Nupson created a trust (the "Anna 1994 Trust") for her lifetime benefit.  At the time of funding and thereafter, Ms. Nupson transferred her shares of the business to the Anna 1994 Trust.  Ms. Nupson named herself, Frances and John as Trustees of the Anna 1994 Trust.  *See* Exhibit 7.

25.      On July 26, 1996, John created a generation-skipping trust for the benefit of his children and more remote descendants (the "1996 Trust"), and transferred certain of his Class B Non-voting shares of G.W. Hunter to that trust.

26.      On January 31, 1997, G.W. Hunter was dissolved in connection with another corporate restructuring.   As a part of this restructuring, Bradford Holdings, Inc. ("Bradford") was formed and became the holding company for numerous wholly-owned subsidiaries

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

including JMI.  In connection with this transaction, the Class A voting and Class B Non-voting shares of G.W. Hunter were exchanged for Class A voting and Class B Non-voting shares of Bradford, and effective on or after the close of business on January 31, 1997, the Hunter Shareholders' Agreement became the Shareholders' Agreement for Bradford, pursuant to the terms and conditions set forth in Amendment No. 3 (hereinafter referred to as "Bradford Shareholders' Agreement").  *See* Exhibit 8.

## June 1999 Meeting

27.     Herbert, Jr. passed away from a sudden, unexpected heart attack on May 11, 1998.  As a result of his death, ownership of the jointly-held Bradford Class B Non-voting shares passed by operation of law to Frances.

28.     In or about June 1999, Frances convened a meeting at her home with her attorney, Bruce A. Rosenfield ("Attorney Rosenfield"), a member of Schnader Harrison Segal & Lewis, LLP ("the Schnader firm"), and John (hereinafter "the June 1999 meeting").

29.     As set forth in more detail in John's Affidavit filed December 23, 2016, which is incorporated by reference, during the June 1999 meeting Frances reiterated the rationale for giving John both voting control of the company and a disproportionate economic interest in it, which had been discussed numerous times previously by Herbert, Jr., Frances and John.  Among other things, Frances said that she and Herbert, Jr. had discussed creating an additional trust or trusts for John's benefit that would be funded with their remaining shares of company stock.

30.     Frances' statement was consistent with provisions in the 1982 JMI Trust, which was executed by Herbert, Jr. on behalf of JMI and by Frances and John as Trustees, and which provided:

> [JMI] desires to enable John S. Middleton to purchase shares of
> [JMI] in order to provide an incentive for him to enhance the value

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

> of the Company.  To that end, John S. Middleton shall have the
> right at any time following the death of Herbert H. Middleton, Jr.
> and prior to the death of Frances S. Middleton, while he is active in
> the management of [JMI], to borrow the trust principal or any
> portion of it . . . without interest . . . provided that the proceeds of
> such loan shall be used to purchase shares of [JMI].

See Exhibit 9 at Item NINTH.  The 1982 JMI Trust was funded with a life insurance policy with

a $1 million face value on the life of Herbert, Jr., which at the time represented approximately

13% of the value of JMI.

31.    Frances also stated that she was contemplating disinheriting Ms. Nupson because,

among other reasons, Ms. Nupson had already been generously provided for and had not taken

steps to address personal and financial issues that concerned Frances.

32.    Frances was therefore inclined to leave all the non-Bradford assets that she

possessed to Ms. Hughes, which would make Ms. Hughes' inheritance more substantial.  See

John's Affidavit filed December 23, 2016 at docket No. 2015-X1266, at ¶ 15.

33.    During the June 1999 meeting, Attorney Rosenfield described different ways in

which Frances could gain liquidity in her estate and simultaneously transfer the value of the

company, including setting up trusts and transferring her Bradford shares to them, redeeming her

Bradford shares and combinations of these ideas.  One type of trust he described was a grantor

retained annuity trust ("GRAT").

34.    Attorney Rosenfield explained how these different trusts operated, including that

if Frances created a GRAT and funded it with Bradford stock, any annuity payments which could

not be paid out of income would have to be repaid using shares of Bradford stock in the

principal.  Attorney Rosenfield added that it was most likely that such a trust would have to

repay shares of stock to Frances which, in turn, could be re-gifted by creating a new trust, GRAT

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

or otherwise, or an entirely different estate planning technique.  Attorney Rosenfield advised that he expected it would take a series of trusts for Frances to dispose of all of her Bradford stock.

## The Norristown Meeting

35.     In the period of time following the June 1999 meeting, Frances consistently stated that she and Herbert, Jr. had always wanted to give John a significantly disproportionate amount of her Bradford shares.  Frances also consistently stated that she wanted to give Ms. Hughes all her other assets and disinherit Ms. Nupson.

36.     At John's repeated urging, Frances finally agreed to advise Ms. Hughes of her estate plan and called a meeting among Ms. Hughes, herself, John and Attorney Rosenfield at the Schnader firm's office in Norristown, Pennsylvania.

37.     At that meeting in Norristown, Attorney Rosenfield stated, among other things, that (a) Frances had decided to give her shares of Bradford stock to John through a GRAT, (b) Frances intended to give Ms. Hughes everything else, and (c) Frances intended to disinherit Ms. Nupson.  Attorney Rosenfield advised that these were important family matters that needed to be discussed, and he left the room.

38.     Following Attorney Rosenfield's departure, Frances, John and Ms. Hughes remained in the conference room to further discuss Frances' estate plan and the reasons she made certain decisions.  Among other things, the discussions covered the value of the company at that time and in the future, and the trade-off between its risk (with specific reference to class action lawsuits against tobacco companies, governmental regulation and the increasingly hostile legislative environment, all of which adversely affected the profitability, and potentially the viability, of JMI) versus the certainty of Frances' other assets.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

39.     By way of background, in the 1990's, more than 1,500 tobacco lawsuits were filed across the country against companies in the tobacco industry, of which 1,225 were still pending at the end of 1999.  Many of these lawsuits were class actions involving millions of plaintiffs; many hundreds of billions of dollars were sought in damages in these suits.

40.     In 1994, states began suing tobacco companies seeking to recover medical costs expended to treat smoking-related illness, and that year JMI was sued by the Attorney General of the State of West Virginia as part of the state's class action suit.  By the end of 2002, JMI was a named defendant in dozens of tobacco lawsuits, including a second class action lawsuit filed in West Virginia in 1998.

41.     At no time during the discussions did Ms. Hughes voice any objections to Frances' decisions.

42.     Subsequent to that meeting, Ms. Hughes and John had at least two telephone conversations during which the subject of Frances' estate plan arose.  During both conversations, Ms. Hughes continued to voice support for the plan.

**February 1, 2001 - The Cousins' Redemption and Frances' Trust**

43.     In 2000, an appraisal of Bradford was being prepared by Howard, Lawson & Co. for general corporate purposes and in connection with possible estate planning by Frances.  The Howard, Lawson & Co. appraisal valued the shares as of April 19, 2000 at $215 per Class A voting share and $205 per Class B Non-voting share.

44.     In 2000 and 2001, John had discussions with his cousins, Susan Flood Thorkelson and Nancy Flood Smith (the children of Anne Middleton Flood), about whether they wished to have Bradford redeem the 84 Class A voting shares and 59,547 Class B Non-voting shares owned by each of them.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

45.     Ms. Nupson and Ms. Hughes were aware of John's discussions with the cousins regarding Bradford.

46.      For years Attorney Rosenfield and John B. Stine, II ("Stine"), then a partner in the tax department of Ernst & Young, had advocated that the company convert from a "C Corp." to an "S Corp." because the favorable tax treatment of an S Corp. made it much more tax efficient to distribute dividends to all Bradford shareholders, increasing their annual incomes and greatly facilitating their estate planning, including funding annuity payments from a GRAT. Accordingly, John talked to all the shareholders about the need to convert to an S Corp.

47.     Thus, by the fall of 2000, there were three significant transactions that were being planned: converting Bradford to an S Corp., the redemption of the Smith's and Thorkelson's stock and Frances' creating a GRAT using all her Class B Non-voting shares of Bradford.  Each of these transactions required an accurate appraisal of Bradford's enterprise value.  It was essential that the formation of the GRAT be tied directly to the planned Smith and Thorkelson redemption, which had been planned to coincide with the S Corp. election, in order to use the enterprise value of the company in that arm's length transaction for the valuation of the GRAT.

48.     Because the company made a timely S Corp. election, February 1, 2001, the first day of Bradford's fiscal year, was its S Corp. effective date.  Accordingly, February 1, 2001 was the closing date for all three transactions.

49.     Effective as of February 1, 2001, Bradford redeemed the minority interest owned by the two children of Anne Middleton Flood at $215 per Class A voting share and $205 per Class B Non-voting share, for a total purchase price of $18,060.00 to each for their Class A voting shares and $12,207,135.00 to each for their Class B Non-voting shares.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

50.     Ms. Nupson and Ms. Hughes were aware of the 2001 redemption of the cousins' shares by Bradford and the price per share.

51.     Also effective as of February 1, 2001, Bradford converted from a C Corp. to an S Corp. for income tax purposes.

52.     On or about February 1, 2001, Frances created an oral trust, which was then permitted under Pennsylvania law.

53.     Specifically, in early February 2001, Attorney Rosenfield advised John that Frances formed a trust, namely a two-year GRAT with John and his family as the sole beneficiaries, and John as the sole Trustee.  He further advised that the GRAT was funded with all of Frances' shares of Class B Non-voting Bradford common stock, and that she had executed the necessary legal documents and given them to Attorney Rosenfield to effect the transfer of assets to the trust.

54.     Attorney Rosenfield further stated that he would prepare a written trust agreement to memorialize the trust, which he anticipated would be executed over the upcoming months.

55.     Shortly after this conversation with Attorney Rosenfield, John spoke to Frances who confirmed that she formed a trust with John as the sole beneficiary and the sole trustee, and that the trust was funded with all of the Class B Non-voting shares of Bradford stock that she owned.

56.     The tobacco lawsuits, regulation and legislation referenced above threatened JMI's and Bradford's profitability and, in some cases, their continued existence.  The lawsuits posed the additional risk that dividends paid out by JMI to Bradford and from Bradford to its shareholders could be treated as fraudulent transfers.  This was especially true because, following the February 1, 2001 S Corp. election, Bradford's distributions would need to increase

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

well-above the company's historical norms in order to fund as much of the GRAT's annuity payments to Frances as cash flow would allow.

57.     For these reasons, John, Frances and Attorney Rosenfield were adamant that the annuity term for the GRAT be no more than the two year minimum required by the tax law, and that the GRAT be established as soon as possible, to commence the annuity period.

58.     Beginning in April 2001, following Frances' return from her winter travels, Attorney Rosenfield and Stine convened meetings with Frances, Larry Laubach ("Attorney Laubach"), then a partner at the Schnader firm, John and themselves to discuss planning the required GRAT distributions and coordinating them with Frances' estimated personal taxes, drafting Frances' written trust agreement to memorialize its creation and beginning to plan the second wave of gifts in anticipation of Frances' GRAT having to return shares of Bradford to her in satisfaction of the annuity obligation.

59.     Frances signed the trust agreement on or about November 19, 2001.  A true and correct copy of the trust agreement is attached as Exhibit 10 and referred to as the "Original GRAT."  On or about November 21, 2001, John executed the written trust agreement.

60.     Although the trust agreement was signed in November 2001, the document was dated February 1, 2001 because Frances created the trust on February 1, 2001, consistent with her execution of stock powers and instructions to Attorney Rosenfield.  John was advised that the written trust agreement signed in November 2001 was simply memorializing an existing, binding oral trust.

61.     Ms. Hughes was aware that Frances had created a trust in 2001 for the benefit of John and his family, and that Frances had transferred her remaining Bradford shares into that trust.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

62.     At all relevant times, John was President and the sole Board member of Bradford, the holding company.

63.     Ms. Nupson and Ms. Hughes were aware that John was President of Bradford.

64.     Ms. Nupson and Ms. Hughes were aware that John was the sole Board member of Bradford.

65.     Although Ms. Hughes never worked in the company, Ms. Nupson had been employed in the sales and marketing departments of JMI for over 9 years, until 1995.

66.     Following the funding of the Original GRAT and the 2001 redemption of the cousins' shares, all of the interests in Bradford were owned by descendants of Herbert, Jr. and Frances, either directly or through various trusts for their benefit as follows:

| Shareholders | Class A Voting | | Class B Non-Voting | |
|---|---|---|---|---|
| | # of Shares | % of Shares | # of Shares | % of Shares |
| John S. Middleton | 716 | 85.4% | 37,705 | 6.3% |
| John P. Middleton | | | 4,286 | 0.7% |
| Frances B. Middleton | | | 4,286 | 0.7% |
| 1982 Trust (shares fbo John) | | | 75,073 | 12.6% |
| 1996 Trust fbo John's children | | | 29,774 | 5.0% |
| Lucia Middleton Hughes | 84 | 10.0% | 67,563 | 11.4% |
| J. Alexander Hughes | | | 3,645 | 0.6% |
| Thomas M. Hughes | | | 3,645 | 0.6% |
| John C. Hughes | | | 3,645 | 0.6% |
| 1994 GST Trust for grandchildren | | | 35,445 | 6.0% |
| Anna 1994 Trust | 38 | 4.5% | 70,963 | 11.9% |
| Original 2001 GRAT | | | 258,029 | 43.4% |
| **Totals** | **838** | **100.0%** | **594,059** | **100.0%** |

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

**Lucia's Threats of Litigation Result in a Modified 2001 GRAT**

67.    Beginning in the spring of 2002, Ms. Hughes began complaining to Frances and insisting that certain terms and conditions of the Original GRAT must be changed.

68.    Ms. Hughes was angry when she learned of Bradford's growth in value since the Norristown meeting, based upon her review of certain financial information about Bradford.

69.    Specifically, as a result of Bradford's conversion to a Subchapter S corporation, all Bradford shareholders received a tax form K-1 in early 2002 that contained information from which one could determine the company's profits.

70.    Ignoring the vagaries and uncertainties created by the pending tobacco litigation on the value of the company, Ms. Hughes and her representatives studied this financial information and concluded that the value of the Bradford shares given to John through the Original GRAT substantially exceeded the value of the balance of Frances' estate, which Ms. Hughes had expected to receive.

71.    As such, Ms. Hughes' representatives concluded that, in their view, Ms. Hughes should receive more of Frances' estate than was contemplated in Frances' estate plan.

72.    In response to learning Ms. Hughes' new position, John spoke with his mother and asked what, if anything, she wanted to do to address Ms. Hughes' issues.  Frances stated that she wanted to change the terms of the Original GRAT to achieve family harmony and avoid threatened litigation and the attendant publicity.

73.    Thereafter, Ms. Hughes, through her attorneys at Womble, Carlyle, Sandridge & Rice, LLP ("the Womble firm"), demanded changes to the Original GRAT.

74.    Ms. Hughes threatened John with litigation over the Original GRAT on at least three occasions.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

75. From the first conversation that John had with his mother about changing the terms of the trust instrument for the Original GRAT, John told her, in substance, that he would only agree to do so if (i) the contemplated changes resulted in a comprehensive and final family resolution of all issues related to Frances' assets and estate once and for all time, which final resolution could not be achieved unless Ms. Nupson were included in the family negotiations, (ii) he received appropriate protection from any possible adverse gift tax consequences that could arise from changing the terms of the trust instrument for the Original GRAT and (iii) Ms. Nupson were included in Frances' inheritance.

76. At the direction of his mother, John had not previously discussed the Original GRAT with Ms. Nupson. In or around September 2002, however, and with the permission of his mother, John called Ms. Nupson and informed her of Frances' estate plan, which included the creation of a trust in 2001 for the benefit of John and his family and that Frances had transferred her remaining Bradford shares into that trust. John also told Ms. Nupson that Ms. Hughes was now disputing the validity of that trust. Ms. Nupson thanked John, and subsequently discussed the matter directly with Frances.

77. An appraisal by Fleet M & A Advisors in September 2002, prepared for Frances' 2001 gift tax return, concluded that the fair market value of the Bradford shares as of February 1, 2001 was $215 per Class A voting share and $205 per Class B Non-voting share.

78. Ms. Nupson and Ms. Hughes each received a copy of the September 2002 Fleet M & A Advisors appraisal.

79. Frances filed her 2001 gift tax return in October 2002, declaring under penalties of perjury the creation and funding of the Original GRAT on February 1, 2001. *See* Exhibit 11.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

80.     Although John told each of Ms. Nupson and Frances that they had to retain new and separate counsel, Ms. Nupson and Frances insisted that Attorney Rosenfield represent both of them as their counsel, and a waiver was thereafter executed by Ms. Nupson, Frances and John in October 2002.  *See* Exhibit 12.

81.     In mid-October 2002, Frances requested Attorney Rosenfield to change certain terms and conditions of the Original GRAT so that following the expiration of Frances' annuity the then remaining principal of the Original GRAT would no longer continue in trust for the sole benefit of John and his descendants, but instead would be distributed one-third to each of Frances' children.  *See* Exhibit 13.  Given Frances' concerns regarding the class action lawsuits against JMI and other tobacco companies, which she feared would bankrupt JMI, Frances also wanted Attorney Rosenfield to change her Will to give John the first $10 million of her estate. *See id.*

82.     By the fall of 2002, John and Bradford were represented by Attorney Laubach, who was then a member of the law firm of Cozen O'Connor, P.C. ("the Cozen firm").

83.     Thereafter, attorneys from the Womble firm, Attorney Rosenfield and other attorneys from the Schnader firm, and John's attorneys at the Cozen firm began drafting changes to the terms of the trust instrument for the Original GRAT.

84.     Throughout the fall of 2002, Ms. Hughes also raised Bradford-related concerns regarding her governance rights.  Through her counsel, Ms. Hughes' demands for information about Bradford were very broad.

85.     During the same period of time, the attorneys for Frances and Ms. Nupson (the Schnader firm), Ms. Hughes (the Womble firm) and John (the Cozen firm) prepared a draft

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

family settlement agreement.  That family settlement agreement was never finalized because of the events described below.

86.     In the Fall of 2002, attorneys from the Womble, Cozen and Schnader law firms were preparing changes to the terms of the trust instrument for the Original GRAT.  On November 25, 2002, Womble distributed to all of the parties a draft containing Ms. Hughes' proposed changes.  *See* Exhibit 14.

87.     On December 19, 2002, a family meeting occurred, the participants at which were Ms. Hughes, Ms. Nupson, Frances and John, along with their respective counsel.  The purpose of the meeting was to discuss outstanding governance issues, open trust and estate matters, and other issues that Ms. Hughes had concerning the operations at Bradford.

88.     To the surprise of everyone at the meeting, Ms. Hughes' counsel made a written proposal for a buy-out, which proposal was distributed to each attendee, including Ms. Nupson.

89.     The proposal requested (a) that Ms. Hughes and her family's Bradford shares, in trust and owned outright, be redeemed at the price of $215 per Class A voting share and $205 per Class B Non-voting share on specified dates or events expected to occur over approximately the next four years, and (b) that Ms. Hughes receive a $10 million priority inheritance from Frances' estate upon her death.  *See* Exhibit 15.  Ms. Hughes' proposal specifically provided that the Class B Non-voting shares "held in the [2001] GRAT . . . will be sold by John, as Trustee . . . ." *See id*.

90.     Because of Ms. Hughes' concerns about the tobacco litigation and the future value of the company, her proposal for payment over the four years was based upon a fixed price per share that would not be negatively affected by adverse changes in the financial condition of the company during those years.

91.     Ms. Hughes' proposal also demanded changes to the Original GRAT, specifically

that after the two-year annuity period the assets would remain in a family "pot" trust until

January 15, 2007, and then divide into shares for each family line.  Ms. Hughes' proposal

specifically required (i) all parties to confirm the contemplated changes to the Original GRAT,

(ii) all parties to acknowledge that it reflected Frances' intent and the intent of the beneficiaries,

and (iii) all parties to cooperate in effecting and implementing the changes to the Original GRAT

and defending its tax treatment.  *See* Exhibit 15.

92.     John told Ms. Hughes that there was no reason to sell her shares if she did not

want to do so; Ms. Hughes replied that she had to sell them because John owned the majority of

the voting stock of Bradford and therefore controlled the company.

93.     In response to Ms. Hughes' written proposal, John requested to know Ms.

Nupson's position.

94.     Through her counsel, Attorney Rosenfield, Ms. Nupson advised that she was

inclined to <u>not</u> participate in the buy-out and thus have a trust hold the Bradford shares she

would inherit based upon the contemplated changes to the Original GRAT, in addition to the

shares held by her September 12, 1994 Trust.

95.     On or about December 24, 2002, however, Ms. Nupson's counsel advised that

Ms. Nupson changed her mind and now desired to explore a buy-out pursuant to the same price,

terms and conditions sought by Ms. Hughes.  *See* Exhibit 16.

96.     Thereafter, by letter dated January 23, 2003, Attorney Rosenfield set forth Ms.

Nupson's demands for a buy-out, which included demanding $1 million in distributions each

year from a new trust to be created for Ms. Nupson from the changes to the Original GRAT.  Ms.

Nupson was copied on this letter as Anna K. Middleton.  *See* Exhibit 17.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

97.     During the period of time leading up to the execution of the buy-out agreements, John was indifferent regarding his two sisters' decisions about the buy-out of their respective shares of Bradford.

98.     John insisted that Ms. Nupson and Ms. Hughes be treated equally with respect to both their Bradford shares and their mother's estate, and he gave up the $10 million inheritance preference that their mother wanted to give him.

99.     In mid-January 2003, John, on behalf of Bradford, made a written proposal to Ms. Nupson's and Ms. Hughes' counsel that included (a) Bradford redeeming all shares owned by or for their (and their families') benefit at a price of $288.41 per Class A voting share, and $275 per Class B Non-voting share, payable within one year, and (b) Ms. Nupson's sharing equally in Frances' estate.  *See* Exhibit 18.  This difference in value between Ms. Hughes' original proposal and Bradford's counter proposal, along with the reasons why Bradford significantly increased the share price Ms. Hughes requested, were communicated to the Womble attorneys and Attorney Rosenfield and is more fully described in Exhibits 19 and 20.

100.     On January 31, 2003, Attorney Rosenfield circulated a revised draft trust agreement, which contained additional proposed changes to the terms of the trust instrument for the Original GRAT.  *See* Exhibit 21.

101.     The parties had extensive, and sometimes contentious, negotiations regarding the terms of the redemption of the Bradford shares in January and February 2003.

102.     Ms. Nupson and/or Ms. Hughes could have terminated the discussions at any time.

103.     On or about February 4, 2003, Ms. Hughes accepted Bradford's counteroffer. Ms. Nupson had previously accepted the counteroffer.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

104.     Thereafter, a comprehensive, master family settlement agreement dated February 20, 2003 (the "2003 Master Settlement Agreement") was signed by all parties in interest in all applicable capacities following consultation with their respective counsel.  *See* Exhibit 22.

105.     During the negotiations culminating in the 2003 Master Settlement Agreement, Ms. Hughes was represented by the Womble firm, one of the largest in North Carolina.

106.     At the December 19, 2002 family meeting, Mike Gunter, a partner at the Womble firm and one of Ms. Hughes' attorneys, stated that the Womble firm had represented RJ Reynolds in product liability tobacco litigation and had attorneys very familiar with, among other things, the risks of class action lawsuits against tobacco companies.  In addition to Ms. Hughes' financial advisors, Mike Gunter had graduated with distinction from University of Pennsylvania, Wharton School with an MBA in finance.

107.     Ms. Hughes' December 19, 2002 proposal included what she and the Womble attorneys considered an appropriate discount for illiquidity and lack of control given the significant legal, regulatory and legislative risks facing JMI.

108.     Given the expertise and sophistication of Ms. Hughes' and Ms. Nupson's advisors, the fact that the parties had negotiated the redemption price, and Bradford's offer was significantly more than the value of Ms. Hughes' initial buy-out proposal, Ms. Hughes, Ms. Nupson, Frances and John, as well as their respective counsel, agreed that an appraisal of Bradford shares was unnecessary.

109.     A material part of the global family resolution and the purchase of the Bradford shares was that certain terms of the trust instrument for the Original GRAT would be changed in a new trust document modifying the Original GRAT, and which would be executed by Frances in connection with the global family resolution.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

110. The new trust document (hereinafter referred to as "the Modified 2001 GRAT") modified the terms of the Original GRAT with the agreement of Frances as Settlor and all parties in interest.

111. Upon the advice and direction of her attorney, and with all parties' agreement after consultation with their respective attorneys, Frances dated the Modified 2001 GRAT February 1, 2001, the same date as the Original GRAT.

112. The Modified 2001 GRAT changed the beneficiaries after the end of the annuity period, and provided that the assets would be divided into three equal and separate family trusts for each of Ms. Hughes, Ms. Nupson and John.  *See* Exhibit 23.

113. The Modified 2001 GRAT was executed by Frances in mid-February 2003, and was executed by John on or about February 18, 2003, when he executed the 2003 Master Settlement Agreement dated February 20, 2003.

114. Paragraph 1 of the 2003 Master Settlement Agreement states:

> 1. <u>Confirmation of the GRAT</u>.  Each of the Parties agrees and confirms that the GRAT, a copy of which is attached hereto as <u>Exhibit A</u>, reflects the intent of Frances and all beneficiaries of the GRAT.  Each Party shall use his, her or its best efforts and cooperate in good faith in effectuating the terms of the GRAT and in defending the tax treatment of the GRAT.

*See* Exhibit 22 at Paragraph 1.

115. The Modified 2001 GRAT was an important part of the consideration for the 2003 Master Settlement Agreement, as were the releases and the indemnity obligations contained therein.  These provisions were essential inducements for each of the parties to enter into the 2003 Master Settlement Agreement.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

116.    A review of the blacklined drafts of the Modified 2001 GRAT clearly reveals that the parties considered and rejected requiring an appraisal in connection with the redemption. *See* Exhibit 14.

117.    The parties ultimately agreed to eliminate the appraisal requirement, opting instead for the following provision at the time the final version of the Modified 2001 GRAT was executed, which is consistent with and complies with the Bradford Shareholders' Agreement, as amended, and the December 15, 1993 Agreement to be Bound:

> FOURTEENTH – <u>Bradford Holdings, Inc. Stock:</u>  A major asset held hereunder is stock in Bradford Holdings, Inc. ("BHI"). Grantor gives to Trustee or Trustees full discretion as to the retention or sale of any or all of the BHI stock held hereunder without the need for court approval and without regard to any state law requirement of diversification and despite the fact that such stock may not pay dividends.  Notwithstanding anything in this Agreement to the contrary, during any period in which BHI stock is held by any trust hereunder, no distribution of either income or principal of such trust or transfer of any stock by BHI owned by such trust shall be permitted to the extent such distribution or transfer is prohibited by the Shareholders' Agreement dated November 17, 1982, as amended, among BHI and each of its stockholders.

*See* Exhibit 23 at Article FOURTEENTH.

118.    The 2003 Master Settlement Agreement waived "compliance with the provisions of the Shareholders' Agreement dated November 17, 1982, as amended, among [Bradford] and each of its stockholders in connection with the [redemption by Bradford] and the Stock Purchase Agreements and agrees that such Shareholders' Agreement does not apply to such sales." *See* Exhibit 22 at ¶ 4.

119.    Paragraph 7 of the 2003 Master Settlement Agreement also provides that Ms. Nupson would be included equally in Frances' estate upon her death. *See* Exhibit 22 at ¶ 7.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

120.    In addition, Ms. Nupson and Ms. Hughes executed a separate Indemnification Agreement dated February 20, 2003, indemnifying John for any gift tax, interest and penalties "arising out of or relating to any gift or purported gift made" by John to Ms. Nupson and Ms. Hughes "resulting from or relating to the creation of the [Modified 2001] GRAT attached as Exhibit A" to the 2003 Master Settlement Agreement.  *See* Exhibit 24.

121.    As a result of the 2003 Master Settlement Agreement, Ms. Nupson received approximately $26 million from the Modified 2001 GRAT in trust, plus in excess of $5 million from Frances and her estate.

122.    As discussed below, the 2003 Master Settlement Agreement provides for a series of undertakings prior to the February 28, 2003 redemption of the Bradford shares (the "2003 Redemption"), primarily in the form of divisions of trusts and changes in trustees.

123.    The 2003 Master Settlement Agreement includes a general release, which specifically includes any claims of self-dealing or breach of fiduciary duty, *see* Exhibit 22 at ¶ 18, as well as a broad indemnification provision.  *See* Exhibit 22 at ¶ 19.

124.    The 2003 Master Settlement Agreement has as Exhibits, among other things, each of the stock purchase agreements to be signed by the separate shareholders being redeemed.  As discussed in more detail below, the Exhibits also included a separate 2001 GRAT Release and Indemnification Agreement.

125.    Each of the Exhibits to the 2003 Master Settlement Agreement was incorporated into and made a part of the 2003 Master Settlement Agreement.  *See* Exhibit 22 at ¶ 35.

**Divisions of Trusts and Changes in Trustees between
February 20, 2003 and Redemption on February 28, 2003**

126.    The 1994 GST Trust was a single trust benefiting each of Herbert, Jr. and Frances' grandchildren, being John's two children and Ms. Hughes' three children.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

127.    Because only the Bradford shares in the 1994 GST Trust allocable to Ms. Hughes' children were to be redeemed, for tax reasons the 2003 Master Settlement Agreement provides that, prior to redemption and among other things:  (a) the 1994 GST Trust would be divided into five separate trusts; and (b) John would resign as Trustee of the separate 1994 GST Trusts for Ms. Hughes' three children and Ms. Hughes would be appointed successor trustee.  *See* Exhibit 22 at ¶ 2.

128.    Under the terms of the Anna 1994 Trust, upon her death Ms. Nupson could appoint the remaining principal to and among the issue of Herbert, Jr. and Frances, and in default of complete appointment the remaining principal would be paid to Ms. Nupson's issue, or if none, to the then living grandchildren, *per capita*, of Herbert, Jr. and Frances, or if none, to the then living issue, *per stirpes*, of Herbert, Jr. and Frances.  *See* Exhibit 7, Item FIRST (2).

129.    In 2003 Ms. Nupson had no issue and was not likely to have issue.

130.    Again for tax reasons, the 2003 Master Settlement Agreement provides that the Anna 1994 Trust would be divided into two separate trusts pursuant to the terms of a separate family settlement agreement (the "2003 Family Settlement Agreement").  *See* Exhibit 22 at ¶ 3, and Exhibit 25.

131.    Although Ms. Hughes's original proposal provided that Ms. Nupson would agree to exercise the limited power of appointment she held over the 1994 Anna Trust to benefit Ms. Hughes' and John's families equally, the 2003 Family Settlement Agreement provided that the Anna 1994 Trust would be divided into two trusts – 60% in one trust with the Hughes family as remainder beneficiaries ("Anna 1994 Trust fbo Hughes") and 40% in a separate trust with the Middleton family as remainder beneficiaries ("Anna 1994 Trust fbo Middleton").  *See* Exhibit 15

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

and Exhibit 25 at ¶¶ 1, 2.  The Anna 1994 Trust fbo Hughes and the Anna 1994 Trust fbo Middleton are sometimes collectively referred to as the "Anna 1994 Trusts."

132.    The Anna 1994 Trust was divided, and the Bradford shares held by the Anna 1994 Trusts were allocated solely to the Anna 1994 Trust fbo Hughes.

133.    Following the February 28, 2003 Redemption, all parties in interest in all applicable capacities executed a separate Release and Indemnification Agreement with respect to the 2001 GRAT (the "2001 GRAT Release and Indemnification Agreement").  *See* Exhibit 26. The 2001 GRAT Release and Indemnification Agreement was an Exhibit to the 2003 Master Settlement Agreement.  *See* Exhibit 22 at ¶ 12.

134.    All parties in interest signed the 2001 GRAT Release and Indemnification Agreement.  *See* Exhibit 26.

135.    As a result of the divisions of trusts agreed to in the 2003 Master Settlement Agreement and the additional agreements referenced above, the shareholders immediately before the February 28, 2003 Redemption were as follows:

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

| Shareholders | Class A Voting | | Class B Non-Voting | |
|---|---|---|---|---|
| | # of Shares | % of Shares | # of Shares | % of Shares |
| John S. Middleton | 716 | 85.4% | 37,705 | 6.3% |
| John P. Middleton | | | 4,286 | 0.7% |
| Frances B. Middleton | | | 4,286 | 0.7% |
| 1982 Trust (shares fbo John) | | | 75,073 | 12.6% |
| 1994 GST Trust fbo John P. Middleton | | | 7,089 | 1.2% |
| 1994 GST Trust fbo Frances B. Middleton | | | 7,089 | 1.2% |
| 1996 Trust fbo John's children | | | 29,774 | 5.0% |
| | | | | |
| **Shareholders being redeemed** | | | | |
| Anna 1994 Trust fbo Hughes | 38 | 4.5% | 70,963 | 11.9% |
| Modified 2001 GRAT | | | 258,029 | 43.4% |
| Lucia M. Hughes | 84 | 10.0% | 67,563 | 11.4% |
| J. Alexander Hughes | | | 3,645 | 0.6% |
| Thomas M. Hughes | | | 3,645 | 0.6% |
| John C. Hughes | | | 3,645 | 0.6% |
| 1994 GST Trust fbo J. Alexander Hughes | | | 7,089 | 1.2% |
| 1994 GST Trust fbo Thomas C. Hughes | | | 7,089 | 1.2% |
| 1994 GST Trust fbo John C. Hughes | | | 7,089 | 1.2% |
| **Totals** | **838** | **100.0%** | **594,059** | **100.0%** |

136.    As noted, there were separate stock purchase agreements attached to the 2003 Master Settlement Agreement for each of the shareholders being redeemed, including the 2001 GRAT.

137.    John signed all stock purchase agreements as President of Bradford.

138.    John as Trustee, and Frances as Grantor, signed the 2001 GRAT Stock Purchase Agreement attached to the 2003 Master Settlement Agreement.  *See* Exhibit 27.

139.    Although Ms. Nupson did not sign the 2001 GRAT Stock Purchase Agreement, she did sign the Anna 1994 Trust Stock Purchase Agreement, and represented and warranted that

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

she had received financial statements, an appraisal and "all other information" she requested

from Bradford, and that she had the opportunity to discuss Bradford's "business, operations and

financial affairs with management . . . ." *See* Exhibit 28.

140.    All parties in interest accepted the benefits of the 2003 Master Settlement

Agreement, including the benefits of the 2003 Redemption and the receipt of the proceeds by the

2001 GRAT.

141.    All parties in interest consulted with their respective counsel before signing the

2003 Master Settlement Agreement and the corresponding Exhibits.

**Relevant provisions of the Modified 2001 GRAT**

142.    The Modified 2001 GRAT Trust Agreement explicitly waives the requirement of

court approval and exempts the trustee from any law that might otherwise prohibit the trustee

from exercising the power to sell the Bradford shares as follows:

> FOURTEENTH -- <u>Bradford Holdings, Inc. Stock</u>:  A major asset held hereunder is stock in Bradford Holdings, Inc. ("BHI").  Grantor gives to Trustee or Trustees full discretion as to the retention or sale of any or all of the BHI stock held hereunder without the need for court approval . . . .
>
> . . . .
>
> SIXTEENTH -- <u>Business Powers</u>:  With respect to any business interest, whether such business is conducted as a proprietorship, partnership, corporation, or in any other form, held hereunder, Grantor gives to Trustee or Trustees the following additional powers:
>
> > . . . .
>
> 5.       To act as officer, partner, director, manager or employee of the business interest, and to exercise all rights of ownership for the election or appointment of any person, including any Trustee hereunder, as director, officer, manager or a similar position, and Grantor hereby exempts Trustees from the adverse operation of any law or provision that might otherwise prevent Trustees from exercising the powers hereunder by reason of a conflict of interest.
>
> > . . . .

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

> 9.    To sell or liquidate all or any part of the business at such time, for such prices, on such terms, with or without security, and to such persons as Trustees, in Trustees' absolute discretion, shall deem appropriate, notwithstanding any law or provision that might otherwise prohibit such transaction by reason of self-dealing or conflict of interest.

*See* Exhibit 23 at Article FOURTEENTH and SIXTEENTH.

143.    The waiver of conflicts of interests and prohibition on self-dealing set forth in Article SIXTEENTH of the Modified 2001 GRAT and quoted above were also contained in the Original GRAT. *See* Exhibit 10 at Article FOURTEENTH (5) and (9).

**Relevant Representations, Warranties and Releases**

144.    All parties agreed in Paragraph 4 of the 2003 Master Settlement Agreement "not to challenge or dispute [the redemption of Bradford shares] at the indicated price or any actions undertaken by [Bradford] or each Selling Stockholder to effectuate such sale." *See* Exhibit 22 at ¶ 4.

145.    All parties represented and warranted in Paragraph 16(b) of the 2003 Master Settlement Agreement that they had "the requisite power and authority," had the "legal capacity" and were "duly and validly authorized" to enter into that Agreement and to "consummate the transactions contemplated hereby" and to perform the obligations under that Agreement. *See* Exhibit 22 at ¶ 16(b).

146.    Paragraph 18 of the 2003 Master Settlement Agreement provides a general release by each party of each other party in all capacities:

> Each of the Parties hereto . . . hereby releases, remises, forever discharges and agrees not to sue . . . the other Parties hereto . . . of and from any and all manner of actions, causes of actions, suits, sums of money, debts, bonds, covenants, contracts, controversies, agreements, judgments, plans, promises, damages, losses, liabilities, claims and demands whatsoever, in law or at equity, known or unknown, including but not limited to, those arising from or related to (i) the GRAT, (ii) the subdivision of the 1994 [GST] Trust or the Anna [1994] Trust, (iii)

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

the subdivision of the assets of the 1994 [GST] Trust or the Anna [1994] Trust, including without limitation, all shares of Class B Stock owned by the 1994 [GST] Trust and all shares of Class A Stock and Class B Stock owned by the Anna [1994] Trust, (iv) the Corporation's purchase of the Class A Stock and Class B Stock at the purchase prices set forth in Section 4 of this Agreement, (v) self dealing or breach of any other legal or fiduciary obligation of any of the trustees or custodians of the Trusts or Custodial Accounts in connection with the administration or operation of any Trust or Custodial Account or the Corporation's purchase of the Class A Stock and Class B Stock provided in Section 4 of this Agreement, (vi) the operation or management of the Corporation or any other matters pertaining to the Corporation, which against the Party Releasees such Party Releasors or any of them ever had, now have, or which such Party Releasors or any of them, can, shall or may have, for, upon or by reason or any cause, matter or thing whatsoever, from the beginning of the world up to and including the Stock Purchase Closing Date, except for those that may arise out of any breach or violation of this Agreement (including without limitation the representations and warranties in Section 16 hereof) or any Stock Purchase Agreement.

*See* Exhibit 22 at ¶ 18.

147.    Paragraph D of the 2001 GRAT Release and Indemnification Agreement provides that each party:

[a]bsolutely and irrevocably remises, releases, quit-claims and forever discharges John S. Middleton ("John") as a Trustee of the GRAT from any and all actions, suits, payments, accounts, reckonings, liabilities, and demands relating in any way to the administration of the GRAT from the inception of the GRAT up to and including the effective date hereof.

*See* Exhibit 26 at ¶ D.

148.    Further, Paragraph E of the 2001 GRAT Release and Indemnification Agreement provides that all parties agree to "indemnify and hold harmless John as Trustee of the GRAT from and against any and all [losses] . . . which he may suffer or to which he may be subjected by reason of his administration of the GRAT and settlement of the assets of the GRAT . . . without having the formal approval of [this Court]". *See* Exhibit 26 at ¶ E.

149.    The validity of the 2001 GRAT Release and Indemnification Agreement was raised by John in his Petition for Adjudication/Statement of Proposed Distribution filed with the

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

Court on February 1, 2017.  That Petition for Adjudication/Statement of Proposed Distribution is incorporated by reference.

## Section 3356

150.     Section 3356 of the Probate, Estates and Fiduciaries Code, 20 Pa. C.S.A. § 3356, provides:

> In addition to any right conferred by a governing instrument, if any, the personal representative, in his individual capacity, may bid for, purchase, take a mortgage on, lease, or take by exchange, real or personal property belonging to the estate, subject, however, to the approval of the court, and under such terms and conditions and after such reasonable notice to parties in interest as it shall direct. The court may make an order directing a co-fiduciary, if any, or the court's clerk to execute a deed or other appropriate instrument to the purchasing personal representative.

151.     In 2003, Section 3356 was applicable to trusts by cross reference through 20 Pa. C.S.A. § 7133.

152.     Upon the enactment of the Pennsylvania Uniform Trust Act ("UTA"), effective November 6, 2006, Section 7133 was repealed and replaced with Section 7792.

## Count I – *Declaratory Judgment re: 2003 Redemption*

153.     Petitioners incorporate Paragraphs 1 through 152.

154.     Pursuant to Section 7533 of the Declaratory Judgments Act, 42 Pa. C.S.A. § 7531 *et seq.*, any person whose rights are affected by a statute may request this Court to determine any question arising under such statute and obtain a declaration of rights, status or other legal relations.  *See* 42 Pa. C.S.A. § 7533.

155.     Pursuant to Section 7535 of the Declaratory Judgments Act, any person interested as a trustee or beneficiary of a trust may request this Court to declare the rights or legal relations with respect to any question arising in the administration of the trust.  *See* 42 Pa. C.S.A. § 7535.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

156.    Petitioners seek a declaration that Sections 3356 and 7133 were not applicable to the 2003 Redemption of Bradford shares from the Modified 2001 GRAT because, among other things:

a.    Section 3356 is not applicable where, as here, all parties in interest were represented by counsel, fully informed as to the circumstances and consented, in writing, to the transaction in the context of a master family settlement agreement;

b.    Section 3356 is not applicable to a redemption of shares by a corporation;

c.    John did not purchase the Bradford shares in his "individual capacity";

d.    The Modified 2001 GRAT expressly exempts the trustee from any prohibition against self-dealing and any requirement of Court approval of the sale of Bradford shares;

e.    All parties requested that the Bradford shares be redeemed, with full knowledge of John's role with Bradford; and

f.    All parties voluntarily signed the 2003 Master Settlement Agreement and related Exhibits, in all applicable capacities and not under any duress.

157.    To the extent Sections 3356 and 7133 were otherwise applicable to the 2003 Redemption of Bradford shares from the February 1, 2001 GRAT:

a.    All parties expressly waived and released any claims against John and Bradford in the 2003 Master Settlement Agreement including specifically any claims of self-dealing;

b.    All parties expressly waived any claims against John in the 2001 GRAT Release and Indemnification Agreement;

c.    All parties expressly waived any claims that the 2003 Redemption required Court approval;

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

d. All parties are equitably estopped from asserting that the 2003 Redemption required Court approval;

e. John, Bradford and others relied upon the representations, warranties and releases recited above, and therefore any attempt to claim that Sections 3356 and 7133 were applicable to the 2003 Redemption is barred by the doctrine of unclean hands;

f. John, Bradford and others would be prejudiced if Sections 3356 and 7133 were applicable to the 2003 Redemption, and therefore any such claim is barred by the doctrine of laches; and

g. All parties accepted the benefits of the 2003 Redemption with full knowledge of the circumstances while represented by counsel, and therefore any claim that Sections 3356 and 7133 were applicable to the 2003 Redemption is barred by the doctrine of acquiescence.

158.    Section 7772 of the UTA became effective November 6, 2006, and therefore it is not applicable to the 2003 Redemption.

**WHEREFORE**, your Petitioners respectfully request that this Court enter a judgment declaring that the 2003 Redemption of shares of Bradford Holdings, Inc. held by the Modified 2001 GRAT did not require approval of this Court under Sections 3356, 7133 or 7772 of the Probate, Estates and Fiduciaries Code, 20 Pa. C.S.A. §§ 3356, 7133, 7772, or in the alternative, even if Court approval was required, all parties in interest validly released any claims that approval by this Court was required.

### Count II – *Declaratory Judgment re: 2003 Master Settlement Agreement*

159.    Petitioners incorporate Paragraphs 1 through 158.

160.    Ms. Nupson, in now-dismissed filings with this Court, disputed the validity of the 2003 Master Settlement Agreement and all of its related agreements and Exhibits, including but

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

not limited to the 2001 GRAT Release and Indemnification Agreement and the Family Settlement Agreement relating to the Anna 1994 Trusts, and asked the Court to rescind the 2003 Master Settlement Agreement and all related agreements and transactions.

161.    Pursuant to the Declaratory Judgments Act, any person interested under a deed, will, written contract, or other writings constituting a contract may have determined any question of construction or validity arising under the instrument or contract, and obtain a declaration of rights, status, or other legal relations thereunder.   *See* 42 Pa. C.S.A. § 7533.

**WHEREFORE**, your Petitioners respectfully request that this Court enter a judgment declaring that all provisions of the 2003 Master Settlement Agreement and all of its related agreements and Exhibits, including but not limited to the 2001 GRAT Release and Indemnification Agreement, the 2003 Family Settlement Agreement relating to the Anna 1994 Trusts, and the February 20, 2003 Indemnification regarding gift taxes, are valid and enforceable agreements, binding upon all parties in interest.

### Count III –*The February 1, 2001 Trust*

162.    Petitioners incorporate Paragraphs 1 through 161.

163.    Ms. Nupson, in now-dismissed filings with this Court, asserted that an irrevocable trust cannot be modified and asked the Court to rescind the 2003 Master Settlement Agreement and all related agreements and transactions, which includes the modification of the February 1, 2001 trust as reflected in the trust agreement attached to the 2003 Master Settlement Agreement as Exhibit A.

164.    Pursuant to the Declaratory Judgments Act, any person interested as a trustee or beneficiary of a trust may request this Court to declare the rights or legal relations with respect to any question arising in the administration of the trust.   *See* 42 Pa. C.S.A. § 7535.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

**WHEREFORE**, your Petitioners respectfully request that this Court enter a judgment declaring that a valid trust was created under applicable law, and that the trust was validly modified by Frances and all parties in interest as provided in the 2003 Master Settlement Agreement and the trust agreement attached as Exhibit A thereto.

### Count IV – *Turnover/Disgorgement (in the alternative)*

165.     Petitioners incorporate Paragraphs 1 through 164.

166.     As described above, the modification of the Original GRAT was a material part of the global family resolution and the purchase of the Bradford shares, as provided in the 2003 Master Settlement Agreement and the agreements and Exhibits attached thereto and incorporated by reference.

167.     If the Court does not enter a judgment as requested in Count II, declaring that all provisions of the 2003 Master Settlement Agreement and all of its related agreements and Exhibits, including but not limited to the 2001 GRAT Release and Indemnification Agreement, the 2003 Family Settlement Agreement relating to the Anna 1994 Trusts and the February 20, 2003 Indemnification regarding gift taxes, are valid and enforceable agreements, and binding upon all parties in interest, then Ms. Nupson and Ms. Hughes will have been unjustly enriched by improperly receiving more than $26 million in 2003, together with all earnings, dividends, interest, gains and distributions received under their separate subtrusts under the Modified 2001 GRAT.

168.     Moreover, if the Court does not enter a judgment as requested in Count III, declaring that the Original GRAT was validly modified by all parties in interest as reflected in the Modified 2001 GRAT, as provided in the 2003 Master Settlement Agreement and Exhibit A thereto, then Ms. Nupson and Ms. Hughes will have been unjustly enriched by improperly

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

receiving more than $26 million in 2003, together with all earnings, dividends, interest, gains and distributions received under their separate subtrusts under the Modified 2001 GRAT.

169.    If the Court does not grant both Count II and Count III of this Petition, it would be inequitable to permit Ms. Nupson and Ms. Hughes to retain the more than $26 million that each of them received in 2003, together with all earnings, dividends, interest, gains and distributions earned on their separate subtrusts under the Modified 2001 GRAT.

170.    For these reasons, if the Court does not grant both Count II and Count III of this Petition, then Ms. Nupson and Ms. Hughes should be directed to turnover to John and disgorge all assets improperly received from their separate subtrusts under the Modified 2001 GRAT.

171.    In addition, if the Court does not grant both Count II and Count III of this Petition, then Thomas P. Hughes, as Trustee of the subtrust for Ms. Hughes under the Modified 2001 GRAT, and Bruce A. Rosenfield, as Trustee of the subtrust for Ms. Nupson under the Modified 2001 GRAT, are in possession of assets improperly received pursuant to the Modified GRAT and the 2003 Master Settlement Agreement and should likewise be directed to turnover to John and disgorge all assets improperly received as Trustee of such subtrusts under the Modified 2001 GRAT.

172.    A constructive trust is an appropriate remedy for unjust enrichment, and should be imposed on Ms. Nupson, Ms. Hughes, Thomas P. Hughes, as Trustee of the subtrust for Ms. Hughes under the Modified 2001 GRAT, and Bruce A. Rosenfield, as Trustee of the subtrust for Ms. Nupson under the Modified 2001 GRAT, to the extent of all assets received pursuant to the Modified GRAT and the 2003 Master Settlement Agreement, together with all earnings, dividends, interest, gains and distributions received.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

**WHEREFORE**, if this Court does not grant both Count II and Count III of this Petition, your Petitioners respectfully request, in the alternative, that this Court find that Ms. Nupson, Ms. Hughes, Thomas P. Hughes, as Trustee of the subtrust for Ms. Hughes under the Modified 2001 GRAT, and Bruce A. Rosenfield, as Trustee of the subtrust for Ms. Nupson under the Modified 2001 GRAT, have been unjustly enriched, and impose a constructive trust to the extent of all assets received pursuant to the Modified GRAT and the 2003 Master Settlement Agreement, together with all earnings, dividends, interest, gains and distributions received.

### Count V – *Nunc pro tunc Approval of 2003 Redemption (in the alternative)*

173.    Petitioners incorporate Paragraphs 1 through 172.

174.    Prior to the execution of the 2003 Master Settlement Agreement and the 2001 GRAT Release and Indemnification Agreement, all parties in interest were provided with and carefully reviewed:

    a.    Bradford's audited financial statements as of and for the fiscal years ending January 31, 2000, January 31, 2001 and December 31, 2001;

    b.    Bradford's unaudited financial statements as of and for the 12-month period ending December 31, 2002;

    c.    The September 2002 Fleet M & A Advisors appraisal valuing Bradford's stock at $215 per voting share and $205 per non-voting share; and

    d.    All documents, records, books and other information that they requested.

175.    All parties in interest also had the opportunity to discuss Bradford's business, operations and financial affairs with management.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

176. Because Bradford was family owned, all parties in interest were familiar with Bradford and its operations, including the significant risk of tobacco-related litigation and judgments.

177. After consultation with counsel and financial advisors of their choosing, all parties in interest determined that it was in their best interests, and the best interests of the trusts and the beneficiaries of those trusts, to enter into the 2003 Master Settlement Agreement and, specifically, the 2003 Redemption.

178. The 2003 Master Settlement Agreement also (a) provided the trustees of the various trusts with releases and indemnifications for past administration, and (b) addressed Frances' estate plan and the disposition of her estate upon her death, which was then in contention. The resolution of these other issues was part of the consideration exchanged in the 2003 Master Settlement Agreement.

179. The 2003 Master Settlement Agreement, including but not limited to the 2003 Redemption, was in the best interests of the beneficiaries of the Original GRAT and the Modified 2001 GRAT on February 20, 2003.

180. This Court has the equitable power to approve, *nunc pro tunc*, the 2003 Master Settlement Agreement, including specifically the 2003 Redemption, pursuant to Sections 3356 and 7133.

**WHEREFORE**, your Petitioners respectfully request, in the alternative, that this Court approve, *nunc pro tunc*, the 2003 Master Settlement Agreement, including specifically the 2003 Redemption, pursuant to Sections 3356 and 7133 of the Probate, Estates and Fiduciaries Code, 20 Pa. C.S.A. §§ 3356, 7133.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

## Count VI – *Breach of Contract*

181.     Petitioners incorporate Paragraphs 1 through 180.

182.     Ms. Nupson, individually and as Trustee of the Anna 1994 Trusts, breached the

2003 Master Settlement Agreement, and its attached agreements and Exhibits, by, among other

things:

      a.     threatening to "bring substantive claims that pertain to possible self-dealing" and

the "possibility" that "[John] Middleton purchased shares of Bradford Holdings from Nupson,

contrary to 20 Pa. C.S.A. § 7772(c)(3);"

      b.     threatening to seek to open this Court's April 19, 2013 Adjudication, which

confirmed her account as co-Trustee of the Anna 1994 Trust, including the 2003 Redemption;

      c.     falsely alleging that John knew of a possible sale of JMI to another tobacco

company and concealed that fact in 2002 and 2003, and falsely alleging that John fraudulently

transferred stock from Herbert, Jr.'s Estate into the 2001 GRAT, which allegations Ms. Nupson

later abandoned;

      d.     claiming that the 2003 Family Settlement Agreement for the Anna 1994 Trust,

which is an Exhibit to, and incorporated into, the 2003 Master Settlement Agreement, is

"unenforceable";

      e.     requesting the Court to rescind the 2003 Master Settlement Agreement, the 2003

Family Settlement Agreement for the Anna 1994 Trust and "all transactions contemplated

thereby" based upon false claims of fraud, conspiracy, self-dealing and breach of fiduciary duty;

and

      f.     revoking her June 15, 1998 Assignment, under which she assigned her

distributions from the 1982 JMI Trust (No. 2014-X3827), the 1972 Trust (No. 2017-X1239) and

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

the 1990 Trust (2017-X1364) to the Anna 1994 Trusts, despite representations and warranties that it was irrevocable.

**WHEREFORE**, your Petitioners respectfully request that this Court enter a judgment against Ms. Nupson, individually and as Trustee of the Anna 1994 Trusts, and the Anna 1994 Trusts, jointly and severally, in favor of John, individually and as former Trustee of the February 1, 2001 trust, and Bradford, in an amount in excess of $50,000.00, together with pre-judgment and post-judgment interest thereon.

### Count VII – *Indemnification*

183.    Petitioners incorporate Paragraphs 1 through 182.

184.    Paragraph 19(a) of the 2003 Master Settlement Agreement provides, in pertinent part:

> Each Party hereto (the "Indemnifying Party") agrees to indemnify and hold harmless each other Party hereto from and against any and all damages, liabilities, losses, costs or deficiencies (including, but not limited to, costs of settlement, attorneys' fees and other costs and expenses incident to proceedings, investigations, preparations or the defense of any claim) (herein a "Loss") arising out of, resulting from or relating to, and shall pay the other Parties on demand the full amount of any Loss which the other Parties are or become obligated to pay or suffer on account of (i) any inaccuracy in any representation or the breach of any warranty of the Indemnifying Party, the spouse of the Indemnifying Party or the issue (including adopted persons) of the Indemnifying Party, (ii) the Indemnifying Party, the spouse of the Indemnifying Party or the issue (including adopted persons) of the Indemnifying Party contesting or challenging any term or provision of this Agreement, any Stock Purchase Agreement or any other document or agreement executed pursuant to or in connection with this Agreement or its Exhibits or any other transaction contemplated hereby, including without limitation, the subdivision of the 1994 Trust or the Anna Trust or the subdivision of the assets of the 1994 Trust or the Anna Trust, including without limitation, all shares of Class B Stock owned by the 1994 Trust and all shares of Class A Stock and Class B Stock owned by the Anna Trust, or (iii) any failure of the Indemnifying Party, the spouse of the Indemnifying Party or the issue (including adopted persons) of the Indemnifying Party to perform, comply with or observe any term, provision, covenant or agreement to be performed or observed by the Indemnifying Party pursuant to this Agreement.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

*See* Exhibit 22 at ¶ 19(a).

185.   Paragraph 3.2 of the Stock Purchase Agreement for the Anna 1994 Trust

provides, in pertinent part:

> The Stockholder shall indemnify and hold the Corporation harmless from and against any and all damages, liabilities, losses, costs or deficiencies (including, but not limited to, costs of settlement, attorneys' fees and other costs and expenses incident to proceedings, investigations, preparations or the defense of any claim) arising out of, resulting from or relating to, and shall pay the Corporation on demand the full amount of any sum which the Corporation is or becomes obligated to pay or suffers on account of (a) any inaccuracy in any representation or the breach of any warranty of the Stockholder under this Agreement, or (b) any failure of the Stockholder to perform or observe any term, provision, covenant or agreement to be performed or observed by it pursuant to this Agreement.

*See* Exhibit 28 at ¶ 3.2.

186.   Paragraph E of the 2001 GRAT Release and Indemnification Agreement

provides, in pertinent part, that each party:

> Agrees to indemnify and hold harmless John as a Trustee of the GRAT from and against any and all damages, liabilities, losses, costs and deficiencies (including legal fees and costs in connection therewith) (collectively, "Losses") which he may suffer or to which he may be subjected by reason of his administration of the GRAT and settlement of the assets of the GRAT, in each case without a formal accounting and without having the formal approval of the Orphans' Court Division of the Court of Common Pleas of Montgomery County, Pennsylvania.

*See* Exhibit 26 at ¶ E.

187.   Paragraph F of the 2003 Family Settlement Agreement relating to the Anna 1994

Trusts provides, in pertinent part, that each party:

> Agrees to indemnify and hold harmless (i) the Trustees of the Anna Trust and the Anna Trusts from and against any and all damages, liabilities, losses, costs and deficiencies (including legal fees and costs in connection therewith ) (collectively, "Losses") which they or any of them may suffer or to which they or any of them may be subjected by reason of their or any of their administration of the Anna Trust or the Anna Trusts, the distribution of the assets of the Anna Trust and any other actions taken pursuant to or in connection with this Family Settlement Agreement or the consequences thereof, in each case without a formal accounting

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

and without having the formal approval of the Orphans' Court Division of the Court of Common Pleas of Delaware County, Pennsylvania . . . .

*See* Exhibit 25 at ¶ F.

188.    John and Bradford gave written notice of their claim for indemnification against Ms. Nupson, individually and as Trustee of the Anna 1994 Trust, by letter dated March 11, 2015. *See* Exhibit 29.

189.    Ms. Nupson, individually and as Trustee of the Anna 1994 Trusts, and the Anna 1994 Trusts, are liable to John, individually and as former Trustee of the February 1, 2001 trust, and Bradford, under one or more of the above-quoted indemnification provisions, for all damages, liabilities, losses, costs or deficiencies (including, but not limited to, costs of settlement, attorneys' fees and other costs and expenses incident to proceedings, investigations, preparations or the defense of any claim), incurred by them, and either of them, as a result of Ms. Nupson's actions in the litigation in the docket for the 1972 Trust (No. 2017-X1239), the 1982 JMI Trust (No. 2014-X3827), the 1990 Trust (2017-X1364), and the Anna 1994 Trust (No. 2012-X3503), and in the above-captioned docket.

**WHEREFORE**, your Petitioners respectfully request that this Court enter a judgment against Ms. Nupson, individually and as Trustee of the Anna 1994 Trusts, and the Anna 1994 Trusts, jointly and severally, in favor of John, individually and as former Trustee of the February 1, 2001 Trust, and Bradford, for indemnification in an amount in excess of $50,000.00, together with pre-judgment and post-judgment interest thereon.

### Parties in Interest

190.    The parties in interest to this Petition are set forth in Exhibit 30.

191.    Pursuant to 20 Pa. C.S.A. § 7723, Anna K. Nupson, Lucia M. Hughes, J. Alexander Hughes, Thomas M. Hughes, John C. Hughes, John P. Middleton and Frances B.

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

Middleton are notified that they are designated as representatives of (a) their respective minor and unborn descendants who are or may be a beneficiary of one or more of the trusts identified on Exhibit 30, and (b) all potential appointees and takers in default of appointment of one or more of the trusts identified on Exhibit 30 to the extent of any such power of appointment.

**WHEREFORE**, your Petitioners respectfully request that the Court issue a Citation directed to the parties in interest set forth in Exhibit 30 to show cause, if any there may be, why the relief requested in the Petition should not be granted, and why the Court should not enter a judgment declaring that (a) the 2003 Master Settlement Agreement and all of its related agreements and Exhibits, including but not limited to the 2001 GRAT Release and Indemnification Agreement, the 2003 Family Settlement Agreement relating to the Anna 1994 Trusts and the February 20, 2003 Indemnification regarding gift taxes, are valid and enforceable agreements, binding upon all parties in interest; (b) the Original February 1, 2001 GRAT was validly modified by all parties in interest as reflected in the Modified 2001 GRAT, as provided in the 2003 Master Settlement Agreement and Exhibit A thereto; and (c) the 2003 Redemption of shares of Bradford Holdings, Inc. held by the February 1, 2001 GRAT did not require approval of this Court under Sections 3356, 7133 or 7772 of the Probate, Estates and Fiduciaries Code, 20 Pa. C.S.A. §§ 3356, 7133, 7772, and grant further relief by entering judgment against Anna K. Nupson, individually and as Trustee of the Anna 1994 Trusts, and the Anna 1994 Trusts, jointly and severally, in favor of John S. Middleton, individually, and as former Trustee of the February 1, 2001 Trust, and Bradford, in an amount in excess of $50,000.00, together with pre-judgment and post-judgment interest thereon.

Respectfully submitted,

/s/ James F. Mannion

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

_____
James F. Mannion (No. 58951)
Jennifer D. Gayle (No. 205648)
Mannion Prior, LLP
840 1st Avenue, Suite 100
King of Prussia, PA  19406-4063
(610) 265-7800
(610) 265-1204 (facsimile)
jmannion@mannionprior.com
jgayle@mannionprior.com

Counsel for John S. Middleton, as
Former Trustee of the Trust of Frances S.
Middleton, Settlor, under Agreement of Trust
dated February 1, 2001

/s/ James T. Smith
_____
James T. Smith (No. 39933)
Rebecca D. Ward (No. 79547)
Blank Rome, LLP
One Logan Square
130 North 18th Street
Philadelphia, PA  19103
(215) 569-5500
Smith-JT@BlankRome.com
Ward@BlankRome.com

Counsel for John S. Middleton,
Individually and Bradford Holdings, Inc.

Dated:  May 22, 2017

43

Case# 2015-X1266-58 Received at Montgomery County Register of Wills Office on 05/22/2017 5:01 PM, Fee = $139.00

**<u>Verification</u>**

I, John S. Middleton, verify that the facts set forth in the foregoing pleading, to the extent based upon my personal knowledge, are true and correct, and to the extent based upon knowledge provided by others, I believe them to be true and correct.  This Verification is made pursuant to 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

/s/ John S. Middleton

_____

John S. Middleton