

EXHIBIT D

**Expert Report of John Fenn**

January 14, 2022

Presented in:

**Anna K. Nupson v.
Schnader Harrison Segal & Lewis LLP, et al.**

CASE NO. 2:18-cv-02505-NIQA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

1



**I.      Report Overview**

     I.A      Purpose of Analysis     5

     I.B      Background & Qualifications     7

**II.     Valuation Principles and Concepts**

     II.A     Standards of Value     8

     II.B     Overview of Valuation Approaches     9

     II.C     Selection of Methods     9

**III.    Fleet Report Review**

     III.A    Overview     11

     III.B    Middleton Valuation     11

     III.B.1  DCF Method     11

     III.B.2  GPC Method     12

     III.B.3  GMAC Method     12

     III.B.4  Conclusion     13

     III.C    McIntosh Valuation     13

     III.D    Double Play Valuation     13

     III.E    Conglomerate Discount     14

     III.F    Discount for Lack of Marketability, Size Discount, & Minority Discount     15

     III.G    Conclusion     15

**IV.     Stout Report Review**

     IV.A     Overview     17

     IV.B     Lack of GMAC Method     17

     IV.C     Middleton Valuation     18

     IV.D     McIntosh Valuation     18

     IV.E     Double Play Valuation     18

     IV.F     Other Subsidiaries     19

     IV.G     Discounts     19

     IV.G.1   Conglomerate Discount     19

     IV.G.2   Discount for Lack of Marketability     19

     IV.H     Conclusion     20

 
**V.    BHI Valuation as of February 28, 2003**

| | |
|---|---|
| V.A    Overview | 21 |
| V.B    Middleton Valuation – Market Approach | 21 |
| V.B.1    GPC Method | 21 |
| V.B.2    GMAC Method | 23 |
| V.B.3    Conclusion | 25 |
| V.C    McIntosh Valuation – Market Approach | 25 |
| V.C.1    GPC Method | 25 |
| V.C.2    GMAC Method | 27 |
| V.C.3    Conclusion | 28 |
| V.D    Bradford Holdings – Income Approach | 28 |
| V.E    Double Play | 31 |
| V.F    Conclusion | 31 |
| V.F.1    Lower Bound | 31 |
| V.F.2    Upper Bound | 32 |
| V.F.2.a    Class A Shares | 32 |
| V.F.2.b    Class B Shares | 33 |
| V.F.3    Conclusion | 33 |

**VI.    Gould & Pakter Damages Review**

| | |
|---|---|
| VI.A    Overview | 34 |
| VI.B    Model 1 Review | 34 |
| VI.B.1    Gould & Packer Damages Calculation Summary – Model 1 | 34 |
| VI.B.2    My Rebuttal of the Damages Model 1 | 35 |
| VI.B.2.a    Premise of Damages | 35 |
| VI.B.2.b    My Calculation of Damages – Model 1 | 36 |
| VI.C    Model 2 Review | 37 |
| VI.C.1    Gould & Packer Damages Calculation Summary – Model 2 | 37 |
| VI.C.2    My Rebuttal of the Damages Model 2 | 38 |
| VI.C.2.a    Premise of Damages | 38 |
| VI.D    Additional Assumptions | 38 |

**VII.    Additional Valuation Information**

| | |
|---|---|
| VII.A    Certification of Valuation | 40 |
| VII.B    Statement of Conditions | 41 |



**VIII.**   **Appendix A - Valuation Exhibits**

**IX.**   **Appendix B – Sources of Information**

**X.**   **Appendix C – Valuation Premiums & Discounts**

|        |                                                    |     |
| ------ | -------------------------------------------------- | --- |
| **X.A** | **Valuation Premiums and Discounts in General**   | 66  |
| **X.B** | **Discount for Lack of Control**                  | 67  |
| **X.C** | **Discount for Lack of Marketability**            | 70  |





# I.   Report Overview

### I.A   Purpose of Analysis

1.   I have been retained by Dilworth Paxson LLP ("Counsel") in connection with a dispute between Anna K. Nupson ("Ms. Nupson" or the "Plaintiff") and Schnader Harrison Segal & Lewis LLP and Bruce Rosenfield (collectively, the "Defendants").

2.   This report concerns claims made by the Plaintiff in litigation titled Anna K. Nupson v. Schnader Harrison Segal Lewis LLP, et al., Case No. 2:18-cv-02505-NIQA, pending in the United States District Court for the Eastern District of Pennsylvania. This report contains my expert opinions regarding the claims made by the Plaintiff.

3.   As outlined in a third amended complaint dated August 26, 2020 (the "Complaint"), I understand that Plaintiff alleges that Defendants engaged in legal malpractice, breach of contract, breach of fiduciary duty, negligent misrepresentation, and constructive fraud that resulted in Plaintiff selling her interest in a family-owned corporation at a value significantly below the actual value of those shares. Plaintiff's 1994 self-settled trust held Plaintiff's 38 voting Class A shares and 70,963 non-voting Class B shares of Bradford Holdings, Inc. ("Bradford", "BHI", or the "Company"), which were sold for approximately $275 per share, or approximately $19.5 million in aggregate. Plaintiff was also a beneficiary of Frances S. Middleton's February 1, 2001 Grantor Retained Annuity Trust (the "GRAT") which gave Plaintiff beneficial ownership of one-third of the GRAT's 258,029 Class B shares of Bradford. Based on representations of Counsel and deposition testimony, the purchase price for Plaintiff's shares was based, at least in part, on a report issued on September 17, 2002, prepared by Fleet M&A Advisors ("Fleet"), that provided an opinion of the Fair Market Value of certain minority interest non-voting and voting shares of Bradford, as of February 1, 2001 (the "Fleet Report").

4.   Counsel has requested that I (1) review and critique the valuations performed on Bradford Holdings prior to the Plaintiff's redemption transaction with Bradford, specifically the report prepared by Fleet issued September 17, 2002; (2) review the Expert Report of Jeffrey M. Risius CPA/ABV, CFA, ASA dated December 13, 2021 (the "Stout Report" or "Stout") which was issued related to this litigation; (3) form a reasonable Fair Market Value for the Class A and Class B shares of Bradford redeemed by the Plaintiff as part of the redemption transaction; and (4) review the damages calculations and conclusions.

5.   The purpose of this preliminary report is to summarize my findings to date pertaining to the review of the Valuation of Minority Interests of Common Stock of Bradford Holdings, Inc. as of February 1, 2001 prepared by Fleet M&A Advisors (the "Fleet Report") dated September 17, 2002. The Fleet Report provides the basis for the purchase of those Minority Interests by Bradford Holdings from the Plaintiff and her sister in early 2003. During our review, I found the assumptions and methodologies used to conclude the value of Bradford Holdings, Inc. were within a reasonable range.  In this review of the report, and based on the documents I have reviewed, I am expressing my opinions based on a reasonable degree of professional certainty.

6.   Overall, as described in more detail herein, it is my opinion that the conclusions reached in the Fleet Report are based on supportable assumptions that result in reasonable

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

5





conclusions. The Fleet Report's concluded value relies on a prior transaction of the Company's stock which is in line with the definition of Fair Market Value.

7.  Based thereon, I recreated the analysis presented in the Fleet Report and adjusted several assumptions and inputs in the Fleet Report to determine the Fair Market Value of Bradford's voting Class A shares and non-voting Class B shares, as of February 28, 2003. These corrections included, but were not limited to: i) adjusting the market multiples applied to two of Bradford's subsidiaries to a lower level; ii) removing a minority-interest discount that was inappropriately applied to Bradford's subsidiaries; and iii) adjusting a high discount for lack of marketability ("DLOM") to a more appropriate level.

8.  Based on my analysis, as described herein, I conclude that:

9.  The lower bound of the Fair Market Value of a voting Class A share and a non-voting Class B share of Bradford, as of February 28, 2003, was $258 per share and $246 per share, respectively.

10. The upper bound of the Fair Market Value of a voting Class A share and a non-voting Class B share of Bradford, as of February 28, 2003, was $415 per share and $395 per share, respectively.

11. The lower bound to the economic damages should be $0 as the price paid to the Plaintiff was reasonable.

12. The upper bound to economic damages should be based on my calculated share prices of $415 per Class A share and $395 per Class B share. Under this model, damages flowing from the 1994 Trust would include $1.2 million, and an adjusted net principal shortfall of $6.6 million. Plaintiff may have been able to access an additional $5.5 million if she persuaded the trustees to distribute the additional funds. There is no evidence that I have seen that the trustees would have distributed additional funds. Damages flowing from the 2001 Sub Trust would be $7.9 million. Plaintiff may have been able to access an additional $1.5 million if she persuaded the trustees to distribute the additional funds. I have calculated the total damages and principal shortfall, at the high end of my valuation range, to be approximately $22.7 million. The Plaintiff's expert calculated damages that range from $168.3 million to $886.6 million under two different scenarios.

13. A detailed list of the sources of information I considered is presented in Appendix B.

14. Hilco Enterprise Valuation Services, LLC ("Hilco") is compensated at a rate of $750 per hour for time incurred by me. Other individuals from Hilco also provided assistance in this matter; their hourly rates range from $275 per hour to $425 per hour. My compensation is not dependent on my opinion or the outcome of this case.

15. While the terms "we" and "our" may be used throughout this report, any other Hilco representatives involved in this matter worked under my direction and control with respect to assisting in the research, analysis development, and report preparation for this engagement.

16. To the extent necessary, I reserve the right to amend or supplement this report as additional information is provided.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

6





I.B   **Background & Qualifications**

17.  I have deep experience and a long history in the field of valuation and fundamental corporate financial analysis. My advisory experience covers a broad range of financial topics and a wide range of industries. In my career, I have structured lending and acquisitions transactions, advised professional investors (both traders and professional money managers), and acted as a Principal on behalf of Institutional Investors. The majority of these assignments involved evaluation of the underlying financial condition and valuation of corporate entities. As a valuation specialist, I have performed valuations for Financial Reporting and Investor Reporting, provided Fairness Opinions and Solvency Opinions as well as analytical support in matters related to such opinions, and acted as an advisor to certain investors on valuation related matters including principal investments.

18.  I am currently a Senior Managing Director for Hilco Valuation Services LLC and lead Hilco's Enterprise Valuation Services business. In my capacity at Hilco, I lead a team that performs dozens of business valuations each year. I joined Hilco in June 2020. Prior to Hilco, I spent more than four years with Berkeley Research Group ("BRG") and almost two years with KPMG LLP ("KPMG"). During those six years, I performed and oversaw hundreds of business valuations. I am extremely familiar with proper business valuation techniques.

19.  Prior to moving into business valuation for financial reporting purposes as well as litigation, I spent more than 20 years in the debt capital markets representing a variety of investment management firms and broker-dealers.  During that time, I analyzed thousands of companies through a variety of corporate development time periods. I am very familiar with the analysis of both mature and start-up companies. While my familiarity with company analysis is largely as a generalist, I have reviewed hundreds of industrial companies and am comfortable reviewing diversified companies in a variety of consumer segments.

20.  I received a Bachelor of Arts degree in Mathematics with Honors from Lehman College of the City University of New York. I also received a Master of Business Administration with a concentration in Finance from the Wharton Business School of the University of Pennsylvania.

21.  With the aforementioned education, training, and experience I am well established to offer opinions regarding the disputes identified in this matter.

22.  I have been retained as a valuation expert previously, and given deposition testimony, in the following matters:

     Jade-Sterling Steel Co., Inc., et al. vs. Taft Stettinius & Hollister, et al., Case No. CV-19-925878 in the Court of Common Pleas General Division Cuyahoga County, Ohio, March 31, 2021.





# II.   Valuation Principles and Concepts

**II.A   Standards of Value**

23.   In valuing a business, business interest, or business asset, often the same object carries different values if viewed from different viewpoints. Furthermore, the same object may also have a different value from the same viewpoint at different points in time (even without accounting for the interest-generating ability or the earning power of the object at hand). The standard of value applied to this appraisal is Fair Market Value.

24.   **Fair Market Value (FMV)**
The term Fair Market Value ("FMV") was first officially defined by Revenue Ruling 59–60, .02 section 20.2031–1(b) of the Estate Tax Regulations (section 81.10 of the Estate Tax Regulation 105) and section 25.2512–1 of the Gift Tax Regulations (section 86.19 of the Gift Tax Regulations 108). The common definition from these sources is:

25.   *The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts. In addition, court decisions frequently state that the hypothetical buyer and seller are assumed to be able as well as willing to trade and remain well informed about the property and the market for such property.*

26.   The definition of FMV by Raymond C. Miles, Executive Director of the Institute of Business Valuation Analysts, Inc. found in Basic Business Appraisal states that:

27.   *Fair Market Value is the price, in cash or equivalent, that a buyer could reasonably be expected to pay and a seller could reasonably be expected to accept, if the property were exposed for sale on the open market for a reasonable period of time with buyer and seller being in possession of the pertinent facts, and neither being under any compulsion to act.*

28.   Recently, several valuation organizations—including the American Institute of Certified Public Accountants ("AICPA"), American Society of Valuation Analysts ("ASA"), The Institute of Business Valuation Analysts ("IBA"), and the National Association of Certified Valuation Analysts ("NACVA")—came together and reached an agreement on the following definition of FMV:

29.   *The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.*

30.   These definitions are all accepted and used interchangeably in the valuation profession. Viewpoints, demand, supply, circumstances, and intent of the parties may affect which standard of value is applicable.





## II.B   Overview of Valuation Approaches

31.   For valuing businesses and assets, there are three generally accepted valuation approaches: market approach, income approach, and cost approach.

32.   **Market Approach:** This approach involves the collection of market data meaningful to the subject assets being appraised. The primary intent of the market approach is to estimate the value of the assets based on recent sales or offerings of similar assets. Because the comparable assets sold are not exactly the same as the asset being appraised, adjustments must be made to the sale price to reflect the differences.

33.   **Income Approach:** This approach considers value in relation to the present worth of future benefits expected to be derived from ownership and is often measured through the capitalization of a specific level of income.

34.   **Cost Approach:** This approach is based on the premise that the informed purchaser would pay no more for an asset than the cost of producing a substitute property with the same utility as the subject property. It considers that the maximum value of a property to a knowledgeable buyer would be the amount currently required to construct or purchase a new asset of equal utility. The cost approach is sometimes used when future benefits associated with the ownership of an individual asset are difficult or impossible to quantify.

## II.C   Selection of Methods

35.   I used the Income and Market Approach for the underlying analysis of the Company, including my critique of both Fleet and Stout. There are several methods to consider within each approach. Below is a description of the methods used for my analysis.

36.   **Market Approach: Guideline Publicly Traded Company Method ("GPC Method):** The Guideline Publicly Traded Company ("Guideline Company") Method follows the premise that the value of a business ownership interest should be based on what astute and rational capital market investors would pay to own that interest. Capital market ratios of guideline publicly traded companies are used to estimate the value of the subject interest.

37.   **Market Approach: Guideline Merged or Acquired Company Method ("GMAC Method"):** The Guideline Merged or Acquired Company ("Guideline Transaction") Method considers the market value of business enterprises similar to the subject company, as observed in (1) the acquisition price of either public or private companies, or (2) the trading price of publicly traded companies. Market pricing multiples are derived from the indicated market value relative to various financial metrics for those companies. The guideline company market pricing multiples are applied to the appropriate level of the subject company's financial metrics after being adjusted for the subject company's investment risk profile relative to those of the guideline companies.

38.   **Income Approach: Discounted Cash Flow Method ("DCF Method")**: The discounted cash flow ("DCF") method is used to estimate value using the concepts of the time value of money. All future cash flows are estimated and discounted to give their present values - the sum of all future cash flows, both incoming and outgoing, is the net present value, which is taken as the value or price of the cash flows in





question. In addition to estimating the present value of future economic cash flow for a discrete period, the residual - or terminal - value of the business enterprise is estimated as of the end of the discrete projection period. This terminal value is discounted to estimate its present value as well.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

10





A Hilco Global Company
Vested in Your Success

---

# III. Fleet Report Review

## III.A  Overview

39.  Bradford is a conglomerate and, as such, Fleet valued the subsidiaries John Middleton, Inc. ("Middleton"), McIntosh Inns ("McIntosh"), and Double Play, Inc. ("Double Play") separately as part of a sum-of-the-parts analysis.

## III.B  Middleton Valuation

40.  Fleet used the guideline public company method and the discounted cash flow method to calculate the value of Middleton on a marketable, minority-interest basis.

### III.B.1  DCF Method

41.  In the DCF method, Fleet used management-provided projections to calculate the projected cash flows. Fleet discounted these cash flows using a 19% weighted average cost of capital ("WACC").[1] The use of management-provided projections is appropriate, but the 19% WACC seems understated. In calculating the WACC, Fleet did not give enough consideration for the risk of litigation in the tobacco industry in my opinion. While large industry players such as R.J. Reynolds or US Tobacco have the resources to fight any and all lawsuits, a smaller player such as Middleton does not have the requisite resources to continuously battle lawsuits. Additionally, significant legislative risk existed at the time of the valuation in the forms of potential product regulation and tax regulation which, if enacted, could have significantly decreased Company profitability. According to Middleton management, the figures provided in the projections did not include any of the potential negative effects which could be caused by legislative reform or litigation. Given the unique legislative and litigation risks Middleton was exposed to at the time of the Fleet valuation, I believe the WACC should be higher, thus lowering the value of the firm.

42.  Fleet uses the wrong discount factor in calculating the terminal value in its DCF model.[2] The terminal year present value factor should be equal to the present value factor used in the final year of the discrete period. Fleet calculates the present value factor for the terminal period at the end of the year compared to the mid-year discounting in the discrete period. The different timing convention undervalues Middleton because the terminal year cash flows are being discounted at a period later than they actually should.

43.  Fleet arrives at a DCF enterprise value of $402.2 million before adding cash of $23.5 million to arrive at an equity value of $425.7 million.[3] After correcting the terminal value, Fleet would have arrived at an enterprise value of $419.8 million and an equity value of $443.3 million. However, I believe that Fleet's DCF Method ultimately overestimated Middleton by using a WACC that does not fully capture the risks the Company was facing at the time of the valuation.

---

[1] Fleet Report, page 9 & exhibit 10
[2] Fleet Report, exhibit 9
[3] Fleet Report, exhibit 9

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

11





A Hilco Global Company
Vested in Your Success

### III.B.2 GPC Method

44. In the GPC Method, Fleet reviewed and selected public companies similar to Middleton. In my review of the report, I agree with the selections of Fleet's guideline public companies. Fleet selected multiples based on total capitalization to latest twelve months ("LTM") EBITDA, total capitalization to LTM EBIT, price to LTM earnings, and price to forecasted earnings to determine the value of Middleton. Fleet selected multiples from UST, Inc. and Swedish Match AB, two guideline companies that most aligned with Middleton's financials. Fleet then selected the median of the four indicated values and applied a size discount to determine the value of Middleton.[4]

45. Fleet should have selected the minimum or lower multiples instead of the median of the two companies. This is due to the litigation risk facing Middleton that does not impact as severely the larger industry participants. As Middleton faces more risk, its value should receive a lower multiple than what is currently given. This would decrease the value of the firm.

46. Fleet chose the median of the public multiples which effectively selected for the capital to EBITDA and capital to EBIT multiples. I agree that the EBITDA and EBIT multiples are the better of the four comparables for Middleton.

47. Fleet then applied a 32% size discount to arrive at an equity value of $291.4 million.[5] Typically, the size discount for a smaller company relative to the comp set is done by using lower end multiples rather than being explicitly applied. In addition, the specialist might also identify smaller companies in the comp set as being more applicable. I do not agree that a size discount is appropriate for Middleton, nor do I agree with the rationale used to develop and apply the size discount. For one, different valuation methods for a company should produce relatively similar results, and Fleet's DCF method and GPC Method produce significantly different values. By removing the size discount, Fleet would have calculated a GPC equity value of $428.5 million and a DCF equity value of $443.3 million, a difference more in line with the expectations of a valuation professional. I believe Fleet should have removed the size discount and used lower end multiples to account for the significant risks Middleton was facing. If Fleet had used lower end multiples for the GPC Method and a higher WACC for the DCF method, the two methods would have come to similar results.

### III.B.3 GMAC Method

48. Fleet conducted a search for data on acquisitions of companies but did not use the GMAC Method to arrive at a value conclusion because "the minority interests represented by the shares lack the power to cause the sale or merger of Bradford or any Bradford subsidiary, including Middleton."[6] I disagree that the GMAC Method should be excluded from the valuation analysis on the basis of this logic. The GMAC Method is a commonly accepted valuation method utilized in valuations of all manner of companies with varying ownership structures. By dismissing the GMAC Method, Fleet does not take the opportunity to highlight an actual transaction in Bradford shares which is an important component of its conclusion.

---

[4] Fleet Report, page 6

[5] Fleet Report, page 6

[6] Fleet Report, page 8

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

12





### III.B.4   Conclusion

49.  Overall, in my professional judgement, Fleet overvalues Middleton because it does not account for the legislative and litigation risks when calculating the WACC in the DCF method and when selecting multiples in the GPC Method. By selecting a higher WACC and lower GPC Method multiples, the value would have been more in line with the risk associated with Middleton at the time of the valuation.

### III.C   McIntosh Valuation

50.  Fleet used the GPC Method to calculate the value of McIntosh.[7] In my review of the report, I agree with the guideline companies Fleet selected for the analysis. Of these guideline companies, Fleet used multiples from ShoLodge and Candlewood, as the other two companies, AmeriHost and Hudson, had considerable portions of revenue not related directly to operating company-owned hotels. While it's difficult to determine exactly what portion of the comparable companies' revenue and profits were related directly to hotel ownership, I agree that Fleet makes educated and reasonable assumptions in choosing its comparable companies. Fleet compared three multiples: total capitalization to LTM EBITDA, total capitalization to LTM EBIT, and total capitalization to LTM revenue. Fleet only placed value on the revenue multiple as the guideline companies had significantly different levels of depreciation and amortization than McIntosh. I agree that the multiple chosen falls within a reasonable range. The Fleet Report reaches an equity conclusion of $46.0 million on a marketable, minority-interest basis even though Bradford is the controlling owner of McIntosh.[8]

### III.D   Double Play Valuation

51.  Double Play owns a 35.75% stake in the Phillies. Fleet used the Arthur Anderson appraisal[9] and the Ernst & Young report[10] of the Phillies to determine the value of Double Play's stake. Arthur Anderson valued the net enterprise value of the Phillies at $157 million as of October 31, 1999. Between the valuation date of the Arthur Anderson appraisal and the valuation date of the Fleet appraisal, Double Play participated in a $50 million capital infusion into the Phillies on April 10, 2000 at a price consistent with the price paid by other investors in the infusion. In the March 28, 2002 report, Ernst & Young stated, with the exception of adjusting for the $50 million capital infusion, it is reasonable to conclude that the Fair Market Value of partners' equity of the Phillies in the Anderson Appraisal had not changed significantly between October 31, 1999 and January 31, 2001. Fleet therefore concluded that the value of the Phillies was $207 million. Fleet calculated Double Play's 35.75% stake to be $74 million before applying a 25% minority discount to arrive at a value of $55.5 million.[11]

52.  Instead of relying on the Ernst & Young update to the Arthur Anderson Valuation from 1999, I would have relied on the subsequent transaction of a 9.1973% stake in the Phillies as described below in paragraph 54.

---

[7] Fleet Report, page 12
[8] Fleet Report, page 13
[9] BHI065661_image
[10] BHI065638_image
[11] Fleet Report, page 14

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.          January 14, 2022

13



53.  Fleet argues that the $207 million valuation of the Phillies was on a controlling, liquid interest basis. The Fleet Report applies a 25% minority interest discount to arrive at the $55.5 million valuation of Double Play. Fleet argues that a minority interest is necessary because the Eighth Amended and Restated Agreement of Limited Partnership of the Phillies (the "Partnership Agreement") only allows for limited opportunities for limited partners to obtain liquidity. [12] The partnership agreement allows limited partners to sell shares to outside parties (outside parties exclude immediate family or an entity controlled by immediate family, and partners, principles, or related principles, current or in the last twelve months or entities controlled by partners, principles, or related principles) at five year intervals (October 1999, October 2004, October 2009[13]). I believe that a minority discount is not necessary because as a member of the limited partnership, Double Play is aware of and understands the time windows required to sell shares without the potential effect of a minority discount. Additionally, the Fleet Report discounts the consolidated value of BHI using a discount for lack of marketability of 45% which effectively discounts the value of Double Play for the company's inability to market its shares to outside parties.

54.  During the fiscal year ended January 31, 2001, Double Play purchased an additional 9.1973% stake in the Phillies for $19.1 million.[14] Based on this purchase price, the implied value of the Phillies would be $207.7 million. Double Play purchased the additional stake as a minority interest from other limited partners (at an implied valuation consistent with the April 10, 2000 capital infusion in which Double Play participated), and according to the Partnership Agreement, share transfers between limited partners are conducted pro-rata. Therefore, I believe the minority discount should not have been applied. The value of Double Play without the discount should be $74 million.

### III.E  Conglomerate Discount

55.  Fleet includes a conglomerate discount of 20% in its analysis of BHI.[15] The conglomerate discount decreases Fleet's calculation of the BHI equity value from $451.1 to $360.9 million. [16]

56.  Bradford qualifies as a conglomerate because it has distinct and unrelated lines of revenue: tobacco products, economy lodging, and professional baseball. The negative aspects of a conglomerate include an additional layer of management to manage the unrelated lines of business and the potential for losses from unprofitable businesses to dilute the profits of other businesses. As a result, conglomerates often have valuations that are less than the sum of its parts. Fleet discounted the valuation of Bradford by 20% to account for this factor. The leading paper on the conglomerate discount is Diversification's Effect on Firm Value by Berger and Ofek. The study determined the conglomerate discount by calculating the stand-alone values for individual business segments and comparing the sum of these stand-alone values to the firm's actual value. The study compared 3,659 multi-segment firms from the years 1986-1991.[17] The study concluded that diversified firms are on average 12.7% to 15.2% lower than the sum of their imputed segment values. After eliminating the effect

---

[12] Fleet Report, page 14
[13] BHI065708_image
[14] Fleet Report, page 3 & BHI048335_image
[15] Fleet Report, page 15
[16] Fleet Report, page 19
[17] Diversification's Effect on Firm Value, page 43




of leverage, the value loss to equity holders ranged from 18.7% to 21.7%. A conglomerate discount of 20% is therefore appropriate.

### III.F  Discount for Lack of Marketability, Size Discount, & Minority Discount

57. As the final step Fleet applied a 45% discount for lack of marketability to the voting and non-voting shares. Fleet considered a variety of qualitative factors and quantitative studies to determine the 45%. My view is that a 45% DLOM is high, thus understating the value of the shares.  An appropriate DLOM would have been closer to 30% given a marketplace that would not likely have identified many potential investors for a small private tobacco companies in 2003.

58. Fleet applies a size discount in its GPC Method of 20% to calculate the value of Middleton. I would have used lower multiples in the GPC Method instead of a size discount which would have had a similar effect. As a result, the size discount used in the Fleet report would not end up having a perceived compounding negative effect on the valuation.

59. As mentioned previously, I disagree with Fleet's application of a 25% minority discount to its valuation of Double Play since the shares were marketed on a minority basis. This discount is unnecessary and effectively adds another discount on top of the conglomerate discount.

### III.G  Conclusion

60. Fleet determined the freely-traded aggregate equity value of Bradford Holdings, Inc. to be $360.1 million. To determine this value, Fleet added the values of Middleton, McIntosh, Double Play, and other cash held by BHI, then applied a conglomerate discount of 20%. The application of the conglomerate discount was on top of applying a minority discount to Double Play and valuing McIntosh on a minority interest basis.[18]

61. Fleet then applied a 5% voting premium to the Class A voting shares, thereby adjusting up the Class A ownership to 0.148% of the Company and adjusting down the Class B ownership to 99.852% of the Company. Fleet multiplied the $360.1 million equity value by the ownership percentages to determine the freely-traded aggregate equity value for each share class. Finally, Fleet applied a 45% discount for lack of marketability to the equity values to determine the indicated value per share. Fleet calculated the Class A share price at $292 per share and the Class B share price at $278 per share.[19] As described above, I disagree with these values as they are a product, in my professional opinion, of overstated subsidiaries and the application of certain discounts – the discounts for lack of control and marketability.

62. On February 1, 2001, two minority shareholders, Nancy F. Smith and Susan F. Thorkelson (the "Cousins"),[20] redeemed their shares in the Company for a price of $215 per Class A share and $205 per Class B share (the "2001 BHI Transactions"). The purchase price was negotiated over several months stretching back to at least June 2000. Among factors motivating shareholders to sell were (1) the desire to diversify their assets; (2) estate planning; (3) an anticipated slowing in the Company's

---

[18] Fleet Report, page 19
[19] Fleet Report, page 19
[20] Fleet Report, page 21

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

15





A Hilco Global Company
Vested in Your Success

growth rate after years of rapid growth; and, (4) increased levels of tobacco-related litigation involving the Company and the in the industry. To the best of our knowledge, neither shareholder was under any duress to sell. By January 2001, as put forth by the Company and John Middleton, a countervailing factor arguing against selling was an expected increase in dividends to shareholders subsequent to the Company's anticipated election of Subchapter S status on February 1, 2001. Negotiations included a discussion of the risk that adverse tobacco-related litigation results might inhibit the Company's ability to increase or sustain dividends over time. [21]

63.   The sellers considered a number of other factors in their decisions, including the valuation report of Howard, Lawson & Co., LLC dated November 13, 2000, that opined that the Fair Market Value of the shares was $215 per voting share and $205 per non-voting share as of April 19, 2000. The sellers also considered the Company's audited and unaudited financial statements as well as the market conditions and industry outlooks for the Company's subsidiaries. The sellers were provided an opportunity to discuss BHI's business, operations, and financial affairs with the Company's management and were supplied with all of the documents, records, books, and other information pertaining to the Company and its operations that they requested. [22]

64.   None of the sellers were compelled to sell shares of the Company, and the Company was not compelled to buy their shares. The sellers were both well informed about the Company, and, through the advice of their spouses, were also qualified to make such investment decisions. Both spouses were investment banking professionals with 15 to 20 years of experience in corporate finance and valuation techniques with major Wall Street firms. Both held MBA degrees from elite business schools, Wharton (University of Pennsylvania) and Kellogg (Northwestern University). [23]

65.   Considering the above factors, the transactions constituted arm's length transactions between Bradford and the sellers. **Fleet concluded that these transactions represented the best indication of the Fair Market Value of minority interests in BHI's common stock.** Therefore, Fleet concluded the Fair Market Value was $215 per Class A share and $205 per Class B share as of Fleet's February 1, 2001 valuation date.[24]

66.   It is reasonable to conclude a share price of $215 and $205 because a transaction of the Company stock is the most appropriate method to determine the Fair Market Value of the Company. As stated in Section II.A, Fair Market Value is defined as:

"*the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.*"

---

[21] Fleet Report, page 20
[22] Fleet Report, page 20
[23] Fleet Report, page 21
[24] Fleet Report, page 22

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

16



# IV.   Stout Report Review

## IV.A  Overview

67.   Stout valued the Company as of February 28, 2003 using the market approach.

## IV.B  Lack of GMAC Method

68.   The Stout analysis effectively misses the forest for the trees in its approach to the valuation performed by Fleet. The Stout Report in its overview goes into the history of the Fleet analysis and its predecessor Howard, Lawson & Company ("Howard Lawson"). The April 19, 2000 Howard Lawson report was used to help value an actual transaction between BHI and its shareholders for the purpose of a redemption. The two shareholders were family members. The purchase is referred to as the "2001 BHI Transactions"

69.   The significance of the 2001 BHI Transactions is that they represent two true market-based sales supported by the Howard Lawson report. The 2001 BHI Transactions were at arms-length and established a benchmark for future transactions. The sellers were not compelled to sell and were provided with sufficient information to make an informed decision. Under most definitions, this is the fact pattern that embodies fair value or Fair Market Value.

70.   The Fleet Report performed a year later, as part of the analysis of the shares on behalf of the GRAT, ultimately concluded the Fair Market Value of the shares to be the same as it was in the 2001 BHI Transactions. The Fleet Report goes through a standard theoretical valuation approach to the equity value of BHI yet, in its professional opinion, concluded the prior transaction in the shares represented Fair Market Value.

71.   Stout seems to dismiss this conclusion out of hand. Instead, Stout concludes a theoretical value is appropriate for pricing the Plaintiff's redemption transaction because a theoretical value was the basis for the 2001 BHI Transactions. This conclusion brushes off the notion that the sellers could have rejected the Howard Lawson price and chosen not to transact.

72.   Besides ignoring the 2001 BHI Transaction as an applicable basis for the valuation of Bradford, Stout also overlooks the fact that, in December 2002, Lucia Middleton Hughes ("Ms. Hughes" or the "Plaintiff's Sister") offered to sell her significant stake in BHI back to the Company as part of the redemption negotiations at a price that was consistent with the 2001 BHI Transactions.[25] As such, she independently verified the price paid in 2001 as a valid consideration for Fair Market Value since she was willing to transact at the same price under no compulsion. Ms. Hughes was well represented by Counsel and had sufficient facts to arrive at her offer to sell.  Ultimately, she sold at the same price received by the Plaintiff. Additionally, according to documents reviewed, it seems that Ms. Hughes was adversarial to Mr. Middleton at this time because of disagreements about the structure and handling of the GRAT.[26] Given this

---

[25] 2002-12-19 Lucia Buyout Proposal
[26] Undated Fran Notes





acrimony, I do not believe that Ms. Hughes would have been willing to sell her shares at a discount to the Company.

73. Ultimately, I do not follow the Stout conclusion. The Fleet conclusion was reasonable since it tied to an actual financial transaction. In the context of the Plaintiff's redemption, there are reasons to believe another participant (the Plaintiff's Sister) was willing to consider the price paid in the 2001 BHI Transactions to be market. I do not think it is appropriate to simply dismiss the conclusion – especially since the Plaintiff's redemption was executed at a meaningfully higher price.

## IV.C  Middleton Valuation

74. In the GPC Method, Stout reviewed and selected public companies similar to Middleton.[27] In my review of the report, I agree with the selections of Stout's guideline public companies. Stout selected multiples based on enterprise value to LTM EBITDA and enterprise value to LTM EBIT. Stout selected the lower quartile of the two multiples to determine the indicated enterprise value of Middleton.

75. I believe Stout should have selected lower multiples instead of the lower quartile of the guideline companies. Stout did not account for risk of litigation in the tobacco industry. While large industry players such as R.J. Reynolds or US Tobacco have the resources to fight any and all lawsuits, a smaller player such as Middleton does not have the requisite resources to continuously battle lawsuits. Additionally, significant legislative risk existed at the time of the valuation in the forms of potential product regulation and tax regulation which, if enacted, could have significantly decreased Company profitability. As Middleton faces more risk than the typical publicly traded tobacco company, its value should receive a lower multiple than what is currently given. This would decrease the value of the company.

## IV.D  McIntosh Valuation

76. Stout used the GPC Method to calculate the value of McIntosh.[28] In my review of the report, I agree with the companies Stout selected for the analysis. Stout selected a multiple based on enterprise value to LTM revenue. Stout selected the upper quartile multiple to determine the indicated value of McIntosh.

77. Stout should have selected a multiple materially below the median multiple rather than the upper quartile. McIntosh is significantly smaller than any of the public comparable companies, experienced negative growth over the 2001 and 2002 years and was barely profitable. Additionally, based on interviews with BHI management, McIntosh was clearly not a focus of management at the time of the valuation due to its small footprint and minimal cashflows. McIntosh is not a company that would trade at median GPC Method multiples. It would much more likely have traded at a low-end multiple.

## IV.E  Double Play Valuation

78. Stout used the March 29, 2002 *Forbes* magazine valuation of the Phillies to determine the indicated value of Double Play.[29] *Forbes* determined the value to be $231 million,

---

[27] Stout Report, page 36
[28] Stout report, page 37
[29] Stout report, page 38

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

18





up from the $207.7 million based on the 2001 Double Play transaction. I do not agree with Stout's reliance on the March 29, 2002 *Forbes* article to value the Phillies. In fact, I find it troubling that Stout would rely on a magazine article rather than the standard and recognized valuation approach of referencing a recent round of financing. Stout should have used the minority transaction from January 31, 2001 to value the Phillies because the transaction valuation represents an actual sale of the Company and is a stronger indication of value than *Forbes*' valuation. To my knowledge, there is no substantiation of value in the Forbes article, and one would call into question the article's source of information in reaching its conclusion. By relying on the *Forbes* magazine article to value the Phillies, Stout overstated the value of Double Play.

## IV.F  Other Subsidiaries

79.  In addition to Middleton, McIntosh, and Double Play, Stout also includes other assets and liabilities held by BHI's other subsidiaries in its value.[30] These subsidiaries are largely responsible for inter-company transactions and the application of shared services which is seen in many conglomerate structures as a method to appropriately cost and allocate overhead. Other assets and liabilities amount to $116.7 million which is largely driven by $109.4 million of cash held in Delfinco. Adding the additional assets and liabilities to BHI's value is incorrect because the cash balance of $109.4 million held in Delfinco does not reflect normal operations. The large cash balance was held as part of a planning process to purchase shares and pay for other obligations given the expiration of the GRAT. Because of these unusual circumstances surrounding the large cash balance, Stout should have considered a normalized cash balance in calculating the value of the Company.

## IV.G  Discounts

### IV.G.1  Conglomerate Discount

80.  Stout should have included a conglomerate discount when calculating the value of the Company. By electing not to include the conglomerate discount, Stout has failed to consider the negative aspects affecting conglomerates such as added complexity for investors to understand, additional layers of management, and the potential for losses from one subsidiary to dilute the profits of another.

### IV.G.2  Discount for Lack of Marketability

81.  I agree that a 27% DLOM is reasonable for the Company.[31] As discussed in Appendix C, I have observed that the range for a DLOM is from 10% (difference in discounts from registered private placements and unregistered placements) to 43% to 44% (mean and median from the IPO studies). Current valuation theory uses the factors from the Mandelbaum case and studies from Dr. Bajaj as the Industry standard for application of DLOM. No source provides an exact marketability discount. The determination is a matter of judgment; considering the analysis in Appendix C, I believe that a marketability discount near 30% is reasonable.

---

[30] Stout report, page 39
[31] Stout Report, page 39

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

19





**IV.H  Conclusion**

82. Stout added the values of Middleton, McIntosh, Double Play, and the assets and liabilities of BHI's other subsidiaries to determine the freely-traded aggregate equity value of Bradford Holdings, Inc., as of the valuation date, as $962.7 million.[32]

83. Stout then applied a 5% voting premium to the Class A voting shares, thereby adjusting up the Class A ownership to 0.148% of the Company and adjusting down the Class B ownership to 99.852% of the Company.[33] Stout multiplied the $962.7 million equity value by the ownership percentages to determine the freely-traded aggregate equity value for each share class. Finally, Stout applied a 27% discount for lack of marketability to the equity values to determine the indicated value per share. Stout calculated the Class A share price at $1,240 per share and the Class B share price at $1,181 per share.

84. As discussed throughout Section IV, Stout's values are not reasonable and are overstating the value of the Company both in its theoretical conclusion and by ignoring genuine market transactions in Bradford shares.

---

[32] Stout Report, page 39
[33] Stout Report, page 40



A Hilco Global Company
Vested in Your Success

# V. BHI Valuation as of February 28, 2003

## V.A Overview

85. I valued BHI as of February 28, 2003. I used the Guideline Public Company Method ("GPC Method"), the Guideline Merged or Acquired Method ("GMAC Method"), and the DCF Method to value the Company. I calculated a range of values for the Class A and Class B shares. I valued Middleton and McIntosh (the "Operating Assets") using the Market Approach. I then valued the combined projections for Middleton and McIntosh using the Income approach. I weighted the Market Approach and the Income Approach of the Operating Assets equally to determine the Total Enterprise Value ("TEV") of the Operating Assets. I then valued the Phillies (the "Non-operating assets") using the market approach to determine the value of the Non-operating Assets. I then added the TEVs of the BHI Operating Assets and Non-operating Assets to determine the TEV of BHI.



## V.B Middleton Valuation – Market Approach

## V.B.1 GPC Method

86. The guideline company method is used to estimate value based on an analysis of prices of the common stocks of guideline publicly traded companies ("Guideline Companies") that operate in the same industry as Middleton.

87. Applying this method, the first step was to identify publicly traded companies that were similar to Middleton in terms of business activity and financial status. All of the guideline companies that I selected had common stock that was traded on an organized stock market exchange. The guideline companies that I selected, utilizing Capital IQ, are listed in Exhibit 1a.

88. The second step was to calculate various valuation multiples for each of the guideline comps. In my guideline company analysis, I used a total enterprise value ("TEV") valuation approach. A TEV approach is commonly used in the valuation of closely

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

21





held companies to address capital structure differences between the subject company and the guideline comps. Accordingly, the financial fundamentals used in this analysis do not reflect the companies' interest expense.

89. A TEV valuation approach provides an indication of value that includes both net interest-bearing debt and equity. For purposes of this analysis, I calculate TEV as follows:

> Market value of short-term interest-bearing debt, including capitalized leases
> \+ Market value of long-term interest-bearing debt, including capitalized leases
> \+ Market value of preferred stock outstanding
> \+ Market value of common stock outstanding
> <u>- Cash & Cash Equivalents and Short-term Investments</u>
> = Total enterprise value

90. I calculated the ratios of the TEV of each of the guideline comps to their respective revenue, EBIT, and EBITDA. Those ratios or valuation multiples, are referred to in this report as:

- TEV/Revenue;
- TEV/EBIT; and
- TEV/EBITDA.

91. A summary of my valuation multiple calculations for the guideline companies are provided in Exhibits 1a and 1b. As these exhibits reflect, I analyzed these valuation multiples on the basis of the LTM ended February 28, 2003.

92. My calculation of the valuation multiples for each guideline company and the selection of the multiples to use in my analysis was performed as follows:

- Make appropriate adjustments to the historical financial fundamentals of the guideline companies;
- Calculate the guideline companies' LTM period valuation multiples for each of the relevant financial fundamentals;
- Identify the low, high, mean, and median of the guideline companies' valuation multiples;
- Review and analyze the historical performances of the guideline companies as compared to their respective valuation multiples and determine if positive or negative correlations exist;
- Compare the historical financial performance of the Company to the historical financial performances of the guideline companies for guidance in selecting appropriate valuation multiples; and
- Select appropriate valuation multiples and apply them to the corresponding financial fundamentals of the Company.

93. My valuation multiple selection process primarily involved analyses of historical ratios, company size (in terms of revenue and earnings), historical growth rates, and historical profitability. These multiples were chosen by comparing each of the following to the Company's respective financial metrics with the guideline companies and zeroing in on the most appropriate comparison multiple. Based on my analysis, I found the TEV/EBITDA and the TEV/EBIT as the only appropriate valuation multiples.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.          January 14, 2022

22





94. I used financial figures from the Bradford Holdings, Inc. & Subs U.S. income tax Filing for the year ended December 31, 2002[34] and applied multiples of guideline companies to the LTM period to arrive at a Fair Market Value of TEV.

95. **TEV/EBITDA:** The guideline companies' LTM EBITDA multiples ranged from 3.6x to 8.7x with a median of 6.0x and a mean of 6.2x. I applied an LTM EBITDA valuation multiple of 2.7x which is lower than the minimum multiple found in the compset. I applied a lower multiple to reflect the unique litigation and legislation risk that Middleton faces and its smaller size in comparison the comparable companies.

96. **TEV/EBIT:** The guideline companies' LTM EBIT multiples ranged from 4.2x to 13.7x, with a median of 7.9x and a mean of 8.3x. I selected and applied an LTM EBIT valuation multiple of 3.1x. I applied a multiple lower than the minimum to reflect the unique litigation and legislation risk the company faces and its smaller size in comparison the comparable companies.

97. Based on my guideline company valuation analysis, the FMV of the Enterprise Value of Middleton, as of the valuation date, was:

**$293.901 million.**

98. My guideline public company analysis is provided in Exhibits 1a and 1b.

## V.B.2   GMAC Method

99. The transaction method is used to estimate value based on an analysis of the transaction values of recently merged or acquired companies that operate in the same industry as Middleton.

100. Applying this method, the first step was to identify transactions of companies that were similar to Middleton in terms of business activity and size. The target companies selected in the comparable transactions are listed in Exhibit 2a. The most appropriate transaction to analyze would be a transaction of the Company's own stock. The 2001 BHI Transactions are the best indication of value for the Company; however, the 2001 BHI Transactions are only comparable to the consolidated companies of BHI and therefore cannot be used as a direct comparable to Middleton. The 2001 BHI Transactions will be used in my conclusion to determine a reasonable range of value of BHI.

101. The second step was to calculate various valuation multiples for each of the comparable transactions. In my comparable transaction analysis, I used a TEV approach.

102. I calculated the ratios of the TEV of each of the guideline transactions to their respective revenue, earnings before interest and taxes ("EBIT"), and earnings before interest taxes depreciation and amortization ("EBITDA"). Those ratios or valuation multiples, are referred to in this report as:

- TEV/Revenue;
- TEV/EBIT; and

---

[34] BHI050845_image

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

23





- TEV/EBITDA.

103. Based on my analysis, I found the TEV/EBITDA and TEV/EBIT as the appropriate valuation multiples.

104. A summary of my valuation multiple calculations for the guideline transactions are provided in Exhibits 2a and 2b. As these exhibits reflect, I analyzed these valuation multiples on the basis of the companies' metrics for the LTM period.

My calculation of the valuation multiples for each guideline transaction and my selection of the multiples to use in the analysis were performed as follows:

- Make appropriate adjustments to the historical financial fundamentals of the guideline companies;
- Calculate the guideline companies' LTM period valuation multiples for each of the relevant financial fundamentals;
- Identify the low, high, mean, and median of the guideline companies' valuation multiples;
- Review and analyze the historical performances of the guideline companies as compared to their respective valuation multiples and determine if positive or negative correlations exist;
- Compare the historical financial performance of the Company to the historical financial performances of the guideline companies for guidance in selecting appropriate valuation multiples; and
- Select appropriate valuation multiples and apply them to the corresponding financial fundamentals of the Company.

105. I used financial figures from the Bradford Holdings, Inc. & Subs U.S. Income Tax Filing for the year ended December 31, 2002[35] and applied multiples of guideline companies to the LTM period to arrive at a Fair Market Value of TEV. My valuation multiple selection process primarily involved analyses of company size (in terms of revenue and earnings) and profitability.

106. **TEV/EBITDA:** The guideline companies' LTM EBITDA multiples ranged from 0.5x to 9.4, with a median of 4.7x and a mean of 5.2x. Many of the transactions selected represent acquisitions of companies which operate outside the United States and would not be subject to the highly litigative environment in which Middleton operates. As a result, multiples derived from the comp set are likely overstated in comparison to how a U.S.-based tobacco products company would trade at the time the valuation. Correspondingly, I selected and applied the lower quartile LTM EBITDA valuation multiple of 1.9x.

107. **TEV/EBIT:** The guideline companies' LTM EBIT multiples ranged from 0.8x to 12.8x, with a median of 6.9x and a mean of 6.8x. Many of the transactions selected represent acquisitions of companies which operate outside the United States and would not be subject to the highly litigative environment in which Middleton operates. As a result, multiples derived from the comp set are likely overstated in comparison to how a United States based tobacco products company would trade at the time the valuation. Correspondingly, I selected and applied the lower quartile LTM EBIT valuation multiple of 3.6x.

---

[35] BHI050845_image

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                January 14, 2022

24





108. Based on my transaction analysis, as described above, the FMV of the Enterprise Value of Middleton as of the valuation date, was:

**$277.519 million.**

109. My transaction analysis is provided on Exhibits 2a and 2b.

### V.B.3  Conclusion

110. I then equally weighted the two methods to determine the FMV of the Enterprise Value of Middleton as of the valuation date, was:

**$285.710 million.**

111. My enterprise value analysis is provided in Exhibit 9a.

### V.C   McIntosh Valuation – Market Approach

### V.C.1   GPC Method

112. The guideline company method is used to estimate value based on an analysis of prices of the common stocks of guideline publicly traded companies ("guideline companies") that operate in the same industry as McIntosh.

113. Applying this method, the first step was to identify publicly traded companies that were similar to McIntosh in terms of business activity and financial status. All of the guideline companies that I selected had common stock that was traded on an organized stock market exchange. The guideline companies that I selected, utilizing Capital IQ, are listed in Exhibit 3a.

114. The second step was to calculate various valuation multiples for each of the guideline comps. In my guideline company analysis, I used a total enterprise value ("TEV") valuation approach. A TEV approach is commonly used in the valuation of closely held companies to address capital structure differences between the subject company and the guideline comps. Accordingly, the financial fundamentals used in this analysis do not reflect the companies' interest expense.

115. A TEV valuation approach provides an indication of value that includes both net interest-bearing debt and equity. For purposes of this analysis, I calculate TEV as follows:

> Market value of short-term interest-bearing debt, including capitalized leases
> + Market value of long-term interest-bearing debt, including capitalized leases
> + Market value of preferred stock outstanding
> + Market value of common stock outstanding
> <u>- Cash & Cash Equivalents and Short-term Investments</u>
> = Total enterprise value

116. I calculated the ratios of the TEV of each of the guideline comps to their respective revenue, EBIT, and EBITDA. Those ratios or valuation multiples, are referred to in this report as:

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

25



- TEV/Revenue;
- TEV/EBIT; and
- TEV/EBITDA.

117. A summary of my valuation multiple calculations for the guideline companies are provided in Exhibits 3a and 3b. As these exhibits reflect, I analyzed these valuation multiples on the basis of the LTM ended February 28, 2003.

118. My calculation of the valuation multiples for each guideline company and the selection of the multiples to use in its analysis was performed as follows:

- Make appropriate adjustments to the historical financial fundamentals of the guideline companies;
- Calculate the guideline companies' LTM period valuation multiples for each of the relevant financial fundamentals;
- Identify the low, high, mean, and median of the guideline companies' valuation multiples;
- Review and analyze the historical performances of the guideline companies as compared to their respective valuation multiples and determine if positive or negative correlations exist;
- Compare the historical financial performance of the Company to the historical financial performances of the guideline companies for guidance in selecting appropriate valuation multiples; and
- Select appropriate valuation multiples and apply them to the corresponding financial fundamentals of the Company.

119. My valuation multiple selection process primarily involved analyses of historical ratios, company size (in terms of revenue and earnings), historical growth rates, and historical profitability. These multiples were chosen by comparing each of the following to the Company's respective financial metrics with the guideline companies and zeroing in on the most appropriate comparison multiple. Based on my analysis, I found the TEV/Revenue as the only appropriate valuation multiples.

120. I used financial figures from the Bradford Holdings, Inc. & Subs U.S. Income Tax Filing for the year ended December 31, 2002[36] and applied multiples of guideline companies to the LTM period to arrive at a Fair Market Value of TEV.

121. **TEV/Revenue:** The guideline companies' LTM Revenue multiples ranged from 0.6x to 3.7x with a median of 1.9x and a mean of 2.0x. I chose a multiple between the lower quartile and the median to apply an LTM Revenue valuation multiple of 1.3x.

122. Based on my guideline company valuation analysis, the FMV of the Enterprise Value of McIntosh, as of the valuation date, was:

**$29.538 million.**

123. My guideline public company analysis is provided on Exhibits 3a and 3b.

---

[36] BHI050845_image

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.        January 14, 2022

26





### V.C.2   GMAC Method

124. The transaction method is used to estimate value based on an analysis of the transaction values of recently merged or acquired companies that operate in the same industry as the Company.

125. Applying this method, the first step was to identify transactions of companies that were similar to McIntosh in terms of business activity and size. The target companies selected in the comparable transactions are listed in Exhibit 4a. The most appropriate transaction to analyze would be a transaction of the Company's own stock. The 2001 BHI Transactions are the best indication of value for the Company; however, the 2001 BHI Transactions are only comparable to the consolidated companies of BHI and therefore cannot be used as a direct comparable to McIntosh. The 2001 BHI Transactions will be used in my conclusion to determine a reasonable range of value of BHI.

126. The second step was to calculate various valuation multiples for each of the comparable transactions. In my comparable transaction analysis, I used a TEV approach.

127. I calculated the ratios of the TEV of each of the guideline transactions to their respective revenue, earnings before interest and taxes ("EBIT"), and earnings before interest taxes depreciation and amortization ("EBITDA"). Those ratios or valuation multiples, are referred to in this report as:

- TEV/Revenue;
- TEV/EBIT; and
- TEV/EBITDA.

128. Based on my analysis, I found the TEV/EBITDA and TEV/EBIT as the appropriate valuation multiples.

129. A summary of my valuation multiple calculations for the guideline transactions are provided in Exhibits 4a and 4b. As these exhibits reflect, I analyzed these valuation multiples on the basis of the companies' metrics for the LTM period.

My calculation of the valuation multiples for each guideline transaction and my selection of the multiples to use in the analysis were performed as follows:

- Make appropriate adjustments to the historical financial fundamentals of the guideline companies;
- Calculate the guideline companies' LTM period valuation multiples for each of the relevant financial fundamentals;
- Identify the low, high, mean, and median of the guideline companies' valuation multiples;
- Review and analyze the historical performances of the guideline companies as compared to their respective valuation multiples and determine if positive or negative correlations exist;
- Compare the historical financial performance of the Company to the historical financial performances of the guideline companies for guidance in selecting appropriate valuation multiples; and

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

27





A Hilco Global Company
Vested in Your Success

- Select appropriate valuation multiples and apply them to the corresponding financial fundamentals of the Company.

130. I used financial figures from the Bradford Holdings, Inc. & Subs U.S. Income Tax Filing for the year ended December 31, 2002[37] and applied multiples of guideline companies to the LTM period to arrive at a Fair Market Value of TEV. My valuation multiple selection process primarily involved analyses of company size (in terms of revenue and earnings) and profitability.

131. **TEV/Revenue:** The guideline companies' LTM Revenue multiples ranged from 0.2x to 3.9x with a median of 2.5x and a mean of 2.5x. I chose a multiple between the lower quartile and the median to apply an LTM Revenue valuation multiple of 1.3x.

132. Based on my transaction analysis, as described above, the FMV of the Enterprise Value of McIntosh as of the valuation date, was:

**$29.906 million.**

133. My transaction analysis is provided on Exhibits 4a and 4b.

### V.C.3  Conclusion

134. I then equally weighted the two methods to determine the FMV of the Enterprise Value of McIntosh as of the valuation date, was:

**$29.722 million.**

135. My enterprise value analysis is provided in Exhibit 9a.

### V.D  Bradford Holdings – Income Approach

136. The DCF method is used to estimate value based on a projection of financial performance over future periods of time. The projected financial performance includes analyses of revenue, expenses, capital investment, residual value, capital structure, and required rates of return.

137. Based on the results of those analyses, a projection of economic cash flow from business operations is estimated for future periods of time. The resulting cash flow projection is discounted at an appropriate present value discount rate to estimate the present value of the future cash flow.

138. In addition to estimating the present value of future economic cash flow for a discrete period, the residual, or terminal, value of the business enterprise, if valued in perpetuity, is estimated as of the end of the discrete projection period. This terminal value is discounted to estimate its present value as well.

139. The present value of the cash flow projected for the discrete period is added to the present value of the terminal value to derive the value of the equity of the business enterprise.

---

[37] BHI050845_image

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

28





140. I used management-provided projected financial statements for the BHI's Operating Assets (projections which include consolidated results for Middleton and McIntosh) for fiscal years 2003 through 2007 (the "Projected Period").[38] I utilized these projections as the basis of my analysis.

141. Several cash flow adjustments were necessary to convert projected net income into projected debt free cash flow to the enterprise ("DFCF"), which is the cash flow measure to which the present value discount factor is applied. Projected depreciation and amortization expense and non-cash interest is added back, and projected capital expenditures are subtracted. Projected increases in operating working capital requirements are also subtracted.

142. **Depreciation and Amortization Expense:** I used projected depreciation and amortization expenses provided by management.[39]

143. **Capital Expenditures:** I used projected capital expenditures provided by management.[40]

144. **Operating Working Capital Requirements:** The annual incremental operating working capital requirement is generally described as that amount of cash needed during each year to finance additional working capital assets, such as accounts receivable and inventory. In general, as a business grows, it may need to invest cash from operations in working capital assets. This investment of cash is a negative cash flow for the purpose of quantifying the projected investment cash flow of the subject company. I relied on guidance from management and historical financial statements in projecting the incremental annual operating working capital requirements.

145. I utilized a WACC of 30% based on the Expert Report of Pieter Vorster.[41] Mr. Vorster is an industry expert and determined that at the valuation date the expected rate of return from a minority investment in Middleton would have been at least 30%. This is in line with my own calculated present value discount factor of 30.3%, using the Build-up method and based on discussions with Company management and industry analysis.  The high discount rate accounts for litigation risk and legislative risk in the tobacco industry. From 1996 to 2009, federal and state excise taxes increased dramatically for cigarettes and other tobacco products. During this time period, there was great uncertainty as to the scope and scale of increases in tobacco excise taxes. This particularly came to a head in the 2009 expansion of the State Children's Health Insurance Program ("SCHIP") funded by an increase in tobacco excise taxes. Federal taxes increased by $0.62 for a pack of cigarettes, $1.01 for a pack of little cigars, and $0.35 for a pack of cigarillos. This brought the federal excise taxes on little cigars in line with the taxes on cigarettes. According the CDC, the combined federal and state average excise tax on cigarettes increased by 290% from 1996 to 2009[42]. Although the period discussed here extends beyond the time of the Plaintiff's redemption transaction, it is certainly representative of the heightened sense of regulatory and legislative risk that was prevalent in 2001 to 2003. The risk of further tobacco taxes is

---

[38] BHI Projections provided by management
[39] BHI Projections provided by management
[40] BHI Projections provided by management
[41] Expert Report of Pieter Vorster, page 10
[42] CDC – Federal & State Cigarette Excise Taxes – United States, 1995-2009 - https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5819a2.htm

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

29





an appropriate factor in increasing the risk factors used in calculating the discount rate for Middleton.

146. Litigation risk also contributes to a high discount rate. According to Ibisworld industry reports, litigation and settlement payouts were the single greatest cost to the tobacco manufacturing industry as of the valuation date and was projected to remain significant for the foreseeable future.[43] Litigation against the tobacco industry came in full force in 1998 when the major U.S. tobacco firms settled tobacco litigation with the country's states, agreeing to pay $206 billion over 25 years for the purpose of receiving protection from further state lawsuits (The other four states had already settled for $40 billion).[44] The Engle lawsuit against tobacco firms at this time was also significant as it was the first class-action lawsuit against tobacco companies to proceed to trial, and it was the longest civil action in the history of tobacco litigation at the time. The initial jury verdict in 2000 awarded $145 billion in damages, although this was eventually lowered in the appeal process in May 2003. On September 22, 1999 the United States government filed suit against members of the tobacco industry.[45] The lawsuit had four counts: Count I sought recovery of medical payments made by the federal government under various federal programs, including Medicare, pursuant to the Medical Cost Recovery Act ("MCRA"). Count II sought recovery of payments by Medicare (but not other programs) under the Medicare Secondary Payor Act ("MSPA"). Counts III and IV sought "equitable" relief – injunctions and "disgorgement" – under the Racketeer Influenced and Corrupt Organizations ("RICO") statute. On September 28, 2000 the federal court agreed that the medical care cost portions of the government's lawsuit (Counts I and II) were without legal basis, and accordingly dismissed them. That means the government could no longer pursue claims for recovery of medical expenses paid by Medicare and other federal programs. It was, however, ruled that the Department of Justice could proceed with (1) its claims under the federal racketeering laws to give up profits allegedly obtained through fraud and deceit since the 1950s; and (2) injunctive relief to restrict tobacco companies' activities in the future. These lawsuits, and the numerous cases brought by individuals in the late 1990s and 2000s, highlight the litigation risk the Company faced. The Company is also much smaller than the major players in the industry, and as such would not have the financial depth to continuously defend itself, thus necessitating a higher discount rate.

147. Based on discussions with Company management and Industry analysis, I estimated a long-term DFCF growth rate of 2% for the terminal year analysis. I consider this long-term growth rate appropriate based on the rate of growth in the tobacco and hotel industries based on Ibisworld industry reports[46,47], historical inflation rates, and historical changes in GDP.

148. The capitalization rate used to estimate the terminal value is calculated by subtracting the estimated long-term growth rate from the WACC. The terminal year DFCF is divided by the capitalization rate to calculate the terminal value. I calculated the capitalization rate for the Company to be 28.0%.

---

[43] Tobacco Product Manufacturing in the US May 2003, page 14
[44] Tobacco Product Manufacturing in the US May 2003, page 29
[45] Tobacco Product Manufacturing in the US May 2003, page 32
[46] Tobacco Product Manufacturing in the US May 2003, page 5
[47] Hotels (except Casino Hotels) and Motels in the US September 2003, page 4





149. Based on my DCF analysis, as described above, the FMV of the Enterprise Value of the Bradford Operating Assets, as of the valuation date was:

**$291.000 million.**

150. My DCF analysis is provided on Exhibits 5a through 6.

## V.E   Double Play

151. During the fiscal year ended January 31, 2001 Double Play purchased an additional 9.1973% stake in the Phillies for $19.1 million. As mentioned previously, this transaction represented the purchase of a minority interest in the Phillies by another minority owner at a pro-rata value. I used this transaction as the basis for its analysis. I do not know of any subsequent comparable transactions.

152. I calculated the value of the Phillies by dividing $19.1 million by 9.1973% to determine a total enterprise value of $207.7 million. I then multiplied the enterprise value by the 35.75% Double Play stake. Based on my analysis, the FMV of the Enterprise Value of Double Play, as of the valuation date, was:

**$74.253 million.**

153. My analysis of Double Play is provided in Exhibit 7.

## V.F   Conclusion

154. I calculated a range of values for the Class A and Class B shares on a non-controlling, non-marketable basis.

## V.F.1   Lower Bound

155. I calculated the low end of the range based on the 2001 BHI Transactions between the sellers and the Company. I first calculated the indicated equity of BHI by multiplying the price per share paid in the transaction by the number of shares. The indicated BHI equity valuation of the transaction was $146.4 million (Exhibit 8a).

156. I rolled forward the price per share by dividing the $146.4 million by the updated share count as of the valuation date to determine the share price of the Class A stock to be $258 per share and the Class B stock to be $246 per share. (Exhibit 8b).

157. The 2001 BHI Transactions are a fair and reasonable indicator of FMV because they represent the most recent price at which the BHI stock has traded between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties having reasonable knowledge of relevant facts. In addition, court decisions frequently state that the hypothetical buyer and seller are assumed to be able as well as willing to trade and remain well informed about the property and the market for such property.

158. As I have stated previously, not only do the 2001 BHI Transactions represent a Fair Market Value price since it is an actual transaction, but it was later validated as a fair





price since the Plaintiff's Sister offered to sell her considerable stake in the Company at that price in December 2002.[48]

### V.F.2   Upper Bound

159.   I calculated the upper bound using the valuation of BHI in Section V of this report. As previously discussed, I used (1) the guideline publicly traded company method, (2) the guideline merged and acquired company method, and (3) the DCF method to estimate the FMV of the Enterprise Value of the Company.

160.   The market approach indicated a combined FMV of Enterprise Value of Middleton and McIntosh (the BHI Operating Assets) of $315.4 million. The income approach indicated a FMV of Enterprise Value of BHI Operating Assets of $291.0 million.

161.   I applied the following weights to each of the indications of value:

- Market Approach: 50%
- Income Approach: 50%

162.   I calculated the weighted FMV Enterprise Value of the BHI Operating Assets at $303.2 million. I then added the enterprise value of Double Play (the non-Operating Assets) to calculate the total Enterprise Value of BHI Holdings, Inc., as of the valuation date, to be $377.5 million.

163.   I then determined the equity value of BHI Holdings by adding what I believe to have been a normalized cash balance of $25.0 million to determine the FMV Equity Value of the Company of $402.5 million.

164.   I then subtracted a conglomerate discount of 20%. A conglomerate discount is applied to capture the negative aspects of conglomerates such as the complexity of operations, additional layers of management, and the potential for losses from one business to dilute the profits of another. Since BHI controlled all of its subsidiaries, including acting as the principal owner of the Phillies, I believe the conglomerate discount is appropriate. The equity value of BHI Holdings after the conglomerate discount was $322.0 million.

165.   To account for the power of voting shares over non-voting shares, I assigned a voting premium of 5% to the Class A voting shares. After adjusting for the voting premium, the Class A shares owned 0.148% of the Company and the Class B shares owned 99.852% of the Company.

### V.F.2.a   Class A Shares

166.   I calculated the 0.148% Class A ownership value to be $0.476 million. I then subtracted a 27% discount for lack of marketability to determine a Fair Market Value of the Class A ownership, as of the valuation date, of:

**$0.348 million.**

---

[48] 2002-12-19 Lucia Buyout Proposal

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                January 14, 2022

32



167. The Class A price per share, as of the valuation date, is:

**$415 per share.**

### V.F.2.b    Class B Shares

168. I calculated the 99.852% Class B ownership value to be $321.499 million. I then subtracted a 27% discount for lack of marketability to determine a Fair Market Value of the Class B ownership, as of the valuation date, of:

**$234.694 million.**

169. The Class B price per share, as of the valuation date, is:

**$395 per share.**

### V.F.3   Conclusion

170. I determined the fair and reasonable range of values for the Class A shares to be $258 to $415 per share. The February 28, 2003 transaction Class A price per share was $288 and is therefore within the reasonable range.

171. I determined the range of values for the Class B shares to be within $246 to $395 per share. The February 28, 2003 transaction Class B price per share was $275 and is therefore in the reasonable range.

172. My analysis of the enterprise value and share price is provided in Exhibits 9a and 9b.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

33




A Hilco Global Company
Vested in Your Success

# VI.    Gould & Pakter Damages Review

## VI.A  Overview

173. Gould & Pakter outlines two models to calculate damages owed to the Plaintiff. The first model assumes Plaintiff sold her shares at the share price determined by the Stout report. The second model assumes Plaintiff did not sell her shares but retains her interest in the Company and instead received dividends and distributions over time. In my analysis I assume the methodology of both of Gould & Pakter's models is correct and I restate those values based on my determination of value. The following table summarizes Gould & Pakter's calculations and my calculations.

**Damages Summary**

| | Pakter Model 1 | Hilco Low End Model 1 | Hilco Mid Point Model 1 | Hilco High End Model 1 |
|---|---|---|---|---|
| Anna Nupson 1994 Trust | | | | |
| Net Principal Shortfall | $49,488,022 | $0 | $3,279,235 | $6,558,471 |
| Unitrust Shortfall | $8,953,380 | $0 | $604,429 | $1,208,858 |
| Additional Available Funds in the Income Account | $40,045,780 | $0 | $2,765,056 | $5,530,112 |
| | | | | |
| Anna Nupson 2001 Sub Trust | | | | |
| Net Principal Shortfall | $59,947,516 | $0 | $3,972,325 | $7,944,649 |
| Investment Income Foregone due to Principal Shortfall | $9,867,776 | $0 | $729,346 | $1,458,693 |
| **Total Damages** | **$168,302,474** | **$0** | **$11,350,391** | **$22,700,783** |

| | Pakter Model 2 | Hilco Low End Model 2 | Hilco Mid Point Model 2 | Hilco High End Model 2 |
|---|---|---|---|---|
| Anna Nupson 1994 Trust | | | | |
| Net Principal Shortfall | $347,413,147 | $0 | $0 | $0 |
| Unitrust Shortfall | $38,173,004 | $0 | $0 | $0 |
| Additional Available Funds in the Income Account | $157,390,489 | $0 | $0 | $0 |
| | | | | |
| Anna Nupson 2001 Sub Trust | | | | |
| Net Principal Shortfall | $271,762,351 | $0 | $0 | $0 |
| Investment Income Foregone due to Principal Shortfall | $71,912,791 | $0 | $0 | $0 |
| **Total Damages** | **$886,651,781** | **$0** | **$0** | **$0** |

Note: The Hilco mid point values are the average of the low end and high end values.
Note: Plaintiff may have been able to access the additional available funds if she persuaded the trustees to distribute the funds.

## VI.B  Model 1 Review

### VI.B.1    Gould & Packer Damages Calculation Summary – Model 1

174.  In Gould & Pakter's analysis, the Plaintiff's economic damages flowing from the Anna Nupson 1994 Trust exceed $8.9 million ("Model 1"). In Model 1, the 1994 Trust receives $83.9 million based on a Class A share price of $1,240 per share and a

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

34





A Hilco Global Company
Vested in Your Success

Class B share price of $1,181 per share. This is an additional $64.3 million over the actual purchase price which amounts to $49.5 million after tax.

- In Gould & Pakter's analysis, the Plaintiff has a net principal shortfall of $49.5 million.
- In Gould & Pakter's analysis, this net principal amount is grown at the historical rate of return of the Trust from February 26, 2003 through December 31, 2021, less historical management fees and taxes to arrive at the net income shortfall. The net income shortfall from the Trust amounts to $40.0 million. The Plaintiff may have been able to access these funds in the income account had she been able to persuade the trustees to distribute the funds to her. There is no evidence that I have seen that the trustees would have distributed additional funds.
- In Gould & Pakter's analysis, the lost Unitrust distributions from July 2019 through December 2021 amount to funds in excess of $8.9 million. Plaintiff, under this model, would continue to receive distributions exceeding $298,000 per month on and after January 1, 2022, over and above the $8.9 million.

175. In the Gould & Pakter report the Plaintiff's economic damages relating to the Anna Nupson 2001 Sub Trust exceed $59.9 million ("Model 1"). In Model 1, the Sub Trust receives $101.6 million based on a Class B share price of $1,181 per share. This is an additional $77.9 million over the actual purchase price which amounts to $59.9 million after tax.

- In Gould & Pakter's analysis, the Plaintiff has a net principal shortfall of $59.9 million.
- In Gould & Pakter's analysis, this net principal amount is grown at the historical rate of return of the Trust from February 28, 2003 through December 31, 2021, less historical management fees and taxes. The net income shortfall from the Trust amounts to funds in excess of $9.8 million. The Plaintiff may have been able to access these funds in the income account had she contested the trustees' discretion. There is no evidence that I have seen that the trustees would have distributed additional funds.

### VI.B.2  My Rebuttal of the Damages Model 1

#### VI.B.2.a    Premise of Damages

176. The Model 1 Damages focus on the monetary losses allegedly suffered by the Plaintiff as a result of being paid a price in the redemption transaction that was less than Fair Market Value. This being the case, the calculation of any damages should focus on the difference between the amount paid for the Plaintiff's shares and the amount she should have been paid under the premise of Fair Market Value. In addition, there would have been a compounding effect on those damages as there would be the notion that the increased proceeds would have generated an economic return over time. Of course, this calculation is highly dependent on significant assumptions over the subsequent 18 years.

177. I believe that there are no damages to be realized by the Plaintiff other than the opportunity cost had she done nothing. Of course, that conclusion has the benefit of perfect hindsight. The reason I see no damages is that I believe Fair Market Value would have been consistent with the 2001 BHI Transaction and, in fact, the Plaintiff





A Hilco Global Company
Vested in Your Success

was paid more than the price paid in the 2001 BHI Transaction as a result of Mr. Middleton raising the price to cover the lower share count, additional taxes, and Company performance. The Plaintiff was under no compulsion to sell yet chose to sell her shares. It is reasonable to believe that she thought she was receiving Fair Market Value at the time of the redemption. In fact, based on her sister's offer to sell shares based on the 2001 BHI Transactions, she might have thought she was receiving more than Fair Market Value.

178. Since the price paid in the 2001 BHI Transaction forms the lower bound of my valuation of Bradford shares, it follows that $0 is the low end of my damages calculation.

179. For the upper bound of any damages calculation, I believe it is appropriate to use the high end of my valuation of BHI shares as of February 28, 2003 despite the fact the Plaintiff could have held out for a higher price had she felt at the time she was not receiving a fair price.

### VI.B.2.b    My Calculation of Damages – Model 1

180. As a result, my calculation of the high end of the damages begins with a Class A share price of $415, versus the $288 price paid and a Class B share price of $395 versus the $275 price paid.

181. Under these share prices, the 1994 Trust would receive $28.1 million based on Class A share price of $415 per share and a Class B share price of $395 per share. This is an additional $8.5 million above the actual purchase price which amounts to $6.6 million after tax. I calculate that the Plaintiff's economic damages relating to the Anna Nupson 1994 Trust are $1.2 million (consistent with the Pakter methodology). Additionally, the Plaintiff may have been able to access $5.5 million in additional funds if she persuaded the trustees to distribute them.

- I calculate that the Plaintiff has a net principal shortfall of $6.6 million.
- I calculate this net principal amount is grown at the historical rate of return of the Trust from February 26, 2003 through December 31, 2021, less historical management fees and taxes to arrive at the net income shortfall. The net income shortfall from the Trust amounts to $5.5 million. The Plaintiff may have been able to access these funds in the income account had she been able to persuade the trustees to distribute the funds to her. There is no evidence that I have seen that the trustees would have distributed additional funds.
- I calculate that the lost Unitrust distributions from July 2019 through December 2021 amount to $1.2 million. Plaintiff, under this model, would continue to receive distributions of $40,295 per month on and after January 1, 2022, over and above the $1.2 million

182. I calculate that the Plaintiff's economic damages relating to the Anna Nupson 2001 Sub Trust are $7.9 million. Additionally, the Plaintiff may have been able to access $1.5 million in additional funds if she persuaded the trustees to distribute them. The 2001 Sub Trust receives $34.0 million based on a Class B share price of $409 per share. This is an additional $10.3 million over the actual purchase price which amounts to $7.9 million after tax.

- Plaintiff has a net principal shortfall of $7.9 million.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                January 14, 2022

36





A Hilco Global Company
Vested in Your Success

- This net principal amount is grown at the historical rate of return of the Trust from February 26, 2003 through December 31, 2021, less historical management fees and taxes. The net income shortfall from the Trust amounts to funds of $1.5 million. The Plaintiff may have been able to access these funds in the income account had she been able to persuade the trustees to distribute them. There is no evidence that I have seen that the trustees would have distributed additional funds.

183. Calculation of my damages can be found in Exhibits 10a and 10b.

## VI.C  Model 2 Review

### VI.C.1    Gould & Packer Damages Calculation Summary – Model 2

184. In Gould & Pakter's analysis, the Plaintiff's economic damages flowing from the Anna Nupson 1994 Trust exceed $38.1 million ("Model 2"). In Model 2, Anna does not sell her shares and retains her interest in BHI, receiving distributions and dividends over time. Anna would have received distributions from the 2005/2006 sales of the McIntosh hotels and from the 2007 sale of Middleton.

- In Gould & Pakter's analysis, the Plaintiff, under this model, may have been able to access in excess of $157.3 million in additional available funds in the income account had she contested the trustees' discretion. This is calculated by adding the net principal shortfall to the net income shortfall and subtracting the total principal net of taxes. Plaintiff's distributions would have amounted to an additional $224 million net of taxes. This total principal amount is grown at the historical rate of return of the Trust from February 26, 2003 through December 31, 2021, less historical management fees and taxes. The net principal shortfall from the Trust amounts to $347.4 million. Dividends received, subtracting management fees and taxes, amount to a $34.3 million net income shortfall.
- In Gould & Pakter's analysis, the lost Unitrust distributions from July 2019 through December 2021 amount to funds in excess of $38.1 million. Plaintiff, under this model, would continue to receive distributions exceeding $1,272,000 per month on and after January 1, 2022, over and above the $38.1 million.
- In Gould & Pakter's analysis, Anna Nupson would receive the principal shortfall effective February 1, 2028, computing this amount as of December 31, 2021. Anna Nupson would, under this model, only receive these funds on February 1, 2028.

185. In Gould & Pakter's analysis, the Plaintiff's economic damages relating to the Anna Nupson 2001 Sub Trust exceed $271.7 million ("Model 2"). In Model 2, Anna does not sell her shares and retains her interest in BHI, receiving distributions and dividends over time. Anna would have received distributions from the 2005/2006 sales of the McIntosh hotels and from the 2007 sale of Middleton.

- In Gould & Pakter's analysis, the Plaintiff, under this model, may have been able to access in excess of $271.7 million in additional available funds in the income account had she contested the trustees' discretion. Plaintiff's distributions from the sale of McIntosh and JMI would have amounted to an additional $271.7 million net of taxes.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                          January 14, 2022

37





- In Gould & Pakter's analysis, the Plaintiff, under this model, may have been able to access in excess of $71.9 million in additional available funds in the income account had she contested the trustees' discretion. This is calculated by adding the net principal shortfall to the net income shortfall and subtracting the total principal net of taxes. Plaintiff's distributions would have amounted to an additional $271.8 million net of taxes. This total principal amount is grown at the historical rate of return of the Trust from February 26, 2003 through December 31, 2021, less historical management fees and taxes. The net principal shortfall from the Trust amounts to $301.1 million. Dividends received, subtracting management fees and taxes, amount to a $42.6 million net income shortfall.
- In Gould & Pakter's analysis, Anna Nupson would receive the principal shortfall effective February 1, 2028, computing this amount as of December 31, 2021. Anna Nupson would, under this model, only receive these funds on February 1, 2028.

## VI.C.2  My Rebuttal of the Damages Model 2

### VI.C.2.a    Premise of Damages

186. The premise of Model 2 (lost gains had the Plaintiff done nothing) is not a valuation issue. The idea that the Plaintiff is entitled to damages for willingly entering into a transaction does not necessarily focus on the idea that the price paid by the Company as part of the redemption transaction was insufficient. These "damages" rely entirely on the benefit of hindsight. As I have argued in reviewing Model 1, if the Plaintiff thought the price being offered by the Company for her shares was inadequate, then she should have done nothing. However, she sold at what she believed to have been a fair price. Holding BHI shares was a viable option which she chose not to exercise. It follows that there are no possible valuation-related damages under the scenario in which she held her BHI shares.

## VI.D  Additional Assumptions

187. **Management Fees from the Trusts**
The report assumed that significant increases in funds received, discussed above, would have resulted in additional returns on the invested funds, these same significant increases would have resulted in increased investment advisory compensation and/or management services. Gould & Pakter determined that the average investment advisory compensation and/or management services from approximately March 2003 to June 2019 for the Anna Nupson 1994 Trust was 3.40% and that the average investment advisory compensation and/or management services from approximately March 2003 through January 2021 for the Anna Nupson 2001 Sub Trust was 1.90%. Gould & Pakter reduced Anna Nupson's economic damages by these increased investment advisory compensation and/or management services costs.

188. **Taxes from additional income**
While the significant increases, as discussed above, would have resulted in additional returns on the invested funds, these same significant increases would have resulted in additional capital gains taxes and additional income taxes. Gould & Pakter assumed the following income tax rates would apply capital gains taxes of 15% on the BHI 2007-2008 Distributions; capital gains taxes of 20% on all other principal amounts; Trust income taxes of 37% on all dividends; and 3.07% Pennsylvania state





taxes. Both capital gains taxes and ordinary taxes were computed without deducting the investment advisory compensation and/or management services costs, due to the likely application of alternative minimum tax (AMT). Gould & Pakter assumed all other Trust expenses like legal, accounting and tax preparation fees would not vary with additional returns on invested funds and, accordingly, would have no impact on my economic damages modeling.



*A Hilco Global Company*
Vested in Your Success

# VII.   Additional Valuation Information

**VII.A Certification of Valuation**

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. My engagement in this assignment is not contingent upon developing or reporting predetermined results.

4. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this valuation.

5. No individuals have provided significant valuation assistance to the person(s) signing this certification.

6. No one that worked on this engagement has any known financial interest in the Company, its shareholders, any of its related entities, or the outcome of the analysis.

7. This report is solely for use in the cited dispute, for the purpose stated herein, and is not to be referred to or distributed, in whole or in part, without prior written consent.

John Fenn
Senior Managing Director





**VII.B Statement of Conditions**

1. Hilco Enterprise Valuation Services, LLC; Hilco Valuation Services, LLC; and Hilco Global (collectively "Hilco") and its principals assume no responsibility for the legal description or matters including legal or title considerations. Title to the subject business interest is assumed to be good and marketable unless otherwise stated.

2. The subject business and/or intangible asset ownership interest(s) is/are appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3. We assume responsible ownership and competent management with respect to the subject business and/or intangible asset ownership interest(s).

4. The information furnished to us by others is believed to be complete and accurate. However, we did not make independent examinations of this information. Accordingly, we make no representations or warranties, nor do we express any opinion, regarding the accuracy or reasonableness of such information.

5. We assume no hidden or unapparent conditions regarding the subject business and/or intangible asset ownership interest(s).

6. We assume that there is full compliance with all applicable federal, state, and local regulations and laws unless the lack of compliance is stated, defined, and considered in this report.

7. We assume that all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state, or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in this report is based.

8. Unless otherwise stated in this report, we did not observe, and we have no knowledge of, the existence of hazardous materials with regard to the subject business and/or intangible asset ownership interest(s). However, we are not qualified to detect such substances. We assume no responsibility for such conditions or for any expertise required to discover them.

9. Possession of this report does not carry with it the right of publication. It may not be used for any purpose by any person other than the client to whom it is addressed without our written consent, and, in any event, only with proper written qualifications and only in its entirety.

10. We, by reason of this valuation report, are not required to give testimony or to be in attendance in court with reference to the business and/or intangible asset ownership interest(s) in question unless arrangements have previously been made.

11. Neither all nor any part of the contents of this report shall be disseminated to the public through advertising, public relations, news, sales, or other media without our prior written consent and approval.

12. The analyses, opinions, and conclusions presented in this report apply to this engagement only and may not be used out of the context presented herein. This report





is valid only as of the valuation date specified herein and only for the purpose specified herein.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                              January 14, 2022

42





## VIII.  Appendix A - Valuation Exhibits



A Hilco Global Company
Vested in Your Success

**Market Approach**
**Guideline Publicly Traded Company Method**
**Market Pricing Multiples as of** 2/28/2003

*Exhibit 1a*

(in $000,000's)

*John Middleton, Inc.*

## Market Pricing Multiples as of 2/28/2003

| Ticker | Company Name | Name At Valuation Date | Filing Date | Enterprise Value | Revenue | LTM EBITDA | EBIT | LTM Multiples Revenue | EBITDA | EBIT |
|---|---|---|---|---|---|---|---|---|---|---|
| LSE:BATS | British American Tobacco p.l.c. | AMEX:BTI | December-02 | $27,742 | $17,061 | $4,661 | $3,509 | 1.6x | 6.0x | 7.9x |
| NYSE:IL | Loews Corporation | NYSE:LTR | December-02 | 17,396 | 17,495 | 2,246 | 1,920 | 1.0x | 7.7x | 9.1x |
| NYSE:MO | Altria Group, Inc. | Philip Morris Companies, Inc. - NYSE:MO | December-02 | 98,577 | 62,182 | 18,476 | 17,145 | 1.6x | 5.3x | 5.7x |
| IQ24047934 | R.J. Reynolds Tobacco Holdings, Inc. | NYSE:RJR | December-02 | 4,404 | 6,211 | 1,232 | 1,059 | 0.7x | 3.6x | 4.2x |
| OM:SWMA | Swedish Match AB (publ) | NASDAQ:SWMAY | December-02 | 3,065 | 1,569 | 351 | 277 | 2.0x | 8.7x | 11.1x |
| IQ190876 | UST LLC | NYSE:UST | December-02 | 5,595 | 1,639 | 912 | 862 | 3.4x | 6.1x | 6.5x |
| NYSE:VGR | Vector Group Ltd. | NYSE:VGR | December-02 | 581 | 311 | (1) | (15) | 1.9x | N/A | N/A |
| LSE:IMB | Imperial Brands PLC | | December-02 | 16,548 | 4,140 | 1,516 | 1,210 | 3.4x | 8.7x | 13.7x |

| | Revenue | EBITDA | EBIT |
|---|---|---|---|
| Minimum | 0.7x | 3.6x | 4.2x |
| Lower Quartile | 1.0x | 4.9x | 5.7x |
| Mean | 1.7x | 6.2x | 8.3x |
| Median | 1.6x | 6.0x | 7.9x |
| Upper Quartile | 2.0x | 8.0x | 11.1x |
| Maximum | 3.4x | 8.7x | 13.7x |
| Selected Multiple | n/a | 2.7x | 3.1x |

Source: S&P Capital IQ

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.    January 14, 2022

44



**Hilco.**
Valuation Services

*A Hilco Global Company*
*Vested in Your Success*

---

**Market Approach**
**Guideline Publicly Traded Company Method**
**Multiple Selection and Valuation Summary**                    *Exhibit 1b*

*John Middleton, Inc.*

| Financial Fundamentals | John Middleton, Inc. (in $000's) | Low | High | Mean | Median | Selected Pricing Multiples | Indicated Value (in $000's) |
|---|---|---|---|---|---|---|---|
| | | \multicolumn{4}{Industry Pricing Multiples}| | |
| **EBITDA:** | | | | | | | |
| 2002 | $106,024 | 3.6x | 8.7x | 6.2x | 6.0x | 2.7x | $284,233 |
| | | | | | | | |
| **EBIT:** | | | | | | | |
| 2002 | $97,337 | 4.2x | 13.7x | 8.3x | 7.9x | 3.1x | $303,570 |
| | | | | | **Implied Enterprise Value** | | $293,901 |

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

45



Hilco Valuation Services

A Hilco Global Company
Vested in Your Success

**Market Approach**
**Guideline Merged or Acquired Company Method**
**Market Pricing Multiples**

*Exhibit 2a*
(in $000,000's)

*John Middleton, Inc.*

## Summary Valuation Multiples

| Acquisition Date | Target Company | Acquirer | Transaction Amount | Enterprise Value | LTM Revenue | LTM EBITDA | LTM EBIT | Adjusted Multiples Revenue | EBITDA | EBIT |
|---|---|---|---|---|---|---|---|---|---|---|
| October-01 | Austria Tabak GmbH & Co.KG | JTI UK Limited | $1,493 | $2,076 | $32,579 | $3,948 | $2,632 | 0.1x | 0.5x | 0.8x |
| June-01 | Massalin Particulares S.R.L. | Philip Morris Companies Incorporated (f/k/a Altria Group, Inc.) | 35 | 618 | 389 | 134 | 116 | 1.6x | 4.6x | 5.3x |
| June-01 | Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes SAS | Altadis S.A. | 54 | 2,435 | 26,796 | 2,582 | 2,345 | 0.1x | 0.9x | 1.0x |
| April-01 | Tabacos S.A. | Imperial Tobacco Group PLC (f/k/a Imperial Brands PLC) | 256 | 2,533 | 1,640 | N/A | 348 | 1.5x | N/A | 7.3x |
| May-01 | Benidi American Tobacco Australasia Limited | British American Tobacco p.l.c. | 592 | 2,937 | 3,817 | 311 | 240 | 0.8x | 9.4x | 12.2x |
| March-01 | Massalin Particulares S.R.L. | FTR Holding S.A. | 219 | 677 | 358 | 116 | 98 | 1.9x | 5.9x | 6.9x |
| July-00 | Nabkoa Picardie S.A.H.C.v.F. (aka British American Tobacco Argentina S.A.H.C.v.F.) | British American Tobacco p.l.c. | 33 | 148 | 270 | 50 | 41 | 0.5x | 2.9x | 3.6x |
| July-00 | Gevrali Cigar Holdings, Inc. | Swedish Match AB (publ) | 278 | 301 | 178 | 32 | 24 | 1.7x | 9.3x | 12.8x |
| February-00 | Imasco Ltd. | Imperial Tobacco Canada Limited | 11,191 | 16,536 | 8,706 | 3,538 | 3,272 | 1.9x | 4.7x | 5.1x |
| September-99 | W.D. & H.O. Wills Holdings, Ltd. | Rothmans Holdings Ltd. (f/k/a British American Tobacco Australasia Limited) | 158 | 738 | 1,797 | N/A | 74 | 0.4x | N/A | 10.0x |
| January-99 | Consolidated Cigar Holings | Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes SAS | 733 | 729 | 285 | 84 | 76 | 2.6x | 8.7x | 9.6x |
| July-98 | Douwe Egberts Van Nelle Tobacco | Imperial Tobacco Group PLC (f/k/a Imperial Brands PLC) | 1,080 | 1,080 | 300 | N/A | N/A | 3.6x | N/A | N/A |

| | Revenue | EBITDA | EBIT |
|---|---|---|---|
| Minimum | 0.1x | 0.5x | 0.8x |
| Lower Quartile | 0.4x | 1.9x | 3.6x |
| Mean | 1.4x | 5.2x | 6.8x |
| Median | 1.6x | 4.7x | 6.9x |
| Upper Quartile | 1.9x | 9.0x | 10.0x |
| Maximum | 3.6x | 9.4x | 12.8x |
| Selected Multiple | n/a | 1.9x | 3.6x |

Source: Capital IQ

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

46



**Hilco**
Valuation Services

A Hilco Global Company
Vested in Your Success

**Market Approach**
**Guideline Merged or Acquired Company Method**
**Multiple Selection and Valuation Summary**                    *Exhibit 2b*

*John Middleton, Inc.*

| Financial Fundamentals | John Middleton, Inc. (in $000's) | Transaction Pricing Multiples | | | | Selected Pricing Multiples | Indicated Value (in $000's) |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| **EBITDA:** | | | | | | | |
| 2002 | $106,024 | 0.5x | 9.4x | 5.2x | 4.7x | 1.9x | $205,426 |
| **EBIT:** | | | | | | | |
| 2002 | $97,337 | 0.8x | 12.8x | 6.8x | 6.9x | 3.6x | $349,612 |
| | | | | | | **Implied Enterprise Value** | **$277,519** |



A Hilco Global Company
Vested in Your Success

# Market Approach
## Guideline Publicly Traded Company Method
### Market Pricing Multiples as of 2/28/2003

*Exhibit 3a*

(in $000,000's)

*McIntosh Inns*

### Market Pricing Multiples as of 2/28/2003

| Ticker | Company Name | Name At Valuation Date | Filing Date | Enterprise Value | LTM Revenue | LTM EBITDA | LTM EBIT | LTM Multiples Revenue | EBITDA | EBIT |
|---|---|---|---|---|---|---|---|---|---|---|
| IQ250572 | Arlington Hospitality, Inc. | Amerihost Properties, Inc. | December-02 | $95 | $77 | $8 | $3 | 1.2x | 11.8x | 37.4x |
| OTCPK:CNDL | Candlewood Hotel Company, Inc. | Candlewood Hotel Company, Inc. | December-02 | $165 | $268 | ($4) | ($10) | 0.6x | N/A | N/A |
| IQ321708 | ShoLodge, Inc. | ShoLodge, Inc. | December-02 | $104 | $28 | ($9) | ($12) | 3.7x | N/A | N/A |
| IQ366667 | Hudson Hotels Corp. | Hudson Hotels Corp. | September-02 | $113 | $45 | $14 | $7 | 2.5x | 8.2x | 16.0x |

| | Revenue | EBITDA | EBIT |
|---|---|---|---|
| Minimum | 0.6x | 8.2x | 16.0x |
| Lower Quartile | 0.8x | n/a | n/a |
| Mean | 2.0x | 10.0x | 26.7x |
| Median | 1.9x | 10.0x | 26.7x |
| Upper Quartile | 0.8x | n/a | n/a |
| Maximum | 3.7x | 11.8x | 37.4x |
| Selected Multiple | 1.3x | n/a | n/a |

Source: S&P Capital IQ.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

48


**Hilco**
Valuation Services

| A Hilco Global Company
Vested in Your Success

**Market Approach**

**Guideline Publicly Traded Company Method**

**Multiple Selection and Valuation Summary**                                    *Exhibit 3b*

*McIntosh Inns*

| Financial Fundamentals | McIntosh Inns (in $000's) | Industry Pricing Multiples | | | | Selected Pricing Multiples | Indicated Value (in $000's) |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| **Revenue:** | | | | | | | |
| 2002 | 22,406 | 0.6x | 3.7x | 2.0x | 1.9x | 1.3x | $29,538 |
| | | | | | **Implied Enterprise Value** | | $29,538 |

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

49



Hilco Valuation Services

A Hilco Global Company
Vested in Your Success

# Market Approach
## Guideline Merged or Acquired Company Method
### Market Pricing Multiples

*Exhibit 4a*

(in $000,000's)

*McIntosh Inns*

**Summary Valuation Multiples**

| Acquisition Date | Target Company | Acquirer | Transaction Amount | Enterprise Value | LTM Revenue | LTM EBITDA | LTM EBIT | Adjusted Multiples Revenue | Adjusted Multiples EBITDA | Adjusted Multiples EBIT |
|---|---|---|---|---|---|---|---|---|---|---|
| May-02 | Suburban Lodges of America, Inc. | InTown Suites, Inc | $219 | $198 | $76 | $25 | $15 | 2.6x | 7.9x | 13.6x |
| January-01 | Sunburst Hospitality Corporation | | 330 | 384 | 212 | 61 | 35 | 1.8x | 6.3x | 11.0x |
| June-00 | Homestead Village Incorporated | Security Capital Group Incorporated | 65 | 936 | 238 | 107 | 64 | 3.9x | 8.8x | 14.7x |
| October-00 | Courtyard By Marriott II LP | Marriott International, Inc. | 651 | 673 | 299 | 85 | 57 | 2.3x | 7.9x | 11.8x |
| December-00 | CMH One Hotels LP | Marriott International, Inc. | 457 | 476 | 206 | 63 | 44 | 2.3x | 7.6x | 10.8x |
| March-00 | Bristol Hotels & Resorts | Bass PLC (fka InterContinental Hotels Group PLC) | 164 | 156 | 757 | 15 | 12 | 0.2x | 10.2x | 12.8x |
| November-99 | Promus Hotel Corporation | Hilton Worldwide, Inc. (fka Hilton Worldwide Holdings Inc.) | 3,902 | 3,869 | 1,109 | 414 | 330 | 3.5x | 9.4x | 11.7x |
| August-99 | Red Roof Inns Inc | Accor SA | 1,142 | 1,129 | 372 | 147 | 109 | 3.0x | 7.7x | 10.3x |
| May-99 | Signature Inns, Inc | Jameson Inns, Inc. | 127 | 127 | 117 | 42 | 16 | 2.8x | 7.4x | 10.4x |
| May-98 | Red Lion Inns LP | Boykin Lodging Co. | 236 | 236 | 236 | 40 | 26 | N/A | 9.1x | 15.0x |
| March-98 | Chartwell Leisure Inc. (aka.W.W Leisure, Inc) | West Street Capital Partners, Westmont Hospitality Group, Inc., Whitehall Street | 328 | 272 | 127 | 24 | 15 | 2.1x | N/A | N/A |

| | Revenue | EBITDA | EBIT |
|---|---|---|---|
| Minimum | 0.2x | 6.3x | 10.3x |
| Lower Quartile | 2.1x | 7.5x | 10.7x |
| Mean | 2.5x | 8.2x | 12.2x |
| Median | 2.5x | 7.9x | 11.8x |
| Upper Quartile | 3.1x | 9.2x | 13.9x |
| Maximum | 3.9x | 10.2x | 15.0x |
| Selected Multiple | 1.3x | n/a | n/a |

Source: Capital IQ

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.          January 14, 2022

50



 A Hilco Global Company
Vested in Your Success

**Market Approach**
**Guideline Merged or Acquired Company Method**
**Multiple Selection and Valuation Summary**                    *Exhibit 4b*

*McIntosh Inns*

| Financial Fundamentals | McIntosh Inns (in $000's) | Transaction Pricing Multiples | | | | Selected Pricing Multiples | Indicated Value (in $000's) |
|---|---|---|---|---|---|---|---|
| | | Low | High | Mean | Median | | |
| **Revenue:** | | | | | | | |
| 2002 | 22,406 | 0.2x | 3.9x | 2.5x | 2.5x | 1.3x | $29,906 |
| | | | | | Implied Enterprise Value | | $29,906 |

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

51



A *Hilco* Global Company
Vested in Your Success

---

## Income Approach
## Discounted Cash Flow Method
## Weighted Average Cost of Capital                    *Exhibit 5a*

*Bradford Holdings, Inc.*

| Cost of Equity Capital: | Weighted Average Cost of Capital | Source |
|---|---|---|
| Risk-free Rate of Return | 4.70% | [a] |
| Long-term Equity Risk Premium | 7.00% | [b] |
| Industry Risk Premium per Exhibit 5b | -2.86% | |
| Size Equity Risk Premium | 3.50% | [c] |
| Unsystematic Equity Risk Premium | 18.00% | [d] |
| **Total Cost of Equity Capital** | **30.34%** | |
| | | |
| **Cost of Debt Capital:** | | |
| Pretax Cost of Debt Capital | 5.5% | [e] |
| Tax Rate | 40.0% | |
| **Total After-tax Cost of Debt Capital** | **3.3%** | |
| | | |
| **Capital Structure:** | | |
| Equity / Invested Capital | 100% | [f] |
| Debt / Invested Capital | 0% | [f] |
| | **100%** | |
| | | |
| **WACC** | **30.3%** | |
| | | |
| **Selected WACC** | **30.0%** | [g] |

Sources:
[a] Federal Reserve Statistical Release as of 02/28/2003.
[b] 2002 Long Term ERP per Ibbotson Associate SBBI Valuation Edition 2004 Yearbook.
[c] 2002 Micro Cap Size Premia per Ibbotson Associate SBBI Valuation Edition 2004 Yearbook.
[d] Analyst's estimate primarily based on review of company specific risks.
[e] Middle Market Debt Rate for February 2003 per S&P LCD Leveraged Loan Index.
[f] Per BHI's capital strucure as of February 2003.
[g] Selected WACC based on the Vorster Report.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

52





**Income Approach**

**Discounted Cash Flow Method**

**CAPM Beta Calculation as of**          2/28/2003                                              *Exhibit 5b*

*BHI Holdings, Inc.*

| Company Name | Levered Beta per Capital IQ | Outstanding Debt [a] ($000,000) | Market Value of Equity ($000,000) | Minority Interests ($000,000) | Debt/ Equity | Enterprise Value [b] ($000,000) | Unlevered Beta |
|---|---|---|---|---|---|---|---|
| British American Tobacco p.l.c. | 0.689 | 0.0 | 20,950.2 | 0.0 | 0.0x | 20,950.2 | 0.69 |
| Loews Corporation | 0.939 | 6,817.8 | 8,687.1 | 1,891.3 | 0.6x | 17,396.2 | 0.63 |
| Altria Group, Inc. | 0.684 | 19,235.0 | 79,952.5 | 4,235.0 | 0.2x | 103,422.5 | 0.59 |
| R.J. Reynolds Tobacco Holdings, Inc. | N/A | (536.0) | 0.0 | 0.0 | N/A | (536.0) | N/A |
| Swedish Match AB (publ) | 0.169 | 389.7 | 2,573.6 | 76.1 | 0.1x | 3,039.4 | 0.15 |
| UST LLC | N/A | 758.0 | 4,837.4 | 0.0 | 0.2x | 5,595.4 | N/A |
| Vector Group Ltd. | 1.178 | 54.0 | 478.8 | 47.9 | 0.1x | 580.7 | 1.10 |
| Imperial Brands PLC | 0.584 | 5,152.6 | 11,305.6 | 26.4 | 0.5x | 16,484.7 | 0.42 |
| Arlington Hospitality, Inc. | N/A | 82.1 | 16.2 | 0.3 | 5.0x | 98.6 | N/A |
| Candlewood Hotel Company, Inc. | 1.383 | 47.0 | 6.8 | 0.0 | 7.0x | 53.8 | 0.17 |
| ShoLodge, Inc. | N/A | 89.9 | 13.3 | 0.8 | 6.4x | 104.1 | N/A |
| Hudson Hotels Corp. | N/A | 0.0 | 0.3 | 0.0 | 0.0x | 0.3 | N/A |

**Company Beta Rele Company Beta Relevering Calculation:**

| | |
|---|---|
| Tax Rate (Marginal)   Tax Rate (Marginal) | 40% |
| Unlevered Beta (Secto Unlevered Beta (Sector) [c] | 0.59 |
| Subject Company Deb Subject Company Debt/Equity | 0.0x |

| | |
|---|---|
| Relevered Beta (Subject Company) [d] | 0.59 |
| Historical Long Term Equity Risk Premium(1926-Present) [e] | 7.00% |
| Industry Risk Premium Based on Beta [f] | -2.86% |

Footnotes:

[a] Includes preferred stock and minority interest.

[b] Cash has been subtracted in the calculation of enterprise value (Market Capitalization+Total Debt-Cash+Preferred Stock+Minority Interest).

[c] Unlevered Beta (Sector) = Levered Beta (Sector)/(1+((1-Tax Rate (Sector) x Debt/Equity (Sector))

[d] Relevered Beta (Subject Company) = Unlevered Beta (Sector) x (1+((1 - Tax Rate (Sector) X Debt/Equity (Sector)

[e] Per Ibbotson Associates SBBI Valuation Edition 2004 Yearbook

[f] Industry Risk Premium = Relevered Beta x Historical LT ERP - Historical LT ERP

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

53



Hilco
Valuation Services

A Hilco Global Company
Vested in Your Success

## Income Approach
## Discounted Cash Flow Method
## Projected Cash Flow and Valuation Summary                    *Exhibit 6*

(in $000's)

*BHI Holdings, Inc.*

| | Stub Period | | Projected Year | | |
|---|---|---|---|---|---|
| **Present Value of Net Free Cash Flow to Firm (FCFF):** | Mar-Dec 2003 | 2004 | 2005 | 2006 | 2007 |
| Pre-Tax Profit [1] | $112,760 | $130,861 | $141,977 | $151,499 | $160,608 |
| Taxes @ 40% | 45,104 | 52,345 | 56,791 | 60,600 | 64,243 |
| Debt Free Net Income | $67,656 | 78,517 | 85,186 | 90,899 | 96,365 |
| Add: Depreciation | 10,922 | 9,009 | 6,898 | 5,915 | 5,387 |
| Less: Capital Expenditures | 2,338 | 6,392 | 5,699 | 2,475 | 3,702 |
| Less: Working Capital Requirement | 9,144 | 21,204 | 14,737 | 13,567 | 13,363 |
| Debt Free Cash Flow | $67,096 | 59,929 | 71,647 | 80,773 | 84,688 |
| Partial Period Multiple | 0.83 | | | | |
| PV Period | 0.42 | 1.33 | 2.33 | 3.33 | 4.33 |
| Present Value Factor @ 30% [a] | 0.8964 | 0.7048 | 0.5422 | 0.4171 | 0.3208 |
| Present Value of Discrete Period FCFF | $50,123 | $42,239 | $38,845 | $33,686 | $27,169 |
| Total Present Value of Discrete Period FCFF | $192,062 | | | | |
| **Present Value of Terminal Value:** | | | | | |
| Terminal Year Cash Flow | $86,381 | | | | |
| Direct Capitalization Rate [b] | 28.0% | | | | |
| Terminal Value | $308,505 | | | | |
| Present Value Factor @ 30% [a] | 0.3208 | | | | |
| Present Value of Terminal Value | $98,971 | | | | |
| **Valuation Summary:** | | | | | |
| Present Value of Discrete Period | $192,062 | | | | |
| Present Value of Terminal Value | $98,971 | | | | |
| **FMV of 100% Enterprise Value of the Firm** | **$291,000** | | | | |

Source:
[1] Projections are per BHI Projections provided by management.

Footnotes:
[a] Calculated as if cash flow received at mid-year.
[b] Incorporating an expected long-term nominal growth rate of 2.0%.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.          January 14, 2022

54




A Hilco Global Company
Vested in Your Success

---

## Valuation Synthesis and Conclusion                    *Exhibit 7*

($000's)

*Double Play , Inc.*

| Various Historical Valuations of the Phillies | | Indicated Value |
|---|---|---|
| Arthur Anderson Report - October 31, 1999 | | $157,000 |
| Forbes 2000 MLB Franchise Valuation | | $158,000 |
| Ernst & Young Report (Relied on in Fleet Valuation) -January 31, 2001 | | |
| Arthur Anderson FMV as of - October 31, 1999 | $157,000 | |
| Capital Infusion into the Phillies | $50,000 | $207,000 |
| January 31, 2001 Double Play purchased an additional 9.1973% for $19.1 million. | | |
| $19.1 million / 9.1973%=          207,670 | | $207,700 |
| Forbes March 29, 2002 MLB Franchise Valuation | | $231,000 |

January 31, 2001 Double Play purchased an additional 9.1773% for $19.1 million. This transaction represented the purchase of a minority interest in the Phillies by another minority owner at a pro-rata

| | | |
|---|---|---|
| Total Enterprise Value of the Phillies | | $207,700 |
| Double Play's Ownership in the Philies | | 36% |
| **Total Enterprise Value of the Phillies** | | **$74,253** |

---

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.          January 14, 2022

55



Valuation Services

A Hilco Global Company
Vested in Your Success

| Bradford Holdings, Inc. Share Transactions | *Exhibit 8a* |
|---|---|

*Bradford Holdings, Inc.*

### Transactions of Bradford Holdings, Inc. Shares

February 1, 2001 - Nancy F. Smith ("Ms. Smith")
    Ms. Smith a minority shareholder redeemed 84 Voting Shares and 59,457 Non-Voting Shares of Common Stock in BHI for $215 and $205, respectively

| Share Class | Share Count | Share Price $'s | Total Company Shares | Indicated BHI Equity Valuation ($000's) |
|---|---|---|---|---|
| Class A (Voting) | 84 | $215 | 1,006 | $216 |
| Class B (Non-Voting) | 59,457 | $205 | 713,153 | $146,196 |
| | 59,541 | | 714,159 | $146,413 |

February 1, 2001 - Susan F. Thorkelson ("Ms. Thorkelson")
    Ms. Thorkelson a minority shareholder redeemed 84 Voting Shares and 59,457 Non-Voting Shares of Common Stock in BHI for $215 and $205, respectively

| Share Class | Share Count | Share Price $'s | Total Company Shares | Indicated BHI Equity Valuation ($000's) |
|---|---|---|---|---|
| Class A (Voting) | 84 | $215 | 1,006 | $216 |
| Class B (Non-Voting) | 59,457 | $205 | 713,153 | $146,196 |
| | 59,541 | | 714,159 | $146,413 |

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

56





**Per Share Price Roll Forward**                                                                    *Exhibit 8b*

*Bradford Holdings, Inc.*

**Bradford Holdings, Inc. Share Price Based on Latest Transactions**

There were two transactions of BHI shares on February 1, 2001, where in total 119,082 shares were redeemed at $215 per Voting Share and $205 per Non-voting Share. If the value indicated by the 2.1.2001 transactions is rolled forward to the share count as of 2.28.2003, the price per share would be $258 per Voting Share and $246 per Non-voting Share.

| Share Class | Share Price $'s As of 2.1.2001 | Company Shares as of 2.1.2001 | Indicated BHI Equity Valuation ($000's) | Total Company Shares as of 2/2003 | Rolled Forward Price Per Share As of 2/2003 |
|---|---|---|---|---|---|
| Class A (Voting) | $215 | 1,006 | $216 | 838 | $258 |
| Class B (Non-voting) | $205 | 713,153 | $146,196 | 594,059 | $246 |
| | | 714,159 | $146,413 | 594,897 | |

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                     January 14, 2022

57





| Valuation Synthesis and Conclusion | | | | *Exhibit 9a* |
|---|---|---|---|---|

($000's)

*BHI Holdings, Inc.*

| | | Indicated Enterprise Values | Weighting | Weighted TEV |
|---|---|---|---|---|
| **John Middleton, Inc.** | | | | |
| JMI GPCM | $293,901 | | | |
| JMI GMAC | $277,519 | | | |
| **Enterprise Value of JMI** | | $285,710 | | |
| | | | | |
| **McIntosh Inns** | | | | |
| McIntosh GPCM | $29,538 | | | |
| McIntosh GMAC | $29,906 | | | |
| **Enterprise Value of McIntosh** | | $29,722 | | |
| | | | | |
| **Build Up Enterprise Value of JMI and McIntosh** | | | $315,432 | 50% |
| | | | | |
| **Total Enterprise Value of Bradford Holdings, Inc.** | | | | |
| **BHI DCF Valuation** | | | $291,000 | 50% |
| | | | | |
| **Weighted Enterprise Value of Bradford Holding, Inc. Operating Assets** | | | | $303,216 |
| | | | | |
| **Plus: Non-operating Assets (Double Play, Inc.)** | | | | $74,253 |
| | | | | |
| **Total Enterprise Value of BHI Holdings, Inc. Operating and Non-Operating Assets** | | | | $377,469 |

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

58



A Hilco Global Company
Vested in Your Success

| Valuation Synthesis and Conclusion | *Exhibit 9b* |
|---|---|

($000's)

*BHI Holdings, Inc.*

| | |
|---|---|
| **Total Enterprise Value of BHI Holdings, Inc.** | **$377,469** |
| **Total Other Assets** | |
| Less: Interest Bearing Debt | 0 |
| Plus: Normalized Cash [1] | 25,000 |
| **FMV 100% Equity of BHI Holdings, Inc.** | **$402,469** |
| **Less Conglomerate discount of 20%** | **80,494** |
| **FMV 100% Equity of BHI Holdings, Inc. after Conglomerate Discount** | **$321,975** |

| Capitalization Table | | | | | |
|---|---|---|---|---|---|
| Share Class | Share Count | Votes/ Share | Percentage | Voting Premium | Adjusted Percentage |
| Class A | 838 | 1 | 0.141% | 5.0% | **0.148%** |
| Class B | 594,059 | - | 99.859% | - | **99.852%** |
| **Total** | **594,897** | **N/A** | **100%** | **N/A** | **100%** |

| Class A Shares | | Class B Shares | |
|---|---|---|---|
| 0.141% Class A Ownership | $476 | 99.859% Class B Ownership | $321,499 |
| Less 0% Discount for Lack of Control | $0 | Less 0% Discount for Lack of Control | $0 |
| Class A Ownership less DLOC | $476 | Class B Ownership less DLOC | $321,499 |
| Less 27% Discount for Lack of Marketability | ($129) | Less 27% Discount for Lack of Marketability | ($86,805) |
| **FMV of Class A Ownership** | **$348** | **FMV of Class B Ownership** | **$234,694** |

| Fair Market Value Per Share Range of Value [2] | | |
|---|---|---|
| | Class A | Class B |
| **High Scenario [3]** | $415 | $395 |
| **2.28.2003 Transaction [4]** | $288 | $275 |
| **Low Scenario [5]** | $258 | $246 |

Notes:

[1]  Cash balance adjusted to represent normalized operating conditions.

[2]  Represents a range of values per share we believe is reasonable and fair.

[3]  Represents a high scenario of value determined using the GPCM, GMAC, and DCF analysis including normalized cash, a conglomerate discount of 20%, and a DLOM of 27%

[4]  Represents the price per share

[5]  Represents a low scenario of value calculated based on the 2.1.2001 transaction adjusted for updated share counts.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                                          January 14, 2022

59





**Damages Calculation**
**Anna Nupson 1994 Trust**                                    *Exhibit 10a*

**Principal Analysis**
Cash Proceeds from Bradford Holdings, Inc. shares redeemed [a]:

|  | Shares | Price per Share | Total Received |
|---|---|---|---|
| Class A | 38 | $288.41 | $10,960 |
| Class B | 70,963 | $275.00 | 19,514,825 |
|  |  |  | 19,525,785 |

Fair Market Value of Bradford Holdings, Inc. shares redeemed [b]:

|  | Shares | Pricer Per Share |  |
|---|---|---|---|
| Class A | 38 | $429.85 | 16,334 |
| Class B | 70,963 | $409.35 | 29,048,792 |
|  |  |  | 29,065,126 |

| | |
|---|---|
| Shortfall in Principal Received February 28, 2003 | 9,539,342 |
| Less: Capital Gains Taxes @ 23.07% | (2,200,726) |
| **Net Principal Shortfall** | **$7,338,616** |

**Income Analysis**

| | | |
|---|---|---|
| Historical Monthly Rate of Return @ 0.66% | | |
| Number of Months from 2/28/03 to 12/31/21 | 226 | 10,946,279 |
| Less: Investment Management & Custody Expenses @ 3.40% | | (372,173) |
| Less: Capital Gains Taxes @ 23.07% | | - |
| Less: Income Taxes @ 40.07% | | (4,386,174) |
| **Net Income Shortfall** | | **$6,187,931** |

| | | |
|---|---|---|
| **Combined Principal & Income Shortfall** | | 13,526,547 |
| Unitrust Calculation | | |
| Annual 4% Distribution | | 541,062 |
| Monthly Distribution | | 45,088 |
| Lost Unitrust distributions from July 2019 though December 2021 | | |
| Number of Months from July 2019 to December 2021 | 30 | |
| **Plaintiff's Damages - Anna Nupson 1994 Trust** | | **$1,352,655** |

Footnotes:
[a] Historical price of redeemed shares.
[b] Upper Bound of calculated share price per Exhibit 9b.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

60



**Hilco**
Valuation Services

A Hilco Global Company
Vested in Your Success

**Damages Calculation**
**Anna Nupson 2001 Sub Trust** *Exhibit 10b*

**Principal Analysis**
Cash Proceeds from Bradford Holdings, Inc. shares redeemed [a]:

|         | Shares | Price per Share | Total Received |
|---------|--------|-----------------|----------------|
| Class B | 86,010 | $275.00         | 23,652,750     |
|         |        |                 | 23,652,750     |

Fair Market Value of Bradford Holdings, Inc. shares redeemed [b]:

|         | Shares | Pricer Per Share | |
|---------|--------|------------------|----------------|
| Class B | 86,010 | $409.35          | 35,208,300     |
|         |        |                  | 35,208,300     |

| | |
|---|---|
| Shortfall in Principal Received February 28, 2003 | 11,555,550 |
| Less: Capital Gains Taxes @ 23.07% | (2,665,865) |
| **Net Principal Shortfall** | **$8,889,685** |

**Income Analysis**

| | | |
|---|---|---|
| Historical Monthly Rate of Return @ 0.14% | | |
| Number of Months from 2/28/03 to 12/31/21 | 226 | 2,812,696 |
| Less: Investment Management & Custody Expenses @ 1.90% | | (53,441) |
| Less: Capital Gains Taxes @ 23.07% | | - |
| Less: Income Taxes @ 40.07% | | (1,127,047) |
| **Net Income Shortfall** | | **$1,632,208** |

| | |
|---|---|
| **Plaintiff's Damages - Anna Nupson 2001 Sub Trust** | **$8,889,685** |

Footnotes:
[a] Historical price of redeemed shares.
[b] Upper Bound of calculated share price per Exhibit 9b.

 

**Damages Summary** *Exhibit 10c*

| | Pakter Model 1 | Hilco Low End Model 1 | Hilco Mid Point Model 1 | Hilco High End Model 1 |
|---|---|---|---|---|
| **Anna Nupson 1994 Trust** | | | | |
| Net Principal Shortfall | $49,488,022 | $0 | $3,279,235 | $6,558,471 |
| Unitrust Shortfall | $8,953,380 | $0 | $604,429 | $1,208,858 |
| Additional Available Funds in the Income Account | $40,045,780 | $0 | $2,765,056 | $5,530,112 |
| **Anna Nupson 2001 Sub Trust** | | | | |
| Net Principal Shortfall | $59,947,516 | $0 | $3,972,325 | $7,944,649 |
| Investment Income Foregone due to Principal Shortfall | $9,867,776 | $0 | $729,346 | $1,458,693 |
| **Total Damages** | **$168,302,474** | **$0** | **$11,350,391** | **$22,700,783** |

| | Pakter Model 2 | Hilco Low End Model 2 | Hilco Mid Point Model 2 | Hilco High End Model 2 |
|---|---|---|---|---|
| **Anna Nupson 1994 Trust** | | | | |
| Net Principal Shortfall | $347,413,147 | $0 | $0 | $0 |
| Unitrust Shortfall | $38,173,004 | $0 | $0 | $0 |
| Additional Available Funds in the Income Account | $157,390,489 | $0 | $0 | $0 |
| **Anna Nupson 2001 Sub Trust** | | | | |
| Net Principal Shortfall | $271,762,351 | $0 | $0 | $0 |
| Investment Income Foregone due to Principal Shortfall | $71,912,791 | $0 | $0 | $0 |
| **Total Damages** | **$886,651,781** | **$0** | **$0** | **$0** |

Note: The Hilco mid point values are the average of the low end and high end values.
Note: Plaintiff may have been able to access the additional available funds if she persuaded the trustees to distribute the funds.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

62




A Hilco Global Company
Vested in Your Success

## IX.   Appendix B – Sources of Information

In the course of its analysis, Hilco used financial and other information (1) provided by Company management, and (2) obtained from publicly available financial and industry sources Hilco believes to be reliable.

Hilco considered the following documents when preparing this report:

1. BHI Historical Sales 1991-2011
2. 2001 BHI Phillies Valuation
3. Smart – 12-31-04 and 12-31-05
4. Smart – 12-31-03 and 12-31-02
5. Smart – 12-31-06 and 12-31-05 and 12-31-04
6. 2003-01-21 John Buyout Counterproposal to Anna
7. 2003-01-15 John Buyout Counterproposal to Lucia
8. 2002-12-19 Lucia Buyout Proposal
9. E&Y – Year ended 1-31-00
10. E&Y – Years ended 1-31-01 and 1-31-00
11. E&Y – 11 month period ended 12-31-01 and Year ended 1-31-01
12. E&Y – Year ended 12-31-02 and 11 month period ended 12-31-01
13. Financial Statement for YE 12-31-03
14. E&Y – two month period ended 2-28-03 and year ended 12-31-02
15. Nupson- M Pakter Report Schedules and Professional Profile 12-13-2021
16. Risius Report – Bradford Holdings Inc_
17. Nupson-v-Schnader – Civil Action – Filed 12.17.18
18. Forbes – March 29, 2002
19. [119] Third Amended Complaint
20. [131] Answer to Third Amended Complaint (2)
21. 2.4.01 BHI action by unanimous consent
22. 1982 Shareholders Agreement
23. 1987 Amendment - G.W. Hunter Agreement
24. 1992 Amendment 2 to Shareholders Agreement
25. 2000 Howard Lawson & Co. Valuation of Bradford Holdings, Inc
26. 2002 Fleet Valuation
27. BHI010758_image
28. BHI011399_image
29. BHI011442_image
30. BHI011454_image
31. BHI037846_image
32. BHI037868_image
33. BHI037869_image
34. BHI040329_image
35. BHI041087_image
36. BHI041773_image
37. BHI045445_image
38. BHI046641_image
39. BHI046642_image
40. BHI046643_image
41. BHI046692_image
42. BHI047046_image
43. BHI047406_image
44. BHI047574_image
45. BHI047605_image
46. BHI047632_image
47. BHI047665_image
48. BHI047731_image
49. BHI047753_image
50. BHI047770_image
51. BHI048213_image
52. BHI048220_image
53. BHI048222_image
54. BHI048274_image
55. BHI048291_image
56. BHI048299_image
57. BHI048301_image
58. BHI048306_image
59. BHI048317_image
60. BHI048335_image
61. BHI048338_image
62. BHI048340_image
63. BHI048342_image
64. BHI048351_image
65. BHI048352_image



Hilco
Valuation Services

A Hilco Global Company
Vested in Your Success

66. BHI048355_image
67. BHI048358_image
68. BHI048361_image
69. BHI048386_image
70. BHI048390_image
71. BHI048395_image
72. BHI048399_image
73. BHI048406_image
74. BHI048407_image
75. BHI048408_image
76. BHI048409_image
77. BHI048410_image
78. BHI048411_image
79. BHI048548_image
80. BHI049044_image
81. BHI050651_image
82. BHI050845_image
83. BHI051059_image
84. BHI051327_image
85. BHI051531_image
86. BHI051745_image
87. BHI052721_image
88. BHI052896_image
89. BHI055306_image
90. BHI056535
91. BHI056535_image
92. BHI060083_image
93. BHI061576_image
94. BHI065638_image
95. BHI065661_image
96. BHI065708_image
97. BHI066278_image
98. BHI066835_image
99. BHI067428_image
100. BHICOZ000001_image
101. BHICOZ000176_image
102. BHICOZ000242_image
103. BHICOZ000257_image
104. BHICOZ000315_image
105. BHICOZ000406_image
106. BHICOZ000681_image
107. BHICOZ000697_image
108. BHICOZ000706_image
109. BHICOZ000763_image
110. BHICOZ000805_image
111. BHICOZ000904_image
112. BHICOZ000920_image
113. BHICOZ001369_image
114. BHICOZ001697_image
115. BHICOZ003746_image
116. BHICOZ017990_image

117. BHICOZ018486_image
118. BHISH027260_image
119. Confidentiality Designations - Rosenfield Deposition
120. Elizabeth Arias
121. Elizabeth Arias-CT
122. Elizabeth Arias-CT-CT-LE
123. Elizabeth Arias-LE
124. Ex. 11 - Investment Returns in the Hotel Industry (BHI040472)
125. Ex. 13 - JSM Handwritten notes (BHI012137-012140)
126. Ex. 14 - JSM Handwritten notes_Transcribed (BHI012137-012140)
127. Ex. 16 - 2001 Thorkelson Stock Purchase Agreement (BHI012219-BHI012226)
128. Ex. 17 - Exhibit B from JPM Petition to Approve Settlement Agreement 2020.02.18
129. Feb. 2003 BHI action by unanimous written consent
130. February 1, 2001 Modified GRAT
131. JSM-HE-SH000006-JSM-HE-SH004116_01396_image
132. JSM-HE-SH000006-JSM-HE-SH004116_02894_image
133. JSM-HE-SH000006-JSM-HE-SH004116_02903_image
134. JSM-HE-SH000006-JSM-HE-SH004116_02906_image
135. LHW-00000808_image
136. Rosenfield, Esq., Bruce (cond)
137. Rosenfield, Esq., Bruce (full)
138. Rosenfield, Esq., Bruce (with confidentiality designations)
139. Siwicki, Robert (cond)
140. Siwicki, Robert (full)
141. Thorkelson, William (cond)
142. Thorkelson, William (full)
143. Federal Reserve Statistical Release
144. SBBI Valuation Edition 2004 Yearbook, Ibbotson Associates
145. Capital IQ
146. S&P LCD Leveraged Loan Index Data
147. Tobacco Product Manufacturing in the US May 2003

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

64




A Hilco Global Company
Vested in Your Success

148. Hotels (except Casino Hotels) and Motels in the US September 2003
149. Diversification's Effect on Firm Value
150. CDC – Federal & State Cigarette Excise Taxes – United States, 1995-2009 -

https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5819a2.htm
151. Expert Report of Pieter Vorster
152. BHI Projections provided by management
153. Undated Fran Notes



A Hilco Global Company
Vested in Your Success

# X.   Appendix C – Valuation Premiums & Discounts

## X.A   Valuation Premiums and Discounts in General

The final value reached in the valuation of a closely held business may be more or less than the value that was calculated using the various methods of valuation that are available. The type and size of the discount(s) or premium(s) will vary depending on the starting point. The starting point will depend on which methods of valuation were used during the appraisal, as well as other factors, such as the sources of information used to derive multiples or discount rates, as well as normalization adjustments.

*Order of Application*
The minority discount is applied to the value first. However, if the value indication includes an investment or strategic level of value, the adjustments would be:

- An adjustment for the investment or strategic value should be made to arrive at the control value first;
- Next adjust for the minority discount to arrive at a minority level of value; and
- Then apply the discount for lack of marketability ("DLOM").

These discounts are multiplicative rather than additive; that is, they are to be taken in sequence, not added together, and taken once as shown below.



a. *Control shares in a privately held company also may be subject to some discount for lack of marketability, but usually not nearly as much as minority shares.*
b. *Minority and marketability discounts normally are multiplicative rather than additive. That is, they are taken in sequence:*
   > $10.00    Control Value
   > -  3.00 Less:  Minority Interest Discount (.30 x $10.00)
   > $ 7.00 Marketable minority value
   > -  2.80 Less Lack of Marketability Discount (.40 x $7.00)
   > $ 4.20 Per share value of non-marketable minority shares
c. *Note that neither the minority/control nor the marketability issue are all-or-nothing matters. Each covers a spectrum of degrees.*

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

66




A Hilco Global Company
Vested in Your Success

## X.B   Discount for Lack of Control

It is commonly recognized and well documented that an ownership interest lacking control will sell at a lower price than an equivalent controlling ownership interest. When control is not conveyed with the sale of an ownership interest, a downward adjustment to the preliminary indication of value may apply. This is commonly referred to as a "discount for lack of control" (a.k.a. minority discount). In some instances a premium (as opposed to a discount) for control may be applied when valuing a controlling ownership interest.

For the purpose of this report, a minority party interest being valued is, by definition, a minority position for the following reasons:

- Lack of control;
- Management cannot force sale or liquidation;
- Fractional interest; and
- Lack of ability to finance.

A controlling position in a business enterprise is typically worth more on a pro-rata basis than a non-controlling minority position for many reasons, including the rights of controlling owners to do any or all of the following:

- elect management/directors;
- select and/or remove management;
- set dividend/distribution policies;
- establish compensation and benefits;
- set business strategies and goals;
- acquire and liquidate assets;
- self-dissolve, or recapitalize the entity;
- revise organizational documents;
- establish or change buy-sell agreements or clauses; and
- cause the entity to become publicly traded.

A non-controlling interest holder cannot cause these actions to occur.

Other factors such as the rights of non-controlling owners and the distribution of ownership can also impact the value of an ownership interest. When assessing the value of an ownership interest it is important to consider the following factors:

**Relative Ownership Distribution.** The size of the ownership block being valued in relation to other blocks is important in establishing the degree of control. In a business enterprise that has hundreds of owners, a 20% interest can have a tremendous amount of control while in a business enterprise with only two owners, the owner of a 20% interest may have no control. If there are two owners, each holding 50%, neither has absolute control, but both have the ability to block any decision requiring a majority vote.

**Swing Vote Characteristics.** The existence of "swing vote" characteristics can significantly impact the value of a particular ownership interest. For instance, in a situation where a business enterprise has only three owners, two of them owning 49% each and the third owning 2%, the 2% owner can effectively exert significant control by casting the "swing vote."

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

67



**Supermajority Statutes.** Many states require a supermajority vote, usually 66.67%, before certain actions, such as a merger, can take place. In situations requiring a supermajority, a single owner with only a 34% interest is able to "block" the actions of the majority owner(s).

**Minority Dissolution Statutes.** Some states permit minority interests to sue for dissolution. The specific applicable circumstances and size of the interest varies by state.

**Organizational Documents.** The rights and restrictions of owners contained in the articles of incorporation, bylaws, and organizational agreements can vary greatly from entity to entity. Such rights and restrictions can affect the ability to control or influence an entity in innumerable ways. The rights and restrictions that are most commonly addressed in organizational documents involve voting rights such as:

**Nonvoting Interest.** A holder of a nonvoting interest has little influence over the affairs of a business enterprise. If the holder cannot vote for board members or any other matter that requires a vote of the owners, such a holder has no control and little or no influence over the company, even if such owner has 2001 BHI Transactions of the outstanding ownership interest.

**Cumulative Voting.** Cumulative voting is a system whereby owners are allowed votes in proportion to their ownership percentage. The effect of cumulative voting can be illustrated by considering a vote of owners to elect directors. Under cumulative voting, a 20% owner can elect 20% of the board members. In situations where cumulative voting is not present, a 51% owner can elect all of the board members and deny board representation to all others. In some states, cumulative voting is mandated by statute.

**Contractual Agreements.** Certain contractual arrangements may also restrict control. Ownership agreements may preclude owners from exerting certain rights. Additionally, owners may forfeit, by contract, the right to do certain things, such as obtaining additional debt.

David W. Simpson illustrated the relationship between ownership rights and ownership distribution in an article published in the Business Valuation Review (see exhibit below). The table illustrates that influence and control increases by degrees, and that the impact of control or lack thereof must be analyzed in such manner.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.          January 14, 2022

68





**Source:** *David W. Simpson, "Minority Interest and Marketability Discounts: A Perspective: Part I," Business Valuation Review (March 1991).*

**Note:** *The above assumes the ability of an owner to vote for board members or managers. The inability to do so may cause the value of ownership interests greater the 50% to be similar in value (on a pro-rata basis) to ownership interest less than 50% that can vote.*

## Quantifying Adjustments for Control

Diverse methods exist to estimate and quantify the impact of marketability on the value of a privately held business enterprise. These methods include studies of empirical data and market return comparisons. We will discuss each of these and their applicability to KCP. Studies analyzing lack of control include transaction control premium studies and voting/nonvoting stock studies.

### FactSet MergerStat/BVR Control Premium Study

This control premium study analyzes controlling interest transactions. These are transaction where the acquirer gains at least a 50.01% ownership interest in the target company. To calculate the implied minority discount, the control premium is converted by using the formula: premium/(1+premium). The median minority discount, as calculated on a yearly basis over the last 10 years, is 24.1%, and the average minority discount is 23.5%.

In 1996, Z. Christopher Mercer conducted a study analyzing the overstatement of control premiums in the FactSet MergerStat/BVR Control Premium Study. After analyzing the data to account for outliers in the data, including premiums that were less than 0%, he concluded that the median minority discount was overstated by between 5-21% and the average by 19-63%.

### Voting/Nonvoting Stock Price Differential Studies

Some publicly listed companies offer dual class structures where different share classes have different voting rights. There have been a number of studies analyzing the price differentials between voting shares and nonvoting shares. Of nine studies, the average discount for a nonvoting share was 5.1% and the median discount was 5.0%.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

69



There has also been a series of court cases involving price differentials between voting and nonvoting shares. In the group of court cases, the average nonvoting share discount was 3.6% and the median discount was 4.0%.

A minority discount would be higher than the price differentials between voting and nonvoting shares because even if an investor owns voting shares, it does not necessarily mean that the investor owns enough of the company to exert influence over the company's decisions.

Based on our review and analysis of the operating agreement, a study of the relevant facts, and circumstances from the cases noted above, we believe a 20% minority interest discount is appropriate for the Class A shares and a 10% discount is appropriate for the Class B shares. The Class B shares receive a lower discount because they have 10 times the voting power as Class A shares.

The minority interest holder cannot, on his or her own accord, conduct and make management decisions in relation to operations of the subject Company. They do not individually have the power to bind the Company contractually or in any other manner. They also have limited personal liability for Company obligations.

### X.C   Discount for Lack of Marketability

Previously, we concluded that the standard of value applicable to the Company is the FMV Standard, which implies marketability.

An ownership interest that can be sold easily and converted to cash is more valuable than an equivalent interest that cannot be sold easily. The ability to sell is called marketability, and the ability to convert to cash is called liquidity.

Marketability is:

*The capability and ease of transfer or salability of an asset, business, business interest, or security.[49]*

Closely related to marketability is liquidity. Liquidity is:

*The ability to readily convert an asset, business, business ownership interest, or security        to cash without significant loss of principal.[50]*

In this report we will consider marketability and liquidity in combination, and will refer to them in aggregate as "marketability," unless otherwise indicated.

When an ownership interest lacks certain elements of marketability an adjustment from the preliminary indication of value may be applicable. This is commonly referred to as a discount for lack of marketability.

The standard for marketability is publicly traded stocks that enjoy significant trading volume on a major stock exchange. Owners of these stocks can know the value of their

---

[49] International Glossary of Business Valuation Terms.
[50] Ibid.

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

70




A Hilco Global Company
Vested in Your Success

interests on a minute-by-minute basis, and can buy or sell these stocks at a moment's notice with the proceeds (net of fees) delivered in a matter of days.

A privately held business enterprise does not enjoy such marketability. Liquidating a position in a privately held entity is more costly and time consuming. Fees may need to be paid to a business broker and other marketing costs may be incurred. Time is required to find a buyer, negotiate a price, and draw up the necessary legal documents. In many cases the purchase price is paid over a period of years.

In some cases, more onerous restrictions are placed on the ownership of privately held enterprises through by-laws or shareholder agreements. These can include rights of first refusal, giving existing owners the right to purchase an ownership interest before it is sold to an outside party, and in some cases, an outright ban on the transferability. For these reasons, the marketability of a Subject Interest is important to estimating its value.

**Factors Impacting Marketability**

The following is a list of several factors that can impact the marketability of an equity ownership interest in a business enterprise. Many of these factors were set forth in the Mandelbaum Tax Court decision. In 1995, the Tax Court issued a decision on the Estate of Mandelbaum (T.C. Memo 1995-255, June 12, 1995). The Mandelbaum court case considered various studies on the lack of marketability as benchmarks and adjusted the benchmark discounts for several factors affecting marketability. We have presented each of the Mandelbaum factors, as well as other factors, in order the analyze the marketability of the Subject Interest.

Mandelbaum Factors:

- Financial Statement Analysis
- Divided Policy
- Nature of the Company, its History, Position in the Industry, and Economic Outlook
- Company Management
- Amount of control in the transferred shares
- Restrictions on transferability of stock
- Holding period for stock
- Company's redemption policy
- Costs associated with a public offering

**Listing Requirements.** Although not specifically mentioned in Mandlebaum, the requirement imposed by stock exchanges can impact marketability. Stock exchanges require minimum capitalization, corporate governance requirements, independent directors, audit committees, and other requirements, of the entities listed on such exchanges. These requirements can serve to lower the risk of an investment in entities traded on stock exchanges. KCP has no such requirements. This factor would tend to decrease the marketability of the Subject Interest.

**Access to Information.** Although not specifically mentioned in Mandlebaum, investors in restricted stocks of SEC reporting companies can access vast amounts of information about the issuing entity through required SEC filing. An investor in KCP does not have the same level of access to information. This factor would tend to decrease the marketability of the Subject Interest.



A Hilco Global Company
Vested in Your Success

Based on these facts, we believe the marketability of the Subject Interest is impaired relative to a highly marketable investment such as a publicly traded stock, and that an disinterested, third party investor would require a discount to the purchase price to be enticed to invest in the Subject Interest.

**Quantifying Adjustments for Marketability**
Diverse methods exist to estimate and quantify the impact of marketability on the value of a privately held business enterprise. These methods include studies of empirical data, market return comparisons, and computational methods. We will discuss each of these and their applicability to KCP.

**Studies of Empirical Data**
Studies of empirical data measuring adjustments for marketability include studies of restricted stocks and studies of pre-IPO transactions. The restricted stock studies are not presented because KCP shares are not restricted, and there is no visible market for them.

**Initial Public Offering Method**
There are several studies that estimate the discount for lack of marketability by comparing transactions involving privately held shares, and the trading price of shares in the same company after they have undergone an IPO (initial public offering). After the IPO, shares in the company became freely traded, and the difference in the trading price and the price paid before the IPO is to represent the value investors place on marketability.

The SEC requires companies undergoing an IPO to disclose the terms of recent insider transactions in the prospectus. This enables a comparison of prices before and after "marketability" being achieved via the IPO. For example, if a shareholder disposes of company stock at $6.00 per share and the stock is subsequently brought public at $10.00 per share, it suggests an adjustment for marketability of 40%.

**Emory Studies.** John Emory, ASA, examined the transaction values of privately held company stock (not freely traded) prior to its initial public offering and compared them with prices paid for the shares when the company's stock was taken public.

In Mr. Emory's studies, pre-IPO transactions are limited to the five-month period preceding the IPO, implying that most buyers and sellers are aware of the impending IPO and the potential marketability of the stock. In eight separate studies conducted over 18-month periods since 1980, Mr. Emory examined 310 companies and found a mean average discount of 46% between the pre-IPO trades and the actual IPO price.

Reflecting on his work, Emory stated:

- "The final question to be answered is that if these kinds of discounts are appropriate for promising situations where marketability is probable, but not a certainty, how much greater should discounts be for the more typical company's stock that has no marketability, little if any chance of ever becoming marketable, and is in a neutral to unpromising situation?" and
- "In summary, the size of the discount for lack of marketability depends on the individual situation. While there is not one discount for lack of marketability applicable at all times to all situations, it is apparent that the lack of marketability





is one of the most important components of value, and the public marketplace emphasizes this point."

**Willamette Management Associates Studies.** Willamette Management Associates has performed studies of pre-IPO transactions occurring from 1975 through 2000. They specifically looked at transactions occurring from one to 36 months prior to the IPO, and made adjustments to the data to account for differences in market conditions between the date of the transaction and the date of the IPO. These studies found median implied discounts ranging from a low of 27.7% in the 1999 study, to a high of 73.1% in the 1984 study. The average of the medians was approximately 48%.

**Hitchner Studies.** James R. Hitchner and Katherine E. Morris performed further analysis on the Emory Studies by separating the transactions into those occurring five months, four months and three months prior to the IPO. Generally, their analysis found that discounts decreased for transactions occurring closer to the date of the IPO.

**Valuation Advisors Studies.** Valuation Advisors, LLC has compiled a searchable database of nearly 3,000 pre-IPO transactions occurring from 1999 through 2004. This database separates the data into three-month increments for the year prior to the IPO and then groups together transactions occurring between one and two years prior to the IPO. These studies also found that the closer the IPO date to the transaction, the smaller the discount. The median discounts ranged from 28% for transactions occurring between zero and three months prior to the IPO, to 72.2% for transactions occurring between one and two years prior to the IPO.

There are several criticisms of the restricted stock and IPO studies. Perhaps the criticism most relevant in this case is that blind reliance on empirical studies may be over simplistic and does not adequately consider the unique facts and circumstances of a specific entity. Despite this criticism, we believe these empirical studies provide valuable guidance as to the general range of discounts that may be applicable, as well as empirical evidence that as the length of the holding period before a liquidity event increases, the magnitude of the discount should also increase. Further, the more detailed data provided in the FMV studies help target their data to parameters specific to the Subject Interest.

*Contentions that Restricted Stock Studies are Flawed* [51]
Dr. Mukesh Bajaj points out that the restricted stock studies are flawed for the following reasons:

- Private placements of registered shares, shares that are fully marketable, are often made at sizeable discounts;
- The restricted stock discount can result from factors other than lack of marketability (e.g., discounts to key individuals who perform unique and valuable service and advice to the Company); the discount could represent compensation to the investor; and
- Studies have indicated that discounts in restricted offerings versus discounts in registered offerings were approximately 16% higher from 1990 through 1995. Since some of the discounts in both of these offerings may be attributable to

---

[51] Bajaj M, et al., "Firm Value and Marketability Discount," *Journal of Corporation Law*, Vol. 27, No. 1

Anna K. Nupson v. Schnader Harrison Segal & Lewis LLP, et al.                    January 14, 2022

73




A Hilco Global Company
Vested in Your Success

compensation, the remaining difference is a more appropriate measure of the marketability discount.

Dr. Bajaj also contends that the IPO studies are flawed for the following reasons: [52]

- The size of the marketability discounts implies unrealistically high return expectations;
- Transactions in the IPO studies again reflect compensation to company insiders;
- The investment in pre-IPO shares also reflects the discount for the possible failure of the business enterprise. This seems to contradict the first point, because added risk of failure may require a higher return expectation of something in between, enough to compensate for the taking the added risk; and
- The Emory study's data errs in the treatment of the granting of stock options in a similar way to actual transactions. Other omissions of other transactions in pre-IPO shares of discounts of less than 13%, Dr. Bajaj contends that the results of the studies are unreliable once the biases are known.

**Computational Methods**
There are various computational methods to estimate an applicable adjustment for lack of marketability. We have considered the Longstaff Study, which falls under option theory, in our analysis.

**Option Theory**
A tactic used by investors to protect the value of an appreciated security is to purchase a put option. A put option gives the holder the right to sell a security at a predetermined price. If the market value of the security declines, the put allows the investor to sell it at the higher option price, thus protecting the investor from the decline in value. The holder of a non-marketable security runs the risk of declining value while he/she is waiting for a marketability event. Based on option theory, he/she would require a discount to the price equal to the cost of purchasing a put option. The two primary methods for measuring adjustments for lack of marketability under option theory are the Longstaff study and the Black- Scholes model.

**Longstaff Study.** Francis A. Longstaff, professor of finance at UCLA, argues that a "lookback" option measures the upper bound of adjustments for lack of marketability. A lookback option is a nonexistent, hypothetical option that would allow the holder at the end of the option term, to retroactively look back in time and select the optimal date on which to exercise the option. This would provide the holder of the option the maximum benefit, and thus it is used to measure the upper limit to an adjustment for lack of marketability.
As with most option pricing models, the Longstaff Study measures the value of an option as a function of, among other things, the holding period, and the price volatility of the underlying stock. The results of the Longstaff Study are presented in the accompanying table. This table presents a matrix of results from the Longstaff Study for different holding periods and different price volatilities (see exhibit below).

---

[52] Bajaj M, et al., "Firm Value and Marketability Discount," *Journal of Corporation Law*, Vol. 27, No. 1



**Hilco** Valuation Services

*A Hilco Global Company*
Vested in Your Success

| Holding Period | Price Volatility | | |
|---|---|---|---|
| | 10% | 20% | 30% |
| 30 days | 2.32% | 4.69% | 7.10% |
| 60 days | 3.30% | 6.68% | 10.15% |
| 90 days | 4.05% | 8.23% | 12.54% |
| 180 days | 5.77% | 11.79% | 18.08% |
| 1 year | 8.23% | 16.98% | 26.28% |
| 2 years | 11.79% | 24.64% | 38.61% |
| 5 years | 19.13% | 40.98% | 65.77% |

The above matrix presents adjustments for lack of marketability, varied by holding period and price volatility.

*Size of DLOM Applied to Subject Company*

From the above discussion, we have observed that the range for DLOM is from 10% (difference in discount from registered private placements and unregistered placements) to 43% to 44% (mean and median from the IPO studies). Current valuation theory uses the factors from the case and studies from Dr. Bajaj as the Industry standard for application of DLOM.