EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| ANNA K. NUPSON, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | No. 2:18-cv-02505-NIQA |
| v. | ) | |
| | ) | |
| SCHNADER HARRISON SEGAL & LEWIS, LLP, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

---

# Expert Report
## of
## Pam H. Schneider

---

**January 13, 2022**

I.      **Qualifications**

1.      I am an attorney engaged in the private practice of law and of counsel to Gadsden Schneider & Woodward LLP (GSW), a boutique law firm concentrating in estate planning, trust and estates administration and litigation and related areas of tax and personal and fiduciary law. GSW was founded in February 2001 and is located in suburban Philadelphia.  I was one of the Founding Partners, and I remained a partner until 2014.

2.      I have been practicing law for close to 45 years.  During all but eight months of that time my practice has been limited to the trust and estates and related tax areas, and most specifically to estate planning. My estate planning clients have primarily been individuals and have included multiple members of the same family and owners of closely held businesses.

3.      I was Chair of the Real Property, Probate and Trust Law Section (now the Real Property Trust and Estate Law Section) of the American Bar Association during its 1998-1999 fiscal year.  I am a fellow  of the American College of Trust and Estate Counsel and was a member of its Board of Regents from 1994-2000.  I have spoken and written extensively on estate planning topics with a particular concentration on the generation-skipping transfer tax and retained interest trusts, including in particular grantor retained annuity trusts.  I was an Adjunct Professor at New York University Law School where I co-taught courses in its Masters in Tax Program on various estate planning topics and was an Advisor to two of the American Law Institute's projects on the Restatement of the Law involving trusts, wills and donative transfers and a member of the Advisory Committee to the State Commission on Decedents' Estates Laws in Pennsylvania.

4.      I received a B.A. from the University of Pennsylvania in 1973 and a J.D. from Columbia Law School in 1976.  My *curriculum vitae* is attached hereto as Appendix A.

5.      I have been aided with the preparation of this report by Christopher H. Gadsden, who recently retired as a partner of  Gadsden Schneider & Woodward LLP.  His practice, like mine, was concentrated in trusts and estates.  I have also been assisted by Kenneth E. Martin, an associate at Gadsden Schneider & Woodward LLP.

6.      I am charging for this engagement at my regular hourly rate of $675 or $700, depending on the date on which the services were rendered.  The time of Christopher Gadsden and Kenneth Martin are being billed at their respective regular hourly rates.  Our compensation is not contingent on my opinions and conclusions or on the outcome of this case.

7.      All opinions expressed herein are my opinions, and each opinion is expressed to a reasonable degree of professional certainty.

8.      Attached as Appendix B is a list of the documents that I reviewed in connection with the preparation of this report.

## II.   Scope of Report

9.      I have been retained by Dilworth Paxson LLP ("Dilworth) on behalf of defendants, Schnader Harrison Segal & Lewis LLP ("Schnader") and Bruce A. Rosenfield, Esq. ("Bruce"), to produce this report in connection with litigation between the above-captioned parties.

10.     This Report relates primarily to [i] the creation and funding of an irrevocable trust[1] under Pennsylvania law by Frances S. Middleton ("Frances") as Settlor that would pay her a

---

[1] The reference in this report to an "irrevocable trust" means a trust that the Settlor alone or in conjunction with one or more non-adverse parties can neither revoke, causing the trust property to be returned to her or him, nor modify. However, it does not mean that under Pennsylvania law as it existed in 2001, the trust could not be terminated or modified by a settlement agreement.

specific dollar amount each year for two years (a retained annuity), thereafter continue to hold

any remaining trust property for the benefit of her son, John S. Middleton ("John") and his

appointees, and qualify as a GRAT for federal gift tax purposes;[2] [ii] the dispute that arose by

reason of the exclusion of the plaintiff, Anna K. Nupson ("Anna"), and her sister, the two

daughters of Frances, as trust beneficiaries; and [iii] the representation by Schnader and Bruce of

Frances and Anna in the settlement of that dispute, including the adequacy of Anna's waiver of

potential conflicts of interest of Schnader and Bruce in connection with such representation.

11.     I have been asked to opine on Schnader and Bruce's conduct relating to

Pennsylvania Trust Law, Federal Gift Tax and the Pennsylvania Rules of Professional Conduct,

respectively, and the applicable standard of care.  For the purposes of rendering my opinion, I

understand "the standard of care" that an attorney owes a client to be that of a reasonable

attorney, who is in possession of the same knowledge and skill that an ordinary member of his or

her profession possesses and who acts with reasonable care, diligence, and in good faith and

honest belief that his or her advice and acts are well founded at the time.  The specific issues

addressed are:

    (a)     **With respect to Pennsylvania Trust Law:**

       (i)     Whether it was a breach of the standard of care as it existed in 2001
for a lawyer to create an irrevocable oral trust, incorporating all the
required governing instrument provisions of a GRAT (the "Oral
Trust") and conclude that such oral trust was effective as a GRAT at
the time of its creation;

       (ii)     Whether it was a breach of the standard of care in 2001 for a lawyer to
conclude that a trust document dated February 1, 2001, signed by the
settlor (Frances) on November 19, 2001 and intended as a
memorialization in the same tax year of the Oral Trust (the "Written

---

[2] The reference in this report to a "GRAT" or "grantor retained annuity trust" means a trust in which the grantor retains a right to receive fixed amounts payable at least annually that meets the definition of a "qualified annuity interest" as defined in Treas. Reg. §§ 25.2702-2(a)(7)  and  25.2702-3(b) and (d).  See paragraphs 68-69, *infra*.

Version"), as contemplated at the time of creation of the Oral Trust, would be recognized by the IRS as the governing instrument of the Oral Trust as of February 1, 2001;

(iii)    Whether it was a breach of the standard of care in 2001 for a lawyer to conclude that, even if the Oral Trust was not a valid irrevocable trust under Pennsylvania law when it was created, the Written Version would be recognized by the IRS as the governing instrument of a valid irrevocable trust created on November 19, 2001, when the Written Version was executed (the "November Trust");

(iv)    Whether it a was a breach of the standard of care in 2001 for a lawyer to conclude that the validity of a trust (oral or written) created under Pennsylvania law is not impaired because the trust may not qualify for an intended federal gift tax benefit, such as the benefits applicable to a GRAT;

(v)    Whether the standard of care in Pennsylvania in 2002 and 2003 required a lawyer for an individual co-trustee or beneficiary (whose views are considered by the trustee) to inform her of the duty to diversify the trust's investments pursuant to the Pennsylvania Prudent Investor Act under the following circumstances: (A) the portfolio of the trust consists originally and exclusively of a minority interest in one non-public company and (B) the trustee or beneficiary is represented by the lawyer in a transaction that, *inter alia*, presents the trustee with an opportunity to sell the stock and diversify the portfolio;[3] and

(vi)    Whether, as both Edward L. Perkins ("Mr. Perkins") and Thomas Ross ("Professor Ross") suggest in their Expert Reports on behalf of Anna, the Pennsylvania law issues discussed above create vulnerabilities that an attorney acting consistently with the standard of care in Pennsylvania in 2002 and 2003 would have used in the 2002/2003 family settlement negotiations, which involved modifying the GRAT (whether the Oral Trust/Written version or the November Trust) to reduce John's share of the remainder (from 100% to 33-1/3%) and increase Anna's share (from 0% to 33-1/3%).

---

[3] The focus of this issue is primarily on the trust for Anna that followed the GRAT (referred to below as the "2001 Anna Trust") because that trust was governed by the entirety of the Pennsylvania Prudent Investor Act, while only portions of the Act, which was enacted in 1999 and amended in 2002, applied to the 1994 Trust for Anna. The Pennsylvania Prudent Investor Act, Chapter 72 of the PEF Code (Title 20 of the Pennsylvania Consolidated Statutes), was created by Act of June 25, 1999, P.L. 212, No. 28 §§ 2, 6, 7. Subsequently, Act of Nov. 6, 2002, P.L. 1101, No. 133 amended section 7203 (Act 133 §§ 1, 4) and 7204 (Act 133 §§ 2, 5). Unlike the 1994 Trust, Anna was not a co-trustee of that trust but the trustee deferred to her on the issue of selling the stock.

(b)　**With respect to federal gift tax:**

(i)　Whether it was a breach of the standard of care in October 2002 for a lawyer acting as a tax return preparer to prepare a 2001 gift tax return for Frances reporting the gift to the Oral Trust as a February 1, 2001 gift to a GRAT;

(ii)　Whether it was a breach of the standard of care in October 2002 for a lawyer to conclude that the November Trust was a valid irrevocable trust that met the requirements of a GRAT for federal gift tax purposes, even if created when the Written Version was executed rather than on February 1, 2001; and

(iii)　Whether Mr. Perkins' discussion of section 2702 of the Internal Revenue Code accurately describes the risk that the Oral Trust/Written Version or the November Trust would not qualify as a GRAT for federal gift tax purposes, such that an attorney acting consistently with the standard of care in Pennsylvania in 2002 and 2003 would have used that risk to achieve leverage in the 2002/2003 family settlement negotiations.

(c)　**With respect to the Pennsylvania Rules of Professional Conduct:**

(i)　Whether the letter from Bruce to Anna and others dated October 11, 2002 (the "Waiver Letter") was consistent with the practice of similarly situated trust and estates lawyers in Philadelphia at the time and adequate under the applicable rules to permit Schnader and Bruce without breaching the standard of care to represent Anna in the 2002/2003 family settlement negotiations in which she was adverse to John when Schnader and Bruce had previously represented each of them.

(ii)　Whether, within the meaning of Rule 1.7(b) of the Pennsylvania Rules of Professional Conduct, Bruce's representation of Anna was "materially limited" by his own interests or by his concurrent representation of Anna and Frances and if it was (A) whether he could have "reasonably believe[d] the representation will not be adversely affected" and (B) whether Anna "consent[ed] after full disclosure and consultation."

## III.　Opinions Rendered

12.　In my opinion, it was consistent with the standard of care in 2001 for a lawyer to create a valid oral trust under Pennsylvania law, make it irrevocable, and incorporate by

reference specific provisions into the terms of the governing instrument; furthermore, it was reasonable under the circumstances described below for a lawyer to conclude that such an oral trust was effective as a GRAT at the time of its creation.  There is little doubt that the Oral Trust was a valid trust as of February 1, 2001.  Because the terms of an oral trust require a high degree of proof, however, it is less certain, but still highly likely, that the Oral Trust was irrevocable and that it incorporated by reference the terms required for a GRAT as of February 1, 2001.  As a result, in my opinion, it was not a breach of the standard of care for Bruce and Schnader to conclude that the Written Version would be recognized by the IRS as the governing instrument of the Oral Trust as of February 1, 2001.  However, supposing that the Oral Trust, although a valid trust, was not an irrevocable trust under Pennsylvania law when it was created, the November Trust would have constituted a valid irrevocable trust governed by the Written Version, which restated the Oral Trust as of the date the Written Version was executed (November 19, 2001).  Therefore, it would not have been a breach of the standard of care had Bruce and Schnader concluded that, even if the Oral Trust were not recognized as a valid irrevocable trust under Pennsylvania law when it was created, the Written Version would be recognized by the IRS as the governing instrument of a valid irrevocable trust created on November 19, 2001.

13.     Moreover, the validity of an irrevocable trust under Pennsylvania Law is not affected by whether it qualifies for an intended tax benefit, although in certain unusual circumstances it may be possible for the Settlor to rescind a transfer to a trust that fails to qualify for an intended tax benefit.  Accordingly, in my opinion, it was not a breach of the standard of care in 2001 for Bruce and Schnader to conclude that the validity under Pennsylvania law of the Oral Trust, or if applicable, the November Trust, would not be impaired if the trust did not

6

qualify for the benefits applicable to a GRAT.  It is also my opinion that in light of Pennsylvania's enactment of the Pennsylvania Prudent Investor Act in 1999, the standard of care in Pennsylvania in 2002/2003 required a lawyer to advise an individual co-trustee (or a beneficiary with whom the trustee is consulting) regarding diversification when (1) the trust's investment portfolio consisted originally and exclusively of a minority interest in a single, non-public company and (2) the lawyer represented the trustee or beneficiary in a transaction that, inter alia, presented the trustee with an opportunity to sell the stock and diversify the portfolio.

14.     Unlike Mr. Perkins and Professor Ross, in my opinion an attorney acting consistently with the standard of care in Pennsylvania in 2002 and 2003 could reasonably conclude that it would be overly risky and likely counterproductive to use any arguable flaws in the formation and funding of the GRAT as leverage in the family settlement negotiations.   This opinion is based on the above conclusions about Pennsylvania law and the significant potential adverse consequences to Anna from raising any such issues.  My conclusions regarding Pennsylvania and federal tax law are consistent with Bruce's belief at the time that there was no such issue to exploit, a position with which the Plaintiff herself has agreed.  *See* 2018 Settlement Agreement ¶ II(A)(3)(b).  It is also based on the risk that if Anna's attorney were to accuse John of malfeasance or exerting undue influence over Frances with respect to the GRAT, Frances might re-think her willingness to include Anna in her estate plan and John might re-think his offer to reduce his share of the remainder of the GRAT from 100% to 33-1/3% (with the remaining 2/3rds of the GRAT remainder to equally benefit Anna and her sister Lucia, neither of whom was to receive any benefit from the Oral Trust or the November Trust, as in effect at the time of the negotiations).  See paragraph 21, *infra*.

15.     In my opinion, it was consistent with the standard of care in October 2002 for a lawyer to report the gift to the Oral Trust on Frances' 2001 gift tax return as a February 1, 2001 gift to a GRAT qualifying for the gift tax benefits available to GRATs, particularly as Frances contemplated at the time of the creation of the Oral Trust that it would be memorialized in writing, which she did later in the same tax year (and before the preparation of the tax return) by executing the Written Version.  Moreover, if the November Trust was a valid irrevocable restatement of the Oral Trust created when the Written Version was executed, rather than on February 1, 2001, it would be appropriate and consistent with the standard of care in 2001 for Bruce and Schnader to conclude that the November Trust met the requirements of a GRAT for federal gift tax purposes as of November 19, 2001.

16.     In my opinion, Mr. Perkins' discussion of section 2702 of the Internal Revenue Code significantly overstates the risk that the Oral Trust/Written Version, and to an even greater extent the November Trust, would not qualify as a GRAT for federal gift tax purposes.  As a result, in my opinion an attorney acting consistently with the standard of care in Pennsylvania in 2002 and 2003 could (and perhaps should) reasonably determine that any federal gift tax risks should not be used as leverage in the 2002/2003 family settlement negotiations.  Moreover, in my opinion, Anna had a lot more to lose than did John from a determination that neither the Oral Trust nor the November Trust qualified as a GRAT and the potential adverse consequences to her of such a determination would have far outweighed any potential benefit to her of making such an argument.  For this reason, using any perceived flaws relating to GRAT qualification would have been particularly dangerous.

17.     In my opinion, under the circumstances of its execution, the Waiver Letter was consistent with the practice of similarly situated trust and estates lawyers in Philadelphia in 2001

and was adequate under the standard of care and the ethical standards at the time to permit Schnader and Bruce to represent Anna in the 2002/2003 family settlement negotiations in which she was adverse to John Middleton.

18.     In my opinion, Bruce's representation of Anna was not "materially limited" within the meaning of Rule 1.7(b) of the Pennsylvania Rules of Professional Conduct by his own interests or by his concurrent representation of Anna and Frances.  As a result it is not necessary to consider whether he could have reasonably believed that his representation of Anna would not be adversely affected by his own interests or the concurrent representation (which of course he did as he did not believe his representation was materially limited) or whether Anna received the necessary disclosures.

## IV.   **Factual Background**

19.     Since at least 1994, Schnader and Bruce represented Frances and her husband, Herbert, in various matters, including trust and estates work.  *See* 3rd Amend. Compl. ¶¶ 3, 7, 13; *see* 3rd Answer ¶¶ 3, 7, 13; *see* Bruce Depo., p. 22.  It is around that time that Anna "became aware of Mr. Rosenfield" as "the family attorney."  Anna Depo., pp. 32, 52.  Bruce participated in the representation of Anna during her divorce in late 1994 or early 1995, although she and he did not actually meet in person until about a month after Herbert's death in May of 1998.  Bruce Depo., pp. 23-24, 29-30.

20.     Beginning in 1998 or 1999 and continuing into late 2000, Frances and Bruce discussed incorporating a lifetime transfer of Frances' shares of Bradford Holdings, Inc. ('Bradford') into her estate plan.  2017 BAR Amd. Pet., p. 13; 2016 JSM Affidavit ¶ 12; *see* Bruce Depo., pp. 90-92.  During these discussions, Bruce mentioned the advantages of a GRAT, including its tax efficiency, how it worked, and the terms required to be included in it.  *See* 2017

BAR Amd. Pet., p. 13; *see* 2016 JSM Affidavit ¶ 16; *see* Bruce Depo., p. 74.  By early 1999,

Bruce and Frances were meeting to have advanced discussions concerning the GRAT.  Bruce

Depo., pp. 79-80, 103-04.

      21.     At a meeting in June 1999 among Frances, John, and Bruce, Frances told John of

her plan to leave all of her shares of Bradford to John, consistent with the plans she made with

Herbert before his death, to leave the balance of her estate to Lucia, and to leave nothing further

to Anna.  2016 JSM Affidavit ¶¶ 12-13, 15.  Also at this meeting, Bruce discussed the use of a

series of GRATs as one way to transfer the shares to John, and they discussed what the terms of

the first GRAT would be, its requirements, the effectiveness of it, and John's appointment as

trustee.  *See id.* at ¶ 16; *see* Bruce Depo., pp. 103-04, 151-52.  After the June 1999 meeting,

Frances repeatedly expressed her intent to transfer all of her shares of Bradford to John through

one or more GRATs, to leave the balance of her estate to Lucia, and to leave nothing further to

Anna.  2016 JSM Affidavit at  ¶¶ 17-18;  *see* Bruce Depo., pp. 150-52, 162-63; *see* Anna Depo.,

pp. 114, 116.

      22.     In November or December of 2000, Bruce and Frances had another meeting

during which Bruce and she went over the requirements of a GRAT.  Bruce Depo., pp. 94, 96.

At this meeting, Frances was "very clear on the terms of the [GRAT] – the two year [annuity],

and all of the requirements."  *Id.* at 97-98.  In short, she announced all of the "required pieces of"

the GRAT except for some "technical terms with respect to the trust that would be created under

the GRAT document following the annuity payments," such as "who would be the trustees

following the GRAT period," "whether [Bruce] would come in to fill vacancies," and details

concerning "the power of appointments that would be given to John's children," which details

were to be fleshed out by Bruce and John without any input from Frances.[4]  *Id.* at 99-101, 104,

---

[4] In his report, Mr. Perkins mischaracterizes Bruce's statements as showing that "Frances did not know how the

121-23, 143-45.  The main provisions of the GRAT, including all provisions relating to the

annuity payments, never changed from the time Frances announced the Oral Trust in late 2000

through the time the Written Version was executed.  *See id* at 121-23, 161; *see* 2017 BAR Amd.

Pet., p. 14.  In conversations with Frances before February 1, 2001, John was made aware of his

appointment as trustee, which he accepted.  *See* Bruce Depo., at 103.

23.     Accordingly, prior to February 1, 2001, Frances took the steps necessary to create

the GRAT as an Oral Trust upon the Flood family sale of their shares of Bradford stock (the

"Flood family sale"), by (1) announcing that the Oral Trust contained the terms she and Bruce

discussed, including the appointment of John as trustee, (2) executing stock powers transferring

her Bradford shares to it, and (3) giving the stock powers to Bruce with instructions to effect the

transfer of her Bradford shares to the Oral Trust upon the Flood family sale, which she expected

to occur on February 1, 2001.  Immediately after receiving the executed stock powers from

Frances, Bruce delivered them either to John as the named trustee of the Oral Trust or to one of

his representatives, subject to the stated condition.  *Id*. at pp. 94-98, 102-06.  Bruce understood

that John had everything he needed to record the transfer once the powers were delivered to him,

which Bruce was told occurred on or about February 1, 2001.[5]

24.     The Flood family sale was the one and only condition precedent for the creation

of the Oral Trust.  *See id*. at 102, 105.  There was a significant benefit to making the GRAT

---

remainder would be distributed, including to whom, who the successor trustee was, or whether the unidentified
remaindermen had a power of appointment."  See Perkins' Report ¶ 54.  However, it is clear from the record that
Frances had decided that John and his appointees were going to be the remaindermen and that John was going to be
the successor trustee of the continuing trust (after the annuity period) during his lifetime.  She was only undecided
on how John's successors were to be appointed.  As to whether John's children (not "unidentified remaindermen")
would have powers of appointment (and the scope of any such powers), Mr. Perkins appears to misinterpret Bruce's
statement.  Frances did not retain the right to determine those details but rather those details were to be determined
by Bruce and John, Frances having irrevocably relinquished any right to participate in their discussions or approve
or reject the ultimate decision.

[5] Contrast with Mr. Perkins Report at ¶ 41.

transfer on the same day and at the same price as the Flood family sale in that the price at which Bradford shares were purchased from the Flood family, parties bargaining at arm's length who had no reason to sell at anything other than fair market value, would have great weight in determining the fair market value of the Bradford shares transferred to the GRAT for gift tax purposes on the same day.  Had the sale not occurred on February 1, Frances still intended to transfer Bradford shares to John through a GRAT, just not necessarily on February 1.

  25. On February 1, 2001, the Flood family sale occurred.[6]  2015 JSM Pet. ¶ 25; *see* 2017 BAR Amd. Pet., p. 13; *see* Exhibit 11 to Anna Depo., pp. 2, 10; *see* Exhibit 12 to Anna Depo., pp. 2, 10.  Accordingly, the transfer of all of Frances' Bradford stock (258,029 shares) to John as trustee of the Oral Trust became complete on February 1, 2001, as recorded in the Bradford stock registry and reported on Frances' federal gift tax return (Form 709) for tax year 2001.[7]  *See* 3rd Amend. Complaint ¶ 37; *see* 3rd Answer ¶ 37; *see* BHI008554; *see* LHW-00001216; *see* Bruce Depo., pp. 102-03, 128.  From February 1, 2001 on, John understood that he was the trustee of the Oral Trust; Bruce Depo., pp. 103, 120; and subsequent court filings refer back to February 1, 2001 as the date the GRAT was created and funded with the Bradford

---

[6] Mr. Perkins states that the sale to the Flood family occurred no earlier than March 12, 2001, which he supports by citing to Exhibits 11 and 12 to Anna Depo.  *See* ¶ 50 and page 30 of Perkins' Report.  However, this is not accurate. The sale had been made by February 1, 2001, as evidenced by the Sale Purchase Agreements and the signed Promissory Notes included in Exhibits 11 and 12, all of which are "effective as of February 1, 2001" or dated "February 1, 2001," respectively.  The cover letters included in these Exhibits, which are perhaps what Mr. Perkins is referring to, show at most that the documentation related to the sale was transmitted on March 12, 2001.  As this was a sale among family members (cousins), the parties were understandably relaxed with regard to the paperwork memorializing the sale.  I have been informed that Bruce believes that the actual payment of the sale price itself may have been delayed until March for tax purposes, although Bruce has said that he was not involved in that decision and has limited knowledge about it.  In any event, the transactional documents referred to above make clear that the parties considered the sale to have occurred on February 1, 2001 even if payment was made later. *See* Laubach Depo., pp. 79-81

[7] In his report, Mr. Perkins casts doubt on the transfer of all of Frances' shares to the GRAT by February 1, 2001 by citing to an email from John to Bruce dated March 10, 2001 in which it is implied that Frances may still have stock upon her death.  Perkins' Report ¶ 56.  However, Mr. Perkins himself provided the explanation for this concern when he noted that Bruce and John did not expect the GRAT annuity to be paid without the transfer of some shares back to Frances and thus expected three to five successive GRATs would be needed.  *See id.* ¶ 37 (citing to Bruce Depo., p. 83).

shares; *see, e.g.*, 2017 BAR Amd. Pet., p. 14; *see, e.g.*, 2015 JSM Pet., ¶ 27. Accordingly, the GRAT was construed and administered as having been created on February 1, 2001 such that the two year annuity period began on that date. Bruce Depo., pp. 156-57.

26. Although the Oral Trust was created by Frances' spoken announcement and execution and delivery of stock powers, it was always intended that there would be a written instrument to memorialize it. *See id.*, pp. 42-45, 98-99. In addition to "confirm[ing] the oral terms upon which [Frances] had established her GRAT on February 1, 2001, and upon which her trustee had been administering the trust;" 2017 BAR Amd. Pet., p. 14; the Written Version specified certain provisions taking effect after "a successful completion of the GRAT;" s*ee* Bruce Depo., pp. 101-02, 104, 121-23, 143-45. The Written Version does not make mention of the Oral Trust; it is a memorialization of the oral trust agreement in writing. *See* BHIMISC000040-61; *see* 2017 BAR Amd. Pet., p. 14; *see* Bruce Depo., pp. 121-23, 143-45. The Written Version stated unequivocally that the GRAT is "irrevocable." BHIMISC000058. It was also explicit that: "The situs of this trust shall be the Commonwealth of Pennsylvania, and all questions pertaining to the construction and validity of the provisions of this Agreement shall be governed by the law of that Commonwealth." *Id.* On November 19, 2001, Frances executed the Written Version.[8] 2017 BAR Amd. Pet., p. 14; Anna's Stmt. of Facts ¶¶ 43, 84.

27. Beginning in the spring of 2002, Lucia began to complain to Frances about the GRAT and insisted that certain of its terms be changed. 2016 JSM Affidavit ¶ 23; 2017 JSM Affidavit ¶ 4; *see* Bruce Depo., p. 163; *see* 3rd Amend. Compl. ¶¶ 39-40, 42. As a result, Frances wanted changes to the GRAT. 2016 JSM Affidavit ¶ 25; 2017 JSM Affidavit ¶ 5. Nevertheless,

---

[8] The Court found Frances to have signed the Written Version on this date. *Nupson v. Schnader Harrison Segal & Lewis LLP*, 2021 U.S. Dist. LEXIS 67825, *4, 2021 WL 1293557 (E.D. Pa., Apr. 7, 2021) (memorandum). John executed the Written Version as trustee sometime after Frances. *See* Bruce Depo., p. 149.

Bruce stressed to her that the GRAT was irrevocable and could only be modified through a family settlement agreement.  Bruce Depo., p. 196.

28.     Beginning in the summer of 2002, Bruce began to represent Anna and Frances in negotiations about modifying the GRAT and resolving other family issues with a family settlement agreement.  *Id.* at 182-83, 194; *see also* 2017 JSM Affidavit ¶ 7.  By October 2002, because of Lucia's threats of litigation and Frances' and John's desire to restore family harmony, Frances and John agreed that the remainder of the GRAT should be split equally (in trust) among John, Lucia, and Anna.  BHI046023; Bruce Depo., pp. 202, 206-07; 2016 JSM Affidavit ¶ 28.

29.     Anna wanted her share to be distributed outright.  Bruce Depo., pp. 178, 230; Anna Depo., pp. 181-82.  However, the rest of the family was opposed because of Anna's health issues and problems in her personal life.  *See* Anna Depo. pp. 181-82.  Anna had been institutionalized for depression and suffered from bipolar disorder and ADHD, conditions for which she was being medicated.  *See* Bruce Depo., p. 225; *see* Anna Depo. pp. 39, 113.  Around the time of the family settlement negotiations, Anna "was seeing [her] psychiatrist about 230 times a year."  Anna Depo., p. 113.  Anna had also rekindled her relationship with Mark Mastrangelo.  *Id*. at pp. 181-82; *see* Bruce Depo., p. 225.  Anna began her relationship with Mr. Mastrangelo, whom she eventually married, soon after her divorce from Andy Bauer.  *See* Bruce Depo., p.  27-28, 33; *see* Anna Depo., p. 29.  During the relationship with Mr. Mastrangelo, Anna's parents "expressed concerns as to his earning ability, his spending habits, and his violence" toward her, which she was unable to conceal.  Anna Depo., p. 30.  In one particular episode, Anna called Bruce after Mr. Mastrangelo had beaten her, which prompted Bruce to hire a retired police officer as her bodyguard.  Bruce Depo., pp. 225, 285.  After this incident, Anna stopped seeing Mr. Mastrangelo for several years; however, she had started seeing him again by

the time of the settlement negotiations, and the relationship continued until 2007. *See id.* at p. 225; *see* Anna Depo., pp. 31, 181-82. Accordingly, Frances believed "Anna needed protection" and insisted that her share of the GRAT be held in trust. Bruce Depo., p. 178. Nevertheless, Bruce managed to secure Anna one million dollars a year for a period of twenty-five years from the principal of her share. *See id.*, pp. 192-93; *see also* Exhibit 11 to 2016 JSM Affidavit (BHI011682-83).

30.     Prior to December 19, 2002, John was negotiating to, among other things (1) achieve final family resolution of the issues concerning Frances' estate plan, including a further inheritance for Anna, (2) receive tax protection from any adverse consequences of modification of the GRAT and (3) preclude his sisters' interference in the affairs of Bradford through the use of limited liability companies to hold their Bradford shares (including any held in trust for their benefit). *See* 2016 JSM Affidavit ¶¶ 27, 31; *see* Notes of John Middleton at BHI036556 (entry dated February 18, 2003); *see* Arias Depo., p. 48. Repurchase of their Class B Bradford shares was not discussed until Lucia proposed it on December 19, 2002 and was not a condition to a deal.[9] *See* 2016 JSM Affidavit ¶¶ 31-34; *see* Notes of John Middleton at BHI036556 (entry dated February 18, 2003); *see* Bruce Depo., pp. 227-29, 231.

31.     By letter dated October 11, 2002, and known herein as the "Waiver Letter," Anna, Frances and John consented to Schnader and Bruce's representation of Frances and Anna (but not John) in connection with a contemplated family settlement agreement concerning various disputes within the family. BHI011141-43; *see* Bruce Depo., pp. 211-13.

32.     On February 20, 2003, the "2003 Master Settlement Agreement" was executed by Frances, John, Lucia, and Anna. BHICOZ002302; 2016 JSM Affidavit ¶ 38; 2017 JSM

---

[9] In short, Bruce directly contradicts the testimony of Lucia's attorney, Elizabeth Arias, as stated in her deposition and cited by Mr. Perkins. *See* Perkins' Report ¶ 66; *see* Arias Depo., pp. 22, 38, 52, 56. John has also confirmed his position that the repurchase of his sisters' Bradford shares was not a condition of a deal.

Affidavit ¶ 13.  In connection with the 2003 Master Settlement Agreement, Frances executed the Modified 2001 GRAT, a modified version of the Written Version in mid-February 2003.  2017 JSM Affidavit ¶ 15; *see* 2016 JSM Affidavit ¶ 41.  The modification of the GRAT split the remainder equally among separate trusts for each of John, Lucia, and Anna, increasing Anna's share of the GRAT remainder from zero to one third.  *Compare* BHIMISC000042-43 *with* Modified 2001 GRAT, pp. 210-11; *see* Bruce Depo., p. 180; *see* 2016 JSM Affidavit ¶ 40.  The modification of the GRAT made no changes to the terms governing the payment of the annuity to Frances or that otherwise might compromise the trust's compliance with the GRAT requirements.[10]

33.     On February 26, 2018, Anna entered into an Agreement wherein she confirmed that "the [Oral Trust/Written Version] was properly created, funded and administered, that all GRAT annuity payments were made to Frances, and that the remainder interest was modified and the Modified 2001 GRAT reflects Frances' and all beneficiaries' intentions, and Anna forever waive[d] her right to contest the Modified 2001 GRAT."  2018 Settlement Agreement ¶ II(F)(3)(b).  In that same Agreement, Anna agreed "that there were no misrepresentations, omissions of fact, or concealment of facts by John or Bradford prior to executing the 2003 Master Settlement Agreement and the exhibits thereto."  *Id.* at ¶ II(F)(3)(g).

## V.     Discussion of Pennsylvania Law Issues as a Predicate for the Standard of Care

### A.     The creation of the Oral Trust on February 1, 2001.

34.     Prior to Pennsylvania's adoption of the Uniform Trust Act (a version of the Uniform Trust Code) in 2006, the creation and validity of trusts were determined by common law.

---

[10] Lucia's attorney has testified to such.  *See* Arias Depo., pp. 53, 58.

35.     Under Pennsylvania common law, oral trusts were valid and enforceable in Pennsylvania.  *Deaver v. Lemon*, 2015 Pa. Super. Unpub. LEXIS 1545, *10, 122 A.3d 1119 (June 1, 2015) (non-precedential decision) (citing *In re Trbovich's Estate*, 413 A.2d 379, 380 (Pa. 1980)).  This law was changed by the Pennsylvania Uniform Trust Act (the "Pa. U.T.A.") but only as to trusts created on or after November 6, 2006.[11]

36.     Under Pennsylvania common law, a trust was "created by one person or entity (the 'settlor') purporting to transfer property (the 'trust res' or 'trust property') to another person or entity (the 'trustee') to hold in trust for the benefit of another (the 'beneficiary')."  *In re Found. for Anglican Christian Tradition*, 103 A.3d 425, 428 (Pa. Commw. Ct. 2014); *accord Passarelli Family Trust*, 242 A.3d 1257, 1269 (Pa. 2020).   To accomplish this, "[t]here must be sufficient words . . . ."  *Passarelli*, 242 A.3d at 1269 (quoting *Vosburgh's Estate*, 123 A. 813 (Pa. 1924)).  These elements of trust creation were codified in the Pa. U.T.A.

37.     Under Pennsylvania common law a trust was irrevocable by default regardless of whether it was written or oral.  *See Ingels Estate*, 92 A.2d 881, 883 (Pa. 1952) ("the general rule [was] that trusts are irrevocable unless a power of revocation is expressly reserved," citations omitted); *see Galford v. Burkhouse*, 478 A.2d 1328, 1332 (Pa. Super. Ct. 1984) (taking no issue with the appellant's claim of an irrevocable, oral trust or the lower court's efforts "to determine the terms of the oral trust, including whether [the settlor] had reserved a power of revocation").  Like the situation with oral trusts, the Pa. U.T.A. changed this rule but only as to trusts created on or after November 6, 2006.[12]

---

[11] *See* 20 Pa.C.S. § 7737 *and* Act of July 7, 2006, P.L. 625, No. 98 §§ 16(4)(i), 17 (specifying the applicability of section 7737).

[12] *See* 20 Pa.C.S. § 7752(a) ("The settlor may revoke or amend a trust unless the trust instrument expressly provides that the trust is irrevocable."); *see* Act of July 7, 2006, *supra.* §§ 16(4)(ii), 17 (specifying the applicability of section 7752(a)).

38.     Under Pennsylvania common law, it is possible to incorporate by reference terms of a trust. *Hocke Trust*, 16 Pa. D. & C.3d 94, 100 (Crawford Cnty. Ct. Comm. Pls., Aug. 11, 1980) ("The courts of Pennsylvania have long subscribed to the doctrine of incorporation by reference in the construction of wills and trusts."). The Internal Revenue Service recognizes that trusts can incorporate by reference the requirements of federal tax regulations as is evidenced by the inclusion in its sample language for certain charitable remainder trusts of the following phrase, "determined under the method described in section … of the federal income tax regulations."[13]

39.     Under Pennsylvania law, "[w]hile no particular form of words or conduct is necessary for the creation of a trust, language or conduct and a manifestation of an intention to create the same must be proven by evidence which is sufficiently clear, precise, and unambiguous." *Keller v. Keller*, 41 A.2d 547, 549 (Pa. 1945).

40.     If a settlor or a beneficiary demonstrates "access and control" over the assets of an alleged oral trust as if they were owned by her personally, then the oral trust will be found not to exist. *See, e.g. Deaver*, 2015 Pa. Super. Unpub. LEXIS at *13. This should be contrasted with Frances' behavior. As settlor Frances signed a memorializing document, the Written Version, bearing the date of the Oral Trust (February 1, 2001) and made no effort to transfer to another or otherwise exert access to or control over the assets held in the Oral Trust since its creation, which is consistent with the statement in the Written Version that the trust was "irrevocable."

41.     In my professional experience, a GRAT is an effective, tax efficient technique to transfer the growth in value of a family business to the younger generation family members running the business while retaining the current value of the business (through the retained

---

[13] *See, e.g.*, Rev. Rul. 88-81, 1988-2 C.B. 127; Rev. Rul. 72-395, 1972-2 C.B. 340, as modified by Rev. Rul. 88-81, 82-128 and 80-123, and clarified by Rev. Rul. 82-165.

annuity interest) for possible eventual disposition to other younger generation family members who were not involved in the business.

42.     According to the record, Frances was aware of all of the requirements to form a valid GRAT from her numerous discussions with Bruce.  In November or December 2000, Frances announced her intent to create a GRAT to Bruce, thereby incorporating by reference the mandatory provisions, and specifying the details of her annuity payments.  In addition, she designated herself as current beneficiary, John and his appointees as remainder beneficiaries, and John as trustee (an appointment which he accepted).  At that time, Frances executed stock powers for Bruce with the instructions to effect the transfer of her Bradford shares to the GRAT effective February 1, 2001, conditioned only on the Flood family selling their shares, which did in fact occur on February 1, 2001.  Bruce delivered the executed stock powers to either John as trustee or to one of his representatives subject to the same condition.  Notably absent from the record is any evidence that Frances ever attempted to exert ownership or control over her shares after she executed the stock powers, or that Frances expressly reserved to herself the power to revoke or amend the Oral Trust when she created it.  In addition, Frances received annuity payments based on the February 1, 2001 creation and funding date of the GRAT.  For the foregoing reasons, in my opinion it was consistent with the standard of care in 2001 for Bruce and Schnader to conclude that Frances created a valid, irrevocable oral trust (the Oral Trust) on February 1, 2001, the terms of which were either explicitly stated or specified through incorporation by reference to the regulatory requirements for a GRAT.

**B.     The Written Version of the Oral Trust.**

43.     During the period when the creation of oral trusts were recognized, Pennsylvania courts permitted an oral trust to be memorialized by a subsequent written instrument.  *See*

*Deaver*, 2015 Pa. Super. Unpub. LEXIS at *12-14 (recognizing that an oral trust could be memorialized in writing several decades after its creation, but concluding on the specific facts of the case that "the trial court erred and abused its discretion in concluding that an oral trust existed.").

44.     In federal tax cases, courts have also reached the conclusion that a written document may be used to memorialize an oral trust.  *See Estate of Hill v. Comm'r*, 64 T.C. 867, 875 (1975) (noting the possibility of a written instrument being used "merely … to memorialize a prior oral trust"), *aff'd*, 568 F.2d 1365 (5th Cir. 1978) (no published opinion).  In *Hill York Corp. v. U.S.*, the Court found that a "a valid and subsisting trust" was created orally through incorporation by reference and that "the reduction to a final formal instrument" of the trust occurred two months later.  *Hill York Corp. v. U.S.*, 1964 U.S. Dist. Lexis 8497, *5, *12, 14 A.F.T.R.2d (RIA) 5160 (S.D. Fla. 1964) (unreported) (considering qualification under IRC § 401).

45.     In *DeJay Stores, Inc. v. Ryan*, "[a]fter deliberations  . . . and after detailed consultation with actuaries and legal counsel" the officers and directors of a company "settled all the terms and conditions of a pension trust  . . . and had agreed with the proposed trustee . . . upon the terms of a trust instrument . . . ."  *DeJay Stores, Inc. v. Ryan*, 229 F.2d 867, 869 (2nd Cir. 1956).  Subsequently, the directors "adopted a 'Plan,' complete in all details" to create the trust, but the trust instrument was not executed until several months later.  *Id.*  The Court found "no reason, either express or implied, why it should be necessary that the 'trust instrument'" could not be executed after the trust was created, and even though the instrument had yet to be executed the Court found that "every element of a trust came into existence . . . [t]here was (1) a

20

trustee, (2) a res, (3) a transfer of the res to the trustee, (4) and a complete agreement upon all the terms on which the trustee should hold the res." *Id.* at 870.

46.     Similar to *Dejay Stores*, in *I.S.C., Inc. v. Comm'r*, 37 T.C.M. (CCH) 1206 the Tax Court considered whether an employer had created an oral stock bonus trust under Pennsylvania law. *I.S.C., Inc. v. Comm'r*, 37 T.C.M. (CCH) 1206, 1212 (1978), *aff'd*, 609 F.2d 501 (3rd Cir. 1979).  After noting that the contemplation of a future, formal trust instrument can be evidence that a purported trust has not been presently created, the Tax Court distinguished *Dejay Stores* as a case where the settlors had "settled all the terms and conditions of a pension trust and had agreed with the proposed trustee upon the terms of a trust instrument" and where "[t]he court found that every element of a trust came into existence . . ." *Id.* at 1212-13. In contrast, the *I.S.C.* court found "no such agreement with the proposed trustee" and that "the language of the [stock bonus] plan clearly contemplates that execution of the trust agreement was necessary to create the trust." *Id.*  Moreover, the date that the trust was purported to have been created was not consistently stated to the IRS. *See id.* at 1212.  Accordingly, the Court found that an oral trust was not created.  *See id.* at 1213.

47.     In *I.S.C.*, the Tax Court cited *Scott on Trusts* (3rd ed. 1967) for the proposition that: "The fact that the settlor of the trust contemplates the subsequent execution of a formal trust instrument is persuasive evidence that he does not intend to create the trust until the instrument is executed." *Id.* at 1212.  This is actually a paraphrase, the original of which is as follows:

> "The mere fact that the settlor contemplates the subsequent execution of a formal trust instrument does not necessarily negative the present creation of a trust, if its terms are sufficiently indicated . . . On the other hand, the fact that the settlor contemplates the subsequent execution of a formal trust instrument is a strong indication that he does not intend to create the trust until the instrument is executed.  Clearly, if essential terms of the trust have not been decided upon, no trust is created." *Scott on Trusts* (3rd ed. 1967) § 26.

The Tax Court's reasoning in *DeJay Stores* and *I.S.C.* is consistent with the passage cited by *I.S.C.* from *Scott on Trusts* taking into account the facts in each case.  In *DeJay Stores*, as in the instant case, the oral trust at issue was "complete in all the details" and a proposed trustee had already accepted its appointment.  *DeJay Stores*, 229 F.2d at 869; *see I.S.C.*, 37 T.C.M. (CCH) at 1213.  Thus, "the essential terms of the trust [had] been decided upon" and "the mere fact that the settlor contemplate[d] the subsequent execution of a formal trust instrument [did] not . . . negative the present creation of the trust" because "its terms [were] sufficiently indicated."  *Scott on Trusts* (4th) § 26.  In *I.S.C.*, the completeness was lacking, there was no agreement with the proposed trustee, and execution of a written instrument was clearly a condition precedent for creation of the trust.  *I.S.C.*, 37 T.C.M. (CCH) at 1213.  In other words, "essential terms of the trust [had] not been decided upon," and not only did "the settlor contemplate[] the subsequent execution of a formal trust instrument" but it also required such, which is clearly "a strong indication that [it did] not intend to create the trust until the instrument [was] executed."  *Scott on Trusts* (4th) § 26.  Accordingly, no trust was created in the *I.S.C.* case.

48.    As discussed at length in paragraphs 20 through 23 above, at least as far back as 1999 and continuing through late 2000, Frances and Bruce had numerous and detailed discussions regarding her estate plan and the advantages and requirements of a series of GRATs as a way to tax efficiently transfer her Bradford shares to John and his family while retaining liquid assets in the form of an annuity that could be left to one or both of her daughters.  At Bruce and Frances' meeting in November or December of 2000, Bruce went over all of the requirements of a GRAT with Frances yet again, Frances clearly announced the terms of the trust, which eventually appeared in the Written Version in November 2001, except for some "technical terms with respect to the trust that would be created under the GRAT document

following the annuity payments," such as "who would be the trustees following the GRAT period," "whether [Bruce] would come in to fill vacancies," and details concerning "the power of appointments that would be given to John's children," the latter of which was to be worked out between Bruce and John without any input from Frances.  In addition, she delivered to Bruce the executed stock powers necessary to effectuate the transfer of her shares to the Oral Trust conditioned only upon the Flood family's redemption of their shares, and Bruce delivered the stock powers either to John as trustee or to one of John's representatives.  There is no evidence in the record to indicate that Frances thought she had to sign a document for the Oral Trust to constitute a valid trust or that she did not believe the Oral Trust was going to be created on February 1, 2001 as long as the Flood family sold their shares. The question therefore is whether the details concerning the remainder that were retained by Frances were "essential terms" that were so material as to prevent the trust from being created.  These details appear to relate to purely administrative issues and as such would not negate the existence of a trust.

49.    Thus, the creation of the Oral Trust and subsequent execution of the Written Version occurred under circumstances more similar to *DeJay Stores* than those of *I.S.C.*  To wit:

(a)    All of the essential terms of the Oral Trust were decided upon at the late 2000 meeting whereas the *I.S.C.* trust was incomplete when it was alleged to have been created;

(b)    John knew of the trust terms and accepted his trusteeship prior to the creation of the Oral Trust whereas the *I.S.C.* trustee had not agreed to the terms of the trusteeship before the alleged creation;

(c)    Although it was always contemplated that there would be a written instrument, it was not a condition of the creation of the Oral Trust whereas in *I.S.C.* the execution of a written instrument was a condition that was not satisfied until after the purported creation of the trust;

(d)    The only condition on the creation of the Oral GRAT was the redemption of shares by the Flood family, which occurred as anticipated on February 1, 2001, and such date is consistent with court filings, Frances' 2001 gift

tax return, and the 2018 Settlement Agreement[14] whereas in *I.S.C.*, the
date of creation was inconsistently stated to the IRS.

For this reason, and for the reason that Pennsylvania law acknowledges the possibility of
memorializing an oral trust with a written instrument, in my opinion it was consistent with the
standard of care in 2001 for Bruce and Schnader to conclude that the Written Version is a
memorialization of the oral trust agreement articulated by Frances in late 2000, and was not a
new November trust created on the date the Written Version was executed.

       **C.**    **The November Trust.**

    50.    Nonetheless, if it were to be determined that the Oral Trust, although a valid trust,

was not an irrevocable trust, then the execution of the Written Version would have either [a]

restated the Oral Trust as the November Trust, or [b] revoked the Oral Trust and replaced it with

the November Trust.  The result in either case is that under such circumstances a new trust, the

November Trust, would have been created as of November 19, 2001, the date of execution of the

Written Version, with the trustee thereof holding the property transferred to the Oral Trust and

not previously disposed of.

       **a.**  **The Written Version as Restatement of the Oral Trust.**

    51.    A revocable trust may be restated if the settlor merely rewrites and re-executes the

trust's provisions – explicitly revoking the prior provisions is unnecessary.  This was recognized

in *Heusted Estate*, 169 A.2d 57, in which a settlor who "entirely rewrote all the dispositive

provisions" of his revocable inter vivos trust several times without expressly revoking those

portions of the original trust indenture was found to have revoked certain "dispositive provisions

of the prior trust and create at that time new dispositive interests or gifts." *Heusted Estate*, 169

A.2d 57, 59, 61 (Pa. 1961)

---

[14] The 2018 Settlement Agreement, dated February 26, 2018 and approved by the Orphans' Court Division of the
Court of Common Pleas of Montgomery County, Pennsylvania, settled a litigation between John and Anna in
various capacities involving several different disputes with respect to several different trusts including the two trusts
involved in this litigation.  Neither Bruce nor Schnader was a party to that litigation.

52.     Since its creation, it had always been contemplated that the Oral Trust would be reduced to a writing.  The Written Version was that writing, and it completely restated the Oral Trust.  In my opinion, if the Written Version is not regarded as a memorialization of the Oral Trust, then the Written Version would likely be regarded as an implicit restatement of the Oral Trust, converting it into the irrevocable trust referred to herein as the "November Trust" as of the date of the restatement.

> **b.  The Written Version as a Replacement of the Oral Trust with the November Trust.**

53.     In a challenge to the validity of a trust, the Philadelphia Orphans' Court held that if the trust were invalid, its subsequent modification "in effect executed a new deed of trust, incorporating by reference all of the terms and provisions of the [failed] deed . . . [and] that the trustees thereafter held the assets . . . under the terms of a new trust."  *Scholler Estate*, 20 Pa. D. & C.2d 318, 329-330 (Phila. Cnty. Ct. of Comm. Pls., Dec. 7, 1959) (en banc), *aff'd sub nom. Scholler Trust*, 169 A.2d 554 (Pa. 1961).  This is an alternative way to view the November Trust.

54.     "Where the settlor reserves the power to revoke the trust, he can revoke it and immediately create a new trust of the property, designating the trustee of the old trust as trustee of the new . . . it is unnecessary to go through the formality of . . . making a new conveyance to the trustee."  *Scott on Trusts* (4th ed.) § 331.1; s*ee Schautz Trust*, 8 Fiduc. Rep. 677, 684 (Lackawanna Cnty. Ct. Comm. Pls., June 6, 1958 and Oct. 30, 1958) (quoting and effectively adopting *Scott on Trusts* § 331.1).

55.     In *Schautz Trust*, the Court found that a "donor's deed  . . . was a termination and revocation of the original trust agreement and the creation of a new deed of trust."  *Schautz Trust*, 8 Fiduc. Rep. at 684.  On appeal, the Supreme Court of Pennsylvania affirmed the lower court, but held that an interpretation whereby a trust is terminated and recreated ("wiping clean

25

the slate") is generally not to be preferred to one whereby the trust is simply modified. *Schautz Trust*, 151 A.2d 457, 460-61 (Pa. 1959).

56.     Assuming that the Written Version is neither a memorialization nor a restatement of the Oral Trust, then the Written Version would have revoked the Oral Trust and replaced it with the November Trust.  In my opinion, this would not be the interpretation preferred by Pennsylvania courts (compared to the other two interpretations), but it is consistent with Pennsylvania law and the facts.  In such circumstances, the reconveyance of the trust property between John and Frances could be dispensed with as a mere formality.  John as trustee was already in possession of stock powers indorsed in blank and the Written Version contains specific conveyance language.  It provides in its first operative paragraph "Grantor hereby transfers and delivers to Trustee the property set forth in Schedule 'A' …" and Schedule A sets forth a description of Frances' Bradford shares, including the details of the stock certificates in question.

### c.   The November Trust was a valid irrevocable trust in either case

57.     If the Written Version is not considered a memorialization of the Oral Trust, then the November Trust met all the requirements of a valid trust as of the execution of the Written Instrument, regardless of whether the Written Instrument is viewed as a restatement or replacement of the Oral Trust.  This is because the terms were all specified, Frances was the designated annuity beneficiary, John and his family were the designated remainder beneficiaries, John had accepted his trusteeship, and the Bradford shares had been transferred to John as trustee.  Furthermore, the November Trust was unequivocally "irrevocable."  Therefore, in my opinion it would have been consistent with the standard of care in 2001 for Bruce and Schnader to have concluded that if the Oral Trust were determined to not be a valid irrevocable trust on

26

February 1, 2001, the November Trust would be a valid irrevocable trust as of November 19, 2001.

### D.    The validity of a trust (oral or written) under Pennsylvania law that does not qualify for an intended federal gift tax benefit.

58.    "Property interests are created and defined by state law." *Stern v. Marshall*, 564 U.S. 462, 495 (2011) (indirectly quoting *Butner v. U.S.*, 440 U.S. 48, 55 (1979)).  In particular, whether a trust exists, the interpretation of its terms, the rights of beneficiaries and the duties of trustees are all determined by state law.  *Skiba v. Laher*, 496 F.3d 279, 288 (3ʳᵈ Cir. 2007) ("trusts are by nature created and defined by state law").  "State law, which creates legal interests and rights in property, determines the nature, scope and validity of such legal interests and rights," and "[f]ederal law, in turn, determines the federal taxation of such interests or rights." *Cameron v. U.S.*, 2004 U.S. Dist. Lexis 22144, *8, 2004-2 USTC Para. 60,491, 2004-2 USTC 85,673 (W.D. Pa. Oct. 6, 2004) (citing *Morgan v. Comm'r*, 309 U.S. 78 (1940)); *accord. Estate of Feinstein*, 527 A.2d 1034, 1037 (Pa. Super. Ct. 1987) ("Although federal law governs the taxability of the various interests involved, Pennsylvania law governs the interpretation and administration of the trust itself.")  Accordingly, in federal transfer tax cases federal courts will apply Pennsylvania law to interpret the provisions of a Pennsylvania trust.  *See, e.g., Miller v. U.S.*, 387 F.2d 866, 868 (3ʳᵈ Cir. 1968); *see, e.g. Cameron,* 2004 U.S. Dist. Lexis at *8-*17.[15]

---

[15] There is no doubt that Pennsylvania law governs the validity of the GRAT.  Under Pennsylvania common law, "the court having jurisdiction to administer a trust and the governing law to be applied in that administration are primarily matters of settlor's intent." *Holdeen Trust*, 58 Pa. D. & C.2d 602, 612 (Phila. Cnty. Ct. of Comm. Pls. Nov. 20, 1972), *aff'd sub nom. Trusts of Holdeen*, 403 A.2d 978 (Pa. 1979). The Pa. U.T.A. is consistent with this position, and it governs all trusts before, on, or after its effective date.  *See* 20 Pa.C.S. § 7707(1); *see* Act of July 7, 2006, P.L. 625, No. 98 § 16(3).  In the absence of an explicit designation, the law of the state in which the Settlor is domiciled at the time the trust becomes irrevocable governs.  20 Pa.C.S. § 7707(2).  Not only was Frances (the Settlor) domiciled in Pennsylvania at the time the GRAT became irrevocable, but also the Written Version states explicitly at Item FIFTEENTH that "The situs of this trust shall be the Commonwealth of Pennsylvania, and all questions pertaining to the construction and validity of the provisions of this Agreement shall be governed by the law of that Commonwealth."  BHIMISC0000058.

59.     Under Pennsylvania law, the failure to qualify for an intended tax consequence does not make a trust invalid – if it did, Pennsylvania courts would never permit the reformation of trusts in order to achieve the settlor's tax goals.  *See*, *e.g.*, *Scholler Trust*, 169 A.2d 554 (Pa. 1961) (permitting reformation of an irrevocable trust to achieve charitable status and tax objectives); *see*, *e.g.*, *Irish v. Irish*, 65 A.2d 345 (Pa. 1949) (permitting reformation of an irrevocable trust to achieve tax objectives); *see*, *e.g.*, *Fisher Estate*, 26 Pa. D. & C.2d 351 (Phila. Cnty. Ct. of Comm. Pls. Feb. 5, 1962) (permitting reformation of an irrevocable trust to achieve tax objectives).

60.     Consequently, Pennsylvania and federal courts would acknowledge that Pennsylvania law governed the administration and interpretation of the GRAT, whether as announced orally or under the Written Version.  Because Pennsylvania law would not invalidate the GRAT for failure to meet Frances' tax objectives, neither would federal courts.

61.     Notwithstanding the foregoing, when a transfer to an inter vivos trust does not qualify for the intended tax benefit, it may be possible for the transferor to rescind a transfer to a trust due to a mistake of fact or law (namely, that the transfer does not qualify for the intended benefit).  See, for example, *Neal v. U.S.*, 98-2 USTC Para. 60,318, 98-2 USTC 86,519 (W.D. Pa. 1998) and *Lange v. U.S.,* 78 AFTR 2d (RIA) 96-6553 (N.D. In. 1996), which reach different conclusions on facts similar to each other involving trusts intended to comply with IRC §2036(c), a forerunner to section 2702.[16]  However rescission is not automatic and requires an

---

[16] Mrs. Neal created a grantor retained income trust ("GRIT") in 1988.  In 1989, the IRS issued Notice 89-99 under which her GRIT would not qualify for an exception to application of then existing IRC § 2036(c) because it included a reversionary interest worth more than 25% of the trust value.  To comply with the Notice, Mrs. Neal released her contingent reversion and paid a gift tax on the release.  Section 2036(c) was retroactively repealed in 1990 as a result of which there was no need for Mrs. Neal to have released her contingent reversion.  Mrs. Neal then rescinded her release and claimed a refund of the gift tax.  The Third Circuit affirmed (without published opinion) the lower court's holding that Mrs. Neal was entitled to rescind her release due to "her unilateral mistake of law as to the validity of the repealed provision of the tax code and the implementing IRS notice."  *Neal* 98-2 USTC at 520.  They therefore concluded that her gift tax paid should be refunded.  *Neal v. U.S.*, 187 F.3d 626 (3rd Cir. 1999) (without published opinion).

act by the transferor. *See, e.g., Passarelli*, 242 A.3d at 1269 ("an irrevocable trust is not easily changed . . . Because a grantor gives up the right to amend or rescind an irrevocable trust, care must be taken in drafting, reviewing, and funding a trust . . ."). There is no suggestion that Frances ever attempted to rescind the trust transfer. Therefore, in my opinion it was consistent with the standard of care in 2001 for Bruce and Schnader to conclude that the Oral Trust was a valid irrevocable trust even if it were determined that it did not qualify for federal gift tax purposes as a GRAT.

### E.    The Lawyer's Standard of Care Regarding the Investment Standards Applicable to Pennsylvania Trusts.

62.    In my opinion the standard of care in Pennsylvania in 2002 and 2003 under the circumstances existing then required an attorney advising a beneficiary or an individual co-trustee with respect to a possible sale of the trust's sole asset to inform her about the benefits of diversification, including the decision whether to retain or sell an inception asset that comprises the entirety of the trust's investment portfolio.[17]  Bruce explained the risks of having an investment in a single, private company and the benefits of a more diversified portfolio while leaving the ultimate decision of whether to sell or continue to hold the Bradford stock entirely in Anna's hands. Therefore, in my opinion Bruce's advice in 2002/2003 met the applicable standard of care.

### F.  Use of "Vulnerabilities" Under Pennsylvania Law in Negotiations

---

[17] Pennsylvania trusts became subject to a new set of investment rules, codified in the Pennsylvania Prudent Investor Act, on December 25, 1999, which changed the investment standards to which Pennsylvania trustees were subject. See footnote 3, *supra*. The fundamental change from the earlier Prudent Man Rule was the emphasis placed on a trustee's duty to diversify, rather than on the prudence of each individual stock selection. Of the two trusts for Anna that sold Bradford stock in 2003, only the 2001 Anna Trust was subject to all provisions of the Pennsylvania Prudent Investor Act. Although the Pennsylvania Prudent Investor Act is generally effective on or after December 25, 1999, certain of its provisions, including its provision concerning diversification, are only applicable to trusts created on or after that date. See 20 Pa.C.S. § 7204(b) (codifying Act of June 25, 1999, *supra* § 6(b)).

63.     As is discussed in section A of this Part V, Frances created the Oral Trust with her son, John, as trustee and transferred her Bradford Stock to it, both effective on February 1, 2001. The Oral Trust was intended to qualify as a GRAT and intended to be memorialized in a signed writing within the taxable year.  As is discussed in section B of this Part V, it was memorialized in a signed writing, dated February 1, 2001, which was executed on November 19, 2001.  As is also discussed in section B, it is my opinion that the best interpretation of these events is that the November 19, 2001 memorialization (referred to herein as the "Written Version") is a continuation of the Oral Trust and that the terms of the Written Version are in fact the terms of the Oral Trust.  Therefore, the formulation "Oral Trust/Written Version" is sometimes used herein to refer to the single trust that began as an oral trust and continued as a trust with a written governing instrument by reason of its being memorialized in the Written Version.  It is also sometimes referred to herein simply as the "Oral Trust."

64.     As is discussed in section C of this Part V, it is my opinion that even if the Written Version were not a memorialization of the Oral Trust, the Written Version would be the governing instrument of a new trust, effective on the date of its execution, November 19, 2001, and holding the Bradford stock.  This New Trust is referred to herein as the November Trust to distinguish it from the Oral Trust/Written Version.

65.     In my opinion, for the reasons set forth in sections A-D of this part V, there is no doubt that as of November 19, 2001, there existed a valid irrevocable trust holding Bradford shares of which the grantor and initial term beneficiary was Frances, the trustee was John and the remainder beneficiary was a trust for John's benefit during his life and the benefit of John's appointees after his death.  This valid trust was either the Oral Trust governed by the Written Version or the November Trust.

66.     Mr. Perkins and Professor Ross argue that the circumstances and implementation of the creation and funding of the Oral Trust suggest that it was not valid or properly funded or, as is discussed below, eligible to be treated as a GRAT for federal gift tax purposes.  Further, they argue that those arguments could have given Anna leverage in negotiations with John, presumably by undercutting the advantage he maintained as the named remainder beneficiary (along with his appointees) of the Oral Trust, to the exclusion of Anna and Lucia (and their families).  In my opinion their arguments about the validity of the GRAT are considerably weaker than they claim and making them would have been contrary to Anna's economic interest (from the beginning of the settlement discussions she was to receive in the settlement, in trust, a full one-third share of the GRAT remainder and a full one-third share of the balance of Frances' estate), and would have risked alienating Frances and John.  Moreover, I strongly disagree with the conclusion that such arguments should have been used in the negotiations to threaten John or that a competent attorney would have used them.  The negotiations occurred well after November 19, 2001 and John had all the same rights in the November Trust as he had in the Oral Trust.  Attempting to discredit the Oral Trust to obtain leverage would therefore have been fruitless as well as potentially harmful to Anna's interests.  Neither Mr. Perkins nor Professor Ross provide any support for their proposition that such a strategy would have worked, let alone been beneficial to Anna.  *See* Perkins' Report, pp. 38-39; *see* Ross' Report, pp. 5-6.  I reserve the right to supplement this opinion based on John's testimony at trial as to what he would have done if confronted by the threats suggested by Mr. Perkins and Prof. Ross.

67.     It seems that Mr. Perkins concluded that if the Oral Trust was invalid or revocable or that if a transfer to it would be considered incomplete, then the Written Version should simply be ignored.  In my opinion, on the other hand, if any of those conclusions concerning the Oral

31

Trust were reached, they would have become moot on November 19, 2001, when the November Trust would have been created, substituting a written trust for an invalid oral trust, converting a revocable oral trust into an irrevocable written trust or completing any incomplete gift created by a valid oral trust.  In any case as is discussed in section C of this Part V, the November Trust would be as of November 19, 2001 a valid trust holding the Bradford stock and any retained rights to revoke the trust or change beneficiaries that applied to the Oral Trust would have terminated.

## VI.   Discussion of Federal Gift Tax Issues as a Predicate for the Standard of Care

### A.   Reporting of the Oral Trust on Frances' 2001 Federal Gift Tax Return as a GRAT.

68.     The term "GRAT" is used to describe a trust in which the grantor has retained an interest that meets the definition of a "qualified interest" under IRC § 2702(b)(1), i.e., an interest that "consists of the right to receive fixed amounts payable not less frequently than annually."[18] Treasury Regulations § 25.2702-2(a)(6) and (7) refer to this type of qualified interest as a "qualified annuity interest" and add detail to and expand upon the statutory qualification requirements, which are met by including specific provisions in the "governing instrument" of the trust.  The "governing instrument" of a GRAT is defined in the Treasury Regulations as "the instrument or instruments creating and governing the operation of the trust arrangement."  Treas. Reg. § 25.2702-2(a)(9).  There is no stated requirement that the governing instrument of a GRAT be in writing.  This differs, for example, from Treas. Reg. § 1.408-2(c) (1), which states in

---

[18] A retained interest in a trust that also benefits family members of the grantor (as defined in IRC § 2704(c)(2)) and that does not meet the definition of a "qualified interest" results in an artificially large taxable gift unless the transfer is wholly incomplete for federal gift tax purposes.  This is because under IRC § 2702 the retained interest is valued at zero with the result that the value of the gift for gift tax purposes includes the value of the grantor's retained interest.  For example if a grantor gives $100 to a trust in which the grantor has retained an interest valued at $95, the taxable gift for gift tax purposes would be $5 ($100-$95) if the retained interest is a qualified interest and $100 ($100-0) if the retained interest is not a qualified interest.

pertinent part "A … is treated as an individual retirement account if the requirements of paragraphs (c)(2) and (c)(3) of this section are satisfied under **the written governing instrument creating the trust**." (Emphasis added).  No court case holds that the governing instrument of a GRAT must be in writing.

69.     The GRAT requirements applicable to the Oral Trust as reduced to writing in the Written Version are:[19]

   a.   The annuity or fixed amount must be payable at least annually to (or for the benefit of) the grantor retaining the interest, based either on the anniversary date of the creation of the trust or the taxable year of the trust.  Treas. Reg. § 25.2702-3(b)(1)(i) and (3).

   b.   The governing instrument must require proration of the annuity amount in short taxable years and the last taxable year of the term.  Treas. Reg. §27.2702-3(b)(3).

   c.   If based on the taxable year of the trust, the annuity amount may be paid following the close of the taxable year "provided the payment is made no later than the date by which the trustee is required to file the income tax return of the trust for the taxable year (without regard to extensions)." Treas. Reg. §25.2702-3(b)(4).

   d.   The annuity amount must be either a stated dollar amount or a "fixed fraction or percentage of the initial fair market value of the property transferred to the trust, as finally determined for federal tax purposes." Treas. Reg. § 25.2702-3(b)(1)(ii).

   e.   If the annuity amount  is stated in terms of a percent of the initial fair market value of the trust, the governing instrument must contain provisions meeting the requirements of Treas. Reg. §1.664-2(a)(1)(iii) relating to incorrect valuations.  Treas. Reg. §25.2702-3(b)(2).

   f.   The annuity amount must be paid to the grantor whether or not the trust has produced income equal to the annuity.  If income is insufficient, the trustee must be required to invade principal to pay the annuity.  *See* Treas. Reg. §25.2702-3(e), example 4.

---

[19] The specific Treasury Regulations referred to in this report are referred to by their current numbers even though certain of them had different numbers at the time of the creation of the Oral Trust.  *See* T.D.9181 (February 22, 2005), which *inter alia*, inserted certain new provisions and re-numbered certain existing regulations.

g.    The term of the trust must be for the life of the grantor retaining the interest, for a specified term of years or for the shorter of the two periods, and it must be fixed in the governing instrument and ascertainable at the creation of the trust.  Treas. Reg. §25.2702-3(d)(4).

h.    The governing instrument must prohibit additional contributions to the trust. Treas. Reg. §25.2702-3(b)(5).

i.    The governing instrument must prohibit distribution of trust property to anyone other than the holder of the annuity interest during the term of the GRAT.   Treas. Reg. §25.2702-3(d)(3).

j.    The governing instrument must prohibit commutation, i.e. the prepayment of the annuity interest at its actuarial value at the date of prepayment. Treas. Reg. §25.2702-3(d)(5).

k.    The governing instrument must prohibit the trustee from issuing a note, other debt instrument, option, or other similar financial arrangement in satisfaction of the annuity payment obligation. Treas. Reg. §25.2702-3(d)(6)(i).

70.    Despite the detailed regulations setting forth these requirements (collectively referred to herein as the "GRAT Requirements"), there remains both uncertainty and controversy surrounding certain of the requirements.  Some of the controversy that existed at the time of the Oral Trust has been resolved today.[20]  More to the point, there is no explicit guidance as to whether the governing instrument requirements of a GRAT can be met with an oral trust that is reduced to writing within the same tax year.[21]

71.    What guidance there is suggests that the terms of an oral trust that can be proven by "evidence that is clear, precise, indubitable, and unequivocal" will be respected for tax purposes.  *See I.S.C., Inc.*, 37 T.C.M. (CCH) at 1212.  The subsequent memorialization of the Oral Trust within the same tax year, along with the testimony of those present when the Oral

---

[20] See, for example, *Walton v. Comm'r*, 115 T.C. 589 (2000) in which a unanimous Tax Court held an example in the GRAT regulations to be invalid; Notice 2003-72, 2003-2 C.B. 964 (announcing IRS acquiescence in *Walton*); Reg. §25.2702-3(d)(4) & (e), Example 5 as amended February 15, 2005.

[21] See paragraph 68, *supra*.

34

Trust was created should provide the necessary evidence.  Moreover, a subsequent memorialization of an oral trust is different from the subsequent execution of a formal trust instrument.

72.    As discussed at paragraphs 43-49, the best interpretation of the Written Version is as the intended memorialization of the Oral Trust.  The record makes clear that Frances intended to create an Oral Trust that would subsequently be memorialized in writing, and did not intend that the trust not be created until the written instrument is executed.

73.    It is inarguable that it is easier to establish that the terms of a trust meet the GRAT requirements if the governing instrument of the trust is in writing.  This does not mean it is impossible to establish that the terms of an Oral Trust do, however.  In the instant case, if the Written Version is recognized as memorializing the terms of the Oral Trust, rather than as a formal trust instrument creating a trust as of the date of its execution, then it can be reviewed to determine if all the requirements of a GRAT are met.  They are.  Specifically:

a.    The requirement relating to the timing of payment of the annuity amount is met by the first sentence of paragraph 1 of Item SECOND.

b.    The requirement that the governing instrument require proration of the annuity amount is met by Item SECOND, paragraph 3.

c.    The requirement that the annuity amount must be paid no later than the date by which the trustee is required to file the income tax return of the trust for the taxable year (without regard to extensions) is met by Item SECOND, paragraph 2.

d.    The requirement concerning the description of the annuity is met by Item FIRST.

e.    The requirement that the governing instrument contain provisions meeting the requirements of Treas. Reg. §1.664-2(a)(1)(iii) is met by Item SECOND, paragraph 4.

f.    The requirement that the annuity amount be paid to the grantor whether or not the trust has produced income equal to the annuity is met by the second sentence of paragraph 1 of Item SECOND.

g.    The requirement relating to the term of the trust is met by Item FIRST.

35

h.    The requirement that the governing instrument prohibit additional contributions to the trust is met by Item SECOND, paragraph 7.

i.    The requirement that the governing instrument prohibit distribution of trust property to anyone other than the holder of the annuity interest during the term of the GRAT is met by Item SECOND, paragraph 5.

j.    The requirement that the governing instrument prohibit commutation is met by Item NINTH.

k.    The requirement that the governing instrument prohibit the trustee from issuing a note, etc. in satisfaction of the annuity payment obligation is met by Item SECOND, paragraph 6.

74.    In my opinion, it is, and was in 2002, consistent with the standard of care to prepare a 2001 gift tax return for Frances reporting the gift to the Oral Trust as a February 1, 2001 gift to a GRAT as long as the preparer believes in good faith that the position has a realistic likelihood of success, which the Internal Revenue Service has said means a 1 in 3 chance of success if challenged.[22]  *See* IRC §§ 6662(b)(1) and 6664(c); *see* Treas. Reg. §§ 1.6662-1 and 1.6664-4.  Given Bruce's strong belief that the Oral Trust was a valid GRAT properly memorialized in the same tax year by the Written Version, the above discussion indicates that Bruce met the standard of care in preparing the 2001 gift tax return.  *See* Bruce Depo., pp. 215-17.

**B.  The November Trust as a GRAT.**

75.    As is discussed in part V.C, if it were to be determined that the Oral Trust, although a valid trust, was not an irrevocable trust, then a new trust, the November Trust, would have been created as of the date of execution of the Written Version with the trustee thereof holding the property transferred to the Oral Trust and not previously disposed of.

---

[22] See, for example, slide 3 of the *Statements on Standards for Tax Services*, presented by the American Institute of Certified Public Accountants at the 2010 IRS Nationwide Tax Forum, https://www.irs.gov/pub/irs-utl/statements_on_standards_for_tax_services.pdf (2010).

76.     Under such circumstances the Written Version would be considered the governing instrument of the November Trust, and its terms must be examined to determine whether it qualifies as a GRAT for federal gift tax purposes.  As discussed below, in my opinion it does.

77.     In reaching this conclusion, it is significant that the Written Version does not refer to "February 1, 2001" *per se* with respect to the provisions concerning the annuity amount and its payment.  Rather, Item FIRST provides that the trust term shall begin on "the date on which the original contribution is transferred, **for federal gift tax purposes**, from Grantor to Trustee ('trust creation date'), and shall continue until the second anniversary of the trust creation date ('trust term')." (Emphasis added.)  The "trust creation date" of the November Trust as so defined would be the date that the Written Version was executed because if it is posited, as stated in paragraph 75 above, that the Oral Trust was not an irrevocable trust, then the contribution would not be transferred for federal gift tax purposes until the Written Version was executed creating the irrevocable November Trust.  The terms of the November Trust, interpreted in that light, would meet the GRAT requirements in the same manner and for the same reasons discussed in paragraph 73 above.

78.     However, by administering the trust as if the trust creation date were February 1, 2001, rather than November 19, 2001, the trustee would not have administered the trust consistently with its terms.  For example, the trust would have overpaid the annuity amount due for 2001 (essentially paying early amounts due in 2002) and prematurely made the 2003 payment.  Nonetheless the full annuity amounts for the November Trust would have been paid timely, albeit early.

79.     The regulations do not suggest any adverse consequences if the trust is not administered consistently with the terms of the trust required by the regulations, and there do not

appear to be any cases or rulings holding that a failure to administer a trust consistently with one

or more trust terms that comply with the GRAT regulations would disqualify the GRAT.

Moreover, in related areas courts have held that the terms of the trust determine the tax

consequences flowing from it even where the trust has been administered inconsistently with the

terms. *See, e.g., Bennett v. Comm'r*, 79 T.C. 470 (1982); *see, e.g., Estate of Bloch v. Comm'r*, 78

T.C. 850 (1982); *but see Estate of Atkinson v. Comm'r*, 309 F.3d 1290 (11th Cir. 2002), *aff'g* 115

T.C. 26 (2000).

80.      In *Bennett*, the Tax Court considered, *inter alia*, whether the trustees' failure to

pay income as required by the trust agreement would result in the grantors' being deemed the

owners of the trust for income tax purposes by reason of IRC section 674 and held "that the

misadministration of the trust, although possibly subjecting the trustees to liability for a breach

of fiduciary duty, does not bring the trust within the purview of section 674." *Bennett*, 79 T.C. at

485-87.  In *Estate of Bloch*, the court held that the trustee's "wrongful use of his trust powers . . .

did not convert those powers into 'incidents of ownership,'" which would include trust assets in

his gross estate and remarked: "The estate tax is an excise tax on the transmission of property at

death, not a device to correct past wrongs." *Estate of Bloch*, 78 T.C. at 862-64.

81.      Furthermore, regardless of the November 19, 2001 value of the shares transferred,

the gift reported for 2001 would have exceeded the amount that should have been reported for

the November Trust, which would have been zero.  A gift into a GRAT is valued by subtracting

the present value of the annuity payments required to be paid to the grantor from the amount

contributed.  The present value of the annuity payments is determined by the interest rate

prescribed by the Internal Revenue Service pursuant to section 7520 of the Internal Revenue

Code for the month in which the gift to the GRAT occurred (the "7520 rate").  Therefore, the

value of a gift to a GRAT is zero when the present value of the retained annuity payments so determined equals or exceeds the value of the assets contributed.  Because the 7520 rate fell from 6.2% in February of 2001 to 5.0% in November of 2001[23] and the annuity amount was defined not as a dollar amount but as a percentage (54.64%) of the gift tax value of the initial contribution, the percentage that would result in a relatively small gift if considered made in February, 2001 would result in a gift of zero if considered made in November, 2001.[24]

82.     Therefore, in my opinion it would have been consistent with the standard of care in 2001 for Bruce and Schnader to have concluded that should it be determined that the Oral Trust was not a valid irrevocable trust meeting the requirements of a GRAT as of February 1, 2001, the November Trust would in any event be determined to be a valid irrevocable trust meeting the requirements of a GRAT as of November 19, 2001 and that Frances' taxable gift would not have increased as a result.

### C.  Use of Federal Gift Tax "Vulnerabilities" in Negotiations.

83.     At the beginning of  Part III of his report (on page 31), Mr. Perkins states "Without offering an opinion as to whether the GRAT transaction met the requirements of an exception to IRC § 2702 on February 1, 2001 [by meeting the requirements of a GRAT], in order to realize the intended gift tax result, I have concluded that an unconflicted attorney acting on Anna Nupson's behalf, in the process of negotiating the terms of the Family Settlement Agreement could have raised the following questions in order to strengthen her negotiating position."  In my opinion, Mr. Perkins overstates the risk of non-qualification as a GRAT,

---

[23] Rev. Rul. 2001-7 and Rev. Rul. 2001-52.

[24] The percent of fair market value needed to result in a gift valued at zero in a two year GRAT at the November 5% interest assumption is, per Tiger Tables, 53.78% (rounded).  As this is less than the 54.64% of fair market value set forth in the GRAT, if the gift to the GRAT were considered to have been made in November, it would have resulted in a zero gift, regardless of the fair market value of the amount contributed.

particularly with respect to the November Trust, and perhaps more importantly in my opinion, raising questions concerning the GRAT qualification could only be construed as a threat affecting Frances' gift tax liability.  Making such a threat would have been foolhardy and would have hurt Anna in the negotiations.  See paragraphs 21 and 66, *supra* and paragraphs 87 and 88, *infra*.

84.    First, as discussed in section B of this Part VI, the November Trust met all of the requirements of a GRAT listed by Mr. Perkins. [25]  If, contrary to Bruce's belief, the transfer to the Oral Trust was not completed as of February 1, 2001 or if the transfer, although complete under Pennsylvania law to make the Oral Trust the owner of the stock, did not result in a completed gift for federal gift tax purposes, then the creation date for purposes of the Treasury Regulations would have been November 19, 2001, [26] and by that date all the listed requirements were met.

85.    Second, with respect to the Oral Trust, section A of this Part VI already fully discusses the requirements set forth in Part II of Mr. Perkins' report other than the requirements for the application of IRC § 2702 in the first place.[27]  The first of these, that the individual must make a "transfer of an interest in trust," while not a requirement for the application of the GRAT exception is essential to gaining the benefit of a GRAT.[28]  As is discussed earlier in this report,

---

[25] The first two of the five requirements for a transfer in trust to qualify as a GRAT (i.e., "[t]o qualify for an exception under IRC § 2702) that Mr. Perkins identifies on page 32 of his report are not requirements to qualify for the GRAT exception to IRC § 2702.  Rather they are conditions for IRC § 2702 to apply in the first place.  If IRC § 2702 does not apply to a transfer, the tax treatment is no worse (and may be better, depending on the trust terms) than the tax treatment that results when IRC § 2702 applies to a transfer but the transfer satisfies the requirement of the GRAT exception.

[26] Section. 25.2702-1(c)(1) of the Treasury Regulations provides that Section 2702 does not apply to a "transfer no portion of which would be treated as a completed gift without regard to any consideration received by the transferor."  As a result, the creation of a trust for purposes of determining whether an interest in it is a qualified interest under section 2702 can be deemed to occur no earlier than the earliest time at which section 2702 applies to a transfer to the trust, i.e., at the earliest time at which a transfer to it would be a completed gift without regard to consideration.

[27] See footnotes 25 and 26 *supra*.

Bruce delivered the executed stock powers to John as trustee or his agent subject to a condition and once the condition was met, Frances no longer had any rights to or control over the stock and John as trustee had everything necessary to require the title to the stock to be changed on the books of Bradford.  This is all that is necessary for a completed transfer for gift tax purposes.[29]  The more significant question is whether the terms of the Oral Trust were complete for gift tax purposes, which if the Written Version is respected as a memorialization of the Oral Trust it certainly would be.  Moreover, if the Written Version were not so respected, the November Trust, as discussed in section B of this Part and stated above, would then come into existence and meet the requirements of a GRAT.

86.     Mr. Perkins then raises the question of whether the Oral Trust was, as of February 1, 2001, for the benefit of a "member of the transferor's family."  While some details may not have been known as of that date, what was known was that the Oral Trust was for the sole benefit of John (a member of Frances' family within the meaning of the Treasury Regulations cited at footnote 12 of Mr. Perkins' report) during John's lifetime and that he was given a broad power of appointment over the disposition of the trust property on his death.  This simply means that the transfer to the Oral Trust was subject to IRC § 2702 as long as the transfer to the Oral Trust was complete for gift tax purposes. [30]  The gift was complete because any details not known on February 1, 2001, were either purely administrative in nature (and not of a type to

---

[28] The estate planning benefit of  a GRAT is that the gift for gift tax purposes is complete when the GRAT is created and funded (with the value of the annuity subtracted from the amount contributed to determine the size of the taxable gift) and that no gift occurs when (or after) the retained annuity interest terminates.

[29] *See* Treas. Reg. 25.2511-2; *Estate of Davenport v. Comm'r*, 184 F.3d 1176, 1187 (10th Cir. 1999) (recognizing that there can be a completed gift of stock without a transfer of the certificates if there is constructive delivery by the delivery of stock powers signed in blank); *see also Richardson v. Comm'r,* 1984 T.C. Memo 595, 49 T.C.M. (CCH) 67, 1984 WL 15230 (1984)

[30]  See Treas. Reg. § 25.2511-2 for a discussion of what retained rights prevent a transfer in trust from constituting a completed gift for gift tax purposes.

make the gift incomplete for gift tax purposes under the regulations) or left to be determined by John and Bruce without any input from Frances.

87.     The above paragraphs indicate that the gift tax risks relating to the Oral Trust are not as great as they are in Mr. Perkins' opinion and in any event they were resolved by November 19, 2001.  However, the question remains whether arguing that the transfer to the Oral Trust would not qualify as a transfer to a GRAT would "strengthen [Anna's] bargaining position."  In my opinion, it would not.  My opinion is based on my view that (1) the consequence of treating the gift to the Oral Trust as incomplete would simply mean that the completed transfer was to the November Trust, in which John and his family have a 100% remainder interest[31] and (2) the consequence of treating the transfer to the Oral Trust or the November Trust as a completed transfer for federal gift tax purposes, but not a transfer to a GRAT, would have been considerably more damaging economically to Anna than to John, particularly if John's family retained 100% of the remainder interest.

88.     A completed transfer to a trust in which the grantor has retained an annuity interest that is subject to section 2702 but does not qualify as a GRAT is a gift on which the grantor must pay gift tax on the fair market value of the transferred assets rather than on the excess of the fair market value of the transferred assets over the fair market value of the retained annuity.  See footnote 18.  In this case, using the values reported on Frances' 2001 gift tax return, this would mean Frances would have had to pay gift tax on a taxable gift of more than 52 *million* dollars, rather than on a taxable gift of just under 54 *thousand* dollars.  Frances would have been primarily liable for this tax.  Her ability to give or leave property to Anna upon her death would

---

[31] If somehow the transfer were considered not to occur even to the November Trust, which in my opinion would be very unlikely, the tax benefits of the Oral Trust or the November Trust would be lost and Anna would have no reason to feel confident that she would benefit from Frances estate to a greater extent than she would under the Family Settlement Agreement.

have been severely compromised by this tax liability.  John's Trust, created out of the remainder, on the other hand, would not have been reduced by the substantial additional taxes except to the extent, if any, that the taxes exceeded the value of Frances' other assets, which is unlikely because the annuity payments she received would, of course, be part of her "other assets."  For this reason, using any perceived flaws in the GRAT transactions as a negotiating position would have been unlikely to give Anna any leverage and would have risked alienating both Frances and John.[32]

89.     Based on the above, in my opinion it would have been particularly risky, to the point of being unwise, for Anna's attorney to attempt to use any perceived flaws related to GRAT qualification in negotiating the Family Settlement Agreement.

## VII.  The Waiver Letter.

### A.  Rules of Professional Conduct Rule 1.7(a).

90.     By signing the Waiver Letter, Anna consented in writing to her representation by Schnader in connection with a settlement of various disputes within the family in which she was adverse to John when she and John had been represented by Schnader in the past and each expected to be represented by it in the future.

91.     In my experience, in 2002 and 2003, the time of the representation of Anna with respect to the settlement, similarly situated trust and estates lawyers in Philadelphia generally complied with the Rules of Professional Conduct in a manner consistent with the length and closeness of their client relationships and did not generally write detailed protective, technical

---

[32] As Lucia's attorney stated in her deposition: "if any portion of that 52 million was taxable, you'd be looking at a huge tax bill.  So it was in **everybody's best interest** to make sure that the IRS did not attack this because that would cause everybody tax dollars. . . . and so there was back and forth constantly about how to best effectuate the settlement in a way that raise the least concern with the IRS."  Arias Depo., p. 48 (emphasis added).

43

letters to longtime clients. Therefore, the Waiver letter was consistent with the practice of similarly situated attorneys provided that it complied with the Rules of Professional Conduct.

92.     Rule 1.7(a) of the Pennsylvania Rules of Professional Conduct in effect at the time of the representation of Anna in the settlement, sets forth the circumstances under which Pennsylvania attorneys were permitted to represent a client who is directly adverse to another client.  At that time Rule 1.7(a) contained only two requirements.  First, the lawyer must reasonably believe the representation of a client [Anna in this case] will not adversely affect the relationship with the other client [John in this case].  Second, each client must consent "after consultation."  The consent was not required to be in writing.

93.     Accordingly, under Rule 1.7(a) as it read at the time of the representation of Anna in the settlement, the Waiver Letter was adequate to permit Schnader and Bruce to represent Anna as long as it reflects Bruce's and Schnader's reasonable belief that their representation of Anna will not adversely affect their relationship with John and the consent signified in writing by each client can be shown to have been made "after consultation."

94.     The Waiver Letter, which quotes Rule 1.7 in its entirety, explicitly states that

"you are each aware that in the past we have represented each of you individually in estate planning matters and various trusts of which you are trustees and beneficiaries – although in this matter John is being represented by Larry Laubach of Cozen O'Connor. As you are further aware, I am a Director of Hunter Service Company, Inc."

and includes the following important paragraph

"We believe that Rule 1.7 does not preclude us from representing either and both of Fran and Anna in this matter and that the criteria of Rule 1.7(a) are satisfied, provided that we obtain the consent of each of you.  If prior to giving your consent, you have any questions, please call me to discuss them."[33]

---

[33] At the time of the Waiver Letter, Rule 1.7(a) read in its entirety as follows::

"Rule 1.7. Conflict of Interest:  General Rule

(a)   A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

95.     The first quoted paragraph in paragraph 94 is a brief explanation of the reason there is a conflict.  The second quoted paragraph makes clear the Schnader and Bruce believe that their representation of Anna will not adversely affect their relationship with John and John's consent makes it clear that he agreed.  Moreover, the last sentence invites Anna to call Bruce for further discussion and consultation prior to signing.

96.     The statement in the second quoted paragraph that "Rule 1.7 does not preclude us from representing either and both of Fran and Anna in this matter …, provided we obtain the consent of each of you" makes clear that Schnader believes the criteria of Rule 1.7 are satisfied.

97.     Standing alone, it would appear that the Waiver Letter coupled with the written consents met the requirements of Rule 1.7(a).  Moreover, the Waiver Letter should not be considered in a vacuum.  Rather, it must be examined in the context in which it was sent.  The key factors that need to be considered are:

  a.     Anna was aware that Bruce and Schnader for many years had been regarded as the "family attorney," representing her as well as her mother Frances, her father Herbert and her brother John  in connection with each's estate planning in addition to other matters.

  b.     Despite Anna's stated lack of memory with respect to the subject matter of the Settlement, the objective facts of the representation make it clear that regardless of the amount of detail in the Waiver Letter itself, she had to know at the time details of the representation and, to the extent she did not, the Waiver Letter contained an express invitation to call Bruce to discuss any questions prior to giving consent.

98.     In my experience Philadelphia estate planning attorneys routinely represented multiple members of the same family in their estate planning and that it was not uncommon for such attorneys to represent less than all of them in settling disputes that arose out of their estate

---

(1)  the lawyer reasonably believes the presentation will not adversely affect the relationship with the other client; and

(2)  each client consents after consultation.

planning, provided that all affected clients agreed to the representation.  This is consistent with

the Commentaries on the Model Rules of Professional Responsibility published by The

American College of Trust And Estate Counsel ("ACTEC"), referred to herein as the ACTEC

Commentaries or just the Commentaries.[34]  The preamble to the Fifth Edition of the

Commentaries (2016) explain the history and reasons for the creation of the Commentaries[35] as

follows:

> "Neither the Model Rules of Professional Conduct (MRPC) nor the
> Comments to them provide sufficiently explicit guidance regarding the
> professional responsibilities of lawyers engaged in a trusts and estates
> practice. Recognizing the need to fill this gap, ACTEC has developed the
> following Commentaries on selected rules to provide some particularized
> guidance to ACTEC Fellows and others regarding their professional
> responsibilities. First published in 1993, the Commentaries continue to
> assist courts, ethics committees and others concerned with issues
> regarding the professional responsibility of trusts and estates lawyers. The
> Commentaries generally seek to identify various ways in which common
> problems can be dealt with, without expressly mandating or prohibiting
> particular conduct by trusts and estates lawyers. While the Commentaries
> are intended to provide general guidance, ACTEC recognizes and respects
> the wide variation in the rules, decisions, and ethics opinions adopted by
> the several jurisdictions with respect to many of these subjects."

99.     The comments to Model Rule 1.7 in the ACTEC Commentaries explains the

appropriateness of representing multiple members of the same family as follows:

> "It is often appropriate for a lawyer to represent more than one member of
> the same family in connection with their estate plans, … or more than one
> of the investors in a closely held business. See ACTEC Commentary on
> MRPC 1.6 (Confidentiality of Information). In some instances the clients
> may actually be better served by such a representation, which can result in
> more economical and better coordinated estate plans prepared by counsel

---

[34] Unless otherwise noted all references herein to the ACTEC Commentaries refer to the third edition of the commentaries, published in 1999.  Although there have been several subsequent editions, the Third Edition was the most recent edition in existence at the time of the actions by Bruce and Schnader that are the subject of this report.

[35] By way of full disclosure the ACTEC Commentaries are published by the ACTEC Foundation.  I have donated to and, from 2004 to 2010 served on the Board of Trustees of, the ACTEC Foundation.  In addition, Christopher H. Gadsden who assisted in this Report has been a member of the Professional Responsibility Committee of ACTEC, which produced the Commentaries, since 1994 and was its chair from 2012-2015.

who has a better overall understanding of all of the relevant family and property considerations. The fact that the estate planning goals of the clients are not entirely consistent does not necessarily preclude the lawyer from representing them: Advising related clients who have somewhat differing goals may be consistent with their interests and the lawyer's traditional role as the lawyer for the 'family.'  Multiple representation is also generally appropriate because the interests of the clients in cooperation, including obtaining cost effective representation and achieving common objectives, often clearly predominate over their limited inconsistent interests. Recognition should be given to the fact that estate planning is fundamentally nonadversarial in nature … ."

100.    When Anna, Frances, Lucia and John sought to settle their disputes by, *inter alia*, modifying the post-annuity terms of the Oral Trust memorialized by the Written Version through a family settlement agreement, it was natural that Bruce and Schnader would agree to represent Anna and Frances in the settlement as long as Anna, Frances and John all agreed to waive any conflicts of interest by reason of both their prior and present representation of each of them on other matters.  That Anna agreed to waive any such conflicts is evidenced by her signature on the Waiver Letter.

101.    Accordingly, the Waiver Letter was consistent with the practice of similarly situated trust and estates lawyers in Philadelphia in 2002/2003 and adequate under the ethical standards of that time to permit Schnader and Bruce to represent Anna in the family settlement negotiations in which John was adverse and when Anna and John had both been represented by Schnader and Bruce in the past and expected to be represented by them in the future on other matters.

**B.  Rules of Professional Conduct Rule 1.7(b).**

102.    The reports of Mr. Perkins and Professor Ross reach the conclusion that Bruce was severely conflicted in representing Anna in negotiating the Family Settlement Agreement. Both seem to believe the conflict is primarily with "his own interests."  The ethics rule governing

47

conflicts of this kind is Rule 1.7(b) of the Pennsylvania Rules of Professional Conduct.  As it existed in 2002 and 2003, Rule 1.7(b) read in pertinent part as follows:

> "(b)     A lawyer shall not represent a client if the representation of that client may be materially limited … by the lawyer's own interests, unless:
>
> > (1)     the lawyer reasonably believes the representation will not be adversely affected; and
> >
> > (2)     the client consents after full disclosure and consultations. …"

103.     In my opinion, it is simply not the case that Bruce's representation of Anna "may be materially limited" by his own interests.  There are at least two reasons for this conclusion.  First, as is clear from his deposition, Bruce sincerely believes he did nothing wrong in creating an oral trust and handling the funding, memorialization and the tax reporting with respect to it the way he did.[36]  Anna agrees with Bruce's belief and has stipulated that the Oral Trust/Written Version was properly created and funded.  2018 Settlement Agreement ¶ II(A)(3)(b).  That Bruce preferred to avoid IRS scrutiny of the GRAT and the valuation of gifted stock is something that, based on my experience, he had in common with most attorneys who create GRATs and fund them with non-marketable assets.  Second, in my opinion Bruce's interests and Anna's interests were substantially aligned.  It is in Bruce's self-interest to preserve the integrity of the GRAT transactions and for the qualification as a GRAT of the Oral Trust (or the November Trust) to remain unquestioned by the IRS.  As discussed in paragraphs 87-89, it is in Anna's self-interest to do the same.

---

[36] "**Q**: Okay.  Did you ever explain to Anna that there could be an argument that the February 1, 2002 [*sic*] GRAT was unenforceable? . . . **A**: I never said that because I don't believe it, and to this day, I don't believe it.  **Q**: All right.  Because you created that GRAT; correct?  **A**: I created it.  I complied with all law required.  It was a valid document.  **Q**: And you never had any concern when you undertook the representation of Anna Nupson that it was not a valid GRAT?  **A**:  I knew it was a valid GRAT.  **Q**: Okay.  Even though you've never done an oral GRAT before?  **A**: It's well-established in Pennsylvania.  The fact that I haven't done it doesn't mean it's not well-established and valid."  Bruce Depo., pp. 180-81; *see also* Arias Depo., p. 68 ("He never said . . .anything that led me to believe that he, Bruce, questioned the validity of the GRAT.")

104.   As Bruce's representation of Anna is not materially limited, there is no need to examine 1.7(b)(1) or (2).

105.   Professor Ross explains his contrary conclusion on pages 4 -5 of his report as follows:

> "On these facts there can be no doubt that Attorney Rosenfield's representation of Ms. Nupson may have been materially limited by his own interests.  * * *
>
> "Any competent and loyal attorney representing Anna in these negotiations would have instinctively explored ways to challenge and undermine the leverage held by the opposing parties in the negotiations – beginning with questioning the presumed validity and legality of the GRAT I trust.  * * *
>
> "Attorney Rosenfield acting as Anna's attorney engaged in no such interrogation, insisting in his deposition that GRAT I had been legally valid, dismissing any possible arguments to the contrary."

106.   This explanation ignores that a competent and loyal attorney could have concluded, as Bruce did, that "questioning the presumed validity and legality of the GRAT I trust" would not have undermined the leverage held by John as Anna had more to lose than John did from such questioning.  Notably, Lucia, whose interests were largely aligned with Anna's in the negotiations, was represented by an attorney whose competence and loyalty has not been questioned, and she did not explore ways to challenge and undermine the leverage held by John or to discover or raise any of these issues concerning the validity of the GRAT.[37]  On the contrary, Lucia's attorney was of the opinion that "it was in **everybody's best interest** to make sure that the IRS did not attack" the validity of the GRAT.  Arias Depo., p. 48 (emphasis added).

107.   The reports of Mr. Perkins and Professor Ross also briefly address the question of Bruce's concurrent representation of Anna and Frances, concluding that Bruce's duty to Frances "materially limited" his ability to represent Anna and that the exceptions to 1.7(b) that would

---

[37] In fact, Lucia's attorney suggested a revision to a draft of the Modified 2001GRAT instrument to specifically avoid challenges to the GRAT.  *See* Arias Depo., pp. 76-77; *see* BHI011508 at ¶ 8.

have permitted the representation were not met.  I disagree.  Frances' involvement in the settlement negotiations was focused primarily if not exclusively, on her desire to effectuate her change of heart by modifying the trust to divide the remainder in three ways, an issue on which she was perfectly aligned with Anna.  With one important exception, she was a disinterested party with respect to the other issues and therefore Bruce's representation of her could not have materially limited his representation of Anna.  The important exception was whether Anna would receive her share outright or in trust.  In this, Anna stood alone among all parties to the settlement.  Frances' involvement was overshadowed by the others.  As a result, Bruce's ability to advocate for Anna's position could not be materially limited due to his representation of Frances.  Furthermore, as Bruce himself has stated, it was in Anna's best interest to have her share held in trust where it would be protected from creditors.  *See, e.g.,* Bruce Depo., pp. 178-79.

108.    In a comment to Rule 1.7 of the ABA Model Rules on which the Pennsylvania Rule is based, the considerations that determine whether an attorney is "materially limited" is explained as follows:

> "The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client."  Model Rules of Prof'l Conduct R. 1.7 cmt. 6 (current ed.).[38]

Given the state of Anna's marriage and her mental health issues at the time, it is hard to imagine that any competent trust and estates attorney would consider it reasonable to encourage Anna to insist on receiving her share outright. Both Bruce and Frances had Anna's best interests at heart and Bruce's success in advocating that Anna receive a payment from the 2001 Anna Trust of

---

[38] Available on the ABA website at https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_7_conflict_of_interest_current_clients/comment_on_rule_1_7/.

$1,000,000 per year is proof that his concurrent representation of Frances did not limit his ability to advocate for Anna's wishes or to consider alternatives or foreclose courses of action.

109.    Somewhat ironically, Prof. Ross cites to *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277 (Pa. 1992) to support the proposition that under Pennsylvania law "an attorney owes a fiduciary duty to his client; such duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest." Ross' Report, p. 9 (quoting *Maritrans* at 1283). The irony of Prof. Ross's claim is that *Maritrans* concerned an attorney and a law firm that were enjoined from representing the business competitors of a client and using the client's confidential information in such representation to benefit of the competitors. *See Maritrans*, 602 A.2d at 1280-81. However, Prof. Ross seems to conclude that Bruce's inability ethically to use the confidential information he gathered from his representation of Frances in his representation of Anna means he is materially limited in his representation of Anna. He in essence is suggesting that Anna would have been better served by a hypothetical attorney who, like Elizabeth Arias, would have no knowledge of the facts that Professor Ross believes could have given Anna more leverage in the negotiations and therefore could not have used them.

110.    In summary, in my opinion Bruce was not materially limited either by his own interests or his representation of Frances. As is discussed above, Bruce's interest in upholding and defending the integrity of the Oral Trust (and if that failed, the November Trust) and its qualification as a GRAT was aligned with Anna's in that the  consequences to her in the event that settlement talks failed were considerably greater than the adverse consequences to her brother. A predicate of the negotiations was that the trust was valid but should be modified. Indeed in the very first operative paragraph of the 2003 Master Settlement Agreement, the parties agree to use their "best efforts and cooperate in good faith in … defending the tax

treatment of the GRAT." Moreover, Bruce's concurrent representation of Frances in no way interfered with his ability to exercise independent professional judgment in representing Anna with respect to the modifications, including the only one with which Frances disagreed with Anna.

Respectfully submitted,

Pam H. Schneider, Esquire
Gadsden Schneider & Woodward LLP

**APPENDIX A**

# CURRICULUM VITAE

**Pam H. Schneider**
**1275 Drummers Lane, Suite 210**
**Wayne, PA 19087**
**Telephone: 484-683-2615**
**Email: Pam Schneider PSchneider@gsw-llp.com**

1.   <u>Current Position</u>

Of Counsel, Gadsden Schneider & Woodward LLP,  2014 – Present

2.   <u>Prior Positions</u>

Partner, Gadsden Schneider & Woodward LLP, 2001-2013
Partner, Drinker Biddle & Reath LLP, Philadelphia, PA,     1984 – 2001
Associate, Drinker Biddle & Reath, Philadelphia, PA, 1978 - 1984
Associate, White & Case, New York, NY, 1976 - 1978

3.   <u>Bar Admissions</u>

New York State; 1977
Supreme Court of Pennsylvania, 1978

4.   <u>Education</u>

B.A. 1973 University of Pennsylvania, *Cum Laude*
J.D. 1976 Columbia Law School, New York, NY Harlan Fiske Stone Scholar (1974/5;
1975/6)
Attended New York University Law School, New York, NY LL.M. Program in Taxation
(part-time)  1978-1981

5.   <u>Publications, Lectures and Presentations</u>

Selected Publications (includes all publications within the last ten years)

*The Gift by Promise Plan SHOULD Work-At Least in Pennsylvania,* Steve
Leimberg's Estate Planning Email Newsletter - Archive Message #2034
(December 4, 2012) (with Carlyn S. McCaffrey and Kim V. Heyman)

*Time Traveling and Generation-Skipping in 2010 and Beyond*, Tax Notes (July
2010) (with Carlyn S. McCaffrey)

*The Aftermath of Walton: The Rehabilitation of the Fixed-Term, Zeroed-Out GRAT,* 95 Journal of Taxation 325 (December 2001) (with Carlyn S. McCaffrey and Lloyd Leva Plaine).

*The Flaw in Example 5: Did the 2702 Regulations Try to Extend the Repeal of the Doctrine of Worthier Title?,* 93 Journal of Taxation 219 (October 2000) (with Carlyn S. McCaffrey).

*Trust Modification, Proposed Regulations and Other Significant GST Tax Developments,* 92 Journal of Taxation 212 (April 2000) (with Carol A. Harrington, Carlyn S. McCaffrey and Lloyd Leva Plaine).

*Section 2702 or GRITs, GRATs, GRUTs (What Does Your Client Want?)*, University of Miami 26th Annual Philip E. Heckerling Institute on Estate Planning, Chapter 12 (1992).

*Proposed Regulations on Valuation Rights and Restrictions Focus on Exceptions*, 75 Journal of Taxation 204 (October 1991) (with Lloyd Leva Plaine).

*Proposed Valuation Regulations Provide Workable Exceptions for Transfers in Trust*, 75 Journal of Taxation 142 (September 1991) (with Lloyd Leva Plaine).

*Proposed Valuation Regulations Flesh Out Operation of Subtraction Method*, 75 Journal of Taxation 82 (August 1991) (with Lloyd Leva Plaine).

*A Preliminary Analysis of Chapter 14 of the Internal Revenue Code and its Effect on Family Businesses*, University of Southern California Law Center 43rd Annual Institute on Federal Taxation, Chapter 16 (1991) (with Harry L. Gutman).

Speaker at numerous Continuing Legal Education Seminars including, among others:

University of Miami, Philip E. Heckerling Estate Planning Institute (numerous), including a program and Special Session in January 2011 on "GRAT Planning 401: Advanced Strategies and Creative Uses for GRATs" with S. Stacy Eastland and Carlyn S. McCaffrey and a Special Session in January 2014 on "GST Tax: Post-ATRA Planning and Practical Pointers"  (with Julie Kwon)
University of Southern California Tax Institute (1991)
Duke University, Estate Planning Conference (1987, 1990)
University of California, Los Angeles, Estate Planning Institute (1987)
Georgetown University Advanced Estate Planning Institute (October 1992)
ALI-ABA, University of Wisconsin, Estate Planning In Depth, (1985 - 1989)
ALI-ABA, Planning for Large Estates (1988 - present)
Massachusetts C.L.E. "Expert in Residence" Program (1989)
Illinois C.L.E. "Estate Planning with the Masters" program (1992)
ABA, Annual Meeting Programs (numerous)
American College of Trust and Estate Counsel Annual Meeting Programs (numerous) including 2012 Annual meeting Seminar H: The Morning After: GST Tax Headaches and Some Palliatives Post-2010 – materials or presentation with )

Tracy Blake DeVlieger; Pam H. Schneider; Carol A. Harrington and Julie K. Kwon
OMI Washington Non-Profit Tax Conference (1989)
Numerous ALI-ABA and ABA Video Law Reviews
Several Pennsylvania Bar Institute programs
Montgomery County Estate Planning Council (September 26, 2011) Dealing with Uncertainty: Gift, Estate and GST Planning in 2011, with Tracy Blake DeVlieger

6.   Expert Testimony None

7.   Professional Associations (selected)

Adjunct Professor, New York University Law School, LL.M. (Taxation) (1996-2012)

American Bar Association,

Member, ABA Advisor, Joint Editorial Board for Uniform Trust and Estate Acts (2010-2019)

Chair of the Section of Real Property, Probate and Trust Law (1998 - 1999)

Member (as representative of American Bar Association), National Conference of Lawyers and Corporate Fiduciaries (1992 - 1994)

Advisor, American Law Institute, Restatement of the Law, Third, Property (Wills and Other Donative Transfers)

Advisor, American Law Institute, Restatement of the Law, Third, Trusts

American College of Trust and Estate Counsel
Fellow (1988 - Present)
Regent (1994 - 2000)

Member, Advisory Board, University of Miami, Philip E. Heckerling Institute on Estate Planning

Member, PA Joint State Government Commission, Advisory Committee on Decedents' Estates Laws (approx. 1994 - 2011)

Adjunct, Lecturer in Law, University of Pennsylvania Law School (1987)

8.   Selected Honors and Awards

Named a " Super Lawyer"

Ranked as a "senior statesperson" by Chambers and Partners in their High Net Worth Guide (started in 2016), under Private Wealth Law: Eastern Region – USA; previously ranked by Chambers USA in the top-tier for wealth management.

3

Named Philadelphia Area Best Lawyers Trusts and Estates Lawyer of the Year" for 2010

Elected to the Estate Planning Hall of Fame of the National Association of Estate Planning Councils in 2010

One of three attorneys named by The National Law Journal as the Most Influential Lawyers in Trusts and Estates in 2011

Included in various lists of "best lawyers," including *The Best Lawyers in America* and *Who's Who in American Law*.

Named the "1998 Distinguished Estate Planner" by the Philadelphia Estate Planning Council.

**APPENDIX B**

# MATERIALS CITED

1. Third Amended Complaint for Legal Malpractice, Breach of Contract, and Breach of Fiduciary Duty, and Other Tortious Misconduct filed by Anna K. Nupson on August 26, 2020 (herein referred to as "3rd Amend. Complaint") (Document 119).

2. Answer to Amended Complaint (Third Amended) filed by Schnader Harrison Segal & Lewis and Bruce A. Rosenfield, Esq. on September 23, 2020 (herein referred to as "3rd Answer") (Document 131).

3. Letter to Frances S. Middleton, Anna K. Nupson, and John S. Middleton from Bruce A. Rosenfield dated October 11, 2002 (herein referred to as the "Waiver Letter"  (Document 52-29; BHI011141-43).

4. Trust Instrument dated February 1, 2001 (herein referred to as the "Written Version") (Document 19-4, pp. 6-27; BHIMISC000040-61).

5. Settlement Agreement dated February 20, 2003 (herein referred to as the "2003 Master Settlement Agreement") (BHICOZ002302 -2323).

6. Trust Agreement of Frances S. Middleton, Settlor, dated February 1, 2001, as modified in accordance with the 2003 Master Settlement Agreement (herein referred to as the "Modified 2001 GRAT") (Document 19-3, pp. 208-53).

7. Petition for Declaratory and Other Relief of John S. Middleton, individually and as former Trustee dated April 7, 2015 (herein referred to as "2015 JSM Pet.") (Document 52-14, pp. 1-144).

8. Amended Petition for Adjudication of Bruce A. Rosenfield, Trustee dated May 2, 2017 (herein referred to as "2017 BAR Amd. Pet.") (Document 52-23).

9. Plaintiff's Statement of Facts  dated July 19, 2019 (herein referred to as "Anna's Stmt. of Facts") (Document 52).

10. Deposition of Bruce A. Rosenfield, Esquire dated June 24, 2021 (herein referred to as "Bruce Depo.")

11. Deposition of Anna . Nupson dated June 15, 2021 (herein referred to as "Anna Depo.").

12. Letter to Bruce Rosenfield from Frances S. Middleton dated October 10, 2002 (Document 19-3, p. 75; Document 52-28; BHI046023).

13. Excerpt of the Stock Registry of Bradford Holdings (BHI008549-55).

14. Pennsylvania Rules of Professional Conduct, 204 Pa. Code § 81.4, as last amended by 31 Pa. B. 3728 (July 14, 2001).

15. Affidavit of John S. Middleton dated December 23, 2016 (herein referred to as the "2016 JSM Affidavit) (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on December 23, 2016 under control no. 2015-X1266).

16. Affidavit of John S. Middleton dated September 11, 2017 (herein referred to as the "2017 JSM Affidavit) (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on September 11, 2017 under control nos. 2012-X3503 and 2015-X1266).

17. Settlement Agreement dated February 26, 2018 (herein referred to as the "2018 Settlement Agreement") with all exhibits (23) attached (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on February 27, 2018 under control no. 2015-X1266-85).

18. Gift Tax Return of Frances S. Middleton for Tax Year 2001 (LHW-00001212-19).

2

19. Agreement of Trust of Anna M. Bauer dated September 12, 1994 (herein referred to as the "1994 Trust") (BHICOZ001848-53).

20. Expert Report of Edward L. Perkins dated December 13, 2021 (herein referred to as "Perkins' Report").

21. Expert Report of Thomas Ross (undated) (herein referred to as "Ross' Report").

22. Letter from John S. Middleton to Nancy F. Smith dated March 12, 2001 with all enclosures (Exhibit 11 to Anna Depo.).

23. Letter from John S. Middleton to Susan F. Thorkleson dated March 12, 2001 with all enclosures (Exhibit 12 to Anna Depo.).

24. Deposition of Elizabeth K. Arias dated June 30, 2021 (herein referred to as "Arias Depo.").

25. Notes of John Middleton (BHI036546-89).

26. Fax from Elizabeth K. Arias to Bruce Rosenfield and Larry Laubach dated November 25, 2002 containing a memorandum and a draft GRAT (BHI011505-71).

27. Deposition of Larry P. Laubach dated November 4, 2021 with exhibits attached.

# MATERIALS REVIEWED BUT NOT CITED

1. Second Amended Complaint for Legal Malpractice, Breach of Contract, and Breach of Fiduciary Duty filed by Anna K. Nupson on December 17, 2018 (Document 28).

2. Answer, Affirmative Defenses and Counterclaim filed by Schnader Harrison Segal & Lewis and Bruce A. Rosenfield, Esq. on December 14, 2019 (Document 67).

3. Settlement Agreement dated February 25, 2003 (herein referred to as the "Family Settlement Agreement") (1994 Nupson 1846-59).

4. Letter from John S. Middleton to Lucia M. Hughes and Anna K. Middleton dated February 20, 2003 (also known as the "Side Letter Agreement") (Document 19-3, pp. 255-59).

5. Letter from Bruce Rosenfield to Anna Middleton dated December 20, 2001.  (Document 52-24, p. 1).

6. Letter from Anna K. Middleton to Bruce Rosenfield, Esq. dated August 22, 2001 (Document 52-24, p. 2).

7. Petition for Declaratory and Other Relief of John S. Middleton, individually and as former Trustee dated May 22, 2017  (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on May 22, 2017 under case no. 2015-X1266).

8. Order of J. Lois E. Murphy, Court of Common Pleas of Montgomery County, Pennsylvania, Orphans' Court Division dated March 16, 2017 (Document 52-22, pp. 1-10; published as *Frances S. Middleton Trust*, 7 Fiduc. Rep.3d 187).

9. Letter from Bruce A. Rosenfield to Mrs. Frances S. Middleton dated February 5, 2003 (BHI046042-44).

10. Shareholder's Agreement of John Middleton, Inc. dated November 17, 1982 with Amendments  (BHI046463-99).

11. Document titled "Fran Middleton Estate Planning Meeting" and dated April 25, 2001 (BHI086203-62).

12. Letter from Bruce A. Rosenfield to Mrs. Frances Middleton dated October 11, 2002 (labeled "Nupson 18" during the Deposition of Anna K. Middleton at p. 118).

13. Affidavit of Roy S. Ross dated December 22, 2016 (Document 52-20).

14. Document titled "Questions," dated February 4, 2003 (BHICOZ020279).

15. Document titled "Minority Interest Adj," undated (BHI040558-59).

16. Valuation of a Minority Block of the Non-Voting Common Stock of Bradford Holdings, Inc. as of March 3, 2003, dated June 21, 2004.

17. Petition for Adjudication of Bruce A. Rosenfield, Trustee dated October 5, 2016 (Document 52-19, pp. 1-84).

18. Affidavit of Jeffrey L. Baker dated March 15, 2019 (Document 38-10, pp. 1-6).

19. List of assets transferred to Irrevocable Trust of Anna M. Bauer (Hughes and Middleton shares) (undated) (unlabeled).

20. "Time Entries Produced in Response for Production #12" containing time entries of Bruce A. Rosenfield, et al. (unlabeled).

21. Release and Indemnification Agreement dated March 4, 2003 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on April 7, 2015 under case no. 2015-X1266).

22. Stock Purchase Agreement between Bradford Holdings, Inc. and John S. Middleton as trustee of the GRAT, dated February 28, 2003  (unlabeled – filed with the Montgomery

County, Pennsylvania Register of Wills' Office on April 7, 2015 under case no. 2015-X1266).

23. "Repetitive Wire Transfer Form, Request #4414" dated February 4, 2003 (BHISH047459-60).

24. Letter from Robert M. Siwicki to Bruce A. Rosenfield dated July 30, 2002 (BHISH021063-66).

25. "Valuation of Minority Interest of Common Stock of Bradford Holdings, Inc. as of April 19, 2000" dated October 18, 2000 (unlabeled).

26. "Valuation of Minority Interest of Common Stock of Bradford Holdings, Inc. as of February 1, 2001" dated September 17, 2002 (unlabeled).

27. Letter from Larry P. Laubach to Bruce A. Rosenfield dated April 5, 2002 with "Valuation Analysis of the Assets of Bradford Holdings Inc." enclosed (unlabeled).

28. Memorandum of Bradford Holdings, Inc. titled "C to S Conversion" with attachments (BHISH043286-370).

29. "Comparison of Lucia's and Company's Proposals" (BHI046063-65; Document 19-3, pp. 148-50).

30. Letter from Larry P. Laubach to Bruce A. Rosenfield dated January 21, 2003 with "Analysis of Proposed GRAT Transaction" enclosed (BHICOZ006413-21; Document 19-3, pp. 134-42).

31. "Bradford Holdings, Inc./Lucia Hughes & Children Proposed/Proposed Settlement" dated December 19, 2002 (BHI036629-36; Document 19-3, pp. 112-19).

32. Letter from Larry P. Laubach to Michael D. Gunter Esquire and Elizabeth K. Arias Esquire dated January 15, 2003 with "Bradford Holdings, Inc./Family Settlement Proposal" attached (BHICOZ006303-12; Document 19-3, pp. 124-33).

33. Letter from Bruce A. Rosenfield to Elizabeth K. Arias, Michael D. Gunter, and Larry P. Laubach dated January 31, 2003 with a revised draft of the Modified GRAT attached (BHI012017-47; Document 19-3, pp. 152-82).

34. Email from Elizabeth Arias to Larry Laubach and Bruce Rosenfield dated February 5, 2003 (BHISH000320).

35. Email from Elizabeth Arias to Larry Laubach and Bruce Rosenfield dated February 5, 2003 (BHISH000376).

36. Email from Bruce Rosenfield to Elizabeth Arias and Larry Laubach dated February 5, 2003 (BHISH000377).

37. Email from Elizabeth Arias to Amy Newman dated February 5, 2003 (BHISH000385).

38. Email from Bruce Rosenfield to Elizabeth Arias and Nancy Pole dated April 21, 2003 (BHISH000412-13).

39. Email from Bruce Rosenfield to Larry Laubach and Amy Newman dated February 4, 2003 (BHISH000444).

40. Email from Bruce Rosenfield to Amy Newman dated February 1, 2003 (BHISH000598-99).

41. Memorandum of John S. Middleton, Trustee titled "Re: Error in Transferring Funds" dated August 21, 2000 (BHISH040586-91).

42. Email from Margaret Thompson to Bruce A. Rosenfield and Larry Laubach dated April 19, 2013 (BHISH040665-66).

43. Memorandum of Bruce A. Rosenfield titled "Re: Anna Bauer" dated September 28, 1994 (BHISH047477).

44. Letter from Bruce A. Rosenfield to Herbert H. Middleton, Jr. dated March 21, 1994 (BHISH047484-85).

45. Email from Mike Gunter to Larry Laubach and Elizabeth Arias dated January 31, 2003 with "Settlement Agreement/Conduct of Business Provision" attached (LHW-00000683-86).

46. Email from Elizabeth Arias to Larry Laubach, Bruce Rosenfield, Neil O'Rourke, and Mike Gunter dated February 5, 2003 (LHW-00000688-89).

47. Email from Larry Laubach to Mike Gunter, Elizabeth Arias, and Bruce Rosenfield dated February 4, 2003 (LHW-00000691-93).

48. Email from Larry Laubach to Mike Gunter, Scott D. Barbakoff, and Elizabeth Arias dated February 6, 2003 (LHW-00000723-24).

49. Email from Scott D. Barbakoff to Elizabeth Arias, Mike Gunter, John Middleton, Larry Laubach, James B. Jumper, et al. dated February 10, 2003 without attachments (LHW-00000727).

50. Fax from John B. Stine, II to Liz Arias and Larry Laubach dated February 14, 2003 with "Proposed Redemption Transaction" and calculations attached (LHW-00000808-30).

51. Memorandum Via Fax from Larry Laubach to Mike Gunter dated January 31, 2003 with marked up draft Settlement Agreement attached (LHW-00001220-34).

52. Facsimile from Elizabeth K. Arias to Bruce Rosenfield and Larry Laubach dated February 1, 2003 without attachments (LHW-00001269-71).

53. Email from Bruce Rosenfield to Elizabeth Arias, Scott Barbakoff, Larry Laubauch, Nancy Pole, John Middleton, and Mike Gunter dated March 6, 2003 (LHW-00001454-55).

54. Email from John Middleton to Lucia Hughes, Elizabeth Arias, and Larry Laubach dated February 24, 2003 (LHW-00001465).

55. Email from Elizabeth Arias to Larry Laubach, Bruce Rosenfield, and Mike Gunter dated February 26, 2003 (LHW-00001470).

56. Email from Bruce Rosenfield to Elizabeth Arias, Larry Laubauch, Mike Gunter, and Nancy Pole, dated February 26, 2003 (LHW-00001471).

57. Handwritten document titled "my part re Anna" (undated) (BHI000013).

58. Letter from Bruce A. Rosenfield to Frances Middleton dated December 8, 2003 (BHI000011-12).

59. Handwritten document titled "Transfers from Trust 6 Checking or Direct bill" (undated) (BHI006966).

60. Handwritten document titled "Dr Cox" dated January 17, 1997 (BHI006989).

61. Draft Agreement with handwritten annotations marked "Womble's Comments 10/11/02" (BHI011266-76).

62. Document titled "Why is Bradford Suggesting a Purchase Price of $275.00 per Share?" with attachments (undated) (BHI011676-81).

63. Document titled "Bradford Holdings, Inc./Family Settlement Proposal" (undated) (BHI011669-73).

64. Document titled "Middleton Family Settlement Agreement/Term Sheet" (undated) (BHI011913-94).

9

65. Document titled "Bradford Holdings, Inc./Analysis of Proposed GRAT Transaction" dated February 21, 2003 (BHI011936-54).

66. Untitled handwritten document dated December 19, 2002 (BHI011968-69).

67. Documents titled "Annuity Trust," "Family Trust," and "Distribution of Shares Upon Termination of Family Trust" (undated) (BHI011970-72).

68. Document titled "Bradford Holdings, Inc./Analysis of Proposed GRAT Transaction" labeled "Version II" dated January 9, 2003 (BHI011992-2011).

69. Document titled "Bradford Holdings, Inc./Analysis of Proposed GRAT Transaction" labeled "Version I" dated January 9, 2003 (BHI011973-91).

70. Handwritten document titled "Meeting of Floods, Thorkelsons and Smiths" dated June 10, 2000 (BHI012137-40).

71. "Bradford Holdings, Inc./Lucia Hughes & Children Proposed/Proposed Settlement" dated December 19, 2002 (BHI012013-16).

72. Blackline draft of the Modified GRAT (undated) (BHI036752-97).

73. Document titled "Lucia Litigation Resolution" (undated) (BHI040557).

74. Form GRAT Instrument marked "will be revised" (undated) (BHI043659-91).

75. Pictures of checks from the Vanguard Prime Money Market Fund of Frances S. Middleton dated April 30, 2003 (BHI043701-02).

76. Document titled "Middleton Family Settlement Agreement/Term Sheet" with handwritten annotations (undated) (BHI046011-12).

77. Document titled "Analysis of Proposed GRAT Transaction" dated February 2, 2003 with handwritten annotations (BHI046045-49).

78. Estate planning flow chart of Frances Middleton (undated) (BHI086314).

10

79. Document titled "Comments on Settlement Agreement E-Mailed February 3, 2003 at 3:15 pm" (undated) (BHICOZ028975).

80. Valuation Report regarding minority interests of Bradford Holdings, Inc. common stock prepared by Fleet M&A Advisors and dated September 17, 2002 (BHI066291-342).

81. Document labeled "Exhibit G-5," a draft of a Stock Purchase Agreement dated February 28, 2003 (BHICOZ024300-306).

82. Document labeled "Exhibit B," a draft of a Family Settlement Agreement (undated) (BHICOZ024293-99).

83. Document labeled "Exhibit G-2," a draft of a Stock Purchase Agreement dated February 2003 (BHICOZ024172-79).

84. Draft of the 2003 Master Agreement dated January 2003 without exhibits (BHICOZ024269-292).

85. Draft of the 2003 Master Agreement dated February 2003 without exhibits (BHICOZ024070-87).

86. Draft of a Promissory Note dated February 28, 2003 between Bradford Holdings, Inc. and Thomas P. Hughes, Custodian in the amount of $127,600 (BHICOZ024091-92).

87. Document labeled "Exhibit 2 to Family Settlement Agreement…," adraft of "Acknowledgment of Receipt of Funds by Trustee" (undated) (BHICOZ024112-14).

88. Document labeled "Exhibit J," a draft of "Release and Indemnification Agreement" (undated) (BHICOZ024065-69).

89. Document beginning with the phrase "Here is a timeline of the events that are to take place pursuant to the Bradford Settlement Agreement" (undated) (BHICOZ023732-34).

11

90. Draft of a Stock Purchase Agreement titled "Action by Unanimous Written Consent of the Board of Directors" dated February 2003 (BHICOZ023705-06)

91. Fax to Bruce and Larry re GRAT dated February 3, 2003 (LHW-00001477)

92. Email from Mike Gunter to Larry Laubach re Bradford/Hughes dated January 31, 2003 (LHW-00001475)

93. Email from Liz to Bruce and Larry re Comments on Remaining Issues dated February 7, 2003 (LHW-00001487-88)

94. Email from Mike Gunter to Larry, Scott, Liz dated February 6, 2003 (LHW-00001493-95)

95. Email from Liz to Amy Newnam and Mike re GRAT dated February 4, 2003 (LHW-00001499)

96. Email from Larry to Mike re Revised Promissory Note and Stock Purchase Agreement dated February 2, 2003 (LHW-00001554-55)

97. Email from Bruce to Liz, Bruce, Larry re Comments on Settlement Agreement dated February 2, 2033 (LHW-00001557-59)

98. Letter from Larry to Mike re Bradford Holdings dated October 17, 2002 (LHW-000000001582)

99. Email from Liz to Larry re Bradford Holdings, Inc. dated October 28, 2002 (LHW-00001579-80)

100. Email from Mike to Scott dated February 15, 2003 (LHW-00001685)

101. Email from Bruce to Liz re Lucia Hughes/Fran Middleton dated October 10, 2002 (LHW-00001595-97)

102. Email from Scott to Mike and Liz dated February 14, 2003 (LHW-00001687)

103. Email from Bruce to Liz, Scott, Mike and Bruce re wrap up issues dated February 20, 2003 (LHW-00001698-701)

104. Email from Liz to Bruce re wrap up issues dated February 20, 2003 (LHW00001702-05)

105. Email from Bruce to Liz re wrap up issues dated February 20, 2003 (LHW-00001706-09)

106. Email to Liz re Dividend Distribution dated February 22, 2003 (LHW-00001738)

107. Email from Liz to Larry re amount of dividend to be paid dated February 11, 2003 (LHW-00001760)

108. Fax from Larry to Liz dated October 3, 2002 (LHW-00001811-31)

109. Letter from Larry to William Davis re Bradford Holdings, Inc. dated September 27, 2002 (LHW-00001854)

110. Email from Larry to Mike Todd, Liz, Mike, Larry, John, Scott re LLC Agreement dated October 22, 2002 (LHW-00001855)

111. Letter from Larry to Mike re Bradford Holdings, Inc. dated January 15, 2003 (BHI011684)

112. Email from Bruce to Larry, Liz, Mike re Revised Settlement Agreement dated February 9, 2003 (BHI011703)

113. Email from Liz to Larry re Equalizing Payments in GRAT dated October 17, 2002 (BHI036657-58)

114. Email from John to Liz dated January 31, 2003 (BHI036659)

115. Letter to Patrick Schaefer dated March 14, 2000 (BHI040489-91)

116. Email from John Middleton to Liz dated January 31, 2003 (BHI039903)

117. Letter to Patrick Schaefer, Donald Erickson dated April 4, 2000 (BHI040492-93)

118. Email from John to David Montgomery re Phillies Stadium dated November 24, 2000 (BHI040519)

119. Letter from John Middleton to Stephanie Wiseman dated March 5, 2003 (BHICOZ042617-18)

120. Email from Larry Laubach to John Middleton re Hughes/Bradford dated December 16, 2002 (BHICOZ031293)

121. Fax from Bruce Rosenfield to Larry Laubach re Middleton GRAT dated October 18, 2002 (BHICOZ029943-30010)

122. Email from Nancy Pole to John Stine, Larry, Bruce, Regina Wall dated February 21, 2003 (BHICOZ023874)

123. Letter to Anna Middleton (undated) (BHICOZ023862-71)

124. Email from Larry Laubach to Bruce Rosenfield dated December 17, 2002 (BHICOZ023861)

125. Email from Laura McDonough to Larry Laubach dated February 5, 2003 (BHICOZ023831-33)

126. Letter from John Stein to Liz Arias dated October 7, 2003 (BHICOZ023783)

127. Email from Richard Slipe to Larry Laubach dated January 28, 2003 (BHICOZ023776)

128. Email from Bruce Rosenfield to Nancy Pole re Middleton dated February 11, 2003 (BHICOZ023774)

129. Fax from John Stine to Larry Laubach dated January 23, 2003 (BHICOZ023725-29)

130. Email from Bruce Rosenfield to Regina Wall, Bruce Rosenfield dated February 28, 2003 (BHICOZ023712-14)

14

131. Email from John Stine to Bruce Rosenfeild dated February 28, 2003 (BHICOZ023689)

132. Fax from Bruce Rosenfield to Larry Laubach re Middleton/GRAT dated October 10, 2002 (BHICOZ023200-37)

133. Fax from Bruce Rosenfield to Larry Laubach re Middleton Agreement dated October 1, 2002 (BHICOZ023133-66)

134. Email from Larry Laubach to Bruce Rosenfield dated January 30, 2003 (BHICOZ021122-3)

135. Email from Larry Laubach to Bruce, John, John Stine re Anna True-Up dated December 19, 2003 (BHICOZ021113-14)

136. Email from John Middleton to Stephanie Wiseman dated February 25, 2003 (BHICOZ021112)

137. Email from Richard Slipe to Larry Laubach dated February 2, 2003 (BHICOZ020942)

138. Email from Larry Laubach to Bruce Rosenfield dated January 30, 2003 (BHICOZ021073)

139. Email from John Middleton to Bruce Rosenfield dated February 5, 2003 (*BHICOZ020838-39)

140. Email from Bruce Rosenfield to Larry, John, John Stine dated February 11, 2003 (*BHICOZ020838-39)

141. Letter from Larry Laubach to Bruce Rosenfield re Anna Middleton (undated) (BHICOZ020809)

142. Fax from John Stine to Larry Laubach dated October 3, 2003 (BHICOZ020801-06).

143. Fax from John Stine to Larry Laubach dated December 10, 2003 (BHICOZ020728-40).

15

144. Email from Roy Ross to Larry, Scott Barbakoff, Bruce dated February 5, 2003 (BHICOZ020776).

145. Fax from John Stine to Larry Laubach dated January 27, 2003 (BHICOZ020281-82).

146. Email from Larry Laubach to Bruce Rosenfield dated February 3, 2003 (BHICOZ020075-77).

147. Email from John Middleton to Larry Laubach, Bruce Rosenfield dated February 5, 2003 (BHICOZ020278).

148. Fax from Regina Wall to Bruce Rosenfield dated January 3, 2008 (BHICOZ020053-58).

149. Email from Nancy Pole to Larry, Bruce re Wiring Instructions dated March 3, 2003 (BHICOZ019631-32).

150. Email from Bruce Rosenfield to John Middleton dated February 5, 2003 (BHICOZ019974).

151. Email from Larry to Richard Slipe re family settlement agreement for Anna trust dated February 2, 2003 (BHICOZ019603).

152. Email from Bruce to Larry re Anna Trust (undated) (BHICOZ018062).

153. Email from Liz Arias to Bruce, Larry re final comments on 2/3 draft of settlement agreement dated February 4, 2003 (BHICOZ017242-43).

154. Email from John to Larry, Scott Barbakoff, Bruce, John Stine dated February 11, 2003 (BHICOZ017267).

155. Letter to Mike Gunter re Bradford Holdings, Inc. (undated) (BHICOZ015634)

156. Email from Bruce to Larry re award against cigarette company dated October 4, 2002 (BHICOZ016300-01).

16

157. Email from Bruce to John Stine, Bruce, Larry, Laura MacDonough re changes dated February 15, 2003 (BHICOZ016845-46).

158. Email from Larry to Bruce re cover letter for Bradford Docs dated October 17, 2002 (BHICOZ015633).

159. Email from Roy Ross re resignations, designations and acceptances dated January 31, 2003 (BHICOZ015572).

160. Email from John to Larry, Bruce re settlement agreements (2 trust) dated February 4, 2003 (BHICOZ015570).

161. Letter from Herbert Middleton to Bruce dated September 20, 1994 (BHICOZ011493-99).

162. Fax from Scott Barbakoff to Mike, Liz, Bruce dated January 31, 2003 (BHICOZ006486-512).

163. Letter from Larry to Bruce re Frances S. Middleton dated January 21, 2003 (BHICOZ006409-21).

164. Letter from Larry to Mike re Bradford Holdings, Inc. dated January 15, 2003 (BHICOZ006313-21).

165. Letter from Larry to Mike and Liz re Settlement Proposal dated January 15, 2003 (BHICOZ006303-12).

166. Fax from Larry to Bruce dated September 27, 2002 (BHICOZ005907-46).

167. Email from Larry to Scott Barbakoff re Lucia's response to John's settlement dated January 31, 2003 (BHICOZ003754-55).

168. Email from Larry to Scott Barbakoff re Stock Purchase Agreement dated February 3, 2003 (BHICOZ003752-53).

169. Letter from Thomas Mucci to Bruce Rosenfield dated November 24, 2013 (unsigned) (Document 52-02).

170. Forwarded email from Bruce Rosenfield to Thomas Mucci dated December 5, 2013 (Document 52-03).

171. Letter from Thomas Mucci to Bruce Rosenfield dated December 17, 2013 (Document 52-04).

172. Letter from Taina Shanley on behalf of Thomas Mucci to Bruce Rosenfield dated January 27, 2014 (Document 52-05).

173. Letter from Wilbur Kipnes to Thomas Mucci dated February 12, 2014 (Document 52-06).

174. Letter from Anna Nupson to Bruce Rosenfield dated September 11, 2014 (Document 52-12).

175. Memorandum from Bruce Rosenfield to "FILE" dated December 24, 2002 (BHI008543).

176. Memorandum from Bruce Rosenfield to "FILE" dated January 13, 2003 (BHI008544).

177. Letter from Bruce Rosenfield to Frances Middleton, John Middleton, and Lucia Hughes dated January 23, 2003 (BHI008545-46).

178. Memorandum from Bruce Rosenfield to Roy Ross and Amy Newman dated January 28, 2003 (BHI008547-48).

179. Email from Larry Laubach to Bruce Rosenfield dated February 3, 2003 (BHICOZ028719-21).

180. Email from Bruce Rosenfield to Larry Laubach dated February 3, 2003 (BHICOZ028147-49).

181. Document labeled "Exhibit E," a draft of a Release and Indemnification Agreement (undated) (BHICOZ024060-64).

182. Documents labeled "Exhibit C-1," Exhibit C-2," "Exhibit C-3," "Exhibit D-1," "Exhibit D-2," "Exhibit D-3," "Exhibit H-1," "Exhibit H-2," "Exhibit I-1," "Exhibit I-2," "Exhibit K," "Exhibit L," "Exhibit N," "Exhibit O," "Exhibit Q," and "Exhibit R," a collection of draft trustee resignation and successor designation, and acceptance of designation  and refunding bond documents (BHICOZ023928-43).

183. Email from Bruce Rosenfield to John Middleton dated March 10, 2001.

184. Draft of a Resolution to Retire Stock titled "Action by Unanimous Written Consent of the Board of Directors" dated February 2003 (BHICOZ023963).

185. Partially executed copy of the 2003 Master Settlement Agreement dated February 20, 2003 (BHICOZ021310-25).

186. Email from John Middleton to Bruce Rosenfield and John Stine, copying Larry Laubach dated February 27, 2003.

187. Draft Family Settlement Agreement (undated)  (BHICOZ021292-99).

188. Email from Larry P. Laubach to John S. Middleton, forwarding an email from Roy Ross without attachment dated January 31, 2003 (BHICOZ021291).

189. Draft of a Memorandum from Bradford Holdings, Inc. to Lucia M. Hughes, Anna K. Middleton, John S. Middleton, Frances S. Middleton, J. Alexander Hughes, and Thomas P. Middleton dated February 2003 (BHICOZ021284-85).

190. Comparison document of a draft of a Memorandum from Bradford Holdings, Inc. to Lucia M. Hughes, Anna K. Middleton, John S. Middleton, Frances S. Middleton, J. Alexander Hughes, and Thomas P. Middleton dated February 2003 (BHICOZ021286-88).

191. Draft of a Stock Purchase Agreement dated January 31, 2003, labeled "Exhibit B" (BHICOZ021074-80).

192. Comparison document of a draft Family Settlement Agreement (undated) (BHICOZ020711-19).

193. Document titled "Family Settlement Agreement 2/4/03 Questions – Revised" (undated) (BHICOZ020279).

194. Document titled "Comments on Settlement Exhibit (Feb 10 drafts)" dated February 10, 2003 (BHICOZ017270-71).

195. Document titled "Comparison of Lucia's and Company's Proposals" (undated) (BHI046063-65).

196. Draft of an Acceptance of Appointment as Successor Custodian dated 2003 (BHICOZ015593).

197. Handwritten note beginning with the phrase "seeing psychiatrist" (undated) (unsigned) (BHI046112).

198. Handwritten note beginning with the phrase "Lucia" (undated) (unsigned) (BHI046099-103).

199. Draft of an Acceptance of Appointment as Successor Custodian dated 2003 (BHICOZ015592).

200. Draft of a Designation of Successor Custodian and Resignation of Custodian dated 2003 (BHICOZ015590).

201. Draft of a Designation of Successor Custodian and Resignation of Custodian dated 2003 (BHICOZ015591).

202. Draft of a Designation of Successor Trustee and related documents dated 2003 (BHICOZ015585-89).

203. Draft of a Designation of Successor Trustee and related documents dated 2003 (BHICOZ015582-84).

204. Draft of a Designation of Successor Trustee and related documents dated 2003 (BHICOZ015573-81).

205. Fax titled "Comparison of Lucia's and Company's Proposals" dated January 31, 2003 (BHICOZ006326-30).

206. Handwritten note beginning with the phrase "Totally unreasonable" (undated) (BHI046185).

207. Handwritten note beginning with the phrase "Lucia's estate will" (undated) (BHI046184).

208. Handwritten note beginning with the phrase "This has to be negotiated" dated October 14, 2002 (BHI046186-90).

209. Handwritten note beginning with the phrase "From 5711 cash transferred to 5682," preceding an Account Statement of the Rittenhouse Trust Company dated February 26, 2003 (BHICOZ003914-18).

210. Account Statement of the Rittenhouse Trust Company dated February 27, 2003 (BHICOZ003912-13).

211. Handwritten note beginning with the phrase "Ask John" written upon a letter from Mark Saville Antiques to Customer (unsigned) (undated) (BHI046223).

212. Partially executed copy of the Side Letter Agreement dated February 20, 2003 (BHICOZ002246-49).

213. Handwritten note beginning with the phrase "Lucia's lawyer" (undated) (BHI046224-26).

214. Stipulation for Entry of Judgment dated October 17, 1988, in the matter of *State of California v. Safeway Stores, Inc., et al.*, San Francisco Cnty., CA Super. Ct. No. 897576 (BHICOZ000158-69).

215. Valuation of Minority Interests of Common Stock of Bradford Holdings, Inc. as of April 19, 2000 by Howard, Lawson & Co. dated November 13, 2000 (BHI049980-50089).

216. Handwritten note titled "Insurance" dated July 31, 2003 (unsigned), preceding an Agenda titled "July 31, 2003 Management Meeting" (BHI047537-40).

217. Handwritten note beginning with the phrase "60-40 share irrevocable" (unsigned) (undated) (BHI046288).

218. Handwritten note beginning with the phrase "1) 'I will not talk to Lucia the rest of my life'" (unsigned) (undated) (BHI046230).

219. Handwritten notes beginning with the name "Stan " (unsigned) (undated) (BHI046256-70).

220. Handwritten note titled "Worte und Musik" signed "Anna Middleton" (undated) (BHI046275-81).

221. Petition for Declaratory and Other Relief of John S. Middleton dated May 22, 2017 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on May 22, 2017 under control no. 2015-X1266).

222. PACER Civil Docket Report for U.S. Dist. Ct., E.D. Pa. case no. 2:18-cv-02505-NIQA dated June 2, 2021.

223. Petition to Approve Settlement Agreement of John S. Middleton dated February 27, 2018 with exhibits (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on February 27, 2018 under control no. 2015-X1266).

224.  Response of John S. Middleton and Bradford Holdings, Inc. to Anna K. Nupson's Motion for Reconsideration of March 16, 2017 Opinion and Order dated March 28, 2017 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on March 28, 2017 under control no. 2015-X1266).

225.  Reply of John S. Middleton and Bradford Holdings, Inc. to New Matter of Anna K. Nupson dated January 19, 2016 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on January 19, 2016 under control no. 2015-X1266).

226.  Answer and New Matter to Counterclaim and Petition for Declaratory and Other Relief of John S. Middleton and Bradford Holdings, Inc. dated January 19, 2016 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on January 19, 2016 under control no. 2015-X1266).

227.  Response of John S. Middleton, Individually and as Former Trustee, to Anna K. Nupson's Motion for Summary Judgment dated May 12, 2017 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on May 12, 2017 under control no. 2015-X1266).

228.  Answer and New Matter of John S. Middleton, Former Trustee, to Petition of Anna K. Nupson for Declaratory Relief, Etc. dated February 18, 2016 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on February 18, 2016 under control no. 2015-X1266).

229.  Answer and New Matter of John S. Middleton to Anna K. Nupson's Motion to Compel Production of Records of Professional Fees and Legal Advice dated July 11, 2016 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on July 11, 2016 under control no. 2015-X1266).

230. Answer and New Matter to Petition for Discovery by Anna K. Nupson dated August 7, 2015 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on August 7, 2015 under control no. 2015-X1266).

231. Answer of John S. Middleton, Individually and as Former Trustee, and Bradford Holdings, Inc. to Motion of Anna K. Nupson for Summary Judgment dated August 31, 2016 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on August 31, 2016 under control no. 2015-X1266).

232. Petition for a Declaration of Anna K. Nupson's Rosenblum Common Law Right to Take the Deposition Duces Tecum of Larry P. Laubach, Esq. and Any Lawyer Who Provided Advice and Counsel to Trustee John S. Middleton dated September 12, 2016 (unlabeled – filed with the Montgomery County, Pennsylvania Register of Wills' Office on September 12, 2016 under control no. 2015-X1266).

233. Memorandum Opinion of the Honorable Lynne A. Sitarski in the matter of *Nupson v. Schnader Harrison Segal & Lewis LLP, et al.* dated April 7, 2021, published as 2021 U.S. Dist. LEXIS 67825*, 2021 WL 1293557.

234. Plaintiff's Motion to Compel Discovery Responses from Defendants Schnader Harrison Segal & Lewis, LLP and Bruce A. Rosenfield filed August 5, 2020 (Document 102).

235. Defendants' Opposition to Plaintiff's Motion to Compel Discovery Responses dated and filed September 2, 2020 with exhibits attached (Document 123).

236. Memorandum in Support of Defendants' Motion to Deem Defendants' Requests for Admission Admitted dated and filed November 24, 2020 with exhibits attached (Document 157).

24

237.  Second Affidavit of Courtney Johnson-Vidales dated July 18, 2019 and filed July 19, 2019 (Document 52-1).

238.  Petition for Discovery by Anna K. Nupson dated June 23, 2015 (Document 52-15).

239.  Petition for Declaratory Relief and a Citation Directing the Trustee to Prepare an Accounting and Produce Documents of Anna K. Nupson dated January 14, 2016 with exhibits attached (Document 52-15).

240.  Answer of Respondent Bruce A. Rosenfield to Petition for Declaratory Relief and Citation Directing Trustee to Prepare an Accounting and Produce Documents dated February 18, 2016 (Document 52-17).

241.  Order of the Honorable Lois E. Murphy dated July 18, 2016, directing an accounting of the Trust of Frances S. Middleton, Settlor, under Agreement dated February 1, 2001 (Document 52-18).

242.  Will of Herbert H. Middleton, Jr. dated September 7, 1994 (Document 52-25).

243.  Fax dated November 30, 1999 of a table titled "Bradford Holdings, Inc. Class B Non-Voting Common Shares – Detail" and dated January 18, 1999 (Document 52-31, JSM-HE-SH 002895-97).

244.  Defendants' Motion for Partial Judgment on the Pleadings dated October 12, 2020 and Defendants' Memorandum in Support of Motion for Partial Judgment on the Pleadings dated October 12, 2020 with exhibits attached (Document 138).