UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNA K. NUPSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-02505-NIQA |
| | ) | |
| SCHNADER HARRISON SEGAL & LEWIS | ) | |
| LLP, and BRUCE A. ROSENFIELD, ESQ., | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**DILWORTH PAXSON LLP**
Lawrence G. McMichael, Esquire
Patrick M. Harrington, Esquire
Timothy J. Ford, Esquire
Jessica L. Titler-Lingle, Esquire
Pa. Id. Nos. 28550/317998/325290/320618
1500 Market Street, Suite 3500E
Philadelphia, PA 19102-2101
P: (215) 575-7000 / F: (215) 575-7200
lmcmichael@dilworthlaw.com
pharrington@dilworthlaw.com
tford@dilworthlaw.com
jtitler-lingle@dilworthlaw.com
*Attorneys for Defendants Schnader Harrison
Segal & Lewis LLP, and Bruce A.
Rosenfield, Esquire*

Dated: February 14, 2022

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY .................................................. 2

I.    Undisputed Facts Concerning the Middleton Family and Schnader's Representation of
      the Family .......................................................................................................................... 2

II.   Undisputed Facts Concerning the 2003 Transaction .......................................................... 5

III.  Undisputed Facts Concerning the 2007 Altria Sale and Subsequent 2015 Orphans' Court
      Litigation ............................................................................................................................ 9

IV.   Plaintiff's Third Amended Complaint .............................................................................. 14

STANDARD OF REVIEW ........................................................................................................... 16

ARGUMENT ................................................................................................................................. 17

I.    Plaintiff's Claims Are Barred by the Statute of Limitations........................................... 17

      A.    There Is No Genuine Issue of Material Fact That Plaintiff's Claims Accrued Well
            More Than Two Years Before Plaintiff Filed Her Case ........................................... 18

      B.    No Equitable Tolling Principles Apply To Delay Commencement Of The Statute Of
            Limitations In This Case .......................................................................................... 21

            1.    The Discovery Rule Does Not Toll Plaintiff's Statute of Limitations to 2018 .... 22

                  a.    Plaintiff Discovered Her Claimed Injury and Its Alleged Cause More Than Two
                        Years Before She Sued Defendants .................................................................. 22

                  b.    Plaintiff's Allegations of Other Alleged Misconduct Are at Most Additional
                        Evidence in Support of Her Already Accrued Legal Malpractice Claim .......... 27

            2.    The Facts Do Not Show Any Fraudulent Concealment by Rosenfield ................ 31

II.   Plaintiff Cannot Maintain a Claim for Legal Malpractice Because She Admitted
      Dispositive Material Facts .............................................................................................. 33

III.  Plaintiff Cannot Meet Her Burden to Establish that Any Alleged Breach by Rosenfield
      Caused Her Alleged Damages ......................................................................................... 38

      A.    Plaintiff's Alleged Damages Are Too Speculative for Recovery as a Matter of Law,
            As She Has Not and Cannot Present Evidence John Would Have Paid a Higher Price
            for Her Shares........................................................................................................... 40

      B.    Any Damages Plaintiff Can Prove Cannot Be Recovered By Her Because "Her"
            Alleged Damages Inure to Trusts, Not to Her Individually ...................................... 45

      C.    Any Damages Plaintiff Can Prove Must Be Offset by Her 2018 Settlement............ 47

      D.    Plaintiff Has No Evidence to Meet the High Standard for Punitive Damages.......... 49

CONCLUSION.............................................................................................................................. 50

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Agostini's Estate*,
    457 A.2d 861 (Pa. Super. Ct. 1983)..........................................................................................6

*Anderson v. Liberty Lobby Inc.*,
    477 U.S. 242 (1986)..................................................................................................................18

*Arndt v. Johnson & Johnson*,
    67 F. Supp. 3d 673 (E.D. Pa. 2014)........................................................................................35

*ASTech Int'l, LLC v. Husick*,
    676 F. Supp. 2d 389 (E.D. Pa. 2009)................................................................................42, 43

*Baselice v. Franciscan Friars Assumption BVM Province, Inc.*,
    879 A.2d 270 (Pa. Super. Ct. 2005)..................................................................27, 28, 29, 31

*Blackhawk Bldg. Sys., Ltd. v. The Law Firm of Aspelmeier, Fish, Power, Warner
    & Engberg*,
    428 N.W.2d 288 (Iowa 1988)..................................................................................................45

*Bochetto & Lentz, P.C. v. Datz*,
    No. 3165 EDA 2014, 2016 WL 490053 (Pa. Super. Ct. Feb. 5, 2016) ......................50, 51, 52

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................................18, 19

*Ciprut v. Moore*,
    540 F. Supp. 817 (E.D. Pa. 1981), *aff'd*, 688 F.2d 819 (3d Cir. 1982)....................................34

*Commc'ns Network Int'l, Ltd. v. Mullineaux*,
    187 A.3d 951 (Pa. Super. Ct. 2018)..........................................................................20, 30, 31

*Countryside Oil Co., Inc. v. Travelers Ins. Co.*,
    928 F. Supp. 474 (D.N.J. 1995)..............................................................................................19

*Dinnerstein v. Burlington Cty. Coll.*,
    764 F. App'x 214 (3d Cir. 2019)..............................................................................................36

*Doe v. E. Hills Moravian Church, Inc.*,
    C.A. No. 12-5823, 2013 WL 5050593 (E.D. Pa. Sept. 13, 2013) ............................................25

*Donovan v. Pittston Area Sch. Dist.*,
    218 F. Supp. 3d 304 (M.D. Pa. 2016).....................................................................................37

ii

*Duke & Co. v. Anderson*,
    418 A.2d 613 (Pa. Super. Ct. 1980)...................................................................................41, 42

*Eckroth v. Pa. Elec., Inc.*,
    12 A.3d 422 (Pa. Super. Ct. 2010)...........................................................................................42

*Edwards v. Thorpe*,
    876 F. Supp. 693 (E.D. Pa. 1995)............................................................................................20

*Fine v. Checcio*,
    870 A.2d 850 (Pa. 2005)...................................................................................................21, 26

*Fink v. Kirchner*,
    731 F. App'x 157 (3d Cir. 2018) .............................................................................................19

*Fireman's Ins. Co. v. DuFresne*,
    676 F.2d 965 (3d Cir. 1982).....................................................................................................18

*Froom v. Perel*,
    872 A.2d 1067 (N.J. Super. Ct. 2005) .....................................................................................46

*Glenbrook Leasing Co. v. Beausang*,
    839 A.2d 437 (Pa. Super. Ct. 2003), *aff'd*, 881 A.2d 1266 (Pa. 2005)...............................20, 31

*Green v. Altman*,
    No. CIV.A.03-6437, 2004 WL 2106552 (E.D. Pa. Sept. 21, 2004) ........................................50

*Hazel & Thomas, P.C. v. Yavari*
    465 S.E.2d 812 (Va. 1996).......................................................................................................46

*Jones v. United Parcel Serv.*,
    214 F.3d 402 (3d Cir. 2000).....................................................................................................18

*Kituskie v. Corbman*,
    682 A.2d 378 (Pa. Super. Ct. 1996).........................................................................................50

*Kituskie v. Corbman*,
    714 A.2d 1027 (Pa. 1998)...............................................................................................37, 41, 42, 50

*Lange v. Burd*,
    800 A.2d 336 (Pa. Super. Ct. 2002), *appeal denied*, 818 A.2d 504 (Pa. 2003).......................34

*Lewis v. Pietragallo Bosick & Gordon, LLP*,
    No. 1607 WDA 2012, 2013 WL 11247432 (Pa. Super. Ct. Dec. 5, 2013).................43, 44, 47

*Mahoney v. McDonnell*,
    616 F. App'x 500 (3d Cir. 2015) .............................................................................................19

iii

*Mariscotti v. Tinari*,
   485 A.2d 56 (Pa. Super. Ct. 1984)............................................................................................44

*Maritrans, GP v. Pepper, Hamilton & Scheetz*,
   602 A.2d 1277 (Pa. 1992).......................................................................................................35

*Marra v. Lipsky*,
   No. C-48-CV-2014-4260, 2015 WL 13778390 (Pa. Ct. C.P. Northampton Cty.
   Feb. 23, 2015) ..........................................................................................................................53

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................................................19

*McClain v. Golden*,
   Civ. A. No. 08-1347, 2017 WL 3226471 (E.D. Pa. July 28, 2017)...................................21, 25

*McDevitt v. Guenther*,
   522 F. Supp. 2d 1272, 1288 (D. Hawaii 2007).......................................................................44

*Mest v. Cabot Corp.*,
   449 F.3d 502, 517 (3d Cir. 2006)............................................................................................34

*Meyers v. Sudfeld*,
   No. 05-CV-2970, 2007 WL 419182, at *12-13 (E.D. Pa. Feb. 2, 2007) .................................52

*Morris v. Supplee*,
   57 A. 566, 568 (Pa. 1904).......................................................................................................50

*Myers v. Robert Lewis Seigle, P.C.*,
   751 A.2d 1182, 1185 (Pa. Super. Ct.), *appeal denied*, 795 A.2d 978 (Pa. 2000)........41, 42, 43

*Nail v. Husch Blackwell Sanders*,
   LLP, 436 S.W.3d 556, 565 (Mo. 2014) ..................................................................................44

*Namani v. Bezark, Lerner, & Devirgilis, P.C.*,
   2017 WL 57153, at *3 (Pa. Super. Ct. 2017)..........................................................................34

*Nelson v. Heslin*,
   806 A.2d 873, 876 (Pa. Super. Ct. 2002), *appeal denied*, 831 A.2d 600 (Pa.
   2003) ........................................................................................................................................43

*New Castle Cty. v. Halliburton NUS Corp.*,
   111 F.3d 1116, 1125 (3d Cir. 1997)........................................................................................30

*Nkansah v. Kleinbard LLC*,
   Civ. A. No. 19-4472, 2021 WL 1238892, at *3 (E.D. Pa. Apr. 1, 2021) ................................42

*O'Kelly v. Dawson*,
   62 A.3d 414, 420 (Pa. Super. Ct. 2013)...................................................................................20

*Pa. R. Co. v. Duncan*,
   5 A. 742, 746 (Pa. 1886)................................................................................................48, 49

*Pashak v. Barish*,
   450 A.2d 67, 68 (Pa. Super. Ct. 1982)..............................................................................42, 43

*Raske v. Gavin*,
   438 N.W.2d 704, 706 (Minn. Ct. Ex. 1989) ...........................................................................45

*Rice v. Diocese of Altoona-Johnstown*,
   255 A.3d 237 (Pa. 2021) ............................................................................................. *passim*

*Rinker v. Amori*,
   No. CV 3:15-1293, 2016 WL 6879617 (M.D. Pa. Nov. 22, 2016) .........................................19

*Rizzo v. Haines*,
   555 A.2d 58 (Pa. 1989) ...............................................................................37, 41, 43, 52

*Rogers v. Williams*,
   616 A.2d 1031 (Pa. Super. Ct. 1992).....................................................................................42

*Estate of Rothberg*,
   166 A.3d 378 (Pa. Super. Ct. 2017).........................................................................................6

*Schenkel v. Monheit*,
   405 A.2d 493 (Pa. Super. Ct. 1979)..................................................................................41, 42

*Sevin v. Kelshaw*,
   611 A.2d 1232 (Pa. Super. Ct. 1992).....................................................................................34

*Sherman Indus., Inc. v. Goldhammer*,
   683 F. Supp. 502 (E.D. Pa. 1988).........................................................................................30

*Shrader v. Legg Mason Wood Walker, Inc.*,
   No. CIV. A. 93-3967, 1993 WL 532911 (E.D. Pa. Dec. 20, 1993)...................................48, 49

*SodexoMAGIC, LLC v. Drexel Univ.*,
   Nos. 19-1028, 19-1107, 2022 WL 176427 (3d Cir. Jan. 20, 2022)..........................................26

*Spade v. Star Bank*,
   No. Civ. A. 01-3349, 2002 WL 31492258 (E.D. Pa. Nov. 6, 2002).........................................25

*Thompson v. Hens-Greco*,
   Civ. A. No. 16-1100, 2017 WL 3616672 (W.D. Pa. Apr. 11, 2017).......................................20

v

*Trice v. Mozenter*,
  515 A.2d 10 (Pa. Super. Ct. 1986), *aff'd*, 621 A.2d 108 (Pa. 1993)......................28, 29, 41, 42

*Twice Baked, LLC v. Gross*,
  No. 341378, 2019 WL 943191 (Mich. Ct. App. Feb. 26, 2019).............................................47

*Veneri v. Pappano*,
  622 A.2d 977 (Pa. Super. Ct. 1993)..........................................................................................42

*Vestar Dev., II, LLC v. Gen. Dynamics Corp.*,
  249 F.3d 958 (9th Cir. 2001) ...................................................................................................45

*Wastvedt v. Vaaler*,
  430 N.W.2d 561 (N.D. 1988) ...........................................................................................33, 45

*Wilson v. El-Daief*,
  964 A.2d 354 (Pa. 2009) .........................................................................................20, 21, 25

## Statutes

42 Pa. C.S. § 5502(a) ......................................................................................................................20

42 Pa. C.S. § 5524..........................................................................................................................20

Fed. R. Civ. P. 37(c)(2)...................................................................................................................40

Fed. R. Civ. P. 56(a) ......................................................................................................................18

Fed. R. Civ. P. 56(c)(1)(A) ............................................................................................................36

Fed. R. Civ. P. 56(c)(2)...................................................................................................................19

Pa. Rule of Prof'l Conduct 1.6.......................................................................................................35

## Other Authorities

4 Austin W. Scott & William F. Fratcher, *Scott on Trusts* § 294.1 (4th ed. 1989).......................48

## INTRODUCTION

When this Court denied Defendants' Motion to Dismiss on statute of limitations grounds, it noted that the application of the statute of limitations is "an affirmative defense that is often fact-dependent." [ECF 62]. Despite more than three years of litigation and protracted discovery, Plaintiff Anna K. Nupson ("Plaintiff" or "Anna") has yet to create any record that would cause reasonable minds to disagree that her claims are time-barred. Those claims arise from her representation by Defendants Bruce A. Rosenfield ("Rosenfield") and Schnader Harrison Segal & Lewis LLP (collectively, "Defendants" or "Schnader") in a transaction that took place nineteen years ago in February 2003 (the "2003 Transaction").

Defendants move for summary judgment because the indisputable facts establish as a matter of law that the statute ran no later than June 5, 2016, two years after Plaintiff's counsel stated in a letter that she was going to "proceed against Schnader." That letter was filed as an exhibit to a petition Plaintiff filed in the Orphans' Court of Montgomery County on October 31, 2014. In fact, the statute expired much earlier, in 2009, two years after Plaintiff knew of a huge increase in the value of the shares of stock that are the focal point of her lawsuit, far in excess of the amount her trusts received in February 2003. It is uncontested that Plaintiff knew that she was represented by Defendants in 2002 and 2003, that Defendants had conflicts of interest that were disclosed in writing at the time, and that she agreed to have stock that was held in trusts for her benefit redeemed for approximately $44.5 million. It is also uncontested that Plaintiff knew in 2007 that a publicly announced transaction occurred that resulted in a dramatically higher value than four years earlier. When she knew of this increase in value in 2007, as a matter of well settled Pennsylvania law, Plaintiff had an obligation to investigate any claims that she thought that she might have as a result of the redemption in which she was represented by Defendants, or forever waive the right to assert such claims. Instead, she waited another decade to file this suit.

Even if this action were not time-barred, summary judgment is appropriate for several additional reasons. First, Plaintiff's own admissions in her sworn deposition testimony in this case defeat necessary elements of a legal malpractice claim. Second, as a matter of law, Plaintiff cannot show adequate evidence of causation or non-speculative individual damages. Third, her alleged damages would not belong to her—they would belong to trusts that owned the redeemed stock. Neither these trusts nor their trustees are parties to this case. Plaintiff does not have standing to pursue damages on behalf of the trusts and has made no attempt to do so. For any and all of these reasons, Schnader and Rosenfield are entitled to judgment as a matter of law.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

## I. Undisputed Facts Concerning the Middleton Family and Schnader's Representation of the Family

Virtually all facts in this case are undisputed. Plaintiff is one of three children born to Herbert H. Middleton, Jr. ("Herbert") and Frances S. Middleton ("Frances"). Ex. 1 (Affidavit of John S. Middleton (Dec. 23, 2016) ("John Aff.")) ¶¶ 8, 12. Their other children were Anna's sister, Lucia Middleton Hughes ("Lucia"), and brother, John S. Middleton ("John"). *Id.*

Plaintiff's paternal great-great grandfather, John Middleton, founded a specialty cigar and tobacco retail store in 1857 that later went on to become John Middleton Inc. ("JMI"). *Id.* ¶ 1. JMI was very successful, generating "vast wealth" for the Middleton family. Ex. 2 (3d Am. Compl.) ¶ 12. By 2001, a series of transactions had led JMI to become a subsidiary of Bradford Holdings, Inc. ("Bradford"), a holding company wholly owned by various members of the Middleton family. Ex. 1 (John Aff.) ¶¶ 5, 10. Although Herbert's sister owned some shares in Bradford, as did her children and Herbert's daughters (Lucia and Anna), it was customary within the Middleton family for the bulk of shares in the company to be passed to the male heir and for leadership of the company to follow. Ex. 3 (Deposition of Anna K. Nupson ("Nupson Dep.")) at 13:8–14:20, 25:10–

2

17. Until 2007, Bradford remained family operated, with Herbert taking the reins from his father and then John from Herbert. *Id.* By 2000, John already had a controlling interest in Bradford as a result of earlier transfers of Bradford stock within the family. Ex. 1 (John Aff.) ¶ 12.

Schnader began its representation of the Middleton family and their businesses before the 1990s. Ex. 4 (Deposition of Bruce A. Rosenfield ("Rosenfield Dep.")) at 22:14–23:4. Over the course of several decades, Schnader represented Herbert, Frances, John, and Plaintiff, as well as a host of other Middleton family business entities, including Bradford. *Id.* at 22:14–24:21. Sometimes, Schnader represented individual Middleton family members, while other times it represented the interests of the family as a whole (other than Lucia who had her own counsel at all relevant times). *Id.* Although many different lawyers at Schnader worked on various matters for the Middleton family and their businesses, Defendant Rosenfield held primary responsibility for Middleton family trust and estates matters from the early 1990s through at least 2002.[1] *Id.* at 22:16–23:4. For example, Defendant Rosenfield oversaw Herbert's and Frances's estate planning, drafted various family members' wills and codicils thereto, and prepared documents for a trust Anna self-settled in 1994. *Id.* at 31:14–32:7, 34:23–24, 40:11–22, 77:19-22, 80:2–7, 83:24–25.

By 2000, Plaintiff's mother, Frances S. Middleton ("Frances"), unhappy with Anna's life choices, felt that she already had sufficient wealth in earlier trusts that had been established for her benefit and was not inclined to leave her anything further.[2] Ex. 1 (John Aff.) ¶ 15. Against this

---

[1] As set forth more fully below, Defendant Rosenfield did not represent John in any capacity in connection with the 2003 Transaction. Ex. 5 (Bruce A. Rosenfield Letter to Frances B. Middleton, Anna K. Nupson, and John S. Middleton (Oct. 11, 2002) ("Conflict Waiver Letter")).

[2] Under Pennsylvania law, a child has no right to inherit from a parent. *Estate of Rothberg*, 166 A.3d 378, 385–86 (Pa. Super. Ct. 2017) (affirming trial court reasoning that "[i]t has always been the law of Pennsylvania that a parent does not have to leave any of his property to any of his children" and "[t]he public policy of Pennsylvania in regard to disinheritance of relatives is guided by the law which states 'the only person who cannot be disinherited is the surviving spouse'")

backdrop, and of particular relevance to this case, Defendant Rosenfield represented Frances in settling a grantor retained annuity trust ("GRAT"), beginning in late 2000. Ex. 4 (Rosenfield Dep.) at 94:11–17. In late 2000, Frances orally stated her intention to settle a GRAT with a two-year annuity period funded by all of her Bradford shares for the sole benefit of John[3] to be settled and funded on February 1, 2001. *Id*. at 94:6–23, 100:22–25, 102:22–103:17. John was named the sole trustee of the GRAT. *Id.* The GRAT was later memorialized in writing on November 19, 2001. Ex. 6 (Agreement of Trust (Feb. 1, 2001) ("Original GRAT")); Ex. 4 (Rosenfield Dep.) at 148:18–20. This 2001 trust is referred to herein as the "Original GRAT."

A critical factor in the valuation of Frances's Bradford shares for purposes of federal gift tax was the redemption of Bradford shares owned by John's cousins as of the same February 1, 2001 date. Ex. 4 (Rosenfield Dep.) at 94:11–17; Ex. 12 (Arias Dep.) at 41:16–42:21. The Original GRAT served at least two purposes: (1) moving illiquid Bradford shares out of Frances's estate with minimal gift tax impact and replacing those shares with cash from annuity payments, Ex. 4 (Rosenfield Dep.) at 55:25–56:7, 80:13–16, 83:7–14; and (2) continuing the Middleton tradition of passing the majority of Bradford shares to John, Herbert's only son and the then-CEO of Bradford, Ex. 3 (Nupson Dep.) at 13:8–14:20, 25:10–17.

In early to mid-2002, Plaintiff's sister Lucia began raising concerns about the Original GRAT. Ex. 7 (Deposition of Lucia M. Hughes) at 19:11–14; Ex. 1 (John Aff.) ¶ 23. Upset with

---

(citations omitted); *In re Agostini's Estate*, 457 A.2d 861, 865 (Pa. Super. Ct. 1983) ("[A] testator with children can disinherit some or all of them for any reason whatsoever; he can give in his lifetime and also by Will all of his property to the poor or to any charity he may desire, or he can give it to a friend, or he can prefer one child over all the others."); *see also Estate of Rothberg*, 166 A.3d at 385 (affirming trial court's reliance on *Agostini's Estate*).

[3] In this context, "John" means John individually, his wife, his children and trusts benefiting any of them.

4

the perceived inequity in her mother's disposition of her shares in Bradford, Lucia caused an uproar within the family, pressuring her mother to revise the GRAT's terms to benefit the three Middleton children equally and accusing her brother John of wrongdoing. Ex. 1 (John Aff.) ¶ 26; Ex. 8 (Declaration of John S. Middleton ("John Dec.")) ¶ 4. At some point, Lucia threatened litigation against John and/or Frances in connection with the Original GRAT. Ex. 8 (John Dec.) ¶ 4; Ex. 4 (Rosenfield Dep.) at 163:2–8, 197:10–13. In an effort to resolve the family's disputes and avoid unnecessary litigation, in mid-2002, John and Frances provisionally agreed to revise the GRAT such that all three siblings would benefit from it equally. Ex. 1 (John Aff.) ¶¶ 25–28; Ex. 9 (Frances B. Middleton Letter to Bruce A. Rosenfield (Oct. 10, 2002)); Ex. 4 (Rosenfield Dep.) at 163:2–8.

## II.  Undisputed Facts Concerning the 2003 Transaction

Having received provisional agreement from John and Frances to modify the Original GRAT, the parties began negotiation of a family settlement agreement to achieve this outcome, as well as resolve other family disputes (the "Family Settlement Agreement"). Ex. 1 (John Aff.) ¶¶ 28–30; see also Ex. 10 (Settlement Agreement (Feb. 20, 2003)). On September 17, 2002, Frances gathered Anna and Bruce at her home for a meeting, during which Bruce generally explained to Anna what a GRAT was and the terms of the Original GRAT, including that all of Frances's Bradford stock was going to John. Ex. 3 (Rosenfield Dep.) at 63:23–64:16, 161:8–10; Ex. 11 (Handwritten Notes of Anna K. Nupson) ("John stock everything else to Lucia + me").[4] Around this time it was determined that, although Rosenfield had represented each of them on trust and

---

[4] Although Plaintiff claims she does not remember this meeting or being informed of the Original GRAT, her limited recollection does not allow her to directly dispute that the meeting occurred. Ex. 3 (Nupson Dep.) at 102:6–9. In fact, Plaintiff authenticated contemporaneous notes taken at the meeting, which lay out in exacting detail the terms of Frances's GRAT (*e.g.*, the 108% annuity payments). *Id.* at 104:1–110:8; Ex. 11 (Handwritten Notes of Anna K. Nupson). These notes caused Plaintiff to acknowledge that Rosenfield at least described the GRAT to Plaintiff. Ex. 3 (Nupson Dep.) at 105:13–17.

5

estates matters at various times in the past, it would be a conflict for him to simultaneously represent John, Frances, and Anna in connection with negotiation of the Family Settlement Agreement and Modified GRAT. Ex. 5 (Conflict Waiver Letter). As such, in October 2002, Rosenfield presented John, Frances, and Anna with the Conflict Waiver Letter in which Rosenfield disclosed that "in the past we have represented each of you individually in estate planning matters and various trusts of which you are trustees and beneficiaries" but that in this matter (*i.e.*, negotiation of the Family Settlement Agreement and modification of the GRAT), he would represent only Frances and Anna. *Id.*

---

Schnader
ATTORNEYS AT LAW

1600 MARKET STREET    SUITE 3600
PHILADELPHIA, PA 19103-7213
215.751.2000    FAX 215.751.2205    schnader.com

*[handwritten: Family Settlement]*
*[handwritten: Signatures - Fran Anna]*

Bruce A. Rosenfield
Direct Dial: 215-751-2080
Direct Fax: 215-972-7267
Internet Address: brosenfield@schnader.com

October 11, 2002

Frances S. Middleton
416 Morris Avenue
Bryn Mawr, PA 19010

Anna K. Middleton
20 Shamrock Lane
Bryn Mawr, PA 19010

John S. Middleton
C/O Larry Laubach, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Re:    **Waiver of Conflict**

Dear Everyone:

Fran and Anna have requested that Schnader Harrison Segal & Lewis LLP represent them in connection with the contemplated family settlement agreement concerning various disputes within the family.

In this regard, you are each aware that in the past we have represented each of you individually in estate planning matters and various trusts of which you are trustees and beneficiaries - - although in this matter John is being represented by Larry Laubach of Cozen O'Connor. As you are further aware, I am a Director of Hunter Service Company, Inc.

6

On or about October 14, 2002, Plaintiff executed the Conflict Waiver Letter, as did Frances. *Id.* John also signed the Conflict Waiver Letter. Ex. 8 (John Dec.) ¶ 7. John was represented by Cozen O'Connor P.C. and Lucia by Womble Carlyle Sandridge & Rice, LLP (now Womble Bond Dickinson (US) LLP). Ex. 12 (Deposition of Elizabeth Arias ("Arias Dep.")) at 9:3–22, 15:4–5, 28:18–21.

Thereafter, the parties' counsel engaged in protracted negotiation of the terms of the Family Settlement Agreement and Modified GRAT, with several drafts of each and their various exhibits and other incidental agreements being exchanged. E.g., Ex. 4 (Rosenfield Dep.) at 163:2–8; Ex. 13 (Deposition of Larry P. Laubach) at 63:19–64:1.

In December 2002, Lucia requested that the parties come together and meet in person to discuss the matter. Ex. 14 (Email from Bruce A. Rosenfield to Elizabeth Arias and Larry P. Laubach (Dec. 4, 2002)). This meeting was held on December 19, 2002 and attended by Frances, Anna, John, Lucia, and their respective counsel. Ex. 12 (Arias Dep.) at 29:4–30:10. During the meeting, Lucia presented a proposal that Bradford redeem all of her and her family's shares following the GRAT's annuity period, both shares she would receive from the GRAT and those they currently held directly or indirectly. Ex. 15 (Bradford Holdings, Inc. Lucia Hughes & Children Proposed Settlement). She proposed a purchase price of $205 per share for their Class B non-voting shares and $215 per share for their Class A voting shares. *Id.* This price was based on the cousins' redemption on February 1, 2001 for the same price. Ex. 12 (Arias Dep.) at 41:16–42:21. Lucia's proposal also included that she would receive a $10 million preference under her mother's will. Ex. 15 (Bradford Holdings, Inc. Lucia Hughes & Children Proposed Settlement).

Following the December 19 meeting, John made a counterproposal to Lucia, omitting any preference under Frances's will for Lucia but offering to redeem all of Lucia and her immediate

7

family's Bradford shares for $275 per share for their Class B non-voting shares and $288.41 per share for their Class A voting shares. Ex. 16 (Larry P. Laubach Letter to Bruce A. Rosenfield (Jan. 21, 2003)). John made the same offer to Anna. *Id.* The redemption represented a significant risk to John, as Bradford's future success at the time was largely dependent on the outcome of highly unpredictable tobacco litigation. Ex. 4 (Rosenfield Dep.) at 252:3–9; Ex. 3 (Nupson Dep.) at 195:17–196:13; Ex. 8 (John Dec.) ¶ 11. Following the 2003 Transaction, John and his family owned all of Bradford. Ex. 10 (Settlement Agreement (Feb. 20, 2003) ("Family Settlement Agreement")) at Recitals, ¶ 4.

Lucia accepted John's offer. Ex. 17 (Elizabeth Arias Email to Larry P. Laubach (January 29, 2003)); Ex. 12 (Arias Dep.) at 57:6–20. Although Anna was hesitant to accept at first—in particular because John and Frances would only agree to modify the GRAT and redeem her shares if such shares and the proceeds were held in trust for her benefit rather than outright[5] and did not benefit any potential future adopted children. After some reflection, Plaintiff ultimately accepted John's offer as well. Ex. 3 (Nupson Dep.) at 181:4–183:15.

In late February 2003, the 2003 Transaction closed, with a trust for Anna's benefit receiving the proceeds of Bradford's redemption of one-third of the GRAT's Bradford shares (named the "2001 Trust" because of the date of the Original and Modified GRAT from which it derived) and the 1994 Trust receiving the benefit of Bradford's redemption of the shares held by

---

[5] Plaintiff had a history of mental health problems, alcoholism, and tumultuous relationships that were very concerning to her mother. Ex. 4 (Rosenfield Dep.) at 32:23–34:1; Ex. 8 (John Dec.) ¶ 5. As a result, Frances and Herbert often sought to protect Anna from herself and from others who might try to take advantage of her. Ex. 4 (Rosenfield Dep.) at 32:23–34:1. For example, Herbert asked Rosenfield in 1994 to draft a trust that Plaintiff herself settled that transferred all of her assets (the "1994 Trust"), including her Bradford stock that she had received from her grandparents, to the trust. *Id.* at 31:14–32:7; Ex. 19 (Agreement of Trust (Sept. 12, 1994) ("1994 Trust"))

8

it, for a total combined benefit of approximately $44.5 million. Ex. 18 (Agreement of Trust (Feb. 1, 2001) ("Modified GRAT")); Ex. 1 (John Aff.) ¶ 48.

### III. Undisputed Facts Concerning the 2007 Altria Sale and Subsequent 2015 Orphans' Court Litigation

Following the 2003 Transaction, all shares of Bradford were owned by John and members of his immediate family or trusts for their benefit. Ex. 10 (Family Settlement Agreement) at Recitals ¶ 4. In late 2007, more than four years after the 2003 Transaction, Bradford sold its tobacco subsidiary, JMI, to Altria Group, Inc. ("Altria"), one of the world's largest tobacco companies, for $2.9 billion, representing a substantial increase in value of the company between the 2003 Transaction and the sale to Altria. Ex. 3 (Nupson Dep.) at 192:12–18; 197:6–15. The sale to Altria was publicly announced. *Id.* at 192:12–193:4. Plaintiff testified that she was aware of it at the time. *Id.*

From 2011 through 2015, Plaintiff engaged a number of attorneys who investigated potential claims on her behalf in connection with the 2003 Transaction. First, Plaintiff retained Jonathan Freund and John Stoviak in 2011 to review whether she could terminate her 1994 Trust and 2001 Trust. Ex. 20 (Jonathan Freund Email to Bruce A. Rosenfield (July 12, 2011)). This analysis included a review of the 2003 Transaction and Family Settlement Agreement. *Id.*; Ex. 21 (John S. Middleton Email to Jonathan Freund (June 1, 2011)). In notes taken by Stoviak in 2011, he wrote, "Schnader Claim?" Ex. 22 (Affidavit of John F. Stoviak (Feb. 10, 2022)) Ex. A at 6. Stoviak and Freund's representation of Anna continued through at least January 2012. Ex. 23 (John F. Stoviak Letter to Anna K. Nupson and Jonathan Freund (Jan. 16, 2012)).

Sometime after 2011, Anna retained another new counsel, Thomas J. Budd Mucci, to whom Freund transferred Anna's representation. Ex. 24 (Deposition of Jonathan Freund) at 95:4–97:11. In a June 5, 2014 letter from Mucci sent to John's attorney, Larry Laubach of Cozen

9

O'Connor P.C., which Plaintiff attached as an exhibit to a Petition for Declaratory Relief she filed

in the Montgomery County Orphans' Court on October 31, 2014, her counsel stated explicitly that

Nupson "ha[s] determined to proceed against Schnader Harrison Segal & Lewis LLP" based upon

Schnader's "ignoring these various conflicts of interest," which allegedly left Plaintiff "severely

damaged." Ex. 25 (Thomas J. Budd Mucci Letter to Larry P. Laubach (June 5, 2014) ("Mucci

Letter")).

---

**THOMAS J. BUDD MUCCI**

*Attorney and Counselor at Law*

504 14th Street NW

Albuquerque, NM 87104

Office: (505) 247-2211                                                                                        Facsimile: (505) 217-1061

Larry P. Laubauch
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

June 5, 2014

**Re. Follow up to today's telephone conference**

Mr. Laubauch:

Thank you for your insights shared with me in our recent telephone conference. However, after speaking with Anna, we do not feel that we should approach Lucia's attorneys to ask permission to do something which John Middleton has the right and discretion to do. We do feel that Anna is the victim of actions taken by Bruce Rosenfeld as an attorney, who represented other family members while purporting to represent Anna's interest in drafting documents, counseling her pertaining to various Trusts, and securing her sale of family interests. As a result of ignoring these various conflicts of interest, Anna has been locked away from control of her assets and has been severely damaged without benefit to her.

Accordingly, we have determined to proceed against Schnader Harrison Segal & Lewis LLP, and I am traveling to Philadelphia to speak with local counsel about initiating that lawsuit, as well as, seeking disgorgement of the improperly assigned funds to the 1994 Anna Trust. You advised that

---

Notwithstanding that Anna and her counsel were aware of the alleged conflicts of interest that

"severely damaged" her in 2014, that threatened suit was not filed until June 15, 2018, more than

four years later

Following a series of aggressive communications by Plaintiff's counsel, in March 2015,

John and Bradford filed a declaratory judgment action in the Orphans' Court in the docket for

Frances's 2001 Trust (the "Orphans' Court Litigation"). Ex. 26 (Settlement Agreement (Feb. 26, 2018) ("2018 Settlement Agreement")) ¶ 71. Like the instant case, the Orphans' Court Litigation involved the 2003 Transaction. *Id.* John and Bradford took the position that the 2003 Transaction was valid with Plaintiff taking the position that the 2003 Transaction was invalid for a number of reasons. *Id.* In 2018, Anna, John (in all of his capacities), and Bradford entered into a settlement of their claims in the Orphans' Court Litigation, with Bradford making a $22 million settlement payment to Anna. *See generally id.*

In the course of the Orphans' Court Litigation, Plaintiff repeatedly made allegations against Rosenfield and Schnader that demonstrate she had actual knowledge of her claims well more than two years before she filed this lawsuit. Indeed, these verified pleadings largely repeat those in Mucci's June 5, 2014 letter. For example, in Plaintiff's "Counterclaim and Petition for Declaratory and Other Relief" filed June 23, 2015 ("2015 Counterclaim"), she states that "[i]n trying to accommodate all of the competing interests of multiple clients with direct and indirect conflicts, Bruce A. Rosenfield, Esq. was limited by prior representations and personal interests and was not able to zealously and independently represent each of his clients. . . . Schnader was in the position of having multiple clients with conflicting goals," Ex. 27 (Counterclaim and Petition for Declaratory and Other Relief (June 23, 2015)) ¶ 47, allegations that presage those in the Complaint filed three years later.

Likewise, in her verified "Answer and New Matter to Petition for Declaratory Relief and Other Relief of John S. Middleton and Bradford Holdings, Inc." also filed on June 23, 2015, Plaintiff similarly alleged that although Rosenfield was Plaintiff's "purported" counsel in connection with the 2003 Transaction (referred to in that document as the "2003 Redemption"), he had "years earlier begun to orchestrate the transaction in favor of [John] and had at all times an

11

[sic] unwaivable conflicts of interest." Ex. 28 (Answer and New Matter to Petition for Declaratory Relief and Other Relief of John S. Middleton (June 23, 2015)) at 3. Plaintiff also denied that "she was properly advised or represented by" Rosenfield. *Id.* ¶ 64. Finally, Plaintiff stated precisely the cause of action she now asserts three years later: "Mr. Rosenfield would purport to represent Anna K. Nupson in negotiations against Mr. [John] Middleton relating to the Bradford shares. Mr. Rosenfield continued to represent Mr. Middleton as the Trust's legal counsel throughout these negotiations. Mr. Rosenfield and his firm had numerous and substantial conflicts in this multi-faceted representation and was clearly not in a position to zealously and independently represent Plaintiff in negotiating against Mr. Middleton and Bradford." *Id.* ¶ 124; *see also id.* ¶ 141 (alleging that Schnader had duty to Plaintiff to obtain highest possible price for her Bradford stock, while under a conflicting duty to John to have Bradford pay lowest price).

Legal arguments made by Plaintiff's counsel in the Orphans' Court Litigation make it crystal clear that Plaintiff has long been aware of the claims she is currently making against Schnader. Indeed, the "Introduction" section to one such Orphans' Court filing is virtually indistinguishable from what she alleges in her Complaint filed more than three years later. Specifically, Plaintiff contended on May 20, 2015, in relevant part:

> This matter involves the systematic dissection and concealment of a beneficiary's interest in two generations of a family's estate plan for the purpose of carrying out the purchase and sale, by a trustee [John], of the family's trust property, primarily to enrich the trustee at the expense of other beneficiaries.
>
> The destruction of the Middleton family's estate plan and thwarting of Herbert Sr. and Anna Middleton's intent and Herbert Jr. and Frances Middleton's intent was carried out by a series of transactions culminating in two agreements: the 2003 Family Settlement Agreement (herein "FSA") and 2003 Master Settlement Agreement (herein "MSA"). These agreements accomplished two objectives: (1) the dismantling and amendment of seven irrevocable Middleton family trusts without court approval as required by law; and (2) the acquisition by a trustee of all of the shares of the Middleton family's holding company [Bradford], at less than fair market value, for the eventual sale of the family's tobacco company at 17 times

12

the purchase price paid by the Trustee for the tobacco company as well as two other family holdings.

The concealment of the diminution of Ms. Nupson's share occurred by having the attorney [Rosenfield], who represented the trustee-brother leading up to this complex transaction, then purport to represent one of the beneficiaries, Anna K. Nupson, in the sale of her interest in the family's trust property and reorganization of those trusts, and then return to representing the trustee-brother following the sale of stock, as well as serve as co-trustee of a remaining Trust in which Ms. Nupson is the beneficiary.

*See* Ex. 29 ("Anna K. Nupson's Response to John Middleton's Motion to Strike her Objections to the Petition for Adjudication of the Account and Proposed Distribution of the Anna Bauer Trust, FBO Middleton Subtrust and the FBO Hughes Subtrust and the John Middleton, Inc. Trust" (May 20, 2015)) at 1–2. Notwithstanding this written confirmation of her knowledge of her claims, filed of record in the Orphans' Court, Plaintiff still waited another three years before asserting these claims in this Court.

Finally, in the verified "Petition For Discovery By Anna K. Nupson" filed June 23, 2015, Plaintiff represented that "[t]he disputed facts and areas in which discovery is needed involve the following matters . . . (f) [w]hether Bruce A. Rosenfield, Esq. had conflicts of interest while purporting to represent Anna Nupson . . . which prevented him from reasonably concluding that [he] could zealously represent Ms. Nupson, or worse, whether Mr. Rosenfield remained the agent of John S. Middleton in structuring this transaction to accomplish Mr. Middleton's goal of consolidating his ownership and control of all of the Bradford stock . . . ." Ex. 30 (Petition for Discovery by Anna K. Nupson (June 23, 2015)) ¶ 18. There is no genuine issue as to any of these facts. All of them appear in filed pleadings in other cases and definitively demonstrate what Plaintiff knew and intended more than three years before she filed suit.

13

## IV. Plaintiff's Third Amended Complaint

The crux of Plaintiff's Third Amended Complaint is that Schnader failed to adequately represent her in the 2003 Transaction. Ex. 2 (3d Am. Compl.) ¶¶ 7–8, 44–45. In short, Plaintiff's experts think Rosenfield should have taken a harder bargaining position on her behalf and that, perhaps, she could have gotten a higher price for her shares if he had. Ex. 31 (Expert Report of Thomas Ross) at 5-6. Plaintiff alleges that "[a]t the time of the negotiations for the sale of the stock" she was misled about her rights with respect to Bradford stock—presumably a reference to the Shareholders' Agreement discussed below—as well as the value of that stock. Ex. 2 (3d Am. Compl.) ¶ 8. She further claims that Schnader led her "to believe that selling her interest in the Bradford shares was in her best interests and . . . counseled her to proceed with the transaction" and that Defendants were "motivated by their own conflicts of interest and their recent, undisclosed representation of John in a secret transfer of 258,029 Bradford shares to a trust for John's benefit." *Id.* ¶ 9. With respect to these alleged conflicts of interest, Plaintiff alleges that the 2002 Conflict Waiver Letter was inadequate because it failed to address each matter as a separate representation; to identify the client for each separate representation; or to identify and address other potential and actual conflicts of interest. *Id.* ¶¶ 50–51.

Plaintiff further claims that the 2003 Transaction was inconsistent with a 1982 Shareholders Agreement, in which Schnader represented the Middleton family, and several other family agreements predating the 2003 Transaction. *Id.* ¶¶ 16–23. According to the Third Amended Complaint, the purported "net effect" of these family agreements was that any transfer of Bradford

14

shares required John, Lucia and Plaintiff "to retain proportional ownership in Bradford and or fair value for relinquishing that proportional ownership." *Id.* ¶ 23.[6]

In defending her strategic decision to bring this action 16 years after the subject events took place, the Third Amended Complaint alleges that during the course of discovery in the Orphans' Court Litigation, Plaintiff learned for the first time a series of alleged "facts" that she contends were concealed by Schnader. As noted above, these alleged newly disclosed facts relate to the creation of the Original GRAT in 2001. Ex. 2 (3d Am. Compl.) ¶¶ 69–70. On November 19, 2001, Frances signed a document memorializing the Original GRAT, which bore the same date that the oral trust was established: February 1, 2001. Ex. 6 (Original GRAT); Ex. 2 (3d Am. Compl.) ¶ 34. Plaintiff claims that she did not learn of the Original GRAT until it was disclosed in the Orphans' Court in October 2016, Ex. 2 (3d Am. Compl.) ¶¶ 39, 56, but her contemporaneous handwritten notes prove otherwise, Ex. 11 (Handwritten Notes of Anna K. Nupson). Tellingly, however, Plaintiff does not deny knowledge of the existence of the Modified GRAT, which modified and superseded the Original GRAT to Plaintiff's benefit, for the obvious reason that she signed the Family Settlement Agreement that included the Modified GRAT as an exhibit. These documents clearly benefitted Plaintiff by conferring upon her a one-third interest in assets that she otherwise would not have received. Therefore, the Modified GRAT itself could not be the cause of any harm to Plaintiff. All of these transactions and the facts surrounding them occurred 15 years before the Complaint was filed here.

---

[6] Bradford shares were governed by a Shareholders' Agreement which contained restrictions on transfer of shares outside of eligible family members. Ex. 32 (Bradford Holdings, Inc. Shareholders' Agreement (Nov. 17, 1982)) at Art. 3. Contrary to the Third Amended Complaint, nothing in the Shareholders' Agreement required Frances to give shares equally to her children. In her deposition, Plaintiff admitted that nothing in the Shareholders' Agreement required equal distribution of shares between the three Middleton children. Ex. 3 (Nupson Dep.) at 25:18–26:25.

## STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). If the moving party meets this initial burden, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000); see also *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (a party opposing summary judgment may not rely upon bare assertions, conclusory allegations, or mere suspicions).

To successfully oppose entry of summary judgment, the non-moving party must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 247–50. Such evidence must be sufficient to support a jury's factual determination in favor of the non-moving party. Evidence that merely raises some metaphysical doubt regarding the validity of a material fact is insufficient to satisfy the non-moving party's burden. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Further, "[i]t is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995); see also Fed. R. Civ. P. 56(c)(2).

Where the non-moving party fails to adduce sufficient evidence in connection with an essential element of the case for which it bears the burden of proof at trial, the moving party is

16

entitled to entry of summary judgment. *Celotex*, 477 U.S. at 322–23. For example, courts in this Circuit have routinely granted summary judgment where the plaintiff is unable to proffer sufficient evidence that the defendant-attorney's conduct caused her actual loss, an element required to state a claim for legal malpractice. *See, e.g., Fink v. Kirchner*, 731 F. App'x 157, 160 (3d Cir. 2018) (affirming District Court's entry of summary judgment on legal malpractice claim in favor of defendants where plaintiff "failed to put forth sufficient evidence to allow a jury to reasonably find the requisite causal link between Defendants' alleged conduct and [Plaintiff's] alleged harm"); *Mahoney v. McDonnell*, 616 F. App'x 500, 505 (3d Cir. 2015) (affirming District Court's grant of summary judgment on legal malpractice claim in favor of defendants where "the summary judgment record fully supports the District Court's conclusion that no reasonable jury could find that [attorney's conduct] was the proximate cause of" any damage to the plaintiff); *Rinker v. Amori*, No. CV 3:15-1293, 2016 WL 6879617, at *9 (M.D. Pa. Nov. 22, 2016) (granting defendant's motion for summary judgment where plaintiff failed to meet his burden by sufficiently proving with 'reasonable certainty' his actual loss").

## ARGUMENT

### I.  Plaintiff's Claims Are Barred by the Statute of Limitations.

Pennsylvania strictly applies statutes of limitations. *See Commc'ns Network Int'l, Ltd. v. Mullineaux*, 187 A.3d 951, 961 (Pa. Super. Ct. 2018); *Glenbrook Leasing Co. v. Beausang*, 839 A.2d 437, 441 (Pa. Super. Ct. 2003), *aff'd*, 881 A.2d 1266 (Pa. 2005) ("[W]e are mindful of the Pennsylvania courts' policy favoring the strict application of statutes of limitation."). Actions based on tortious conduct, including legal malpractice actions, are governed by the two-year statute

17

of limitations set forth in 42 Pa. C.S. § 5524.[7] *See Thompson v. Hens-Greco*, Civ. A. No. 16-1100, 2017 WL 3616672, at \*12 (W.D. Pa. Apr. 11, 2017) ("Pennsylvania imposes a two-year statute of limitations on tortious conduct, including legal malpractice actions. 42 Pa. C.S.A. § 5524."); *Edwards v. Thorpe*, 876 F. Supp. 693, 695 (E.D. Pa. 1995) ("Plaintiff's [legal malpractice] claims are subject, at most, to a two year statute of limitations"); *O'Kelly v. Dawson*, 62 A.3d 414, 420 (Pa. Super. Ct. 2013) ("the question of when a statute of limitations runs is a matter typically decided by the trial judge as a matter of law" and "it is undisputed that the statute of limitations in this [legal malpractice] case is two years").

Under Pennsylvania law, a statute of limitations "begins running 'from the time the cause of action accrued[.]'" *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 252 (Pa. 2021) (quoting 42 Pa.C.S. § 5502(a)). "[A] cause of action accrues 'when an injury is inflicted.'" *Id.* (quoting *Wilson v. El-Daief*, 964 A.2d 354, 364 (Pa. 2009)).

### A.    There Is No Genuine Issue of Material Fact That Plaintiff's Claims Accrued Well More Than Two Years Before Plaintiff Filed Her Case.

When Pennsylvania's occurrence rule is applied to the uncontroverted facts, it is clear that the trigger for Plaintiff's potential legal malpractice claim was the 2003 Transaction. Plaintiff alleges that Schnader, driven by its alleged conflicts of interest, counseled her to agree to sell her interests in Bradford for less than they were worth. Ex. 2 (3d Am. Compl.) ¶ 9. Thus, there is no genuine issue of fact that Plaintiff's cause of action accrued on the date of the alleged malpractice. *Wilson*, 964 A.2d at 364.

---

[7] An action "to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud" must be commenced within two years. 42 Pa. C.S. § 5524(7).

Even if Pennsylvania applied the more lenient rule that a claim accrues when damages are suffered (which it does not), Bradford sold its tobacco subsidiary, JMI, to Altria in 2007 in a publicly announced transaction. *See* Ex. 3 (Nupson Dep.) at 192:12–193:4. Plaintiff was aware of the sale to Altria and knew that sale represented a value many times greater than the value at which her trusts' shares were redeemed in 2003. In 2007, she also knew that Schnader had potential conflicts of interest at the time of the 2003 Transaction because she signed the Conflict Waiver Letter in October 2002 acknowledging those very conflicts. Knowing the large disparity in the 2003 redemption price and the price implicit in the 2007 transaction, Plaintiff was thus under a duty to inquire and investigate any claims that she might have had. *Wilson*, 964 A.2d at 356 ("[O]nce a plaintiff becomes aware of the injury, and who occasioned it, she is under a duty to investigate the matter and commence a cause of action."). This obligation to exercise reasonable diligence required her to assert any such claims by 2009, almost a decade before she filed this lawsuit. *Rice*, 255 A.3d at 252; *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005); *McClain v. Golden*, Civ. A. No. 08-1347, 2017 WL 3226471, *6 (E.D. Pa. July 28, 2017) (Quiñones Alejandro, J.).

In fact, Plaintiff did investigate her claims against Rosenfield through a series of attorneys from 2011 onward, deciding at least as early as June 2014 to proceed with claims against him. Ex. 25 (Mucci Letter) ("Accordingly, we have determined to proceed against Schnader Harrison Segal & Lewis LLP[.]"). Notwithstanding this fact, she still did not sue Rosenfield until filing her initial Complaint in this matter nearly *four years* later in June 2018.

Although the untimeliness of Plaintiff's claims is apparent based on the above uncontested facts, the grounds for summary judgment become even stronger in light of Plaintiff's admissions in the Orphans' Court Litigation. Plaintiff's verified filings demonstrate unmistakably that Plaintiff

19

had actual knowledge of her potential claims against Defendants several years before she instituted this litigation, but chose not to bring them.

In a 2015 filing in the Orphans' Court Litigation, Plaintiff placed her potential malpractice claim squarely at issue, notwithstanding her strategic decision not to include Rosenfield and Schnader as parties. Specifically, Plaintiff sought declaratory relief that Schnader "[i]n trying to accommodate all of the competing interests of multiple clients with direct and indirect conflicts . . . was limited by prior representations and personal interests and was not able to zealously and independently represent each of [their] clients. . . . Schnader was in the position of having multiple clients with conflicting goals." Ex. 27 (Counterclaim and Petition for Declaratory and Other Relief (June 23, 2015)) ¶ 47. Such allegations echoed Mucci's *June 5, 2014* letter, included as an exhibit to her October 31, 2014 filing in Orphans' Court, stating that Plaintiff "ha[s] determined to proceed against Schnader Harrison Segal & Lewis LLP" based upon Schnader's "ignoring . . . various conflicts of interest," which allegedly left her "severely damaged." Ex. 25 (Mucci Letter).

In other 2015 pleadings in the Orphans' Court Litigation, Plaintiff made clear that the focal point of her grievance against Schnader was its handling of the 2003 Transaction and Schnader's alleged undisclosed conflicts. For instance, Plaintiff alleged that "Mr. Rosenfield had years earlier begun to orchestrate the transaction in favor of the trustee [John], and had at all times an [sic] unwaivable conflicts of interest" Ex. 28 (Answer and New Matter to Petition for Declaratory Relief and Other Relief of John S. Middleton (June 23, 2015)) at 3; that "Mr. Rosenfield and his firm had numerous and substantial conflicts in this multi-faceted representation and was clearly not in a position to zealously and independently represent Ms. Nupson in negotiating against Mr. Middleton and Bradford" *id.* ¶ 124; and that Schnader had clients with conflicting interests because Plaintiff and other trust beneficiaries had an interest in "obtain[ing] the highest price for their

20

Bradford stock, while John's interest was "for Bradford to pay the lowest possible price for the shares," *id.* ¶ 141.

These allegations made in June 2015 are substantively identical to those asserted in this action, which was not instituted until June 2018, in which Plaintiff alleges that Schnader represented Plaintiff in connection with the sale of Bradford stock, Ex. 2 (3d Am. Compl.) ¶ 7; that the net effect of the 2003 Transaction was that John became the sole owner of Bradford, *id.* ¶¶ 7, 44; that Defendants counseled Plaintiff to believe selling her interest in Bradford was in her best interests, *id.* ¶ 9; and that, at the time of the 2003 Transaction, Schnader was under a conflict of interest due to its representation of John, for which Schnader failed to obtain informed consent, *id.* ¶¶ 48, 50.

In short, it could not be any more obvious than when Plaintiff's attorney sent a letter on June 5, 2014 stating her intent to sue Schnader, and she later filed pleadings in the Orphans' Court Litigation in 2015 asserting that Schnader was conflicted when it represented her in connection with the 2003 Transaction, Plaintiff knew all of the component elements of the claims she alleges in the Complaint. No amount of rhetoric regarding Schnader's alleged concealment and/or nondisclosure of the facts wipes away her previous judicial statements demonstrating actual knowledge of her purported claims more than four years before she filed this lawsuit. There is no genuine issue of material fact as to when Plaintiff's claims accrued or that they became time-barred long before she commenced this action.

**B.    No Equitable Tolling Principles Apply To Delay Commencement Of The Statute Of Limitations In This Case**

The allegations of the Complaint, verified pleadings in the Orphans' Court Litigation, and discovery in this matter conclusively demonstrate that Plaintiff knew of her claimed injury and its alleged cause well more than two years before she sued Schnader. However, recognizing that she

21

is suing for alleged injuries that occurred as the result of a transaction that closed fifteen years before she filed her lawsuit, Plaintiff first seeks to invoke the "discovery rule" to toll the statute of limitations governing her claims. She makes the highly strained argument that her claims are based upon evidence that she purportedly discovered for the first time in the course of the Orphans' Court Litigation. Specifically, Plaintiff contends she was unaware: (1) of the existence of the Original GRAT, which was solely for the benefit of John and his immediate family, until October 2016 (which is contradicted by her 2002 handwritten notes), Ex. 2 (3d Am. Compl.) ¶ 56; and (2) that the Original GRAT had been an "oral trust" until November 2001, when the Original GRAT was executed and was dated February 1, 2001, *id.* ¶ 59. Plaintiff next seeks to toll using the doctrine of fraudulent concealment, asserting that facts regarding Schnader's alleged conflict of interest were fraudulently concealed from her by Rosenfield. But neither of these equitable tolling principles have any application on these undisputed facts.

### 1. The Discovery Rule Does Not Toll Plaintiff's Statute of Limitations to 2018.

#### a. Plaintiff Discovered Her Claimed Injury and Its Alleged Cause More Than Two Years Before She Sued Defendants.

Although Plaintiff, through Mucci, wrote a letter on June 5, 2014 asserting knowledge of her claimed injury and its supposed cause, she waited more than four years to sue Defendants. She tries to invoke equitable tolling to excuse her delay, claiming to have learned of additional facts supporting her claim while litigating with her brother, but doctrines that toll the limitations period are "narrow exception[s] and should be applied in only the most limited circumstances." *Spade v. Star Bank*, No. Civ. A. 01-3349, 2002 WL 31492258, at \*9 (E.D. Pa. Nov. 6, 2002). Accordingly, "Courts must use equitable tolling sparingly, and must evaluate whether a plaintiff 'has shown that he or she exercised reasonable diligence in investigating and bringing [the] claims.'" *McClain*,

22

2017 WL 3226471, *6 (Quiñones Alejandro, J.) (citation omitted). Whether a plaintiff has offered sufficient facts to support the applicability of a tolling doctrine, such as fraudulent concealment or the discovery rule, may be determined as a matter of law. *Doe v. E. Hills Moravian Church, Inc.*, C.A. No. 12-5823, 2013 WL 5050593, at *4–5 (E.D. Pa. Sept. 13, 2013).

Under Pennsylvania law, the statute of limitations of a legal malpractice claim is tolled by the discovery rule only until the plaintiff is put upon "inquiry notice." *Rice*, 255 A.3d at 251 (quoting *Wilson*, 964 A.2d at 364). Inquiry notice "ties commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Id.* (quotation omitted).

In *Rice*, a victim tragically assaulted by her childhood priest sued the Diocese of Altoona-Johnstown thirty-five years after the alleged abuse stopped, invoking the discovery rule and fraudulent concealment because she did not know until a 2014 grand jury report that the Diocese was aware of other instances of sexual abuse by her priest but nevertheless returned him to a parish. *Id.* at 242. The Supreme Court concluded that neither exception to the statute of limitations applied because "Rice knew of her injury at the time of each alleged assault and she knew that Bodziak caused the injury." *Id.* at 251. Even if she did not know of the Diocese's role at that time, she knew of her injury and its cause by the priest and could have filed suit against him and "s[ought] discovery from the Diocese." *Id.*

The Third Circuit recently applied the Pennsylvania Supreme Court's November 2001 decision in *Rice* to hold that the statute of limitations runs from the accrual of a cause of action. *SodexoMAGIC, LLC v. Drexel Univ.*, Nos. 19-1028, 19-1107, 2022 WL 176427, at *18 (3d Cir. Jan. 20, 2022). There, Drexel asserted that its fraud claim was tolled until it received discovery

23

materials suggesting that "SDM never intended to fulfill the commitments it made in its final offer." *Id.* at \*19. But it was "undisputed that Drexel had constructive knowledge of SDM's allegedly false intentions by that date." *Id.* Here, there is no factual dispute whatsoever that Plaintiff had actual knowledge through a 2007 public announcement of the sale price differential between what she was paid in 2003 and the company obtained in 2007. Ex. 3 (Nupson Dep.) at 192:12–193:4. At that point in 2007, Plaintiff knew of the scope of potential injury, she knew that Schnader had a conflict in 2003, and she had an obligation to exercise reasonable diligence, investigate any potential claim and bring it within two years from the 2007 public announcement. *Rice* and *SodexoMAGIC* mandate dismissal of these time-barred claims.

The discovery rule serves to toll the running of the statute of limitations only if the defendant, through fraud or concealment, causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts. *Rice*, 255 A.3d at 252 (quoting *Fine*, 870 A.2d at 861.) Here, rather than establishing that Plaintiff relaxed her vigilance or deviated from her inquiry into the facts, the undisputed evidence demonstrates quite the opposite. From at least 2011, she was represented by a series of attorneys who thoroughly investigated the 2003 Transaction and concluded no later than June 2014 that a legal malpractice claim could and should be brought against Rosenfield. Ex. 25 (Mucci letter). Through her attorney's June 5, 2014 letter and her sworn pleadings in the Orphans' Court Litigation, Plaintiff admits that she knew of her claimed injury and its alleged cause more than two years before she sued Schnader. That ends any argument that she was misled. Moreover, to the extent Plaintiff argues additional facts only recently discovered motivated her finally to sue Schnader in 2018, such argument is both legally irrelevant and demonstrates that she failed to exercise the required level of reasonable diligence. *See also Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270, 276 (Pa. Super. Ct.

24

2005) (holding that the statute of limitations begins to run when the injured party "possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress").

In *Baselice*, a twenty-six-year-old plaintiff alleged improper sexual contact by a priest who also introduced the plaintiff to drugs and alcohol, resulting in the plaintiff's addiction. *Id.* at 273. While the plaintiff was in an in-patient treatment facility on the recommendation of the Archdiocese of Philadelphia, the Archdiocese attempted to contact him about a settlement agreement. *Id.* at 274. The plaintiff argued that the statute of limitations should be tolled because he did not and could not have known that he was injured by the Archdiocese and other defendants at the time he was abused. *Id.* at 275. The Pennsylvania Superior Court held that neither the discovery rule nor fraudulent concealment applied to toll the statute of limitations. The Court found that because the plaintiff had knowledge of the abuse and the identity of his abuser, allegations that defendants had been complicit in the misconduct did not suffice to invoke the discovery rule. *Id.* at 277. Finding that the facts demonstrating the case was time-barred were so clear that reasonable minds could not differ, the Court affirmed judgment on the pleadings in favor of defendants. *Id.* at 276, 279. So, too, in this case, the 2003 Transaction that forms the basis of Plaintiff's alleged cause of action occurred more than 15 years before she initiated this lawsuit. Plaintiff had knowledge that Schnader had represented her in connection with that 2003 Transaction, she signed the Conflict Waiver Letter acknowledging Schnader's conflicts in October 2002, she knew the scope of the potential injury in 2007, and has long alleged that the 2003 Transaction caused her to suffer harm. Accordingly, it was incumbent upon Plaintiff to act with reasonable diligence to investigate Schnader's role in causing the alleged harm.

25

Moreover, any argument by Plaintiff for tolling commencement of the statute of limitations until 2016 is conclusively defeated by the statements made in the June 5, 2014 letter from Plaintiff's general counsel *and* in sworn pleadings in the Orphans' Court Litigation discussed above. The Superior Court's decision in *Trice v. Mozenter*, 515 A.2d 10 (Pa. Super. Ct. 1986), *aff'd*, 621 A.2d 108 (Pa. 1993), is on point. In *Trice*, the plaintiff successfully appealed his criminal conviction, arguing ineffective assistance by the defendant-attorney. After his criminal conviction was overturned by the Third Circuit, plaintiff brought a civil action against his former attorney, arguing that defendant's negligence had caused plaintiff to be unjustly convicted and deprived of his freedom for many years.

When the defendant-attorney filed a motion for judgment on the pleadings in the civil action, arguing that his former client's claim was barred by the two-year statute of limitations, the plaintiff asserted that his complaint was timely because he could not have discovered his cause of action until the Third Circuit's decision reversing his conviction based on ineffective assistance and the complaint was filed less than two years later. *Id.* at 515 A.2d at 11. The Court rejected plaintiff's argument, reasoning: "[s]uffice it to say . . . the plaintiff knew or should have known that he had sustained an injury by the date he signed the Motion, Affidavit and Memorandum in support of his contention that trial and appellate counsel was ineffective." *Id.* at 14–15. By that time, plaintiff "had lost all confidence in counsel's stewardship, [which] should have prompted him to act." *Id.*

Similarly, in this case, when Plaintiff hired independent counsel, who sent a letter explicitly stating that Plaintiff had "determined to proceed against Schnader Harrison Segal & Lewis LLP" based upon Schnader's "ignoring . . . various conflicts of interest," which allegedly left Anna "severely damaged," Plaintiff clearly expressed that she had "lost all confidence in counsel's

26

stewardship" and was required to act on her concerns. *Trice*, 515 A.2d at 15. Plaintiff's obligation to act became even stronger in 2015, when she verified and submitted court documents in which she accused Schnader of, among other things: trying to accommodate all of the competing interests of multiple clients with direct and indirect conflicts; failing to zealously protect Plaintiff's interests as a result; and causing her to suffer millions of dollars of damages as a result of entering into the 2003 Transaction, in which Plaintiff was represented by Schnader.

There can be no genuine issue of material fact that, as of 2014, Plaintiff "possesse[d] sufficient critical facts to put [her] on notice that a wrong has been committed and that [s]he need investigate to determine whether [s]he is entitled to redress." *Baselice*, 879 A.2d at 276. Indeed, having expressly declared a need for discovery on issues relating to Schnader's alleged conflicts in her Petition for Discovery, filed in the Orphans' Court Litigation on June 23, 2015, Ex. 30 (Petition for Discovery by Anna K. Nupson) ¶ 18, Plaintiff cannot credibly contend that she was not, as of that point in time, on notice that she was required to act with reasonable diligence to investigate her alleged claims and assert them within the two year statute. Yet she waited far more than two years to commence this action in 2018. On these undisputed facts, Plaintiff failed to exercise reasonable diligence as a matter of law and her claims must be dismissed as untimely.

> **b.    Plaintiff's Allegations of Other Alleged Misconduct Are at Most Additional Evidence in Support of Her Already Accrued Legal Malpractice Claim.**

Plaintiff's effort to invoke equitable tolling principles fails for the independent reason that the alleged undisclosed and "newly discovered" facts she cites are, at most, additional evidence being offered in support of her already accrued professional negligence claims, rather than bases for independent causes of action. As noted by the Third Circuit, "[t]he discovery rule does not delay the running of the statute of limitations until a plaintiff is aware of all of the facts necessary

27

to bring its cause of action." *New Castle Cty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 1125 (3d Cir. 1997); *cf. Sherman Indus., Inc. v. Goldhammer*, 683 F. Supp. 502, 509 (E.D. Pa. 1988) ("[T]he discovery rule ordinarily is applied in cases in which a plaintiff is unaware initially that it has been harmed, but is inapplicable where the plaintiff knows of the harm, but not the extent of it . . . . Even late discovery of a major increase in the extent of harm does not toll the limitations period.") (citations omitted). Here, Plaintiff knew of the harm at issue no later than when Bradford sold JMI in 2007 for a valuation that far exceeded that which formed the basis of what her trusts were paid in 2003. Ex. 3 (Nupson Dep.) at 192:12–193:4.

The Superior Court's 2018 decision in *Communications Network* is directly on point. In that case, the Court affirmed a decision granting summary judgment based on the statute of limitations in a professional negligence action against an attorney where it was argued the statute of limitations should be tolled by the plaintiff's continued failure to investigate and discover important facts. In so doing, the Court rejected a variety of tolling arguments similar to those advanced by Plaintiff in this case. Of particular importance, the Court rejected plaintiff's theory that the statute of limitations was tolled by an attorney's ongoing concealment of information relevant to the claims against him. 187 A.3d at 964.

The Superior Court further explained that permitting the limitations period to be restarted by new or continuing acts of alleged misconduct, including the alleged ongoing nondisclosure of important facts, "would defeat the fundamental purpose of the statute of limitations' scheme, which is to avoid stale claims."[8] *Id.* ("Under the occurrence rule, the statute of limitations period

---

[8] The staleness of Plaintiff's claims is underscored by her inability to recall key facts related to the claims she brings in this Court. Asked the purpose of the December 19, 2002 family meeting at which all family members and lawyers discussed settlement negotiations, Plaintiff testified, "You have to understanding not only was this 25 years ago or more, it—I'm not sure what the purpose of it was." Ex. 3 (Nupson Dep.) at 41:3–5. Asked about the assignment that Plaintiff signed

is triggered by the first act of alleged malpractice, not the last . . . [t]here is 'no re-set' button to start the limitations period all over again."); *see also Baselice*, 879 A.2d at 279 ("[T]o postpone the accrual of causes of action until [appellant] completed [his] investigation of all potential liability theories would destroy the effectiveness of the limitations period.") (brackets in original); *Glenbrook Leasing*, 839 A.2d at 441–42 (declining to adopt the "continuous representation rule," whereby "the continuous representation of a client by an attorney tolls the running of a statute of limitations").

Plaintiff's claims are based on Schnader's alleged misconduct in causing her to enter into the 2003 Transaction, during a time when Schnader purportedly had undisclosed conflicts of interest. Plaintiff does not, and cannot, come forward with any evidence to show how the circumstances surrounding the creation of the Original GRAT in 2001 (a transaction to which she was not a party), and its subsequent modification, created a separate and distinct cause of action. Plaintiff's experts have advanced the theory that the oral trust and the modification of the Original GRAT *could* have resulted in significant tax liability *for John and Frances*, and that Rosenfeld should have somehow used the potential tax liability to give Plaintiff an advantage in negotiating the redemption price with John, although her experts do not explicitly state what Rosenfield should have threatened on Plaintiff's behalf to achieve such alleged leverage. The history of the Original

---

in 1998, Plaintiff testified, "to recall precise wording and conversation of over a quarter a century ago is difficult." *Id.* at 52:18–20. Asked where Plaintiff was living in 2001, Plaintiff testified, "February, March 2001, I could have been in Bryn Mawr. I also did a lot of traveling, but I believe I may have been in Bryn Mawr. I may have been—let me think. March of 2001, I may have been part-time in Lancaster. I may have been in a number of places. It was a long time ago." *Id.* at Nupson Dep. 68:11–16. Asked if Plaintiff knew to what she was referring in a letter that Plaintiff sent to Defendant Rosenfield dated August 22, 2001, she testified, "Oh, heavens, no" and "And I will tell you that was 25 years ago. I cannot begin to tell you." *Id.* at 78:20, 80:18–19. And when reviewing her own handwritten notes that recounted the terms of the GRAT that Plaintiff now denies knowing, she testified, "I'm trying to reconstruct from 20 years ago . . . at a very turbulent time in my life." *Id.* at 112:16–19.

GRAT did not create the alleged conflict; Rosenfield's multiple representations created potential conflicts that Plaintiff was aware of and waived in October 2002. Ex. 5 (Conflict Waiver Letter). At best, the history of the Original GRAT is additional evidence to support the claim that had already accrued relating to Rosenfeld's representation of Plaintiff in the 2003 Transaction. Ex. 2 (3d Am. Compl.) ¶ 67. And in any event—as discussed more fully in Section II *infra*—the Original GRAT's oral formation could not be material new information that tolled the statute of limitations because Plaintiff *admitted in her sworn deposition testimony in this case that the Original GRAT "was properly created, funded, and administered."* Ex. 3 (Nupson Dep.) at 244:9–20 (emphasis added). Plaintiff's reliance on the alleged "recent discovery" of the Original GRAT is plainly a contrivance intended to escape the fact that her claims against Schnader are obviously time-barred.

Separately, Plaintiff's allegations about the oral nature and dating of the Original GRAT cannot serve as a basis for any tolling doctrine. Had Plaintiff retained different counsel to represent her in the 2003 Transaction, such counsel, like Lucia's counsel, would not have had any knowledge of the Original GRAT's formation and could not have employed the negotiating "strategy" suggested by Plaintiff's experts—just as Lucia's counsel could not pursue such a strategy. *See Wastvedt v. Vaaler*, 430 N.W.2d 561, 568 (N.D. 1988) (granting a judgment notwithstanding the verdict where plaintiffs alleged negligence and conflict of interest in drafting an agreement but "plaintiffs presented no evidence . . . that an attorney with no conflict of interest would have procured a different result for the plaintiffs"). Moreover, this advice and the oral nature of the original GRAT has little if anything to do with Plaintiff's claim of malpractice. She knew of Schnader's conflicts in 2002, *see* Ex. 5 (Conflict Waiver Letter), and she knew that the company sold for much more than her trusts were paid in the family settlement in 2007, Ex. 3 (Nupson Dep.) at 192:12–193:4.

30

In short, Plaintiff's allegations about the Original GRAT, or any other allegedly newly-discovered evidence, do not create a separate and distinct cause of action. They are, at most, a footnote detail in the larger story that Plaintiff has repeatedly told since 2014 about Schnader's purported negligent and conflicted conduct in representing her. Because Plaintiff's alleged claims against Schnader were triggered as soon as she knew of a potential injury and its cause, and the core of her claims against Schnader relate to a 2003 Transaction, these additional "concealed" facts are immaterial to the dispositive legal question of when her cause of action against Schnader accrued.

### 2.     The Facts Do Not Show Any Fraudulent Concealment by Rosenfield.

Finally, the fraudulent concealment doctrine is inapplicable because Schnader's alleged statements and nondisclosures do not rise to the level of conduct sufficient to toll the statute of limitations.

Fraudulent concealment requires that there "be an *affirmative* and independent act of concealment that would divert or mislead the plaintiff from discovering the injury." *Mest v. Cabot Corp.*, 449 F.3d 502, 517 (3d Cir. 2006) (emphasis added). Finding the doctrine of fraudulent concealment inapplicable in a legal malpractice case, the Pennsylvania Superior Court recently held that "[t]he defendant must have committed some *affirmative independent act of concealment* upon which the plaintiffs justifiably relied." *Namani v. Bezark, Lerner, & Devirgilis, P.C.*, 2017 WL 57153, at *3 (Pa. Super. Ct. 2017) (emphasis added) (citing *Lange v. Burd*, 800 A.2d 336, 339 (Pa. Super. Ct. 2002), *appeal denied*, 818 A.2d 504 (Pa. 2003)). "[M]ere silence in the absence of a duty to speak cannot suffice to prove fraudulent concealment." *Id.*; *see also Sevin v. Kelshaw*, 611 A.2d 1232, 1236 (Pa. Super. Ct. 1992) (same).

31

Even if the Third Amended Complaint could be construed to allege that Rosenfield, through his silence, implicitly assured Plaintiff that "all was well," courts in this district have held that a defendant's general statements, such as that "everything was fine, and that [the plaintiffs] should not worry" are insufficient to estop the defendant from raising the statute of limitations, because "such general reassurances do not rise to the level of . . . specific representations" necessary to constitute fraudulent concealment. *Ciprut v. Moore*, 540 F. Supp. 817, 821 (E.D. Pa. 1981), *aff'd*, 688 F.2d 819 (3d Cir. 1982).

Here, as in Doe, Plaintiff has no evidence that Schnader made any affirmative statements that caused Plaintiff to relax her vigilance or deviate from her duty of inquiry into the facts. To the contrary, as discussed above, the record in this case and the sworn pleadings from the Orphans' Court Litigation make clear that Plaintiff has believed for many years that the documents Schnader drafted, and the advice Schnader provided, did not appropriately benefit her and that she has long been concerned about Schnader's alleged conflicts of interest. This Court has previously held that "[r]eliance on the defendant's conduct *when the plaintiff has reason to believe otherwise* is not reasonable reliance and will not toll the statute of limitations." *Arndt v. Johnson & Johnson*, 67 F. Supp. 3d 673, 678 (E.D. Pa. 2014) (emphasis added).

Plaintiff rhetorically characterizes the Conflict Waiver Letter as "false" and states that the Conflict Waiver Letter "concealed" certain alleged conflicts of interest, but fails to offer any evidence of any particular affirmative statements or acts of Defendant that would serve as the basis for such tolling. Ex. 2 (3d Am. Compl.) ¶¶ 50–51. Plaintiff also contends that Rosenfield failed to disclose facts concerning the alleged execution, backdating, and replacement of the Original GRAT. But the failure to disclose those facts is not a basis for tolling under Pennsylvania law because, as discussed above, those facts are not material to her malpractice claim.

32

Furthermore, where an attorney is under an affirmative obligation not to speak, honoring that clear ethical obligation does not constitute fraudulent concealment as a matter of law. *See Rice*, 255 A.3d at 253 (citing other jurisdictions) ("Assuming, arguendo, the imposition of a duty to speak, the failure to do so does not trump a plaintiff's due diligence obligation to investigate other possible causes of her known injury."). The facts concerning the execution, formation, and dating of the Original GRAT related to Rosenfield's representation of different clients, Frances as settlor and John as trustee. Thus Rosenfield was prohibited from disclosing this information pursuant to Pennsylvania Rule of Professional Conduct 1.6. *See Maritrans, GP v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1280–81 (Pa. 1992) (enjoining attorney and law firm from using client's confidential information in representation of the competitors).

There is simply no basis to toll the statute of limitations and Plaintiff's claims are time-barred. As such, summary judgment must be granted in Defendants' favor.

## II. Plaintiff Cannot Maintain a Claim for Legal Malpractice Because She Admitted Dispositive Material Facts.

Earlier in this case, Defendants moved to dismiss Plaintiff's Second Amended Complaint based, in part, on Plaintiff's sworn statements in documents filed in the Montgomery County Orphans' Court [ECF 33]. Defendants also moved to deem admitted requests for admission based on statements incorporated into a 2018 Settlement Agreement between Plaintiff and her brother, which she signed and affirmed under oath in a colloquy before the Montgomery County Orphans' Court [ECF 157]. Discovery gave Plaintiff an opportunity to develop evidence to support her claims for legal malpractice in this case. But, when asked about those same statements in her deposition *in this case*, Plaintiff *admitted* them *again*. Instead of supporting her own claims, *Plaintiff agreed with Defendants*. Given Plaintiff's admissions in her deposition, therefore, there is no genuine dispute of material fact as to two of the three elements of a claim for legal

33

malpractice: failure to exercise ordinary skill and knowledge and the proximate cause of her damages. Because Plaintiff cannot put forth evidence to meet two of the three elements of a legal malpractice claim, Defendants are entitled to judgment as a matter of law.

Opposing-party admissions are fatal to Plaintiff's claims. The Federal Rules of Civil Procedure provide that "[a] party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions[] . . . [and] admissions." Fed. R. Civ. P. 56(c)(1)(A). Summary judgment is appropriate when an opposing-party admission negates a necessary element of a plaintiff's claim. *See, e.g., Dinnerstein v. Burlington Cty. Coll.*, 764 F. App'x 214, 218 (3d Cir. 2019) (affirming dismissal of employment claims on summary judgment because plaintiff "admitted in his deposition that when he was terminated on December 1, 2011, for yelling profanities at his supervisors, he knew that he had been issued prior warnings, understood what the warnings meant, but had nevertheless used profane language with his supervisors in violation of the Civility Policy"); *Donovan v. Pittston Area Sch. Dist.*, 218 F. Supp. 3d 304, 315 n.7 (M.D. Pa. 2016) (Quiñones Alejandro, J.) (dismissing on summary judgment plaintiff's procedural due process claim because, "in light of Plaintiff's own admissions and deposition testimony, Plaintiff received all the due process owed prior to her demotion").

Pennsylvania requires that a plaintiff establish three basic elements to establish a claim of legal malpractice: (1) employment of the attorney or another basis for duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (3) that the attorney's negligence was the proximate cause of damage to the plaintiff. *Kituskie v. Corbman*, 714 A.2d 1027, 1029 (Pa. 1998) (citing *Rizzo v. Haines*, 555 A.2d 58, 65 (Pa. 1989)). In her deposition, Plaintiff admitted key facts that defeat the second and third elements. Specifically, Plaintiff admitted that the Original GRAT

34

was "was properly created, funded, and administered." Ex. 3 (Nupson Dep.) at 244:9–20. This admission defeats Plaintiff's assertion that Schnader should have, in the exercise of reasonable care, attacked the oral formation of the Original GRAT, allegedly to give her more leverage in the negotiations leading to the 2003 Transaction. With the admission that the Original GRAT was properly formed and funded, there was simply nothing to attack, even if such an attack were otherwise prudent. Plaintiff also admitted that "the purchase price paid for the stock redeemed from the modified 2001 GRAT and the Anna '94 trust represented the fair value of the stock," defeating any allegation that Plaintiff suffered damages.

In 2018, Plaintiff entered into a settlement agreement with John and Bradford confirming these facts in exchange for a $22 million payment by Bradford. The 2018 Settlement Agreement stated that "[t]he recitals set forth above are true and correct and are incorporated herein by reference." Ex. 26 (2018 Settlement Agreement) ¶ II.1. In her deposition, Plaintiff did not deny the truth of the facts recited in the 2018 Settlement Agreement. She confirmed that she remembered signing it, Ex. 3 (Nupson Dep.) at 232:9–22, that she asked the Orphans' Court to approve it, *id.* at 232:23–233:6, that she read the entire Agreement, *id.* at 233:23–24, and that she understood the contents of the Agreement, *id.* at 237:5–9. She testified that if there had been something in the agreement that she disagreed with, she would have told the Court in her colloquy that led the Court to approve the agreement.[9] Ex. 3 (Nupson Dep.) at 237:10–13. She admitted that certain provisions were true:

---

[9] Not only did Plaintiff sign the 2018 Settlement Agreement in exchange for $22 million, but she also confirmed her understanding of the 2018 Settlement Agreement under oath in a colloquy with the Montgomery County Orphans' Court and led the Court to enter an order approving the settlement:

Q.    Has counsel explained the agreement to you?
A.    Yes, Your Honor.

Q. . . .

And one of the things that you represent in Paragraph 3(b) is that, "The original 2001 GRAT was properly created, funded, and administered." Do you see that?

A. Yes.

Q. Okay. You further represent, "That all GRAT annuity payments were made to Frances, and that the remainder interest was modified, and the modified 2001 GRAT reflects Frances' and all beneficiaries' intentions." Do you see that?

A. Yes.

Q. And you agree that's true?

MR. DAVIS:  Objection to form; foundation. Go ahead.

A. Yes.

Q. Okay. And it further says, "Anna forever waives her right to contest the 2001 GRAT."

A. Yes.

Q. Okay. And let's skip down to Paragraph 3(f) on Page 21. Paragraph F says, "Anna agrees that Bradford and subsidiaries faced substantial risks as a result of the tobacco litigation." That is also true; right?

MR. DAVIS:  Objection to form. Go ahead and answer.

A. Yes.

Q. Okay. It goes on to say, "That it was possible that the value of Bradford stock would decrease significantly based on industry-wide legal changes." That was true—

MR. DAVIS: Objection; form, go ahead.

Q. —right?

A. Yes.

---

Q. Do you understand the contents of the agreement?

A. Yes, Your Honor.

Q. Do you understand the effect of the agreement?

A. Yes, Your Honor.

. . .

Q. Are you entering into this agreement of your own free will and volition?

A. Yes, Your Honor.

Q. After considering the facts, the risks, the expense, and the possible outcomes, and with the advice of your counsel, do you wish to enter into this agreement?

A. Yes, Your Honor.

Q. And are you asking the Court to approve the settlement?

A. Yes, Your Honor, please. Thank you.

Ex. 33 (Transcript, *In re Estate of Herbert H. Middleton, Deceased*, No. 1998-X1871 (Pa. O.C. Montg. Cty. Feb. 26, 2018)) at 16, 19–20.

36

Q.      Okay. And that concludes by saying, "That the purchase price paid for the
        stock redeemed from the modified 2001 GRAT and the Anna '94 trust
        represented the fair value of the stock." That was true, right?
        MR. DAVIS: Objection to form. Go ahead and answer.
A.      Yes, that's what it said.
Q.      And it was true when you signed the agreement?
        MR. DAVIS: Objection to form. Go ahead and answer.
A.      Yes.

*Id.* at 244:8–246:4.

Plaintiff admitted in her deposition in this case that the facts recited in the 2018 Settlement

Agreement were true. And these facts show that Plaintiff had no basis to challenge the Original

GRAT even if she had known everything about how it was formed because she admits that "the

original 2001 GRAT was properly created, funded, and administered."[10] *Id.* at 244:9–13. Since

there is no basis to challenge the Original GRAT, Mr. Rosenfield's failure to challenge it could

not have caused any damages by definition. Plaintiff also admitted there was no harm from any

alleged breach of duty with respect to the 2003 settlement agreements and the 2003 Transaction

because the purchase price that she received "represented the fair value of the stock," and thus she

suffered no harm from redeeming her stock at that time. These admissions are fatal to her

professional negligence and breach of fiduciary duty claims.

In this case, the Court afforded Plaintiff the opportunity to develop a record to support her

claims notwithstanding her sworn statements of fact in the Orphans' Court that completely

---

[10] Defendants previously posed questions from the 2018 Settlement Agreement in Requests
for Admission directed to Plaintiff. In Supplemental and Amended Responses [ECF 157-3],
Plaintiff specifically denied, among others, Request for Admission No. 52, "that the Original 2001
GRAT was properly created, funded, and administered," and Request for Admission No. 61, "that
the purchase price paid for the stock redeemed from the Modified 2001 GRAT and the Anna 1994
Trusts represented the fair value of the stock." The Court denied Defendants' Motion to Deem
Defendants' Requests for Admission Admitted [ECF 157], but the Court noted that "Plaintiff is
reminded that she may be required to pay reasonable costs, including attorney's fees, if Defendants
later prove the denied facts to be true. *See* Fed. R. Civ. P. 37(c)(2)." [ECF 164]. Plaintiff
subsequently admitted these Requests for Admission in her deposition.

contradict the allegations in this case. She did not. Instead, under oath in her deposition in this case, she agreed with Defendants—admitting the same facts she represented to the Orphans' Court all along. These admissions are fatal to her claims here. Plaintiff had her chance to make her case, but with her admissions, she should not be allowed to prolong this litigation any further. Schnader is entitled to judgment as a matter of law.

### III. Plaintiff Cannot Meet Her Burden to Establish that Any Alleged Breach by Rosenfield Caused Her Alleged Damages.

Even were Plaintiff's claim not time-barred, Plaintiff cannot sustain her burden of proof with respect to damages and her malpractice claim therefore fails for four reasons. First, Plaintiff's claimed damages are entirely speculative, as she has not and cannot put forth evidence that her brother, John, would have agreed to purchase her shares in Bradford for a higher price.[11] Next, Plaintiff owned none of the redeemed stock. Even if Bradford would have agreed to a higher purchase price, any such damages would inure to the trusts that owned the stock rather than to Plaintiff. Plaintiff owned no stock in her individual capacity (the only capacity in which she asserts claims in this matter). Plaintiff does not have standing to pursue such damages for the trusts and has made no effort to do so. Next, any damages Plaintiff could prove must be offset by the $22 million she received in her 2018 settlement with John and Bradford. Finally, Plaintiff has built no record in support of the high standard required for an award of punitive damages.

To establish a claim for legal malpractice, a Plaintiff must adduce evidence to show that the attorney's negligence was the proximate cause of damage to the plaintiff. *Kituskie*, 714 A.2d at 1029 (citing *Rizzo*, 555 A.2d at 65). Pennsylvania courts have consistently required legal malpractice plaintiffs to prove that the harm claimed would not have occurred "but for" the conduct

---

[11] In fact, John has declared under penalty of perjury that he would not have agreed for Bradford to pay more for his sisters' shares in the 2003 Transaction. Ex. 8 (John Dec.) ¶ 10.

of the defendant attorney. *Myers v. Robert Lewis Seigle, P.C.*, 751 A.2d 1182, 1185 (Pa. Super. Ct.), *appeal denied*, 795 A.2d 978 (Pa. 2000); *Duke & Co. v. Anderson*, 418 A.2d 613, 618 (Pa. Super. Ct. 1980); *Schenkel v. Monheit*, 405 A.2d 493, 494 (Pa. Super. Ct. 1979); *Trice*, 515 A.2d at 13. In order to show that the attorney's conduct was the proximate cause of the plaintiff's alleged damages, the plaintiff must prove that the attorney's failure to adhere to the standard of care was a substantial factor in bringing about the plaintiff's alleged harm, not merely one in a series of factors leading up to the alleged damages. *Eckroth v. Pa. Elec., Inc.*, 12 A.3d 422, 428 (Pa. Super. Ct. 2010) (internal citations omitted). In malpractice claims arising out of litigation, the former client must prove the "case within a case," *Kituskie*, 714 A.2d at 1030, to establish that the outcome would have been better but for the attorney's negligence. *Id.* The burden is on the malpractice plaintiff to prove "that the attorney's negligence caused him to lose the case he otherwise *would* have, not *could* have, won." *Nkansah v. Kleinbard LLC*, Civ. A. No. 19-4472, 2021 WL 1238892, at *3 (E.D. Pa. Apr. 1, 2021) (emphasis in original) (citing *Myers*, 751 A.2d at 1185). Although the terminology differs in legal malpractice cases involving transactions, like here, the required elements do not. *ASTech Int'l, LLC v. Husick*, 676 F. Supp. 2d 389, 401–02 (E.D. Pa. 2009). Plaintiffs must still satisfy the proximate causation prong by proving that the plaintiff would not have suffered an actual loss but for the legal malpractice. *Id.* Therefore, in order to prove that the conduct was the proximate cause of the damage to Plaintiff, Plaintiff must be able to establish by a preponderance of the evidence that the outcome would have been in her favor but for Rosenfield's actions. *Duke & Co.*, 418 A.2d at 618; *Schenkel*, 405 A.2d at 494; *Trice*, 515 A.2d at 13.

Plaintiff must also prove actual loss. *Kituskie*, 714 A.2d at 1030; *Veneri v. Pappano*, 622 A.2d 977, 979 (Pa. Super. Ct. 1993); *Rogers v. Williams*, 616 A.2d 1031, 1034 (Pa. Super. Ct.

1992); *Pashak v. Barish*, 450 A.2d 67, 68 (Pa. Super. Ct. 1982); *Schenkel*, 405 A.2d at 399 ("Proof of damages is as crucial to a professional negligence action for legal malpractice as is proof of the negligence itself."). In order to prevail, a plaintiff must demonstrate that she suffered actual loss rather than only nominal damages, speculative harm, or the threat of future harm. *Rizzo*, 555 A.2d at 68. Damages are considered remote or speculative if there is uncertainty concerning the identification of the existence of damages, not just the inability to precisely calculate the amount or value of damages. *Id.*; *Pashak*, 450 A.2d at 69; *Nelson v. Heslin*, 806 A.2d 873, 876 (Pa. Super. Ct. 2002), *appeal denied*, 831 A.2d 600 (Pa. 2003) ("An essential element to this cause of action is proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or threat of future harm") (citation omitted). "Regardless of whether the method of proof is characterized as 'case-within-a-case' [or] 'transaction within-a-case' . . . Pennsylvania courts have been very clear that plaintiffs in all malpractice actions must prove actual loss. To do so, they must prove that the underlying legal representation would have achieved whatever the plaintiffs hoped to achieve." *Astech Int'l*, 676 F. Supp. 2d at 402.

## A. Plaintiff's Alleged Damages Are Too Speculative for Recovery as a Matter of Law, As She Has Not and Cannot Present Evidence John Would Have Paid a Higher Price for Her Shares.

Because Plaintiff has put forth no evidence that Bradford would have agreed to redeem her shares for a higher price, or that it even had the ability to do so, regardless of whatever advocacy Plaintiff claims attorney Rosenfield should have deployed, Plaintiff's claimed damages are too speculative for recovery under Pennsylvania law and her legal malpractice claims therefore fail.

In cases such as this one, where the plaintiff alleges she could have secured a "better deal" but for the defendant's negligence, the Pennsylvania Superior Court has held that the plaintiff must provide evidence that the contract counter-party would have agreed to that "better deal." *Lewis v.*

40

*Pietragallo Bosick & Gordon, LLP*, No. 1607 WDA 2012, 2013 WL 11247432, at \*5 (Pa. Super. Ct. Dec. 5, 2013). In *Lewi*s, the plaintiff sued the defendant attorney for legal malpractice in connection with the attorney's representation of him in drafting a "cohabitation" and custody agreement with his then-girlfriend. *Id.* at \*1. During negotiations, the plaintiff insisted on terms for payment of a lump sum to his paramour if the relationship were terminated and his girlfriend insisted instead on installment payments. *Id.* The plaintiff's attorney sent him a draft contract containing the installment payments, which he signed without conferring with the attorney. *Id.* Subsequently, the relationship ended and the installment payment provision was enforced. *Id.* at \*2. The plaintiff then brought claims for legal malpractice against his attorney. *Id.* Finding that there was no indication the plaintiff's girlfriend would have agreed to the plaintiff's desired lump sum payment, the Superior Court held that the plaintiff's damages were speculative and therefore his malpractice claim failed. *Id.* at \*5; *see also Mariscotti v. Tinari*, 485 A.2d 56 (Pa. Super. Ct. 1984) (where the client sued attorney because attorney incorrectly valued certain stock during divorce settlement and claimed she would have been in a better bargaining position had she known the correct value of the stock, the court held that damages were too speculative because the client could only guess that she may have been able to achieve a better settlement)

Many other federal and state courts have likewise found that a plaintiff must provide evidence that the contract counter-party would have agreed to the alternative terms. *See, e.g.*, *Nail v. Husch Blackwell Sanders*, LLP, 436 S.W.3d 556, 565 (Mo. 2014) (granting summary judgment in favor of defendant attorney because plaintiff had to prove that former employer would have agreed to include the necessary provisions in the settlement agreement and, without such evidence, had failed to show that, but for the law firm's allegedly negligent drafting of a settlement agreement, he would have obtained a more favorable outcome); *McDevitt v. Guenther*, 522 F.

41

Supp. 2d 1272, 1288 (D. Hawaii 2007) (where plaintiff sued lawyer asserting she improperly drafted a prenuptial agreement such that it did not provide a term allegedly orally agreed to prior to formal negotiations, court found that damages were impossibly speculative because they were based upon an unenforceable oral agreement and because it was impossible to know what the outcome of a negotiated agreement would have been); *Vestar Dev., II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 962 (9th Cir. 2001) (holding damages are impermissibly speculative when based upon a nonbinding agreement that did not set terms because "[t]here is no way to know what the terms of the eventual sale would have been-or even if a deal would have been reached."); *Blackhawk Bldg. Sys., Ltd. v. The Law Firm of Aspelmeier, Fish, Power, Warner & Engberg*, 428 N.W.2d 288, 290–91 (Iowa 1988) (finding that legal malpractice claim was defective where there was no evidence that the other party would have agreed to include a non-compete provision in contract at issue); *Wastvedt*, 430 N.W.2d at 568 (granting a judgment notwithstanding the verdict where plaintiffs alleged negligence and conflict of interest in drafting an agreement, but "plaintiffs presented no evidence to establish that, but for [the attorney's] conflict of interest, they would have received . . . a different price for their stock. There was no evidence that an attorney with no conflict of interest would have procured a different result for the plaintiffs"); *Raske v. Gavin*, 438 N.W.2d 704, 706 (Minn. Ct. Ex. 1989) (dismissing legal malpractice claim where there was no evidence that the other party to the negotiations would have sold his shares for less than he did in the absence of the alleged negligence).

Plaintiff fails to adduce any evidence to connect Rosenfield's alleged negligence to any actual loss. That is, while she makes allegations and attempts to present (albeit insufficient) evidence that Rosenfield "breached" his duty to her and puts forth a modicum of evidence endeavoring to set a value on her "damages," she fails to offer any evidence of a causal connection

42

between Rosenfield's alleged breaches and her alleged damages. Plaintiff does not even allege that John would have paid more had Rosenfield taken a harder negotiating position (as her experts state he should have done), let alone provide any documentary evidence.[12] Although not an admission, Plaintiff's own expert expressly acknowledges that "[w]e will never know what effect this possible strategy might have had on the outcome of those negotiations." Ex. 31 (Expert Report of Thomas Ross) at 6. In his rebuttal report, Plaintiff's expert doubled down, opining that "[w]e will never know with certainty what outcome might have been obtained for Anna Nupson" and recognizing that his own opinion was "speculation." Ex. 34 (Rebuttal Expert Report of Thomas Ross) at 4 ("Yet, *all this speculation*—the speculation of the opposing Reports *as well as my own above*—is ultimately beside the point for the Rule 1.7(b) analysis.") (emphases added).

In contrast, the circumstances surrounding the 2003 Transaction suggest that Plaintiff's expert's conjecture is incorrect. Anna's claims are premised upon speculation that an independent, unconflicted attorney could have negotiated a better deal for her in the 2003 Transaction. To jump to that conclusion, however, one would need to disregard the undisputed fact that independent, unconflicted attorneys representing another party to the 2003 Transaction, Lucia, negotiated the exact same purchase price for redemption of their client's shares.

In fact, John has explicitly stated under penalty of perjury that he would not have agreed for Bradford to pay more than he offered even if his sisters had sought to negotiate for a higher

---

[12] Of note, courts adopting the case within a case standard in transactional settings generally hold expert witness testimony alone is insufficient for a plaintiff to meet the burden to show causation of actual loss. *See, e.g.*, *Hazel & Thomas, P.C. v. Yavari*, 465 S.E.2d 812, 815 (Va. 1996) (holding it insufficient for a plaintiff to prove causation with only expert testimony; plaintiff must produce evidence from the underlying transaction to sustain this burden); *Froom v. Perel*, 872 A.2d 1067 (N.J. Super. Ct. 2005) (holding expert testimony insufficient to establish causation where fact witnesses' testimony failed to provide an evidential foundation).

43

price. Ex. 8 (John Dec.) ¶ 10.[13] Moreover, in a 2016 affidavit submitted in the Orphans' Court Litigation, John attested that he would not have agreed to several terms beneficial to Anna had she not agreed to Bradford's proposed purchase price including: "(i) mandatory principal distributions to Anna of $1,000,000 per year for her subtrust, (ii) distribution of the remaining principal assets of the subtrust for Anna's benefit to Anna in February 2028, or (iii) a power of appointment over the principal assets of the subtrust for Anna's benefit that could be exercised by Anna other than equally between Lucia's family and my family." Ex. 1 (John Aff.) ¶ 17. All of these benefits were achieved through Rosenfield's negotiations on Anna's behalf. Entirely uncontested, John's testimony is conclusive on this question. *See, e.g.*, *Twice Baked, LLC v. Gross*, No. 341378, 2019 WL 943191, at *3 (Mich. Ct. App. Feb. 26, 2019) (affirming trial court dismissal of legal malpractice claim for failure to prove causation where plaintiff offered no evidence negotiating partners would have agreed to contract provision requested by plaintiff and defendant provided affidavits that partners would not have agreed to same). As the Superior Court recognized in *Lewis* and as likewise held by several other state and federal courts, all the hard bargaining in the world cannot force an unwilling negotiating partner to capitulate.

Moreover, despite having received thousands of pages of Bradford financial records contemporaneous to the 2003 Transaction in connection with the Orphans' Court Litigation, Plaintiff has made no documentary showing nor offered any expert opinion that Bradford even *could* have paid more for her shares. The redemption of the Middleton sisters' shares in 2003

---

[13] It is notable that, although she noticed his deposition, Plaintiff ultimately made the strategic choice not to depose John in this case. Rather, she ran from the one person who had knowledge of what John would have done on Bradford's behalf in the hope that by not having his refusal on the record, her experts would not have to take it into account and she could survive summary judgment. Nevertheless, John has provided testimony on this question and definitively stated that Bradford would not have paid more for Anna's Bradford shares in the 2003 Transaction. Ex. 8 (John Dec.) ¶ 10).

required an enormous capital outlay. In the absence of any evidence that Bradford had the cash reserves to pay a higher price, Plaintiff's damages are even more speculative. Thus, as a matter of law, Plaintiff's damages are simply too speculative to permit a recovery and, therefore, her legal malpractice claim fails in its entirety.

For these reasons, Plaintiff cannot prove that she suffered actual loss as a result of any alleged breach by Rosenfield, a shortcoming fatal to her claim for legal malpractice. Accordingly, summary judgment should be entered in favor of Defendants and against Plaintiff.

### B. Any Damages Plaintiff Can Prove Cannot Be Recovered By Her Because "Her" Alleged Damages Inure to Trusts, Not to Her Individually.

Even if Plaintiff were able to prove an actual, non-speculative loss, any remedy for such loss would inure to trusts partly for Plaintiff's benefit rather than to Plaintiff herself. All of the stock redeemed in the 2003 Transaction was owned by these trusts; no stock was owned by Plaintiff. Because Pennsylvania law provides that only a trustee may bring an action to recover on behalf of a trust—and one of Plaintiff's trusts in particular requires the consent of two trustees— Plaintiff does not have standing to pursue the damages alleged here. Plaintiff has not attempted to assert any claims derivatively on behalf of the trusts and such claims are clearly now time barred.

 "The Pennsylvania Supreme Court long ago held that 'where the legal estate is vested in a trustee, all actions at law which affect the trust estate must be brought in his name.'" *Shrader v. Legg Mason Wood Walker, Inc.*, No. CIV. A. 93-3967, 1993 WL 532911, at *4 (E.D. Pa. Dec. 20, 1993) (quoting *Pa. R. Co. v. Duncan*, 5 A. 742, 746 (Pa. 1886)). As such, a trust beneficiary does not have standing to bring tort claim for injury to trust. *Shrader*, 1993 WL 532911, at *4; *see also* 4 Austin W. Scott & William F. Fratcher, *Scott on Trusts* § 294.1 (4th ed. 1989) (when a "third person commits a tort with respect to the trust property, the trustee and not the beneficiary is ordinarily the proper party to bring an action against him"). A trust beneficiary has standing to sue

the "tortfeasor only if the trustee improperly refuses or neglects to bring an action, or if the trustee cannot be subjected to the jurisdiction of the court, or if there is a vacancy in the office of trustee." *Shrader*, 1993 WL 532911, at \*4 (quoting *Scott*, § 294.1).

There is no dispute in this case that Plaintiff asserts claims only in her individual capacity, *see generally* Ex. 2 (3d Am. Compl.), and has made no efforts to bring a claim as trustee or derivatively on behalf of any trust. Plaintiff has asserted no derivative rights and it is now too late to do so.

There is no genuine issue of fact that all of the Bradford stock in which Plaintiff had an interest was owned either by her 1994 Trust or by the Modified GRAT. In the Family Settlement Agreement, Bradford agreed to purchase stock sold by "Lucia, the Anna Trust fbo Hughes [the 1994 Trust], the GRAT, Alexander, the JSM Hughes Custodial Accounts, the LMH Hughes Custodial Accounts and the Hughes Trusts." Ex. 10 (Family Settlement Agreement) ¶ 4. Notably, Bradford did not purchase stock from Plaintiff individually. Instead, Bradford purchased stock from two trusts partly for her benefit: the 1994 Trust and the Modified GRAT.

To the extent Plaintiff might have sought damages on behalf of those trusts, she would not have standing to do so. As to the Modified GRAT, Anna is not a trustee and the 2001 Trust funded as a result of the Modified GRAT was only a one-third beneficiary. Ex. 18 (Modified GRAT). Under the 1994 Trust, a majority of the trustees are required to act on behalf of the trust. Ex. 19 (1994 Trust). Although Anna is a trustee of the 1994 Trust, she is but one of two—falling short of the majority required to bring suit. Furthermore, even if Plaintiff had the individual authority as trustee to institute suit, she has failed to bring this action in her capacity as trustee, as required by *Duncan*. As such, she is unable to seek or recover damages inuring to the trusts.

46

Even if Plaintiff now sought to bring an action on behalf of a trust, that action would be time-barred even under Plaintiff's overly lenient theory of the statute of limitations. Since 2018, Plaintiff has filed four complaints, none of which purported to bring a claim on behalf of a trust. Any attempt to do so now must be barred by the statute of limitations.

Where Plaintiff seeks damages inuring to trusts in part for her benefit rather than to her as an individual and has failed to bring suit in their names or in a derivative capacity, she does not have standing to pursue the damages sought here. Accordingly, summary judgment should be granted in favor of Defendants.

### C. Any Damages Plaintiff Can Prove Must Be Offset by Her 2018 Settlement.

Because Plaintiff has already recovered $22 million related to the 2003 transactions in her 2018 Orphans' Court settlement with her brother and Bradford, any damages Plaintiff could prove here must be offset by that amount.

It is axiomatic that a plaintiff cannot recover twice for the same damages. Pennsylvania law "requires that the actual loss only should be allowed to be recovered . . . . The object of the law is to compensate the party injured. He is entitled to this, and nothing more, and in all cases compensation must be limited to the loss actually sustained . . . . [A prevailing plaintiff is] entitled to compensation for their actual loss, but nothing more." *Morris v. Supplee*, 57 A. 566, 568 (Pa. 1904); *see also Green v. Altman*, No. CIV.A.03-6437, 2004 WL 2106552, at *9 (E.D. Pa. Sept. 21, 2004) (law seeks to "prevent double recovery for a single wrong"). "As noted by the Superior Court, 'it would be inequitable for the plaintiff to be able to obtain a judgment against the attorney which is greater than the judgment that the plaintiff could have collected from the third party; the plaintiff would be receiving a windfall at the attorney's expense.'" *Kituskie*, 714 A.2d at 1030 (quoting *Kituskie v. Corbman*, 682 A.2d 378, 382 (Pa. Super. Ct. 1996)).

47

This principle is illustrated by *Bochetto & Lentz, P.C. v. Datz*, No. 3165 EDA 2014, 2016 WL 490053, at *1 (Pa. Super. Ct. Feb. 5, 2016), in which the Superior Court upheld the trial court's grant of summary judgment in favor of the defendant because the plaintiff had already recovered all of its damages against a third party in another action. In *Bochetto*, an associate with the plaintiff law firm ("Bochetto") allegedly referred a case without his firm's consent to another firm, which then settled the case and obtained a fee of $86,000. *Id.* The Bochetto firm sued the other law firm in court and the associate in arbitration. While the lawsuit was pending, the arbitration was resolved with the Bochetto firm awarded the entire fee. *Id.* at *2. Based on the "undisputed fact that plaintiff has already recovered damages in connection with the improper referral" and the law's general prohibition against "double recovery," the trial court granted the defendant law firm's motion for summary judgment, stating: "plaintiff, having already received its pound of flesh—to which it was clearly entitled—must move on from this sad tale of double-dealing . . . . [A]warding plaintiff additional damages would be redundant punishment and unjustly enrich [it] . . . . Having received its due, it is time for plaintiff to 'let it go.'" *Id.* at *7.

Plaintiff's claims in the Orphans' Court litigation sought to recover the same damages she seeks in this action. The 2018 Settlement Agreement specifically provides that it is entered into in resolution of the Middleton siblings' various claims with respect to, among other trusts, "the Anna 1994 Trust, the Original 2001 GRAT, [and] the Modified 2001 GRAT," Ex. 26 (2018 Settlement Agreement) ¶ I.85, which claims included Plaintiff's allegations that John had breached his fiduciary duties, committed fraud, and conspired against her in connection with the 2003 Master Settlement Agreement, *id.* ¶¶ I.69, 74–75. In consideration for Anna's settlement of those claims, Bradford paid Plaintiff an additional $22 million, *id.* ¶ II.2(b), and John and Bradford granted her other non-monetary concessions related to the 2001 GRAT, *id.* ¶ II.2(c). The $22 million

48

settlement payment by Bradford demonstrates the unambiguous connection between that payment and the alleged "injury" for which she seeks to recover here (i.e., the redemption of Bradford shares in 2003). As in *Bochetto*, Plaintiff cannot recover twice from two different parties for the same alleged damages related to the 2003 Transaction. As such, any recovery here must be offset by the $22 million she recovered from her brother in 2018.

Because Plaintiff's 2018 Orphans' Court settlement compensated her for the same damages sought in this action, any recovery by her in this matter—although none is warranted—must be offset by the $22 million she received there.

### D. Plaintiff Has No Evidence to Meet the High Standard for Punitive Damages.

Defendants should also be granted summary judgment on Plaintiff's claims for punitive damages. To recover punitive damages, a plaintiff must not only prove her claim, but she must prove the higher standard that the defendant's conduct was "outrageous." *Rizzo*, 555 A.2d at 69. The conduct must have been malicious, wanton, reckless, willful, or oppressive to support punitive damages. *Id.* The actor's state of mind must have been intentional, reckless, or malicious. *Id.* Courts examine the act itself in relation to all of surrounding circumstances, including the motive of the actor and the relationship between the parties. *Id.* Allegations of bad legal advice and breaches of professional duty alone cannot sustain a claim for punitive damages. *Meyers v. Sudfeld*, No. 05-CV-2970, 2007 WL 419182, at *12–13 (E.D. Pa. Feb. 2, 2007). There must also exist a plausible allegation of an attorney's evil motive or reckless indifference to the rights of the client for the punitive damages claim to survive judgment as a matter of law. *See Rizzo*, 555 A.2d at 69; *Meyers*, 2007 WL 419182, at *12–13.

The record fails to contain any evidence sufficient for plaintiff to meet the high standard for punitive damages. Plaintiff alleges that Defendants provided her with advice that caused her to

49

sell her Bradford shares at a low value. She also alleges that Rosenfield violated the Rules of Professional Conduct by representing her with conflicting interests even though conflicts were disclosed at the time and she signed the Conflict Waiver Letter. Ex. 5 (Conflict Waiver Letter). But these allegations alone are not "outrageous" to justify punitive damages. Plaintiff must put forth evidence that Defendants held some evil motive or acted in reckless indifference to her interests when they advised her and allegedly violated the Rules of Professional Conduct. At least one Pennsylvania court has held that an attorney's representation of both the buyer and the seller in a transaction was not outrageous to warrant punitive damages. *Marra v. Lipsky*, No. C-48-CV-2014-4260, 2015 WL 13778390, at \*3, (Pa. Ct. C.P. Northampton Cty. Feb. 23, 2015).

In sum, Plaintiff has developed no record to support that Defendants held an evil motive or acted in reckless indifference to Plaintiff's interests. Without such evidence at the summary judgment stage, Plaintiff cannot make out a claim for punitive damages. Defendants are entitled to judgment on Plaintiff's punitive damages claim as a matter of law.

## CONCLUSION

Accordingly, Defendants are entitled to summary judgment on all counts.

Respectfully submitted,

**DILWORTH PAXSON LLP**

/s/ *Lawrence G. McMichael*
Lawrence G. McMichael, Esquire
Patrick M. Harrington, Esquire
Timothy J. Ford, Esquire
Jessica Titler-Lingle, Esquire
Pa. Id. Nos. 28550/317998/325290/320618
1500 Market Street, Suite 3500E
Philadelphia, PA 19102-2101
P: (215) 575-7000 / F: (215) 575-7200
lmcmichael@dilworthlaw.com
pharrington@dilworthlaw.com
tford@dilworthlaw.com

jtitler-lingle@dilworthlaw.com
*Attorneys for Defendants Schnader Harrison*
*Segal & Lewis LLP, and Bruce A.*
*Rosenfield, Esquire*

Dated: February 14, 2022

51