# EXHIBIT
# 4

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

ANNA K. NUPSON,

    Plaintiff,

    VS.

SCHNADER HARRISON SEGAL
& LEWIS, LLP, and BRUCE A.
ROSENFIELD, ESQ.,

    Defendants.    NO. 2:18-cv-02505-NIQA

- - -

CONFIDENTIAL

- - -

    Videotaped deposition of BRUCE A.

ROSENFIELD, ESQUIRE, taken at Dilworth Paxon, LLP,

1500 Market Street, Suite 3500E, Philadelphia,

Pennsylvania, on Thursday, June 24, 2021, beginning

at approximately 9:11 a.m., before Elizabeth Kelly,

Professional Reporter and Notary Public in and of

the Commonwealth of Pennsylvania.

WITH CONFIDENTIALITY DESIGNATIONS BY NON-PARTIES
JOHN S. MIDDLETON AND BRADFORD HOLDINGS, INC.,
PURSUANT TO THE FEBRUARY 28, 2020 STIPULATED
PROTECTIVE ORDER ENTERED IN THIS MATTER

- - -

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO.  2:18-cv-02505-NIQA

Page 2

1
2    APPEARANCES:
3
4    DAVIS KELIN LAW FIRM, LLC
     BY:  BEN G. DAVIS, ESQUIRE
5    127 Bryn Mawr Drive, SE
     Albuquerque, New Mexico 87106
6    (505) 242-7200
     bdavis@daviskelin.com
7    Counsel for Plaintiff
8
9    MUCCI LAW FIRM
     BY:  COURTNEY JOHNSON VIDALES, ESQUIRE
10   BY:  BRITTANY CHAVEZ, ESQUIRE
     504 14th Street, NW
11   P.O. Box 6908
     Albuquerque, New Mexico 87106
12   (505) 247-2211
     courtney@muccilaw.com
13   Counsel for Plaintiff
14
15   (PRESENT VIA VIDEO CONFERENCE)
     5TH STREET LAW
16   BY:  KIMBERLY BRUSUELAS, ESQUIRE
     312 San Pasquale, NW
17   Albuquerque, New Mexico 87104
     (505) 247-9333
18   kim@fifthstreetlaw.com
     Counsel for Plaintiff
19
20
21   (PRESENT VIA VIDEO CONFERENCE)
     GORDON & ASHWORTH, P.C.
22   BY:  BRIAN A. GORDON, ESQUIRE
     One Belmont Avenue, Suite 519
23   Bala Cynwyd, Pennsylvania 19004
     (610) 667-4500
24   briangordon249@gmail.com
     Counsel for Plaintiff
25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 3

1    APPEARANCES CONTINUED:
2
3    DILWORTH PAXSON, LLP
      BY: LAWRENCE G. MCMICHAEL, ESQUIRE
4    BY: TIMOTHY J. FORD, ESQUIRE
      BY: PATRICK HARRINGTON, ESQUIRE (Via Zoom)
5    BY: JESSICA TITLER-LINGLE, ESQUIRE (Via Zoom)
      1500 Market Street, Suite 3500E
6    Philadelphia, Pennsylvania 19102
      (215) 575-7000
7    lmcmichael@dilworthlaw.com
      tford@dilworthlaw.com
8    pharrington@dilworthlaw.com
      jtitler-lingle@dilworthlaw.com
9    Counsel for Defendants
10
11   MANNION PRIOR, LLP
      BY: JAMES F. MANNION, ESQUIRE
12   840 First Avenue, Suite 100
      King of Prussia, Pennsylvania 19406
13   (610) 265-7800
      Counsel for John S. Middleton, Individually, and
14   Bradford Holdings, LLC
15
16
      BLANK ROME, LLP
17   BY: JAMES T. SMITH, ESQUIRE
      BY: REBECCA D. WARD, ESQUIRE (Via Zoom)
18   BY: LEWIS W. SCHLOSSBERG, ESQUIRE (Via Zoom)
      One Logan Square
19   130 North 18th Street
      Philadelphia, Pennaylvania 19103
20   (215) 569-5500
      smith-jt@blankrome.com
21   ward@blankrome.com
      schlossberg@blankrome.com
22   Counsel for John S. Middleton, Individually, and
      Bradford Holdings, LLC
23
24
25

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA



Page 4

1    APPEARANCES CONTINUED:

2

3    SCHNADER HARRISON SEGAL & LEWIS, LLP
     BY: WILBUR L. KIPNES, ESQUIRE
4    1600 Market Street, Suite 3600
     Philadelphia, Pennsylvania 19103
5    (215) 751-2336
     wkipnes@schnander.com
6    Counsel for Defendants

7

8    ALSO PRESENT:

9    David Levine, Videographer

10

11   CONFIDENTIALITY DESIGNATIONS:

12
     66:3-10; 119:6-13; 129:18-133:3; 133:22-139:12; 176:25-178:18;
13   214:3-215:3; 215:11-217:2; 223:13-20; 237:23-239:14; 246:17-247:9;
14   248:23-249:23; 256:2-14; 257:15-260:13; 263:20-264:13; 266:13-16;
     269:16-270:6; 293:24-294:24; 300:4-304:1; Exhibit 44; Exhibit 49;
15   Exhibit 51; Exhibit 55; Exhibit 59; Exhibit 61; Exhibit 63; Exhibit 76;
16   Exhibit 80

17   ATTORNEY'S EYES ONLY DESIGNATIONS:

18
19   109:19-110:5; 163:23-171:13; Exhibit 46; Exhibit 47

20

21

22

23

24

25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 5

1                     I N D E X

2                        - - -

3    WITNESS:                         PAGE

4    BRUCE A. ROSENFIELD, ESQUIRE

5    EXAMINATION

6    By Mr. Davis                     12

7

8

9                    EXHIBITS

10

11                        PAGE FIRST
     EXHIBIT NO.      DESCRIPTION      REFERENCED

12

     Exhibit 44      March 31, 1999 Billing     65
13                   Worksheet

14   Exhibit 45      Rider I, Item 4:     90
                     History of Trust

15

16   Exhibit 46      Irrevocable Stock or     106
                     Bond Power

17

18   Exhibit 47      1/2/2001 Letter     109

19   Exhibit 48      12/19/2000 Letter     110

20   Exhibit 49      3/10/2001 E-mail Chain     125

21   Exhibit 50      Affidavit of John S.     173
                     Middleton

22

23   Exhibit 51      Amendment Conditions,     175
                     9/10/02

24

25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 6

1                    EXHIBITS CONTINUED

2
                                   PAGE FIRST
3     EXHIBIT NO.        DESCRIPTION        REFERENCED

4

5     Exhibit 52        Handwritten Notes,        185
                         9/11/02
6

7     Exhibit 53        10/10/02 Letter        205

8     Exhibit 54        10/1/02 Fax        208

9     Exhibit 55        2001 Tax Return        215

10    Exhibit 56        2/5/03 Letter        217

11    Exhibit 57        12/20/01 Memorandum        219

12    Exhibit 58        9/19/11 E-mail Chain        225

13    Exhibit 59        11/25/02 Fax        237

14    Exhibit 60        Family Settlement Agreement 242

15    Exhibit 61        Bradford Purchase Price        257
                         Document
16

17    Exhibit 62        12/15/93 Witness Statement  267

18    Exhibit 63        Spreadsheet        269

19    Exhibit 64        8/6/98 Fax        272

20    Exhibit 65        Handwritten Notes        274

21    Exhibit 66        Notice of Beneficial        276
                         Interest in Estate
22

23    Exhibit 67        Durable General Power        277
                         of Attorney
24

25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 7

1                  EXHIBITS CONTINUED

2
                                    PAGE FIRST
3        EXHIBIT NO.        DESCRIPTION        REFERENCED

4        Exhibit 68        9/28/94 Memorandum        281

5        Exhibit 69        10/30/96 Memorandum        282

6        Exhibit 70        Physician Bills        283

7        Exhibit 71        Vanguard Account 1999        285

8        Exhibit 72        Series of Checks        286

9        Exhibit 73        Dr. Herring Billing        289

10       Exhibit 74        4/20/04 Correspondence        290

11       Exhibit 75        CMM Holdings, LLC        292
                           Certificate of Formation
12

13       Exhibit 76        11/29/04 Memorandum        293

14       Exhibit 77        9/21/11 Memorandum        295

15       Exhibit 78        July 2011 E-mail Chain        296

16       Exhibit 79        June 2011 E-mail Chain        298

17       Exhibit 80        Billing Records        298

18

19

20

21

22

23

24

25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 8

1              (By agreement of counsel, the

2       sealing, certification and filing are

3       waived; and all objections, except as to

4       the form of the question, are reserved

5       until the time of trial.)

6              - - -

7       THE VIDEOGRAPHER:  Today is Thursday,

8    June 24th, 2021, and the video time is

9    9:11 a.m. the witness is Bruce A. Rosenfeld

10   [sic].  The case number is 2:18-CV-02505-NIQA,

11   filed in the United States District Court of

12   the Eastern District of Pennsylvania, entitled

13   Anna K. Nupson versus Schnader Harrison Segal &

14   Lewis, LLP, and Bruce A. Rosenfeld [sic].

15       Location is 1500 Market Street, Suite 3500

16   East, Philadelphia, Pennsylvania.  My name is

17   David Levine, the legal video specialist with

18   Trattel Court Reporting & Videography, located

19   at 609 12th Street Northwest, Albuquerque, New

20   Mexico 87102.

21       The video deposition is requested by

22   plaintiffs.  The court reporter is Elizabeth

23   Kelly -- and the script didn't say that we're

24   on the record, but we have been on the record.

25   Would counsel and all present please identify

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 9

1    themselves and who they represent?  The court

2    reporter will swear in the witness.

3       MR. DAVIS:  Good morning, Ben Davis on

4    behalf of plaintiff, Anna Nupson.  With me is

5    Courtney Vidales, Brittany Chavez.  On Zoom, is

6    Kim Brusuelas and Brian Gordon.

7       MR. MCMICHAEL:  Good morning, Larry

8    McMichael, Dilworth Paxon, LLP for the

9    defendants.  With me is Tim Ford from Dilworth,

10    and Will Kipnes from Schnader.  And for the

11    record, the witness's name is Bruce Rosenfield.

12       MR. MANNION:  Good morning, James Mannion

13    from Mannion Prior.  I represent intervenor

14    John S. Middleton as trustee.  With me is James

15    Smith, Rebecca Ward, and Lewis Schlossberg who

16    are from the Blank Rome law firm and represent

17    Join S. Middleton individually and Bradford

18    Holdings, Inc., also intervenors.

19       Before we start the deposition, I just

20    want to make a statement about privilege, but

21    we can do that whenever you would like to do

22    that, Mr. Davis.

23       MR. DAVIS:  Go right ahead.

24       MR. MANNION:  Okay.  So we're here for the

25    purpose of protecting both the confidences of

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 10

1        Mr. Middleton and Bradford, and also,

2        protecting privilege.  There are different

3        capacities of the parties, including

4        specifically Mr. Middleton as trustee.  There

5        are things that may be privileged between

6        Mr. Middleton and Ms. Nupson as cotrustees, for

7        instance, and privileged to outside parties,

8        such as Ms. Hughes.

9            And there may be other things that are

10       just privileged to Mr. Middleton and/or

11       Bradford.  So at various points throughout the

12       deposition, if necessary, we'll make an

13       objection to reserve that issue.

14           But at this point, and until we see the

15       deposition transcript, we're going to designate

16       the entire transcript as confidential until the

17       formal designation is made.

18           MR. DAVIS:  And my understanding amongst

19       the parties is that we've agreed to that

20       procedure, but essentially, to -- to avoid

21       delay during the deposition, that to the extent

22       -- unless there's a situation where you're

23       instructing the witness not to answer, we're

24       going to limit the objections with the

25       understanding that you can go back, designate

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 11

1    portions of the transcript as confidential.

2    But, you know, you do as you see fit during the

3    deposition.

4         MR. MANNION:  That's fine.  And if I, or

5    Mr. Smith, or one of the other attorneys

6    asserts a privilege, then I assume Mr.

7    McMichael will direct him not to answer.

8         THE WITNESS:  I'm sorry, I didn't hear the

9    last part.

10        MR. MANNION:  I assume Mr. McMichael will

11   direct the witness not to answer.

12        MR. MCMICHAEL:  That is correct.  We will

13   -- we will honor any assertion of privilege by

14   Mr. Rosenfield's clients.

15        MR. DAVIS:  Okay, all right.  Let's begin.

16   Could you state your name for us --

17        THE REPORTER:  Hold on, I haven't sworn

18   him in.

19            - - -

20            BRUCE A. ROSENFIELD, ESQUIRE,

21            having been first duly sworn to

22            tell the truth, was examined and

23            testified as follows:

24            - - -

25            EXAMINATION

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 12

1                          - - -

2    BY MR. DAVIS:

3        Q    Could you state your name for us?

4        **A    Bruce Allen Rosenfield.**

5        Q    Mr. Rosenfield, have you ever been deposed

6    before?

7        **A    I have.**

8        Q    When was that?

9        **A    Maybe five years ago.**

10       Q    What type of issue was it?

11       **A    It was a will contest.**

12       Q    Okay.  And were you a witness to the will?

13       **A    I was.**

14       Q    All right.  Any other depositions you've

15   been a part of?

16       **A    When I was a first-year associate, I was**

17   **deposed in connection with a prenuptial agreement.**

18       Q    Have you ever testified at a hearing of

19   any type or a trial?

20       **A    I have.**

21       Q    All right.  And what -- which types of

22   hearings, which type of trial, if you can recall?

23       **A    That was in the Pearlman (ph) litigation.**

24       Q    Other than the Pearlman litigation,

25   anything else?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 13

1     **A   Not that I recall.**

2     Q   Other than this lawsuit, have you ever

3   been sued before?

4     **A   No.**

5     Q   You hesitated there --

6     **A   I am trying to think.  I just -- I'm old.**

7     Q   I appreciate that, and do not let me rush

8   you if you need to think, just -- that's okay.  The

9   only reason I saw a little bit of hesitation, I want

10   to make sure I ask the questions to get the

11   information, all right.

12            So a pause made me think that perhaps

13   has there ever been any type of -- other than this

14   litigation or this threat of litigation, has there

15   ever been any types of threats of litigation against

16   you that perhaps did not go all the way to a

17   lawsuit?

18     **A   There -- there may have been threats**

19   **against me in connection with wills.**

20     Q   Okay.  Have you ever compensated any of

21   your clients?  And when I say "you," I'm broadly

22   speaking your firm, yourself, or your insurance

23   carrier.

24            Have you ever compensated any client

25   for any alleged negligent acts?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 14

1 **A No.**

2 Q Have you ever had any disciplinary issues

3 before with the State Bar?

4 **A None that are public.**

5 Q What disciplinary issues have you had that

6 are not public?

7 **A There have been complaints that were --**

8 **that were dismissed.**

9 Q How many complaints?

10 **A Two.**

11 Q How long ago?

12 **A A decade, maybe more.**

13 Q Related to your work for a client or to a

14 third -- from a third party?

15 **A Related -- they were in connection with**

16 **work for clients, and other people were upset about**

17 **it.**

18 Q So I just want to make sure my record is

19 clear.

20   So in other words, not a client

21 complaining to the State Bar about your services,

22 but rather, someone who perhaps is related to the

23 client or somehow affected by your work?

24 **A That's correct.**

25 Q All right. I know your attorney's gone

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 15

1    over the deposition rules today, and I know you're

2    an attorney, so I don't want to necessarily go

3    through them extensively.

4              My one -- my one rule for you will be

5    if I ask a question you do not understand or if it

6    doesn't make sense because there's going to be a lot

7    of technical jargon, I think, at the end of the day

8    that frankly you have far superior knowledge of than

9    I do, just alert me somehow that you don't

10   understand the question because of the way I've

11   asked it.

12       **A    Okay.**

13       Q    And I will try to get down to the bottom

14   of it and see if we can fix the question so you can

15   answer it.

16       **A    That's fine.  May I also ask that you do**

17   **-- you also keep your voice up.  I have hearing**

18   **loss, and I sometimes have trouble understanding if**

19   **something is not said distinctly.**

20       Q    Okay.  Yes.  And please alert me if I'm

21   not doing that, that you didn't understand the

22   question, just because I was too -- speaking too

23   low, just please alert me.

24       **A    Thank you.**

25       Q    So I'll try to speak loud, and I hope it

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 16

1  doesn't come off as I'm angry.

2  **A   Don't worry.  It's much better for me to**

3  **hear.**

4  Q   Okay, great.  So I'll try to speak loud.

5  I just -- I don't mean it to be in attack mode or

6  anything like that.  I just need to make sure you

7  understand me.

8  All right, so my understanding is you

9  graduated from Dartmouth in 1973?

10  **A   Correct.**

11  Q   What degree did you have?

12  **A   I had -- I got an AB, arts baccalaureus.**

13  **I majored in history.**

14  Q   And then you went to Stanford for your JD?

15  **A   Yes.**

16  Q   And after Stanford, where did you go to

17  work?

18  **A   I clerked for a federal district judge,**

19  **Raymond Broderick, in the Eastern District of**

20  **Pennsylvania for two years.**

21  Q   Are you from Pennsylvania?

22  **A   I am not.**

23  Q   Where are you from originally?

24  **A   Minneapolis.**

25  Q   And then after your clerkship here in

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.          June 24, 2021
Bruce Rosenfield, Esq.                                    NO. 2:18-cv-02505-NIQA

Page 17

1    Pennsylvania, where did you go to work?

2        A    At the law firm that I am at now, Schnader

3    Harrison Segal & Lewis.

4        Q    All right.  When did you become a partner

5    at Schnader?

6        A    I think about 1986.

7        Q    What year did you start with Schnader?

8        A    In August 1978.

9        Q    Are you still active?

10       A    I am active.

11       Q    My understanding is you're a fellow of the

12   American College of Trust and Estates Counsel?

13       A    I am.

14       Q    How long have you been a fellow there?

15       A    Since the early '90s.

16       Q    Do you ever give CLEs or any type of talks

17   to other lawyers?

18       A    I have.

19       Q    All right.  When was the last time you did

20   that?

21       A    Pennsylvania adopted a new trust law act,

22   and I was part of that roll-out to the Philadelphia

23   Bar Association.  That may have been eight years

24   ago.

25       Q    Were you a part of drafting any of that

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 18

1    uniform act?

2        **A    Yes.**

3        Q    When did you do that?

4        **A    Prior to that.  It took a long time.  It**

5    **was based on the uniform act, and I am a member of**

6    **the advisory committee to the decedents joint task**

7    **force of government, and legislatures, and judges**

8    **that write the probate laws in Pennsylvania.**

9        Q    And the way I asked my question, it was --

10    it's going to confuse me when I go back and read

11    this transcript.

12            Were you part of writing the uniform

13    act?

14        **A    I was not.**

15        Q    You were part of implementing the uniform

16    act in Pennsylvania; is that correct?

17        **A    Correct.  I was also on -- for the**

18    **American College of Trust and Estates Counsel, there**

19    **was a state laws committee group that I was a part**

20    **of that reviewed and gave input to the uniform act.**

21        Q    And what timeframe was this all occurring?

22        **A    Probably starting in the late '90s.  It**

23    **took many years.**

24        Q    Do you -- are you currently on any boards?

25        **A    I am.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 19

1      Q   Which boards?

2      **A   I am the executive director and trustee of**

3   **the Oberturner (ph) Foundation. I am pro bono**

4   **counsel to Settlement Music School in Philadelphia.**

5   **I served on various boards of -- of various closely**

6   **held family businesses.**

7      Q   Let's -- I want to focus on your pro bono

8   and charity type of work right now.

9           Any other types of organizations

10   you're involved in, in, let's say, the past ten

11   years?

12      **A   For my synagogue, I tried to help them in**

13   **their deferred giving. And I helped put together a**

14   **deferred giving society. Did that as well for a**

15   **Quaker school that my children went to in**

16   **Philadelphia, but that was longer ago. I've served**

17   **on committees for the Jewish Federation of**

18   **Philadelphia.**

19      Q   All right. Any other giving work that you

20   --

21      **A   I was past chair of the Probate Section of**

22   **the Philadelphia Bar Association. I was on the**

23   **Pennsylvania Probate Section on the Board of**

24   **Governors. That's all that comes to mind right now.**

25      Q   Are you on the board of any companies

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 20

1    owned or operated by John Middleton?

2    **A  I am not now.**

3    Q  When was the last time you were on their

4    board?

5    **A  I was a member of the board of Hunter**

6    **Services, which was a service company of the**

7    **Bradford Companies, probably until 2014, 2015,**

8    **something like that.**

9    Q  And as a board member with Hunter

10    Services, when Bradford owned JMI, Inc. and McIntosh

11    Double Play, would you receive financials or

12    financial information about those companies?

13    **A  I would not.**

14    Q  Okay.  Were you privy to any of the

15    finances of those companies --

16    **A  No.**

17    Q  -- when you were on the board?

18    **A  No.  Hunter Services is a service company**

19    **that provided shared services, pension, retirement**

20    **plans, some -- some joint service provisions, but**

21    **not -- any allocation of the charges for Hunter were**

22    **done by the parent companies, not by Hunter.**

23    Q  When did you start with Hunter Services on

24    the board?

25    **A  I served on there for a long time, and**

Page 21

1     maybe -- I'm really guessing, 20 -- around 2002,

2     something like that.  Maybe -- maybe 2005.  But I

3     don't have a firm recollection.

4          Q    Any other companies related to

5     Mr. Middleton or the Middleton family that you've

6     served on the board for?

7          A    No.

8          Q    So you started with Schnader in

9     approximately 1978?

10         A    Exactly August 28, 1978.

11         Q    Which section did you go into?

12         A    Schnader, at that time, had a formal --

13    can we stop that from --

14         Q    Yeah, I don't know.  Is there an off --

15    the Zoom -- it's very distracting.  I agree with

16    you.

17         A    Schnader had a formal rotation requirement

18    when I started, so you had -- I think it was

19    four-month rotations through various departments of

20    the firm.  One of my requirements in coming to

21    Schnader is that I didn't have to rotate through the

22    litigation department, and I wanted a guarantee that

23    I could come to the trust and estates group at the

24    conclusion.

25                And since I was told no one had ever

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO.  2:18-cv-02505-NIQA

Page 22

1    requested trust and estates, they guaranteed me

2    that, and because I had clerked for a district court

3    judge, I was relieved of having to go through the

4    litigation department rotation.

5        Q    All right.  So it sounds like you do not

6    enjoy litigation?

7        A    I prefer to stay away from it.

8        Q    All right, okay.

9             So you started with them, and then

10   you went through your rotation, and eventually you

11   were permanently with the trust and estates

12   department?

13       A    That is correct.

14       Q    When did you initially start providing

15   trust and estates work for -- for Herbert Middleton?

16       A    The early 1990s, maybe 1992.

17       Q    And were you providing work for only

18   Herbert or for his wife as well?

19       A    For both of them.

20       Q    What about John Middleton?

21            When did you start providing trust

22   and estates work for Mr. Middleton?

23       A    He was involved right from the getgo.  And

24   Herb and John -- it was a lawyer at Schnader who

25   left the firm in trust and estates, and Herb and

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 23

1    John were deciding whether to stay with the firm or

2    not.  And they interviewed two members of the trust

3    and estates group.  So it was both of them doing the

4    interviews, and they selected me.

5        Q    All right.  Who left?

6        A    John Hough.

7        Q    Can you spell that for me?

8        A    H-O-U-G-H.

9        Q    So he left for a different firm, I take

10   it?

11       A    Yes.

12       Q    And Herbert and John were trying to decide

13   on new trust and estates counsel; is that correct?

14       A    That is correct.

15       Q    All right.  And they interviewed yourself

16   and someone else at the Schnader firm?

17       A    Yes.  They may have interviewed others

18   outside, but I don't know that.

19       Q    Sure.  And was that approximately 1992?

20       A    That's my recollection.

21       Q    When did you first start -- well, let me

22   -- let me back it up a little bit.

23            When did you first meet Anna Nupson?

24       A    I first met her after Herb died.  Herb

25   died in 1998 in May.  And the following month, I

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 24

1    believe I met her for the first time.

2        Q    And tell me about that first meeting.

3    Where was it at?

4                What was the reason for the meeting?

5        A    The reason for the meeting was to follow

6    up on -- on some planning that I had been discussing

7    with Herb, and then we were then trying to protect

8    Anna with -- as far as some -- she was going to have

9    an inheritance as a result of Herb's death,

10   relatively small, a trust that Anna's grandparents

11   had set up in 1972, I believe.

12               As a result of Herb's death, he had

13   been the income beneficiary of that trust, and that

14   broke into shares then one for Frances Middleton,

15   and one for each of their three children, which Anna

16   would have received her share outright.

17       Q    And so what was the planning necessary

18   related to that?

19       A    She assigned her interest in the

20   inheritance to a trust that she had created several

21   years before.

22       Q    And you're speaking about the '94 Anna

23   trust?

24       A    Yes.

25       Q    So that was the first meeting.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 25

1          Were you speaking to Anna Nupson

2    prior to this on the phone?  Let's go off the record

3    just a second.

4          THE VIDEOGRAPHER:  9:33, off the record.

5               - - -

6          (Recess was taken from 9:33 a.m. to

7    9:36 a.m.)

8               - - -

9          THE VIDEOGRAPHER:  9:36, we are back on

10     the record.

11   BY MR. DAVIS:

12     Q    All right.  So let's -- I think where we

13   were at was the first time you met Ms. Nupson was

14   shortly after her father's death.

15          You were discussing -- technically I

16   don't want to butcher this, but -- but you were

17   discussing moving her small inheritance, as you

18   described it, from her father into her '94 trust; is

19   that right?

20     **A    Among other issues, but yes.**

21     Q    Okay.  And we'll get to the "among other

22   issues" in just a second, but before we do, I want

23   to back up just a little bit.

24          When -- when was the first time you

25   think you actually spoke to Ms. Nupson, like, on the

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 26

1    phone, for example?

2        **A    I don't have a recollection of speaking**

3    **with her on the phone.  I had correspondence with**

4    **her.  I'm not sure if I spoke with her on the phone**

5    **before that.**

6                **(Zoom audio.)**

7            MR. DAVIS:  Drive me insane.

8            MR. FORD:  We're working on it.

9            MR. DAVIS:  No, I appreciate it.  I

10    appreciate.

11            THE WITNESS:  I may have spoken with her

12    on the phone, but I don't have a recollection

13    of it.

14            MR. DAVIS:  Okay.  And...

15            (Zoom audio.)

16            MR. DAVIS:  Tim, are we okay to move

17    forward?  Let's go off the record.

18            THE VIDEOGRAPHER:  9:38, off the record.

19                - - -

20            (Recess was taken from 9:38 a.m. to

21    9:45 a.m.)

22                - - -

23            THE VIDEOGRAPHER:  9:45, we're back on the

24    record.

25

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 27

1    BY MR. DAVIS:

2        Q   All right.  Let me -- let us get back to

3    where we were.  I'm trying to -- I think the pending

4    question I had was -- you said you don't recall

5    speaking to Ms. Nupson on the telephone prior to

6    your meeting in 1998, June about -- I'm making up

7    June.  You didn't say June.  I did.

8            But you said about a month after --

9        A   **It was June.**

10       Q   It was June, okay.

11           June of 1998, you met with her

12   in-person?

13       A   **Yes.**

14       Q   All right.  And let me -- but let me back

15   up.  You said that you didn't speak to her on the

16   phone prior to that, or you don't have a

17   recollection of speaking to her on the phone.

18           Is that right?

19       A   **That is correct.**

20       Q   However, you did mention that you had some

21   correspondence with her?

22       A   **I did.**

23       Q   All right.  Tell me about those.

24       A   **She was -- she had been married to Andy**

25   **Bauer, a physician.  And she was -- they were going**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 28

1    through a divorce, and the divorce was handled by

2    our family law group headed by Albert Momjian.  For

3    whatever reason her -- I'm sorry.  Can I -- I need

4    to ask about privilege.

5          MR. DAVIS:  You need to confer?  Sure.

6          THE VIDEOGRAPHER:  Nine -- I'm sorry, off

7    the record -- 9:47, off the record.

8          (Discussion was held off the record.)

9          THE VIDEOGRAPHER:  9:48, back on the

10   record.

11         MR. MANNION:  So there was a question

12   about a possible privilege issue.  Just to be

13   clear, Mr. Middleton is the executor of

14   Herbert's estate.  There is no objection to

15   privilege as to communications with Herbert

16   about Anna.  And things related to Anna because

17   we viewed Anna as a co-client with Mr.

18   Middleton.

19         We would assert the objection to privilege

20   as to Mr. Middleton -- Mr. Herbert Middleton's

21   personal estate planning matters, but as to the

22   topic right now, there is no privilege

23   objection.

24         MR. MCMICHAEL:  So Mr. Rosenfield, you can

25   answer the question that Mr. Davis posed.  The

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 29

1     reporter can read it back, if you like.

2          THE WITNESS:  Yeah.  Liz, can you please?

3               - - -

4          (The court reporter read the record

5     as requested.)

6               - - -

7          THE WITNESS:  There was -- our family law

8     group handled the divorce.  It was a -- it was

9     not a contested divorce.  And it was handled by

10    Albert Momjian, the head of our family law

11    group, and people working with him.

12          Herb did not think that Anna would deal

13    well with Albert Momjian, and the decision was

14    made for me to be the intermediary with respect

15    to anything concerning the divorce.

16          And I, in fact, entered an appearance on

17    behalf of Anna in connection with the divorce.

18    And then the documents prepared by the family

19    law group were given to me, and I forwarded

20    them to Anna and also to Andy for their

21    signatures.

22    BY MR. DAVIS:

23    Q    Do you know the timeframe?

24    **A    About 19 -- either 19 -- the end of '94 or**

25    **into 1995.**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 30

1    Q   And were you actually speaking to Anna?

2    **A   No, I don't have any recollection of**

3  **speaking with her.  I have a recollection of sending**

4  **her communications.**

5    Q   I see.  And so at this time, there was

6  also the '94 Anna trust.

7         Were you involved in that in any way?

8    **A   I was.**

9    Q   And tell me about that.

10       (Discussion was held off the record.)

11  BY MR. DAVIS:

12    Q   Let me just --

13    MR. MCMICHAEL:  Just answer the question.

14    MR. DAVIS:  Okay.  Let me just -- yeah,

15  yeah.  So, I mean, we're going to have this a

16  lot, I think, where you're going to need to

17  confer with counsel.

18      And if it's okay with our court reporter,

19  I think -- I mean, I -- what I'm going to say

20  is you all can pull off your mics or do this.

21  I do not -- even if you may pick it up on your

22  mic, I do not want it transcribed, okay.  I

23  just want to make sure --

24    MR. MCMICHAEL:  Yeah.

25    MR. DAVIS:  -- that it's clear, okay.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 31

1          MR. MCMICHAEL:  Correct.

2          MR. DAVIS:  Unless you want to go off the

3     every time we do that.

4          MR. MCMICHAEL:  No, let's not go off the

5     record.

6          MR. DAVIS:  Yeah.

7          MR. MCMICHAEL:  It takes too long.

8          MR. DAVIS:  It takes too long exactly.

9          MR. MCMICHAEL:  Most of these can be

10     quickly resolved.

11          MR. DAVIS:  Exactly.

12          MR. MCMICHAEL:  That was not a problem.

13     So you can go ahead and answer the question.

14          THE WITNESS:  So I received a phone call

15     from Herb Middleton, and we discussed how to

16     protect Anna from herself.  And I suggested

17     that she place her assets into an irrevocable

18     trust where she would have to deal with her

19     cotrustees to access the money.  And I prepared

20     the draft document, and I presented it to her.

21     BY MR. DAVIS:

22     Q    Were you representing Anna at that time?

23     **A    I do not -- with respect to the trust, I**

24     **don't think so.  I didn't think so.**

25     Q    And I just want to make sure I understand

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 32

1    your engagement.

2          So your engagement was with Herbert

3    at that time, but you were preparing a trust for a

4    -- essentially a third party, although it's his

5    daughter; correct?

6    **A    I was preparing a trust at his direction**

7    **on behalf of his family.**

8    Q    And in that trust, Anna was a trustee;

9    correct?

10   **A    She was.**

11   Q    John was a trustee?

12   **A    Yes.**

13   Q    And Frances?

14   **A    Correct.**

15   Q    And she was entitled to income and

16   principal?

17   **A    She wasn't entitled to it.**

18   Q    Explain that to me.

19   **A    The trustees had discretion to give it to**

20   **-- give it to her.**

21   Q    Did all three trustees have to agree?

22   **A    No, it's majority vote.**

23   Q    And when you say "protect Anna from

24   herself," what was going on at the time, as you

25   understood it?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 33

1     A   I was told she was a spend thrift, and

2    they worried about her running through her money.

3     Q   Were there any concerns regarding her

4    spouse taking assets or anything like that?

5     A   Herb worried about everything.

6     Q   Okay.

7     A   And -- but Andy never made a claim to

8    anything.

9     Q   And what about the gentleman she started

10   -- Anna started dating after the divorce?

11     A   Let me -- I'm not sure when they started

12    dating.

13     Q   Okay.

14     A   It may -- Andy and Anna, as I understood

15    it, were separated prior to the divorce, and I

16    thought Mark entered the picture, at least after

17    separation.  At least after separation.

18     Q   Was there any concerns by Herbert -- did

19   Herb express any concerns regarding Mark?

20     A   Yeah, yes.  He was very concerned about

21    Mark.

22     Q   What were those concerns, as you

23   understood them?

24     A   That he was not productive at all, and

25    that he -- and Herb was afraid that Mark wanted to

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 34

1    **access Anna's money.**

2        Q    And was that part of the concern when the

3    trust was formed?

4        **A    I don't think so.  I don't think in '94 --**

5    **I had not heard of Mark in 1994.**

6        Q    When was the first time you heard of Mark?

7        **A    1995.**

8        Q    All right.  So you're involved in -- and

9    I'm going to say you were involved in Anna -- but I

10   understand your position is you didn't represent her

11   in 1994 on the trust?

12       **A    On the trust.**

13       Q    You were representing her as an

14   intermediary with her divorce?

15       **A    Correct.**

16       Q    All right.  So that -- any other dealings

17   with Anna?  And I'm going to say "dealings" broadly.

18   I don't necessarily mean you were engaged to

19   represent her, but just kind of as you described.

20            Any other dealings in that timeframe;

21   I'm talking about this timeframe of '94, '95, '96?

22       **A    I -- I think -- I think following the**

23   **divorce, I would have been involved in preparing a**

24   **will for her, but I think I took directions from**

25   **Herb on that.  I don't think I had discussions with**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 35

1    **Anna.**

2        Q    Let me make sure I've got everything.

3            So you were hired by Herb in 1992 and

4    Frances?

5        **A    I was.**

6        Q    And John?

7        **A    I was hired by Herb.  Herb told me who I**

8    **would be allowed to talk to in the family.**

9        Q    Okay.  But let me -- let me just back up.

10   I want to make sure I've got all of them.

11           So from 1992 until the divorce and

12   until the '94 Anna trust, were you -- did you have

13   any involvement with Anna Nupson?

14       **A    I don't think I had any involvement with**

15   **Anna Nupson, other than sending documents to her in**

16   **connection with the divorce.  And I didn't have**

17   **direct contact with Anna on any other matters during**

18   **that period.  And my contact -- my directions were**

19   **solely with Herb.**

20       Q    Okay.  And the way I phrased the question,

21   I think made you answer that way.  What I want to

22   say is -- what I want to ask is, are there anything

23   -- other things like this where perhaps Herb

24   directed you to do something that related to Anna?

25   Does that make sense?

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 36

1          For example, you were asked to draft

2     a trust.  You were asked to perhaps draft a will.

3     You don't recall.  You were asked to be an

4     intermediary in the divorce.

5          Anything else in the '90s with --

6     with Anna Nupson like that?

7     **A   I think Herb asked the family law group to**

8     **prepare a prenuptial agreement between Anna and**

9     **Mark.  And I forwarded that to Herb.  Actually, I**

10    **think there were a couple versions of that because**

11    **Herb thought what Momjian had put together was too**

12    **complicated.**

13         **There was a simplified version.  I**

14    **had prepared -- I mean, in '95, given, I think,**

15    **increased concerns about Mark, I had discussions**

16    **with Herb as to was there anything I could do to**

17    **bulletproof the trust further.**

18         **And I told him if we wanted to**

19    **protect the principal of the trust, if Anna were to**

20    **renounce her rights to the principal, then -- then a**

21    **creditor of hers would not have been able to -- to**

22    **reach the principal of the trust.  And Herb asked me**

23    **to prepare that.**

24    Q    All right.  Let me ask you a few technical

25    questions about that, and correct me if I'm wrong

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 37

1    because I likely am.

2              My understanding is that a

3    self-settled trust, you cannot protect principal

4    from creditors?

5        **A    That's not correct.**

6        Q    Okay.  So --

7        **A    Self-settled trust -- and first of all,**

8    **we're focusing in 1995.**

9        Q    All right.

10       **A    In Pennsylvania.**

11       Q    Yes.

12       **A    A creditor could reach the trust to the**

13   **extent the trustees had the ability to give money**

14   **back to the beneficiaries.  So if Anna did not have**

15   **any rights to principal, her creditors would not**

16   **have had any rights to the principal of the trust.**

17   **They could have reached the discretionary income,**

18   **but not the principal.**

19       Q    And so that was one of the basis [sic] for

20   your recommendations for her to renounce principal?

21       **A    That was the basis.**

22       Q    That was the basis, okay.  And did you --

23   let's see.  Let me show you what's been previously

24   marked as Exhibit 7 to Ms. Nupson's deposition.  And

25   I want to make sure we're talking about the same

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 38

1    thing really.  And it's a two-page document, if you

2    just want to read through it.  It's very short

3    obviously.

4        **A    Yes.**

5        Q    All right.  Is this the renunciation

6    you're referring to?

7        **A    That is.**

8        Q    All right.  And this is a document you

9    drafted?

10       **A    It is.**

11       Q    All right.  And obviously, my client's

12   signature is on the bottom right.  Did you sign this

13   in any way?

14            Do you know if your signature is on

15   this?

16       **A    My signature is not on it.**

17       Q    Okay.  Were you there when this was

18   signed?

19       **A    I was not there.**

20       Q    Do you know the circumstances surrounding

21   the execution of this document?

22       **A    I do not.**

23       Q    You drafted this.  Herb asked you -- well,

24   you gave information to Herb about a way to protect

25   the trust, additionally bulletproof it I think is

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO.  2:18-cv-02505-NIQA

Page 39

1    the word you used?

2        **A    The principal of the trust.**

3        Q    The principal of the trust.  You drafted

4    this.

5            Did you -- and you did not present

6    this to Anna?

7        **A    I did not.**

8        Q    Okay.  Do you know who did?

9        **A    I don't.**

10       Q    I'm assuming you sent this to Herb or

11   provided it to Herb in some fashion?

12       **A    To Herb.**

13       Q    Herb, okay.

14       **A    Yes.**

15       Q    Thank you.  When you received it signed,

16   did you receive any information about the execution

17   or anything else about it?

18       **A    I don't think so.**

19       Q    Was there any discussions at the time that

20   this was being drafted and executed of amending Ms.

21   Nupson's trust to provide her with additional

22   income?

23           In other words, to change the terms

24   of the trust so that she could receive additional --

25   additional funds, perhaps without the trustees'

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 40

1    agreement, or perhaps make it a unit trust, or

2    something to that effect?

3        **A    Not at this point.**

4        Q    Okay, all right.

5            Did you represent anyone else in the

6    family in trust and estates matters?

7        **A    John -- John and Leigh.**

8        Q    What about Lucia?

9            Did you ever represent Lucia?

10       **A    I did not.**

11       Q    So, I mean, looking at it, I think you

12   represented Herbert, John, both the spouses,

13   provided a trust for Anna, although you weren't

14   representing her in the '90s.

15           But is it fair to say by the '90s and

16   early 2000s that you were the Middleton's trust and

17   estates lawyer?

18       **A    For -- for Herb, his wife, two of his**

19   **children, the spouse of one of the children.  I also**

20   **handled Herb's either both parents' or one parent's**

21   **estates.  It was one parent, the second -- the**

22   **second to die.**

23       Q    Do you know who represented the first?

24       **A    A partner, Robert Oberlie (ph).**

25       Q    A partner within your firm?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 41

1    A    Correct.  In our department.

2    Q    Okay.  Make sure I understand just your

3    general practices as a trust and estates lawyer.

4           Do you generally try to document

5    phone calls?

6    A    If they're sufficiently important, I

7    would.

8    Q    All right.

9    A    And I do -- I think I do it more today

10    than I did it back in the -- in the '80s and early

11    '90s.

12    Q    What about in the 2000s, the early 2000s?

13    A    I would have documented phone calls that I

14    thought were sufficiently important.

15    Q    Would the creation of an oral trust be

16    sufficiently important to document?

17    A    Not necessarily, no.

18    Q    Okay.  Why not?

19    A    An oral trust, in a sense, speaks for

20    itself.  I mean, you create it, and -- and then it

21    speaks for itself.  There's no -- there's no need to

22    do that.

23    Q    Tell me about the creation of an oral

24    trust.

25           What does that mean?

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 42

1    A    An oral trust is where someone gives

2    instructions and identifies that they want to create

3    a trust, that they have identified what is being

4    transferred to the trust.  They've identified when

5    the transfer is going to or has occurred.  They

6    identify what is being transferred.  They identify

7    who the trustee is.  They identify the terms of the

8    trust.  And they -- they identify the trustees and

9    then remainder people.

10    Q    Who do they identify it to?

11    A    Whoever is going to be involved in

12    handling it.

13    Q    What do you mean "handling it"?

14    A    Well, I assume here you're asking -- and

15    maybe it's not appropriate to assume.  First of all,

16    oral trusts are something that I probably have only

17    done two or three times in my career.  And so it's

18    not a routine practice.

19    Q    Why not?

20    A    I think it's a better practice to have a

21    written instrument.

22    Q    Why?

23    A    Because it makes it very crystal clear.

24    Q    Right.  And the IRS can't come back on

25    you; right?

Page 43

1       A    IRS can come back on you for anything.

2       Q    But with an oral trust, it's less

3    susceptible -- I mean, with a written trust it's

4    less susceptible for the IRS to say this never

5    existed; correct?

6       A    I don't think so.  Pennsylvania recognizes

7    oral trusts, so -- and the IRS recognizes returns on

8    state law.

9       Q    Okay, right.

10           But your -- your position throughout

11   your career has been that it's a better practice to

12   have a written trust; correct?

13      A    Correct.

14      Q    All right.  And I'm assuming one of the

15   reasons is because you actually have a document, an

16   instrument identifying all of the necessary elements

17   for the trust; right?

18      A    I mean, let's -- I don't want to take you

19   on, you know -- I want you to be asking the

20   questions.  But if -- if what we're identifying is a

21   GRAT, a GRAT is basically a form document.  We have

22   absolute forms that -- that sets forth all of the

23   terms of the GRAT, the annuity period, with a couple

24   of variables.

25           One is -- I mean, obviously the

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.          June 24, 2021
Bruce Rosenfield, Esq.                                          NO. 2:18-cv-02505-NIQA

Page 44

1    corpus differs, who the trustee differs, who is

2    going to receive the remainder if the GRAT is

3    successful, and then the percentage of payout, and

4    the -- and the length of terms, but the rest of the

5    language of the GRAT is really a function of the

6    statute of the regulations.

7                And we have forms and -- and so the

8    question of a challenge to the terms of the GRAT by

9    the IRS are very unlikely.  The issue of the

10   challenge with respect to a GRAT, especially if

11   you're using closely held business interests, are

12   valuation.

13               That's the -- that's where the issue

14   of challenge would come in, and the issue of

15   valuation frankly doesn't matter whether it's an

16   oral trust or if it's a written trust.  You have the

17   same valuation issues.

18       Q    Okay.  And we'll get to the GRAT;

19   obviously, we're going to be talking about that

20   quite a bit today.  So we'll get there.

21               What I want to know, though, is just

22   your practice because it sounds like you testified

23   that you've done maybe two or three oral trusts in

24   your entire career?

25       A    Correct.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 45

1    Q    And I just -- I'm trying to understand why

2    it's not your habit and practice to have your

3    clients do oral trusts?

4    **A    Well, it's better to have a written trust.**

5    Q    Okay.  So why?  That's what I'm trying to

6    get at.

7    **A    Well, with an oral trust, you have to**

8    **explain more.  I mean, that's -- and it's also**

9    **possible that other people might challenge it, you**

10    **know, some potential beneficiaries.  And by having**

11    **it written, there's no issues on that.**

12    Q    Okay.

13    **A    It's better to have a written.**

14    Q    All right.  And earlier, you testified

15    that you announced the oral trust.  And I'm just

16    trying to -- and you said everyone involved.  And I

17    don't think I completed the -- the thought there.  I

18    just want to make sure I understand what you mean by

19    that.

20          Everyone involved would include, I

21    assume, the grantor?

22    **A    Correct.**

23    Q    That's who's announcing the trust; right?

24    **A    That is correct.**

25    Q    The trustee?

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 46

1      A   Yes.

2      Q   And do the beneficiaries need to be a part

3   of that announcement?

4      **A   In fact, if we're focusing on Fran's GRAT,**

5   **the beneficiaries were -- they were involved in it.**

6      Q   Okay.  But the announcement of the oral

7   trust -- I mean, is it verbally announced -- it has

8   to be verbally announced to the -- the trustee?

9      A   Yes.

10      Q   All right.  And it has to be the grantor

11   to make that announcement; correct?

12      **A   Correct.**

13      Q   And anyone else that needs to be a part of

14   that --

15      **A   No.**

16      Q   -- announcement?

17      **A   No.**

18      Q   All right.  And what terms need to be

19   provided in that announcement?

20      **A   You would need to -- I mean, you would**

21   **have to have -- the terms would have to be who the**

22   **-- what is being transferred, when it's being**

23   **transferred, to whom is it being transferred.**

24      **And in this respect, because it's a**

25   **GRAT, the regulations establish what the instrument**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 47

1    needs to include. So the -- what would have to be

2    agreed to at the time of the oral trust are the

3    basic terms to comply with the IRS rules.

4         Q    What are those basic terms?

5         A    It goes to that no one else can get any

6    money, that it's irrevocable, that if there's a

7    short -- a period of when you have to pay the money

8    out, the specified annuity provision, if there is a

9    revaluation, if there's -- so if you misvalued --

10   and that really goes to the issue of an audit --

11   that there would then have to be an adjustment of

12   the annuity payments.

13              And then, that you cannot commute and

14   that the -- and at this point, that you can't make

15   the annuity payments through debt, by -- through an

16   IOU. I think -- I believe those are the terms.

17        Q    Okay. And those terms all have to be

18   announced verbally?

19        A    Agreed to, yes.

20        Q    In the two or three times you've done an

21   oral trust throughout your career, did you document

22   the grantor's intent through a memorandum to your

23   file, through an e-mail, through a letter to the

24   grantor, anything like that?

25        A    No. They were -- in each of the -- in

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 48

1      each of these times, at a later time, the actual

2      terms of the instrument were memorialized.

3          Q    And you say the terms of the instrument,

4      so when someone orally announces a trust, it becomes

5      an instrument?

6          A    It is an instrument.

7          Q    And some of my questions may seem silly or

8      stupid to you --

9          A    It also has to be irrevocable.

10         Q    Tell me what that means.

11         A    With respect to basic terms of the trust,

12     they can't be changed.

13         Q    Are there any circumstances in which you

14     can change it?

15         A    At that point, the only -- without further

16     agreements, no.

17         Q    What do you mean "without further

18     agreements"?

19             Of who?

20         A    There is -- there was some issues of

21     whether family agreements could modify an

22     irrevocable trust where you have the settlor of the

23     trust, the -- and the remainder people agreeing,

24     whether you need court approval is an issue.

25         Q    And just so -- I'm obviously focused in

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 49

1    the 2000, 2001, 2002 timeframe.

2        That's the period of law that we're

3    talking about; correct?

4    **A  Right, it was much tighter.**

5    Q  If you were to modify a written trust,

6    what is your practice?

7    **A  An irrevocable trust?**

8    Q  Well, let's just start with a trust, a

9    revocable, not irrevocable.

10        But let's just say an amendment needs

11    to occur, okay?

12    **A  If it's a revocable trust, you can simply**

13    **-- you either amend it, or you start from scratch**

14    **and make a distribution and start over.**

15    Q  Okay.  Meaning you make a distribution of

16    the corpus?

17    **A  Yes.  Or agree to transfer the corpus to**

18    **the new trust.**

19    Q  Is that called -- you decant to a new

20    trust?

21    **A  No.  That's -- decanting is an irrevocable**

22    **trust, and that's also -- that's a different issue.**

23    Q  I'm mixing apples and oranges, okay.

24    **A  Right.**

25    Q  All right.  But --

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 50

1      **A    It's also a term for wine.**

2      Q    Yes, that I'm aware of.  That I'm aware

3    of.  All right.  So -- but you mentioned two things.

4              One, you can amend?

5      **A    A regular trust that is not irrevocable**

6    **can be amended.**

7      Q    Yeah.

8      **A    So you can just totally restate it in its**

9    **entirety or whatever the specific provision is that**

10   **you wanted to amend.**

11     Q    Okay.  Would you put, for example, amended

12   on the top of it so that everyone knows it's

13   amended?

14     **A    I -- I sometimes do that.  I sometimes in,**

15   **if we're doing a complete amendment, I mention each**

16   **time it's been amended.  Sometimes I don't do that**

17   **because if we're doing an amendment to perhaps cut**

18   **out someone or it'd be best not to tip someone off**

19   **that they've upset the grantor that might have some**

20   **personal problems.  So it varies.  There's no magic**

21   **to it.  I mean, you have to refer to it, but -- and**

22   **-- but there's no magic to it.**

23     Q    When you say you have to "refer to it,"

24   what do you mean?

25     **A    I mean, you have to somehow get the**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 51

1    **original corpus into where -- wherever it's going to**

2    **go.  Often, we restate the trust entirely for an**

3    **amendment.**

4         Q    Okay.  Irrevocable trusts, amendments to

5    those?

6         **A    Irrevocable trusts are irrevocable.**

7         Q    Okay.  But we did discuss there are

8    certain times that that can be -- and 2001, 2002

9    timeframe, there are certain times when those can be

10   amended?

11        **A    There has to be a reason for it.**

12        Q    Okay.  What are acceptable reasons at that

13   timeframe?

14        **A    You can amend it through family settlement**

15   **agreements, where there was a reason to question the**

16   **validity of the original trust.**

17        Q    Any other reasons, other than questioning

18   the validity of the original trust?

19        **A    Back then, I'm -- I'm not aware of any.**

20        Q    We've talked a little bit about a GRAT,

21   and I want for purposes of our jury that we'll, you

22   know, perhaps we'll get to, perhaps we won't, but I

23   want to discuss a little bit about the technical

24   side of that.  I'm trying to understand it.

25             So it's a grantor retained annuity

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 52

1      trust; is that correct?

2          A    That is correct.

3          Q    What is the purpose of it?

4          A    It's -- it's really based on valuation

5      pronouncements by the IRS.  And the IRS, month by

6      month, publishes a rate, an interest rate, which is

7      an assumption of what they say one can earn and that

8      really specifies a hurdle rate for a GRAT that comes

9      out once a month, 7520 rate.  The -- and it's

10     basically based on ten-year treasuries.

11             The idea behind a GRAT is you

12     transfer assets that you think have a shot at

13     appreciating faster than that hurdle rate.  And

14     during -- you have a choice of setting one -- how

15     long the -- this GRAT period lasts and what the

16     annuity rate is.

17             The shortest period of time that the

18     IRS had approved was two years.  I mean, if you -- I

19     mean, ideally, if you have a wealthy enough client

20     and if the IRS would approve, you would set up daily

21     GRATs.  Because the idea is you want to get a spike

22     after you've transferred the asset, and then you

23     would have the asset -- the upside go to the

24     remainder people for free.

25             You -- we would set this up.  We

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 53

1          would, what's called, zero-out the GRAT.  What that

2          meant is if you take the value of the asset given to

3          the trust, you have a percentage payout over those

4          two years based on the IRS hurdle rate.  The -- we

5          would file a gift tax return and because of the

6          retention by the grantor, the grantor retained

7          annuity, the gift, the taxable gift, was basically

8          zero.

9                    At that point, I was -- my practice

10         was not to zero it out, but to have it $100, $200 of

11         a taxable gift based on the hurdle rate.  You

12         then -- if -- and the annuity payment is a dollar

13         amount based on the initial contribution to the --

14         to the GRAT.

15                   So in our case, we transferred

16         Bradford stock.  The -- the -- we -- if there was

17         cash by virtue of dividends or payments from the

18         company to the GRAT, it was a shareholder, that

19         distribution would be used to satisfy the annuity

20         payment.

21                   But if there was a shortfall, we

22         would then have to distribute back shares of the

23         company stock at its current value.  And if the

24         company's value went down and it didn't produce

25         enough cash, then the grantor would simply get the

Page 54

1    **stock back and be no worse off than they would have**
2    **been without doing the transaction at all.**
3             **But if the -- if the stock went up in**
4    **value, then the -- not one hundred percent of the**
5    **stock would come back to the grantor.  It would**
6    **depend on how much of the cash flow was coming out**
7    **of the business, and you would then figure out if it**
8    **was successful at the end of the two years.**
9             **Motivation is an estate planning**
10    **technique, and if you look at the -- the treasury**
11    **pronouncements for the last three decades, they've**
12    **been trying to restrict GRATs dramatically.**
13    Q    Sure.  And let's -- I want to just make
14    sure I'm always focused on the 2001 timeframe.
15    **A    Yes.**
16    Q    For our discussion purposes right now
17    because I know things change, regulations change, et
18    cetera.  But I just want to -- let me see if I can
19    tell you what you just told me perhaps in a very --
20    in a more simple way.  I just want to make sure I
21    understand it.
22             Is the idea behind a GRAT to transfer
23    to the next generation -- and I'm saying next
24    generation -- in other words, as you say, estate
25    planning purposes is to move assets from one estate

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 55

1     to another generation or another estate?

2              Is that one of the purposes?

3       A    Yeah.  At -- it's at a -- as cheap of a

4     gifted estate tax value as possible.  Yes.

5       Q    Okay.

6       A    And -- and you're correct into one

7     generation.  Because if you're trying -- you -- you

8     would have a generation skip by going two

9     generations.  And you couldn't do -- you can't --

10     the GRAT itself wouldn't work for multiple

11     generations because of the retained interest by, in

12     this case, Fran Middleton for the initial two years.

13     So what is making it work for the next generation

14     would not work for two generations.

15      Q    All right.  And so let's -- let's take our

16     situation here.  We have Fran Middleton; we have

17     John Middleton.

18              And then we have children; correct?

19      A    John's children.

20      Q    John's children.

21      A    Yes.

22      Q    So what you're saying is it works for

23     John, but it wouldn't work for John's children?

24      A    Correct.

25      Q    Okay.  But the purpose for -- in terms --

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 56

1    as a trust and estates attorney, what you're trying

2    to do is move assets from Fran's estate to -- we'll

3    keep it John's estate for now -- to John's estate,

4    is that correct, at the lowest possible gifting

5    value?

6         **A    Not gift -- the lowest tax consequence, in**

7    **position of tax.**

8         Q    Okay.  And so I'm trying -- what I want to

9    understand is you said, for very wealthy

10   individuals, you would do this daily?

11        **A    Correct.**

12        Q    Okay.

13        **A    The IRS has not blessed that.**

14        Q    Right.  And you said at this time, the

15   shortest timeframe was two years; correct?

16        **A    Correct.**

17        Q    That's the part I want to try and

18   understand.  So what I think I hear you saying is,

19   is that -- and correct me if I'm wrong, is what

20   you're saying is -- is that if you know a particular

21   asset's going to rapidly appreciate, then a GRAT is

22   useful because you can value the GRAT at year one,

23   let's say, year zero we'll say, paid gift tax at

24   year zero.

25             Then presuming the GRAT's successful

Page 57

1    and the annuity was paid, then at year two, that

2    same asset is then moved from the GRAT to the next

3    generation, and its basis is moved up?

4        **A    The only place I quibble with you is if**

5    **you know it's going to be increasing in value, the**

6    **appraiser has to know that as well, and the whole**

7    **issue is valuation.  So that, you know, it has to be**

8    **a valid appraisal, and if you know it's going up in**

9    **value, the appraiser should know it's going up in**

10   **value, which means the valuation would be higher,**

11   **and it's -- you're still in a problem.**

12       Q    Well, but I'm trying to understand the

13   purpose of a GRAT.  So let's just take my

14   hypothetical here, start with year zero.  Let's take

15   out the appreciation.  Let's just say it's valued at

16   $100 a share, put in one -- one share into this

17   GRAT.  Year two, we have a two-year GRAT.  The value

18   is still $100.

19            What benefit is that?

20       **A    None.**

21       Q    Okay.

22       **A    But you set up a GRAT -- I mean, I -- I'm**

23   **involved with families -- with Campbell Soup.  And**

24   **we have this Vlasic pickles.  We did five GRATs with**

25   **those.  We failed every single one of them.  I mean**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 58

1    --

2          MR. MCMICHAEL:  Hold on.  Hold on.  Hold

3    on.  Wait.  We need to take a time out.

4          THE VIDEOGRAPHER:  The time is 10:30, off

5    the record.

6          (Discussion was held off the record.)

7          THE VIDEOGRAPHER:  10:30, back on the

8    record.

9          THE WITNESS:  I think they're more,

10   certainly in that period, there were more GRATs

11   that I prepared that failed than succeeded.

12   But there's no downside.  Other than lawyer's

13   fees, there's no downside.

14   BY MR. DAVIS:

15       Q    I see, okay.

16            So that's what I'm trying to

17   understand is -- is the hope is -- is that the asset

18   appreciates?

19       **A    Correct.**

20       Q    All right.  Because there would be no

21   benefit if it doesn't, essentially?

22       **A    That is correct.**

23       Q    All right, okay.

24            Are GRATs still permitted under the

25   IRS regs currently?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 59

1    A    They are.

2    Q    What are the other ways to accomplish --

3    is there another instrument that can accomplish what

4    a GRAT can accomplish?

5    A    I mean, first of all, you can just make a

6    straight gift.

7    Q    Okay.

8    A    I mean, you file a gift tax return, and

9    you use up lifetime exemption, and that, you're

10   guaranteed succeeds because it's out of the estate,

11   doesn't come back.  There were more aggressive

12   techniques that I didn't do, but others did, things

13   like sales of -- sales to a defective grantor trust.

14        A lot of people talked about that.

15   We still don't know for sure what the tax

16   ramifications of that are.  If the -- if the grantor

17   of the trust creates the trust and the debt that was

18   used to buy the instrument is still in place at the

19   time of the grantor's death, there's some

20   uncertainties.  Members of my group do that, I

21   don't.

22   Q    Okay.  But the issue with just an outright

23   gift is you potentially do not have the benefits

24   that you would with a GRAT?

25   A    Leverage, you get more leverage with the

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 60

1    GRAT, but you have the -- the downsides.

2        Q    Explain -- explain the leverage to me.

3        A    The leverage is you've made a gift that

4    the upside is out of your estate for free.

5        Q    Okay.

6        A    Without using unified credit.

7        Q    Okay.

8        A    You also have to survive the term of the

9    GRAT.  Because if you die while the GRAT is -- the

10   GRAT period is still in place, that's a gift with

11   the retained life estate.  It comes back into your

12   estate entirely.

13       Q    Switching gears a little bit here.

14            An oral trust also has to reflect the

15   grantor's intentions; correct?

16       A    Of course.

17       Q    Okay.  And it could not ever be made for

18   any illegal purpose; correct?  An oral trust could

19   not be used for an illegal purpose.

20            Would you agree with that?

21       A    I don't think there's any difference

22   between an oral trust and a written trust with

23   respect to illegal purposes.

24       Q    Fair.  Any trust, a trust cannot be used

25   for an illegal purpose.

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 61

1           Is that a fair way to say it?

2       **A    I really don't understand that.  I...**

3       Q    Okay.  Have you ever -- let me -- let me

4    back up a little bit then.

5           Have you ever had a situation where a

6    trust was perhaps not adjudicated by a court, but

7    perhaps a beneficiary asserted that the trust was --

8    the purpose of the trust was for an illegal purpose?

9           For example, for evading taxes, just

10   as an example, and therefore -- therefore, the trust

11   is not valid?

12      **A    I've never heard of that.**

13      Q    Okay.

14      **A    I mean, unless you're not filing a gift**

15   **tax return.  I mean, if you file a gift tax return,**

16   **you are putting a value, and the IRS has the right**

17   **to audit it and either agrees or disagrees with the**

18   **value that you've put.  If you don't, if you don't**

19   **file a gift tax return, the trust is irrelevant.**

20          **If you want to hand money to your**

21   **children and you don't -- above the annual exclusion**

22   **amount and you haven't filed a gift tax return,**

23   **that's illegal, but --**

24      Q    Okay.  Go ahead.

25      **A    It's the same thing.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 62

1      Q    Okay.  We'll get into some other examples

2    just in a bit.  Let me move on.  Let's -- let's turn

3    to this GRAT.  And, of course, I'm speaking about --

4    I'm going to kind of define this and just make sure

5    we're using the same words and you may not

6    necessarily agree that they're different, but I just

7    want to make sure I'm using the same words.

8            So I'm going to call February 1st,

9    2001 the oral GRAT, okay.  I'm going to call the

10   November execution GRAT 1, and I'm going to call the

11   2003 execution, GRAT 2.

12           All right, that's the way I'm going

13   to refer to it.

14     A    Okay.

15     Q    And you may disagree with my definitions,

16   and we'll get into that, of course.  But that's how

17   I'm going to try to refer to this throughout the

18   discussion here right now.

19           Okay?

20     A    Okay.

21     Q    I want to -- let's -- and I'm just going

22   to -- I'm not going to use either of those

23   definitions first.

24           But I just want -- when did the

25   concept of a GRAT, when was that initially kicked

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 63

1    around?

2         MR. MANNION:  So to the extent that

3    involves discussions with Mrs. Middleton that

4    were not in the presence of a third party

5    and/or Mr. Rosenfield was not authorized to

6    reveal those communications to the third party,

7    John Middleton as co-executor of Frances

8    Middleton's estate will assert a privilege.  So

9    I'll caution the witness to be thinking about

10   those parameters.

11        MR. MCMICHAEL:  Okay.  Mr. Rosenfield, the

12   question is:  When was the topic of a GRAT

13   first -- when did it first come about?  You can

14   answer the question of when without referring

15   to any discussions that might be privileged.

16   So we'll take it one question at a time.

17        THE WITNESS:  Somewheres around 1999.

18        MR. DAVIS:  Okay.

19        THE WITNESS:  Possibly before that.

20   BY MR. DAVIS:

21     Q    Okay.  Let me back up and just see if I

22   understand.

23            Did Frances Middleton ever authorize

24   you to discuss either the oral GRAT or GRAT 1 with

25   Anna Nupson?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 64

1          MR. MCMICHAEL:  Yeah.  At what point in

2     time?

3     BY MR. DAVIS:

4          Q    At any point in time?

5          **A    Yes.  In 2002.**

6          Q    Okay.

7          **A    Later in 2002.**

8          Q    Do you have a writing of that

9     authorization?

10         **A    No.**

11         Q    She just orally provided that?

12         **A    Yes.**

13         Q    When did she do that?

14         **A    I think at -- well, I think it was in -- I**

15    **think at the meeting that I had with Fran and Anna**

16    **was in September of 2002.**

17         Q    And did she permit you to discuss all of

18    the details of the oral GRAT or GRAT 1 with Anna

19    Nupson?

20         **A    Yes.**

21         Q    Okay.  So I don't think the privilege

22    stands anymore.  It seems to be waived.  Perhaps I'm

23    wrong.  We'll just keep going on the questions and

24    see where we get.

25         MR. MCMICHAEL:  Yeah.  I mean, I think

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 65

1      that -- I think we probably all agree that

2      there is no privilege with respect to the

3      September meeting and the directions that Mr.

4      Rosenfield had from Fran in connection with

5      that meeting. I think if you ask questions

6      about what their discussions were in 1999 about

7      GRAT and other, you know, alternative estate

8      plans, there's going to be an assertion of

9      privilege.

10    BY MR. DAVIS:

11      Q   Well, I am going to ask you those

12   questions.

13        What were those discussions with Fran

14   --

15    **A   What --**

16      **(Indecipherable cross-talk.)**

17      THE WITNESS: I'm sorry, I don't

18      understand what you're saying.

19    BY MR. DAVIS:

20      Q   Sure. Let me -- well, first, let me --

21   we're going to mark as Exhibit 44 the billing from

22   3/12/99. Let me get you your billing, and then

23   hopefully, that will kind of center us a little bit.

24         - - -

25      (Exhibit 44 was marked for

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 66

1      identification.)

2                    - - -

3      BY MR. DAVIS:

4          Q    So this was kind of -- kind of with your

5      recollection, this was what I seem to have is if you

6      look, March 12th, 1999, the entry, it -- it says

7      GRAT for Frances Calcs Re: GRAT.  And then the

8      biller is RSR.  I don't know who that is.

9               Do you know who that is?

10         **A    Roy Ross.**

11         Q    Okay.  And who is Roy Ross?

12         **A    Well, a colleague of mine in the trust and**

13     **estates group at Schnader.**

14         Q    Would he be drafting for GRATs, and

15     trusts, and things?

16         **A    Yes.**

17         Q    Okay.  So this appears, at least in the

18     documentation, the first time I've seen the term

19     GRAT mentioned with Frances, all right.  And so I'm

20     trying to -- and I think that coincides with about

21     the timeframe that you mentioned earlier.

22              And so what I would like to know is:

23     What are the discussions you had with Frances

24     regarding a GRAT in this timeframe?

25

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 67

1          MR. MANNION:  Again, on behalf of Mr.

2     Middleton as co-executor, I'm going to object

3     to the extent that it involves a discussion

4     with Mrs. Middleton that did not include a

5     third party or that Mr. Rosenfield was not

6     specifically authorized to reveal to third

7     parties.

8          And, Mr. Davis, you made a reference to

9     authorizing information to be revealed to Ms.

10    Nupson.  There is a difference between

11    authorizing specifics and authorizing every

12    aspect of every conversation that Mrs.

13    Middleton had with Mr. Rosenfield.

14          So again, if it's been authorized by Mrs.

15    Middleton to be released or there was a third

16    party present, there is no objection.

17    Otherwise, we are asserting the privilege.

18          MR. MCMICHAEL:  All right.  So I'm going

19    to ask you a couple of questions to determine

20    whether I'm going to direct you not to answer.

21    Did you have a conversation with Mrs. Middleton

22    around March of 1999?  Do you recall?  And just

23    answer yes or no.  I don't want you to describe

24    the conversation, obviously.

25          THE WITNESS:  I don't recall.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 68

1          MR. MCMICHAEL:  All right.  Okay.  What's

2     your question now?

3     BY MR. DAVIS:

4          Q    Well, let me back up.  My understanding of

5     your testimony was you recalled that a GRAT was

6     being discussed in the 1999 timeframe.

7               That was the first time that there

8     was any discussions of a GRAT with Ms. Middleton?

9          **A    There may have been discussions before**

10    **that.**

11         Q    Okay.  I am asking you now, those

12    discussions, either before that or in 1999, what

13    were those discussions?

14         MR. MCMICHAEL:  All right.  Don't answer

15    that question.  Let me ask you a couple

16    questions first.  Did Mrs. Middleton authorize

17    you to reveal those discussions to third

18    parties, whatever discussions you were having

19    at that point in time?

20         THE WITNESS:  No.

21         MR. MCMICHAEL:  And were there other

22    parties present, other than Schnader lawyers,

23    during those discussions?

24         THE WITNESS:  Yes.

25         MR. MCMICHAEL:  Who else was present?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 69

1          THE WITNESS:  John Middleton would have

2     been present.  And it is possible that in some

3     discussions, John Stein could have been

4     present.

5          MR. MCMICHAEL:  And who is John Stein?

6          THE WITNESS:  The family accountant.

7          MR. MCMICHAEL:  Okay.  So I need some

8     guidance on your privilege assertion with

9     respect to conversations where John Middleton

10    was present.

11         (Discussion was held off the record.)

12         MR. MCMICHAEL:  Mr. Rosenfield, at the

13    time that these discussions occurred with Ms.

14    Middleton, was John a co-client?

15         THE WITNESS:  Yes.

16         MR. MCMICHAEL:  He was a co-client.  Sorry

17    about this.

18         (Discussion was held off the record.)

19         MR. MCMICHAEL:  Okay.  So now, Mr.

20    Rosenfield, we just want to make the record

21    clear.  At the time of the discussion, was John

22    a co-client for purposes of the discussion you

23    were having?

24         THE WITNESS:  I'm sorry, I don't

25    understand that.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 70

1          MR. MCMICHAEL:  When you were having the

2    discussions with Ms. Middleton and with John,

3    were you, in your mind, representing both of

4    them in connection with that discussion that

5    you were having?

6          MR. DAVIS:  With the GRAT discussion.

7          MR. MCMICHAEL:  The GRAT discussion, yes.

8          THE WITNESS:  I mean, John was involved in

9    it.  I mean, they were primarily for -- for

10   Fran and for estate planning for Fran.

11         MR. MCMICHAEL:  Yeah.  I'm going to direct

12   the witness not to answer at this point.

13         MR. DAVIS:  All right.

14         MR. MCMICHAEL:  I mean, if you want to go

15   off the record, I can have a more fulsome

16   discussion with counsel for Mr. Middleton about

17   it right now, or we can just keep moving and

18   deal with it later.  It's your call.

19         MR. DAVIS:  Let me -- let me ask one

20   follow-up question, and I --

21         MR. MCMICHAEL:  Sure.

22         MR. DAVIS:  -- may let you do that.

23   BY MR. DAVIS:

24      Q    Mr. Rosenfield, the 2002 permission

25   provided by Frances Middleton, did she authorize you

Page 71

1    to speak to her daughter, Anna Nupson, about the --

2    everything related to the GRAT, GRAT 1 or the oral

3    GRAT as I'm defining them?

4        **A   Yes.**

5        Q    She did, okay.

6             And that would include discussions

7    prior to the actual formation of the oral GRAT or

8    GRAT -- the execution of GRAT 1?

9        **A   No.  She simply asked me to discuss with**

10   **Anna the terms of the GRAT.**

11       Q    Okay.  And did you take that authorization

12   to include an authorization to discuss the formation

13   of the GRAT and all of the surrounding

14   circumstances?

15       **A   No, I didn't.  No.**

16       Q    Okay.  Just to make sure I understand, is

17   there any writing that you made to Frances Middleton

18   or to Anna Nupson related to your authorization to

19   speak about the -- either the oral GRAT or GRAT 1?

20       **A   No.**

21       Q    Okay.  If you could, and let me not lead

22   you, explain what you understood as the authority

23   you received from Frances Middleton to discuss the

24   GRAT?

25       **A   Fran invited me to her house to -- for the**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 72

1    express purpose of describing it to Anna.

2        Q    Okay.  And when you say "describing it to

3    Anna," you're referring to the oral GRAT and GRAT 1?

4    That's what I'm calling them.  I know you have a

5    different name for them.

6        A    I do have a different name for them, but

7    yes.

8        Q    Okay.  And you didn't understand that

9    authorization to include discussions prior to the

10   formation, the oral -- the oral GRAT in

11   February 1st, 2001?

12       A    The discussions -- I'm sorry, there's one

13   GRAT, and --

14       Q    Okay.

15       A    -- the discussions were of that GRAT.

16       Q    Okay.  I'm just trying to understand the

17   scope because that's what these gentlemen are going

18   to want to discuss.  And that's what I'm trying to

19   understand.

20           What was your understanding of the

21   scope of your authorization to speak with Anna

22   Nupson about it?

23       A    It was a meeting that Fran was at.  She

24   asked me to take the lead and to tell her -- tell

25   Anna how the GRAT worked, and that it was there.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 73

1           MR. DAVIS:  Let's go off the record.

2           THE VIDEOGRAPHER:  10:49, off the record.

3                    - - -

4           (Recess was taken from 10:49 a.m. to

5     11:01 a.m.)

6                    - - -

7           THE VIDEOGRAPHER:  11:01, back on the

8     record.

9           MR. MCMICHAEL:  Okay.  Mr. Davis, having

10     had a further discussion with Mr. Rosenfield

11     off the record to explore the privilege issues,

12     I'm going to withdraw the direction not to

13     answer the question that was asked immediately

14     prior to the break.

15           And to make our position clear on the

16     record, we will permit Mr. Rosenfield to answer

17     questions concerning his discussions with

18     Frances Middleton prior to the formation of the

19     February 1, 2001 GRAT, provided that John

20     Middleton or another third party was present in

21     those discussions.

22           MR. DAVIS:  All right.  And for purposes

23     today, Ms. -- John Middleton is going to be

24     considered a third party, and I appreciate that

25     he is a client, but --

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 74

1          MR. MCMICHAEL:  Well, yeah.

2          MR. DAVIS:  Yeah.

3          MR. MCMICHAEL:  He is considered a third

4     party at this point in time.

5          MR. DAVIS:  Okay.

6          MR. MCMICHAEL:  Prior to the formation of

7     the February 1, 2001 GRAT.  In connection with

8     the GRAT and thereafter, he was a co-client, as

9     he was trustee of the GRAT.

10    BY MR. DAVIS:

11        Q    Okay.  With that explanation, can you

12    describe the conversation you had with Mrs.

13    Middleton, Frances Middleton?

14        **A    I would have had conversations describing**

15    **the advantages of a GRAT, how they worked, the**

16    **required terms, and how they fit in with her overall**

17    **estate planning and the possible benefits, if they**

18    **were successful.**

19        Q    I'm going to ask you some questions.

20    These gentlemen are definitely going to have some

21    heartburn.  So give them a second.  They may need to

22    interrupt you.

23          Okay?

24        **A    Thank you, thank you.**

25        Q    During those conversations -- first of

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 75

1    all, do you know how many conversations occurred?

2    **A    I do not.**

3    Q    Okay.

4    **A    There were several.**

5    Q    And define "several" for me.

6         Can you give me a range?

7    **A    Between 1998 and the late 2000s, there**

8    **probably were four or five, maybe more.**

9    Q    Would those be in your billing?

10   **A    I'm a very bad biller, so I -- I didn't**

11   **necessarily annotate them, and I also don't always**

12   **record all the time that I charge.  The chairman of**

13   **our firm is not happy with me.**

14        MR. MCMICHAEL:  Okay.  I need to interrupt

15        just for one second because, Mr. Rosenfield, in

16        your answer, you said the late 2000s plural.

17        You mean late in the year 2000?

18        THE WITNESS:  That's what I meant.

19        MR. MCMICHAEL:  That's what I thought you

20        meant.  I just want that to be clear on the

21        record.

22        THE WITNESS:  I'm sorry.

23        MR. MCMICHAEL:  Timeframes are important

24        for purposes of privilege assertion.

25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 76

1    BY MR. DAVIS:

2        Q    Would you have documented the meetings

3    with memorandum to the file, for example?

4        **A    Probably not.**

5        Q    What about letters to your client?

6        **A    If I did letters to clients, they would be**

7    **in the file.**

8        Q    Okay.  You just don't know if you did a

9    letter to the client to document a meeting?

10       **A    It would be unlikely for me to have done**

11   **that.**

12       Q    Okay.  Is that your general practice with

13   all your clients, or just these particular clients?

14       **A    The time entries were less detailed for**

15   **the Middleton family than perhaps for other clients.**

16   **Documenting a meeting, unless someone asks me to**

17   **summarize the meeting, I wouldn't do that.**

18       Q    Less detailed, why, for the Middletons?

19       **A    Because they weren't relevant.  They**

20   **were -- we did not send detailed time diaries to the**

21   **Middleton family.**

22       Q    Was that at their direction?

23       **A    Yes.**

24       Q    Do you know why they had that direction to

25   you?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 77

1    **A   I don't, sorry.**

2    Q   Okay.  So the four or five conversations

3    you had, was John Middleton present at all of those

4    conversations?

5    **A   No.**

6    Q   Okay.  I want to -- because my

7    understanding is you're -- you have been instructed

8    not to answer.

9         And I take it you're not going to

10   answer on the advice of counsel; is that right?

11   **A   Correct.**

12   Q   I want you to focus, of the four or five

13   conversations -- and I know you don't have dates and

14   times at this point -- but of the four or five

15   conversations, I want you to only focus on those

16   that John Middleton was at.

17        All right?

18   **A   Yes.**

19   Q   And during those conversations, one of the

20   things you said that was discussed was Frances

21   Middleton's general estate planning?

22   **A   Correct.**

23   Q   All right.  What was your understanding of

24   her general estate planning desires during those

25   meetings?  And if it changed, please tell me that.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 78

1    And again, I'm cautioning you only to focus on the

2    meetings that John Middleton was at.

3        MR. MANNION:  And I'll further clarify

4    that we're going to focus on pre 2/1/01,

5    because post 2/1/01, Mr. Middleton was a

6    co-client.

7        THE WITNESS:  I have to get advice.

8        MR. MCMICHAEL:  Okay.  I'm going to try it

9    on the record first.  If we have to go off the

10   record, we will, but you can answer, Mr. Davis'

11   question, which was asking you for your

12   understanding, to the extent that your

13   understanding came from a conversation that you

14   had with Frances in John's presence.

15       To the extent that a conversation occurred

16   outside of John's presence and that contributed

17   to your understanding, you can't talk about

18   that.  All of this relates to the period of

19   time, as Mr. Mannion pointed out, prior to

20   February 1, '01.

21       THE WITNESS:  Can I just ask?

22       MR. MCMICHAEL:  Yes.  Okay, we're going to

23   have to go off the record, I apologize.

24       THE VIDEOGRAPHER:  11:07, off the record.

25            - - -

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 79

1                    (Recess was taken from 11:07 a.m. to

2        11:08 p.m.)

3                          - - -

4            THE VIDEOGRAPHER: 11:08, back on the

5        record.

6            MR. MCMICHAEL: Okay. So Mr. Rosenfield

7        will answer your question based on his

8        recollection of a discussion that occurred with

9        Frances Middleton in John Middleton's presence.

10            Broader questions concerning his

11        understanding, his understanding came from a

12        number of sources, including privileged

13        sources, so they're a little harder to answer.

14            But he has a specific recollection, and

15        I'm fine with him putting that on the record,

16        subject to you wanting to know about it, of

17        course.

18        BY MR. DAVIS:

19            Q    I do. Go ahead.

20            A    In -- either I think it would have been in

21        the timeframe in the early part of 1999, I am not

22        sure. I have no entries in this period. I had a

23        meeting in Fran's house with Fran and John. We had

24        already had advanced discussions of the GRAT, and

25        how it worked, and the potential benefits, and the

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 80

1    likelihoods of success.

2         Other than in 1982 where a trust was

3    created to induce John Middleton to come back to the

4    company with a significant number of shares, the

5    estate plan for both Herb and Fran Middleton had

6    always had a three-way split among their three

7    children with different dispositive terms for each.

8         I came in to the meeting that I have

9    the recollection of talking about the GRAT and them

10   saying that on -- to the extent it was successful,

11   the remainder would then pass to the three children.

12   And Fran said that's not what she wanted to do.

13   That she wanted it to go to John.  That he was

14   taking all of the risks and was the reason for the

15   success of the company.  And that was where the

16   course of this -- of the GRAT followed from that.

17        Q    At that point, when you hear this

18   information, which appears to be different than the

19   information you've had prior to this, correct, I

20   mean, in terms of her intentions on how to dispose

21   of her assets?

22        A    Correct.

23        Q    And you had not heard that before; is that

24   fair?

25        A    That is fair.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 81

1      Q   Okay.  At that point, did you ask

2   Mr. Middleton to leave so you could have a

3   discussion with Frances Middleton about her wishes?

4      **A   I did not.  I would -- I believe I did**

5   **have phone calls with her after that, too, with just**

6   **her.**

7      Q   Okay.

8         MR. MANNION:  Could you repeat that last

9      part?  I believe I did...

10        THE WITNESS:  I said I had conversations

11    -- phone conversations with Fran alone.

12        MR. MCMICHAEL:  After the meeting?

13        THE WITNESS:  After the meeting.

14        MR. MCMICHAEL:  Okay, yeah.  Don't

15    describe those conversations.

16        THE WITNESS:  I understand.

17   BY MR. DAVIS:

18      Q   Okay.  Any other conversation that's

19   within the confines of what we've been defining with

20   your lawyer that you can think of regarding Mrs.

21   Middleton's intentions?  And I don't want the phone

22   calls because those are not with John Middleton.

23      **A   We discussed, with John's presence,**

24   **whether, to the extent the GRAT was successful, the**

25   **remainder of her estate should then go exclusively**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO.  2:18-cv-02505-NIQA

Page 82

1      to Lucia and Anna and exclude John.  And she said,

2      no, let's see whether the tobacco company can be

3      successful.  She was very concerned because of her

4      husband about the litigation risks.

5          Q    Let me make sure I have some context to

6      understand what you're saying.  What you're -- what

7      I think you said, and correct me if I'm misstating

8      this, but what I think you're saying is that there

9      was a discussion that we're going to do a GRAT.

10             You suggested it would be one-third,

11     one-third, one-third?

12         A    Correct.

13         Q    To the three children?

14         A    To the extent it was successful.

15         Q    Of course.

16         A    We didn't...

17         Q    Absolutely.  I didn't -- I understand

18     that.  Yeah.  If -- technically, if it wasn't

19     successful, then the rules still apply and all that.

20     Okay, let's put that aside for just one second.

21     One-third, one-third, one-third.

22             She responds, no, I want it to go to

23     John because he's taking all the risk?

24         A    Correct.

25         Q    Okay.  And then at that same timeframe --

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 83

1      I think -- I take it it's the same conversation?

2          A    I think it's the same meeting.

3          Q    Okay, same meeting.

4               Who suggested then that the remainder

5      of her estate, other than -- I take it we're talking

6      about the Bradford stock is what we're discussing?

7          A    The expectation was that if it was

8      successful, only a piece of the Bradford stock would

9      get out of her estate.  And our expectation was that

10     we probably would have to, when she got shares back,

11     start afresh.  And our wildest dreams was it would

12     take three to five GRATs, so six to ten years to get

13     the stock out of her estate, and who knows if we

14     would be able to do that.

15              So my discussions with Fran where

16     John was present was to be consistent, would the

17     rest of her estate -- would the stock then -- the

18     idea would be that the stock would go to Fran -- to

19     John, but everything else would go to the girls.

20         Q    Okay.

21         A    And she said, no, that maybe down the line

22     if we see the tobacco company really is successful

23     and survives and all of that, then maybe she would

24     make changes, but she -- but we were doing new

25     revisions to her estate planning documents, and it

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 84

1      **was -- he remains a full beneficiary.**

2          Q    I see.  So what I -- what I think Frances

3      was telling you was that I'm not sure if giving John

4      all of this stock in Bradford is going to be as

5      valuable as --

6          **A    Of any value.**

7          Q    Of any value?

8          **A    Correct.**

9          Q    Because of the lawsuits?

10         **A    Correct.**

11         Q    Okay, let me -- let me -- you mentioned

12     something; I want to make sure I understand.

13             You said that you were -- at this

14     planning meeting, at least your understanding was is

15     that not all of the Bradford stock was going to be

16     -- all of Francis' Bradford stock was going to be

17     put into the GRAT; is that right?

18         **A    No.  A hundred percent -- well, she had**

19     **inherited shares by operation of law from her**

20     **husband.  All of his shares went to her by operation**

21     **of law.  They had been made joint tenants by**

22     **entireties prior to his death.  Every year, she made**

23     **annual exclusion gifts of the stock, I think just to**

24     **the grandchildren and not to her children, but I'm**

25     **not sure of that.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 85

1          But when we did the GRAT, we stripped

2    out annual exclusion gifts for each of the five

3    grandchildren.  And then 100 percent of her stock

4    that was left over was put into the GRAT.

5        Q    Okay.  I think I know, but I want to make

6    sure I'm not assuming anything.

7          What's the reason you said that you

8    would take a number of GRATs to -- explain that part

9    to me?

10       A    We didn't think there would be enough cash

11   flow from the company to distribute cash to satisfy

12   the annuity payments.  And we expected that as part

13   of the annuity payments, we'd have to return to Fran

14   shares of stock.  You couldn't borrow.

15          I mean, that's -- that's required

16   under -- so we couldn't have given her a note.  We

17   had to -- we -- if we -- to pay it, we would have to

18   use stock.

19       Q    Stock or dividends?

20       A    If -- to the extent there was cash flow

21   from the company, we were going to use that first.

22       Q    Okay.

23       A    To the extent there was a shortfall and we

24   owed her money because of the annuity payment was

25   not being satisfied with the existing cash, we would

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 86

1     **have had to distribute to her shares of stock.**

2          Q    And how do you value that stock at that

3     point?

4          **A    We'd get an appraisal.**

5          Q    A new one?

6          **A    A new appraisal.**

7          Q    And you can't use the old appraisal that

8     you initially transferred shares in?

9          **A    There it's a judgment call as to how stale**

10    **a tran -- it is.  I mean, my normal rule of thumb is**

11    **I try not to be over a year.**

12         Q    What makes a valuation stale?

13         **A    It's up to the IRS.  The whole issue is**

14    **value -- do they accept the valuation, and the**

15    **further it is from the current date, the more likely**

16    **they're going to challenge it.**

17         Q    Okay.  Change of circumstances also can

18    create a stale document or a stale valuation?

19         **A    I don't know what you mean.**

20         Q    For example, this is not this company, but

21    let's just say some tech company, you know,

22    initially puts stock in there, and, you know, some

23    valuator puts it at $50 a share.  And they hit a

24    home run with some app, or Facebook, or whatever,

25    and then all of the sudden it's, you know, within

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 87

1      six months from the time you put the GRAT in, it's

2      gone through the roof, the valuation, because of

3      change of circumstances.

4              That -- is that the type of thing,

5      maybe it's not a full year, but you would want a --

6      you would want to update the valuation?

7          **A   If there's something -- if there's**

8      **something dramatic, yes.**

9          Q   Yes, okay.  So this March 12, '99 entry

10     here?

11         **A   Which -- which March 12th?**

12         Q   Good point.  The one that says, GRAT for

13     Frances.

14         **A   Right.**

15         Q   Do you know if, at this time, a GRAT was

16     actually being drafted, the instrument itself?

17         **A   I don't recall.**

18         Q   Do you know if there were any drafts of

19     the instrument prior to 2/1 of '01 created by you or

20     your firm?

21         **A   I'm sure there must have been.  I don't**

22     **have them.**

23         Q   Why do you say there must have been?

24         **A   We would circulate drafts.  But here, we**

25     **have an oral trust.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 88

1      Q   I know, but hold on.  I want to understand

2   prior to the oral trust.

3      **A   Right.**

4      Q   I want to --

5      **A   This is -- first of all, I don't -- I'm**

6   **speculating, so that's a problem.  This could be a**

7   **GRAT that had the three-way split.  It could be.  I**

8   **may have come to that meeting with a draft document,**

9   **but I don't have a firm recollection of that.**

10     Q   Just in terms of your firm and maybe you

11  don't know the answer because this is technical

12  stuff, but, you know, things like that where an

13  attorney drafts something, but it's not executed, is

14  that maintained in a server somewhere or storage.

15          Do you know?

16     **A   I am not aware of that.**

17     Q   Okay.  As we sit here today, do you have

18  any firm memory of any written GRATs drafted prior

19  to 2/1/01?

20     **A   For?**

21     Q   For -- for Ms. Middleton?

22     **A   There -- there -- I -- there may well have**

23  **been.  I mean, this could be a reference to writing**

24  **a draft of a GRAT.  I just don't know.**

25     Q   At this timeframe, '99, I'm going to --

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 89

1     let me define that, '99 to '01, did your firm have

2     templates they would use for GRATs?

3         **A    Yes.**

4         Q    And is that something a paralegal could

5     call up and -- and fill in information?

6         **A    We did not use paralegals to do that.  We**

7     **-- lawyers did those.**

8         Q    All right.  How much time would it

9     generally take, and I'm talking generally, I'll get

10    specific about this particular GRAT, but just, in

11    general, a GRAT to draft calling up the template for

12    a lawyer to draft?

13        **A    The -- the essential terms of the GRAT**

14    **takes minutes.  The problem is to the extent**

15    **following the GRAT term what's happening to -- to**

16    **the remainder, if there is any remainder.  And**

17    **that's similar to doing someone's will or a basic**

18    **trust because that's very customized, and that could**

19    **take a long time.**

20        Q    Is the delay just the conversations with

21    the client, trying to ensure their wishes are met

22    through the GRAT?

23        **A    That's part of it.  The other is just that**

24    **we're extraordinarily busy, and sometimes it takes**

25    **time to turn things around.**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 90

1      Q    Okay.  Let me mark as -- what am I on, 45?

2                   - - -

3            (Exhibit 45 was marked for

4      identification.)

5                   - - -

6      BY MR. DAVIS:

7      Q    This is a document filed in Orphans' Court

8      on May 2, 2017.

9            And Item 4, I think you'll recall

10     this document; is that correct, Mr. Rosenfield?

11     **A    I don't specifically recall it, but I'm**

12     **sure I was involved with it.**

13     Q    Okay.  So let's -- I'm just going to kind

14     of walk through this because I think it's helpful

15     for our discussions.

16     **A    Okay.**

17     Q    I want to look at the second paragraph.

18     It starts, Beginning in 1999 and continuing to late

19     2000, grantor discussed with her son, John S.

20     Middleton, John, and her advisors, including her

21     estate planning attorney, Bruce A. Rosenfield,

22     Bruce, an inter vivos transfer of grantor's shares

23     in the company as part of her estate planning.

24     Those discussions focused on the use of grantor

25     retained annuity trusts, or GRATs, as a

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 91

1    tax-efficient way to accomplish the transfer.

2              Now, the question I have for you is,

3    within the confines of what your lawyer has

4    discussed you're permitted to discuss with me today,

5    was there any other conversations that you can

6    discuss with me?

7        A    What I said before is it's possible that

8    my discussions started in 1998, I just -- I don't

9    know.

10       Q    Okay.  But beyond -- so that's kind of a

11   technical correction that perhaps it was in 1998,

12   but your attorneys advised you that you cannot

13   discuss with me anything you just discussed with --

14   solely with Ms. Middleton, but you can discuss with

15   me any meetings or conversations where John

16   Middleton was a party to that conversation, or

17   perhaps a third party outside of Mr. Stein, who's

18   the family accountant.  And by third party, I mean

19   not a lawyer, someone -- someone else.

20           MR. MANNION:  Clarification, prior to

21       2/1/01.

22           MR. DAVIS:  Okay, correct, correct.  Prior

23       to 2/1/0/1.

24   BY MR. DAVIS:

25       Q    Anything else?  Any other conversations

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 92

1     that we have not already discussed that you -- you

2     can recall that meet those requirements?

3          **A    With respect to the GRAT?  I mean, I'm**

4     **sorry?  What are you...**

5          Q    Yeah, that's okay.  That's all right.

6               So with respect to these discussions

7     that are identified in this pleading here, it says,

8     Beginning in 1999 -- and you have a correction

9     there, it may be 1998 -- and continuing to late

10    2000, grantor -- and that is Frances S. Middleton as

11    defined here in this document -- discussed with her

12    son, John S. Middleton, and her advisors, including

13    her estate planning attorney, Bruce Rosenfield,

14    obviously you, the transfer of the shares, right,

15    and the GRAT.  So really, I'm focused on that

16    paragraph.

17         **A    I -- no, I think it's complete.**

18         Q    Okay.  And so no other discussions that

19    meet the criteria that your lawyers outlined you

20    have any other information about; is that right?

21         **A    That's correct.**

22         Q    Okay.  And next, it says, By December of

23    2000, grantor had confirmed that she would fund a

24    two-year GRAT using all of her company shares.

25               All right.  How did she confirm that?

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 93

1          **A    I think, under the parameters, I can't**

2     **answer that.**

3               MR. DAVIS:  Hmm.  Are you instructing him

4          not to answer?  And the reason I ask is because

5          this is a -- is a pleading with the court, with

6          Orphans' Court, identifying discussing the

7          history of this trust which affects Ms. Nupson?

8               MR. MCMICHAEL:  Yeah, okay.

9               MR. DAVIS:  So I --

10              MR. MCMICHAEL:  Give me a second.

11              MR. DAVIS:  Sure.  We're going to go off

12         the record.  The court reporter -- they just

13         announced we have five minutes left on

14         videotape, so it's a good time to take a break

15         if you guys need to talk, so.

16              THE VIDEOGRAPHER:  This is the end of DVD

17         No. 1 of the videotaped deposition of Bruce A.

18         Rosenfield.  The time is approximately 11:29.

19                    - - -

20              (Recess was taken from 11:29 a.m. to

21         11:33 a.m.)

22                    - - -

23              THE VIDEOGRAPHER:  This is the beginning

24         of DVD No. 2 of the video -- video deposition

25         of Bruce A. Rosenfield.  The time is

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 94

1        approximately 11:33.  We're on the record.

2    BY MR. DAVIS:

3        Q    Okay.  I think your attorney said that you

4    can address this question.  So -- so the question,

5    I'll just rephrase it, was really focused on that

6    first line of the third paragraph.  It says, By

7    December 2000, grantor had confirmed she would fund

8    a two-year GRAT using all of her company shares.

9            Explain that to me.  How did that

10   occur?

11       **A    I had a meeting with her, and she -- in**

12   **the later part of 2000, and she directed me to**

13   **effectuate the GRAT, assuming that her nieces were**

14   **bought out, which was expected to be happening on**

15   **February 1, 2001, which then allowed us to have a**

16   **very firm, independent transaction to -- to -- to**

17   **rely on for purposes of valuation.**

18           **So that -- so that November of the --**

19   **February 1, 2001 date was a critical date for us to**

20   **hit for the forming of the GRAT for valuation**

21   **purposes.  So she directed me and signed stock**

22   **powers to do it, but it was conditioned on the sale**

23   **to the cousins happening.**

24       Q    She executed stock powers that day?

25       **A    Yes.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 95

1       Q    And she would -- I mean, it was -- she --

2    throughout -- let me back up.

3              She had executed stock powers before,

4    right, for you?

5       A    Not for me.

6       Q    Not for you, okay.

7              Would generally a letter accompany

8    those stock powers to the company?

9       A    Generally?

10      Q    Yes.  Were you aware --

11      A    I wasn't involved with the previous stock

12   powers.

13      Q    Okay.  And the stock powers, were they

14   dated?

15      A    I don't think so.

16      Q    Did they identify who had the power, who

17   received the stock power?

18      A    Who received it?  I received it.  And I

19   was -- and I delivered it, I believe, the part that

20   I -- I don't remember if I delivered it to Larry

21   Laubach, or I delivered it to John Middleton.  But I

22   did deliver it to one of them.

23      Q    And when did you do that?

24      A    Immediately afterwards.

25      Q    Immediately after what?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO.  2:18-cv-02505-NIQA

Page 96

1      **A    The meeting with Fran.**

2      Q    The December 2000 meeting?

3      **A    Yeah.  It was either late November or**

4      **early December.  I don't -- I don't remember which.**

5      Q    Okay.  Did you draft any memorandums to

6      the file to document that meeting?

7      **A    No.**

8      Q    Did you draft a letter to Frances to

9      document her wishes?

10     **A    No.**

11     Q    Did you draft a letter to John Middleton

12     to document those wishes?

13     **A    No.**

14     Q    Did you inform Mr. Middleton of this

15     December or November 2002 meeting?

16     **A    I'm confident that I did.**

17     Q    Do you have any written documentation to

18     show this meeting?

19     **A    No.**

20     Q    Did you have e-mail at this time?

21     **A    I did have e-mail at this time.**

22     Q    I don't mean to be -- I'm not trying to

23     say anything.  I'm just -- it is -- you know, it's

24     around the timeframe that we're all starting to get

25     e-mail, so I just wanted to make sure you had

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 97

1     e-mail.  Okay.

2          **A    I had e-mail.**

3          Q    All right.  Do you know if there's an

4     e-mail to John or to Frances documenting her wishes?

5          **A    I -- at this point, I don't remember**

6     **e-mailing Fran at all.  I don't recall whether she**

7     **used e-mail, and I don't know whether there's an**

8     **e-mail to John.**

9          Q    All right.  So late November,

10    December 2000, you have your client's wishes to you

11    to create this GRAT.

12               And her intention at that point is,

13    what, to give all -- put all --

14         **A    Other than the annual exclusion gift to**

15    **her grandchildren, which was very important to her,**

16    **to give all of the remaining shares in trust to this**

17    **GRAT, to create the GRAT.  And very clear on the**

18    **terms of the -- the two year, and all of the**

19    **requirements.**

20         Q    And she verbally said all of this?

21         **A    Correct.  I mean, she and I went over the**

22    **requirements for the GRAT term.**

23         Q    Okay.  And so at this -- was it a physical

24    meeting or a telephone meeting?

25         **A    Physical meeting.  She signed the stock**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 98

1    powers.

2        Q    She signed the stock powers.

3        A    And the only reason it wasn't waiting

4    until January or February was, I believe, the

5    Phillies had started -- would be starting the spring

6    training practice.  And she was very, very active

7    with the Phillies and was down there to, you know --

8    and so she would not have been available.

9        Q    Okay.  So you have this direction from

10   your client and she announces all of the terms of

11   the trust in December or November?

12       A    All the terms about the GRAT provisions.

13       Q    The GRAT provisions, she announces them in

14   December or November; correct?

15       A    Correct.

16       Q    And you also understood that February 1st

17   of 2001 was an important date for valuation because

18   that was the expected date that the Floods, their

19   cousins, would settle; correct?

20       A    Correct.

21       Q    And at this time, do you start drafting

22   the GRAT?

23       A    I -- I don't recall when we started

24   drafting the GRAT.

25       Q    Would you expect that to be your habit,

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.        June 24, 2021
Bruce Rosenfield, Esq.                                               NO.  2:18-cv-02505-NIQA

Page 99

1    though, if a client directs you to create a GRAT to

2    actually draft it and write it?

3        **A    The problem here was John Middleton -- am**

4    **I --**

5          MR. MCMICHAEL:  You can describe what the

6    issue is, just don't --

7          THE WITNESS:  The issue was the absolute

8    terms of the -- following the GRAT period.

9    BY MR. DAVIS:

10       Q    I don't understand.

11       **A    Fran was relying on John, since at that**

12   **point, if we were at all successful, he would be**

13   **receiving the shares for his planning was somewhat**

14   **complicated, and she was relying on him to come up**

15   **with the terms.**

16       Q    Okay.  What terms are complicated?  I'm

17   trying to understand -- that's what I'm trying to

18   understand.

19            What terms from John's perspective

20   were complicated?

21          MR. MANNION:  Well, I'm going to assert on

22   John's behalf, if we're going to be getting

23   into discussions with John about the terms of

24   the trust following the GRAT period.

25          THE WITNESS:  That's what we would be

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 100

1     talking about.

2         MR. MCMICHAEL:  You can identify what the

3     issue was without referring to any

4     conversations.

5         THE WITNESS:  The issues were the terms of

6     the trust, what -- how -- what -- who would be

7     the trustees following the GRAT period and what

8     the rights were.

9    BY MR. DAVIS:

10    Q   I see.  All right.  Let me make sure I

11   understand.

12         So when you say "trust" in this

13   instance, you're talking about a trust for John

14   Middleton and his family?

15    **A**   **Correct.**

16    Q   Okay.  And this is so that they -- so that

17   there is a, for lack of a better word, something to

18   receive the shares?

19    **A**   **Correct.**

20    Q   After the completion of the GRAT period?

21    **A**   **Correct.**

22    Q   Well, that's two years down the line;

23   right?

24         Does that have to be --

25    **A**   **Yes.  Either -- I mean, it could have said**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 101

1       it goes outright to him.  The trust has to say what

2       the terms are.  The GRAT -- if the GRAT doesn't

3       provide for the terms following the annuity period,

4       then it's John creating the trust.  That's the

5       self-settled trust that you were alluding to before.

6       This is a third-party-settled trust, and so it's

7       important for those terms to be specified.

8          Q     Within the GRAT?

9          A     Correct.  It has nothing to do with the

10      GRAT term.  It's after a successful completion of

11      the GRAT.  It has nothing to do with Fran.  It has

12      to do with John.

13         Q     And the instrument -- I'm going to call it

14      that; if I'm butchering the language, just tell me.

15              The instrument that the shares are

16      going to go to after the termination of the GRAT has

17      to be fully functional and ready at that -- before

18      the GRAT can be drafted?

19         A     Yes.

20         Q     Why is that?

21         A     It's got to contain it.

22         Q     Okay.

23         A     I mean, if you have a will that's blank,

24      it's not very effective.

25         Q     At this time, were you -- so you received

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 102

1       these instructions November, December 2000.

2               We have this issue of we got to

3       create an instrument for John to receive?

4       **A   It's the same instrument.**

5       Q    Okay.  Same instrument?

6       **A   But just goes on following the GRAT term.**

7       Q    All right.  Was it -- and you just don't

8       recall whether it was -- the drafting had started in

9       that timeframe?

10      **A   That is correct.  I don't recall.**

11      Q    Next sentence, On or before February 1,

12      2001, grantor clearly and irrevocably made a gift of

13      shares in the company to a two-year GRAT.

14      **A   It should have said "on February 1, 2001."**

15      Q    Okay.  Tell me then, what happened?

16      **A   The GRAT had a condition precedent to**

17      **being funded, and that was the sale of the stock to**

18      **-- from the cousins.**

19      Q    So on February 1st, 2001, did Frances

20      Middleton clearly and irrevocably make a gift orally

21      to you?

22      **A   She made the gift the previous year with a**

23      **condition that it would be effective if the sale to**

24      **the cousins was -- was consummated.  The sale to the**

25      **cousins was consummated.  The GRAT became**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 103

1       **irrevocable on February 1. The transfer was made.**

2           Q    Did you, on February 1 or sometime

3       thereafter, make a memo to your file that this gift

4       was -- was made?

5           **A    I did not.**

6           Q    Did you, on February 1 of 2001 or shortly

7       thereafter, send any type of letter to Frances

8       documenting the gift?

9           **A    I did not.**

10          Q    Did you, on February 1, 2001 or shortly

11      thereafter, send a letter to John Middleton

12      documenting the gift?

13          **A    There was no need to, but no, I did not.**

14          Q    Okay. Did you notify him through a letter

15      or through an e-mail that he was trustee for the

16      trust?

17          **A    He knew he was trustee.**

18          Q    How did he know that?

19          **A    Through communication.**

20          Q    What type of communication?

21          **A    Discussions with his mother.**

22          Q    And how do you know that?

23          **A    I was at some of the meetings where the**

24      **GRAT was -- we're going to form the GRAT and you are**

25      **the trustee.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 104

1      Q    Tell me about those meetings.

2      **A    That was the meeting I was talking about**

3      **that.**

4      Q    This was what --

5      **A    No, not -- not the one with Fran alone,**

6      **the previous one where we -- we thought out what was**

7      **going to be the terms of the GRAT, the effectiveness**

8      **of it, who was the trustee, all of the required**

9      **pieces of it. But she was relying on John to come**

10     **up with the terms following the GRAT terms.**

11     Q    Okay. So on February 1st, 2001 -- and I

12     just want to make sure I understand because of the

13     way this is written, it seems a little bit different

14     than what you just explained to me.

15     **A    It's one word different.**

16     Q    My reading is a little bit different, and

17     I'll tell you why. Not just the one word, I

18     understand. The one word you're talking about is

19     the "or about"; correct?

20         MR. MCMICHAEL: Or before.

21         MR. DAVIS: Or before, sorry. Thank you

22         for the correction.

23     BY MR. DAVIS:

24     Q    But what -- the way I read this, and now,

25     I see I'm mistaken apparently, the way I read this

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 105

1  was that on February 1, 2001, grantor clearly and

2  irrevocably made a gift of her shares in the company

3  to a two-year GRAT. And I know what you're about to

4  say, but hold -- hold tight.

5           What I -- what I envisioned was is

6  that somehow she made that oral GRAT, I'm going to

7  call it right now, an oral GRAT, to you over the

8  telephone or at a meeting.

9           But that's not what occurred, is that

10  --

11    **A    That is not what occurred.**

12    Q    Okay. What -- the February 1, 2001 date

13  occurred because the cousins sold --

14    **A    Correct.**

15    Q    -- their stock?

16    **A    And that was the condition precedent for**

17  **the creation of the trust, that she had already put**

18  **in motion the previous year.**

19    Q    Okay. Did you explain to the cousins at

20  any time that this GRAT was formed independent --

21  and it was dependent on their sale?

22    **A    I have never -- I had no communications**

23  **with the cousins.**

24    Q    So have you ever spoken with Mr.

25  Thorkelson, for example?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.          June 24, 2021
Bruce Rosenfield, Esq.                                                  NO.  2:18-cv-02505-NIQA

Page 106

1      **A    Not at this timeframe.**

2      Q    Okay.

3      **A    Later on.**

4      Q    Thanks for the clarification.  Obviously,

5      you did.  Yeah, I know you did later on.  Next line

6      is -- and I'm just going to make sure I get my

7      timing right.  Grantor had signed stock powers and

8      directed transfer of her shares in the company.

9             And again, that occurred in the

10     meeting we discussed earlier, December or November

11     of 2000?

12     **A    Correct.**

13     Q    Okay.  So let's mark -- we'll mark Exhibit

14     46.

15                  - - -

16            (Exhibit 46 was marked for

17     identification.)

18                  - - -

19     BY MR. DAVIS:

20     Q    Just -- okay.  I've changed this a little

21     bit.  Hand this -- so what I'm marking as 46 is just

22     what I believe to be the stock powers executed.  I

23     am going to ask you some questions about that in

24     just a second, but let me see.

25            What I've marked as Exhibit 46 -- and

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 107

1    if you could, Mr. Rosenfield, I'm going to -- just

2    give me -- just bear with me.  Let me do some -- I

3    have marked Mediation Bates No. -- it says,

4    "Mediation," on the bottom right, guys, that's what

5    I'm referring to.  Mediation-90, 87, and I think

6    that is it.  There is one more.

7            If you could -- I'm sorry, Mr.

8    Rosenfield, will you just -- will you just

9    annunciate what Bates number's at the bottom right

10   of the document I gave you?

11   **A    It says, Mediation-87, 90, and 93.**

12   Q    Thank you.  All right.

13       MR. MCMICHAEL:  Okay.  Just hold on here

14   for a second because I'm looking at a different

15   document.

16       MR. DAVIS:  Let me tell you what I did, so

17   I -- we initially had these all together, and

18   so that's what I gave you.  And I'm going to

19   get to those stock certificates in just a

20   second.

21       MR. MCMICHAEL:  So -- okay, so this is not

22   -- this Exhibit A is not what you're marking?

23       MR. DAVIS:  No.

24       MR. MCMICHAEL:  Okay.  So hold on, let me

25   just -- so I have my record straight, standby.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 108

1          MR. DAVIS:  Yeah.

2          MR. MCMICHAEL:  Eighty-seven.  Okay, so

3      these documents have been marked 87, 90, 93.

4  BY MR. DAVIS:

5      Q    Here's -- here's what I what to ask, I

6  think we've got it together.

7            Is this the stock powers that you

8  referred to earlier in our discussion that was

9  signed by Frances?

10     **A    I believe so.**

11     Q    Okay.  How can we tell?  That's what I'm

12  trying to understand.

13            How do I know?

14     **A    One, it's her signature.  And it looks**

15  **like the form stock powers that we would have in our**

16  **department files.  So I would have grabbed them on**

17  **my way to the meeting.**

18     Q    Did you -- do you know if these stock

19  powers were attached to any stock certificates, for

20  example, stapled or, you know, somehow bound to

21  stock certificates?

22     **A    When I had her sign it, they were not.**

23     Q    Okay.

24     **A    They were just -- I had just taken these**

25  **with me.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 109

1      Q    Okay.  And then where did they go to from

2   there?

3      **A    As I said before, I either gave them to**

4   **Larry Laubach or to John Middleton directly, but I**

5   **would have hand-delivered them to one of them.**

6      Q    I'm going to show you something that I'll

7   mark as Exhibit 47.

8                - - -

9           (Exhibit 47 was marked for

10  identification.)

11               - - -

12  BY MR. DAVIS:

13     Q    This is Bates-numbered Mediation-984.

14     **A    Right.**

15     Q    And it's dated January 2nd, 2001.  And it

16  appears to be signed by Frances Middleton.

17          Is that her signature?

18     **A    Yes.**

19     Q    All right.  And this is -- for example, it

20  says, Dear Joanne, who is the assistant secretary at

21  Bradford Holdings?

22     **A    Correct.**

23     Q    Please transfer 48 shares of Bradford

24  Holdings -- Bradford Holdings, Inc., Class B

25  non-voting stock from my account to each of the

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 110

1    following.  And then it lists ten different people

2    all within the family.

3        **A    Correct.**

4        Q    You see that there?

5        **A    Uh-huh.**

6        Q    Is this -- do you know if you drafted this

7    letter for Ms. Middleton?

8        **A    I did not.**

9        Q    Okay, would you happen to know who did?

10       **A    I don't.**

11       Q    Okay.  I will tell you -- I'll represent

12   to you that -- here's another one, guys.  This seems

13   to be her custom, practice, and habit when she

14   transfers shares to different folks.  Let me mark as

15   Exhibit 48 another letter, dated December 19, 2000.

16                - - -

17              (Exhibit 48 was marked for

18   identification.)

19                - - -

20   BY MR. DAVIS:

21       Q    Same type of thing.

22              I think, and I'm guessing, you tell

23   me, do you think this was part of an estate-planning

24   transfer?

25       **A    Yes.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 111

1    Q   Okay.  Do you know if Ms. Middleton would

2   type up her own letterhead and letters like this, or

3   would that be done by a lawyer within your firm, for

4   example?

5   **A   One, to the best of my knowledge, I never**

6   **saw Fran typing anything.  And I'm relatively**

7   **comfortable that this didn't come from our office.**

8   Q   Okay.

9   **A   It would have been -- it would have come**

10   **pursuant to my suggestions.**

11   Q   I see.  It would have come from, for

12   example, Bradford Holdings, maybe Joanne drafted

13   this for Frances --

14   **A   Someone did.**

15   Q   Okay.

16   **A   These were the annual exclusion gifts that**

17   **I have been referring to.**

18   Q   Yeah, that's what I -- that's what I was

19   discussing.

20       And, for example, we don't have a

21   trans -- a transmittal letter like this with the

22   stock powers that you're aware of at all, do we?

23   **A   None -- none -- certainly none that I**

24   **prepared.**

25   Q   Okay.  Certainly, you could have prepared

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 112

1      something like this, right, with the stock powers to

2      transmit them to Larry Laubach?

3          **A    I'm capable of doing that.**

4          Q    Of course.

5              Is there a reason you didn't do that?

6          **A    I handed the certificate to them, the**

7      **stock powers.**

8          Q    Okay.

9          **A    I -- I didn't -- my job was never to**

10     **effectuate the actual stock.  That was either under**

11     **the control of John or Larry.**

12         Q    Okay.  Are you -- are you aware of

13     anything that either John or Larry did to identify

14     the transaction from -- the transmittal that you

15     effectuated with the stock powers?

16         **A    The stock -- the stock should have, on**

17     **February 1, been transferred to John, as trustee of**

18     **the GRAT.  Whether that was done, I have no idea.**

19     **Actually, I do know it wasn't done because we found**

20     **out later that year, I think, in discussions with**

21     **John Stein, and it was supposed to have been done.**

22     **Then, it was supposed to have been corrected.**

23         Q    Did you learn why it wasn't done?

24         **A    No.**

25         Q    All right.  So the next line says,

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 113

1      Consistent with --

2          **A   I'm sorry, are we back on 45?**

3          Q    We are.  Thank you.  Sorry about that.  So

4      the next line, third paragraph, one, two, three,

5      four -- fourth line, it says -- starts, Consistent

6      with those directions.

7                    Are you there?

8          **A   I'm there.**

9          Q    Okay.  Consistent with those directions

10     and as recorded in the company stock register on

11     February 1, 2001.

12                    As we just discussed, that was

13     actually not recorded; is that right?

14         **A   To the best of my knowledge, it was not**

15     **recorded then.**

16         Q    Okay.  Grantor's shares in the company

17     were --

18         **A   But I had believed it had been.**

19         Q    Okay, all right.

20                    But by March 2, 2017, you knew that

21     was not the case; right?

22         **A   By March 2, 2019?**

23         Q    2017.

24                    MR. MANNION:  I'm sorry, what was the

25     question that he knew by March?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 114

1      MR. DAVIS:  That he knew the stock

2   register of the company was -- the stock

3   transfer was not recorded in the stock

4   register?

5      THE WITNESS:  Correct.  By then, I knew.

6   BY MR. DAVIS:

7   Q   By then, you knew.

8      When did you learn?

9   **A   Sometime around then.  And we saw some**

10  **e-mails or something before that, and it was**

11  **supposed to have been corrected.**

12  Q   Okay.  In your mind, who was responsible

13  for making the transfers in the stock register, if

14  you know?

15  **A   Either Larry Laubach, or John Middleton,**

16  **or his assistant, Joanne.**

17  Q   Okay.  Then you -- the next line says,

18  Grantor shares in the company were transferred to

19  John as trustee of the GRAT.

20     Do you see that there?

21  **A   Yes.**

22  Q   All right.  To your understanding, and I

23  don't know if you know the answer to this question,

24  at that point, who has ownership of those shares?

25  **A   Well, there's different types of**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 115

1      ownership.

2          Q    Yeah, that's -- okay.

3              Describe that.

4          A    The trustee was the equitable -- was the

5      person who -- the title of the shares were in John,

6      as trustee's name, on February 1, 2001.

7          Q    Okay.  And so what about documents for the

8      IRS, and maybe specific as to this particular

9      document.

10             But for the IRS's purposes, who would

11     -- who would need to sign as the owner of a

12     particular share?

13         A    John would sign as trustee.  He was the

14     trustee of the January 1 -- I'm sorry, February 1,

15     2001 trust, as of February 1, 2001.

16         Q    Okay.  Would Frances need to sign anything

17     for the IRS?

18         A    She would have to sign a gift tax return

19     that would have been due by October 15, 2022.

20         Q    What about an s-selection?

21             Would she be considered an owner for

22     s-selection?

23         A    It depends on --

24             MR. MCMICHAEL:  2002?

25             THE WITNESS:  2002.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 116

1          MR. MCMICHAEL:  You said 2022.

2          THE WITNESS:  What's two decades?  2002.

3          MR. MCMICHAEL:  Just want to make sure the

4     record is clear.

5          THE WITNESS:  Thank you.  It depends on

6     whether a -- the election -- well, first of

7     all, because it was a grantor trust, the

8     grantor trust doesn't have to sign an

9     s-selection, that's as if -- under the rules

10    for S corporations, that's the same as an

11    individual and a grantor.

12         So you don't have to make any sort of an

13    s-selection for -- for those -- for the -- for

14    the grantor trust.

15   BY MR. DAVIS:

16    Q    All right.  But who would be considered

17   the shareholder for purposes of an s-selection?

18    **A    It's a grantor trust.  So she is -- it's a**

19   **disregarded entity for IRS purposes.**

20    Q    That's what I'm trying to get at, all

21   right.

22              And so it wouldn't be John as

23   trustee?

24    **A    He would sign the tax returns.  John would**

25   **sign the tax returns.  All of the -- and the tax**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 117

1    **return would show all income consequences passing**

2    **out to Fran as a grantor.**

3        Q    Okay.  So you were aware that the

4    effective date for the s-selection was February 1,

5    2001?  I'm looking at the next line on your --

6        A    I was.

7        Q    Okay.  And you would -- we touched on this

8    a little bit earlier, but the significance of

9    February 1, 2001 from a tax-planning, I think,

10   perspective, I just want to make sure I'm

11   understanding, is that we had a sale of shares?

12       A    An arm's length sale, yes.

13       Q    Okay.  We'll get to an arm's length sale

14   in just a second.  I want to put that aside for a

15   second, but we had a sale.  I'm going to just call

16   it that.  And we also had the s-selection.

17             Now, why is the s-selection

18   significant?

19       A    The s-selection would not have been made

20   had the cousins not been bought out.

21       Q    Tell me why.

22          MR. MANNION:  Hang on a second.  Let's go

23   off the record.

24          THE VIDEOGRAPHER:  12:06, off the record.

25                - - -

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 118

1          (Recess was taken from 12:06 p.m. to

2     12:16 p.m.)

3                - - -

4          THE VIDEOGRAPHER: 12:16, back on the

5     record.

6     BY MR. DAVIS:

7          Q    Okay. Mr. Rosenfield, we've had an

8     off-record discussion regarding the last series of

9     questions related to s-selection I've -- I've been

10    asking you. I don't want to -- if you have

11    information that you obtained from Bradford

12    representatives or from Schnader corporate

13    attorneys, I don't necessarily want that

14    information.

15          What I'm asking really is in this

16    public document here, Item 4, History of Trust, that

17    was filed in Orphans' Court on May 2nd, 2017, there

18    is a discussion regarding the GRAT and its effective

19    date of February 2001.

20          And what you say -- I don't believe

21    you say this, but what it says, February 1, 2001 was

22    a significant date, as it was also intended to be

23    the effective date of the company's redemption of

24    all shares held by the families of Herbert

25    Middleton's sister. Okay. You explained to me why

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 119

1    that was significant.

2           Then the next line, I'm trying to

3    understand the tie in here.  And it was the

4    effective date of the company's conversion to an S

5    corporation.

6           And my question to you is, what's

7    significant about that to the GRAT, if anything?

8      **A    It's possible, depending on the current**

9    **earnings of the company that it bypassed a layer of**

10   **taxation and allowed additional cash flow to come to**

11   **all of the shareholders at less of a tax cost.  And**

12   **if so, that helped in allowing the GRAT to be**

13   **successful.**

14     Q    Any other reason, in your mind, that

15   that's significant?

16     **A    No.  I mean, it was good tax planning.**

17     Q    Okay.  And an s-selection also can raise

18   the value of companies; right?

19     **A    I'm not aware of that.**

20     Q    All right.  So you -- you're not aware

21   that when you bypass one layer of corporate taxation

22   that that can be increased value --

23     **A    Depends on the company.  It's company by**

24   **company, depending on practices within the company**

25   **and whether or not -- I mean, if the company has a**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 120

1    **history of declaring dividends, it's more effective**

2    **to be an s-selection, to be an S.  If it's not,**

3    **you're relying on significant dividends, then C --**

4    **depending on the relative tax rates, C might be**

5    **better.**

6        Q    What about in 2001 timeframe?

7        **A    I -- I don't remember what the respective**

8    **rates were.**

9        Q    Okay.  They were higher then, is my

10   understanding, than they are now?

11       **A    It's differ -- differentiation between the**

12   **corporate rate and the individual rate, and that's**

13   **what I don't remember.**

14       Q    I see.  So -- and I'm just -- forgive me

15   if this is -- I'm just confirming.

16            But my understanding of what you

17   described so far is that by February 1 of 2001, John

18   understood that he was a trustee to this GRAT;

19   correct?

20       **A    He was the trustee as of that date.**

21       Q    Yes.  And he understood he was going to be

22   the recipient of all of his mother's shares that

23   were in the GRAT?

24       **A    No, he didn't.**

25       Q    He didn't?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 121

1      **A**   **Because it all could have gone back to**

2  **Fran. We've talked about this many times.**

3      Q   I see -- I see what you're saying. Okay,

4  let me just -- I want to make sure of that, okay.

5          So in other words, if the GRAT was --

6      **A**   **To the extent the GRAT was successful, he**

7  **would be the recipient of the remaining shares.**

8      Q   Okay, okay. Next paragraph, Over the next

9  several months, Bruce prepared and forwarded

10  confirmatory trust documents for review by grantor

11  and John.

12          How would those have been forwarded,

13  first of all?

14      **A**   **Either by mail, or by e-mail, or by**

15  **personal delivery.**

16      Q   Okay. Do you know if there were -- how

17  many drafts there were, first of all?

18      **A**   **I don't recall that.**

19      Q   Do you know if there were any significant

20  changes?

21      **A**   **To the GRAT term, there were no changes.**

22      Q   Okay.

23      **A**   **Never a change to the GRAT term.**

24      Q   Okay. And the term, you mean the two-year

25  term?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 122

1      **A    All the provisions relating to the annuity**

2      **payments, they've never changed.**

3      Q    What changed?

4           MR. MANNION:  Objection to the extent that

5      it calls for privilege information about what

6      Mr. Middleton was directing with respect to the

7      terms after the end of the GRAT.

8           THE WITNESS:  Then I can't respond to the

9      question.

10          MR. DAVIS:  And that --

11          MR. MCMICHAEL:  Wait a second.  Just hold

12     on one second.

13          MR. DAVIS:  Okay.

14          MR. MCMICHAEL:  Okay.  Mr. Rosenfield, you

15     can say -- oops, thank you.  In response to

16     Mr. Davis' question, you can say generically

17     what part of the trust changed, i.e., like the

18     remainder terms.  But you can't say how they

19     changed, or who told you to change them, or

20     anything like that.

21          Okay?

22          THE WITNESS:  Okay.

23          MR. MCMICHAEL:  All right.  So you can

24     answer the question to that extent.

25          THE WITNESS:  The remainder terms were

Page 123

1    changed.  But I just want to be clear, at no

2    time did any -- there wasn't a change in any

3    particular way, in any way whatsoever, to the

4    terms of the GRAT and annuity terms.  They were

5    locked in and didn't change.

6    BY MR. DAVIS:

7        Q    And so if John Middleton would ask you,

8    what happens if the GRAT's successful and payments

9    are made, then you tell him it's his stock; right?

10            MR. MANNION:  Objection.

11            MR. DAVIS:  Whatever remainders, the type

12       of arrangement he has; correct?

13            MR. MCMICHAEL:  Well, I object that it's a

14       hypothetical question.

15            MR. MANNION:  There is an objection to the

16       extent it's not hypothetical, and it's an

17       actual question.

18            MR. MCMICHAEL:  Well, there's a privilege

19       objection, as well so.

20    BY MR. DAVIS:

21       Q    Hold on.  I'm asking a very -- at a

22    specific timeframe here.

23            In early 2001, after 2/1/01, if John

24    Middleton, as a trustee for this GRAT and as the

25    recipient of the shares of Frances Middleton if the

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 124

1      GRAT's successful, if he were to ask you about

2      getting shares from his mother, you would tell him

3      he's got the shares; right?

4             MR. MANNION:  Objection.

5             MR. DAVIS:  If we -- if the GRAT's

6      successful?  Go ahead.

7             MR. MANNION:  Objection.  First of all,

8      it's a hypothetical.  Second of all, we object

9      on two grounds.  First of all, as of 2/1/01,

10     John is the trustee of that trust.  He's

11     represented by Mr. Rosenfield.  There is a

12     privilege.

13        So to the extent he was asking in his

14     capacity as trustee, that's a privileged

15     communication.  And to the extent he was asking

16     about something impacting him individually,

17     that is also a privileged conversation.

18            MR. MCMICHAEL:  Yes.  I renew my objection

19     that the question is hypothetical, and I don't

20     think you can evade the attorney-client

21     privilege by asking that question on a

22     hypothetical form.  So I want to direct the

23     witness not to answer.

24     BY MR. DAVIS:

25        Q    Okay.  If the GRAT's successful, would

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 125

1    Frances have any shares of Bradford?

2    **A    It depends how successful the GRAT was.**

3    Q    A hundred percent?

4    **A    If it was a hundred percent successful,**

5    **she would have had no shares.**

6                   **- - -**

7                   **(Exhibit 49 was marked for**

8    **identification.)**

9                   **- - -**

10    MR. DAVIS:  Mark as Exhibit 49 an e-mail,

11    I think the Bates number is --

12    MR. MCMICHAEL:  Cut off.

13    MR. DAVIS:  -- cut off.  But I think

14    it's -- oh, yeah, BHICOZ027092, which is an

15    e-mail between Mr. Rosenfield and John

16    Middleton, I believe.

17    Is that John Middleton's e-mail there?

18    THE WITNESS:  Yes.

19    BY MR. DAVIS:

20    Q    And the date of this e-mail is 3/10/2001;

21    correct?

22    **A    Correct.**

23    Q    This is after the formation of the GRAT;

24    correct?

25    **A    Correct.**

Page 126

1      Q    And the subject is, Additional

2   Redemptions.

3            Do you see that there?

4      **A    Correct.**

5      Q    All right.  So let's go -- I want to start

6   at the bottom because I think it's -- if you look at

7   the time, I believe Mr. Middleton sends you an

8   e-mail first?

9      **A    Correct.**

10     Q    All right.  Saturday, March 10, 8:59 a.m.,

11  I believe.  It starts, Bruce, on and off for the

12  last --

13         MR. SMITH:  Wait.  I'm just taking a

14      moment to look at this document.  This may have

15      been inadvertently produced.  Could you just

16      give me a moment to confer with Ms. Ward?  She

17      is the person who is responsible for this.

18         MR. MCMICHAEL:  Well --

19         MR. SMITH:  I'm sorry, oversight of the

20      production, not responsible for this.  That

21      sounds accusatory.  Just give me one second,

22      all right.

23         MR. DAVIS:  Okay.

24         MR. SMITH:  I'll make sure you get

25      whatever time back on the clock this costs you.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 127

1        MR. DAVIS:  All right.  Let's go off the

2    record.

3        THE VIDEOGRAPHER:  12:29 off the record.

4                - - -

5        (Recess was taken from 12:29 p.m. to

6    12:31 p.m.)

7                - - -

8        THE VIDEOGRAPHER:  12:31, back on the

9    record.

10       MR. MCMICHAEL:  Okay.  With respect to

11   Exhibit 49, there's no privilege issue.  So you

12   can proceed with whatever questions you have on

13   this document.  With respect to Exhibit 45,

14   while we were off the record, the witness

15   advised me that he believes his testimony was

16   incorrect with respect to one aspect of your

17   questioning about the timing of when things

18   were recorded on the company books.  So if you

19   want to go back and clean that up, you can.  If

20   not, at some point, I will.

21   BY MR. DAVIS:

22       Q    Okay.  Well, I'll -- sure, what's the

23   issue?

24       **A    I think I was confused with another,**

25   **totally unrelated trust, and I -- I am unware that**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 128

1      the stock was not recorded on the company books, as

2      transferring on February 1, 2001.

3          Q   So do you believe it did transfer on

4      February 1, 2001 in the company's books?

5          A   I -- it was supposed to have transferred

6      on the company books on that date.  I have no

7      independent knowledge one way or the other of

8      whether that happened.  I had assumed it did.

9          Q   I don't have it with me, but I think you

10     verified this rider, Rider 1.

11             And I don't have the verification

12     with me, so I'll see if I can locate that at lunch,

13     but do you know -- and I didn't ask you these types

14     of questions, but is this -- are these your words?

15         A   Well, they're not my words, but second, I

16     don't think that's what it says.

17         Q   Okay.

18         A   That as -- I think it's saying as recorded

19     on the stock register, which it was recorded, that

20     on February 1, grantor shares were transferred to

21     John.

22         Q   Okay.

23         A   The shares, regardless of when they were

24     recorded on the company's books, were transferred to

25     John, as trustee.  It would have been -- it should

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 129

1     **have been done on the company's books, but that was**

2     **not a requirement to be transferred.**

3          Q    All right.  Exhibit 45, did you draft

4     this?

5          **A    I did not.**

6          Q    Do you know who did?

7          **A    I think Roberta Barsotti in our law firm.**

8          Q    Okay.  And did you review this?

9          **A    I did.**

10         Q    For accuracy?

11         **A    Yes.  And I've already pointed out one**

12    **error.**

13         Q    I understand.  And that happens; errors

14    happen in documents, I get that.  Okay.

15              But you approved of this before

16    filing?

17         **A    I did.**

18         Q    Okay.  Let's go back to 49.

19         **A    Okay.**

20         Q    So the very bottom, it says, Bruce, on and

21    off for the last few months, I have wondered whether

22    it would be worthwhile to make the same offer to my

23    sisters that we have to my cousins.

24              Do you believe that Mr. Middleton

25    there is referring to the redemption that just

Page 130

1    occurred with his cousins?

2    **A   Correct.**

3    Q   The problem I keep stumbling over is

4    exactly what is the benefit given that my mother

5    will eventually -- when my mother eventually dies,

6    they will receive more stock?

7        Do you see that there?

8    **A   Right.**

9    Q   Okay.  Your thoughts, let's go to your

10    thoughts.  Several quick thoughts, first to take

11    them out now removes the problem down the line that

12    we have finally solved with your cousins.

13        What problem are you referring to?

14    **A   Herb was consumed with the fear that his**

15    **sister and her children would try to interfere with**

16    **the operations of the company.  And it -- it kept**

17    **certain transactions from happening and -- and**

18    **forever we had discussions on whether to buy them**

19    **out.**

20    MR. MANNION:  I think this has got to be

21    privileged communications with Herb.  So we

22    object.

23    MR. MCMICHAEL:  Do you object to the --

24    MR. MANNION:  John as executor of Herb.

25    MR. MCMICHAEL:  So just to explore, Mr.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 131

1          Rosenfield, you have made a statement.

2              Is that statement something that you

3          learned from discussions with Herb or something

4          that you generally just understood?

5              THE WITNESS:  I learned from discussions

6          with Herb.

7              MR. MCMICHAEL:  Okay.  Then there is a

8          privilege, so.

9              MR. DAVIS:  All right.

10             MR. MCMICHAEL:  So let's be clear on the

11         record.  We're asserting -- and I accept the

12         witness has answered the question, but we are

13         asserting attorney-client privilege with

14         respect to that answer.

15     BY MR. DAVIS:

16         Q    Okay.  The next line is, It also serves to

17         get money to them now, removing risk from them,

18         paren, but takes away upside from them, close paren.

19         With respect to your mom, during our last meeting my

20         thought -- my thought, she was leaning to make no

21         further benefit to Anna under her will.  It wouldn't

22         be that much of a stretch to say she would give you

23         stock, and then the rest, or something like that --

24         that's in parentheses, sorry.  We will be addressing

25         that sooner or later -- sooner than later if we get

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 132

1    together on gifting.

2            All right, gifting is referring to a

3    GRAT; correct?

4        **A    No.  Gifting is referring to the shares**

5    **that she would have received back from this GRAT in**

6    **order to satisfy the annuity payments to her.**

7        Q    Well, if it's unsuccessful; right?

8        **A    We, at this point, thought it would not be**

9    **totally successful.  This was right after we started**

10   **the GRAT.  We expected her to get back two-thirds of**

11   **the stock.**

12       Q    Anywhere in this e-mail -- and please read

13   it -- do you say what you just said that -- I'm

14   sorry, that -- let me be specific about my question.

15           Anywhere in this e-mail, do you tell

16   Mr. Middleton that if the GRAT's successful, he

17   receives all of the stock?

18       **A    We were on the same page.  We all expected**

19   **Fran to get back a vast majority of the stock she**

20   **contributed in this GRAT.  We were then discussing**

21   **what to do with the additional shares she would**

22   **have.**

23       Q    I don't think you necessarily -- the

24   answer to my question is no, right?  There's nothing

25   in here, in this e-mail, that says --

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 133

1       A    The answer was there's no need for me to
2   have said anything like that because John knew that
3   better than I did.
4       Q    Okay.  Is there any document that you can
5   provide me that shows that understanding, that
6   Frances was going to be returned two-thirds of the
7   stock?
8       A    I don't have anything in front of me.  I
9   think projections by John Stein show that, and those
10  would have been shared with her.
11      Q    All right.  How would, in a gifting
12  program, Frances receive money?
13      A    In the current GRAT, she was getting all
14  the cash flow that the company could make with
15  respect to these shares.  And those, to the extent
16  -- so in essence, some of her shares were being
17  redeemed by the company, and that's technically what
18  -- what was in her mind.
19          So she's getting some significant
20  cash flow, but it depended on the success of the
21  company.  Otherwise, she would be getting stock.
22      Q    Next paragraph, it says, In this regard,
23  if there is enough assets we are talking about --
24  talking about cashing out lots of her stock through
25  gifting -- through the gifting program.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

1           I'm assuming the gifting program

2    there is referring to the GRAT you just discussed;

3    right?

4        **A    Correct.**

5        Q    All right.  So when I asked you earlier

6    about the last line, you said -- the last line was,

7    We will be addressing that sooner than later if we

8    ever get together on gifting.

9        **A    Correct.**

10       Q    And that gifting, you're referring to the

11   GRAT; right?

12       **A    No.  That -- that's not -- first of all,**

13   **I'm doing this on my BlackBerry, Saturday at 2:58 in**

14   **the afternoon.  Who knows how many other e-mails**

15   **where I'm visiting with clients and I have a very**

16   **short time between, but yeah, so my grammar -- I'm**

17   **mixing up discussions.**

18           **In the first paragraph, I'm jumping**

19   **from the cousins to his sisters back and forth.  And**

20   **I'm not -- this is not something I'm proofreading**

21   **and all of that.  The gifting program, the issue of**

22   **further gifting is not this existing GRAT.  It is**

23   **the shares she receives back from the gift, the**

24   **original -- from our -- the current GRAT, to the**

25   **extent they -- she gets shares back because we don't**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 135

1    have enough cash flow to make the full annuity

2    payment.

3              It was everyone's expectation, and

4    John was totally aware of that, that we expected a

5    significant number of shares to be returned to Fran,

6    as paying -- satisfying her annuity payments in

7    connection with this GRAT.

8              So the further gifting was what are

9    we doing, what is Frances doing with the additional

10   shares that she is now receiving back to fulfill her

11   annuity payments?

12   Q    So you state, If there are enough assets,

13   we're talking about cashing out lots of her stock

14   through the gifting program.

15             Again, I think you said that one

16   refers to the GRAT, that gifting program --

17   A    The current GRAT.

18   Q    The paragraph just before it, that gifting

19   program does not refer to the current GRAT?

20   A    That is correct.

21   Q    Okay.  Of course, you don't say GRAT in

22   here anywhere, but regardless --

23   A    I don't, but.

24   Q    Okay.

25   A    Nevermind.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 136

1     Q   All right.  When you say "enough assets,"

2  you're talking about a distribution; correct?

3     **A**  **From the GRAT.**

4     Q   From the GRAT.  And you're talking about

5  whether Bradford is going to have enough cash on

6  hand to make a dividend payment; correct?

7     **A**  **It's not a dividend payment.  Make a**

8  **distribution.**

9     Q   Make a distribution, fair.  Okay.

10       And if there's enough cash, then

11  there's going to be cashing out her stock

12  essentially; right?

13     **A**  **I think we're talking -- yes.**

14     Q   Okay.  The next line says, she will be

15  getting cash in stead, which would help in overall

16  program of getting non-company assets to your

17  sisters.

18       What program is that?

19     **A**  **I was having discussions -- well, I can't**

20  **answer that.**

21     Q   Why not?

22     **A**  **It was discussions I had directly with**

23  **Fran.**

24     Q   So the gifting in the third paragraph is

25  not a GRAT, but the gifting in the fourth paragraph

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 137

1    is a GRAT.

2              Is that what you're saying?

3        **A    Let me just make sure I'm on the right**

4    **page.  So the third paragraph, in reference to, If**

5    **we ever get together on gifting, refers to the**

6    **shares that come back to her from the existing GRAT.**

7    **The, She will be getting cash in stead, is a**

8    **reference to the current GRAT.**

9        Q    Okay.  So February 1, 2001, the -- I'm

10   going to call it the oral GRAT; you can call it the

11   GRAT, that's fine -- is effective; correct?

12       **A    Yes.**

13       Q    And at that point, you transfer 50 --

14   approximately $52 million worth of stock into a

15   trust; right?

16       **A    I don't remember the number.  It was all**

17   **of her remaining shares.**

18       Q    All right.  I'll tell you it's roughly

19   $52 million.

20       **A    Okay.**

21       Q    Just for our purposes.

22       **A    Okay.**

23       Q    And that is not documented anywhere in

24   writing?

25       **A    If I am correct that the shares**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.      June 24, 2021
Bruce Rosenfield, Esq.                                        NO.  2:18-cv-02505-NIQA

Page 138

1      transferred on the company books, that's

2      documentation itself.

3          Q    Did anyone get a copy of those company

4      books at that time?

5               Do you know?

6          A    I have no idea.  I never would have.

7          Q    All right.  You didn't send a transmittal

8      letter to Frances saying, Congrats, your cousin's

9      sold; 52 million has been moved into the trust?

10         A    I did not.

11         Q    You didn't send a letter or an e-mail to

12     John saying, Congrats, if we're successful, you're

13     going to have all of your mother's stock, valued at

14     $52 million?

15         A    I didn't, but no one thought he would do

16     -- I mean, that's -- no one thought that was

17     happening.

18         Q    And no one thought that was happening

19     because why?

20         A    Because we wouldn't have distributions

21     from the company to allow the -- to allow the

22     annuity payments to be made just in cash.  We

23     were -- everyone expected that there would be

24     significant stock, company stock, going back to Fran

25     to satisfy her annuity payments.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 139

1     Q    Have you ever moved $52 million from a

2   person to a trust without any documentation before?

3     **A    We had --**

4          MR. MCMICHAEL:  Objection.  Hold on, hold

5      on.  That misstates the record.  He said that

6      there was documentation.

7   BY MR. DAVIS:

8     Q    Beyond the stock book, the register,

9   beyond that, have you ever done this before

10   $52 million worth of assets to a trust without an

11   actual written instrument --

12     **A    No.**

13     Q    -- at the time?  Okay.  Let's -- let's

14   break for lunch.

15          MR. MCMICHAEL:  Okay.

16          THE VIDEOGRAPHER:  12:48, off the record.

17                - - -

18          (Recess was taken from 12:48 p.m. to

19   1:49 p.m.)

20                - - -

21          THE VIDEOGRAPHER:  1:49, we are back on

22      the record.

23   BY MR. DAVIS:

24     Q    We ended, I think, before our lunch break,

25   I was discussing transactions you've done without a

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 140

1    written instrument.

2            Do you recall that discussion?

3        **A   Yes.**

4        Q    And I think you previously testified that

5    you've done two or three oral trusts throughout your

6    career; is that fair?

7        **A   That's fair.**

8        Q    All right.  And what is the largest asset

9    transfer in those two or three oral trusts that

10   you've had?

11       **A   I think the other one may have been**

12   **larger, but this was maybe comparable.**

13       Q    I believe you testified at the very end

14   before we broke for lunch, this was -- you've never

15   done this large of a transfer?

16       **A   By an oral --**

17       Q    Trust?

18       **A   -- trust.**

19       Q    Yeah.

20       **A   I have done several bigger transfers.**

21       Q    But with written trusts?

22       **A   Yes.**

23       Q    Okay.  Have you ever created an oral GRAT

24   before?

25       **A   This was the first time I've done an oral**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 141

1    **GRAT.**

2        Q    Did you do any research to determine

3    whether an oral GRAT is permissible under the IRS

4    regulations?

5        **A    I was of the opinion it was permissible.**

6        Q    When did you do that research?

7        **A    At -- I'm pretty familiar with**

8    **Pennsylvania law and federal law.  And I'm pretty**

9    **familiar with the requirements for a GRAT.**

10        Q    Okay.  Earlier you testified as to what

11    was required to create a GRAT?

12        **A    Yes.**

13        Q    I think you recall that testimony.  Is

14    it -- I want to kind of make sure I'm using the

15    right language here.  When you have a GRAT -- and

16    I'm going to butcher all of your language, but you

17    fix it for me.  So we put an asset into the GRAT.

18    At the end of the term, if the GRAT's successful as

19    you point out, then the asset then is transferred to

20    another party.

21            What do we call that party?

22        **A    First of all, the -- it's only to the**

23    **extent the GRAT is successful that whatever's**

24    **remaining in the GRAT after the annuity payment**

25    **passes on, it's the remainder people.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 142

1      Q    The remainder people, okay.

2            And so do you have to know the

3    remainder people at the time of the creation of the

4    GRAT?

5      **A   Yes.**

6      Q    All right.  And is it -- in that remainder

7    people -- is that then the sub trust?

8      **A   I don't know what a sub trust is.**

9      Q    I'm using the wrong language then clearly.

10           Can the remainder people be a trust,

11   another trust?

12     **A   Yes.**

13     Q    Okay.  And clearly, it could be just

14   individuals; correct?

15     **A   Correct.**

16     Q    But you have to have that identity clear

17   at the time of the creation of the GRAT; correct?

18     **A   There's really two pieces to be effective**

19   **for the GRAT.  You really don't, but -- but the**

20   **instrument has to include it all.**

21           THE REPORTER:  Has to include?

22           THE WITNESS:  It all.  I'm sorry.  I'm

23   sorry.

24   BY MR. DAVIS:

25     Q    Okay.  But at the time of the creation of

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 143

1     the GRAT, my understanding was is we need to know

2     the identity of the remainder people; correct?

3     **A  Yes.**

4     Q   And that has to be either documented in

5     the written instrument or, as in this case, the oral

6     instrument?

7     **A  Yes.**

8     Q   Okay.

9        MR. MCMICHAEL:  Hold on one second.

10        (Discussion was held off the record.)

11 BY MR. DAVIS:

12     Q   So here's what I'm struggling with.  We

13     just discussed the terms of the trust must be

14     announced if you're going to do an oral trust, an

15     oral GRAT.

16     **A  Uh-huh.**

17     Q   And essentially, all of the essential

18     terms to the GRAT, I take it, and -- including a

19     remainderman, so what is -- what term do you not

20     know that can't be drafted as of December 2000 or

21     November 2000?

22     **A  I think those are matters I'm not allowed**

23     **to answer.**

24     Q   Why not?

25     **A  Because --**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 144

1           MR. MCMICHAEL:  You can -- you can

2       describe what you didn't know that you needed

3       to know before you could draft a GRAT.  You can

4       do that without referring to any privileged

5       conversations.

6           THE WITNESS:  There were some technical

7       terms with respect to the trust that would be

8       created under the GRAT document following the

9       annuity payments to Fran.

10      BY MR. DAVIS:

11          Q    The technical trust, that's for so -- so

12      the annuity payments are going to be made into

13      another trust?

14          **A    The annuity payments went to Fran.**

15          Q    Okay.  Individually?

16          **A    Correct.  Outright individually.**

17          Q    So that's not what you're referring to?

18          **A    That is not what I'm referring to.**

19          Q    You're referring to the remainderman?

20          **A    Correct.**

21          Q    Let's take a look at Exhibit 15.  Just for

22      the record, this is BHIMISC-40 through 61.  And this

23      is what I've been referring to as GRAT 1; you've

24      referred to as the GRAT.

25              Correct?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 145

1      A    Correct.

2      Q    So I want you to identify which term in

3   Nupson-15 was not known in December of 2000?

4      **A    It was the issue of whether I would come**

5   **in to fill vacancies, and there was, I believe, the**

6   **issue of the power of appointments that would be**

7   **given to John's children.**

8          MR. MANNION:  I think we're getting into

9      specifics about things that are privileged.

10         MR. DAVIS:  I don't think so.  I think

11     this is the discussion in December of 2000 with

12     John, Frances, that we've already agreed we can

13     discuss.  We already have discussed it, in

14     fact.  So any privilege that was there is

15     waived at this point.

16         MR. MANNION:  There has been no waiver.

17         MR. DAVIS:  Okay.  Question is --

18         MR. MCMICHAEL:  Let me just clarify that.

19     There is no waiver for that period because we

20     believe there is no privilege --

21         MR. DAVIS:  Okay.

22         MR. MCMICHAEL:  -- for that period.

23         MR. DAVIS:  Fair.

24         MR. MCMICHAEL:  After on or about

25     February 1, 2001, there is a privilege.  So

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 146

1          that's why you have to be careful in terms of

2          what timeframes are.

3               MR. SMITH:  The question I thought was

4          what hadn't been decided by December of '00;

5          right?

6               MR. DAVIS:  That's right.

7               MR. SMITH:  So it wasn't about a

8          conversation.

9               MR. MCMICHAEL:  That is correct.

10              MR. MANNION:  To be clear, it's pointing

11         to specifics in a document that had not been

12         determined by the subsequent terms, so it

13         necessarily involves conversations, I think.

14              MR. MCMICHAEL:  Let's go off the record

15         for a second, sorry.

16              THE VIDEOGRAPHER:  2:00 p.m., off the

17         record.

18                    - - -

19              (Recess was taken from 2:00 p.m. to

20         2:02 p.m.)

21                    - - -

22              THE VIDEOGRAPHER:  2:02, back on the

23         record.

24              MR. MCMICHAEL:  Okay.  Mr. Rosenfield, you

25         may answer Mr. Davis' questions with reference

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 147

1      to the sections of the trust agreement,

2      referring to specific sections that were not

3      known to you as the drafter of the instrument

4      prior to February 1, 2001.  Okay, without

5      commentary on them, just identify what sections

6      of the instrument, you didn't know about at

7      that time, prior to February 1, 2001.

8            (Discussion was held off the record.)

9         MR. DAVIS:  Yeah, they had been -- things

10     that had not been resolved or decided.

11        THE WITNESS:  Item fifth, paragraph four.

12     The very end of the first paragraph of Item 17.

13        MR. MANNION:  Fifth, paragraph 4?

14        MR. MCMICHAEL:  Yes.

15        MR. MANNION:  Okay.  Sorry, I'm having a

16     little trouble hearing him back here.

17    BY MR. DAVIS:

18      Q   Well, I wasn't quite clear on that.

19         You said paragraph four -- can you

20    just identify the Bates number for us, maybe that

21    will make life a little easier?

22     **A   Page eight, last paragraph on the page,**

23    **starts with paragraph four.**

24      Q   So that's 47, all right.  Bates number 47,

25    all right.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 148

1      A     And the Bates stamp 60, top of the page.

2      There may have been others, but I can't -- those

3      were the primary issues.

4      Q     When you say "top of the page," which --

5      which top of the page?

6      A     There's only one top of the page.

7      Q     Well, I want to make sure I'm --

8      A     This is the top of the page.

9      Q     Okay.  So the first paragraph?

10     A     Not the -- the remnants of the first

11     paragraph.

12     Q     Okay.  Your appointment, essentially?

13     A     Yes.

14     Q     What about Schedule A?

15     A     What about it?

16     Q     When was this written?

17     A     Shortly before the signing of the GRAT.

18     Q     When was the GRAT signed?

19     A     It's signing was in November.  The

20     creation was February 1.

21     Q     And notably, you did not in the first page

22     of Exhibit Nupson-15, the agreement says that -- The

23     agreement of trust executed this first day of

24     February 2001.

25            Do you see that there?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 149

1       **A   Correct.**

2       Q   And that would mean the signing; correct?

3       **A   No, it doesn't.  It means the creation.**

4       Q   And you didn't put effective?

5       **A   I didn't.**

6       Q   You put executed?

7       **A   Correct.**

8       Q   But it wasn't technically signed on that

9       day; correct?

10      **A   It was created on that date.**

11      Q   Okay.  Whose handwriting is this on

12      Exhibit A?

13      **A   Well, you have two different handwritings.**

14      Q   Yeah, the first, the longer paragraph?

15      **A   I believe that's John Middleton.**

16      Q   Were you there when he wrote that?

17      **A   I was not.**

18      Q   Where was this signed at, your office or

19      the home?

20      **A   I -- I believe that I went to Fran's house**

21      **to sign it.  The fact that Jo -- and I don't know**

22      **the answer to John's signature, but the fact that**

23      **his secretary witnessed it would suggest it was in**

24      **his office that he signed it.  But he may have --**

25      **I -- that -- I don't know that.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 150

1          Q    I believe you said you testified earlier

2     that in November, December 2000 there was a

3     conversation between yourself, Frances, and John

4     that there was a suggestion -- and maybe I have the

5     date wrong, so correct me if I'm wrong -- there was

6     the suggestion that John could get all the stock and

7     then the girls, I think as you put it, Lucia and

8     Anna, would receive the remainder of the estate of

9     Frances.

10               But Frances objected to that and

11    said, no, let's see how the company does.  I don't

12    recall the exact timing of that conversation.

13         A    Right.  First off, the conversation was

14    before that.  Second, it's not what I --

15         Q    Go ahead.  Yeah, tell me what you

16    testified to then, I'm sorry.

17         A    I believe what I said was that when I came

18    to the meeting, I was under the assumption that the

19    GRAT would be created, and that if any shares

20    remained in the GRAT after the payment of the full

21    annuity payment, that it would pass to all three of

22    the children.

23               And that Fran said, no, I want it to

24    pass exclusively to John.  And I also raised, on

25    that event, when we were revising your estate

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 151

1    **planning documents to the extent you have -- should**

2    **we be then benefiting the girls and not John, and**

3    **Fran did not want to make that change at that point.**

4        Q    And that was at that November,

5    December 2000 meeting, we don't know --

6        **A    Two different meetings.  There was the**

7    **meeting with John, Fran, and me where we're talking**

8    **about the basic terms.  That was the first meeting.**

9    **There was a second meeting that I met with Fran**

10   **alone.**

11       Q    Did anything change between then and

12   February 1, 2001?

13       **A    No.**

14       Q    Do you know where John -- if we're looking

15   at Exhibit A, Nupson-15 -- Schedule A, excuse me,

16   Schedule A, Bates number 61 -- where the stock

17   numbers came from, the certificate numbers?

18       **A    I don't.**

19       Q    And part of your explanation of November,

20   December 2000, or perhaps the meeting before, I'm

21   not sure if you had -- which time you would have

22   explained this, would have been to Frances that if

23   the company makes all of the annuity payments, then

24   all of the stock will go to John?

25       **A    I doubt that I actually said that because**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 152

1    **no one expected that to happen.**

2       Q    Okay.  So she would not have had that

3    understanding necessarily?

4       **A    She would have had the understanding that**

5    **this was the first of three or four GRATs that we**

6    **would be setting up every two years.**

7       Q    Okay.  And so -- you don't have a -- well,

8    strike that.  Okay.  I want to look at Footnote I on

9    page two of Exhibit 45.

10          MR. MCMICHAEL:  Exhibit 45?

11          MR. DAVIS:  History of the GRAT.

12          MR. MCMICHAEL:  Yeah, history of the GRAT.

13       Thank you.

14    BY MR. DAVIS:

15       Q    It says, Grantor established a two-year

16    annuity trust beginning on February 1, 2001 of which

17    grantor was sole beneficiary entitled to

18    distributions of specified annuity payments; upon

19    termination of the two-year trust, the trustee would

20    deliver the remaining property --

21       **A    I'm sorry, are you reading the footnote?**

22       Q    No, I'm not.  I'm getting to the footnote.

23          MR. MCMICHAEL:  Yeah.  Where are you

24       reading from?

25          MR. DAVIS:  It's what the footnote's

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 153

1      attached to.

2          MR. MCMICHAEL:  So we're on page two.

3      BY MR. DAVIS:

4          Q    We're on page two.  You'll see a colon.

5          **A    I'm sorry, can you start reading again,**

6      **please?**

7          Q    Yes, I will.

8          MR. MCMICHAEL:  Okay.  I see it.  It

9      starts with -- right here.

10         THE WITNESS:  Grantor established -- thank

11     you.

12     BY MR. DAVIS:

13         Q    Yeah.  Grantor established two-year

14     annuity trust beginning on February 1st, 2001 of

15     which grantor was the sole beneficiary entitled to

16     distributions of specified annuity payments upon

17     termination of the two-year annuity trust.  The

18     trustee would deliver the remaining property to a

19     trust to be established for the benefit of John and

20     his family.

21              Now, we drop a footnote there.

22     That's what I want to talk to you about.

23         **A    Okay.**

24         Q    And it says, Pennsylvania law governing

25     the attorney-client privilege, along with Rule 1.6

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 154

1      of the Pennsylvania Rules of Professional Conduct,

2      do not allow Bruce to reveal confidential

3      information relating to his representation of

4      grantor, unless and until grantor's representatives

5      waive the privilege and direct Bruce to disclose all

6      information relevant to grantor's establishment of

7      the GRAT.

8              All right, that's what I want to talk

9      to you about.  And then it goes on to say,

10     According, at this time, Bruce is constrained to

11     describe in further detail the planning steps that

12     led to the execution of the original trust

13     agreement.

14             So as of the filing of this, 5/2/17,

15     was it your understanding that the grantor, and

16     that's Frances Middleton, had not waived privilege?

17     **A    That's my understanding.**

18     Q    Okay.  And that was true in 2002 and 2003

19     as well?

20     **A    To herself, yes.  For her own privilege,**

21     **yes.**

22     Q    And so in 2002, 2003, you were still bound

23     by this same issue in determining what you could

24     speak of, right, regarding the -- the establishment

25     of the GRAT?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 155

1     **A   I am not sure I understand what you're**

2    **saying.**

3     Q   Yeah.  Well, sure.  Let's clarify.

4     **A   Thank you.**

5     Q   In 2002, 2003, I'm just basing this off of

6    this footnote, because this is filed in 2017.

7     **A   Right.**

8     Q   At that timeframe, you were constrained by

9    the attorney-client privilege; correct?

10    **A   Uh-huh.**

11    Q   Is that a yes?

12    **A   Yes.**

13    Q   Sorry, I don't mean to be rude.

14    **A   Yes.**

15    Q   And so the grantor, Mrs. Middleton, had

16    not waived her privilege, as you say for her own

17    privilege, to discuss the formation or establishment

18    of the GRAT.  That's what you put in the footnote,

19    establishment of the grant.

20         You see that there?

21    **A   Yes.**

22    Q   All right.  And that was true in 2002,

23    2003; correct?

24    **A   Correct.**

25    Q   Okay.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 156

1          MR. MCMICHAEL:  And our position remains

2     true today, just to be clear.

3          MR. DAVIS:  Sure.

4          MR. MCMICHAEL:  There's been no waiver of

5     privilege that we're aware of.

6          MR. DAVIS:  Okay.

7          MR. MCMICHAEL:  So he -- we'll continue to

8     direct him not to answer questions that invade

9     the privilege.

10    BY MR. DAVIS:

11         Q    All right.  In 2001, was the annuity

12    payment made?

13         **A    I believe it was made shortly -- I think**

14    **we were paying it annually.  And so the first**

15    **annuity payment would have been made in 2002.**

16         Q    I see.  The calender year from the date of

17    the start?

18         **A    Based on the date of the starting of**

19    **the -- yes.**

20         Q    Of the GRAT, all right.

21         **A    But I wouldn't have been the person**

22    **orchestrating that.**

23         Q    Who would that be?

24         **A    John Stein and John Middleton.  They ran**

25    **numbers by us, but they were the ones who handled**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 157

1  that.

2      Q    So if the first payment is made and let's

3  say no further payments are made, then stock -- I

4  just want to make sure -- and I know we've gone over

5  this a million times.

6           But stock would then revert to

7  Frances Middleton; correct?

8      A    Let's just be really clear on this.

9      Q    Uh-huh.

10     A    The annuity payment has to be made, and to

11 the extent it was cash, it would be paid with cash.

12 If it was -- there wasn't enough cash, the remainder

13 of the annuity payment would have been made by

14 stock.  In -- in this case --

15     Q    I see.

16     A    -- the entire annuity payment was made

17 with cash.

18     Q    Okay.  When was the second payment made?

19     A    The second payment would have been made

20 shortly in 2000, and if it was still being handled

21 on an annual basis, the second payment would have

22 been paid in 2003.  It is possible that they were

23 made on a quarterly basis, but I don't have a

24 recollection of that.

25     Q    Okay.  And so -- and I understand you're

Page 158

1    tech -- you're being precise, and I appreciate that.

2    What you're saying -- what I'm saying is just

3    incorrect.

4                Is that the payment's still made,

5    it's just made with stock?

6       A   **Correct.**

7       Q   I see, yeah.

8       A   **To the extent there was a shortage of**

9    **cash.**

10      Q   I see, yeah.  All right.  Did you have --

11   and let me fast forward to September, October 2002

12   timeframe.

13               Did you have any concerns, or were

14   you made aware of any concerns that the second

15   annuity payment would not be made?

16      A   **No.**

17      Q   And when I say "be made," I mean, with

18   cash?

19      A   **I wasn't aware whether it was being made**

20   **in cash or partially in cash and partially in stock.**

21      Q   Okay.

22      A   **It's too early in the year.  We really**

23   **needed to conclude the year to know that.**

24      Q   Okay.

25      A   **The operations of the company.**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 159

1      Q    And by the end of the year, you would have

2    known?

3      **A    There would have been -- yes, by the end**

4    **of the year, we would have known.**

5      Q    And by the end of 2002, you did know that

6    a cash payment would be -- would be made?

7      **A    Yes.**

8      Q    I want to continue on here.

9      **A    Where are you?**

10     Q    Yeah.  Sometime after March 2002, I'm on

11   page two.

12     **A    Okay.**

13     Q    Same exhibit, history of the trust.

14   Grantor's eldest daughter, Lucia M. Hughes, raised

15   strong objections to the provision that upon

16   expiration of the two-year annuity trust, the

17   remaining property would be distributed to a trust

18   for the benefit of John and his family.

19          Okay, how did you become aware of

20   that?

21     **A    I think that's a privileged communication.**

22     Q    Well, let me ask.

23          Who was -- who was the conversation

24   with?

25     **A    With Fran.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 160

1          MR. MANNION:  Sorry?

2          MR. MCMICHAEL:  Fran.

3          THE WITNESS:  Frances Middleton.

4          MR. MANNION:  Okay.  And this is what time

5     period?

6          THE WITNESS:  This would be the summer of

7     2002.

8          MR. MCMICHAEL:  And the conversation you

9     had with Frances was just between you and

10    Frances and no one else?

11         THE WITNESS:  Correct.

12         MR. MCMICHAEL:  Okay.  Then you should not

13    answer the question.

14         THE WITNESS:  All right.

15    BY MR. DAVIS:

16    Q    Do you know if the -- first of all, if the

17    oral trust I'm going to call it, but it's the

18    February 1, 2001 GRAT, either in written form,

19    executed in November, signed in November or verbally

20    made in November of 2000, if that information was

21    ever transmitted to Lucia by -- first of all, by

22    you?

23    **A    It was never transmitted by me.**

24    Q    Do you know if it was ever transmitted by

25    anyone else?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 161

1     **A   I don't know that.**

2     Q   Okay, same question.

3          Was the oral GRAT and/or the GRAT 1,

4     the written version, ever transmitted to Anna Nupson

5     by you?

6     **A   And again, there's only one GRAT.**

7     Q   Okay.

8     **A   And I was instructed in, I believe it was,**

9     **September 2002 to go over the terms of the GRAT with**

10    **Anna by Fran, and I did it at Fran's house.**

11    Q   Do you remember the actual date of the

12    meeting?

13    **A   I'm going to say September 16th, but I may**

14    **be off.**

15    Q   Okay.

16    **A   My time entries would -- would show a**

17    **meeting.**

18    Q   Okay.  Look at page three, if you could.

19    And the second full paragraph, let me just read this

20    into the record.  The parties and their attorneys

21    negotiated intensely, but with a common goal.  All

22    strove to confirm and implement grantor's original

23    intent to establish a GRAT on February 1, 2001, give

24    away her company shares to the benefit of her

25    family, and avoid family discord and litigation.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 162

1          So was that Francis's intent in

2    November, December 2000, to give the shares to her

3    family?

4          **A   No.**

5          Q    Okay.  What is meant by this then?

6          **A    This is -- this is the result -- this is**

7    **the family settlement agreement that was -- was**

8    **discussed at the later part of 2002, which resulted**

9    **in a modification of the GRAT.**

10         Q    So I'm trying to understand the language

11   here because --

12         **A    Right.**

13         Q    -- what you say is, "grantor's original

14   intent"; correct?

15         **A    Yes.**

16         Q    And the original intent, I think you

17   described was this, you know, November 2000,

18   December 2000 timeframe?

19         **A    Correct.**

20         Q    And kind of the lead up there to some

21   meetings before that was to give it all to John?

22         **A    Correct.**

23         Q    That's what I understood the original

24   intent, as described by you, but then this seems to

25   suggest that the original intent was actually to

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 163

1    give the shares to the family?

2        **A   No.  It was the result of a settlement, a**

3    **family settlement agreement, to resolve disputes**

4    **within the family, and that -- that because of**

5    **challenges by Lucia saying that -- that John had**

6    **exuded -- exerted undue influence, she was going to**

7    **bring litigation.  And there was intense**

8    **negotiations to resolve a family dispute.**

9            **It was resolved by virtue of a family**

10   **settlement agreement, that the -- the -- one of the**

11   **pieces of that family settlement agreement was to**

12   **agree to restate the February 1, 2001 GRAT to -- to**

13   **implement the terms of the family settlement**

14   **agreement, which converted from a three-way -- I'm**

15   **sorry, from a one-way split to benefit exclusively**

16   **John to a three-way split, benefiting all three of**

17   **Fran's children.  That was not Fran's original**

18   **intention when she created the trust.**

19       Q   Let's look at Exhibit 25.

20       **A   Is this Nupson?**

21       Q   No, this is not Nupson.  This is just

22   Exhibit 25.

23           Do you remember having a planning

24   meeting with Frances in April?

25       **A   Yes.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 164

1     Q   Who was at that meeting?

2     **A   Fran was there, John Stein, John**

3   **Middleton, and it's possible that Larry Laubach was**

4   **there, but I'm not sure.**

5     Q   We have been provided -- we've marked as

6   Exhibit 25 to Mr. Stein's deposition, and was this

7   the information presented to Ms. Middleton?

8     **A   It looks like it.**

9     Q   I want to turn you to BHI86206.  It says

10   there, Children trust.

11       Do you see that?  There's scenario

12   one and scenario two.

13     **A   I'm having trouble reading it.  It looks**

14   **like it's pretty blacked up.**

15     Q   Just above the blackout?

16     **A   I see, Children Trust, yes, okay.**

17     Q   And was your understanding that -- well,

18   what's your understanding of that line item there, I

19   guess, is my first question?

20     **A   I don't know what that is.**

21     Q   All right.  Do you recall if "children"

22   was referring to all of Francis's children?

23     **A   I don't recall what it meant.**

24     Q   An outright gift would not be a GRAT; is

25   that right?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 165

1      **A**   **Correct.**

2      Q   Okay. So if we're looking at BHI6207, one

3   of the estate planning alternatives identified here

4   is an outright gift of a hundred percent of stock.

5         Do you see that?

6      **A**   **Yes.**

7      Q   All right. And 258,000 shares, more or

8   less?

9      **A**   **Correct.**

10     Q   Okay. And is that how many shares Frances

11  owned?

12     **A**   **I believe that's consistent with the**

13  **numbers shown on GRAT 1. I'm not sure.**

14     Q   So an outright gift of a hundred percent

15  of her stock, I'm trying to understand why in April,

16  if we have this GRAT, why we're having a scenario of

17  a hundred percent of the stock being given away, why

18  that's being contemplated?

19     **A**   **This, again, the discussions at this**

20  **meeting were what to do with the stock that Fran was**

21  **getting back from the GRAT. And I believe this is**

22  **assuming that the GRAT was not successful at all.**

23     Q   So --

24     **A**   **That she had to get one hundred percent of**

25  **the shares back. That would have been the worst**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 166

1      scenario of the GRAT.

2          Q    Do you know if any document like this was

3      presented to Frances prior to her entering into the

4      oral GRAT?

5          A    I mean, I thought there was back in '98.

6      I thought John Stein prepared something, but maybe

7      he didn't.  I haven't seen it since then, but I have

8      a recollection of that.

9          Q    Let's go to -- I think we discussed a

10     little bit one option is -- if we look at 86218,

11     same exhibit.  And I'm looking at the Bates numbers

12     on the bottom.

13         A    Yes.

14         Q    One of the strategies could be a defective

15     trust?

16         A    A sale to a defective truck.

17         Q    Yes, okay.

18         A    John Stein was very fond of this.

19         Q    All right.  My memory is you weren't as

20     fond of these?

21         A    I've never done one.

22         Q    Okay.

23         A    I don't like them.

24         Q    All right.  If we look at 86219, this is

25     going to be a little bit harder to read.  I just

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 167

1    want to know what you know about this. On transfer

2    date, it says, Client Middleton, transfer date

3    4/28/01.

4          Do you see that there?

5    **A   I see 4/28/01.**

6    Q   Right. And they're then doing the

7    analysis and running the numbers for the clients?

8    **A   Right.**

9    Q   Any idea why they would have started the

10    analysis at 4/28/01 because isn't all the stock in

11    the GRAT?

12    **A   All the stock is in the GRAT. I would**

13    **think that's probably just sloppiness on his part,**

14    **but I don't know.**

15    Q   He doesn't seem like a sloppy guy to me.

16    I have met him.

17          You think it's just sloppiness?

18    **A   I doubt he prepared this.**

19    Q   Okay. You think his staff's sloppy?

20    **A   Could be.**

21    Q   At Ernst & Young?

22    **A   He changed firms five times during our**

23    **period. I don't know what staff he brought with**

24    **him.**

25    Q   All right. But that's the date in here --

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 168

1       **A    Yes.**

2       Q    -- of sloppy work?  Okay.

3       **A    I don't know.  It may also have been the**

4  **way his computer program's run.**

5       Q    Let's look at 86243, executive summary.

6  Again, this is a planning meeting, Frances and key

7  assumptions here, again, Mr. Stein, I guess, made

8  another mistake.  It says, Sale date, 4/28/01.

9       **A    I'm sorry, I can't read this.**

10      Q    I'm sorry, are you on 86243?

11      **A    6243, okay.**

12      Q    You see key assumptions right there?

13      **A    Yup.**

14      Q    And summary of transactions is value of

15  freeze property sold.  It's got $52,895,945.

16           Do you see that?

17      **A    I see that.**

18      Q    All right.  That's about the value of

19  Frances Middleton's stock; correct?

20      **A    I think that's the number you said.  I**

21  **don't know that.**

22      Q    Okay.  Well, for our purposes, I'll just

23  -- I'll make that representation.

24           Okay?

25      **A    All right.**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 169

1        Q    At 205 a share?

2        **A    Uh-huh.**

3        Q    Planning parameters, it says, Sale date,

4    4/28/01.

5              You see that?

6        **A    Yes.**

7        Q    All right.  So again, presenting executive

8    summary to Ms. Middleton where we're starting to do

9    a sale of all of her stock two months after the

10   stock has been placed into the GRAT?

11       **A    Correct.**

12       Q    So how are these even useful?

13             Do you have any idea?

14       **A    I think they're useful because what he was**

15   **trying to do is have a meeting to anticipate the**

16   **shares that she got back, and he was just using the**

17   **total number of shares for purposes of the analysis.**

18             **We totally thought that she was going**

19   **to get a significant percentage of the shares gifted**

20   **back.  And any number would be as good as another to**

21   **use.  But you should ask him.  He's the one who**

22   **prepares this.**

23       Q    I have.  He had the same thing you had to

24   say; it's just a mistake.  Okay.  We saw there also

25   a -- we saw children trust, you saw that, I pointed

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 170

1    that out --

2         A    I saw the line, children.

3         Q    Yes.  You did say you didn't quite know

4    what that was referring to.

5              But what I want to ask you, though,

6    is:  Did you have an understanding that if the stock

7    was going to come back to Frances, the GRAT was not

8    effective, that she intended to then distribute it

9    to her three children?

10        A    I think that's something I'm not allowed

11   to talk to you about.

12             MR. MCMICHAEL:  What's the question?

13             MR. DAVIS:  All right.

14             MR. MCMICHAEL:  Let me just ask.

15             MR. DAVIS:  You want to follow-up -- you

16   need to --

17             MR. MCMICHAEL:  No, no.  I was just going

18   to ask for the question to be read-back to see

19   if I could process it to help the witness, but

20   if you want to ask it or re-ask it in a

21   slightly different form, that's fine.

22   BY MR. DAVIS:

23        Q    Yeah.  I am asking that his -- his

24   post-GRAT and, you know, this timeframe, April of

25   2001, there was a line item in Mr. Stein's models,

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 171

1          financial modeling that says, Trust Children [sic],

2          something to that effect.

3                    You testified you didn't quite know

4          what that line was about, which I appreciate.  But

5          what I'm asking is a little bit different question

6          is:  Did you have an understanding that the

7          intentions were the stock to go into the GRAT and

8          then, as you said, everyone expected the stock to be

9          not successful?

10                   The stock would be returned to

11         Frances Middleton, and then from there, there would

12         be a transfer to the three children, a trust to the

13         three children?

14            MR. MCMICHAEL:  Okay.  If the only basis

15            upon which you can answer the question about

16            the intention is a conversation you had with

17            Frances alone, that's privileged, and you

18            should not answer the question.  If there's

19            some other way of answering the question, then

20            we will talk about it further.

21            THE WITNESS:  No, I can't answer the

22            question.

23         BY MR. DAVIS:

24            Q    Okay.  And so Frances Middleton did not

25         waive privilege to discuss her personal discussions

Page 172

1    with you regarding her trust and estates planning;

2    correct?

3        A    Correct.

4        Q    Okay.  Never waived that ever; right?

5        A    There were meetings for her personal

6    estate planning with John present.

7        Q    Okay.  And we're going to discuss those,

8    and we have been discussing those, I understand.

9            But she never verbally, to you, said,

10   you can speak to Anna Nupson about any of my trust

11   and estates planning; correct?

12       A    She never said that.

13       Q    Okay.  Did Francis' intentions change by

14   2002?

15           MR. MANNION:  I think it depends on what

16   time in 2002, as to whether or not --

17           MR. MCMICHAEL:  Yeah, it's complicated.

18           (Discussion was held off the record.)

19           MR. MCMICHAEL:  By when in 2002 are you

20   talking about?

21           MR. DAVIS:  I am talking about September,

22   October 2002.

23           MR. MCMICHAEL:  Okay.  So if you had

24   conversations with Frances after August 1 of

25   2002 relating to the settlement discussions

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 173

1    that were going on and they included

2    discussions about her estate plan, you can

3    answer the question.

4         THE WITNESS:  I had discussions with her

5    alone about her estate plan, but I had

6    discussions in -- between August, September

7    about this settlement of the GRAT, and those

8    would have included, at some point, Anna.

9         But that didn't -- she never said, in

10   discussing the GRAT, that it was okay for me to

11   discuss her other estate planning documents

12   with Anna.

13        MR. DAVIS:  Let me -- let me move on for

14   now, okay.

15        MR. MCMICHAEL:  Because otherwise, I'm

16   going to have to take a break.

17        MR. DAVIS:  Yeah, let's move on.  I'll

18   just keep going.  I'm going -- I don't want to

19   get bogged down again.

20        MR. MCMICHAEL:  It's a complicated

21   privilege question.

22              - - -

23        (Exhibit 50 was marked for

24   identification.)

25              - - -

Page 174

1    BY MR. DAVIS:

2        Q    Grab your history of the GRAT again, hold

3    this affidavit of Mr. Middleton.

4              MR. MCMICHAEL:  This is exhibit what?

5              MR. DAVIS:  50, yeah.

6              MR. MCMICHAEL:  5-0.

7              MR. DAVIS:  Sorry, guys, I only have --

8              it's 9/11/2017.  It was filed in Orphans'

9              Court.

10             THE WITNESS:  Thank you.

11             MR. DAVIS:  You're welcome.

12   BY MR. DAVIS:

13       Q    I want you to look at paragraph six.

14       **A    Of which one?**

15       Q    The affidavit, yeah.

16       **A    Okay.**

17       Q    Just read that to yourself.

18             Was that your understanding during

19   the -- during the settlement discussions of John's

20   intentions?

21       **A    That is my understanding.**

22       Q    Yeah.  So he made it clear to his mother

23   and his sisters that he would not agree to a

24   modification of the original GRAT without coming to

25   a resolution of all of the outstanding issues,

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 175

1    including the ultimate division of the Bradford

2    shares; correct?

3        **A    Correct.**

4        Q    And you had an understanding of that

5    intention when you represented Anna Nupson?

6        **A    I did know that, yes.**

7            MR. DAVIS:  I don't want to remark this if

8    it's already -- I'm sorry, you don't think it

9    is?  Do you know, Larry?  The amendment

10   conditions.  It's all right.  We'll remark.

11           MR. MCMICHAEL:  This has not been marked.

12           MR. DAVIS:  Okay.

13               - - -

14           (Exhibit 51 was marked for

15   identification.)

16               - - -

17           MR. MCMICHAEL:  This is 51?

18           MR. DAVIS:  Fifty-one.

19   BY MR. DAVIS:

20       Q    Just go ahead and read that to yourself

21   for a second.  I just want to ask you a few

22   questions about it.

23       **A    Okay.**

24       Q    The first question is, I'm assuming this

25   is not your document; correct?

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 176

1      A    This is not my document.

2      Q    All right.  Do you know whose document

3    this is?

4      A    It was on behalf of John.

5      Q    Okay.  And when you say "on behalf," was

6    it drafted by someone else?

7      A    It may have been drafted by Larry Laubach,

8    or it could have been drafted by John.

9      Q    Did you ever receive a copy of this

10   document?

11     A    I don't recall receiving it.  I'm not

12   telling you I never saw it, but I don't recall it.

13     Q    Do you recall seeing it?

14     A    At that point -- thank you.  I evidently

15   received it on September 11, 2002, according to a

16   stamp.  I don't have a current recollection of that.

17     Q    Something --

18     A    That is my -- that is my -- that's my

19   stamp.  That's my office stamp, so.  And things that

20   came in, especially by mail, would have been

21   stamped, timestamped.

22     Q    What's BAR mean?

23     A    That's my initials, Bruce Allen

24   Rosenfield.

25     Q    All right.  So at least as of

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 177

1       September 11, 2002, you had an understanding that

2       John was making -- at least these were the

3       conditions he was willing to modify the GRAT?

4           **A    Appears so, yes.**

5           Q     Okay.  And it required for John to

6       concede, at least in number one, it says, In return,

7       the following concessions will be made.

8                 It required Anna to sell her stock?

9           **A    No, it didn't.  It required division.  She**

10      **would -- this says she has to sell her voting stock.**

11          Q     Okay.

12          **A    It's a very small amount of her stock.**

13          Q     So at this time, there was not an

14      expectation that Anna would have to sell all of her

15      Class B shares?

16          **A    I think there was an expectation she would**

17      **not, which is why the LLC was being set up.**

18          Q     Okay.  Did you go over this document with

19      Anna?

20          **A    Yes.**

21          Q     What portions did she agree to or not

22      agree to?

23          **A    The -- the first, the issue that there was**

24      **a big fight over was eight.  First of all, if Anna**

25      **had children, her '94 trust would pass to her**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.    June 24, 2021
Bruce Rosenfield, Esq.                                            NO.  2:18-cv-02505-NIQA

Page 178

1    children.  The '94 trust allowed for adopted

2    children, children adopted while a minor to be

3    treated as a natural child.

4           And so she would not have agreed,

5    that at the time of her death, half of her stock

6    would go to Lucia's family and the other half goes

7    to John's family.

8    Q    Anything else?

9    A    She was not comfortable with her one-third

10   of the GRAT staying in trust.  She wanted that

11   distributed to her -- to her outright.

12   Q    And that was a possibility; correct?

13   A    It was a possibility?

14   Q    Yes.

15   A    If the family -- if Fran agreed to it.

16   Q    Did Fran say she wouldn't agree to it?

17   A    I don't think I'm allowed to discuss that

18   with you.

19        MR. MCMICHAEL:  Actually, you can.

20        THE WITNESS:  I can?

21        MR. MCMICHAEL:  Yeah.  There's a

22   representation period.  You can -- you can

23   answer the question.

24        THE WITNESS:  She said absolutely not.

25   She -- Anna needed protection, and anything

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 179

1          Anna got with the exception of that very small

2          payment for the A shares was going into trust

3          for Anna.

4     BY MR. DAVIS:

5          Q    Okay.  Did it have to go into the '94

6     trust, or could it have gone to another trust?

7          **A    It didn't go to the '94 trust.**

8          Q    Oh, I understand that.

9          **A    It could have gone to the '94 trust.**

10         Q    That's what I'm asking you.

11         **A    But that would have been -- that would not**

12    **have been in Anna's best interest.**

13         Q    Why not?

14         **A    Because she had given up her right to**

15    **principal of the '94 trust.  You have to remember**

16    **your discussion of a self-settled trust as opposed**

17    **to a third-party trust.  This would be a third-party**

18    **trust.  So even though Anna would have -- have the**

19    **ability to get at principal, her creditors would not**

20    **have been able to.  So it would not have been in her**

21    **best interest to put it in the '94 trust.**

22         Q    And -- and that, what I'm -- what I think

23    we're -- I think we're getting a little ahead of

24    ourselves because I know what the ultimate

25    disposition was.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 180

1          But -- but at this time, we're not

2      talking about money; we're talking about stock?

3          A    That -- that's the expectation, but we

4      don't know.

5          Q    Okay.

6          A    I mean, at this point, I mean by

7      September '02, we had an idea.  We didn't know for

8      sure that the entire -- the entire annuity payment

9      would be made in cash, but the company was doing

10     very well.

11         Q    Did you ever suggest to Anna that one

12     option was she do nothing?

13             In other words, don't enter into the

14     family settlement?

15         A    And don't get a third of the GRAT, that

16     would have been really stupid advice from me.

17         Q    Was that one option?

18         A    Of course, she could say to her brother,

19     forget it.  I don't want to be part of this.

20         Q    Because she still had her shares --

21         A    Her shares which were dwarfed by these.

22         Q    Okay.  Did you ever explain to Anna that

23     there could be an argument that the February 1, 2002

24     [sic] GRAT was unenforceable?

25             MR. MCMICHAEL:  2001.

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 181

1          MR. DAVIS:  2001, thank you.

2          THE WITNESS:  I never said that because I

3     don't believe it, and to this day, I don't

4     believe it.

5     BY MR. DAVIS:

6     Q     All right.  Because you created that GRAT;

7     correct?

8     **A     I created it.  I complied with all law**

9     **required.  It was a valid document.**

10    Q     Right.  And you never had any concern when

11    you undertook the representation of Anna Nupson that

12    it was not a valid GRAT?

13    **A     I knew it was a valid GRAT.**

14    Q     Okay.  Even though you've never done an

15    oral GRAT before?

16    **A     It's well-established in Pennsylvania.**

17    **The fact that I haven't done it doesn't mean it's**

18    **not well-established and valid.**

19    Q     Do you have any -- and you said you

20    testified earlier that you provided -- let's --

21    let's take a look at Nupson-15, which is GRAT --

22    we'll call it GRAT 1, which is the executed GRAT.

23          It should be in here.  Not that you

24    don't know it, but I just want to make sure you have

25    it before you before asking questions about it.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 182

1     **A  Thank you.**

2     Q  Was this document ever transmitted to

3  Anna?

4     **A  I don't know the answer to that. I don't**

5  **recall. I don't think I gave it to her, but I don't**

6  **-- I can't be sure of that. And I don't know that**

7  **-- whether someone else did, I don't know.**

8     Q  Did she ever see this document?

9     **A  I think she did. I went -- because at the**

10  **meeting on what I think is September 17th, I went**

11  **through the terms of the GRAT with her, so I would**

12  **have had a copy of the GRAT with me and sitting with**

13  **her.**

14        **So whether I gave her a copy, I**

15  **really don't remember. I might have given her a**

16  **copy of the GRAT at that point, but I went through**

17  **all of the terms of it. And that's reflected in her**

18  **notes.**

19     Q  Did you tell her that this began as an

20  oral GRAT?

21     **A  No, it was -- that's irrelevant. I told**

22  **her it began as a GRAT. It was created on**

23  **February 1, 2001.**

24     Q  What did you -- when did you start

25  representing Anna Nupson in this matter that we're

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 183

1    discussing here, the negotiation of --

2        **A    The late summer of 2002.**

3        Q    Did you have an engagement letter with

4    her.

5        **A    I did not.**

6        Q    What was the scope of your representation?

7        **A    I'm sorry, I can't hear you.**

8        Q    What was the scope of your representation?

9        **A    The representation was to try to resolve**

10    **the family dispute over the 2001 GRAT.**

11        Q    And you also represented Frances Middleton

12    at the same time in that same dispute?

13        **A    I did.**

14        Q    And you previously represented John

15    Middleton in other trust and estates matters?

16        **A    I did.**

17        Q    Frances Middleton permitted you to

18    disclose Nupson-15, which is GRAT 1?

19        **A    She asked me to disclose it.**

20        Q    Asked you to disclose it.

21            Did she ask you to disclose any other

22    details about her trust and estates planning?

23        **A    She did not.**

24        Q    Okay.  Did you explain to Anna that you

25    were not permitted to discuss any of those matters

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 184

1    with Anna?

2        A    I didn't explain that, no.

3        Q    Nupson-15 was that ever transmitted -- I

4    know we talked about Anna Nupson.

5            But do you know if it was transmitted

6    formally to Frances Middleton?

7        A    I'm just -- actually just trying to recall

8    whether she wanted copies of her documents.  If she

9    wanted them, she would have had it.  Usually copies

10   of -- certainly in Herb's time, all of the family

11   documents were kept by Herb in binders at the

12   company.

13           And I just don't recall if Fran had

14   her own binders at home.  If she did, I would have

15   -- when I brought it, I would have given her this

16   copy and put it in her binder.  But I don't have a

17   specific recollection of that.  Are we done with

18   this one?

19       Q    We are.

20       A    Things are piling up.

21       Q    No, I appreciate it.  You know what,

22   before I go to Exhibit 52, I said you're done with

23   that one -- let me -- let me -- do we know what the

24   notes are, what exhibit notes are Anna's notes?

25           (Discussion was held off the record.)

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 185

1                    - - -

2              (Exhibit 52 was marked for

3    identification.)

4                    - - -

5    BY MR. DAVIS:

6        Q    So I think this is -- at least these are

7    Anna's notes, and I just want to see if that's --

8    you mentioned earlier that her notes reflected --

9        A    Yes.

10       Q    -- the GRAT.  So if you could just point

11   that out to me, I would appreciate it.

12       **A    The terms of the GRAT, it starts out with**

13   **GRAT misspelled, set in February 1 of '01.**

14       Q    Okay.

15       **A    I'm assuming "set" meant created, but I**

16   **don't know what she meant.  Mom gets 108 percent of**

17   **the value, not income.**

18       Q    Okay.

19       **A    I explained to her the percentages of the**

20   **annuity payments.  And at the time in February 1,**

21   **2001, basically, Fran would get back a dollar amount**

22   **equal to 108 percent-plus, a minor amount of**

23   **fraction, of the dollar amount that she contributed**

24   **to the GRAT.**

25       **I explained to Anna that -- that Fran**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 186

1    would be filing, and that by then, we were -- we

2    would have been filing a gift tax return within the

3    next month.  And that's when -- that's the

4    reference, Mom pays gift taxes.  Filing of a gift

5    tax return shortly.

6            Two-year GRAT, it ends on '03, which

7    were the -- which was the basic terms.  Something --

8    John stock everything.  Everything else to Lucia and

9    me.  So she understood that the trust -- the GRAT

10   trust benefits exclusively John.

11           Stock will be in the trust.  Stock

12   passes in trust to John.  No, I don't know what that

13   words -- if the IRS isn't satisfied, goes back to

14   mom.  That was a reference in my discussion with her

15   that provision of the GRAT said that if the stock

16   was in -- inappropriately -- inappropriately valued,

17   if the IRS challenged the value and said that the

18   value at the time of the gift was higher than what

19   we reported, the annuity payments to Fran would be

20   increased.  She understood that.

21           She understood that what was given

22   was the Bradford stock, which was the ownership

23   interest that the family had in the Phillies, and

24   the tobacco company, and in the hotel companies.

25   The piece that I would not have said to her, but I

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 187

1       believe that Fran would have at that time, I believe

2       that, in fact, Fran did say was that her intention

3       when she created the GRAT giving all of the stock to

4       John was that the rest of her estate would go to

5       Anna -- to Anna and Lucia.

6               I wouldn't have said that.  And I --

7       my -- in thinking about that, my guess is Fran said

8       that to soften the blow to Anna as to why all the

9       stock was going to John.

10      Q    Okay.  We can close that now.  This is

11      going to be a bit painful.  What I want to do,

12      though, we have --

13      A    Thank you for the heads up.

14      Q    You're welcome.  These are not your notes,

15      okay.  These are -- my understanding, these are

16      Frances Middleton's notes.  And the reason it's

17      going to be painful is because I'm just going to see

18      if it jars your memory or triggers your memory about

19      this timeframe.

20              Does that look like Frances

21      Middleton's handwriting to you?

22      A    I believe it is.  I'm not sure, but I

23      think so.

24      Q    All right.  Let's start with the ones

25      dated September 11, 2002.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.                June 24, 2021
Bruce Rosenfield, Esq.                                                       NO. 2:18-cv-02505-NIQA

Page 188

1        **A    Okay.**

2        Q    Do you know if there was meeting at that

3    time between yourself and Frances Middleton?

4        **A    I don't -- that -- is that the date of my**

5    **meeting with Fran and Anna, or is that a different**

6    **one? I don't -- I don't remember.**

7        Q    And I'm sorry, the way I phrased the

8    question made you think, like, oh, he's going to

9    catch me or something like that.  I don't really

10   know.  So if the answer's "I don't know," I'm just

11   curious if you knew, if you have a recollection.

12       **A    I don't have a recollection.**

13       Q    Okay.

14           MR. MCMICHAEL:  If you want to know

15       precisely, you have to look at his time sheets,

16       which you have.

17   BY MR. DAVIS:

18       Q    And we'll get to those.  I'll get to

19   those.  I'm not trying to catch you.

20       **A    Okay.**

21       Q    Okay.  Issues one, review bidding.  No

22   interference, I think, no interfere?

23       **A    Yeah, that would have been a reference to**

24   **Lucia not interfering with the -- this may be a**

25   **meeting between Fran and John.  I mean, I don't -- I**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 189

1      don't know.  But the no interference was something

2      that's been stressed, and that's in -- I mean,

3      that's the LLC structures and stuff.

4         Q    Yeah.  And you discussed it in your e-mail

5      as well that we identified earlier between you and

6      John.

7               I'm trying to understand what that

8      interference was because my understanding was the

9      shareholders are -- I'm sorry, the voting shares

10     were all with John?

11        A    Right.

12        Q    Of the vast majority?

13        A    Right.

14        Q    And so what interference are we actually

15     referring to?

16        A    In the discussions, in the negotiations,

17     and they were almost -- they were exclusively

18     between Lucia's lawyers and John's lawyers, they --

19     Lucia's lawyers were trying to restrict the

20     compensation John would be receiving, stock options,

21     retirement benefits.

22               They wanted to make sure that they

23     were protected, and that he wouldn't be able to

24     compensate himself at their expense.

25        MR. MCMICHAEL:  Let me just interrupt you

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 190

1          for one second.  I noticed that there are no

2          Bates numbers on this document.  Do you have

3          Bates numbers for us?

4              MR. DAVIS:  Do we?  Oh, we do apparently.

5          Thank you.  All right.  So we'll put a pin in

6          that thought.  Let me come back to you.  So the

7          9/11/02 is BHI1046169.  9/17/02 is BHI000056.

8          And then the 10/10/02 notes are BHI046241, and

9          there's just a kind of one that's undated

10         BHI046240, just for the record.

11     BY MR. DAVIS:

12         Q    But going back to that, that was -- so

13     that's the interference you're referring to?

14         **A    Yeah.**

15             MR. MANNION:  Hang on a second.

16             MR. MCMICHAEL:  Yeah, we're trying to

17         figure out whether these documents were

18         produced and -- or whether these are in the

19         file without Bates numbers.

20             MR. DAVIS:  No, they're produced, I

21         believe.  We just gave you the Bates numbers.

22             MR. MCMICHAEL:  Were they produced by BHI?

23         Are these the BHI documents, but the Bates were

24         just cut off for some reason, or are these --

25             MS. JOHNSON VIDALES:  Yeah, the printer

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 191

1       just cut them off.

2           MR. DAVIS:  Same issue you guys had last

3       time, last week.

4           MS. JOHNSON VIDALES:  In your depo.

5           MR. MCMICHAEL:  Okay.

6           MR. DAVIS:  Because they're just pushed

7       too far down.

8           MR. MCMICHAEL:  Okay, so -- all right.  So

9       just bear with me for one second.  So I've got

10      -- I'm up to 10/10/02.

11          What is 10/10/02?  What's the 10/10/02?

12      Okay.  I'm sorry.

13      BY MR. DAVIS:

14      Q    It's okay.  Okay, all right.

15          So the control or interference you

16      just identified, it's not that Lucia necessarily had

17      the power to do any of that because she didn't have

18      the voting power for Bradford, but it was just a

19      part of the negotiations; is that --

20      **A    Well, as minority shareholder, you have**

21      **some rights.**

22      Q    All right, all right.

23          Number two, '94 trust equal, any idea

24      what that means?  That's why I'm saying it's going

25      to be frustrating because I'm having you guess what

Page 192

1    other people's words are.

2         A    Yes.  I'm -- I'm willing to speculate that

3    these were not -- were Fran's notes of a meeting

4    with John.

5         Q    Okay.

6         A    And going over the same terms, and then

7    later, there's something dated 9/17, which would be,

8    if I'm correct about the date of my meeting with

9    Fran and Anna, would have been notes of the meeting

10   with me.  Fran took notes on telephone calls, on

11   meetings.  She -- the only way she could really

12   remember things is to write it down.

13        Q    Okay.  Do you -- let me go through some

14   specifics here.  Distribution to Anna, paren, for

15   four years, close paren, of one million per year.

16             Do you have any idea what that's

17   referencing?

18        A    In the -- in the -- in the discussions,

19   and I can only assume that -- that what John is

20   repeating is what I was telling everyone is there --

21   the statute of limitations with respect to the

22   challenge of the GRAT could be six years.

23             So that we were talking about some

24   sort of a hold back until that statute of

25   limitations would have run, but in the meantime, out

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 193

1    of Anna -- Anna would be getting distributions of a

2    million dollars a year, which would be replacing the

3    deal that I struck to get her a million dollars a

4    year on the '94 trust in return for her seeing

5    appropriate psychiatrists and taking appropriate

6    medications.

7        Q    Okay.  And that deal you struck was

8    already in place at this point; right?

9        A    Correct.

10       Q    And she was seeing the psychiatrist and

11   receiving appropriate medication; correct?

12       A    Correct.

13       Q    And you didn't foresee that deal going

14   away, did you?

15       A    It was going to be substituted to come out

16   of this trust.

17       Q    All right.

18       A    But it'd be locked in.

19       Q    Okay.  Go to the next page.

20       A    Okay.

21       Q    Bruce has two versions of GRAT, question

22   mark.  One purchase agreement at 215 of voting

23   shares.

24            Do you see that?

25       A    I see that.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 194

1      Q    Tell me what you know about that?

2      **A    I don't know what it means.**

3      Q    Did you ever have two versions of the

4    GRAT?

5      **A    As part of the -- what we were discussing**

6    **as part of the family settlement agreement was a**

7    **modified GRAT, so it would have been a second**

8    **version.  I think you refer to it as GRAT 2 or**

9    **something.**

10     Q    I do.

11     **A    Which is the GRAT of the February 1, 2001,**

12   **as modified by a family settlement agreement, but I**

13   **don't know what he had put in that -- in the term**

14   **sheet purchase of voting shares.**

15     Q    I recall that.

16          I just -- in September 11, 2002, did

17   you have two drafts of a GRAT going, I guess, is my

18   question?

19     **A    Not that I'm aware of that I recall.**

20     Q    And then it says, Documents dated 2/1/01.

21   Number one, it says 60 or 40, or two, one-third,

22   one-third, one-third way -- way numbers closer, ten

23   million irrelevant.  I think that's what that means,

24   ten mill, ML.

25          Any idea what that's about?  What

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 195

1    documents are dated 2/1/01 that have a 60/40 or a

2    one-third, one-third, one-third?

3        **A    I don't -- I don't know.  The one-third,**

4    **one-third, one-third I think is the three-way split**

5    **among the children.  I believe the ten million was**

6    **Lucia asking for a sweetener.**

7        Q    Okay.  But the document's dated 2/1 --

8    2/1/01, any -- any understanding of what that

9    document would be that would have those different

10   splits in it?

11       **A    No.**

12       MR. MCMICHAEL:  To the extent, it assumes

13   that these things are tied together.

14       MR. DAVIS:  Yeah, I have no idea.

15   BY MR. DAVIS:

16       Q    9/17/02 is the next one.  I'm going to

17   read this into the record.  I think that's a seven.

18   107 percent of value not income return to me, plus

19   taxed.  I pay gift tax on above.  Stock is Bradford

20   stock.  Only stock which can be in -- traded.  And

21   then it has revocable there at the bottom right, I

22   believe.

23       **A    I don't know that that word is revocable.**

24       Q    What word do you think that is?

25       **A    Receivable.  I don't know.  I don't know**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 196

1      what that word is.

2          Q    Do you know if Frances Middleton had an

3      understanding as of September 17th, 2002 that the

4      GRAT was revocable?

5          **A    I know she knew it was not.  This is --**

6      **these are her notes of the meeting with me and Fran**

7      **and Anna.  And Anna had the percentage better than**

8      **Fran.  But I would have stressed it was an**

9      **irrevocable trust.**

10          MR. MCMICHAEL:  That's assuming that's

11      107.  It looks to me like it's 109.

12          THE WITNESS:  That could be closer because

13      it's 108, plus change.

14          MR. DAVIS:  I don't -- you're right.  It

15      could be a nine.  I don't know.  That's why I

16      said --

17          MR. MCMICHAEL:  Mathematically, it would

18      be closer if it were a nine.  Seven is just

19      wrong.

20      BY MR. DAVIS:

21          Q    Okay.  Next page, 10/10/02.  It says,

22      numeral -- Roman numeral I, Bruce, colon, enormous

23      cost to you and the company.

24              Do you recall a conversation around

25      this timeframe?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 197

1      A    I believe there was a conversation with

2    Fran and Liz Arias.  That might have been

3    October 10th.  It could have been on October 11th,

4    something like that.

5      Q    Okay.

6      A    This would have been notes of the

7    telephone conversation.

8      Q    Enormous cost to you and the company, do

9    you know what that's referring to?

10     A    I mean, my guess is if Lucia goes forward

11   with the lawsuit and the lawsuit -- defending the

12   entire lawsuit and the cost could be both financial

13   and destruction of the family.

14     Q    Next line, Harmful to send out letter,

15   family agreement.

16          Any idea what that's referencing?

17     A    I don't know what -- the reference to a

18   letter.  Family agreement was the only way this

19   could be achieved would be by virtue of a family

20   settlement agreement.

21     Q    And then there's a star.  John has

22   negative interest in the GRAT change.

23          Do you know what that means?

24     A    I know what it means.  I don't know why

25   she would have written it.

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 198

1  Q Yeah. That's what I'm really getting at

2 is -- is if you had this conversation with --

3  **A** **I would not have had that conversation.**

4  Q Okay. And the bottom says, Conversation

5 W, four slash Bruce early.

6    This early morning conversation, does

7 that ring any bells for you?

8  **A** **I thought that the conversation with Liz,**

9 **Fran, and me was in the morning, but I -- I don't**

10 **know.**

11  Q Okay. What about guaranteed distribution

12 for taxes?

13    Do you have anything -- do you know

14 what that's about?

15  **A** **There -- with the s-selection, the**

16 **shareholders were guaranteed distributions to pay**

17 **income taxes in connection with the distributions**

18 **from the earnings of the company.**

19  Q Very bottom, second to last, it says --

20 it's got three stars on it. I think it says,

21 Dishonest because John allowed me to sign GRAT, plus

22 wanted it all. Never should have allowed John to

23 get.

24    Is that something you conveyed?

25  **A** **No. These are notes of a conversation**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 199

1    **with Lucia.**

2        Q    All right.  That's what I thought, just

3    wanted to see.

4        **A    She would have written down verbatim what**

5    **Lucia is telling her.**

6        Q    Okay.

7            MR. MCMICHAEL:  I need to take a short

8    break when you have a convenient stopping

9    place.

10           MR. DAVIS:  Sure.  Go ahead.

11           MR. MCMICHAEL:  You want to do it now?

12   Just give me a minute.

13           THE VIDEOGRAPHER:  This is the end of DVD

14   No. 2 of the video deposition of Bruce A.

15   Rosenfeld [sic].  The time is --

16           THE WITNESS:  Field.

17           THE VIDEOGRAPHER:  -- 3:23.

18              - - -

19           (Recess was taken from 3:23 p.m. to

20   3:37 p.m.)

21              - - -

22           THE VIDEOGRAPHER:  This is the beginning

23   of DVD No. 3 of the video deposition of Bruce

24   **A. Rosenfield.  The time is approximately 3:37.**

25   **We are on the record.**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 200

BY MR. DAVIS:

Q    We just took a break, Mr. Rosenfield.

    Did you have a discussion with Mr.
Mannion at all during that break?

**A    No.**

Q    What about Mr. Smith?

**A    No.**

Q    Did you have a discussion with your
lawyers with those two in that discussion?

**A    No.**

Q    Let me point you to the next page, which I
believe is this one.

**A    Yes.**

Q    All right.  And, again, I think you
identified this as probably being a conversation
with Lucia and Ms. Middleton.  And it says at the
top, I should have divided my will one-third,
one-third, one-third.  Dad wanted L and A -- I'm
assuming that's Lucia and Anna -- to have identical
shares with John.

**A    I really don't have any idea what this is.**

Q    Okay.  Do you have any idea if that was
the intent of dad?

    MR. MANNION:  Objection.

    MR. MCMICHAEL:  Hold on, this could be a

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 201

1      privilege issue.  You're objecting on the basis

2      of attorney-client privilege?

3          MR. MANNION:  Yes.

4          MR. MCMICHAEL:  Okay.  Do you have any

5      knowledge of dad's, or Herb's, intention,

6      outside of conversations you would have had

7      with Herb?

8          THE WITNESS:  No.

9          MR. MCMICHAEL:  Okay.  I direct him not to

10     answer the question.

11     BY MR. DAVIS:

12         Q    Did you have any understanding outside of

13     Herbert that there was an intention to provide the

14     same number of shares to all the children?

15         **A    I know there was not.**

16         Q    Based on the conversations that we

17     discussed earlier?

18         **A    No, based on the 1982 trust.**

19         Q    Okay, fair.  All right.

20              But the shares in possession of

21     Frances Middleton, outside of your conversations

22     with Herbert, did you have an understanding if those

23     shares were to be divided equally amongst the

24     children?

25              MR. MANNION:  Hang on a second.  There's a

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 202

1       privilege issue to anything -- the question has

2       no time period.  So you need a time period for

3       --

4           MR. DAVIS:  This is the '02 timeframe.

5       That's what I'm asking --

6           MR. MANNION:  After October -- after

7       August 1st?

8           MR. DAVIS:  Yes.

9           MR. MANNION:  That's fine.

10          MR. DAVIS:  Yeah.

11          MR. MCMICHAEL:  You can answer the

12       question.

13          THE WITNESS:  After -- in October 2002,

14       Fran told me she wanted to divide the shares of

15       the GRAT, one-third, one-third, one-third.

16    BY MR. DAVIS:

17      Q   I want to try to point you to -- there's

18   no numbers on these, so I'm sorry.  I'm just going

19   to have to show it to you and see if you can find

20   it.

21      **A   Yup.**

22      Q   Okay.  And if there's a little arrow

23   there, and it says, John has never stopped Bruce

24   from -- I think --

25          MR. MCMICHAEL:  Hang on.  Let me get on

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 203

1      the same page here, just a second.

2           MR. DAVIS:  Yeah.

3           MR. MCMICHAEL:  Okay, got it.

4    BY MR. DAVIS:

5      Q    It says, John has never stopped Bruce from

6    giving.  Does that ring any bells?  Do you

7    understand?

8           Would that have any meaning to you?

9      **A    It has no meaning to me.**

10     Q    Okay.

11     **A    This is not based on a conversation I had**

12   **with Fran.**

13     Q    And I think it continues, maybe she just

14   stopped there, but it says, John never -- has never

15   stopped Bruce from giving, if get back more in GRAT.

16          And I know that's not a conversation

17   you had.  I'm just trying to see if you have any

18   understanding what that would be referencing to?

19     **A    These have to be discussions between Lucia**

20   **and Fran.  I mean, that's the -- that's the only**

21   **thing that would make sense.**

22     Q    And then it says, Bruce says John doesn't

23   need more stock, needs -- I don't really have

24   anything after that.

25          Any idea what that's concerning?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 204

1          **A    No.**

2          Q    Okay.  Then we've got something that says.

3     Bruce, re UPS letter, gifting, question mark.

4                    Any idea what that would be, UPS?

5          **A    No, I don't.**

6          Q    Okay, all right.  Again, here -- and I

7     know these are not your notes, but I'm going to

8     point you to this page here.

9          MR. MCMICHAEL:  Got it.

10    BY MR. DAVIS:

11         Q    Okay.  It says, Ask Bruce.  Bruce in

12    compromise 1.6 position.

13                   Again, does that strike you at all?

14    Does that ring any bells for you?

15         **A    No.**

16         Q    And then it says, Can GRAT -- oh, I think

17    it says, Can change GRAT without settlement

18    agreement.  And then on top of that it says, No.

19                   Do you see that?

20         **A    I see that.**

21         Q    Okay.  Do you know if that's information

22    you would have conveyed to Frances?

23         **A    No.  I do not believe -- I think these are**

24    **notes of the conversation she had with one of her**

25    **children.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 205

1     Q    Okay.  I'm going to mark as Exhibit 53, a

2   letter dated October 10, 2002.

3                - - -

4          (Exhibit 53 was marked for

5   identification.)

6                - - -

7   BY MR. DAVIS:

8     Q    First of all, are you familiar with this

9   letter?

10    **A    I am.**

11    Q    Based on our previous discussion, it

12   sounded like you were not aware of Frances Middleton

13   typing any of her own letters.

14          So would this have been a letter that

15   you would have typed for her?

16    **A    We did not type this letter.  We are**

17   **usually pretty good about typing the name of our law**

18   **firm correctly.**

19    Q    Okay.  What's wrong with the name of the

20   law firm, just spelled --

21    **A    It's not the name of our law firm.**

22    Q    Okay.

23    **A    Schanader.  I think they're trying to make**

24   **us Irish or something, Pennsylvania Dutch.**

25    Q    I didn't pick up on that.  That's very

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 206

1    good.  Okay, all right.

2            Do you -- would you have an idea who

3    would have typed this?

4        A    I don't know.

5        Q    Okay.  But you did receive this letter at

6    some point?

7        A    Yes.

8        Q    All right.  And is this the change that

9    you were referring to earlier in your testimony?

10       A    Yes.

11       Q    And it says -- it says in the letter, This

12   letter confirms my telephone conversation with you

13   of today's date in which I requested that you change

14   the provisions of the GRAT, which I signed on

15   February 1, 2001, to direct that the assets of the

16   GRAT distribute out to my children upon the GRAT's

17   termination on February 1, 2003 in the following

18   percentages.  And it goes one-third John; one-third

19   Lucia; one-third Anna.

20           Additionally, it discusses a $10

21   million amount to John Middleton, and then asks for

22   an overnight revision of the GRAT to Lucia as soon

23   as changes have been made.  So let's back up here.

24           Do you recall a conversation with her

25   on October 10th, 2002?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 207

1      A    Yes.  And I believe -- and I believe it's

2    October 10th, and I believe that is the conversation

3    that was being pushed by Lucia's lawyer, Liz Arias.

4      Q    And is it at that time that Ms. Middleton

5    decided to divide her GRAT distribution one-third,

6    one-third, one-third?

7      A    Whatever the remainder interest in the

8    GRAT was, yes.

9      Q    And it states -- it says, Which I signed

10    on February 1, 2001.

11           You see that there?

12     A    I see it.

13     Q    She did not sign the GRAT on February 1,

14    2001; correct?

15     A    She created the GRAT on February 1, 2001.

16     Q    She didn't sign it; right?

17     A    She gave it -- she created an oral GRAT on

18    February 1, 2001.

19     Q    Did she sign the GRAT on February 1, 2001?

20     A    She didn't sign the GRAT in 2001, on

21    February 1, 2001.

22     Q    Okay.  Did you comply with this direction?

23           Did you overnight a copy of a revised

24    GRAT to Lucia?

25     A    I don't know that I got it done by

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 208

1    **October 15th.  And we were waiting for input -- I**

2    **mean, this is part of the negotiation of the whole**

3    **deal.**

4        Q    Okay.  Let's -- I'll go ahead and mark --

5    this is 54.

6                    - - -

7            (Exhibit 54 was marked for

8    identification.)

9                    - - -

10   BY MR. DAVIS:

11       Q    This is October 1, 2002, and just -- and

12   this is a fax to Larry Laubach from yourself called

13   the Middleton Agreement.  And it has, I believe, the

14   GRAT, and I believe terms of the GRAT have changed

15   already in here.

16           And I guess that's what I'm -- is

17   there something else, other than this, that came

18   after this date that you would have sent to, like,

19   Lucia's lawyers?

20       A    I must tell you, I don't remember this --

21   **this document.  I'm not saying I didn't send it, but**

22   **I don't remember it.**

23           MR. MCMICHAEL:  Do you have Bates numbers

24   on these?

25           MR. DAVIS:  We do.  Looks like

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 209

1          BHICOZ031059.

2              MR. MCMICHAEL:  I'm sorry, zero?

3              MR. DAVIS:  031059.

4              MR. MCMICHAEL:  Got it.

5      BY MR. DAVIS:

6          Q    If we just look at page four, it looks

7      like, Remaining principal passing hereunder into

8      three equal shares.

9          A    Yes.

10         Q    You see that?

11         A    Yes.

12         Q    Okay.  So do you have a memory of -- and I

13     know Exhibit 53 is dated October 10th, 2002.

14              But do you have a memory of Ms.

15     Middleton wanting changes prior to that timeframe

16     because this is dated October 1st, 2002?

17         **A    We were in discussions before that about**

18     **-- about the family settlement agreement.**

19         Q    And I understand that, but it looks like

20     this is a specific direction about the GRAT

21     changing.  And we know in Exhibit 53, for example,

22     October 10, 2002, she's instructed you how to change

23     the GRAT one-third, one-third, one-third.

24              This is a little -- this is, you

25     know, ten days before October 1, 2002.  You're

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 210

1    sending it to Larry Laubach, who, of course, at the

2    time was John Middleton, Jr.'s attorney.

3        **A    Correct.**

4        Q    And so -- and there seem to be those

5    similar types of changes already in here.

6            What I'm asking simply is, Did -- did

7    Ms. Middleton have a change of intention prior to

8    October 10, 2002, to your knowledge, to your memory?

9        **A    We were just --**

10        MR. MCMICHAEL:  Are they --

11        THE WITNESS:  Direct conversations with

12    Fran.

13        MR. MCMICHAEL:  In October of 2002, you

14    can testify about a conversation with Fran

15    because you were jointly representing.

16        THE WITNESS:  Fran wanted to -- to -- she

17    wanted this resolved, and she wanted -- where

18    she was coming out at that point was a

19    three-way split.

20    BY MR. DAVIS:

21        Q    Exhibit 53, and if you're still looking at

22    that --

23        **A    That's okay.**

24        Q    -- then go ahead.

25        **A    No.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 211

1      Q    Just trying to jog your memory about --

2      **A    I was trying, not doing it.**

3      Q    That's all right.  Exhibit 53, the one

4    right before.

5      **A    Yes.**

6      Q    Handwritten notation there, In addition, I

7    would like my will to be changed to give my son,

8    John S. Middleton, the first $10 million of my

9    estate, signed Frances S. Middleton.

10           Do you -- do you have any

11   recollection what that was about, the $10 million,

12   what that was for, sweeten the pot, so to speak?

13     **A    I don't know what that was about.  She --**

14   **she said that to me, but I don't know the rationale**

15   **behind it.**

16     Q    Okay.  Pass it out, but it's already

17   Exhibit 19.

18           MR. MCMICHAEL:  We're not going to remark

19     it?

20           MR. DAVIS:  We're not.

21           MR. MCMICHAEL:  Okay.

22           MR. DAVIS:  It's Nupson-19.

23   BY MR. DAVIS:

24     Q    Just quickly, this was previously marked

25   as Nupson-19.  It's your waiver of conflict.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 212

1              Is that your signature in the back --

2       the end of the letter?

3           **A    It is.**

4           Q     And that's Anna Middleton's signature, as

5       you recall it?

6           **A    Yes.**

7           Q     Okay.  And Frances Middleton's signature

8       on the page before?

9           **A    Correct.**

10          Q     And do you know if John Middleton signed

11      this?

12          **A    I was under the impression he did.  I**

13      **don't think I ever saw a copy sent to Mr...**

14          Q     You don't know if you ever had a copy

15      received for your files?

16          **A    I don't think I ever did.  Larry wasn't so**

17      **good about passing on things.**

18          Q     When did Larry leave your firm?

19          **A    I'm not sure.  Something like the later**

20      **part of 2001, but I'm not -- I'm really not sure.**

21          Q     What I want to go to is, you've identified

22      the conflict of interest rule, Rule 1.7, in the

23      Supreme Court of Pennsylvania.  And I want to go to

24      the second page of the letter.

25              And you say that the criteria of 1.7

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 213

1    A are satisfied provided that we obtain the consent

2    of each of you, okay.

3            And so A, as you probably recall, is

4    the direct adversity rule; correct?

5        **A    Correct.**

6        Q    All right.  And then B is the materially

7    limited rule; correct?

8        **A    I think that's right.**

9        Q    All right.  Does this letter identify that

10   you're satisfied with -- that B was waivable?

11       **A    It doesn't say that.**

12       Q    Okay.  You would agree that you could --

13   could not represent Anna Nupson if that

14   representation would materially limit your

15   responsibilities to another client, including John

16   Middleton or Frances Middleton; correct?

17       **A    I thought the purpose of this was I was**

18   **not representing John Middleton in this transaction.**

19       Q    In this transaction.

20            But even if it's another client or a

21   third person, correct, if you look at B?

22       **A    Right.  Correct.**

23       Q    Okay.  As we sit here today, do you feel

24   satisfied that even though you don't identify B,

25   subsection B as being satisfied, do you feel like

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 214

1    subsection B was satisfied in October 11, 2002?

2    **A   I do.**

3    Q   If we look back at the March of 2001

4    e-mail exchange between yourself and John Middleton,

5    you were aware at least as of that time that John

6    Middleton desired all of the stock of Bradford;

7    correct?

8    **A   I was not.**

9    Q   You were not?

10    **A   No.  He was asking me whether it made**

11    **sense to try to buy the stock.**

12    Q   Okay.  So if we look at Exhibit 49, and

13    we'll turn to it.

14    Based on this e-mail exchange, you

15    didn't have an understanding that John Middleton

16    sought to additionally redeem his sister's stock?

17    **A   No, I do not.**

18    Q   Okay, all right.

19    Even though he was contemplating?

20    **A   He was asking my advice as to whether it**

21    **made sense to make an offer.**

22    Q   And your advice was it didn't make sense;

23    right?

24    THE REPORTER:  Sorry, what was that?

25

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 215

1    BY MR. DAVIS:

2        Q    Your advice was it didn't make sense?

3        **A    Yes.**

4        Q    My understanding is you can receive a

5    six-month extension from the IRS for a gift tax

6    return; is that right?

7        **A    That is correct.**

8        Q    Can you get an additional extension beyond

9    six months?

10       **A    You cannot.**

11       Q    Okay.  Now, just for the sake of

12   completeness, let me mark as Exhibit 55 the tax

13   return filed by you.

14                - - -

15                (Exhibit 55 was marked for

16   identification.)

17                - - -

18   BY MR. DAVIS:

19       Q    And under preparer's signature, is that

20   your signature?

21       **A    That is my signature.**

22       Q    I believe that's a two.

23            Is that 10/15/02 dated?

24       **A    Correct.**

25       Q    And can you identify what this is a return

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 216

1    for?

2        A    It's a gift tax return for -- for the year

3    2001 for Frances S. Middleton.

4        Q    And is this for the stock moved to the

5    GRAT?

6        A    Yes.

7        Q    And this is, of course, a few days after

8    the letter that Frances sent to you explaining that

9    she wanted the GRAT to be one-third, one-third,

10    one-third; correct?

11        A    That is correct.

12        Q    Okay, all right.

13            Did you provide a copy of the GRAT to

14    the IRS?

15        A    I did not.

16        Q    I don't know the procedure there.

17            Is that ordinary to provide it, or

18    ordinary not to provide it?

19        A    My practice was if -- I wanted the gift

20    tax return to give enough information to comply with

21    IRS requirements so that they could understand what

22    was being gifted and the value of the gift.  My

23    routine is in -- in a situation where we were doing

24    closely held businesses, as long as I attached the

25    appraisal, I would not attach the trust return as

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 217

1    **well.  And this one, I'm quite certain I did not**

2    **attach the GRAT.**

3        Q    I'm going to mark as Exhibit 56 the letter

4    dated February 5th, 2003.

5                     - - -

6            (Exhibit 56 was marked for

7    identification.)

8                     - - -

9    BY MR. DAVIS:

10       Q    Go to the end of the letter.

11            Is that your signature?

12       **A    Yes.**

13       Q    And I'm not sure why the letter has Anna

14   here.  I'm assuming it was on letterhead.  I don't

15   know the answer to that.  I'm assuming it was, but.

16           MR. MCMICHAEL:  Do you have a Bates number

17       for that?

18           MR. DAVIS:  I do.

19           MR. MCMICHAEL:  This is 56; right?

20           MR. DAVIS:  Fifty-six.  It's BHI046042.

21   BY MR. DAVIS:

22       Q    All right.  And it basically summarizes

23   the agreement.

24       **A    Right.**

25       Q    Okay.

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 218

1      **A   And what's the date of this letter?**

2      Q   If you look at the next page, there's a

3  header that says February 2nd, 2003?

4      **A   February 5th.**

5      Q   February 5th, thanks.

6      **A   Okay.  I don't specifically remember this**

7  **letter, but that's --**

8      Q   Okay.

9      **A   -- I'm not disputing that I sent it.**

10     Q   Did you -- so this was sent to Frances

11  Middleton, I believe?

12     **A   That's what it says.**

13     Q   It is.  And I don't see a similar letter

14  to Anna Nupson.

15           Were you aware if there was one?

16     **A   I'm not aware of this letter, so.  It's**

17  **pretty unusual for me to write, Dear, Frances.**

18     Q   Why is that?

19     **A   I call her Fran.**

20     Q   Okay.  As we discussed earlier, the oral

21  GRAT, or the GRAT as you say, when it was formed,

22  you did not send a similar letter to Frances

23  Middleton discussing the GRAT and what it meant.

24  But after this agreement in 2003, you sent this

25  pretty comprehensive letter identifying what's

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 219

1    occurred.

2            Do you know why that is?

3    **A    I don't remember sending this letter, so I**

4    **don't know why it was sent.**

5    Q    Okay.  Was this not your practice to send

6    these types of letters?

7    **A    Unless a client asked for it, or there was**

8    **some reason that I needed to do it.  She may have**

9    **asked me for it, but I don't -- I don't remember.  I**

10   **would have, at length, discussed the terms of the**

11   **settlement, just as I did at length with Anna.**

12   Q    And when you say "would have discussed the

13   terms," you're talking verbally would have discussed

14   the terms?

15   **A    Correct.**

16   Q    So when did your representation of Anna

17   end?

18   **A    Mr. Mucci (ph) dismissed me on her behalf**

19   **as her -- as general -- her general counsel, I think**

20   **it was 2014.  It could have been 2015, but I think**

21   **2014.**

22            **- - -**

23           **(Exhibit 57 was marked for**

24   **identification.)**

25            **- - -**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 220

1    BY MR. DAVIS:

2        Q    Exhibit 57 is a memorandum, December 20,

3    2001 to your file.

4            And I just want to kind of go through

5    different particulars of this?

6        A    **Okay.**

7        Q    Again, this -- this is confirming a

8    meeting.

9            Do you know why you have a memorandum

10   confirming a meeting with Anna?

11       A    **I think it was because of the deal, and**

12   **the issue of whether I would be allowed to talk to**

13   **her doctor.**

14       Q    Okay.  At this time, were you representing

15   Anna Middleton?

16       A    **I was -- the family had asked me to be the**

17   **interface with Anna for her 1994 trust because that**

18   **was causing a serious problem between her mother and**

19   **Anna and really hurting their relationship.**

20            **So they asked me to step in and**

21   **really be the surrogate.  So I was the one who**

22   **discussed all distributions and the ground rules for**

23   **the '94 trust with her.**

24       Q    What were those ground rules?

25       A    **Well, here, there was an offer of giving**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 221

1      her a million dollars a year if she would get

2      appropriate psychiatric care and appropriate

3      medication.

4          Q    This was prior to your engagement in late

5      August of 2002, obviously, and the negotiations for

6      modification of the GRAT and the family settlement

7      agreement; correct?

8          A    Correct.

9          Q    Okay.  And so my understanding is the

10     million dollars a year, was that coming from a $6

11     million distribution that occurred in '01?

12         A    I'm sorry, I don't remember a six-million

13     -- there was a distribution that the company made,

14     but I don't -- I really don't understand.  I mean, I

15     don't know the rules.  There was a principal account

16     and an income account, and we were making

17     distributions from the income account.

18         Q    Okay.  And income would include dividends;

19     right?

20         A    Correct.

21         Q    And you just don't remember, as we sit

22     here today, whether there was a $6 million dividend

23     payment into her trust?

24         A    I don't recall.  We could -- it would be

25     reflected in the accounting that was filed with the

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.      June 24, 2021
Bruce Rosenfield, Esq.                                            NO. 2:18-cv-02505-NIQA

Page 222

1    '94 trust.

2        Q    Okay.

3        A    I haven't looked at the trust records in

4    20 years.

5        Q    Do you have any -- at this time, in 2001,

6    did you have any concerns -- well, say at this time,

7    December of 2001, did you have any concerns that you

8    could not pay Anna a million dollars a year for the

9    conceivable future?

10       A    I wouldn't have made the deal if I had

11   those concerns.

12       Q    All right.  So by the time you're

13   representing her in 2002, Anna is receiving a

14   million dollars a year; correct?

15       A    That is correct.

16       Q    And you don't anticipate that ever going

17   away at that point?

18       A    It depends on her actions.

19       Q    Meaning?

20       A    If she doesn't see a psychiatrist, she

21   doesn't take medication, they stop.

22       Q    Okay.  But -- but assuming she does that,

23   financially, you didn't have an issue with

24   distributing a million dollars?

25       A    Correct.  But that -- yes.  I mean, it was

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 223

1    dependent on replacement income into the trust

2    because if there wasn't sufficient income in the

3    trust, there wasn't the ability to make those

4    distributions.

5        Q    Well, by this time, wasn't Bradford an S

6    corporation, s-selection?

7        A    Yeah.  But the distributions that were

8    guaranteed -- the -- the distributions that were

9    guaranteed were simply an amount sufficient to pay

10   the income tax liability.  So there was no guarantee

11   of any extra distributions.

12       Q    So at the time of -- okay.

13           So John Middleton was retaining

14   earnings, I take it?

15       A    I don't recall the -- I'm just telling you

16   what the shareholder agreement required.  It

17   required a distribution to look at whoever was in

18   the highest income tax bracket, depending on the

19   state and federal, and that was distributed to each

20   shareholder.

21       Q    I see, okay.

22       A    But there would be no problem with

23   retained earnings once you're an S corporation, no

24   IRS penalties.

25       Q    Were you speaking to Anna Nupson's medical

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 224

1  providers?

2  **A   I met with Dr. Cox at least twice.**

3  Q   Do you recall the dates?

4  **A   I don't recall the dates.**

5  Q   What was your understanding of her

6  psychological condition at that time?

7  **A   I know in the past she had been very**

8  **depressed.  She'd been institutionalized for**

9  **depression.  And I believe she was bipolar.**

10  Q   And this was true in 2001, 2002 timeframe?

11  **A   Right.  Which was one -- it was the reason**

12  **to require medication.  She hadn't been taking it.**

13  Q   And it was true -- you were aware of this,

14  and it was still true during your representation of

15  her in 2002, 2003?

16  **A   She was taking medication.  She was fine.**

17  Q   Okay.  When did she start taking the

18  medication, to your recollection?

19  **A   At least in 2001.  I mean, I think she was**

20  **taking it a little bit before that, but there had**

21  **been a history of her not taking it.**

22  Q   I see.  Any other concerns with substance

23  abuse or anything at that time?

24  **A   No.**

25  Q   Did you have an understanding she was in

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 225

1      an abusive relationship at that time?

2          **A    The -- the reason I'm hesitating is in**

3      **1998, following -- in the fall of 1998, she called**

4      **me up because Mark had beaten her.  And I went out**

5      **to the house, and I arranged for her to get the**

6      **security guard to take care of her and make sure**

7      **that Mark didn't abuse her anymore.**

8              **She was separated from Mark**

9      **immediately following that and stayed away from him**

10     **as far as I know for several years.  I am not sure**

11     **-- she was not being forthright with me.  She was**

12     **going on trips.**

13             **It may have been in 2002, somewheres**

14     **maybe 2003, that she would start driving out to meet**

15     **him and be -- but there was a very -- there was a**

16     **significant period, three to six years, where she**

17     **didn't see him.**

18         Q    We'll mark an e-mail here.

19                  - - -

20             (Exhibit 58 was marked for

21     identification.)

22                  - - -

23     BY MR. DAVIS:

24         Q    This is Bates number AKM-012143.  And it's

25     an e-mail from 2011, but I think it's a discussion

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 226

1       you had with Jon Freund.  And the bottom there,

2       really what I'm trying to get at is the meetings and

3       see if we can discuss each of those meetings, if you

4       have a recollection about any of them.

5              And you tell -- tell John, there's a

6       meeting April 15, 2002, based on your billing

7       records.

8              Do you recall what that meeting was

9       about?

10      **A   I do not.**

11      Q    And then there's a meeting September 17th,

12      2002.  I think we've discussed --

13      **A   That is the meeting we discussed.**

14      Q    Okay.  And did we discuss everything that

15      was talked about at that meeting?

16      **A   I think so.**

17      Q    And then the meeting September 23rd, 2002

18      -- and let me ask.

19             The September 17, 2002 meeting, was

20      that in-person?

21      **A   Yes.**

22      Q    And September 23rd, 2002, do you know if

23      that's in-person?

24      **A   I don't -- I don't have a specific**

25      **recollection of that meeting.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 227

1        Q    Okay.  And the February 18th, 2003?

2        **A    I believe that's when she signed the**

3    **settlement documents.**

4        Q    All right.  And the next date you say, In

5    addition, I saw a reference to a family meeting on

6    December 19, 2002, but I didn't reflect who was

7    there.

8        **A    Correct.**

9        Q    Did you -- do you know what that meeting

10   was about, that family meeting?

11       **A    I do.**

12       Q    What was it about?

13       **A    That was a meeting to try to discuss terms**

14   **of the settlement, and that's the meeting where**

15   **Lucia, to my view, out of the blue suggested that**

16   **her shares be bought out.**

17       Q    Did Anna want her shares bought out?

18       **A    At that point, I don't think we actually**

19   **discussed that.  We did very shortly after that.**

20       Q    What was that discussion?

21       **A    I mean, we talked about whether it was in**

22   **her interest or not.  I just went through the pros**

23   **and cons of whether to -- to sell or not to sell,**

24   **and she initially was telling me that she was**

25   **inclined to hold onto it, just to give her brother**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 228

1     **grief.**

2          MR. MANNION:  I'm sorry, the last part?

3          THE WITNESS:  Just to give her brother

4     grief.  I'm sorry, I'll try to keep my voice

5     up, but it's difficult.

6     BY MR. DAVIS:

7          Q    And -- okay.

8               Did she make a decision at that

9     meeting that you just identified or telephone

10    conversation --

11         **A    I didn't hear what you said.**

12         Q    Or telephone conversation, I'm not sure

13    which it was?

14         **A    December 17th was a lengthy, all-hands**

15    **meeting.  Nineteenth.**

16         Q    Okay.  But I thought you said that -- that

17    was the family meeting where Lucia announces that

18    she would like to have her shares bought out?

19         **A    Right.**

20         Q    And you had a separate meeting with Anna a

21    different day?

22         **A    The separate meeting that was referred to**

23    **was when -- at the conclusion --**

24         Q    I see.

25         **A    -- of the settlement, and that we had to**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 229

1        sign documents.

2            Q   Oh, I've confused myself.

3            **A   February 18, 2003, I thought that's when**

4        **she signed the documents.**

5            Q   All right.  I might use the word "meeting"

6        to mean telephone conversations and in-person

7        meetings, but my understanding is, December 19,

8        2002, Lucia is discussing -- or she announces she'd

9        like the buyout, essentially?

10           **A   Right.  But I think here, I -- I don't**

11       **recall what we searched for.  But I think when I**

12       **usually talk about meetings, it's a face-to-face**

13       **meeting.  I don't think this is picking up a phone**

14       **conversation.**

15           Q   All right.  Regardless, you just mentioned

16       a discussion with Anna where she said she wanted to

17       not sell despite --

18           **A   Those are telephone conversations.**

19           Q   Okay.  Those were obviously after

20       December 19, 2002, I take it?

21           **A   Yes.**

22           Q   Okay.  That's all I'm trying to --

23           **A   Yes.**

24           Q   -- get my head around.

25           **A   Later in December, and I had discussions**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO.  2:18-cv-02505-NIQA

Page 230

1    in January.

2        Q    Okay.  If you could, there's a notebook --

3    22.

4        **A    Twenty-two?**

5        Q    Correct.  Again, another note to your

6    file, December 24, 2002, Spoke with Anna this

7    morning, and it says, While her initial inclination

8    was to continue to hold stock in order to spite John

9    -- what you discussed -- she was agreeable to

10   explore a settlement based upon a distribution to

11   Anna of the total amount in the GRAT.

12           What does that mean?

13       **A    She wanted of -- the -- the division of**

14   **GRAT into three shares for the remainder of whatever**

15   **was left.  Fran wanted -- it was going to Anna to**

16   **stay in trust, and Anna said she wanted it outright.**

17       Q    The '94 trust passing to her natural but

18   short of that, I'm assuming natural children?

19       **A    Yes.  So that was a backing down on her --**

20   **on her previous insistence that adopted children be**

21   **included as well.**

22       Q    Natural but short of that, that 50 -- 50

23   between the two families, and John would be removed

24   as trustee from Anna's trust.  An acceptable

25   replacement trustee would be arrived at.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 231

1              And so is this, essentially, the

2    conversation we were just discussing?

3          A    It's one of them.

4          Q    One of them, okay.  It also says, I also

5    told him that Fran demanded continued involvement

6    with the Phillies.  She understood.

7              Was Fran being pushed out of the

8    Phillies at this time?

9          A    She wouldn't have any stock.  She wanted

10   to go to the shareholder's meetings, to spring

11   training.  And in part of the representation of

12   Fran, I was trying to make sure that she would be

13   included as part of this agreement.

14         Q    I think you discussed this, but during the

15   negotiations that -- where we arrived at the 2003

16   family settlement agreement, was John Middleton --

17   and it seems, based on all the documents, he was

18   essentially threatening that he would not make any

19   amendments to the GRAT unless a further agreement

20   was reached, essentially?

21         A    He was insisting that there be a total

22   family settlement, and that includes that he -- that

23   his day-to-day handling of Bradford would not be

24   interfered with.

25         Q    If we look at Nupson-14.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 232

1    A   Okay.

2    Q   It's a letter to you, and that is your

3  timestamp on the top?

4    A   Correct.

5    Q   Date stamp rather?

6    A   Yup.

7    Q   August 22, 2001.

8        It looks like you received it

9  December 4th, 2001?

10   A   Correct.

11   Q   And I just want to point out a few things

12  here.  It says, Thank you for taking the time to

13  talk with me yesterday about the unsolicited 4,000

14  being transferred to my account from income

15  accumulation account, as well as the statement of

16  the audit of the trust.

17        So first of all, what's the audit of

18  the trust?

19   A   We file an accounting for the 1994 trust

20  with the Orphans' Court in Montgomery County.

21   Q   And that's -- okay.  So it was an

22  accounting not a --

23   A   The account would be audited.

24   Q   Audited, okay.

25        And then you were not the trustee of

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 233

1  that trust at this time?

2     **A  I was not.**

3     Q  Okay.

4     **A  But I was the de facto bill payer,**

5  **decision-maker for the trust.**

6     Q  Yeah, that's what I was getting at.  So

7  essentially, the type of -- day-to-day was handled

8  by you.

9        Is that fair to say?

10     **A  That is fair to say.**

11     Q  Okay.  Next -- third paragraph, it says,

12  Thank you also for the update on where we are on the

13  s-selection of the company.  Still the same, and the

14  other issues.  My understanding, by this time, the

15  s-selection had been made.

16        Do you know what she's referring to?

17     **A  I really don't.**

18     Q  It says, As I mentioned to you, it is

19  difficult, if not impossible, for me to make a

20  decision as important as my selling my stock without

21  any concrete information as to a specific offer or

22  the ifs and whens of the S status.

23        You see that there?

24     **A  I see that.**

25     Q  Any idea why she's confused as to the S

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 234

1       status at this point?

2           **A   I am not.  I mean, we made an s-selection,**

3       **I think, on February 1, 2001.  So I don't -- I mean,**

4       **it may be that she's -- she doesn't -- I don't think**

5       **the -- the issue of what distributions would be made**

6       **was not -- there was no precedent for that.  The**

7       **only thing that was locked in was the income tax**

8       **liability.**

9           Q   I'm trying to understand what discussions

10      were being had about selling her -- her stock in

11      August of 2001?

12          **A   I wasn't involved in any, so I don't know.**

13      **I mean, that's following the -- the e-mails back and**

14      **forth between John and me.  It could be that he had**

15      **discussions with her.**

16          Q   Let's go to Nupson-16.

17          **A   Okay.**

18          Q   Again, it's another letter from Anna

19      Middleton received by you June 11th, 2002, sent

20      June 7th, 2002.  I just want to go to the secondly

21      part.

22          **A   Yes.**

23          Q   You had indicated to me last time we spoke

24      a few weeks ago that my second big cash disbursement

25      would occur this month.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 235

1          What cash disbursement was that?

2     **A    That would be the $250,000 quarterly**

3     **distribution.**

4     Q    Okay.  Then thirdly, my mother and I were

5     talking about estate matters, et cetera, and she

6     asked me why didn't I buy family company stock under

7     the same deal that John will be buying some.

8          Do you know what she's referring to?

9     **A    I can speculate, but no.**

10    Q    Okay.  Speculate for me.

11         MR. MCMICHAEL:  Woah, woah, woah.  This is

12    prior to the joint representation period, so if

13    your speculation involves conversations with

14    Frances or anyone else, I believe there would

15    be a privilege.  You've got to be very careful.

16    Generally speaking, you should not speculate,

17    unless you have some basis upon which to do it

18    that's not privileged.

19         THE WITNESS:  It wouldn't be privileged.

20    I'm just reading what this is, I think this is

21    her having heard something about the terms of

22    the GRAT.

23         MR. MCMICHAEL:  Okay.

24         THE WITNESS:  Okay.

25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 236

1    BY MR. DAVIS:

2        Q    What's your answer to that -- that's the

3    answer?

4        A    **That's the answer.**

5        Q    You told her the offer had not been made

6    to me.

7              Did you send a letter to Frances or

8    to Anna clarifying what the GRAT was after you

9    received this letter?

10       A    **No.**

11       Q    She told me that she would ask you about

12   it and get back to me.  We spoke a few days ago, and

13   she indicated she hadn't managed to get back -- that

14   you hadn't managed to get back to her about it yet.

15   This is just to give you a little nudge to give her

16   a buzz about the issue.

17             Do you recall having those

18   conversations with Frances?

19       A    **I don't recall that.**

20       Q    Okay.  In October of 2002, do you know if

21   Anna was living on Morris Avenue?

22       A    **She was not.**

23       Q    Where was she living?

24       A    **Shamrock Lane or down at the Chesapeake.**

25             MR. DAVIS:  Tell you what, let's go off

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 237

1          the record.  I'm going to take a quick break

2          and get to another section.

3               THE VIDEOGRAPHER:  4:39, off the record.

4                    - - -

5               (Recess was taken from 4:39 p.m. to

6          4:52 p.m.)

7                    - - -

8               THE VIDEOGRAPHER:  4:52, we are back on

9          the record.

10              MR. DAVIS:  Let's mark as Exhibit 60 a

11         letter from Lucia's lawyers, dated November 25,

12         2002.

13                   - - -

14              (Exhibit 59 was marked for

15         identification.)

16                   - - -

17              MR. MCMICHAEL:  Is this 60?  I've got -- I

18         think we're on 59.

19              MR. DAVIS:  Oh, excuse me.  Let me just

20         scratch that out, put something on top of it.

21              MR. MCMICHAEL:  Fifty-nine.

22         BY MR. DAVIS:

23         Q    Okay, all right.  This is a memo to you

24         from Elizabeth Arias, dated November 25, 2002,

25         regarding final comments on the GRAT.

Page 238

1              Do you recall receiving this letter?

2       **A    I -- I know -- I know the substance.  I**

3  **don't -- I know that she was giving us her comments.**

4       Q    Okay.  I want to go down to this

5  particular section.  It's Paragraph 8.  Paragraph --

6  and it says, Paragraph 4(c) of item sixth concerns

7  me because it could raise an issue with the IRS

8  regarding when the GRAT was signed, period.

9              The paragraph clearly contemplates

10  the settlement between the parties.  A quick glance

11  at the settlement agreement would uncover that the

12  parties agreed that Anna must exercise the power of

13  appointment that she retained over her 1994 grantor

14  trust so that neither Lucia's nor John's family --

15  family is unequally benefited.

16              Paragraph 4(c) of item sixth is part

17  of a GRAT that was signed in 2001, and how could

18  such provision have been contemplated at the time.

19  And then she recommended striking the provision.

20              Do you recall having any further

21  discussions with Ms. Arias about the concern there?

22       **A    I actually don't recall that.  I do not**

23  **recall further discussions.**

24       Q    Do you know why she was concerned about

25  the execution date?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 239

1          A    We were all concerned about the execution

2     date.

3          Q    Why?

4          A    Because we didn't want to draw the -- the

5     family agreement did not touch the GRAT.  The family

6     agreement concerned the period after the GRAT term.

7     And there was no modification whatsoever to the GRAT

8     term.  We did not want to draw attention to someone

9     reviewing it ten years in the future, and that might

10    challenge, might question what was going on, and

11    give rise more to a gift tax obligation.

12              So we're trying to be very sensitive,

13    which is why what you refer to as GRAT 2, and what I

14    refer to as the GRAT is February 1.

15         Q    Let's mark that as -- well, I don't need

16    to mark it actually.  It's marked as Exhibit 24 in

17    Anna Nupson's deposition.  I've got copies of it.

18    It's a little bit different version from here, but.

19              When was this signed?  Feel free to

20    take a look through it, if you need to.

21         A    I believe it was signed in mid-February by

22    John and by Fran.

23         Q    Of 2000 and?

24         A    2002.

25         Q    2002.  And it was not --

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 240

1       MR. MCMICHAEL: '3.

2       THE WITNESS: I'm sorry, I'm sorry. Thank

3   you, 2003.

4   BY MR. DAVIS:

5       Q    And what you just testified to is it was

6   not tied to the family settlement agreement; is that

7   right? I think that's how you -- if I miss --

8       **A    No, absolutely. It was a fundamental part**

9   **of the family settlement agreement.**

10      Q    Okay. What -- perhaps I misunderstood

11  what you just testified to. We were discussing the

12  Arias letter, her concerns about the execution date

13  of the GRAT.

14      **A    Right.**

15      Q    And you said because of that concern -- I

16  thought you said, I guess I got it wrong, I thought

17  you said something to the effect of that's why the

18  GRAT was not tied --

19      **A    This was all -- everything was integrated**

20  **into the settlement. The GRAT -- the restatement of**

21  **the GRAT, the terms about Bradford stock, everything**

22  **was one piece. It wouldn't -- nothing would have**

23  **happened unless everything happened.**

24      Q    And that's because John was saying he

25  would refuse -- refusing to sign any type of

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 241

1  reallocation within the GRAT unless everything else

2  happened?

3      A   Correct.

4      Q   Anywhere in Nupson-24 does it say

5  "restated"?

6      A   It does not.

7      Q   Amended?

8      A   Does not.

9      Q   It still says, Executed on the first day

10  of February 2001; correct?

11      A   It does.

12      Q   That's not the date it was executed;

13  right?

14      A   It was the date that, pursuant to a family

15  settlement agreement, it became effective.

16      Q   Okay.  I'm going to mark a couple of

17  things real quick.

18          (Discussion was held off the record.)

19      THE WITNESS:  Nupson-26?

20      MS. JOHNSON VIDALES:  Correct.

21      MR. DAVIS:  All right.  So Nupson-26, and

22  then let me mark the one that's not in yet.

23  We'll mark it 60, entitled family settlement

24  agreement.  I've only got one extra of those,

25  I'm sorry.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 242

1                  - - -

2              (Exhibit 60 was marked for

3       identification.)

4                  - - -

5              THE WITNESS:  Okay.

6       BY MR. DAVIS:

7          Q    What I've identified as 60, this changes a

8       number of terms to the '94 Anna trust; is that

9       right?

10         **A    That is correct.**

11         Q    Was there any need to go to court to make

12      those changes?

13         **A    Family settlement agreements are pretty**

14      **well respected by Pennsylvania's -- established law**

15      **in Pennsylvania Supreme Court.  It encourages family**

16      **settlement agreements to resolve family disputes.**

17         Q    And so, although this is altering a trust

18      --

19         **A    It's not altering a trust.  It's altering**

20      **-- it's agreeing to specific terms by Anna about how**

21      **she would exercise her rights over the trust.**

22         Q    At any point, did you obtain a new

23      valuation for Anna Nupson from the time you

24      represented her in August, more or less, 2002

25      through the execution of the family settlement

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 243

1    agreement?

2    **A   No.**

3    Q   At any point, did you tell Ms. Nupson that

4    she could get a new valuation?

5    **A   My discussions with Anna concerning the**

6    **price was that I wasn't going to be involved in the**

7    **price.  That she was relying on her sister and her**

8    **sister's lawyers to -- to deal with the price**

9    **issues.**

10    Q   Did that limited scope of representation,

11    did you ever put that in any engagement letter to

12    her?

13    **A   I did not.  It was all -- it was all based**

14    **on -- on discussions, oral discussions with her.**

15    Q   Okay.  Any other limitations to your

16    representation of Anna Nupson during that timeframe?

17    **A   I don't understand that.**

18    Q   Sure.  You just described a constriction

19    on your representation of Anna Nupson.  That's what

20    I would call it.

21    **A   Okay.**

22    Q   Okay.  Those are my words, not yours.

23    MR. MCMICHAEL:  Let me just object to the

24    characterization.

25

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 244

1    BY MR. DAVIS:

2        Q    Sure.  But what you testified to was that

3    you told Anna Nupson that you could not be involved

4    in determining --

5        A    No.  That's not what I said.

6        Q    Okay.

7        A    I said -- Lucia was represented by

8    extremely sophisticated counsel involved in tobacco

9    businesses.  And they were spending a huge amount of

10   money on valuing the company.  And the question was

11   whether Anna should be spending her own resources or

12   the trust's resources to get a second opinion on the

13   valuation.

14             And she decided that it wasn't worth

15   doing.  It was not something I put -- I didn't say,

16   Anna, you're crazy not to get your own valuation.  I

17   agreed with her that it was reasonable to rely on

18   Lucia and her lawyers to be paying for and getting

19   the valuations.

20       Q    Did you receive those valuations from

21   Lucia's lawyers?

22       A    We got the -- the end results.  We got the

23   numbers that they were talking about.  I did not

24   review how they arrived at the results, and it would

25   have been meaningless for me to do that.  I'm not --

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 245

1      **I don't have the financial expertise to do that. We**

2      **would have had to hire experts to do that.**

3          Q    And from what I've seen from some of the

4      valuations that you've had done in this -- and

5      would, you know, particularly when you helped form

6      the GRAT, it was about a $10,000 cost?

7          **A    Something like that. I don't know.**

8          Q    Okay.

9          **A    I don't recall.**

10         Q    Is there a difference in a valuation for

11     IRS or gift purposes versus valuation for the sale

12     of a stock?

13         **A    The -- I mean, you are asking the**

14     **appraiser to give you a value that he or she can**

15     **defend. And if I'm doing it purely for gifting**

16     **purposes, I often try to get as low a number as**

17     **possible. In this case, when the appraisal was**

18     **obtained at the time of the discussions with buying**

19     **out the cousins' shares, the -- the request was an**

20     **arm's length fair market value appraisal.**

21         Q    Let me -- I want to make sure I'm

22     referring -- I know what appraisal you're speaking

23     of.

24             What time frame was that, which one?

25         **A    It was effective, and I don't know the**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 246

1    **exact date, something like April 2000.**

2        Q    Fifteen, in not Nupson but --

3        **A    In the not Nupson?**

4        Q    Not Nupson.

5        **A    Okay.  Correct.**

6        Q    This is the one you're referring to?

7        **A    That is the one I was referring to.**

8        Q    And your instructions to Mr. Siwicki and

9    Howard Lawson (ph) were what?

10       **A    We were -- we were looking for the**

11   **absolute -- his best opinion of the value of those**

12   **shares to support the purchase of the shares of the**

13   **cousins.**

14       Q    So this was for the purchase of the shares

15   to the cousins and not for the GRAT?

16       **A    That is correct.**

17       Q    Did the cousins ask you to obtain this?

18       **A    Under the shareholder's agreement, there's**

19   **actually a requirement of the appraisal.  And so in**

20   **-- John was starting discussions, I believe, with**

21   **the cousins, and as a basis of valuation, we got the**

22   **appraisal from Howard Lawson.**

23       Q    And essentially, in this particular

24   appraisal, I believe that the opinion was 205 a

25   share for non-voting shares; correct?  I'm looking

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 247

1    at page five.

2        A    2005 -- 205 for non-voting; 215 for

3    voting.

4        Q    And this is a valuation that you obtained

5    for John to redeem --

6        A    Well, for the company to redeem.

7        Q    For the company to redeem shares from the

8    cousins; correct?

9        A    That is correct.

10       Q    This was not a valuation that the cousins

11   asked you to obtain to determine sale price?

12       A    I had no contact with the cousins.

13       Q    And this is prior to the s-selection; is

14   that right?

15       A    Correct.

16       Q    And was this the basis for the

17   valuation -- or is this the valuation you sent with

18   the gift tax?

19       A    It was not.

20       Q    Okay.  Which one did you send with the

21   gift tax?

22       A    The one that was effective as of

23   February 1, 20 -- 2001.  It was prepared later in

24   2002.

25       Q    Did you have -- was there any deal that

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 248

1     you're aware of for the cousins to receive

2     additional funds at a later point in time?

3         **A    A deal?**

4         Q    Yes.

5         **A    No.**

6         Q    Were you aware that the cousins received

7     additional funds later?

8         **A    I was aware --**

9             MR. MANNION:  Wait, hang on a second.  If

10     the source of that -- and Rebecca may have to

11     speak, but if the source of that was John

12     Middleton, as a client, or Bradford, as a

13     client, then the privilege is being asserted.

14             THE WITNESS:  If that is the ground rules,

15     I can't answer.

16             MR. KIPNES:  Rebecca added it was Leigh

17     Middleton as a client as well.

18     BY MR. DAVIS:

19         Q    Let me -- go to 17.

20             Have you ever seen this spreadsheet

21     before?

22         **A    I don't think so.**

23         Q    Again, on this, it states, On

24     December 27th, 2012, Leigh and I gave Susie and

25     Nancy 15 million each for a total of 30 million paid

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 249

1    to the Flood family.  This is 76 percent more than I

2    calculated that the Middleton family could possibly

3    owe them.  I want to ask you first about that

4    calculation.

5           Do you know what calculation he is

6    referring to?

7    **A    No.  I've never seen this.**

8    Q    Sure.  And I'm just asking if you're aware

9    of some of the information in there.  I'm just

10    asking about the chart.

11    **A    I am really not.**

12    Q    Were you privy to the 2012 transaction

13    where Susie and Nancy received $15 million each?

14    **A    I think that's --**

15           MR. MANNION:  I'm going to object.

16           THE WITNESS:  -- what I'm told I can't

17    answer.

18           MR. DAVIS:  Okay.

19           MR. MCMICHAEL:  Actually, you can answer

20    the question yes or no.  The question is

21    whether you were privy to the transaction?

22           THE WITNESS:  I was privy to a transaction

23    where there was a gift to them.

24    BY MR. DAVIS:

25    Q    Okay.  In 2002 -- I'm sorry.  During your

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 250

1    representation of Anna from August, more or less,

2    2002, through the execution, the signing of the

3    family settlement agreement, were you aware that

4    additional funds were going to be provided to the

5    cousins?

6        **A    I was not.**

7        Q    Let's look at 42.

8        **A    In this --**

9        Q    I don't think it -- I think it goes to the

10   next notebook.

11       **A    Okay.**

12       Q    So 42?

13       **A    Yes.**

14       Q    And is this the valuation that you

15   attached to the gift tax return?

16       **A    Yes.**

17       Q    So in this valuation, looking at page four

18   of the opinion letter.  It's not Bates numbered.

19       **A    Correct.  It's 215 for voting, and 205 for**

20   **non-voting.**

21       Q    The exact same price as the prior

22   valuation, is that right, at least for non-voting?

23       **A    I think for both.**

24       Q    Yeah.

25       **A    Yes.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 251

1    Q   Does that give you any pause that there

2    had not been an increase?

3    **A   No.**

4    Q   And as of February 1, 2001, the

5    s-selection has already occurred; correct?

6    **A   As of February 1, 2001, yes.**

7    Q   And from your understanding, that would

8    not increase the value of the shares?

9    **A   It depends on the practices of the**

10   **company.**

11   Q   The practice of this company, Bradford

12   Holdings?

13   **A   At that point, we had no precedent.  It**

14   **was a brand new s-selection, and I don't think there**

15   **was any track record of distributions.**

16   Q   Did you have any concerns that the number

17   of shares were off?

18   **A   That they were incorrectly reported?**

19   Q   Yes, in the valuation.

20       Because they've not identified the

21   cousins' shares have been redeemed, reducing the

22   total number of shares?

23   **A   I don't recall that.**

24   Q   Okay.  Would that increase value

25   generally?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 252

1      A    It depends on the company, I mean.

2      Q    This company?

3      A    This company, there was a huge outlay of

4    cash to buy the shares, so that came off the balance

5    sheet of the company.  And in this company in

6    particular, the reduction in the cash made the

7    company much more vulnerable to litigation, and

8    couldn't afford the extreme cost of defense of

9    tobacco litigation.

10          MR. MANNION:  Let's not get too far down

11      into privileged communications about --

12          THE WITNESS:  Sorry.

13          MR. MCMICHAEL:  You're not referring to

14      any communications in that answer.  You're just

15      referring to your own understanding.

16          MR. MANNION:  Or work product.

17          THE WITNESS:  I -- I wasn't involved in

18      any of that.  I'm talking about the -- whether

19      or not a company can afford huge defense costs.

20          MR. DAVIS:  I think he's talking about his

21      opinion when he was representing Anna Nupson;

22      is that right?

23          THE WITNESS:  Yes.

24    BY MR. DAVIS:

25      Q    So you say that, I want to point you to

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 253

1    the exhibits here.  And, unfortunately, it's a set

2    with no Bates numbers.  It's hard to point you.  I

3    don't know if you can get to this.

4            MR. MCMICHAEL:  Which Exhibit No. is at

5        the top?

6            MR. DAVIS:  Yeah, let me --

7            MR. MCMICHAEL:  I'm looking at Exhibit 1.

8        It goes all the way down to...

9            MR. DAVIS:  It just says exhibits,

10       valuation report exhibits.

11           MR. MCMICHAEL:  Look at the top and the

12       center, the top and the center.

13           MR. DAVIS:  Exhibit 1, Bradford Holdings,

14       Inc., Consolidated Balance Sheet.

15           MR. MCMICHAEL: Okay.  We're there.

16           THE WITNESS:  Okay.

17    BY MR. DAVIS:

18       Q    All right.  So I see what you're saying,

19    cash and short-term investment top 2000 goes from, I

20    believe, that's 68 million down to 57 million.

21            Right?

22       A    Yes.

23       Q    But then we go down to total liabilities

24    and stockholder's equity from 2000 to 2001, it

25    actually goes up, right, 192 million to 233 million?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 254

1    **A   Correct.**

2    Q   Does that indicate higher value to you?

3    **A   It indicates total -- a higher total**

4    **assets.  I don't know how that translates into**

5    **value.**

6    Q   Okay.  Same thing with EBITDA, if you go

7    down just past net income.

8        MR. MCMICHAEL:  There are different pages.

9    BY MR. DAVIS:

10   Q   I am sorry.  Thank you.  Next page.

11   **A   Next page is blank.**

12   Q   Yeah.  Next page.

13       MR. MCMICHAEL:  Exhibit 2, Consolidated

14   Statement of Income.

15   BY MR. DAVIS:

16   Q   Yeah, Consolidated Statement of Income.

17   If we look at the EBITDA, 277-and-a-half million,

18   and then it goes up to 81, and there's 70 million.

19       Do you see that there?

20   **A   Yes.**

21   Q   Again, any -- does that indicate to you

22   that the value of the company has risen at all?  And

23   I'm just asking your opinion.

24   **A   I -- I'm really not an appraiser.**

25   Q   All right.  Does that give you any pause

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO.  2:18-cv-02505-NIQA

Page 255

1    that perhaps the appraisal is not accurate

2    necessarily?

3        A    No.

4        Q    And my understanding is if you do the math

5    of this appraisal, that essentially the value came

6    in at basically one times earnings after all the

7    discounts for this company.

8        **A    I take your word for it.**

9        Q    Okay.

10       **A    I don't know that.**

11       Q    Okay.  I take it you didn't do the math at

12   the time you were representing Anna Nupson to

13   determine that; right?

14       **A    Correct.  This -- this appraisal was for a**

15   **gift tax return for her mother.  It had nothing to**

16   **do with Anna.**

17       Q    Okay.  But it formed the basis of the

18   GRAT; right?

19       **A    It didn't form the basis.**

20       Q    I'm getting tired.  It didn't form the

21   basis of the value you provided to the IRS to the

22   GRAT; correct?

23       **A    That is correct.**

24       Q    All right --

25       **A    And it was based on an arm's length**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 256

1    transaction.

2        Q    Does an arm -- well, let me ask you about

3    that.

4            I mean, if it's an arm's length

5    transaction, how many of those do you see six, seven

6    years down the road receive $15 million additional?

7        **A    I am not aware of any tie-in between the**

8    **two.**

9        Q    Okay.  So the $15 million gift is

10   unrelated to the purchase of the cousin's stock?

11       **A    That's my understanding and belief.**

12       Q    The share price that Anna ultimately sold

13   at?

14       **A    Yes.**

15       Q    Where did those figures come from, to your

16   knowledge?

17       **A    Lucia made an offer.  John took it under**

18   **advisement and came back with a counteroffer that**

19   **was significantly higher than what Lucia and her**

20   **lawyers had asked for.**

21       Q    Define "significant" for me, if you could.

22       **A    My recollection, it was like 30 percent**

23   **higher.**

24       Q    Let's mark another exhibit, 61.

25            - - -

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 257

1              (Exhibit 61 was marked for

2       identification.)

3                    - - -

4       BY MR. DAVIS:

5          Q    Are you familiar with this document at

6       all?

7              MR. MCMICHAEL:  Do you have a Bates number

8          for this document?

9              MR. DAVIS:  I do.  BHI011676.

10             MR. MCMICHAEL:  Thanks.

11             THE WITNESS:  I think I saw it in

12         preparing for this deposition for the first

13         time.

14      BY MR. DAVIS:

15         Q    Okay.  I want to ask you -- and I know

16      this is not your document, but the first couple of

17      lines, in particular, 205 per share is too low and

18      it may raise questions with the IRS about the value

19      used for the GRAT.

20             Why would that be?  And I know you

21      don't know --

22         **A    I don't know why, and I don't think it**

23      **would have.**

24         Q    Okay.  So you think that at the time of

25      Lucia and Anna's sale of their stock that 205 would

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 258

1    have been appropriate?

2         A    I am talking about raised questions with

3    the IRS.

4         Q    Okay.  You don't think it -- so in other

5    words, if they sold for 205, it wouldn't raise

6    questions with IRS?

7         A    That's -- that's correct.

8         Q    Okay.

9         A    His questions -- he's referring to the IRS

10   with the GRAT.  I was feeling comfortable with the

11   valuation we used in connection with the GRAT, based

12   on an arm's length sale to the cousin.

13             So the fact that whatever a

14   subsequent sale was, I don't -- I didn't see how

15   that -- I don't see how that might have raised a

16   question with the initial valuation of the GRAT.

17        Q    What if it was double, for example, the

18   price in two years?

19        A    It depends on what the company's doing

20   over two years.  This company was much more

21   successful than we thought it would be on

22   February 1, 2001.  We were able to satisfy the

23   entire annuity payments with cash.  That's shocking.

24   No one in their wildest dreams thought that that was

25   possible when we started the GRAT on 2 -- on

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 259

1    **February 1, 2001.**

2       Q    It seems to me that indicates the company

3    is -- is very valuable.

4              Is that fair to say?

5       **A    The two years subsequent, there was no**

6    **litigation that I'm aware of.  And therefore, it was**

7    **producing a lot of money.**

8       Q    So by 2002, by the end of 2002, I think

9    you testified you were aware that the company was

10   going to be able to satisfy the same?

11      **A    We thought we were feeling pretty good.**

12   **We didn't know until after the end of 2002 that we**

13   **actually could make the entire distribution in cash.**

14      Q    When did you know that?

15      **A    Shortly after that.**

16      Q    January?

17      **A    January, February, March, something like**

18   **that.  I don't -- I'm not sure.  And again, I --**

19   **those would have been calculations by John Stein and**

20   **John Middleton.  I would not have been involved.**

21      Q    So you're aware that 2002 when you're

22   representing Anna Nupson that there were not

23   lawsuits?

24      **A    I'm not -- I wasn't involved with anything**

25   **about the tobacco company.  That was all -- that was**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 260

1       **John and Larry Laubach.**

2          Q    Okay.  You just testified --

3          **A    I'm saying they -- we wouldn't have been**

4       **able to make the distributions had we had to have**

5       **been spending dramatic amounts of money in defense.**

6          Q    Are you aware of anything significantly

7       that changed between 2002 and 2007, 2006 in the

8       company?

9          **A    I think its profitability just continued**

10      **to increase.**

11         Q    But there wasn't a home-run product or

12      anything like that that dramatically changed the

13      landscape?

14            MR. MANNION:  What's the timeframe here?

15            MR. DAVIS:  2002 to 2006.

16            MR. MCMICHAEL:  To the extent it's from

17      Bradford or John, there's an objection to

18      privilege, to the extent Bruce learned that

19      information from his clients.

20            THE WITNESS:  I think it would have only

21      been from John or Bradford.

22            MR. MANNION:  Then there's an objection.

23            MR. DAVIS:  Okay.  And you're instructing

24      the witness not to answer, I'm presuming?

25            MR. MCMICHAEL:  I'll instruct him not to

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 261

1    answer.

2        MR. DAVIS:  Okay.

3        MR. MCMICHAEL:  Yeah, I will instruct him

4    not to answer if there's a privilege objection.

5    BY MR. DAVIS:

6        Q    But eventually you become aware of the

7    sale, correct, of the company in 2000 and --

8        **A    Late in 2007, yes.**

9        Q    All right.  For approximately $2.9

10   billion; right?

11       **A    Yes.**

12       Q    And that's a dramatic -- dramatically

13   higher valuation?

14       **A    Yes, it is.**

15       Q    Okay.  Did that give you any pause as to

16   your valuations of -- that were used for the GRAT

17   and for the ultimate sale by Anna or by Lucia?

18       **A    That did not.**

19       Q    You had discussed -- and again, I seem to

20   be hearing you, but not hearing you because I think

21   I'm translating what you say as not exactly what you

22   say, so correct me again if I do that.

23           I thought you said something to the

24   effect of you would not be dealing with valuations

25   with Anna, and that you would rely on Lucia's

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 262

1    attorney?

2    **A   That was the agreement between Anna and**

3    **me.**

4    Q   Okay. Did you have concern that the

5    valuation you used to -- for the underlying GRAT at

6    205, if you pushed a significantly higher value than

7    that, that it would be scrutinized by the IRS?

8    MR. MANNION: At what time?

9    MR. DAVIS: 2002 during his representation

10    of Anna.

11    THE WITNESS: No.

12    BY MR. DAVIS:

13    Q   If, for example, Anna Nupson sold her

14    shares for $500 a share, just making things up, in

15    2003, the early part of 2003 prior to the GRAT term

16    completion -- being completed, would that raise a

17    concern the IRS may look at the valuation two years

18    prior?

19    **A   The IRS might have looked at the valuation**

20    **in any event. I mean, if -- if you have a**

21    **transaction simply with buying out the siblings,**

22    **it's not going to be a public transaction, and it's**

23    **unlikely that it would cause additional concern with**

24    **the IRS.**

25    **The IRS is either going to audit the**

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 263

1    -- the initial GRAT based on the gift tax return or

2    not.  I mean, had, in 2003, while the public sale of

3    -- of the tobacco company for $2.9 billion coming

4    through, which would be public and high profile,

5    that could have given rise to a heightened

6    challenge.

7        Q    Were you within the statute of limitations

8    at that point?

9        A    Statute of limitations would have run

10   right around the time of the sale.

11       Q    Do you know if that was a factor?

12       A    I have no idea.

13           MR. MANNION:  Bruce, you need to get the

14   timeframes.

15           THE WITNESS:  I'm sorry.

16   BY MR. DAVIS:

17       Q    Let me point you to Exhibit 40,

18   non-Nupson.

19       A    Okay.

20       Q    A memorandum here, October 22nd, 2001.

21   Rob Siwicki told me that tobacco -- the total

22   tobacco company would be valued at 40 to

23   $50 million.  This is a controlled premium pushing

24   up the total non-enterprise value from less than

25   300 million.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 264

1          Can you translate that last sentence

2    for me?

3      **A    I cannot at this point.  It makes no --**

4    **makes no sense to me.**

5      Q    Okay.  And I'm just, I'm going to try to

6    see if it -- if there's anything there, but does the

7    300 million mean that's the value of Bradford at

8    that time?

9      **A    I have no idea.  It makes no sense.**

10      Q    Yeah.

11      **A    It is my initial on it, so -- but I have**

12    **no clue what it meant then.  And I certainly have no**

13    **clue what it means now.**

14      Q    And do you know why you're speaking to

15    Mr. Siwicki at this time?

16      **A    Yeah.**

17      Q    Tell me why.

18      **A    We're coming up with the appraisal.  We're**

19    **starting to discuss the appraisal.**

20      Q    And I know there's multiple ones.

21          Which one at this point?

22      **A    I think this is the one for -- for the**

23    **gift, but I am -- would have to look at the**

24    **engagement -- when the engagement for the**

25    **February 1, 2001 effective date appraisal was.  But**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 265

1    that would make sense to me that -- that's what it

2    has to be.  It has to be the start of discussion for

3    operation of the -- of the gift.

4        Q    You can turn to the next exhibit, 41.  And

5    I'm not sure this helps or not, but this is

6    April 9th, 2002?

7        A    Uh-huh.

8        Q    There's an engagement to Mr. Siwicki?

9        A    Right.

10       Q    Do you know if those two were related?

11       A    I don't know if they're related.

12       Q    Okay.  If you look at Exhibit 42 then, I

13   think the evaluation as of February 1, 2001; right?

14       A    That is correct.

15       Q    So are you aware of any communications

16   from Mr. Siwicki around the December 2000 timeframe,

17   as to the value of the company that you may have

18   had?

19       A    December 2000?  I don't think so.  That, I

20   believe, is after the issuance date of the appraisal

21   in 2000.

22       Q    Yeah, there's a November 13th, 2000, look

23   at 39.

24       A    Right.  I would not have had discussions

25   with him following that.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 266

1     Q    If we look at Exhibit 43.

2     **A    Okay.**

3     Q    There's a dividend here of $66 million to

4    be payable on or before April 13th, 2002?

5     **A    Yes.**

6     Q    This is a few months before you start

7    representing Ms. Nupson in negotiations with her

8    family; correct?

9     **A    Yes.**

10    Q    You were aware of this dividend declared;

11   right?

12    **A    I was not aware of the declaration of the**

13   **dividend.**

14    Q    You were aware the dividend was made?

15    **A    Yes.  To pay an annuity payment and to pay**

16   **taxes.**

17    Q    Okay, all right.  Let's turn to 21.

18    **A    In this one?**

19    Q    Yeah, in that book.  I'm sorry.  Now,

20   that's --

21    **A    That's just a straight exhibit?**

22    Q    Yes.  It's not the one I wanted.  Give me

23   just a second.  I'm on the wrong --

24    **A    Okay.**

25    Q    -- the wrong number.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 267

1       **A    Okay.**

2           MR. MCMICHAEL:  You want us to look at

3       Nupson-21?

4           MR. DAVIS:  I may.  I may.  Let me see.

5       No, I don't want you to look at Nupson-21.  I

6       have the wrong exhibit.  Tell you what, I'm

7       just going to mark it as a new one.  Sixty-one.

8       Okay.  Marked as 62, dated December 15th, 1993.

9           THE WITNESS:  Okay.

10          MR. MCMICHAEL:  Sixty-two.

11              - - -

12          (Exhibit 62 was marked for

13      identification.)

14              - - -

15      BY MR. DAVIS:

16      Q    Are you familiar with this document?

17      **A    I haven't seen it for a long time, but I'm**

18      **familiar with it.**

19      Q    Just a few questions about the -- the

20      wording in here.

21          And is this -- is this a document you

22      drafted?

23      **A    Give me a second.**

24      Q    Sure.

25      **A    Okay.  Yes, this is a document I drafted.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 268

1        Q    Let me ask you about the wording.  It

2    says, The parties hereby are married and reside in

3    Bryn Mawr, Pennsylvania.  Herbert is owner of

4    439,374 shares of Class B non-voting common stock,

5    quote the shares, of G.W. Hunter, Inc.

6                Herbert is willing to transfer

7    ownership of the shares to Frances and himself as

8    tenants by the entireties as long as Frances agrees

9    that if she survives Herbert, subject to the payment

10    of any taxes, et cetera, et cetera -- I'm asking

11    about the "will" there.

12        A    Right.

13        Q    Is that an ordinary drafting term to say

14    "willing," rather than "is," or "has," or something

15    to that effect?  And I truly do not know the answer.

16    It seems -- it seems to me to express a future

17    intention rather than a present intention?

18                MR. MANNION:  Okay.  Just to be clear,

19        you're not asking the witness any

20        communications --

21                MR. DAVIS:  No.  I'm asking about this

22        document, this drafting of this document.

23                THE WITNESS:  The -- what is being

24        discussed is if she were the survivor between

25        Herb and herself, she will be willing to be

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 269

1        bound by this agreement.  So I think it's -- I

2        think it's okay.

3    BY MR. DAVIS:

4        Q    Okay.  And you see --

5        **A    No, but I think it's dealing with the**

6    **future.  She's agreeing to what she will do in the**

7    **future.**

8        Q    I see.  Okay.  Do we have a spreadsheet?

9    That's fine.  Let me have the spreadsheet real

10   quick, and we can take a break.  This gets messy.

11              - - -

12              (Exhibit 63 was marked for

13   identification.)

14              - - -

15   BY MR. DAVIS:

16       Q    We'll mark as 63 a spreadsheet that we

17   have.  And I can't tell you where it came from, but

18   we have it.  I'm sure it was Bates numbered in fact

19   -- is this one Bates numbered?  Yeah.  BHI010694.

20   And this is very, very tiny print, but I'm going to

21   try to point you to an entry on July 17, 1998.

22       **A    Right.**

23       Q    And it says, Estate transfer balance,

24   130,174.5, Bradford Holdings, Inc.

25              Do you see that there?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 270

1      A    Barely.  I've had cataract surgery, and

2    it's blurry to me.  But I think I see it.

3      Q    Okay.

4      A    It's the highlighted piece?

5      Q    Yeah.

6      A    Yeah, uh-huh.

7      Q    And my question simply is, were there

8    shares in Herbert's estate at his death?  He died in

9    May of 1998.

10      A    This is -- it's the same inartful

11    description on the Schedule A to the GRAT.  You saw

12    that it talks about half of the shares coming to

13    Fran as by operation of law as tenants by entireties

14    and half coming from the estate.  I think whoever

15    filled out that schedule and whoever did this was

16    just focusing on the federal estate tax consequence,

17    as opposed to state law.

18             One hundred percent of the shares

19    transferred from the entireties to Fran by operation

20    of law.  As a result of Herb's death, 50 percent of

21    those shares got a new basis for income tax

22    purposes, and 50 percent did not.

23      Q    And when you say they transferred by

24    operation of law, is -- is that because of the

25    execution of that agreement we just discussed, the

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 271

1  T.B.?

2  **A   Well, the shares were transferred from**

3  **Herb's name individually to the marriage, to tenants**

4  **by the entireties.  Once they were in the entireties**

5  **on the death of one, by operation of law, the shares**

6  **all went to the survivor.**

7  **But with a transfer from the law back**

8  **then, as far as income tax consequence, 50 percent**

9  **got a new basis, and 50 percent did not.**

10  Q   Okay.  Do you -- and this is -- we've got

11  to hop off because we've got a video issue, but let

12  me ask you this question quickly.

13  Did you see stock certificates with

14  the total number of shares identified by Herb in

15  that -- in the entireties agreement?

16  Did you ever see those stock

17  certificates?

18  **A   I'm sure I saw them, but this is -- I**

19  **mean, it would be double this number.**

20  Q   Right, okay.  Let's go off the record.

21  THE VIDEOGRAPHER:  This is the end of DVD

22  No. 3 of the video deposition of Bruce A.

23  Rosenfield.  The time is approximately 5:48.

24  - - -

25  (Recess was taken from 5:48 p.m. to

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 272

1      6:06 p.m.)

2                      - - -

3           THE VIDEOGRAPHER:  We are on the record.

4      This is the beginning of DVD No. 4 of the video

5      deposition of Bruce A. Rosenfield.  The time is

6      approximately 6:06 p.m.

7                      - - -

8           (Exhibit 64 was marked for

9      identification.)

10                     - - -

11          MR. DAVIS:  Okay.  I'm going to mark as

12     Exhibit 64, a letter -- a fax rather, dated

13     August 6, 1998, from you to Sandy Hansen kind

14     of discussing this issue we were just

15     discussing, which is --

16          THE WITNESS:  It's from Sandy Hansen.

17     BY MR. DAVIS:

18     Q    I'm sorry, you're right.  Thank you.  Your

19     attention.  And let me -- it says, Please review the

20     attached draft of the letter to Fran Middleton,

21     which we discussed this morning.  This letter is

22     dated July 24th to agree with the date on the new

23     stock certificates and the shareholders of the

24     record date for the 7/31 dividend payments.

25               Fran's letter of instructions to

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 273

1    Bradford Holdings should be -- should also be dated

2    July 24. And the letter we have is behind it, and

3    it says, Dear Fran, enclosed is a letter for your

4    signature, whereby you are requesting Bradford to

5    issue certificates to represent the division of one

6    certificate that you had jointly held with Herb.

7            As you will recall, we are doing this

8    to isolate into one share the high basis stock

9    received as a result of Herb's death, and the low

10   basis stock in the other representing your original

11   basis.

12           All right. I am just -- if you could

13   help translate that to English for me a little bit.

14   I think it's what we were just discussing?

15      **A   It was what we were discussing at -- for**

16   **the entireties, the stock was held between Fran and**

17   **Herb as tenants by the entireties. And as a result**

18   **of -- and we did that to back when we were doing**

19   **that, Pennsylvania imposed an inheritance tax on**

20   **property passing from one spouse to another, but**

21   **they didn't impose an inheritance tax on entireties'**

22   **property. So we were trying to save Pennsylvania**

23   **inheritance tax.**

24           **For federal purposes, when you have**

25   **jointly held property, that -- there's a presumption**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.          June 24, 2021
Bruce Rosenfield, Esq.                                              NO.  2:18-cv-02505-NIQA

Page 274

1       that it came from one of the spouses, but there was

2       a 50 percent marital deduction.  And we got a new

3       basis for 50 percent.  So we're just trying to break

4       it apart so that we could just trace the basis.

5            Q     That's what I was going to ask you, what

6       was the purpose of it?

7                  And it was basically to make it

8       easier and simpler at tax time; is that right?

9            A     Well, if there was a sale, yeah.

10           Q     Okay.  Which would be tax time; right?

11      Yeah.

12           A     Because I think of April 15th as tax time.

13           Q     Fair enough, okay.

14                        - - -

15                  (Exhibit 65 was marked for

16      identification.)

17                        - - -

18      BY MR. DAVIS:

19           Q     Marked as Exhibit 65, some handwritten

20      notes.

21                  First of all, is that your

22      handwriting?

23           A     No.

24           Q     The reason I am bringing these notes to

25      your attention is at the very bottom it says, John

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 275

1    Jr., and let me kind of point you there.

2         A    Okay.

3         Q    You follow?  I think it says, John Jr.

4    something A shares, I think.  But father has,

5    question mark, voting control.

6              Do you see that?

7         A    Yes.

8         Q    Do you know if -- if John Jr.'s father,

9    Herbert, had control of the voting, even though he

10   may have not had the voting shares?

11        A    First of all, I don't know when this is.

12        Q    I don't know either.

13        A    And there is no John Jr. that I'm aware

14   of.

15        Q    Okay.  Do you know John?

16        A    John S. Middleton.

17        Q    Yeah.

18        A    He's not a junior.

19        Q    Okay.  But do you know if John -- I don't

20   know if that's --

21        A    I don't --

22        Q    -- who he's referring to or not --

23        A    I don't know what this is referring to.

24        Q    All right.  But my -- my question is a

25   little bit -- this has raised a question for me is

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 276

1    -- do you know if before his death, even though he

2    may have not had possession of all the voting

3    shares, if -- if Herbert had voting control?

4        **A    He did not.**

5        Q    Okay.  You don't know if there's some

6    other agreement or arrangement to give him voting

7    control?

8        **A    I'm not aware of any.**

9        Q    Okay.  That was -- put that down.

10                      - - -

11            (Exhibit 66 was marked for

12    identification.)

13                      - - -

14    BY MR. DAVIS:

15        Q    Sixty-six, something filed by you.

16        **A    Correct.**

17        Q    And this is a Notice of Beneficial

18    Interest in Estate, and it's a notice under Rule 5.6

19    A.

20            Is that your signature, the second

21    page and first page?

22        **A    Yes.**

23        Q    All right.  It looks like it's dated

24    September 2, 1998; correct?

25        **A    I'm sorry?  Say that again, please.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 277

1     Q   This is dated September 2nd, 1998?

2     **A   Give me a second. I'm not seeing it.**

3     **Yes, September 2nd, 1998.**

4     Q   Okay. And is this the rule where you have

5     to notify all beneficial interests?

6     **A   People with an interest under the estate,**

7     **yes.**

8     Q   Under the estate, okay.

9         You've identified Frances S.

10    Middleton; correct?

11    **A   Yes.**

12    Q   And John S. Middleton; correct?

13    **A   Correct.**

14    Q   Why wasn't Lucia and Anna identified?

15    **A   They didn't get anything under his --**

16    **under his will.**

17    Q   I see, okay.

18    **A   The will left everything to -- to -- he**

19    **gave everything to Fran. And John -- or in trust**

20    **for Fran, and John was the trustee.**

21    Q   All right. It's going to be a little

22    scattered here.

23    **A   I'll do my -- I'll do my best to keep up.**

24          - - -

25        **(Exhibit 67 was marked for**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 278

1    **identification.)**

2                    **- - -**

3    BY MR. DAVIS:

4        Q    Durable general power of attorney, 67.

5            Do you know if you drafted this power

6    of attorney?

7        **A    It would have been drafted under my**

8    **direction.**

9        Q    Okay.  It's dated June 15th, 1988; is that

10   correct?

11       **A    Correct.**

12       Q    All right.  And first, a few questions

13   here, it appears that Anna Middleton initially was

14   appointing her mother, Frances Middleton.

15           Do you see that; it's scratched out?

16       **A    Correct.**

17       Q    All right.  And then she put in sister and

18   Lucia; correct?

19       **A    Correct.**

20       Q    First of all, do you know why it was

21   scratched out and not corrected and typed in there?

22       **A    I brought this document with me.  I**

23   **mentioned to you before, the first time I had met**

24   **Anna was, I think, June 15th after Herb's death, and**

25   **I prepared a power of attorney for her in favor of**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 279

1     her mother.  And I brought that with me.

2         Q    Why?

3         A    Everyone should have a power of attorney.

4              MR. MANNION:  Can't hear you.

5              THE WITNESS:  Everyone should have a power

6         of attorney.  If you don't have it and you

7         become incompetent, you have to have a

8         guardianship.

9     BY MR. DAVIS:

10        Q     And my read of this, and you may need to

11    read it to see if you can answer my question.  It

12    doesn't seem like that type of power of attorney.

13    In other words, it doesn't seem like it springs into

14    action if you become incompetent.  It seems like

15    it's a general power of attorney where, in this

16    case, Lucia could act on Anna's behalf, even though

17    she was not deemed incompetent?

18        A    Correct.

19        Q    Is that right?

20        A    Yeah.  In 40-some years of practice, I

21    think I've done three springing powers of attorney,

22    and every other one, and we're talking about

23    thousands, are this form.

24        Q    Okay.  Tell me why it's this form and not

25    the spring, because it seems --

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 280

1      A    Because you have -- every time you want to

2   use it, you have to establish that the person is

3   incompetent.

4      Q    But it was --

5      A    You pick -- you pick someone that is --

6   that you have great faith in and who's not going to

7   abuse the power.  This one, you'll see that the

8   original is in our volt, and she was -- I would

9   think I would have said, unless I have your

10  authorization to release it, it won't be released,

11  unless I think you're incompetent.  That's my

12  standard.  I don't remember that conversation, but

13  that is my standard.

14     Q    Do you know if Lucia ever used this to

15  transfer Anna's shares that she was gifted by her

16  mother into her -- into Anna's trust?

17     A    She did not.

18     Q    Okay.  And how do you know that?

19     A    Because the only shares that were

20  transferred was an assignment signed by Anna in

21  1994.

22     Q    And so this would remain in your volt and

23  could only be used by Lucia if she went to you and

24  obtained it?

25     A    I would have had a discussion with Anna

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 281

1       **whether to authorize Lucia to act.**

2               **- - -**

3               **(Exhibit 68 was marked for**

4       **identification.)**

5               **- - -**

6       BY MR. DAVIS:

7           Q    Okay.  The 1994 memorandum from your file,

8       I believe.  September 28, 1994.  Herb Middleton

9       asked that we hold off on filing.

10              Do you know what that's in reference

11      to, filing what?

12          **A    The divorce.**

13          Q    I see.  All right.

14              So you had an understanding she was

15      more depressed than ever, at least from Herb at this

16      time?

17          **A    Correct.**

18          Q    What's the question at the end, Have I

19      messed you up?

20              Is that his question?  I'm trying to

21      understand your memo.

22          **A    That I told Herb it's okay to hold off,**

23      **and I have -- and I was asking Albert, who knows**

24      **what he's talking about at family law, whether I**

25      **screwed up.**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 282

1        Q    I see, I see.  Okay.

2              Was Andy -- or Dr. Bauer living in

3    Texas at the time?

4        **A    I have a recollection of that.**

5        Q    Residency or something like that?

6        **A    I thought he was a resident up here, but**

7    **that he then had -- he took a more permanent**

8    **position in Texas, but --**

9        Q    Okay.

10       **A    -- I may have that totally wrong.**

11       Q    Neither here nor there.

12                    - - -

13             (Exhibit 69 was marked for

14    identification.)

15                    - - -

16    BY MR. DAVIS:

17       Q    Now, the October 30, 1996 memorandum.

18       **A    Right.**

19       Q    And this is not for -- it's from Albert,

20    but you're cc'd on it.

21       **A    Correct.**

22       Q    And it identifies at least as of 1996 his

23    daughter as being held hostage?

24       **A    Yes.**

25       Q    Is this related to the gentleman that we

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 283

1     saw earlier?

2        **A    Mark.**

3        Q    Mark, yeah.  And the shrink thinks it's

4     imperative, for her emotional health, to get away

5     from this guy.  On the other hand, the shrink thinks

6     that she is not incapacitated or incompetent.

7            Do you know what that discussion -- I

8     mean, I know you're cc'd, so any -- does that ring

9     any bells for you about a discussion at this time

10    with Albert?

11       **A    I would have participated in a lunch with**

12    **Albert, Herb, and Fran, I think, and Steve Anderer**

13    **concerning this topic.**

14       Q    All right.  It clearly seems to indicate

15    that at least her father thinks Anna is in a

16    difficult spot?

17       **A    Correct.**

18       Q    Okay.  As of 1996, all right.

19       **A    Do you want this?**

20       Q    No, just give me the number there.

21       **A    Sixty-nine.**

22       Q    Sixty-nine.

23              - - -

24            (Exhibit 70 was marked for

25    identification.)

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 284

1                    - - -

2    BY MR. DAVIS:

3        Q    Marked as Exhibit 70, Martha Turner, M.D.,

4    statement from February 28th, 1999, addressed to

5    you?

6        A    Yes.

7        Q    All right.  Were you paying her physician

8    bills at this time?

9        A    Yeah.

10       Q    And when I say "you," I don't mean your

11   money, in particular, but I'm assuming out of --

12   well, if we turn to the next page, it appears out of

13   --

14       **A    A Vanguard account, yes.**

15       Q    All right.  What was that Vanguard

16   account?

17       **A    There's an exception to gift taxes for**

18   **payment of medical expenses if one pays the medical**

19   **expenses directly.  Fran set up a Vanguard account,**

20   **with me as her agent, so that I could pay Anna's**

21   **medical bills.  And Anna understood that, and Anna**

22   **would either send me the bills or have the doctors**

23   **send me the bills.**

24       Q    Okay.  Did you have an understanding at

25   this time in 1999 that Anna was having a difficult

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 285

1     situation mentally, with her mental health?

2         **A    I thought she was -- if she stayed**

3     **medicated, she had some hard times, but mostly, she**

4     **was okay.  Things could depress her and could**

5     **trigger her problems.**

6         Q    Let's go to the last page.  It's a letter

7     to you, dated January 29th, 1999.

8         **A    Right.**

9         Q    What is the Stan Fund?

10        **A    I think that was allowing her to pay for**

11    **the retired doctor -- retired police officer, Stan,**

12    **that I engaged to protect her after she was abused**

13    **by Mark.**

14                    **- - -**

15            **(Exhibit 71 was marked for**

16    **identification.)**

17                    **- - -**

18    BY MR. DAVIS:

19        Q    Seventy-one is a Vanguard statement I

20    think you referenced earlier.  I just want to make

21    sure I've got an understanding.

22            This is the account you're referring

23    to --

24        **A    Yes.**

25        Q    -- earlier?

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 286

1      **A    That is the account I'm referring to.**

2      Q    Was anyone else's medical expenses within

3      the family paid out of this?

4      **A   No.**

5      Q    Just Anna's?

6      **A    Just Anna's.  I have no recollection of**

7      **paying anyone else's.**

8           MR. MANNION:  Is there a Bates number?

9           MR. DAVIS:  There's several so.  It's

10      BHICO2015018.

11           MR. MCMICHAEL:  I'm sorry?

12           MR. DAVIS:  COZ, there's a Z, sorry.

13      BHICOZ, for Cozen, 015018, and then it goes --

14      I'll just change the last digits for you 28,

15      38, 47, 60, and 73.

16           (Discussion was held off the record.)

17               - - -

18           (Exhibit 72 was marked for

19      identification.)

20               - - -

21      BY MR. DAVIS:

22      Q    Marked as Exhibit 72, a letter from you to

23      Dr. James Cox, January 15th of 2002.  And the Bates

24      number is -- I don't have one.  Oh, some of them --

25      the first letter doesn't have a Bates, but the next

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 287

1    do.  '94 Nupson 1052, and then a whole host of

2    different numbers.  Anyways, it's a series of checks

3    it looks like.

4              And I guess my question is:  First,

5    January 15th, 2002, were you in contact with Dr.

6    Cox?  I think you testified earlier you talked to

7    him a couple times.

8        **A    Correct.**

9        Q    And what did he relay to you about Ms.

10   Middleton -- or Ms. Nupson?

11       **A    He was talking about -- I mean, he was**

12   **giving me technical diagnoses.  He was also trying**

13   **to -- I had my suspicions about whether he was the**

14   **appropriate doctor for her.  She had seen him**

15   **forever and didn't seem to be getting better.**

16       Q    I see.

17       **A    And I think he was taking this opportunity**

18   **to tell me how important he was to her.**

19       Q    Did -- you had your -- your suspicion was

20   he was not necessarily the right doctor for her?

21       **A    Correct.  And I raised that with Anna.**

22       Q    Okay.  And she eventually did change

23   physicians; is that right?

24       **A    I think this stuff with Turner was before**

25   **this.**

Page 288

1    Q    It was.  It was '99.

2    A    And she saw Cox for a long time.

3    Q    Okay.  What did he tell you about

4    diagnosis?

5    A    I don't remember.

6    Q    You mentioned bipolar before?

7    A    That's a recollection that I have.  I

8    think -- I don't remember whether he was the one who

9    talked about abuse or whether she did in her

10   subsequent rehabs.

11   Q    Substance abuse?

12   A    No.  Abuse that she needed deep therapy to

13   release trauma that she had.

14   Q    Physical abuse?

15   A    I am not sure what it --

16   Q    Okay.

17   A    I don't -- she didn't -- she was saying

18   she wasn't sure if she could -- that she could --

19   that she was strong enough to go through that type

20   of therapy that supposedly was very difficult.

21   Q    Were you aware that Dr. Cox lost his

22   license in 2017?

23   A    I was.

24   Q    Okay.  Were you -- did you know him at

25   that time?

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 289

1      **A   No.**

2      Q   Do you know why he lost his license?

3      **A   I think the allegations was that he was**

4  **abusing some clients.**

5      Q   Yeah.  Was it being inappropriate with

6  patients?

7      **A   That's -- that's what I read.**

8      Q   Yeah.  Okay, so you just read it?  All

9  right.

10         - - -

11      (Exhibit 73 was marked for

12  identification.)

13         - - -

14  BY MR. DAVIS:

15      Q   Mark as 73 -- yeah, this is just -- it

16  looks like payment submissions by Dr. Herring.

17      **A   Correct.**

18      Q   Christine Herring, 2000.  And then the

19  last page of this set of documents, if you look, it

20  says, To Bruce Rosenfield from Carol Whitelock.

21      Is that an assistant of yours?

22      **A   She was the secretary in the trust and**

23  **estates group.**

24      Q   Okay.  June 7, 2000, that she -- Dr.

25  Herring was going to see Anna once a week?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 290

1      **A    Right.**

2      Q    It looks like she only saw her a few times

3      here, at least according to this, the diagnosis of

4      recurrent depression on the first page there?

5      **A    Right, right.**

6      Q    Okay.  So you were aware of that; right?

7      **A    I actually don't recall her -- Dr.**

8      **Herring.**

9      Q    Okay.  But regardless, it says, Received

10     BAR?

11     **A    Yeah.  Oh, I am not -- absolutely.  And I**

12     **paid it.**

13     Q    Okay.

14     **A    I just don't have a recollection of her.**

15     Q    You were aware that Anna had ADHD as well?

16     **A    I was not.**

17     Q    Show you a letter.

18     **A    I guess I was.**

19     Q    April 20th, 2004.

20           - - -

21           (Exhibit 74 was marked for

22     identification.)

23           - - -

24     BY MR. DAVIS:

25     Q    It's to Anna from you saying that you have

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.    June 24, 2021
Bruce Rosenfield, Esq.                                 NO. 2:18-cv-02505-NIQA

Page 291

1    been told Tony Rostain?

2        A    **Rostain.**

3        Q    Rostain -- weird way to spell it -- in the

4    psychiatric department at Penn is the best person

5    for adult ADHD?

6        A    **Right.**

7        Q    Okay.  And then you enclose some

8    information on DHB from analysts at Harvard [sic]

9    Trust.

10            What's DHB?

11       A    **I think that was a stock.  Let's see if**

12   **there's --**

13       Q    And this is -- the attachment is an e-mail

14   back and forth, it looks like, related to the ADHD?

15       A    **Correct.  I think DHB was an investment**

16   **she had asked about, and I followed up with the**

17   **family -- one of the investment advisers for the**

18   **family was Haverford Trust Company.**

19       Q    Are you the trustee at this time?

20       A    **No, I don't think so.**

21       Q    And who is Bonnie Brier?

22       A    **Brier.**

23       Q    Brier, thank you.

24       A    **She was general counsel of Children's**

25   **Hospital.  Also happened to be my wife and happens**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 292

1    **to be my wife.**

2        Q    Oh, okay.

3        **A    I was asking her for medical advice.**

4        Q    Okay, very good.  All right, thank you.

5            Do you know what CMM Holdings, LLC

6    is?

7        **A    Where is that?**

8        Q    It's not there.  It's in my hand.  I'll

9    give it to you --

10       **A    Say it again.  I'm sorry.**

11       Q    CMM Holdings?

12       **A    It's not ringing a bell.**

13       Q    Let's see.  Okay.  Let's look through that

14   document, see if that rings any kind of bells for

15   you.

16                   - - -

17           (Exhibit 75 was marked for

18   identification.)

19                   - - -

20       MR. MCMICHAEL:  Seventy-five, right?

21       MR. DAVIS:  It is, yeah, 75.

22   BY MR. DAVIS:

23       Q    It's formed May 19th, 2004.

24       **A    Right.**

25       Q    Or filed on May 19th, 2004, certificate of

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 293

1     formation.

2         A   It's obviously something for the Middleton

3     family, but I have no recollection of it.  Carol

4     Nachmias was a lawyer in our tax group.

5                   - - -

6             (Exhibit 76 was marked for

7     identification.)

8                   - - -

9     BY MR. DAVIS:

10        Q   Seventy-six, memorandum dated

11    November 29th, 2004.

12               This is not your memorandum?

13        A   This is not, I'm sorry?

14        Q   This is not your memorandum?

15        A   Correct.  It's from Nancy Pole, a legal

16    assistant in my department who helped me with the

17    Middleton family.

18        Q   All right.  Who is Adam Landau?

19        A   Adam Landau was involved with Jim McCabe,

20    McCabe Capital Advisors.  We retained Jim McCabe to

21    oversee all of the family advisors and help us

22    evaluate the effectiveness of the advisors in asset

23    allocations.

24        Q   What's the Family Limited Partnership?  If

25    you go down to the last line, it says, Separate memo

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 294

1      is forthcoming regarding the accounts that will be

2      part of the Family Limited Partnership.

3          A    I don't know.

4          Q    Are you aware of anything like that?

5          A    I'm really not.

6          Q    Does that ring any bells at all?

7          A    It doesn't.

8          Q    Yeah.  Was there any Family Limited

9      Partnership ever formed that you're aware of?

10         A    Not that involved Anna.

11         Q    One that didn't involve Anna?

12         A    There might have been.  There might have

13     been stuff exclusively for John.

14         Q    Okay.

15         A    Let me just say, it's possible -- I have a

16     vague recollection that we may have been doing

17     investments in partnerships that had -- that were

18     limited as to the number of investors.  And we may

19     have formed a partnership so that the different

20     family entities could invest as one, and not screw

21     up the -- the -- the investment.  It's possible that

22     some trust that she was the beneficiary of could

23     have been part of that, but I don't have a

24     recollection of that.

25                    - - -

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 295

1          **(Exhibit 77 was marked for**

2     **identification.)**

3               **- - -**

4     BY MR. DAVIS:

5          Q     Mark this memorandum.  This is not yours.

6     It's a memorandum to the file from Maurice Lee.

7          **A     Okay.**

8          Q     On September 21st, 2011?

9          **A     Okay.**

10         Q     What I want you to do is -- I think it's

11    summarizing a meeting that you had with John Stoviak

12    on September 19th, 2011.

13              And to the best you can, if you can

14    just read it yourself, and I want you to A, if

15    there's anything to correct in here that doesn't

16    appear right from your memory, please just notify me

17    of that.

18         **A     The one thing that is, at least on the**

19    **quick reading of it, is the -- all agreed but all of**

20    **his discussions with respect to the trust, just --**

21    **concerning the crafting -- there was something in**

22    **here about the assignment.  That was -- I discussed**

23    **with Anna, not Herb.  Herb was dead.**

24         Q     1998 assignment of principal?

25         **A     Right.  I think I read that that was**

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 296

1      discussed with Herb.  He was dead.  I discussed that

2      with Anna.  It was after -- and it was signed after

3      Herb's death.

4          Q    Okay.  Anything else?

5          A    Not that -- nothing else jumped out at me.

6          Q    Did you -- what I've identified as GRAT 1,

7      and I understand your position on that, but did you

8      provide that to John Stoviak?

9          A    No.

10         Q    Do you recall that he was asking for your

11     file for Anna Nupson?

12         A    I don't recall what specifically he asked

13     for.  We, I thought, provided everything he asked

14     for.

15              - - -

16          (Exhibit 78 was marked for

17     identification.)

18              - - -

19     BY MR. DAVIS:

20         Q    Let me show you a series of e-mails marked

21     as Exhibit 78.  I think e-mails of Mr. Freund in

22     2011 asking for your files.

23              I'm just going to have you read that

24     to yourself.  And really, what I just want to ask is

25     your memory doesn't change based on this e-mail?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 297

1          That you didn't provide GRAT 1, what

2   I'm calling GRAT 1 to Mr. Freund; correct?

3      **A    Let me read it.**

4      Q    Yeah.

5      **A    I don't have any other recollection.**

6      Q    Okay.  You would agree it seems to be that

7   Mr. Freund is asking for Ms. Nupson's file; correct?

8      **A    Correct.**

9      Q    All right.  But you didn't provide GRAT 1

10  to him; correct?

11     **A    GRAT -- I'm sure I provided the**

12  **February 1, 2001 GRAT to him.**

13     Q    That was ex -- that was signed in 2003?

14     **A    By virtue of a family settlement**

15  **agreement.**

16     Q    Okay.  Eighty-one [sic], another set of

17  e-mails, June 20, 2011, at least at the top.

18          MR. MANNION:  Seventy-nine.

19          MR. DAVIS:  Seventy-nine, thank you.

20  That's what I put on there, 79.

21              - - -

22          (Exhibit 79 was marked for

23  identification.)

24              - - -

25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 298

1    BY MR. DAVIS:

2        Q    Second paragraph, it says, addressed to

3    you, Also, I still have not received any of the

4    files or at least a list of all Anna's files

5    concerning the various trusts.  To reiterate, we

6    will need access to Anna's files regarding the

7    various trusts.  Hopefully, we can receive this

8    information shortly.  All right.

9            But your memory is, is you did

10   provide that, or at least what you've identified to

11   me earlier?

12       **A    I did -- my recollection is I did provide**

13   **it.**

14       Q    Okay.

15                - - -

16           (Exhibit 80 was marked for

17   identification.)

18                - - -

19   BY MR. DAVIS:

20       Q    Okay.  We've marked Exhibit 80 -- yeah,

21   let me ask you, 67, the power of attorney, and you

22   don't necessarily need to get the document.

23       **A    Okay.**

24       Q    As you recall, we discussed that.

25           Do you know of any transfer that

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 299

1      Lucia made using that power of attorney?

2          **A    I am unaware of any transfers that Lucia**

3      **made using the power of attorney.**

4          Q    Do you know if Lucia had a copy of the

5      power of attorney?

6          **A    I don't know that.**

7          Q    Were you aware that she actually did?

8          **A    I don't know that she had a copy.**

9          Q    Okay.  Exhibit 80, some of your billing.

10         **A    Okay.**

11         Q    Or Schnader's billing, I should say.

12         **A    Correct.**

13         Q    Let me -- let me first just get some

14     initials so I can understand.

15              JRM, do you know who that is?

16         **A    Jim Meyer (ph), I believe.**

17         Q    BAR is yourself?

18         **A    Correct.**

19         Q    RSR, I believe you --

20         **A    Roy Ross.**

21         Q    LPL?

22         **A    Larry Laubach.**

23         Q    MES?

24         **A    I'm sorry?**

25         Q    MES?

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.       June 24, 2021
Bruce Rosenfield, Esq.                                               NO. 2:18-cv-02505-NIQA

Page 300

1    **A    I don't know who that is.**

2    Q    SMW?

3    **A    That could be Stuart Wintrop (ph).**

4    Q    Looking at January of 1998.  We see T, I'm

5    assuming that means telephone call?

6    **A    Yes.**

7    Q    Herb, re: estate planning, do you see

8    that?

9    **A    Yes.**

10   Q    And then appraisal, you see that?

11   **A    Yes.**

12   Q    And gifting, do you see that?

13   **A    Yes.**

14   Q    I thought Herb's estate plan was set by

15   this point?

16   **A    There's no such thing as a set estate**

17   **plan.**

18   Q    Okay, all right.

19        So it's always -- there's always

20   continuous work to be done, I guess?

21   **A    Until he dies, and then the estate**

22   **administration starts.**

23   Q    Okay.  Are there changes to Herb's will

24   before he died -- right before he died?

25        MR. MANNION:  I'm going to object.  That's

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 301

1      privileged.

2           MR. MCMICHAEL:  Do not answer that

3      question.

4  BY MR. DAVIS:

5      Q    We'll reserve that question for later

6  then.

7           And you never represented Lucia;

8  correct?

9      **A    I never did.**

10     Q    All right.  So on May 18th, there seems to

11 be -- 1998 from the last -- second to the last,

12 no --

13     **A    I'm sorry, I'm having --**

14     Q    Page four, top left of the pages.

15     **A    Okay.**

16     Q    I'm assuming "M" means meeting?

17     **A    Right.**

18     Q    Fran -- it says Luria, I think it means

19 Lucia?

20     **A    Probably.**

21     Q    And John?

22     **A    Correct.**

23     Q    Do you know what that meeting was about?

24     **A    Herb's estate.  Herb had just died.**

25     Q    Okay.  Do you know what the discussions

297b6575-bff9-44b8-a892-9d03ab7d9a47

Page 302

1        were because Lucia was not a beneficiary; correct?

2            **A    Unless -- unless Fran were to disclaim,**

3        **she would not have been a beneficiary.**

4            Q    Did Fran disclaim?

5            **A    She did not.**

6            Q    Do you know any -- do you remember

7        anything else about that meeting?

8            **A    I believe that I went through what was**

9        **involved in the administration of Herb's estate, and**

10       **I believe that we -- that we did discuss the**

11       **planning that Herb had been trying to accomplish for**

12       **Anna and what was left open.**

13           Q    What planning was that?

14               MR. MCMICHAEL:  Was this discussed in a

15       meeting with Lucia?

16               THE WITNESS:  Yes.

17               MR. MCMICHAEL:  You can -- you can answer

18       the question.

19               THE WITNESS:  The fact that she would be

20       inheriting a piece of the '72 trust, that she

21       still had Shamrock Lane in her own name and

22       that she no longer had a power of attorney to

23       anyone.

24       BY MR. DAVIS:

25           Q    And so I take it Herb wanted to resolve

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 303

1     those issues, and that was part of the meeting?

2         **A    Correct.  But he died, so these were open**

3     **issues.  And the '72 trust became a more pressing**

4     **issue because she would inherit outright some money**

5     **directly from the '72 trust.**

6         Q    How much money?

7         **A    I'm making -- I'm not sure exactly.  I**

8     **think it was something like $100,000, $150,000.**

9         Q    Who is AMS?

10            Do you remember?

11        **A    A biller, is that what this --**

12        Q    Yeah, there's a biller on page six

13    identified as AMS.

14        **A    I -- I don't know who that is.**

15        Q    It says, Researched potential claims for

16    securities fraud --

17        **A    Yeah.  I'm just trying to think of who we**

18    **had in securities with AMS, and I don't remember.**

19    **Hold on, let me just see at the back -- that's --**

20    **no, there's no AMS at the back.**

21        Q    Does that ring a bell for you at all, any

22    issues there?

23        **A    I'm sorry?**

24        Q    Does that ring a bell for you at all, any

25    issues with securities fraud, '98?

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 304

1      A   I don't remember anything about that.

2      Q   Okay.

3      A   I was not the billing lawyer, so I'm not

4   necessarily involved in all of this.

5      Q   Why was Anna not at this meeting with

6   Lucia, and John, and Frances, do you know?

7      A   I think that Frances wanted to talk about

8   the issues that -- as they impacted on Anna in

9   anticipation of the meeting with Anna.

10      MR. DAVIS:  Let me take about a

11   three-minute break, five-minute break, and I

12   will see what else I have.

13      THE WITNESS:  Okay.

14      THE VIDEOGRAPHER:  6:54, off the record.

15         - - -

16      (Recess was taken from 6:54 p.m. to

17   6:55 p.m.)

18         - - -

19      THE VIDEOGRAPHER:  6:55, we are back on

20   the record.

21   BY MR. DAVIS:

22      Q   You had mentioned earlier that Lucia would

23   not take anything from Herb's estate unless Francis

24   disclaimed.

25      A   Correct.

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO.  2:18-cv-02505-NIQA

Page 305

1      Q    At that meeting, was she contemplating

2   disclaiming?

3      **A    She was not.**

4      Q    Okay.  I'm trying to understand why you

5   told me that then.

6           Were you just being technically

7   correct?

8      **A    That's what I was trying -- I was trying**

9   **to be technically correct on everything.**

10     Q    Understood, all right.

11          Is there anything in your file that

12  would aid in your defense that you have not

13  produced?

14     **A    First of all, I really don't know what we**

15  **have produced and what we haven't produced.  I rely**

16  **on our lawyers to do that, my lawyers to do that.**

17  **So no, I don't think -- I am not aware of anything.**

18     MR. DAVIS:  All right.  Well, we're going

19  to reserve questions related to those privilege

20  issues that we have not been able to ask for a

21  later point if the judge agrees with us on

22  those, but other than that, we will pass the

23  witness.

24     MR. MCMICHAEL:  Okay, I have no questions.

25  James?  No.

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 306

1          MR. DAVIS:  Would you like to read and
2    sign?
3          MR. MCMICHAEL:  Read and sign, yup.
4          THE VIDEOGRAPHER:  This concludes the
5    videotaped deposition of Bruce A. Rosenfield.
6    The date is June 24th, 2021.  The approximate
7    time is 6:57.  The master recording of today's
8    testimony will remain in the custody of Trattel
9    Court Reporting & Videography, located at 609
10   12th Street, Albuquerque, New Mexico 87102.  We
11   are off the record.
12          (Discussion was held off the record.)
13          (Deposition ended at 6:57 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 307

1                    C E R T I F I C A T E

2

3                       - - -

4

5        I, ELIZABETH KELLY, hereby certify that the

6    proceedings, evidence, and objections noted are

7    contained fully and accurately in the notes taken by

8    me of the preceding deposition, and that this copy

9    is a correct transcript of the same.

10

11

12                    _____

13                    ELIZABETH KELLY

14                    Professional Reporter

15                    Notary Public

16

17    The foregoing certification does not apply to any

18    reproduction of the same by any means, unless under

19    the direct control and/or supervision of the

20    certifying reporter.

21

22

23

24

25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 308

1          INSTRUCTIONS TO THE WITNESS

2              Read your deposition over carefully.

3     It is your right to read your deposition and make

4     changes in form or substance.  You should assign a

5     reason in the appropriate column on the errata

6     sheet for any change made.

7              After making any changes in form or

8     substance which have been noted on the following

9     errata sheet along with the reason for any change,

10    sign your name on the errata sheet and date it.

11             Then sign your deposition at the

12    end of your testimony in the space provided.  You

13    are signing it subject to the changes you have

14    made in the errata sheet, which will be attached

15    to the deposition before filing.  You must sign it

16    in front of a witness.  Have the witness sign in

17    the space provided.  The witness need not be a

18    notary public.  Any competent adult may witness

19    your signature.

20             Return the original errata sheet to

21    your counsel promptly.  Court rules require filing

22    within thirty days after you receive the

23    deposition.

24

25

297b6575-bff9-44b8-a892-9d03ab7d9a47

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 309

1           ERRATA SHEET

2     Attach to Examination of: Bruce A. Rosenfield, Esquire
       Taken on:   June 24, 2021
3     In the matter of: Nupson v. Rosenfield, et al.

4     PAGE        LINE NO.     CHANGE        REASON

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

Anna K. Nupson v. Schnader Harrison Segal & Lewis, LLP, et al.
Bruce Rosenfield, Esq.

June 24, 2021
NO. 2:18-cv-02505-NIQA

Page 310

1          SIGNATURE PAGE

2

3                    - - -

4

5               I hereby acknowledge that I have

6     read the aforegoing transcript, dated June 24,

7     2021, and the same is a true and correct

8     transcription of the answers given by me to the

9     questions propounded, except for the changes, if

10    any, noted on the Errata Sheet.

11

12                   - - -

13

14

15

16

17    SIGNATURE: _____
                Bruce A. Rosenfield, Esquire
18

19    DATE:      _____

20

21    WITNESSED BY: _____

22

23

24

25

297b6575-bff9-44b8-a892-9d03ab7d9a47