UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANNA K. NUPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-02505-NIQA |
| | ) | |
| SCHNADER HARRISON SEGAL & LEWIS | ) | |
| LLP, and BRUCE A. ROSENFIELD, ESQ., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants Schnader Harrison Segal & Lewis LLP and Bruce A. Rosenfield, Esq. ("Defendants"), by and through their undersigned counsel, respectfully submit the following Notice of Supplemental Authority in support of Defendants' Motion for Summary Judgment [ECF 255] to inform the Court of a development in case law in the Third Circuit pertaining to the statute of limitations defense in their Motion for Summary Judgment [ECF 255-1, 284].

On August 30, 2022, the Third Circuit affirmed the Order of the Western District of Pennsylvania, which dismissed the case on statute of limitations grounds. *LabMD Inc. v. Boback*, No. 20-1446, 2022 WL 3724716 at *8-9 (3d Cir. Aug. 30, 2022). The Opinion is attached to this Notice as **Exhibit A.**

Plaintiff LabMD asserted that an FTC investigation and enforcement action caused it to suffer damages including, but not limited to "a reduction in value of its business, lost revenue, and expenses associated with insolvency." *Id*. at 8. The Third Circuit noted that "[d]etermining when LabMD knew of its alleged injuries is complicated because the extent of the injuries grew over time," but concluded that "the FTC's initial involvement in 2010" triggered the running of the statute of limitations. *Id.*

The Third Circuit reaffirmed the standard that "[a] cause of action accrues even though the full extent of the injury is not then known or predictable," holding that "[w]ere it otherwise, the statute would begin to run only after a plaintiff became satisfied that [it] had been harmed enough, placing the supposed statute of [limitations] in the sole hands of the party seeking relief." *Id.* (internal quotation and citation omitted). With respect to the "accrual of its claims, then, we conclude that LabMD knew of its injuries in 2010[.]" *Id.* The Third Circuit concluded that "[w]hen plaintiffs should have known of the basis of their claims depends on whether and when they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." *Id.* at 9.

Respectfully submitted,

By:     */s/ Lawrence G. McMichael*
DILWORTH PAXSON LLP
Lawrence G. McMichael, Esq.
Patrick M. Harrington, Esq.
Timothy J. Ford, Esq.
Pa. Id. Nos. 28550/317998/325290
1500 Market Street, Suite 3500E
Philadelphia, PA 19102-2101
P: (215) 575-7000 / F: (215) 575-7200
lmcmichael@dilworthlaw.com
pharrington@dilworthlaw.com
tford@dilworthlaw.com
*Attorneys for Defendants Schnader Harrison*
*Segal & Lewis LLP and Bruce A.*
*Rosenfield, Esq.*

Dated: September 13, 2022

# **EXHIBIT A**

2022 WL 3724716
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

LABMD INC., Appellants

v.

Robert J. BOBACK; Eric D.
Kline; Tiversa Holding Corp.;

LabMD, Inc.,

v.

Tiversa Holding Corp., fka Tiversa Inc.;
Robert J. Boback; M. Eric Johnson; Does 1-10

LabMD Inc., Appellant in
20-1731, 20-3191 and 21-1429

*James W. Hawkins, Appellant in 20-1732

*Pursuant to Fed. R. App. P. Rule 12(a)

Marc E. Davies, Appellant in 20-3316

No. 20-1446
|
Nos. 20-1731, 20-1732, 20-3191, 20-3316, and 21-1429
|
Nos. 20-1446, 20-1731, and
21-1429 Argued November 16, 2021
|
Nos. 20-1732, 20-3191, and 20-3316 Submitted under
Third Circuit L.A.R. 34.1(a) November 15, 2021
|
(Filed August 30, 2022)

**Synopsis**

**Background:** In the first of two actions consolidated for appeal, plaintiff, a medical-testing company, brought action against cybersecurity company, its CEO, and company's consultant, asserting claims under federal Racketeer Influenced and Corrupt Organizations Act (RICO) and under Pennsylvania law for defamation, tortious interference with business relations, fraud, and other torts based on cybersecurity company's assertions, which led to a Federal Trade Commission (FTC) investigation of plaintiff, about an alleged leak of plaintiff's confidential patient data over the internet. The United States District Court for the Western District of Pennsylvania, No. 2-15-cv-0092, Mark R. Hornak, Chief Judge, 2016 WL 11269774, adopting in part the report and recommendation of Maureen P. Kelly, Chief United States Magistrate Judge, 2015 WL 13723143, dismissed most claims, and subsequently, 2016 WL 6906050, adopting the report and recommendation of Maureen P. Kelly, Chief United States Magistrate Judge, 2016 WL 6905963, dismissed all remaining claims except defamation based on two particular statements by CEO. The District Court, Maureen P. Kelly, Chief United States Magistrate Judge, 2019 WL 3881700, sanctioned plaintiff and its counsel based on their conduct of certain depositions and excluded depositions, then, 2020 WL 1428935, struck certain evidence and imposed further discovery-related sanctions on plaintiff and its counsel, including revoking counsel's pro hac vice admission. The District Court, Maureen P. Kelly, Chief United States Magistrate Judge, 2020 WL 1441641, granted summary judgment to defendants on the remaining defamation claims. The District Court, Maureen P. Kelly, Chief United States Magistrate Judge, 2020 WL 6373359, subsequently denied the motion of plaintiff's replacement counsel to withdraw, and, 2021 WL 396737, granted defendants' motion to hold plaintiff in civil contempt for not paying sanctions. Plaintiff appealed the dispositive orders and the rulings on sanctions, contempt, and the motion to withdraw. In the second action, plaintiff brought claims against defendant, CEO, and their attorneys, asserting federal and Georgia RICO claims and Georgia-law claims for fraud and related torts based on an alleged scheme to extort plaintiff based on the alleged data leak. The United States District Court for the Western District of Pennsylvania, No. 2-17-cv-0368, Marilyn J. Horan, J., 2020 WL 467828, adopting the report and recommendation of Maureen P. Kelly, Chief United States Magistrate Judge, 2019 WL 7987859, dismissed all claims. Plaintiff appealed.

**Holdings:** The Court of Appeals, Jordan, Circuit Judge, held that:

four-year limitations period on plaintiff's RICO claims in first action began to run when FTC investigation started, more than four years before action's filing;

statements by defendant's CEO made over a year after plaintiff's business shut down could not support tortious-interference claim in first action;

two-year limitations period on plaintiff's fraud and negligent-misrepresentation claims in first action began to run on initiation by plaintiff, more than two years earlier, of prior

action in which plaintiff rested claims on alleged lies by defendant;

plaintiff did not concede, in its brief opposing summary judgment, that certain statements could not support its defamation claim in first action, and dismissal of claim as to those statements was not warranted;

exclusion of expert testimony offered by plaintiff to support its defamation claim in first action was an abuse of discretion;

scope of discovery sanctions imposed on plaintiff in first action for deposition-related conduct was an abuse of discretion;

vacatur of additional discovery sanctions for violations of prior sanctions order, including revocation of plaintiff's counsel's pro hac vice admission and an order requiring plaintiff to pay certain attorney fees and costs, as well as vacatur of related contempt finding was warranted;

district court's denial of plaintiff's replacement counsel's motion to withdraw in first action rested on legal error;

plaintiff's failure to challenge separate, independent reasons provided by district court for dismissing claims in second action required affirmance of dismissal; and

dismissal of claims in second action with prejudice, without leave to amend, was warranted.

In first action, dismissal affirmed in part and vacated in part, orders on sanctions and contempt vacated, order denying counsel's motion to withdraw vacated, and action remanded. In second action, dismissal affirmed.

On Appeal from the United States District Court For the Western District of Pennsylvania (D.C. Nos. 2-17-cv-0368, 2-15-cv-0092), District Judges: Honorable Marilyn J. Horan and Maureen P. Kelly

**Attorneys and Law Firms**

Ronald D. Coleman, Christie C. Comerford [ARGUED], Lawrence G. McMichael, Dilworth Paxson, 1500 Market Street – Ste. 3500E, Philadelphia, PA 19102, Richard B. Robins, Michael A. Saffer, Mandelbaum Salsburg, 3 Becker

Farm Road – Ste. 105, Roseland, NJ 07068, Counsel for Appellant, LabMD, Inc.

Cary Ichter, Ichter Davis, 3340 Peachtree Road, N.E. – Ste. 1530, Atlanta, GA 30326, Counsel for Appellant, James W. Hawkins

Marc E. Davies, 1315 Walnut Street – Suite 320, Philadelphia, PA 19107, Appellant Pro Se, Brandon J. Verdream, Clark Hill, 301 Grant Street, One Oxford Centre – 14th Fl., Pittsburgh, PA 15219, Counsel for Robert J. Boback

Eric N. Anderson, John L. Wainright [ARGUED], Meyer Darragh Buckler Bebenek & Eck, 600 Grant Street – Ste. 4850, Pittsburgh, PA 15219, Counsel for M. Eric Johnson

John C. Toro, King & Spalding, 1180 Peachtree Street, NE – Ste. 1600, Atlanta, GA 30309, Counsel for Eric D. Kline

Jamie S. George [ARGUED], Michael P. Kenny, Alston & Bird, 1201 West Peachtree Street – Ste. 4900, Atlanta, GA 30309, Counsel for Pepper Hamilton

Jarrod S. Mendel, McGuire Woods, 1230 Peachtree Street, NE, Suite 2100, Promenade II, Atlanta, GA 30309, Jarrod D. Shaw [ARGUED], Natalie L. Zagari, McGuire Woods, 260 Forbes Avenue – Ste. 1800, Pittsburgh, PA 15222, Counsel for Tiversa Holding Corp. and Robert J. Boback

Before: AMBRO, JORDAN, and RENDELL, Circuit Judges

**OPINION OF THE COURT**

JORDAN, Circuit Judge.

**\*1** In 2008, Tiversa Holding Corp., a cybersecurity company, informed LabMD, Inc., a medical testing business, that it had found some of LabMD's confidential patient information circulating in cyberspace and that it could provide services to help LabMD respond to the data leak. LabMD's own investigation revealed no such leak, and it accused Tiversa of illegally accessing the patient information. Tiversa submitted a tip to the Federal Trade Commission ("FTC"), prompting an investigation into LabMD's cybersecurity practices, and the regulatory pressure resulting from that and a subsequent FTC enforcement action, along with the reputational damage associated with public disclosure of the supposed leak, ultimately ran LabMD into the ground. Later, in 2014, a former Tiversa employee confirmed LabMD's suspicions about Tiversa when he

claimed that the patient information in question did not spread from a leak but that Tiversa itself had accessed LabMD's computer files and then fabricated evidence of a leak.

Following that accusation, LabMD initiated numerous lawsuits against Tiversa and its affiliates. Two of those suits form the basis of this appeal. The complaint in the first asserted, among other things, claims for defamation and fraud. The District Court dismissed all of those claims, except for one defamation claim that was subsequently defeated on summary judgment. The Court limited the scope of discovery on that defamation claim, including a prohibition on the discovery or use of expert testimony. It then imposed severe sanctions when, in its view, LabMD and its counsel breached those limits. In addition to awarding fees and costs to the defendants, the Court struck almost all of LabMD's testimonial evidence and revoked its counsel's pro hac vice admission. When LabMD's replacement counsel later tried to withdraw, the Court denied that request, and when LabMD failed to pay the monetary sanctions, the Court held it in contempt. The second lawsuit proceeded in somewhat the same timeframe as the first and asserted similar claims for fraud. The District Court dismissed that case in its entirety, for a variety of procedural and substantive reasons.

LabMD now appeals the dispositive rulings in both cases, along with the rulings on sanctions, contempt, and the motion to withdraw. We agree with LabMD that, in the first case, the District Court erred in granting summary judgment, primarily because the Court's prohibition on expert testimony was unwarranted. We also hold that the Court abused its discretion in imposing sanctions and that it erred in denying the motion to withdraw. But we agree with the District Court in general that LabMD's other claims in that case were properly dismissed. Thus, we will affirm in part and vacate in part the judgment of the District Court in that matter. In the second case, because LabMD does not challenge independently sufficient grounds for the District Court's decision, we will affirm in full.

## I. Background[1]

**\*2**  LabMD is a privately owned Georgia corporation based in Atlanta, Georgia. It had been a cancer-testing enterprise and, at its peak, employed approximately forty medical professionals. Before ceasing its ordinary business operations, it had served many thousands of patients. Its CEO is Michael J. Daugherty, a citizen of Georgia.

Tiversa is a Delaware corporation based in Pittsburgh, Pennsylvania. It is a self-proclaimed world leader in peer-to-peer ("P2P") network cybersecurity.[2] Tiversa has provided to the FTC information about data breaches on P2P networks, and representatives from Tiversa have testified before Congress about cybersecurity. Tiversa's CEO is Robert J. Boback, a citizen of Pennsylvania. During times relevant to this litigation, Tiversa had an agreement with Professor M. Eric Johnson, a former director of the Center for Digital Strategies at Dartmouth College, pursuant to which the professor worked with Tiversa on cybersecurity research. Johnson is a citizen of Tennessee.

### A. The Alleged Data Leak and FTC Actions

In mid-2008, Tiversa informed LabMD that it had obtained a 1,718-page computer file containing the confidential data of more than 9,000 LabMD patients (the "1718 File"). Tiversa represented that it had found the 1718 File on a P2P network and that it "continued to see individuals ... downloading copies of the [1718 File]." (1731 App. at 223.) Tiversa tried to use that purported breach to persuade LabMD to purchase its incident response services. LabMD rejected the offer but still "spent thousands of dollars, and devoted hundreds of man hours," seeking to detect and remedy the supposed data leak. (1731 App. at 223.)

In what LabMD alleges to be retaliation for its refusal to purchase Tiversa's services, Tiversa took two actions. First, it gave the 1718 File to Johnson for use in an upcoming research paper. That paper, published in April 2009 under the title "Data Hemorrhages in the Health-Care Sector," prominently featured a redacted version of the 1718 File, although it did not name LabMD as the company whose data had been leaked. (1731 App. at 226-28.) Second, Tiversa provided the 1718 File to the FTC. It told the FTC that it had found the 1718 File on a P2P network and that third parties were also downloading the file from that network.

Relying on Tiversa's tip, the FTC commenced an investigation in 2010 into the suspected failure of LabMD to protect its customers' personal information. That investigation eventually resulted in an FTC enforcement action against LabMD in August 2013. According to LabMD, the repercussions of the investigation and enforcement action were devasting to its business:

> As a direct consequence of the FTC's proceedings, including the attendant adverse publicity and the administrative burdens that were imposed on LabMD to

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

comply with the FTC's demands for access to current and former employees and the production of thousands of documents, LabMD's insurers cancelled all of the insurance coverage for LabMD and its directors and officers, and LabMD lost virtually all of its patients, referral sources, and workforce, which had included around 40 full-time employees. Consequently, LabMD was effectively forced out of business by January 2014, and it now operates as an insolvent entity that simply provides records to former patients.

**\*3** (1731 App. at 229.)

LabMD, for its part, believes that its data was secure, despite some indications to the contrary. (*See* 1731 App. at 53 (Daugherty noting in his book, *The Devil Inside the Beltway*, that a particular P2P file-sharing program "was an unruly beast that could cause [LabMD] to expose ... workstation files without ... ever knowing").).[3] It did, however, "suspect[ ] from as early as May 2008 that [Tiversa was] lying about the source of the 1718 File." (1731 App. at 909.)

### B. The Georgia Action

In October 2011, during the early days of that FTC investigation, LabMD filed a lawsuit against Tiversa in Georgia (the "Georgia Action").[4] The suit included claims for violations of the federal Computer Fraud and Abuse Act ("CFAA") and Georgia's computer crimes statute, along with conversion and trespass claims, all of which were based on allegations that Tiversa had unlawfully obtained the 1718 File. Tiversa was represented in the Georgia Action by the law firm of Pepper Hamilton LLP – now constituted as Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper") – and, in particular, by a partner named Eric D. Kline.

Tiversa moved to dismiss the Georgia Action for lack of personal jurisdiction. In support of its motion, it submitted a declaration from its CEO, Boback, asserting that it did not regularly solicit business in Georgia, and it argued that its only solicitation of business in Georgia was its contact with LabMD in 2008 regarding the 1718 File. The U.S. District Court for the Northern District of Georgia accepted those representations and dismissed the claims against Tiversa for lack of personal jurisdiction. The Eleventh Circuit affirmed. LabMD now alleges, however, that Tiversa and its lawyers knowingly omitted from Tiversa's briefs and from Boback's declaration the fact that Tiversa had also "solicited business from at least five other companies" in Georgia. (1446 App. at 214-15.) Nevertheless, at the time, LabMD did not refute

the factual assertions about Tiversa's lack of Georgia contacts, nor did it refile its claims in another jurisdiction or otherwise pursue further action against Tiversa.

### C. The Whistleblower and the Government's Investigation of Tiversa

**\*4** LabMD was moved to action again in April 2014, when a former Tiversa employee, Richard Wallace, called to share his account of how Tiversa actually obtained the 1718 File. According to Wallace, Tiversa had located the file on one of LabMD's own computers on a P2P network, downloaded it, and then fabricated the file's metadata in forensic reports to make it appear as if the 1718 File had leaked and spread across the network. Wallace later told LabMD that Tiversa was able to search for and access the 1718 File only because it had used secret, government-owned software called "enhanced P2P." According to Wallace, and contrary to Tiversa's earlier representations, the 1718 File had never leaked; Tiversa stole it from LabMD's own computer.

Wallace blew the whistle on Tiversa to the FTC as well, telling them that Tiversa had essentially made an extortionate business model out of accessing a company's files, fabricating evidence of the files spreading across a network, using the false impression of a leak to sell data security remediation services to the company, and reporting the company to the FTC if it refused to purchase Tiversa's services. In response, the U.S. House of Representatives Oversight and Government Reform Committee commissioned an investigation into Tiversa's business practices and its relationship with the FTC. It found that Tiversa "often acted unethically and sometimes unlawfully in its use of documents unintentionally exposed on peer-to-peer networks" and that the information it provided to the FTC "was only nominally verified but was nonetheless relied on by the FTC for enforcement actions." (1446 App. at 297.) Armed with Wallace's testimony and the findings of the congressional investigation, LabMD fought the FTC enforcement action and eventually prevailed. Although it was awarded attorneys' fees from the government in the amount of almost $850,000, that was too little too late. LabMD's business was destroyed.

Through all those dramatic events, Boback vigorously defended Tiversa, proclaiming that the company had done nothing wrong. In February 2015, he published an online post on the Pathology Blawg in which he called LabMD's accusations baseless and reiterated Tiversa's assertion that LabMD's lax security had allowed the 1718 File to be leaked onto the internet. Boback later wrote a letter to the editor

of *The Wall Street Journal*, published in December 2015, in which he similarly defended Tiversa and said that LabMD had publicly exposed the 1718 File.

### D. The First Pennsylvania Action

At the beginning of 2015, LabMD filed a new lawsuit against Tiversa, Boback, and Johnson in the U.S. District Court for the Western District of Pennsylvania (the "First Pennsylvania Action"). It asserted Pennsylvania state-law claims for conversion, defamation, tortious interference with business relations, fraud, negligent misrepresentation, and civil conspiracy, as well as federal RICO claims. Upon the defendants' motion, the District Court dismissed some of the claims with prejudice, including the RICO claims, but it dismissed the rest without prejudice and gave LabMD an opportunity to amend those claims. LabMD filed an amended complaint in February 2016, in which it asserted, among other things, a claim for defamation based on statements Tiversa and Boback made variously to the FTC, in a press release, on the Pathology Blawg, and in *The Wall Street Journal*.

The defendants again moved to dismiss the complaint. This time, the District Court dismissed all of the claims with prejudice, except for the defamation claim, which survived dismissal only as to two allegedly defamatory statements. The first statement, labeled "Statement 13" in the complaint, was one that Boback made for Tiversa on the Pathology Blog:

**\*5** LabMD lawsuit – The claims are baseless and completely unsubstantiated ... even in the complaint itself. This appears to be another attempt by Daugherty to distract people from the INDISPUTABLE FACT that LabMD and Michael Daugherty leaked customer information on nearly 10,000 patients.

(1731 App. at 4897.) The second statement to survive dismissal, listed as "Statement 16," was one that Boback, again speaking for Tiversa, made in *The Wall Street Journal*:

LabMD's CEO Michael Daugherty admits that a LabMD employee improperly installed ... file-sharing software on a company computer. Doing so made confidential patient information publicly available.

(1731 App. at 4898.)

The First Pennsylvania Action proceeded to discovery on the defamation claim. LabMD's counsel, James Hawkins, first deposed Joel Adams, a former Tiversa employee. Tiversa believed that Hawkins's questioning was entirely unrelated to the defamation claim, and it moved for a

protective order, which the District Court granted. The Court highlighted examples of irrelevant questions Hawkins had asked, including "if there was something secretive about [Adams's] children, strengths and weaknesses of a certain employee, the workplace culture at Tiversa, leadership styles, guns in the workplace, an AIDS clinic in Chicago, Edward Snowden, an Iranian IP address[,] and whether the witness had 'ever met [the judge presiding over the case].' " (1731 App. at 1709, 1775.) It then ordered that "[t]he scope of the depositions in this action must be limited to the remaining portion of the defamation per se claim, specifically Statements #13 and #16, LabMD's alleged damages and defenses thereto." (1731 App. at 1713.) The protective order did not otherwise specify what categories of questioning were off limits.

Over the next two weeks, Hawkins deposed six more current and former Tiversa employees, including Boback and Wallace. After completion of the depositions, Tiversa moved for sanctions against LabMD and Hawkins. It argued that Hawkins had continued to ask irrelevant questions at those depositions, in violation of the protective order. The District Court agreed, finding that Hawkins had asked "no questions" or "very minimal questions" related to Statements 13 and 16 and had instead "used the depositions to obtain discovery for other cases" and to conduct "fishing expeditions[.]" (1731 App. at 1798-800.) As examples of such off-limits conduct, the District Court quoted numerous questions from each of the depositions. Those questions fell under the following general topics: the alleged false spread of the 1718 File, including the fabrication and alteration of metadata on the 1718 File; the technology that Tiversa used to search for and access documents on P2P networks; the legality of Tiversa's products and services; Tiversa's prior representations to the FTC and Congress; Boback's alleged attempts to intimidate Wallace into not testifying against Tiversa; and the culture at Tiversa's workplace, including whether there was a "gun culture."

Having concluded that Hawkins's questioning violated the protective order, the Court decided the violations warranted severe sanctions. Although it declined to dismiss the case, the Court ordered the following sanctions (the "First Sanctions Order"): LabMD was to pay Tiversa's and Boback's attorneys' fees and costs related to the filing of the motion for sanctions ($12,056); Hawkins personally was to pay Tiversa's court reporter fees and transcript costs for the six depositions ($4,737.75); and LabMD was barred from using any testimony elicited in those six depositions for any purpose in this case or any other case in any other forum.

The Court also put Hawkins on "final notice" that "further litigation misconduct or disregard of orders" would result in the termination of his pro hac vice admission. (1731 App. at 1804.) LabMD moved for reconsideration of the First Sanctions Order, which the District Court denied.

**\*6** At a status conference ahead of Tiversa's anticipated motion for summary judgment, LabMD indicated that it might have to use an expert witness to respond to issues raised on summary judgment as to its defamation claim. In response, the District Court stated that it was "[not] going to need expert reports for the motion for summary judgment[,]" and that it would set a schedule for expert discovery only if the claim survived summary judgment. (1731 App. at 1766-67.) Tiversa and Boback then moved for summary judgment on the defamation claim. LabMD, in its brief opposing summary judgment, did not cite to any of the depositions outlawed by the First Sanctions Order. It did, however, simultaneously file an "offer of proof" in which it submitted transcripts of all six depositions and explained how it would use the depositions to rebut Tiversa's factual claims if it were permitted to do so. (1731 App. at 4264-71.) LabMD also submitted a declaration from Daniel Regard, a specialist in computer forensics (the "Regard Declaration"). Regard opined that the 1718 File was never "publicly available" on any P2P network and was only accessible using secret, government-owned software.

Tiversa moved to strike the offer of proof and the Regard Declaration, and the District Court granted that motion. It determined that the submission of the deposition transcripts violated the First Sanctions Order and that the submission of the Regard Declaration violated its directive prohibiting experts. It thus imposed additional sanctions (the "Second Sanctions Order"): Hawkins's pro hac vice admission was revoked, and LabMD was to pay Tiversa's and Boback's attorneys' fees and costs related to the filing of the motion to strike. That same day, the Court also granted summary judgment for the defendants on the defamation claim, holding that there was not sufficient evidence to establish actual or presumed damages.

Because Hawkins had lost his pro hac vice admission, LabMD retained attorney Marc Davies to appeal the two Sanctions Orders and the summary judgment order. Hawkins, in his individual capacity, separately appealed the Sanctions Orders. In the meantime, LabMD did not pay the monetary sanctions the District Court had ordered. Instead, it asked the Court to vacate, or at least stay, the monetary sanctions, asserting that it lacked the financial ability to pay. After a quick briefing

schedule, which required Davies to file a supplemental brief and a reply brief for LabMD, the District Court denied LabMD's motion and set a deadline for payment. When LabMD missed that deadline, the Court ordered it to show cause for its nonpayment. Davies, on behalf of LabMD, filed a response to that order.

The next day, Davies moved to withdraw as counsel. He explained that he had originally been engaged only for appellate matters, that the motions practice before the District Court was outside the scope of his engagement, and that LabMD had terminated him as its counsel. He said that LabMD was "currently seeking pro bono counsel" to resolve the sanctions issues. (1429 App. at 683.) The District Court denied his motion. It held that, because a corporation must be represented by a lawyer, Davies could not withdraw without first naming his successor counsel. LabMD and Davies each appealed the denial of the motion to withdraw.

The District Court then held a hearing on the order to show cause. At the hearing, Davies read an email from LabMD's CEO, Daugherty, in which Daugherty explained that he was skipping the hearing because he "did not anticipate [it] going forward" and had scheduled other matters at the same time. (1429 App. at 699.) Daugherty's email also reiterated that "LabMD discharged [Davies] as its attorney long ago" and that Davies had "no authority from LabMD to speak or act on its behalf." (1429 App. at 699.) The District Court found LabMD in civil contempt for failing to comply with the Sanctions Orders. LabMD then appealed the contempt ruling.

In summary, LabMD has appealed the District Court's rulings on dismissal, summary judgment, sanctions, contempt, and the withdrawal of counsel. Additionally, Hawkins has appealed the sanctions orders, and Davies has appealed the order denying his withdrawal.

### E. The Second Pennsylvania Action
**\*7** On July 8, 2016, while the First Pennsylvania Action was ongoing, LabMD and Daugherty filed a complaint against Tiversa, Boback, Troutman Pepper, and Kline, among others, in Georgia federal court, and the case was subsequently transferred to the Western District of Pennsylvania (the "Second Pennsylvania Action"). The complaint asserted Georgia state RICO claims against all the defendants. It also brought claims against Troutman Pepper and Kline for violations of the federal RICO statute, along with state-law claims of fraud, negligence, fraudulent misrepresentation, negligent misrepresentation, and common-law conspiracy.

The defendants filed a motion to dismiss, which the District Court granted in full. LabMD and Daugherty timely appealed,[5] and we combined for argument the appeals from the two Pennsylvania Actions.

## II. Discussion[6]

We begin with the issues on appeal from the First Pennsylvania Action and then turn to the issues in the Second Pennsylvania Action.

### A. The Issues in the First Pennsylvania Action

The District Court's dismissal of the federal RICO claims and the claims for tortious interference with business relations, fraud, and negligent misrepresentation against Tiversa, Boback, and Johnson will be affirmed, but we will vacate in large part the District Court's decisions on the defamation claim – both the dismissal with respect to certain allegedly defamatory statements and the grant of summary judgment with respect to the two statements that had originally survived dismissal. We will also vacate the imposition of sanctions, the finding of contempt, and the denial of Davies's motion to withdraw.

### 1. Dismissal[7]

### i. Federal RICO Claims

LabMD alleges that Tiversa, Boback, and Johnson violated the federal RICO statute, 18 U.S.C. § 1962(c),[8] in three ways: first, by lying about how and where Tiversa found the 1718 File, so as to induce LabMD to purchase Tiversa's incident response services; second, by using the 1718 File in Johnson's research paper on data leaks in the medical field; and third, by turning over the 1718 File to the FTC after LabMD refused to hire Tiversa. The District Court dismissed the RICO claims as being time-barred, and we agree with that conclusion.

"Establishing liability under ... the RICO statute requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, plus [(5)] an injury to business or property," and (6) the racketeering activity must have been "the 'but for' cause as well as the proximate cause of the injury." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 483 (3d Cir. 2015). The limitations period for a federal RICO claim is four years. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,

483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). LabMD filed its complaint on January 21, 2015. Thus, absent any tolling of the statute of limitations, LabMD's federal RICO claims were time-barred if they accrued before January 21, 2011.[9]

**\*8** The statute of limitations begins to run when the plaintiff knows or should know of both its injury and the source of its injury. *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d Cir. 2004);[10] *Forbes v. Eagleson*, 228 F.3d 471, 483 (3d Cir. 2000). Thus, we start by identifying LabMD's injury and the injury's source. As for its injury, LabMD says that, due to the FTC's investigation and enforcement action, it suffered a "reduction in value of its business, lost revenue, and expenses associated with insolvency," as well as costs associated with "attempting to resolve the purported security breach and to comply with the investigations and [their] demands," and finally "the substantial and irreparable loss of goodwill and business opportunities[.]" (1731 App. at 904.)[11] As for the source of the injury, LabMD alleges that Tiversa used fraudulent representations to "proximately cause[ ] the FTC to investigate and bring an enforcement action against LabMD." (1731 App. at 905.)

Determining *when* LabMD knew of its alleged injuries is complicated because the extent of the injuries grew over time. For example, when the FTC launched its investigation in 2010, LabMD faced "administrative burdens ... to comply with the FTC's demand for access to current and former employees and the production of thousands of documents[.]" (1731 App. at 229.) But once the FTC filed the enforcement action in 2013, LabMD suffered more severely from "adverse publicity" resulting in the loss of "all of [its] insurance coverage" and "virtually all of its patients, referral sources, and workforce." (1731 App. at 229.)

Certainly, LabMD may not have expected that the FTC's initial involvement in 2010 would result in the demise of its business. But "[a] cause of action accrues even though the full extent of the injury is not then known or predictable. Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that [it] had been harmed enough, placing the supposed statute of [limitations] in the sole hands of the party seeking relief." *Kach v. Hose*, 589 F.3d 626, 634-35 (3d Cir. 2009) (quoting *Wallace v. Kato*, 549 U.S. 384, 391, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007)). For purposes of assessing the

accrual of its claims, then, we conclude that LabMD knew of its injuries in 2010, at the latest.[12]

**\*9** LabMD also knew or should have known by 2010 that Tiversa was the source of the injuries flowing from the FTC's investigation and subsequent enforcement action. Right from the beginning of the "leak" ordeal, LabMD was suspicious of Tiversa. It alleges that it "suspected from as early as May 2008 that Defendants were lying about the source of the 1718 File." (1731 App. at 909.) Even if LabMD did not have actual knowledge that the FTC had gotten its information about the 1718 File from Tiversa, there were enough "storm warnings" that it should have known that Tiversa was the source. *Cf. Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) ("[W]hen plaintiffs should have known of the basis of their claims depends on whether and when they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." (internal quotation marks and alterations omitted)). Tiversa had demonstrated a willingness to disclose the 1718 File to others, such as when it collaborated with Johnson on a research paper that included a redacted version of the 1718 File. That paper, published in April 2009, begins by noting that Johnson's research was "conducted in collaboration with Tiversa[.]" (1731 App. at 310.) Tiversa had also demonstrated a close relationship with government investigators. In 2007, Boback testified alongside FTC representatives before the Senate Oversight and Government Reform Committee about the dangers of P2P networks. Two years later, he testified before the House Subcommittee on Commerce, Trade and Consumer Protection about P2P network data leaks, and produced the 1718 File as an example. LabMD's complaint also highlights two news articles from *Computerworld* in February 2010, in which Boback and Johnson were both interviewed about the FTC opening investigations into almost 100 companies regarding data leaks on P2P networks. Based on all those circumstances, LabMD knew or should have known by 2010 that Tiversa was very likely the source behind the FTC's investigation and eventual enforcement action.[13]

Because LabMD knew or should have known by 2010 about its injuries and their source, its federal RICO claims accrued more than four years before it filed its complaint in January 2015. Thus, unless the limitations period was tolled, the RICO claims are time-barred.

The limitations period for a RICO claim may be equitably tolled "where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it[.]" *Rotella v.*

*Wood*, 528 U.S. 549, 561, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). Equitable tolling is "the exception, not the rule." *Id.* It requires active misleading by the defendant. *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 256 (3d Cir. 2001). Active misleading involves "tak[ing] steps beyond the challenged conduct itself to conceal that conduct from the plaintiff." *Gabelli v. S.E.C.*, 568 U.S. 442, 447 n.2, 133 S.Ct. 1216, 185 L.Ed.2d 297 (2013). Here, the only purported acts of active misleading that LabMD cites are Tiversa's assertions that LabMD had a data leak and that the 1718 File was spreading across cyberspace. But those misrepresentations, if they are that, are not acts of concealment "beyond the challenged conduct itself." *Id.* Rather, they are at the very heart of LabMD's claims. When LabMD was asked to identify the predicate acts for its RICO claim, it listed a half-dozen acts of alleged "wire fraud" involving Tiversa and Boback "making misrepresentations about the 1718 File" in telephone calls and emails to LabMD. (1731 App. at 889.) LabMD has not pointed to any other independent instances of active misleading that would entitle it to equitable tolling of its RICO claims. As a result, those claims are time-barred, and we will affirm the District Court's dismissal of them.

### ii. Tortious Interference with Business Relationships

**\*10** Next, LabMD claims that Boback's statements in 2015 on the Pathology Blawg and in *The Wall Street Journal* tortiously interfered with LabMD's prospective business relationships.[14] To plead a claim under Pennsylvania law for tortious inference with a prospective business relationship, LabMD must allege facts showing, among other things, "the existence of a ... prospective contractual relationship between [LabMD] and a third party," and "a reasonable likelihood that the relationship would have occurred but for the interference of [Boback]." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir. 1998). A prospective contractual relationship is "something less than a contractual right, something more than a mere hope." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979).

LabMD has not adequately alleged that Boback's statements caused any prospective contractual relationships to suffer. The timing of events matters here. The amended complaint identifies numerous third-party payors and a handful of insurance carriers that previously did business with LabMD, but it does not allege that any of those parties would have been likely to do future business with LabMD.

As the District Court observed, LabMD was effectively shut down by January 2014, over a year before Boback made the statements at issue. And the amended complaint acknowledges that it was the FTC's actions, not Boback's later allegedly defamatory remarks, that drove away business: "OneBeacon, for example, refused to provide LabMD with [insurance] coverage ... because of the FTC investigation and Enforcement Action, which were predicated on Tiversa and Boback's False Statement [from 2008]." (1731 App. at 4905.) There is not an objectively reasonable probability that Boback's 2015 statements did any additional damage to LabMD's prospective contractual relationships. The District Court's dismissal of the tortious interference claim was thus proper.

### iii. Fraud and Negligent Misrepresentation

LabMD claims that Tiversa and Boback are liable for fraud and negligent misrepresentation based on their telling LabMD "that Tiversa had obtained the 1718 File from a [P2P] network and that Tiversa continued to see individuals downloading copies of the 1718 File." (1731 App. at 4909 (internal quotation and alteration marks omitted).) Under Pennsylvania law, plaintiffs must bring fraud claims "within two years of when they learned or should have learned, through the exercise of due diligence, that they have a cause of action." *Beauty Time, Inc. v. VU Skin Sys., Inc.*, 118 F.3d 140, 148 (3d Cir. 1997). For that limitations period to begin running, "a claimant need only be put on inquiry notice by 'storm warnings' of possible fraud." *Id.* The statute of limitations for negligent misrepresentation is also two years. 42 Pa. Cons. Stat. § 5524(7).

We agree with the District Court that LabMD knew or should have known of its fraud and negligent misrepresentation claims by 2011, when it filed its complaint in the Georgia Action. There, LabMD alleged that "Tiversa intentionally accesse[d] LabMD's computers and networks and downloaded the [1718 File] without authorization" and that "Tiversa accessed LabMD's computers and networks with the intent to extort money from LabMD[.]" (1731 App. at 1549-50.) Those older allegations demonstrate that LabMD had already concluded that Tiversa lied about obtaining the 1718 File from a P2P network. That knowledge should have also put LabMD on inquiry notice in 2011 as to whether Tiversa allegedly lied about *others* obtaining the 1718 File from a P2P network. Because LabMD learned or should have learned of the claimed falsehoods more

than two years before filing its original 2015 complaint in the First Pennsylvania Action, its fraud and negligent misrepresentation claims are barred by the applicable statutes of limitations. *See Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 9 (Pa. Super. Ct. 2004) (applying the same statute-of-limitations analysis to uphold dismissal of claims for fraud and negligent misrepresentation), *aff'd*, 593 Pa. 20, 928 A.2d 186 (2007). We will therefore affirm the District Court's dismissal of those claims.

### iv. Defamation

**\*11** "Defamation ... is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements." *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. Ct. 2008). Under Pennsylvania law, the plaintiff bears the burden of proving, *inter alia*, the defamatory character of a statement and harm resulting from its publication. 42 Pa. Cons. Stat. Ann. § 8343(a)(6). The plaintiff does not have to affirmatively prove that the statement was false; rather, a defendant who disputes falsity has to prove the truth of the defamatory communication. *Id.* § 8343(b)(1).

In its amended complaint, LabMD identified twenty allegedly defamatory statements made by Boback, for Tiversa, accusing LabMD of having poor data security practices and exposing the 1718 File to the public. Statements 1 through 4 were made to the FTC in 2009. Statements 5 through 9 were made in a Tiversa press release in May 2009. Statements 10 through 14 were published on the Pathology Blawg in February 2015. And Statements 15 through 20 were made in a letter to the editor of *The Wall Street Journal* that was published in December 2015. The District Court dismissed LabMD's defamation claim as to Statements 1-9, and LabMD does not challenge that aspect of the Court's decision.

Concerning the statements on the Pathology Blawg (Statements 10 through 14), the District Court denied the motion to dismiss only as to Statement 13, which, as noted earlier, reads as follows:

> LabMD lawsuit – The claims are baseless and completely unsubstantiated ... even in the complaint itself. This appears to be another attempt by Daugherty to distract people from the INDISPUTABLE FACT that LabMD and Michael Daugherty leaked customer information on nearly 10,000 patients.

(1731 App. at 4897.) The Court held that Statement 13 was "defamatory on its face," and it rejected Tiversa's argument that the statement was a non-actionable opinion. (1731 App. at 1542.) But the Court granted Tiversa's motion to dismiss as to the other statements made on the Pathology Blawg because it thought LabMD had not addressed those individual statements in its opposition to Tiversa's motion to dismiss and thus had "conceded that [they] were not defamatory." (1731 App. at 1542.)

The District Court erred in that. As to Statements 10 and 14, LabMD did not make such a concession. Those two statements read, respectively:

> After all, we found this file in a public file sharing network that was accessible by millions of people from around the world.
>
> ...
>
> To my understanding from the deposition transcripts, LabMD had a policy against installing file sharing software. An employee at LabMD violated that policy, which resulted in the exposure of nearly 10,000 patients['] private information. This clearly demonstrates that LabMD DID NOT adequately protect their [patients' private information], which is [all] that the FTC needs to demonstrate. Case closed. The rest of this is just a desperate attempt to distract everyone from that INDISPUTABLE FACT.

(1731 App. at 4896-97.)

In its brief in opposition to Tiversa's motion to dismiss, LabMD included a subsection titled "Defamatory Statements Nos. 10 – 14," in which it wrote: "Although the entire statement [on the Pathology Blawg] provides the context of this ongoing dispute, it is absolutely clear that Defendants made a false and defamatory statement about LabMD by asserting as 'indisputable fact' that LabMD 'leaked' customer information on nearly 10,000 patients. Defendants cannot dismiss this statement on the basis that it is an opinion." (1731 App. at 1946-47.) At no point did LabMD single out Statement 13 as the only part of its defamation claim that it was defending.

**\*12**  Instead, the District Court appears to have reached its conclusion by observing that Statement 13 was the only one that specifically included the exact terms "indisputable fact" and "leaked[,]" which were the terms LabMD quoted in its brief. But it appears that LabMD quoted those

specific terms merely to exemplify how Tiversa's statements on the Pathology Blawg contained assertions of fact, not opinions. Other statements on the Pathology Blawg included analogous phrases. Statement 10 said that the 1718 File was "found ... in a public file sharing network that was accessible by millions of people from around the world" – which is consistent with LabMD's use of the term "leaked" in its brief. (1731 App. at 4896.) Statement 14 similarly said that "[a]n employee at LabMD ... expos[ed] ... nearly 10,000 patients['] private information" – again, an assertion effectively synonymous with "leaked" – and it even used the exact phrase "indisputable fact" that LabMD quoted in its brief. (1731 App. at 4897.) Yet the District Court took a constricted view of LabMD's opposition and gave too little weight to the substance of its argument. LabMD was not required to repeat each of the defamatory statements verbatim in order to preserve its claim. *Cf. Nelson v. Adams USA, Inc., 529 U.S. 460, 469, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000)* ("[Preservation] does not demand the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue.").[15]

The District Court applied a similarly erroneous analysis to Statements 15 through 20, found in a letter to *The Wall Street Journal.* The Court sustained the defamation claim as to Statement 16, which said:

> LabMD's CEO Michael Daugherty admits that a LabMD employee improperly installed ... file-sharing software on a company computer. Doing so made confidential patient information publicly available over the Internet.

(1731 App. at 4898.) The Court rejected Tiversa's argument that the statement was true, reasoning that the meaning of "publicly available" was subject to interpretation. But it then granted the motion to dismiss as to the other statements made in *The Wall Street Journal,* because it again thought LabMD had conceded that those statements were not defamatory by not adequately opposing Tiversa's motion to dismiss. Again, however, LabMD did no such thing, at least as to Statements 15, 17, and 18. Those statements read, respectively:

> LabMD, a Georgia-based cancer screening company, admits its own employee mistakenly exposed the confidential medical records of nearly 10,000 individuals on the Internet.
>
> ...
>
> Using this information, LabMD discovered that it had peer-to-peer sharing software on a company computer.

Without Tiversa's free information, LabMD would have never known it was continuing to publicly expose patient information.

The suggestion that Tiversa provided information on exposed files to the Federal Trade Commission as a means of retribution because LabMD didn't hire Tiversa is 100% false.

(1731 App. at 4898.)

In its opposition to the motion to dismiss, LabMD argued that Statements 15 through 20 were defamatory because its files "were and are *never* 'publicly available' on [P2P] networks, as a matter of fact and as a matter of law." (App. at 1948-49 (footnote omitted).) The District Court focused on the words "publicly available," concluding that LabMD had conceded its defamation claim as to all those statements except for Statement 16, the only statement with the exact phrase "publicly available." Once more, the District Court's narrow approach led it to erroneously dismiss the other statements as being concededly non-defamatory. Yet other statements likewise contain accusations of the 1718 File being made publicly available. Statement 15 said that "LabMD ... admits its own employee mistakenly *exposed* the confidential medical records of nearly 10,000 individuals *on the Internet.*" (App. at 4898 (emphases added).) Statement 17 said that "LabMD would have never known it was continuing to *publicly expose* patient information." (App. at 4898 (emphasis added).) And Statement 18 similarly addressed LabMD's "*exposed* files." (App. at 4898 (emphasis added).) Thus, LabMD's briefing adequately preserved its argument with respect to Statements 15, 17, and 18, and not just Statement 16.[16]

**\*13** We will therefore direct the reinstatement of LabMD's defamation claim pertaining to Statements 10, 14, 15, 17, and 18. On remand, the District Court may consider any other arguments Tiversa has made in favor of dismissing the claim as to those statements.

## 2. Summary Judgment[17]

After the District Court held that LabMD had adequately stated a defamation claim as to Statements 13 and 16, Tiversa and Boback moved for summary judgment. The District Court's decision at summary judgment turned on whether LabMD could establish that it was harmed by Boback's statements. The District Court held that the record did not

support a finding of actual damages, since LabMD had already gone out of business over a year before Boback made those statements. It further held that the record did not support an alternative finding of presumed damages. Although LabMD concedes the lack of actual damages, it contests the District Court's decision that there was no evidence to support presumed damages – and, specifically, the Court's refusal to consider the evidence it offered on that issue.

A plaintiff who establishes presumed damages can prevail on a claim for defamation even without proof of actual damages. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760-61, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (discussing the common-law rule that allows juries to presume that damage occurred from defamatory statements, even when "proof of actual damage [is] impossible"). To establish presumed damages in Pennsylvania, the plaintiff must prove that the defendant made the defamatory statements with actual malice. *Joseph v. Scranton Times L.P.*, 634 Pa. 35, 129 A.3d 404, 432 (2015). Actual malice is "knowledge of falsity or reckless disregard for the truth." *Id.* at 426 (quoting *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Whether there has been actual malice is judged by a subjective standard. *Lewis v. Phila. Newspapers, Inc.*, 833 A.2d 185, 192 (Pa. Super. Ct. 2003). The question is whether there is "evidence that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* (emphasis and internal quotation marks omitted).

In support of their motion for summary judgment, Tiversa and Boback submitted an affidavit from Boback in which he declared that files in a folder on a P2P network are "publicly available" and that a person who places the documents on the network has "leaked" the documents. He declared that he has always believed that to be true and that he "relied upon [his] knowledge as it existed ... when [he] made Statements 13 and 16." (1731 App. at 1810.)

LabMD sought to rebut Boback by using expert evidence to demonstrate that the 1718 File was not publicly available. The District Court, however, refused to consider any expert declaration, expert report, or other expert discovery on the motion for summary judgment. At an earlier scheduling conference, the District Court had stated that "it appears to the Court that it's in the interests of efficiency that, before we get into experts we see if the claim survives [the motion for summary judgment]." (App. at 1766.) LabMD's counsel then

observed that "[i]t may be that issues are raised on summary judgment that need to be addressed by an expert[.]" (1731 App. at 1766.) But the District Court reiterated that it would not hear expert testimony:

> **\*14**  And let me be clear. Given the issues of what's left in this case, the two remaining issues are not an issue where we're going to need expert reports for the motion for summary judgment. ... So if the remaining portion of [the defamation claim] survives the motion for summary judgment, then at that point we'll set a schedule for each side's expert reports and expert depositions. [I]f the case happens to be dismissed, then the parties will have spent considerable time and money, and I am respectful of that. And in light of the posture of this case and the issues at hand, we will deal with summary judgment first, and then, if the claim survives as to one or both statements at issue, then we'll set the expert schedule.

(1731 App. at 1767.)

Nevertheless, in LabMD's opposition to the motion for summary judgment, it submitted the Regard Declaration. Regard, a specialist in computer forensics, asserted that the 1718 File was never publicly available; that Tiversa had used secret, government-owned software to access the 1718 File; and that the metadata supported Wallace's story that he was directed by Boback to generate the appearance of a prior leak. But the District Court, at Tiversa's request, struck the Regard Declaration and refused to consider it when ruling on the motion for summary judgment. The Court found that LabMD "plainly violate[d] the Court's clear directive" and "conduct[ed] litigation by surprise." (1731 App. at 1878-79.) LabMD challenges that refusal to consider the Regard Declaration.

Parties are permitted to submit declarations to support or defend against a motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A). That includes expert declarations. *E.g.*, *1836 Callowhill St. v. Johnson Controls, Inc.*, 819 F. Supp. 460, 462 (E.D. Pa. 1993) ("An expert's affidavit ... is eligible for summary judgment consideration if the affiant would be qualified to give the expert opinion at trial."). As with other rules for obtaining and presenting evidence, the timing and availability of expert discovery is subject to the court's discretion. *See Lloyd v. HOVENSA, LLC.*, 369 F.3d 263, 274-75 (3d Cir. 2004) ("It is well established that the scope and conduct of discovery are within the sound discretion of the trial court and that after final judgment of the district court ... our review is confined to determining if that discretion has been abused.") (quoting *Marroquin-Manriquez*

*v. I.N.S.*, 699 F.2d 129, 134 (3d Cir. 1983)). But, of course, a district court's discretion is not unbounded. It abuses that discretion if it "interfere[s] with a substantial right[.]" *Pub. Loan Co. v. FDIC*, 803 F.2d 82, 86 (3d Cir. 1986) (quoting *Marroquin-Manriquez*, 699 F.2d at 134) (internal quotation marks omitted).

Here, the District Court abused its discretion when it prohibited LabMD from submitting an expert declaration during the summary-judgment phase of this case. By refusing to allow expert support for the defamation claim until after summary judgment – and then entering summary judgment against LabMD – the Court denied LabMD any opportunity to present expert testimony, despite the technical subject matter at issue. Discerning the falsity of the allegedly defamatory statements about LabMD "leak[ing]" the 1718 File or making it "publicly available" was predictably going to involve determining whether the participants on a computer network were able to search for and access the 1718 File using publicly available programs. Expert insight into the technical workings of P2P networks and available search software clearly would have aided that determination and should have been allowed. It also may have aided the actual malice inquiry, as it could have shed light on whether reckless disregard of the truth could be inferred from the allegedly false statements of the CEO of a P2P-network cybersecurity company about how his company retrieved documents from a P2P network. Reckless disregard can be proven by circumstantial evidence, *Joseph*, 129 A.3d at 437, and LabMD was not obligated to stand mute in the face of Boback's self-serving testimony that his statements were true and he always thought so. *See Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1090 (3d Cir. 1988) ("[O]bjective circumstantial evidence can suffice to demonstrate actual malice. Such circumstantial evidence can override defendants' protestations of good faith and honest belief that the report was true." (footnote omitted)). Yet the District Court's "no experts" insistence put LabMD in exactly that position, depriving it of the substantial right to prove its case.

**\*15**  We do not minimize the District Court's legitimate concern that expert discovery can become disproportionately burdensome and costly. There are, however, other ways to control costs besides a blanket prohibition on expert evidence. Limits on the type and amount of such evidence and associated discovery may be appropriate. *See* Fed. R. Civ. P. 26(b)(2). But, again, the nature of the accusations here, involving computer software functions, strongly indicated

that resort to expert testimony was to be anticipated and should have been allowed.

The District Court's exclusion of expert evidence on LabMD's defamation claim resulted in fundamental unfairness in the resolution of the case, and its exclusion order was thus an abuse of discretion. We will therefore vacate the District Court's order granting summary judgment. On remand, the District Court should set a schedule that will permit LabMD to present its expert evidence to oppose the motion for summary judgment and also give Tiversa and Boback an opportunity to respond to LabMD's proposed expert declaration. Furthermore, for the reasons already discussed, the District Court should include Statements 10, 14, 15, 17, and 18 as additional grounds for LabMD's defamation claim.

### 3. Sanctions and Contempt[18]

Hawkins and LabMD engaged in aggressive discovery tactics that frustrated Tiversa and unnecessarily burdened the District Court, as is apparent from discovery disputes that we need not describe in detail here. Suffice it to say, we do not doubt that some of those tactics, including some of the questioning at depositions, warranted sanctions. For example, after the District Court issued a protective order because Hawkins was asking deposition questions about guns in the workplace, and he then pursued further questioning on that subject in later depositions, there was a blatant disregard for the District Court's order, and it was not an abuse of discretion to impose some sanction as a consequence.

Yet that First Sanctions Order did not stop at penalizing Hawkins and LabMD solely for asking questions on obviously extraneous topics that the District Court had warned against in the protective order. Instead, the language of the First Sanctions Order and the breadth of the sanctions imposed suggest that the Court was treating a much wider range of questions as off limits. It erred in that regard.

The protective order said that "[t]he scope of the depositions in this action must be limited to the remaining portion of the defamation per se claim, specifically Statements #13 and #16, LabMD's alleged damages and defenses thereto." (1731 App. at 1777.) And large portions of Hawkins's questioning did fall within the narrowed scope of LabMD's defamation claim. For example, questions about what technologies Tiversa used to access documents on P2P networks – which might have included proprietary or government-owned technologies –

are relevant to whether it was true, as Boback stated, that Tiversa's ability to download the 1718 File from LabMD's computer in fact made the 1718 File "publicly available." Furthermore questions about whether Tiversa took steps to create a false appearance of the 1718 File spreading across the P2P network are plainly relevant to whether Boback had "knowledge of falsity or reckless disregard for" the true nature of the 1718 File's availability, which could support a finding of presumed damages. *Joseph*, 129 A.3d at 426 (quoting *Gertz*, 418 U.S. at 349, 94 S.Ct. 2997); *see also id. at 437* (observing that actual malice may be proven through circumstantial evidence). Despite that, the District Court repeatedly expressed its concern that most of the questions, especially those about false spread, were trying to uncover information that would be used in other cases. But evidence of Tiversa creating a false "leaks" narrative could be relevant to claims in other cases and, at the same time, be relevant to the defamation claim here. The District Court erred in holding that the scope of its protective order, as objectively understood from the language of the order, prohibited inquiry into such topics.

**\*16** Even if the Court had intended to prohibit questioning on those topics,[19] the protective order was not specific enough to delineate the exact topics that were off limits during depositions. The order appeared to broadly permit questions within the scope of the defamation claim as to Statements 13 and 16, including whether the 1718 File was publicly available and, if it was not, whether Boback knew that. Those were the rules in effect when Hawkins conducted the remaining depositions. When the District Court penalized Hawkins for asking questions that did not actually violate the announced rules as reasonably understood, it abused its discretion. *See Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 580-81 (3d Cir. 2018) (explaining that a sanction must be "just," which "represents the general due process restrictions on the court's discretion").

Furthermore, with respect to the portion of the First Sanctions Order that prohibited LabMD from using the six depositions for any purpose in any case, it also abused its discretion under the test announced in *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977), *overruled on other grounds as recognized by Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985). In *Pennypack*, we identified five factors to consider when determining whether a district court abuses its discretion in precluding evidence as a discovery sanction: (1) the prejudice or surprise in fact of the party against whom the evidence would have been presented,

(2) the ability of that party to cure the prejudice, (3) the extent to which the presentation of the evidence would disrupt the orderly and efficient trial of the case or other cases in the court, (4) bad faith or willfulness in failing to comply with the court's order, and (5) the importance of the excluded evidence. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997). "The importance of the evidence is often the most significant factor." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012).

The District Court did not expressly consider the *Pennypack* factors. Its primary reasons for excluding the evidence seem to be what it perceived as an unwarranted expansion of issues and LabMD's willful violation of the protective order, which might correspond to the third and fourth *Pennypack* factors. For the reasons discussed above, however, those factors do not weigh as heavily against LabMD when we consider the full scope of the defamation claim and what the protective order objectively prohibited. Furthermore, the importance of the evidence undoubtedly disfavored exclusion; the District Court excluded testimonial evidence from six out of seven witnesses, including the deposition testimony from Boback, the alleged defamer himself. Thus, the *Pennypack* analysis also indicates that, in the First Sanctions Order, the District Court abused its discretion by excluding critical evidence. We will therefore vacate the First Sanctions Order.

As a consequence, we will also vacate the Second Sanctions Order, the revocation of Hawkins's pro hac vice admission, and the contempt order. They were all based on the District Court's finding that LabMD and Hawkins had violated the First Sanctions Order, and that conclusion no longer stands on an entirely sound footing.

Nothing we say here, however, should be understood as license for any counsel to disregard the warnings and orders given by district courts. That we believe the District Court in this case overstepped its bounds with its sanctions orders in no way condones the hyper-aggressive behavior that burned through the patience of a thoughtful judge and got Hawkins and LabMD into trouble. The Court is free to keep them on an appropriately designed and well-explained short leash, as the case continues.

### 4. Attorney Withdrawal[20]

**\*17**  When Davies, the attorney that LabMD hired as Hawkins's replacement to appeal its case, moved to withdraw,

the District Court denied his motion for the sole reason that his withdrawal would leave LabMD unrepresented by counsel. In support of that decision, it cited *Simbraw, Inc. v. United States*, 367 F.2d 373, 373-74 (3d Cir. 1966) (per curiam), where we held that a corporation must be represented in court by an attorney. The District Court acknowledged that Tiversa had made two other arguments for why Davies's motion should be denied – namely, that LabMD still had the means to pay Davies and that the motion to withdraw was simply a litigation tactic intended to avoid paying the sanctions – but the Court determined that it "[did] not need to resolve the merits of these two arguments, in light of the clear application of [*Simbraw*] to the instant Motion." (1429 App. at 689.)

That reasoning too was in error. Although *Simbraw* requires a corporation to be represented by counsel, it does not absolutely prohibit a corporation's counsel from withdrawing before new counsel is retained. We have previously rejected that interpretation of the rule. In *Ohntrup v. Firearms Center, Inc.*, 802 F.2d 676 (3d Cir. 1986) (per curiam), the district court had held that a corporation's attorney who sought to withdraw "would be required to continue to represent [the corporation] until such time as [the corporation] arranged for representation by other counsel." *Id.* at 679. We disagreed and reasoned that such a rigid prohibition on an attorney's ability to withdraw was "neither mandated nor required for the effective administration of the judicial system." *Id.* at 679-80. Thus, in certain circumstances, counsel for a corporation should be permitted to withdraw even before the corporation finds a suitable substitute.

That is not to say that Davies necessarily should have been permitted to withdraw. A lawyer is entitled to withdraw "once [he] demonstrates to the satisfaction of the district court that [his] appearance serves no meaningful purpose[.]" *Id.* at 680; *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 310 F.3d 537, 541 (7th Cir. 2002) (holding that counsel should have been permitted to withdraw, leaving a corporate client unrepresented, after considering the burden imposed on the potentially withdrawing counsel if the status quo is maintained, the stage of the proceedings, and the prejudice to other parties). But the District Court expressly did not decide whether there were other reasons to deny Davies's motion to withdraw. Its decision was based solely on an erroneous conclusion of law, so we will vacate and remand for further consideration.[21]

### B. Appeal in the Second Pennsylvania Action

In the Second Pennsylvania Action, LabMD brought claims primarily against Tiversa's lawyers, Kline and Troutman Pepper, for their alleged participation in Tiversa's extortionate scheme. After conducting a thorough analysis, the District Court dismissed those claims with prejudice. LabMD contests various aspects of the District Court's analysis, and, as a fallback, argues that its claims should have been dismissed without prejudice. None of its arguments is persuasive.

## 1. RICO Claims and Fraud Claims

According to LabMD, the District Court erred in dismissing the federal RICO and Georgia RICO claims because they were barred by the statutes of limitations. LabMD also argues that the Court erred in dismissing its federal and state RICO, fraud, fraudulent misrepresentation, and negligent misrepresentation claims for failure to allege any injury. We need not address the merits of either of those arguments, however, because there is a threshold defect in LabMD's appeal. LabMD does not challenge the District Court's separate, independent reasons for dismissing each of those claims, so we are compelled to affirm. The failure to challenge an independent basis for a district court's decision is fatal to an appeal. *See Nagle v. Alspach*, 8 F.3d 141, 143 (3d Cir. 1993) ("Because the plaintiffs have not contested two of the four independent grounds upon which the district court based its grant of summary judgment, each of which is individually sufficient to support that judgment, we must affirm."); *accord, e.g., Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014).

**\*18** The District Court dismissed the federal RICO claims against Kline and Troutman Pepper for multiple reasons: the claims were time-barred and equitable tolling did not apply; LabMD did not suffer an injury from the Georgia Action being dismissed without prejudice; the allegedly fraudulent acts by Kline and Troutman Pepper did not cause the Georgia Action to be dismissed; LabMD did not adequately plead that Troutman Pepper was involved in a RICO enterprise or acted to further the common purpose of any such enterprise; and LabMD did not adequately plead that Kline engaged in a pattern of racketeering activity or acted to further the common purpose of a RICO enterprise. Yet LabMD contests on appeal only the reasoning related to the first two holdings, the time-bar and the lack of injury. Because LabMD gives us no reason to disturb the other substantive holdings, each of which provides an independently sufficient ground for

dismissing the federal RICO claims, we must and will affirm the dismissal of those claims.

The District Court's dismissal of the Georgia RICO claims against all defendants also rested on multiple independent bases. The Court held that those claims were barred by the statute of limitations. But it then addressed the substantive merits of the Georgia RICO claims and concluded that they were also substantively deficient as to each defendant. As to Tiversa and Boback, the Court held that LabMD waived its argument on the Georgia RICO claims by not opposing Tiversa's and Boback's challenges to the merits of the claims. As to Kline and Troutman Pepper, the Court held that the Georgia RICO claims failed for the same reasons as the federal RICO claims, including that Troutman Pepper was not a part of the alleged enterprise, Kline did not engage in a pattern of racketeering activity, and their conduct did not cause LabMD's alleged injuries. As LabMD contests only the statute-of-limitations determination but not those other reasons, we must and will affirm the dismissal of the Georgia RICO claims.

Finally, the District Court dismissed LabMD's fraud, fraudulent misrepresentation, and negligent misrepresentation claims against Troutman Pepper and Kline for two reasons: because the dismissal of the Georgia Action was without prejudice and thus did not result in injury, and because Troutman Pepper's and Kline's allegedly fraudulent acts did not cause the Georgia Action to be dismissed. In its appeal, LabMD does not address the District Court's causation determination, which stands as an independent basis for dismissing those claims. The dismissal of the fraud, fraudulent misrepresentation, and negligent misrepresentation claims must therefore also be affirmed.

## 2. Dismissal Without Leave to Amend[22]

Lastly, LabMD challenges the District Court's dismissal of its complaint pursuant to Rule 12(b)(6) without giving it an opportunity to amend. "[I] n civil rights cases[,] district courts must offer amendment – irrespective of whether it is requested – when dismissing a case for failure to state a claim[.]" *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007). In other types of cases, however, a plaintiff must properly request leave to amend a complaint in order for the district court to consider whether to permit amendment. *Id.* at 252 ("[A] district court need not worry about amendment when the plaintiff does not properly

request it."). A plaintiff properly requests amendment by asking the district court for leave to amend and submitting a draft of the amended complaint, so that the court can judge whether amendment would be futile. *Id.* The court may deny leave to amend if the plaintiff does not provide a draft amended complaint. *E.g., Fletcher-Harlee,* 482 F.3d at 252-53; *Ramsgate Ct. Townhome Ass'n v. West Chester Borough,* 313 F.3d 157, 161 (3d Cir. 2002); *Lake v. Arnold,* 232 F.3d 360, 374 (3d Cir. 2000).

**\*19** This is not a civil rights case, so the District Court was not obligated to grant leave to amend of its own accord. LabMD never filed a motion to amend, and it never submitted a draft amended complaint. Thus, the District Court did not have any reason to believe that amendment would cure the identified defects, and it "had nothing upon which to exercise its discretion." *Ramsgate,* 313 F.3d at 161. It therefore did not abuse that discretion in dismissing the complaint in the

Second Pennsylvania Action with prejudice and without leave to amend.

### III. Conclusion

For the foregoing reasons, we will affirm in part the District Court's dismissal of the complaint in the First Pennsylvania Action, but will vacate specific rulings regarding the defamation claim and remand, as described above. We will also vacate the District Court's orders on sanctions and contempt, and the order denying Davies's motion to withdraw. In the Second Pennsylvania Action, we will affirm the District Court's dismissal of the complaint.

### All Citations

--- F.4th ----, 2022 WL 3724716

---

Footnotes

1    Unless otherwise noted, the narrative in this section is based on undisputed facts or the evidence produced in discovery (for LabMD's defamation claim on the motion for summary judgment) and the allegations of LabMD's complaints (for all the other claims on the motions to dismiss), all viewed in the light most favorable to LabMD. *Tundo v. Cnty. of Passaic,* 923 F.3d 283, 287 (3d Cir. 2019); *Matrix Distribs., Inc. v. Nat'l Ass'n of Bds. of Pharmacy,* 34 F.4th 190, 195 (3d Cir. 2022). Citations to the appendices from Case Nos. 20-1446, 20-1731, and 21-1429 are designated by reference to the last four digits of the respective case number.

2    P2P networks are networks in which internet-connected computers share resources. They allow users to download a computer file directly from other network participants who already possess that file.

3    In reviewing the FTC's enforcement action, the Eleventh Circuit accepted as supported by substantial evidence that, "contrary to LabMD policy, a peer-to-peer file-sharing application called LimeWire was installed on a computer used by LabMD's billing manager[,]" and that the contents of a "My Documents" folder on that computer could have exposed the 1718 File. *LabMD, Inc. v. FTC,* 894 F.3d 1221, 1224, 1227, 1233 n.35 (11th Cir. 2018). It also noted, however, that the ALJ who presided over the enforcement action determined that "Tiversa's representations in its communications with LabMD that the 1718 File was being searched for on peer-to-peer networks, and that the 1718 File had spread across peer-to-peer networks, were not true." *Id.* at 1224 n.6.

4    The case was filed in state court and subsequently removed to federal court.

5    The District Court dismissed the complaint as to all defendants, but LabMD appealed the decision only with respect to defendants Tiversa, Boback, Kline, and Troutman Pepper.

6    The District Court had jurisdiction in both cases under 28 U.S.C. §§ 1331, 1332, and 1367. We have appellate jurisdiction under 28 U.S.C. § 1291 over all the appeals, including those from the orders on sanctions, contempt, and the motion to withdraw. *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 706 (3d Cir. 1996) ("Under the 'merger rule,' prior interlocutory orders merge with the final judgment in a case[.]"); *Ohntrup v. Firearms Ctr., Inc.,* 802 F.2d 676, 678 (3d Cir. 1986) (per curiam) ("[M]ost post judgment orders are final decisions within the ambit of 28 U.S.C. § 1291 as long as the district court has completely disposed of the matter.").

**7** "We review a District Court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) *de novo.*" *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014).

**8** That statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c).

**9** "[T]he law of this Circuit ... permits a limitations defense to be raised by a motion under Rule 12(b)(6), but only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations. If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (internal quotation marks and citations omitted).

**10** There may be some tension between the accrual rule we laid out in *Prudential* – that a federal RICO claim accrues only after a plaintiff knows of both the injury and the source of the injury, 359 F.3d at 233 – and the Supreme Court's instruction that a federal RICO claim accrues upon "discovery of the injury, not discovery of the other elements of a claim," *Rotella v. Wood*, 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000); *see also Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1278 (10th Cir. 2014) (rejecting the "injury plus source discovery" rule). Nevertheless, because we would conclude that LabMD's RICO claims accrued before 2011 under either the injury-discovery-rule or the injury-plus-source-discovery-rule, we need not address any such tension now.

**11** Those injuries were alleged in LabMD's RICO case statement, a document required by local rules to be filed as a supplement to a RICO complaint. *See* W.D. Pa. Civ. R. 7.1(B). It may be considered as part of the pleadings on a motion to dismiss. *E.g., Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993) (affirming dismissal of RICO claims "[a]fter reviewing the amended complaints and RICO case statement").

**12** LabMD's allegations of injury also arguably encompass the "thousands of dollars" and "hundreds of man hours" that LabMD spent trying to remedy a purported data breach after Tiversa – in 2008 – fed it misleading information about the purported leaked. (1731 App. at 223.) To the extent that LabMD's theory of liability focuses on Tiversa misleading the FTC into investigating LabMD, the injurious effects of that conduct first arose by 2010.

**13** It is further telling that, in a September 2010 letter to Tiversa and in evident anticipation of government action, LabMD accusingly asked Tiversa to describe its relationship with the FTC and to disclose any communications with the FTC about the 1718 File. Nevertheless, because that letter was not mentioned in the complaint nor attached thereto, we do not rely on it in reaching our conclusion here. *Schmidt*, 770 F.3d at 249.

**14** LabMD also claimed tortious interference based on Tiversa's false statements to it in 2008 regarding the source and spread of the 1718 File. The District Court dismissed that portion of the claim as barred by the applicable two-year statute of limitations, and LabMD does not challenge that decision.

**15** We agree with the District Court, however, that LabMD did not adequately defend the motion to dismiss as to Statements 11 and 12. Those two statements read, respectively:

> The FTC then filed a Civil Investigative Demand (CID) that forced Tiversa to comply. In compliance with the CID, Tiversa provided information on 84 companies that were breaching information and that matched the criteria of the CID. LabMD was one of those listed.

> Tiversa has not had a single criminal allegation alleged against us by any individual or organization in our entire 11 year history ... not even Daugherty or LabMD, despite the defamatory and baseless allegations of extortion, theft and fraud. One would think that if Daugherty truly believed he was the victim of an actual extortion plot, as he has suggested, he would have called the police or FBI. To my knowledge, he has not. It is my belief that he knows that if he files a false police statement, he could be prosecuted, which may be the likely reason why he has decided not to do so.

(App. at 4896-97 (alteration in original).) Unlike the other statements on the Pathology Blawg, Statements 11 and 12 do not contain accusations of LabMD "leaking" patient information, declarations of "undisputable facts," or anything else that LabMD alluded to in its brief.

16    We agree with the District Court that LabMD did not sufficiently preserve its opposition to the motion to dismiss as to Statements 19 and 20, which respectively read:

> In the Fall of 2009 – well over a year later – as part of its investigation into cyber leaks, the FTC issued the equivalent of a subpoena to Tiversa, which legally required us to provide information on all the breaches we found from many companies. There was absolutely no "deal" entered into between the FTC and Tiversa. It is no different than the subpoena the FTC issued on LabMD. LabMD was legally required to respond, as was Tiversa.

> As a result of this dispute, LabMD's CEO has defamed my company and made statements that are 100% wrong.

(App. at 4898-99.) Neither statement relates to LabMD making the 1718 File publicly available, which was the topic of the statements that LabMD argued in its briefing were defamatory.

17    "We review orders granting summary judgment *de novo*." *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 388 (3d Cir. 2017).

18    We review for abuse of discretion a district court's decision to impose sanctions under Rule 37 of the Federal Rules of Civil Procedure. *Naviant Mktg. Sols., Inc. v. Larry Tucker, Inc.*, 339 F.3d 180, 185 (3d Cir. 2003). "While this standard of review is deferential, a district court abuses its discretion in imposing sanctions when it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 134 (3d Cir. 2009) (cleaned up).

19    We need not decide here whether a protective order precluding such relevant questioning would have itself been an abuse of discretion.

20    We review for abuse of discretion the District Court's denial of a request by counsel to withdraw from representation. *Ohntrup*, 802 F.2d at 679.

21    The alternative arguments proposed by Tiversa are grounded on the sanctions orders and finding of contempt. As those grounds have been vacated, the alternative arguments fail. There may, however, be other reasons that the District Court believes should be taken into consideration in deciding the resurrected motion to withdraw, and we do not prejudge those.

22    We review for abuse of discretion the decision to dismiss without granting leave to amend. *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011), *overruled on other grounds as recognized by United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*, 728 F. App'x 101 (3d Cir. 2018).

---

**End of Document**                                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**<u>CERTIFICATE OF SERVICE</u>**

I, Patrick M. Harrington, hereby certify that, on September 13, 2022, a true and correct copy of the foregoing Defendants' Notice of Supplemental Authority was served via the Court's electronic filing system on all counsel of record, as follows:

Brian A. Gordon, Esq.
Gordon & Ashworth, P.C.
1 Belmont Ave, Suite 519
Bala Cynwyd, PA 19004
*Briangordon249@gmail.com*
Attorney for Plaintiff Anna K. Nupson

Kimberly Brusuelas, Esq.
5th Street Law
312 San Pasquale, NW
Albuquerque, NM 87102
*kim@fifthstreetlaw.com*
Attorney for Plaintiff Anna K. Nupson

Justin R. Kaufman, Esq.
Durham, Pittard & Spalding, LLP
505 Cerillos Road, Suite A209
Santa Fe, NM 87501
*jkaufman@dpslawgroup.com*
Attorney for Plaintiff Anna K. Nupson

George Benjamin Davis, Esq.
The Davis Kelin Law Firm, LLC
127 Bryn Mawr Dr SE
Albuquerque, NM 87106
*bdavis@daviskelin.com*
Attorney for Plaintiff Anna K. Nupson

James T. Smith, Esq.
Rebecca D. Ward, Esq.
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
*smith-jt@blankrome.com*
*ward@blankrome.com*
Attorneys for Intervenors John S. Middleton and Bradford Holdings, Inc.
Jennifer D. Gayle

Mannion Prior LLP
840 First Avenue, Suite 100
King of Prussia, PA 19406
*jgayle@mannionprior.com*
Attorney for Intervenors John S. Middleton and Bradford Holdings, Inc.

Respectfully submitted,

By:       */s/Patrick M. Harrington*
          DILWORTH PAXSON LLP
          Lawrence G. McMichael, Esq.
          Patrick M. Harrington, Esq.
          Timothy J. Ford, Esq.
          Pa. Id. Nos. 28550/317998/325290
          1500 Market Street, Suite 3500E
          Philadelphia, PA 19102-2101
          P: (215) 575-7000 / F: (215) 575-7200
          lmcmichael@dilworthlaw.com
          pharrington@dilworthlaw.com
          tford@dilworthlaw.com
          *Attorneys for Defendants Schnader Harrison*
          *Segal & Lewis LLP and Bruce A.*
          *Rosenfield, Esq.*

Dated:  September 13, 2022