# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANNA K. NUPSON** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 18-2505** |
| **v.** | : | |
| | : | |
| **SCHNADER HARRISON SEGAL &** | : | |
| **LEWIS, LLP,** *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                     SEPTEMBER 30, 2022

## MEMORANDUM OPINION

### INTRODUCTION

Presently before this Court is a motion for summary judgment filed pursuant to Federal Rule of Civil Procedure ("Rule") 56 by Defendants Schnader Harrison Segal & Lewis, LLP, and Bruce A. Rosenfield, Esquire, which seeks the dismissal of Plaintiff's remaining claims for legal malpractice and breach of fiduciary duty, on the basis that the claims are, *inter alia*, barred by the applicable two-year statute of limitations.  Plaintiff has opposed the motion.  [ECF 278].  The issues presented in the motion have been briefed by the parties and are ripe for disposition.[1]  For the reasons stated herein, Defendants' motion for summary judgment is granted.

### BACKGROUND

When ruling on a motion for summary judgment, a court must consider all record evidence and supported relevant facts in the light most favorable to the non-movant—here, Plaintiff.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  As noted, Defendants' motion for summary judgment is grounded on their

---

[1]     This Court has also considered Defendants' reply, [ECF 284], and Defendants' notice of supplemental authority, [ECF 289].

contention that Plaintiff's claims are barred by the applicable two-year statute of limitations.  The

facts relevant to this issue are summarized as follows:[2]

> Plaintiff Anna K. Nupson ("Plaintiff" or "Anna") is one of three children born to Herbert H. Middleton, Jr. ("Herbert"), and Frances S. Middleton ("Frances").  Their other children were Anna's sister, Lucia Middleton Hughes ("Lucia"), and Anna's brother, John S. Middleton ("John").  Plaintiff's paternal great-great-grandfather, John Middleton, founded a specialty cigar and tobacco retail store in 1856 that later went on to become John Middleton, Inc. ("JMI").  JMI was very successful, generating significant wealth for the Middleton family.  By 2001, a series of transactions had led JMI to become a subsidiary of Bradford Holdings, Inc. ("Bradford"), a holding company wholly owned by various members of the Middleton family, with John having a controlling interest in Bradford as a result of earlier transfers of Bradford stock within the family.

> Defendant Schnader Harrison Segal & Lewis, LLP ("Schnader"), began representing the Middleton family and its businesses before the 1990s.  Over the course of several decades, Schnader represented Herbert, Frances, John, and Plaintiff, as well as a host of other Middleton family business entities, including Bradford.  Defendant Bruce Rosenfield ("Rosenfield"), an attorney working for Schnader, held primary responsibility for the Middleton family's trust and estates matters from the early 1990s through at least 2002.  Rosenfield began representing Plaintiff in 1994 with respect to the formation of a trust (the "1994 Anna Trust").

> Sometime in late 2000, Rosenfield began working with Frances to create a grantor retained annuity trust ("GRAT") with a two-year annuity period funded by all of her Bradford shares for the sole benefit of John.  A critical factor in the valuation of Frances's Bradford shares for purposes of federal gift tax was the redemption of Bradford shares owned by John's cousins as of February 1, 2001.  The agreements to purchase the cousins' stock was not executed until on or after March 12, 2001.  On November 19, 2001, the GRAT was memorialized in writing (the "Original GRAT").  The Original GRAT served two purposes:  (1) moving illiquid Bradford shares out of Frances's estate with minimal gift tax impact and replacing those shares with cash from annuity payments; and (2) continuing

---

[2]      These facts are taken from the parties' briefs, exhibits, and statements of facts.  To the extent that any facts are disputed, such disputes will be noted and, if material, construed in Plaintiff's favor pursuant to Rule 56.

the Middleton tradition of passing the majority of Bradford shares to John, Herbert's only son and then the CEO of Bradford.

In early- to mid-2002, Plaintiff's sister, Lucia, began raising concerns about the Original GRAT.  Upset with the perceived inequity in her mother's disposition of her shares in Bradford, Lucia urged her mother to revise the Original GRAT to benefit the three Middleton children equally and accused John of wrongdoing.  As some point, Lucia threatened litigation against John and/or Frances in connection with the Original GRAT.  In an effort to resolve the family's disputes and avoid unnecessary litigation, in mid-2002, John and Frances provisionally agreed to revise the Original GRAT such that all three siblings would benefit from it equally.  Having received provisional agreement from John and Frances to modify the Original GRAT, the parties began negotiation of a family settlement agreement (the "Family Settlement Agreement").  Though acknowledging her role as a party to the Family Settlement Agreement, Plaintiff disputes that she had knowledge in 2002–2003 that she was negotiating to modify the Original GRAT.

On September 17, 2002, Frances held a meeting at her home attended by Plaintiff and Rosenfield where Rosenfield generally discussed the creation of a GRAT.   Plaintiff contends that Rosenfield did not explain that Frances had already formed the Original GRAT, but rather described a future proposal for such. Around this same time, it was determined that although Rosenfield had represented each of them on trust and estates matters at various points in the past, it would be a conflict for him to simultaneously represent John, Frances, and Plaintiff in connection with negotiating the Family Settlement Agreement.  As such, in October 2002, Rosenfield presented John, Frances, and Plaintiff with a "Waiver of Conflict Letter."  The letter provided, in relevant part:

> Fran and Anna have requested that Schnader Harrison Segal & Lewis LLP represent them in connection with the contemplated family settlement agreement concerning various disputes within the family.

> In this regard, you are each aware that in the past we have represented each of you individually in estate planning matters and various trusts of which you are trustees and beneficiaries—although in this matter John is being represented by Larry Laubach of Cozen O'Connor.

The Waiver of Conflict Letter went on to explain Rosenfield's belief that the applicable rules of professional responsibility regarding conflicts of interest did not preclude him from representing both Anna and Frances if they both provided their written consent.  Both provided their written consent.

Thereafter, the parties' counsel engaged in negotiation of the terms of the Family Settlement Agreement and a modified GRAT (the "Modified GRAT"), with several drafts of each document exchanged.  On December 19, 2002, a meeting was held,[3] during which Lucia presented a proposal that Bradford redeem all of her and her family's shares following the GRAT's annuity period.  She proposed a purchase price of $205 per share for their Class B non-voting shares and $215 per share for their Class A voting shares.  This price was based on the cousins' redemption of their shares for the same price in February 2001.  Lucia's proposal also included that she would receive a $10 million preference under her mother's will.

John made a counterproposal to Lucia, omitting any preference under Frances's will for Lucia but offering to redeem all of Lucia and her immediate family's Bradford shares for $275 per share for their Class B non-voting shares and $288.41 per share for their Class A voting shares.  John made the same offer to Plaintiff.  Lucia accepted John's offer.  After some discussion, Plaintiff also accepted John's offer.  In late February 2003, the transaction closed, with a trust for Plaintiff's benefit receiving the proceeds of Bradford's redemption of one-third of the GRAT's Bradford shares and the 1994 Anna Trust receiving the benefit of Bradford's redemption of the shares held by it, for a total combined benefit of approximately $44.5 million (the "2003 Transaction").

Following the 2003 Transaction, all shares of Bradford were owned by John and members of his immediate family or by trusts for their benefit.  In late 2007, Bradford sold its tobacco subsidiary, JMI, to Altria Group, Inc. ("Altria"), one of the world's largest tobacco companies, for $2.9 billion, representing a substantial increase in the value of the company between the 2003 Transaction and the sale to Altria.  The sale to Altria was publicly announced, and Plaintiff was aware of it at the time.

In 2011, after Rosenfield told Plaintiff that he could not represent her in any challenges to the 1994 Anna Trust, Plaintiff sought counsel from Jonathan Freund and John Stoviak of the Saul Ewing law firm to advise her on the possibility of modifying the

---

[3]     Plaintiff testified that she did not recall attending a meeting on this date.

1994 Anna Trust. These attorneys' representation of Plaintiff included a review of the Family Settlement Agreement. Notes authenticated by Attorney Stoviak reference the Family Settlement Agreement, questions with respect to Rosenfield's status as both Plaintiff's attorney and the "family attorney," "private arbitration," and a "Schnader claim." By letter dated November 11, 2011, Attorney Stoviak advised Plaintiff:

> We reviewed your irrevocable trust to determine if the trust could be successfully challenged and terminated, and the principal distributed back to you. As described below, we concluded that there are significant hurdles that would be difficult to overcome if you were to attempt to terminate the trust. We do, however, recommend an alternate path to help achieve your goals.

Sometime after 2011, Plaintiff retained new counsel, Thomas J. Budd Mucci, to whom Attorney Freund transferred Plaintiff's representation. In a June 5, 2014 letter from Attorney Mucci to John's attorney, Larry Laubach of Cozen O'Connor,[4] Attorney Mucci wrote:

> [A]fter speaking with Anna, we do not feel that we should approach Lucia's attorneys to ask permission to do something which John Middleton has the right and discretion to do. We do feel that Anna is the victim of actions taken by Bruce Rosenfield as an attorney, who represented other family members while purporting to represent Anna's interest in drafting documents, counseling her pertaining to various Trusts, and securing her sale of family interests. As a result of ignoring these various conflicts of interest, Anna has been locked away from control of her assets and has been severely damaged without benefit to her.

> Accordingly, we have determined to proceed against Schnader Harrison Segal & Lewis LLP, and I am traveling to Philadelphia to speak with local counsel about initiating that lawsuit, as well as, seeking

---

[4]      Plaintiff attached this letter as an exhibit to a petition for declaratory relief that she filed in the Montgomery County Orphans' Court on October 31, 2014.

disgorgement of the improperly assigned funds to the 1994 Anna Trust.[5]

In March 2015, John and Bradford filed a declaratory judgment action in the Orphans' Court of Montgomery County with respect to Frances's 2001 trust (the "Orphans' Court Litigation"). The Orphans' Court Litigation involved the 2003 Transaction. John and Bradford took the position that the 2003 Transaction was valid, and Plaintiff took the position that the 2003 Transaction was invalid for a number of reasons.

On May 20, 2015, in her response to a motion filed by John Middleton in the Orphans' Court Litigation, Plaintiff argued:

> This matter involves the systematic dissection and concealment of a beneficiary's interest in two generations of a family's estate plan for the purpose of carrying out the purchase and sale, by a trustee [John], of the family's trust property, primarily to enrich the trustee at the expense of other beneficiaries.
>
> The destruction of the Middleton family's estate plan and thwarting of Herbert Sr. and Anna Middleton's intent and Herbert Jr. and Frances Middleton's intent was carried out by a series of transactions culminating in two agreements: the 2003 Family Settlement Agreement (herein "FSA") and 2003 Master Settlement Agreement (herein "MSA"). These agreements accomplished two objectives: (1) the dismantling and amendment of seven irrevocable Middleton family trusts without court approval as required by law; and (2) the acquisition by a trustee of all of the shares of the Middleton family's holding company [Bradford], at less than fair market value, for the eventual sale of the family's tobacco company at 17 times the purchase price paid by the Trustee for the tobacco company as well as two other family holdings.
>
> The concealment of the diminution of Ms. Nupson's share occurred by having the attorney [Rosenfield], who represented the trustee-brother leading up to this complex transaction, then purport to represent one of

---

[5]    Notably, Plaintiff did not file any lawsuits against Schnader until she filed the underlying federal action on June 15, 2018.

the beneficiaries, Anna K. Nupson, in the sale of her interest in the family's trust property and reorganization of those trusts, and then return to representing the trustee-brother following the sale of stock, as well as serve as co-trustee of a remaining Trust in which Ms. Nupson is the beneficiary.

On June 23, 2015, Plaintiff filed a verified answer and new matter to the petition for declaratory relief and other relief of John S. Middleton and Bradford Holdings, Inc. This pleading included the following allegations:

> Bruce A. Rosenfield, Esq. was Ms. Nupson's purported legal counsel through the negotiations relating to the purchase of the 2001 GRAT's shares of Bradford by Mr. Middleton. Mr. Rosenfield had years earlier begun to orchestrate the transaction in favor of the trustee, and had at all times an unwaivable conflicts of interest. Mr. Rosenfield failed to inform Anna K. Nupson of crucial information to protect her rights under the 2001 GRAT.

Plaintiff also denied that "Bruce A. Rosenfield, Esq. was her independent counsel and/or that she was properly advised or represented by Mr. Rosenfield." She also alleged that:

> Trustee John S. Middleton and Bruce A. Rosenfield, Esq. decided that Mr. Rosenfield would purport to represent Anna K. Nupson in negotiations against Mr. Middleton relating to the Bradford shares. Mr. Rosenfield continued to represent Mr. Middleton as the Trust's legal counsel throughout these negotiations. Mr. Rosenfield and his firm had numerous and substantial conflicts in this multi-faceted representation and he was clearly not in a position to zealously and independently represent Ms. Nupson in negotiating against Mr. Middleton and Bradford.

On that same date, June 23, 2015, Plaintiff filed a counterclaim and petition for declaratory and other relief in the Orphans' Court Litigation. In the counterclaim, Plaintiff referenced the Waiver of Conflict Letter that Plaintiff received and signed in October 2002 and alleged that "[o]n information and belief, Bruce A. Rosenfield, Esq., did not make any disclosures and consultations

to any of the beneficiaries relating to limitations on his representation due to his prior representations or personal interests pursuant to Rule 1.7(b)." Plaintiff also alleged:

> In trying to accommodate all of the competing interests of multiple clients with direct and indirect conflicts, Bruce A. Rosenfield, Esq., was limited by his prior representations and personal interests and was not able to zealously and independently represent each of his clients. For example, Bruce A. Rosenfield, Esq.'s client John S. Middleton, as Trustee, had a duty to act in the best interest of the trust beneficiaries, which in the case of a sale of their stock, would have been to obtain the highest price for their Bradford stock. At the same time, Schnader had been representing Bradford and its subsidiaries for many years and Bruce A. Rosenfield, Esq., was representing John S. Middleton in other capacities. After the sales contemplated by the Stock Purchase Agreements, John S. Middleton would have owned and controlled all shares of Bradford stock, and it would have been in John S. Middleton's interest for Bradford to pay the lowest possible price for the shares. Schnader was in the position of having multiple clients with conflicting goals.

> In 2011, Bruce A. Rosenfield, Esq. wrote to the Respondent in an e-mail that he could not represent her in an effort to challenge certain trusts because he had drafted them. See Exhibit E. Email from Bruce Rosenfield to Anna K. Nupson, dated January 11, 2011. This same reticence about subsequent representation should have guided Mr. Rosenfield not to attempt to represent Anna K. Nupson in the 2002-2003 negotiations.

At the same time that Plaintiff filed her counterclaim in the Orphans' Court Litigation (June 23, 2015), Plaintiff filed a petition for discovery, in which she wrote:

> The disputed facts and areas in which discovery is needed involve the following matters . . . [w]hether Bruce A. Rosenfield, Esq. had conflicts of interest while purporting to represent Anna Nupson . . . which prevented him from reasonably concluding that [he] could zealously represent Ms. Nupson, or

worse, whether Mr. Rosenfield remained the agent of John S. Middleton in structuring this transaction to accomplish Mr. Middleton's goal of consolidating his ownership and control of all of the Bradford stock . . . .

On January 14, 2016, Plaintiff filed a petition for declaratory relief and for an accounting in connection with the Modified GRAT in the Orphans' Court.  By Order dated July 18, 2016, the Orphans' Court directed Schnader and Rosenfield to prepare and file an "Account of [Rosenfield's] administration of the Trust of Frances S. Middleton, covering the period from the inception of his service as Trustee to the present . . . ."  Schnader and Rosenfield filed their accounting on October 5, 2016 (the "Rosenfield Accounting").  The Rosenfield Accounting did not disclose the existence of an "oral" GRAT or the Original GRAT, but instead relied solely on the Modified GRAT.

By Opinion and Order dated March 16, 2017, the Orphans' Court found that Schnader and Rosenfield had misled the court by failing to disclose the existence of the Original GRAT, and ordered the filing of an amended accounting.  Schnader and Rosenfield filed an amended accounting (the "Amended Accounting") on May 1, 2017.  The Amended Accounting provided, in relevant part, the following:

- Frances made an oral gift of her Bradford stock to a GRAT for John's benefit in February 2001;
- The Original GRAT was not executed on February 1, 2001, and was not drafted until November 2001; and
- Rosenfeld backdated the instrument to February 1, 2001.

Plaintiff contends that she learned these facts for the first time on May 1, 2017.

In February 2018, Plaintiff, John (in all of his capacities), and Bradford entered into a settlement agreement with respect to the claims in the Orphans' Court Litigation, with Bradford making a $22 million settlement payment to Plaintiff.  Plaintiff commenced this federal lawsuit against Defendants on June 15, 2018, asserting claims for legal malpractice and breach of fiduciary duty against Defendants premised on Defendants' representation of Plaintiff in the above-described transactions occurring between 2001 and 2003.

**LEGAL STANDARD**

Rule 56 governs summary judgment motion practice.  Fed. R. Civ. P. 56.  Specifically, this Rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  When evaluating a motion under Rule 56, the court must view the evidence in the light most favorable to the nonmoving party. *Galena*, 638 F.3d at 196.

Pursuant to Rule 56, the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that the movant "believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  *Id.* at 322.   After the movant has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the movant's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1)(A)–(B).  The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co.*

*of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), or rest on the allegations in the pleadings, *Celotex*, 477 U.S. at 324.  Rather, the nonmoving party must "go beyond the pleadings" and, either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.*

## DISCUSSION

As stated, Plaintiff asserts claims for legal malpractice and breach of fiduciary duty against Defendants, premised on Defendants' alleged wrongful conduct over the course of their legal representation of Plaintiff between 2001 and 2003, in which Defendants advised Plaintiff to sell all of her stock in Bradford.  Defendants seek summary judgment as to all of Plaintiff's claims on the basis that each is barred by the applicable two-year statute of limitations.  For the reasons set forth herein, this Court agrees.

The parties agree that Plaintiff's claims are governed by Pennsylvania's statute of limitations and applicable principles since they purportedly occurred in Pennsylvania.  *See Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991).  Under Pennsylvania law, Plaintiff's claims for legal malpractice and breach of fiduciary duty are subject to a two-year statute of limitations.  42 Pa. Con. Stat. § 5524(7); *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565, 571 (Pa. Super. Ct. 2007) (applying two-year statute of limitations to legal malpractice claim sounding in tort); *Namani v. Bezark, Lerner, & Devirgilis, P.C.*, 2017 WL 57153, at *3 (Pa. Super. Ct. Jan. 5, 2017) (applying two-year statute of limitations to breach of fiduciary duty claim).[6]  As such, absent equitable

---

[6]     Plaintiff argues that some or all of her legal malpractice claim is governed by Pennsylvania's four-year statute of limitations, applicable to contract claims.  Plaintiff's argument is misplaced.  Pennsylvania's four-year statute of limitations governing contractual disputes only applies in legal malpractice cases when the plaintiff alleges that the lawyer breached a specific contractual undertaking.  *N.Y. Cent. Mut. Co. v. Edelstein*, 637 F. App'x 70, 73 (3d Cir. 2016).   Here, Plaintiff has not alleged a breach of any specific contractual undertaking.  Rather, Plaintiff's legal malpractice claims are premised on her contention that

tolling of the applicable statutes of limitations, Plaintiff's claims are untimely if they accrued

before June 15, 2016 (two years prior to the date Plaintiff commenced this action).

Generally, under Pennsylvania law, a statute of limitations period begins to run as soon as

the right to institute and maintain a suit arises. *Pocono Int'l Raceway, Inc. v. Pocono Produce*,

468 A.2d 468, 471 (Pa. 1983); *Drelles v. Mfrs. Life Ins. Co.*, 881 A.2d 822, 831 (Pa. Super. 2005);

42 Pa. Con. Stat. § 5502(a).  With respect to legal malpractice claims, Pennsylvania courts have

clarified:

> [T]he trigger for the accrual of a legal malpractice action, for statute
> of limitations purposes, is not the realization of actual loss, but the
> occurrence of a breach of duty. Pennsylvania law provides that:
>
>> the occurrence rule is used to determine when the
>> statute of limitations begins to run in a legal
>> malpractice action. **Under the occurrence rule, the
>> statutory period commences upon the happening
>> of the alleged breach of duty.** *Bailey v. Tucker*, 533
>> Pa. 237, 251, 621 A.2d 108, 115 (1993). An
>> exception to this rule is the equitable discovery rule
>> which will be applied when the injured party is
>> unable, despite the exercise of due diligence, to know
>> of the injury or its cause.  *Pocono [International]
>> Raceway v. Pocono Produce, Inc.*, 503 Pa. 80, 85,
>> 468 A.2d 468, 471 (1983). Lack of knowledge,
>> mistake or misunderstanding, will not toll the
>> running of the statute. *Id.* 503 Pa. at 85, 468 A.2d at
>> 471.
>
> *Robbins & Seventko Orthopedic Surgeons, Inc. v. Geisenberger*,
> 449 Pa. Super. 367, 674 A.2d 244, 246–47 (1996) (emphasis added).
> Pennsylvania favors strict application of the statutes of limitation.
> *Glenbrook Leasing Co. v. Beausang*, 839 A.2d 437, 441 (Pa. Super.
> 2003).  Accordingly, the statute of limitations in a legal malpractice
> claim begins to run when the attorney breaches his or her duty, and
> is tolled only when the client, despite the exercise of due diligence,
> cannot discover the injury or its cause.

---

Rosenfield failed to inform her of various facts regarding the formation of the Original GRAT and that his
representation "fell below the standard of care of a reasonably prudent lawyer."  (Pl.'s Resp. in Opp.,
ECF 278, at pp. 5–6).  As such, Plaintiff's legal malpractice claims sound in tort, not contract.  *Id.*

*Wachovia Bank*, 935 A.2d at 572–73; *see also Knopick v. Connelly*, 639 F.3d 600, 607 (3d Cir. 2010) (citing and applying statute of limitations principles detailed in *Wachovia*).

"Where the discovery rule does apply, the two-year period on legal malpractice actions begins to run where the plaintiff knew or in the exercise of reasonable diligence should have known of the injury and its cause." *Knopick*, 639 F.3d at 607 (citing *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000). When applied, the discovery rule merely excludes from the running of the statute of limitations that period of time during which a party who has not suffered an immediately ascertainable injury is reasonably unaware that it has been injured. *Hayward v. Med. Ctr. of Beaver Cnty.*, 608 A.2d 1040, 1043 (Pa. 1992). Thus:

> [a] court presented with an assertion of applicability of the "discovery rule" must, before applying the exception of the rule, address the ability of the damaged party, exercising reasonable diligence, to ascertain the fact of a cause of action.
>
> ***
>
> [T]he "discovery rule" exception arises from the inability, despite the exercise of diligence, to determine the injury or its cause, not upon a retrospective view of whether the facts were ***actually*** ascertained within the period.

*Pocono Int'l Raceway*, 468 A.2d at 471–72.

Under Pennsylvania's discovery rule, the statute of limitations for a tort claim is tolled only until the plaintiff is put on "inquiry notice" of her claims. *Wilson v. El-Daief*, 964 A.2d 354, 364 (Pa. 2009); *see also Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 247 (Pa. 2021) (explaining the *Wilson* court's selection of the more restrictive inquiry notice standard). This standard "t[ies] commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause."

*Rice*, 255 A.3d at 249 (quoting *Wilson*, 964 A.2d at 346); *see also Adams v. Zimmer US, Inc.*, 943 F.3d 159, 164 (3d Cir. 2019) (citing *Wilson* for inquiry notice standard). Thus, under the inquiry notice approach, Pennsylvania's discovery rule only tolls the statute of limitations until the injured party has "actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (2011) (quoting *Wilson*, 964 A.2d at 364); *see also Debiec v. Cabot Corp.*, 352 F.3d 117, 132 (3d Cir. 2003) (noting that an "unrebutted suspicion" of an injury caused by another is sufficient to trigger the statute of limitations in Pennsylvania). "[T]he inquiry notice approach is strict and can be perceived as harsh." *Rice*, 255 A.3d at 255.

Here, as conceded by Plaintiff, "[t]his action arises out of Defendants' representation of Plaintiff in connection with a series of related transactions dating back to 2001 through 2003, in which they advised Plaintiff to sell all of her stock in a family corporation." (Pl.'s Resp. in Opp., ECF 278, at p. 1). As such, Plaintiff's claims accrued no later than 2003, when Defendants allegedly engaged in the conduct underlying Plaintiff's claims for legal malpractice and breach of fiduciary duty. Thus, absent tolling, Plaintiff's claims are barred by the two-year statute of limitations.

Plaintiff argues, however, that the two-year statute of limitations on her claims should be tolled under the discovery rule until May 1, 2017, when she contends she first discovered the requisite facts underlying her injury and its cause. In support, Plaintiff points to Defendants' filing of an Amended Accounting in the Orphans' Court proceedings that purportedly disclosed certain facts regarding the formation of the oral GRAT and Original GRAT. Plaintiff's argument is

misplaced, however, because other uncontroverted evidence shows that she actually knew, or, at least, was on inquiry notice, of her injury and its cause by June 23, 2015, at the latest.

As described above, Plaintiff retained new, independent counsel in 2011, to explore the possibility of challenging the validity of the 1994 Anna Trust. Though these attorneys ultimately concluded that Plaintiff did not have a viable path to terminate the trust, they recommended alternate paths. Most significantly, however, these attorneys reviewed the Family Settlement Agreement, noted Rosenfield's dual role as both Plaintiff's attorney and the family attorney, and posited "private arbitration" and a "Schnader claim." Notwithstanding, Plaintiff did not then pursue any claims against Defendants.

Three years later, Plaintiff retained new, independent counsel, to again consider whether she had any viable legal challenges to the various trusts. On June 5, 2014, Plaintiff's independent attorney, Thomas J. Budd Mucci, wrote a letter on Plaintiff's behalf to attorney Larry P. Laubauch at Cozen O'Connor, advising that he had concluded:

> Anna is the victim of actions taken by Bruce Rosenfeld as an attorney, who represented other family members while purporting to represent Anna's interest in drafting documents, counseling her pertaining to various Trusts, and securing her sale of family interests. As a result of ignoring these various conflicts of interest, Anna has been locked away from control of her assets and has been severely damaged without benefit to her.
>
> Accordingly, we have determined to proceed against Schnader Harrison Segal & Lewis LLP, and I am traveling to Philadelphia to speak with local counsel about initiating that lawsuit, as well as, seeking disgorgement of the improperly assigned funds to the 1994 Anna Trust.

(Def.'s Mot. Ex. 25, ECF 255–26). Notwithstanding the belief by Plaintiff's independent counsel in June 2014 that Plaintiff had been "severely damaged" as "a result of [Rosenfeld] ignoring . . . various conflicts of interest," and Plaintiff's counsel's determination "to proceed against Schnader

Harrison Segal & Lewis LLP," Plaintiff did not file the underlying action asserting these same allegations until June 15, 2018.  This letter alone demonstrates Plaintiff's actual knowledge of some injury caused by Rosenfield's conduct and the known conflicts of interest.  At the very least, this letter shows that Plaintiff was on inquiry notice sufficient to trigger the two-year statute of limitations.  As such, the applicable two-year statute of limitations began to run on Plaintiff's claims no later than June 5, 2014, and she had two years from that date to investigate and bring her claims.  *See Rice*, 255 A.3d at 253.  Because Plaintiff did not commence this suit until June 15, 2018, more than two years after the statute was triggered, Plaintiff's claims are time barred.

In her opposition, Plaintiff attempts to create a genuine issue of material fact around this letter by arguing that its content was not specifically directed at the conduct underlying Plaintiff's current claims.  Specifically, Plaintiff contends that this letter was not related to the 2001 GRAT out of which Plaintiff's current claims arise.  While Plaintiff's parsing of this letter may be accurate, her argument demonstrates a misunderstanding of Pennsylvania's discovery rule.  As outlined above, the discovery rule only tolls a statute of limitations until a plaintiff is on "inquiry notice" of her injury and its cause.  *Wilson*, 964 A.2d at 364.  Under this standard, the statute of limitations begins to run when a plaintiff has "actual or constructive knowledge *of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause*."  *Rice*, 255 A.3d at 251 (emphasis added).  While the 2014 letter may not identify the "full extent" of Plaintiff's underlying harm or its "precise cause," it clearly and undisputedly shows Plaintiff's knowledge of her "severe[] damage[]" as a result of Defendants' conduct and their conflicts of interest.  As such, the two-year statute of limitations began running by no later than June 5, 2014.

Even if the June 5, 2014 letter, somehow does not definitively show Plaintiff to be on inquiry notice of her claims against Defendants, her knowledge of her injury and its cause were again demonstrated in pleadings Plaintiff filed in the Orphans' Court a year later.  For example, in a May 20, 2015 filing, Plaintiff expressly identified the injury she now purports to have suffered on account of her sale of her Bradford stock for less than its true value.  She asserted that "[t]hese agreements accomplished . . . the acquisition by a trustee of all of the shares of the Middleton family's holding company [Bradford], at less than fair market value, for the eventual sale of the family's tobacco company at 17 times the purchase price paid by the Trustee for the tobacco company as well as two other family holdings."  This statement clearly demonstrates Plaintiff's knowledge of her current-injury.

Further, on June 23, 2015, Plaintiff filed a verified counterclaim and petition for declaratory and other relief in the Orphans' Court.  In this document, Plaintiff described the same conflicts of interest held by Rosenfield and Schnader and alleged in this case:

> In trying to accommodate all of the competing interests of multiple clients with direct and indirect conflicts, Bruce A. Rosenfield, Esq., was limited by his prior representations and personal interests and was not able to zealously and independently represent each of his clients.  For example, Bruce A. Rosenfield, Esq.'s client John S. Middleton, as Trustee, had a duty to act in the best interest of the trust beneficiaries, which in the case of a sale of their stock, would have been to obtain the highest price for their Bradford stock.  At the same time, Schnader had been representing Bradford and its subsidiaries for many years and Bruce A. Rosenfield, Esq. was representing John S. Middleton in other capacities.  After the sale contemplated by the Stock Purchase Agreements, John S. Middleton would have owned and controlled all shares of Bradford stock, and it would have been in John S. Middleton's interest for Bradford to pay the lowest possible price for the shares.  Schnader was in the position of having multiple clients with conflicting goals.

(Def.'s Mot. Ex. 27, ECF 255–28, ¶ 47).  On that same date, Plaintiff filed a petition for discovery in the Orphans' Court seeking discovery on several "disputed facts and areas in which discovery is needed," including:

> Whether Bruce A. Rosenfeld, Esq., had conflicts of interest while purporting to represent Anna Nupson in the above transactions that prevented him from reasonably concluding that he could zealously represent Ms. Nupson, or worse, whether Mr. Rosenfeld remained the agent of John S. Middleton in structuring this transaction to accomplish Mr. Middleton's goal of consolidating his ownership and control of all the Bradford stock to prepare for the sale of the family's cigar manufacturing business.

(Def.'s Mot. Ex. 37, ECF 38-10, at p. 2).  These verified court filings show that Plaintiff was at least on "inquiry notice" of her underlying claims premised on Defendants' conflicts of interest and her sale of Bradford stock for allegedly less than its true value.  As such, the two-year statute of limitations was running by no later than June 23, 2015, when Plaintiff filed these court documents in the Orphans' Court and alleged the same injury and conflicts of interest underlying Plaintiff's current claims.  Because Plaintiff did not file her complaint in this matter until June 15, 2018, her claims are untimely.

In her opposition, Plaintiff seeks to downplay the significance of her allegations in her 2015 Orphans' Court filings, stating that in each pleading "counsel was stating what they believed may have been the case, but were at the same time seeking discovery to determine whether that belief was supported by sufficient facts."  (Pl.'s Statement of Facts, ECF 277, ¶ 107).  The allegations in Plaintiff's 2015 Orphans' Court filings, however, were not merely statements of Plaintiff's counsel's beliefs; rather, they were verified allegations by Plaintiff.  In the verifications attached to each of those filings, Plaintiff affirmed that they were "true and correct to the best of [her] knowledge, information, and belief" and "subject to the penalties of 18 Pa.C.S. § 4904

relating to unsworn falsification to authorities."  Moreover, the allegations in Plaintiff's state court pleadings show, at the very least, that she was on "inquiry notice" of her injury and its cause.

Indeed, in her response to Defendants' underlying motion, Plaintiff essentially admits that she was on inquiry notice when she filed her petition for discovery in the Orphans' Court on June 23, 2015.  Plaintiff argues that "rather than demonstrating that Anna knew Defendants had committed legal malpractice and breach of fiduciary duty in June 2015 . . . the 2015 Orphans' Court filings instead show that Anna was (appropriately) seeking discovery to determine *whether* Defendants had done so."  (Pl.'s Resp. in Opp., ECF 278, at p. 49).  By acknowledging that she was investigating potential claims against Defendants for legal malpractice and breach of fiduciary duty in 2015, Plaintiff has effectively admitted that she was on "inquiry notice" of these claims in 2015.  Further, Plaintiff's proffered expert in this case, Jeffrey Baker, essentially reached the same conclusion in his sworn affidavit, opining that "a reasonable lawyer would not believe that he or she had sufficient facts to bring an action for breach of fiduciary duty or legal malpractice in June 2015," but that "a reasonable lawyer would conduct further investigation and discovery to determine whether there were sufficient facts."  (Baker Aff., ECF 38-10, at p. 6).  There could be no clearer acknowledgment that Plaintiff was on "inquiry notice," at the latest, on June 23, 2015.  Under applicable law, Plaintiff had two years from this date to commence this action.  She did not do so; therefore, her claims are time barred.

Plaintiff next argues that her claims should be tolled under the fraudulent concealment doctrine.  For substantially the same reasons as those set forth above rejecting Plaintiff's attempt to invoke the discovery rule, Plaintiff also cannot evade the statute of limitations based on the fraudulent concealment doctrine.

While the fraudulent concealment doctrine is distinct, in application, it is much like the discovery rule. *Rice*, 255 A.3d at 249. The fraudulent concealment doctrine "allows tolling of the statute of limitations for the period in which the opposing party, through fraud or concealment, causes another party to 'relax [its] vigilance or deviate from [its] right of inquiry into the facts.'" *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 219 (3d Cir. 2022) (quoting *Fine*, 870 A.2d at 860). To invoke this doctrine, the "defendant must have committed some affirmative independent act of concealment upon which the plaintiffs justifiably relied. Mere mistake or misunderstanding is insufficient. Also, mere silence in the absence of a duty to speak cannot suffice to prove fraudulent concealment." *Lange v. Burd*, 800 A.2d 336, 339 (Pa. Super. Ct. 2007). "[T]he standard applied under the discovery rule requiring that a plaintiff exercise reasonable diligence to discover both an injury and its causes also applies when fraudulent concealment is the asserted basis for tolling the statute of limitations." *Rice*, 255 A.3d at 252. Thus, the inquiry notice described above applies equally with respect to fraudulent concealment. *Id.* at 252–53.

In support of her invocation of the fraudulent concealment doctrine, Plaintiff points to various occasions in 2010 and 2011 when Rosenfield purportedly failed to provide Plaintiff requested information pertaining to the 2001 GRAT, the 2003 MSA, and Plaintiff's 2001 subtrust. (*See* Pl.'s Resp. in Opp., ECF 278, at pp. 32–33). All of this cited evidence, however, predates the undisputed evidence described above showing that Plaintiff was on "inquiry notice" of her claims by no later than June 23, 2015. Even if Rosenfield's cited 2010 and 2011 conduct constituted fraudulent concealment, Plaintiff was subsequently placed on "inquiry notice" of her claims in 2014 and 2015. She had two years from that point to investigate and bring her claims. *Rice*, 255 A.3d at 253. Moreover, reliance on the conduct of the defendant must be reasonable and justifiable in order to invoke tolling principles. *DeMartino v. Albert Einstein Med. Ctr., N. Div.*, 460 A.2d

295, 301 (Pa. Super. Ct. 1983).  Reliance on a defendant's conduct when the plaintiff has reason to believe otherwise is not reasonable reliance and cannot toll the statute of limitations.  *Id.* at 302. Here, as of June 23, 2015, Plaintiff had reason to believe she had suffered an injury caused by Rosenfield's conduct and Defendants' conflicts of interest.  As such, any reliance on Rosenfield's conduct predating the evidence described above was not reasonable.  Accordingly, the fraudulent concealment doctrine does not save Plaintiff's untimely claims.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted.  An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.